# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAHMOUD KHALIL, JANE JOE, SALLY ROE, NED NOE, LUCY LOE, SAM SOE, WILL MOE, and KAM KOE, students at Columbia University and Barnard College, suing under pseudonyms,<br>       *Plaintiffs.*<br><br>v.<br><br>THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK;<br><br>COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK;<br><br>KATRINA ARMSTRONG, in her official capacity as President of Columbia University in the City of New York;<br><br>BARNARD COLLEGE, COLUMBIA UNIVERSITY;<br><br>LAURA ANN ROSENBURY, in her official capacity as President of Barnard College, Columbia University<br><br>COMMITTEE ON EDUCATION AND WORFORCE, U.S. HOUSE OF REPRESENTATIVES;<br><br>TIM WALBERG, in his official capacity as Chairman of the Committee on Education and Workforce,<br><br><br><br>       *Defendants.* | **COMPLAINT AND JURY DEMAND**<br><br><br>Civil Case No. _____ |

# COMPLAINT

PLAINTIFFS, Mahmoud Khalil, Jane Joe, Sally Roe, Ned Noe, Lucy Loe, Sam Soe, Will Moe, And Kam Koe,[1] by their ATTORNEYS, bring this Verified Complaint against DEFENDANTS: Columbia University ("Columbia"); the Trustees of Columbia University; Barnard College ("Barnard"); Columbia University Interim President Katrina Armstrong, in her official capacity; Laura Ann Rosenbury, in her official capacity; Representative Tim Walberg, in his official capacity; and, the U.S. House of Representatives Committee on Education and the Workforce; and allege as follows:

## INTRODUCTION

1.    Plaintiffs seek declaratory and injunctive relief to prohibit the enforcement of an overbroad and overreaching February 13, 2025, Letter[2] (the "Feb. 13 Letter") issued by the U.S. House of Representatives Committee on Education and the Workforce (the "Committee") demanding that Columbia University and Barnard College (the "University")[3] produce *all* student or student-worker disciplinary records to the Committee relating to eleven specific incidents, which likely involves the records of hundreds of students, and to enjoin the University from producing the requested documents or any other student records prior to a finding by this Court.

2.    The Committee's demand in the Letter that the University provide the student records or

---

[1] Plaintiffs meet this Court's standards to file pseudonymously and under seal, as set forth in Plaintiffs' Motion for Leave to Proceed Using Pseudonyms and to File Under Seal Certain Exhibits with Personally Identifying Information to be filed forthwith.

[2] Letter from U.S. H.R. Rep. Comm. Educ. & Workforce to Dr. Katrina Armstrong, Interim President of Columbia Univ., Mr. David Greenwald & Ms. Claire Shipman, Co-Chairs of the Trs. Columbia Univ. (Feb. 13, 2025), https://edworkforce.house.gov/uploadedfiles/2.13.25 _columbia_letter.pdf [hereinafter the "Feb. 13 Letter"].

[3] Barnard College is an affiliated women's college of Columbia University, meaning Barnard operates as an independent institution with its own trustees, faculty, and administration, but shares academic resources and facilities with Columbia, allowing students to cross-register for classes and access both campuses freely. Notably, Barnard graduates receive Columbia degrees.

risk the withholding or withdrawal of "billions in federal funding"[4] is an improper use of the Committee's power to "do indirectly what [they] are barred from doing directly,"[5] which is to chill and suppress speech and association based on the viewpoint expressed. The Committee's Letter is clearly intended to chill the protected speech of University's students through two primary means: (1) by exposing the students to negative publicity and investigation, pervasive and persistent harassment, doxing,[6] and threats to their safety and lives, and (2) by compelling the University to discipline and punish students, including the four Plaintiffs, as well as to turn over those students' (as well as faculty and staff's) private disciplinary records. This unlawful governmental attempt to circumvent the First Amendment is typically called "jawboning."[7] Indeed, as the U.S. Supreme Court recently reiterated, "[g]overnment officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors."[8]

3.    Furthermore, the Committee's political agenda is apparent in its February 13, 2025, Letter to Columbia. In the Letter, at 1, the Committee accuses students who organized a rally in recognition of "Martyrs' Day" over Veterans' Day of "promot[ing] terrorism and vilify[ing] the U.S. military."  To accuse a student vigil for "Martyr's Day" of justifying or promoting terrorism evidences the deep Islamophobia of the House Committee; in Islam, the concept of "martyrdom"

---

[4] *See* Feb. 13 Letter, **ante**, at 1 n.1.

[5] *NRA v. Vullo*, 602 U.S. 175, 190 (2024).

[6] *See* Sen Nguyen, *What Is Doxxing and What Can You Do if You Are Doxed?*, CNN (Feb. 7, 2023), https://www.cnn.com/2023/02/07/world/what-is-doxxing-explainer-as-equals-intl-cmd/index.html (defining "doxxing" as the "intentional revelation of a person's private information online without their consent, often with malicious intent").

[7] "Jawboning" has been recognized as a phenomenon by First Amendment scholars since the late 1970s. *See, e.g.*, Paul R. Verkuil, *Jawboning Administrative Agencies: Ex Parte Contacts by the White House*, 80 Colum. L. Rev. 943, 943 (1980). Scholars have theorized jawboning as a practice of not only the executive branch, but also U.S. Congress, as is the case here. *See* Jeffrey A. Love & Arpit K. Garg, 112 Minn. L. Rev. 1195, 1233 (2014).  *See also* Genevieve Lakier, *Enforcing the First Amendment in an Era of Jawboning*, U. Chi. L. Rev., Forthcoming (2026).

[8]     *Vullo*, 602 U.S. at 180.

refers to the "willingness to sacrifice one's life for the sake of resisting injustice and oppression," and represents "devotion to righteous causes expressed through courageous confrontation of injustice, not indiscriminate violence."[9]  Further, even if students could be said to have been "vilifying" the U.S. military, expressing views critical of the U.S. military—or any military—is protected political speech unrelated to antisemitism. The Committee's attempt to force the Universities to chastise and intimidate student organizers for protected speech is an abuse of its investigative powers.

4.    Where, as is the case here, its investigation threatens to significantly infringe on First Amendment rights, the Committee must "convincingly show a *substantial relation* between the information sought and a *subject of overriding and compelling state interest*."[10] As with all other forms of hatred and discrimination, antisemitism is unacceptable and should be confronted. The urgency of this issue is not disputed here. However, the records demanded by the Committee are not substantially related to antisemitism. Rather, the Committee has instrumentalized accusations of antisemitism to attack ideas it ideologically opposes. It traffics in anti-Palestinian, anti-Arab, and Islamophobic dog whistles to justify unjustifiable intrusions on First Amendment rights. Committee leaders have made several concerning statements regarding the extent of their interests in higher education. The Committee is led by U.S. Representative Tim Walberg, who has stated that we are "going to KO the bad actors and the activities and the results that go on in education."[11]

---

[9] *See* Islamic Circle of North America (ICNA), *Martyrdom in Islam*, https://icna.org/ martyrdom-in-Islam/#:~:text=In%20Islam%2C%20the%20concept%20of,civil %20disobedience%20against%20authoritarian%20rule. It is important to note that martyrdom in Islam is "not limited to those who die in battle," but also includes "those who lose life prematurely by natural causes, accidents, or illnesses, and even mothers who lose their lives while giving birth." *Id.*

[10] *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963) (emphasis added).

[11] *Id.*

Another key member and the former Chairwoman, Representative Foxx, has stated that the Committee's inquiries could broaden to include the universities' diversity, equity and inclusion policies, as well as their "learning environments."[12] Critically, this nation is seeing a new wave of repression by this Congress and this new Administration that pose a great threat to the First Amendment, akin to the threat that McCarthyism and the broad overreach of the role of the House Unamerican Activities Committee ("HUAC") posed fifty years ago.

5.    The coercive effect of the Committee's actions is very real. Given the plentitude of evidence of members of Congress and President Trump actively attempting to strip universities and others of funding, to roll back contractual obligations,[13] and to ban certain media outlets from the White House because the President does not like what they publish,[14] entities like the University feel pressure to cooperate with the government in its efforts to chill and punish protected speech and protest activity.

6.    In fact, on March 3, 2025, a U.S. Department of Education press release announced: "Given Columbia's ongoing inaction in the face of relentless harassment of Jewish students, the

---

[12] *See* Katherine Knott, *'You Are in the Crosshairs': Higher Ed Braces for Another Antisemitism Hearing*, INSIDE HIGHER ED (Apr. 16, 2024), https://www.insidehighered.com/news/government/ 2024/04/16/higher-ed-braces-another-round-congressional-grilling (last visited Mar. 3, 2025). Investigations into "learning environments" of universities have already occurred at Harvard, MIT, and Penn. *See, e.g.*, Jordain Carney, *House Education Chair Says Campus Antisemitism Probe Will Continue After Harvard President Resignation*, POLITICO (Jan. 3, 2024), https://www.politico.com/live-updates/2024/01/03/congress/foxx-reacts-to-harvard-ouster-00133650 (last visited Mar. 3, 2025).

[13] *See* Press Release, U.S. Dept. Educ., *ED, HHS, and GSA Announce Additional Measures to End Anti-Semitic Harassment on College Campuses* (Mar. 3, 2025), https://www.ed.gov/about /news/press-release/ed-hhs-and-gsa-announce-additional-measures-end-anti-semitic-harassment-college-campuses.

[14] *See* James Oliphant, *White House Bars AP, Reuters and Other Media from Covering Trump Cabinet Meeting*, REUTERS (Feb. 26, 2025), https://www.reuters.com/world/us/white-house-bars-ap-reuters-other-media-covering-trump-cabinet-meeting-2025-02-26/.

Federal Government's Task Force to Combat Anti-Semitism is considering Stop Work Orders for $51.4 million in contracts between Columbia University and the Federal Government. The task force will also conduct a comprehensive review of the more than $5 billion in federal grant commitments to Columbia University to ensure the university is in compliance with federal regulations, including its civil rights responsibilities".[15]  Four days later, on March 7, 2025, the Trump administration stated that it has, in fact, "canceled ~$400M in federal grants to Columbia over its failure to protect Jewish students from antisemitic harassment."[16]

7.    In relation to this Complaint, and as discussed *post*, at ¶ 54 this Committee has now taken to using HUAC's methodologies in its "wide-reaching and intensive investigation"[17] to compel universities around the country to turn over massive quantities of private student, faculty, and staff records – 400,000 pages of documents as of October 31, 2024[18] – for the clear purpose of exposing their identities and suppressing their speech with threats, either from their podium in Congress, with other federal actors such as the Department of Homeland Security, or by deputizing a mass of third-party individuals and organizations who gladly take on the role of doxing and harassing the students until they are too afraid to speak.

8.    Moreover, the Committee's production demand seeks to compel the University to produce otherwise confidential documents—which contain information that Congress itself recognized as

---

[15] Press Release, U.S. Dep't Educ., *ED, HHS, and GSA Announce Additional Measures to End Anti-Semitic Harassment on College Campuses* (Mar. 3, 2025), https://www.ed.gov/about/news/press-release/ed-hhs-and-gsa-announce-additional-measures-end-anti-semitic-harassment-college-campuses.

[16] The White House (@WhiteHouse), X (Mar. 7, 2025, 3:02 PM), available at https://x.com/whitehouse/status/1898101850169393451?s=46.  *See also* Jennifer Peltz, "Trump administration cancels $400M in grants and contracts with Columbia University," *AP News* (Mar. 7, 2025), available at https://apnews.com/article/columbia-university-protests-antisemitism-palestine-israel-9c209ce040e4b60d2702b40b9c2fb321.

[17] *See* Feb. 13 Letter, **ante** at 1 n.1.

[18] *Id.*

sensitive when it passed the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C.S. § 1232(g). FERPA prohibits educational institutions, including the Universities, from disclosing "personally identifiable information in education records" without written consent. 20 U.S.C.S. § 1232(g)(a). The Committee's past actions have shown that it has no regard for those same privacy rights, as it readily released a multitude of personally identifiable information in its October 31, 2024, Report.[19]

9. Ultimately, the Committee's Letter demands that the University violate its own contractual obligations to its students, as well as its obligations to protect student privacy under FERPA, and, in effect coerces the University to ignore the law by making oblique threats to the "billions in federal funding" the Universities receive.[20]

10. Nonetheless, should the University comply with the Committee's Letter, the victim of governmental overreach becomes the enabler and acts as an arm of the government in order to chill and suppress the speech of its own students, faculty, and staff that is undoubtedly protected by both the First Amendment and the University's own Rules of University Conduct.

11. Among the records requested were "*[a]ll* disciplinary records," including "all past disciplinary charges, proposed sanctions, and enacted sanctions" of individuals "implicated" in incidents ranging from a "protest of a class taught by former Secretary Hillary Clinton" to general "[t]hreats and incitement directed at Columbia University trustees."[21] While the Committee's request may seem reasonable on its face given that it is confined to a discrete list of enumerated incidents, in actual fact, it is extraordinarily broad. The Feb. 13 Letter relies on mischaracterizations

---

[19] *See* H. Comm. on Educ. & Workforce, Republican Staff Report, *Antisemitism on College Campuses Exposed* (Oct. 31, 2024), https://edworkforce.house.gov/uploadedfiles/ 10.30.24_committee_on_education_and_the_workforce_republican_staff_report_- _antisemitism_on_college_campuses_exposed.pdf [hereinafter "Republican Staff Report"].

[20] *See* Feb. 13 Letter, **ante** at 1 n.1.

[21] *See id.*, at 5 (emphasis added).

and false accusations of antisemitism to cast a wide net. To fully comply with the Committee's request, the University would need to turn over entire private files of hundreds of its students, faculty, and staff.

12. These records contain, at a minimum, demographic, academic, and financial information, and at most, personally identifying information,[22] student group affiliations and associations, and related private information that could be and have been used to harass, make threats against, and dox the individuals whose records are turned over to the Committee, and whose personal privacy and safety would be jeopardized by the Committee's politically charged investigation.

13. The Committee's vague and overbroad demand letter to the University exceeds the Committee's purported goal of confronting antisemitism, as the Letter is clearly intended to chill the First Amendment rights of speech, expression, and association of the University's student body *through* a third-party. In fact, by the Committee's own acknowledgement in its October 31, 2024, Report, there has already been considerable factfinding conducted, so what other possible legitimate legislative purpose could they have for demanding hundreds of personal disciplinary records? And, if the Committee's alleged purpose is aimed at the University's actions, or lack thereof—though this would still be unlawful jawboning—why is it demanding *student* disciplinary records instead of higher-level University records that do not identify specific students and/or their associations?

14. Based on this Committee's previous actions in publicizing personal information of those with similar viewpoints with the clear intent to chill speech, it likely intends to expose students'

---

[22] To be clear, and as noted elsewhere in this Complaint, Plaintiffs understand that in previous disclosures to Congress, Columbia complied with its legal obligations under FERPA when supplying student records to Congress. However, the spirit of FERPA and the ultimate privacy protections it was intended to offer were violated by Congress's release of information that made it easy for third parties to identify individual students and then target those students in large scale harassment campaigns.

identities and associations for the sake of exposure—both of which will undoubtedly cause irreparable reputational harm, as well as expose the University's students to reprisals, harassment, doxxing, and perhaps even physical harm. When the University previously complied with the Committee's requests, and as detailed in full, **post**, at ¶¶ 56-63, student records were leaked to the press, students' identities were not properly safeguarded in the Committee's October 31, 2024, Report, and members of Congress or their staffers posted students' private information on social media sites and identified students and faculty on the public record during congressional hearings in December 5, 2023, April 17, 2024, and May 3, 2024—all of which led to widespread economic and reputational harm, as well as increased incidents of doxxing and harassment.

15. Based on a February 27, 2025, email with Columbia University's private counsel at Hecker and Fink, Columbia stands at the ready to turn over the records demanded by the Committee, even as it states it will do so in compliance with the law.  *See* Exhibit 1.

16. Critically, students and faculty alike choose to attend Columbia University because of its "cherished traditions of free expression and open debate," along with its "long tradition of valuing dissent and controversy and in welcoming the clash of opinions onto the campus." *See* Columbia University, Rules of University Conduct, Affirmative Statement §440.  It has served as a place to engage in rigorous intellectual inquiry and the "marketplace of ideas" with a diverse student body. These are the promises—and in fact contractual obligations—that the University makes to every student it recruits, admits, and matriculates.

17. During this moment of upheaval and protest, the University, largely due to political pressures from the Committee and other governmental actors, has subjected its students, faculty and staff to investigations in an attempt to repress their views critical of Israel, generating hundreds of disciplinary records. The harm caused by the University's discriminatory system of

9

discipline is now two-fold: Students, faculty and staff associated with demonstrations critical of Israel are facing not only constant surveillance and disciplinary interventions by the University, but also viewpoint-based investigations by the Committee, all of which infringe upon the students' First Amendment rights and violate the University's contractual obligations to its students.

18. As detailed **post,** each of the Plaintiffs has been directly and indirectly harmed by the University's previous provision of their student records to the Committee, and based on that experience, have every reason to believe that further and irreparable harm will occur should the University turn over more of their private student records.  Critically, the Plaintiffs have advanced in their studies since the first records disclosure and are now at critical junctures in their transition from higher education into the workforce. This puts them at an even greater risk of reputational and economic harm should the Committee persist in compelling the student records, and should the University comply by providing those records.

19. Therefore, Plaintiffs seek an injunction enjoining Defendants from responding to the Committee's request.

## PARTIES

20. Plaintiff MAHMOUD KHALIL is an individual who resides in New York, New York and recently completed his studies at Columbia University, with an anticipated graduation date of Spring 2025.

21. Plaintiff JANE JOE is an individual who resides in New York, New York and is a graduate student at Columbia University, with an anticipated graduation date of Spring 2025.

22. Plaintiff SALLY ROE is an individual who resides in New York, New York and is an undergraduate student at Columbia University, with an anticipated graduation date of Spring 2025.

23. Plaintiff NED NOE is an individual who resides in New York, New York and is an undergraduate student at Columbia University, with an anticipated graduation date of Spring 2025.

24. Plaintiff LUCY LOE is an individual who resides in New York, New York and is a undergraduate student at Barnard College, with an anticipated graduation date of Spring 2025.

25. Plaintiff SAM SOE is an individual who resides in New York, New York and is an undergraduate student at Columbia University, with an anticipated graduation date of Spring 2028.

26. Plaintiff WILL MOE is an individual who resides in New York, New York and is an undergraduate student at Columbia University, with an anticipated graduation date of Spring 2028.

27. Plaintiff KAM KOE is an individual who resides in New York, New York and is an undergraduate student at Columbia University.

28. Defendant TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK is the legal name of Columbia University in the City of New York ("Columbia University" or "Columbia"), a private education institution with a campus in upper Manhattan where the actions alleged in this complaint occurred.

29. Defendant COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK ("Columbia University" or "Columbia") is a private educational institution with a campus in upper Manhattan where the actions alleged in this complaint occurred.

11

30. Defendant KATRINA ARMSTRONG is the President of Columbia University and is sued in her official capacity.

31. Defendant BARNARD COLLEGE IN THE CITY OF NEW YORK ("Barnard College" or "Barnard") is a private educational institution with a campus in upper Manhattan where the actions alleged in this complaint occurred.

32. Defendant LAURA ANN ROSENBURY is the President of Barnard College, Columbia University, and is sued in her official capacity.

33. Defendant the COMMITTEE ON EDUCATION AND WORKFORCE is a committee of the U.S. House of Representatives.

34. Defendant TIM WALBERG is a Republican member of the U.S. House of Representatives and serves as the Chairperson of the Committee on Education and Workforce, and is sued in his official capacity.

## JURISDICTION AND VENUE

35. This Court has subject matter jurisdiction because the claims arise under the Constitution and the laws of the United States, *see* 28 USC 1331. This Court has personal jurisdiction over Columbia University and Barnard because they are each located and operating in New York, New York.  F. R. Civ. P. 4(k)(1)(A).  Katrina Armstrong and Laura Ann Rosenberg, in their official capacities, both reside in New York, New York; as such this Court also has personal jurisdiction over them. *Id*.

36. This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, under Title 28, Sections 2201 and 2202 of the United States Code, and under the All Writs Act.

37. Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and where Columbia University is located.  Representative Tim Walberg, and the Committee on Education and Workforce of the House of Representatives are officers of the United States sued in their official capacity, *see* 28 U.S.C. § 1391(e)(1).

## BACKGROUND

### A.  The Committee's hearings and requests for information were a naked attempt to attack and harass individuals who expressed viewpoints critical of Israel.

38. Under the leadership first of Chairwoman Foxx and now of Chairman Walberg, the U.S. House of Representatives Committee on Education and the Workforce ("the Committee") has held several high-profile hearings on antisemitism on college campuses.[23] Doing very little to address the actual problem of antisemitism, most of the Committee's hearings have devolved into fearmongering and the public shaming of University students, faculty and staff based on false accusations, viewpoint discrimination, anti-Palestinian racism, and Islamophobia.

39. As a result of the Committee's December 5, 2023, hearing, titled "Holding Campus Leaders Accountable and Confronting Antisemitism," then-University of Pennsylvania President Liz McGill[24] and then-Harvard University President Claudine Gay[25] were forced to resign. McGill and Gay stumbled in response to Representative Elise Stefanik's disturbing line of questioning

---

[23] *See generally* Robin D.G. Kelley, *UCLA'S Unholy Alliance*, BOSTON REV. (May 18, 2024), https://www.bostonreview.net/articles/uclas-unholy-alliance (last visited Mar. 4, 2025).

[24] Kanishka Singh, *University of Pennsylvania president resigns after antisemitism testimony*, REUTERS (Dec. 10, 2023), https://www.reuters.com/world/us/university-pennsylvania-president-liz-magill-resigns-after-antisemitism-2023-12-09/.

[25] Max Matza, *Claudine Gay resigns as Harvard University president*, BBC NEWS (January 2, 2024), https://www.bbc.com/news/world-us-canada-67868280.

regarding whether calls for the genocide of Jews violated their respective university policies.[26]

40. Attempting to avoid a similar fate, then-Columbia University President Minouche Shafik took a drastically different tone when she was called to appear before the Committee on April 17, 2024. The hearing, titled "Columbia in Crisis: Columbia University's Response to Antisemitism," called into question the university's handling of student protests criticizing Israeli apartheid and denouncing the genocide.[27] In response, then-President Shafik promised there would be consequences for speech and demonstrations deemed by the Committee to be antisemitic.[28] Examples of antisemitism offered by members of the Committee predominantly related to speech, such as protest songs and slogans.

41. U.S. Representative Lisa McClain grilled Shafik, asking her three times whether phrases like "from the river to the sea, Palestine will be free" or "long live the Intifada" — language commonly used by supporters of Palestinian liberation to indicate liberation for all, not the subjugation of some — qualified as antisemitism.[29] After Shafik's first two responses—"when I hear those terms, I find them very upsetting" and "I hear them as such, some people don't"— Representative McClain pressed for a yes or no answer, to which Shafik responded affirmatively

---

[26] Noah Bernstein & Esha Karam, *The House Committee Tried to Make Shafik Trip Over Her Own Testimony But It Failed to Fully Corner Her*, COLUMBIA SPECTATOR (Apr. 18, 2024), https://www.columbiaspectator.com/news/2024/04/18/the-house-committee-tried-to-make-shafik-trip-over-her-own-testimony-but-it-failed-to-fully-corner-her/.

[27] Plaintiffs use this terminology based on recent opinions issued by the International Court of Justice. *See, e.g.*, *Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel), Provisional Measures*, *Order of 26 January 2024*, para. 54 (finding that the facts provided by South Africa were sufficient to conclude that intervention was necessary to present a plausible risk of genocide).

[28] Noah Bernstein, Sarah Huddleston, Shea Vance & Esha Karam, *'Columbia in Crisis:' Shafik Testifies Before Congress About Antisemitism at Columbia*, COLUMBIA SPECTATOR (April 21, 2024), https://www.columbiaspectator.com/news/2024/04/21/columbia-in-crisis-shafik-testifies-before-congress-about-antisemitism-at-columbia/.

[29] *Id.*

that the phrases were antisemitic.[30]

42. Representative (now Chairman) Tim Walberg initiated the line of questioning regarding Professor of Middle Eastern, South Asian, and African studies, Joseph Massad, and the controversial article he published in the Electronic Intifada. He asked whether Shafik condemned the article and whether the University had taken any steps to discipline Massad.[31] In response, Shafik disclosed several private details of Professor Massad's ongoing disciplinary matter, including that Massad had been removed as chair of the Faculty of Arts and Sciences.[32]

43. In the face of persistent questioning by Representative Stefanik, Shafik promised to take Massad out of the classroom and dismiss him from his position as a visiting professor.[33]

44. Concerningly, on April 17, 2024, the same day as the congressional hearing, a nonprofit news organization posted "[a] confidential letter obtained by the *Forward* [which] shows that investigations have been opened over the conduct of several Columbia University professors accused of making antisemitic and anti-Israel comments in the aftermath of Hamas' Oct 7 attacks."[34] The article confirms that the letter was included in the materials Columbia provided to Congress.[35] In a comment to *Inside Higher Ed*, Professor Massad stated "he wasn't aware of the investigation" and learned about from the public congressional hearing.[36]

45. As the Supreme Court recognized in *McGrain v. Daugherty*, "neither house [of Congress]

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] Jacob Kornbluh, "Confidential letter shows Columbia professor who called Hamas attack 'awesome' is under investigation," *The Forward* (Apr. 17, 2024), available at https://forward.com/fast-forward/603775/columbia-president-professor-hamas-israel-congress/.

[35] *Id.*

[36] *See* Ryan Quinn, "Columbia President Accused of Dishonest Testimony, Throwing Professors 'Under the Bus'," *Inside Higher Ed* (Apr. 19, 2024), available at https://www.insidehighered.com/news/faculty-issues/academic-freedom/2024/04/19/columbia-president-accused-throwing-profs-under-bus.

is invested with 'general' power to inquire into private affairs and compel disclosures." 273 U.S. 135, 174 (1927). The investigative power is "an essential and appropriate auxiliary" to its legislative function. *Id.*

46. Therefore, the Committee is prohibited from conducting investigations "solely for the personal aggrandizement of the investigators or to punish those investigated." *Trump v. Mazars USA, LLP*, 591 U.S. ___, 140 S. Ct. 2019, 2031–2032 (2020) (internal citations omitted). It has no power to "try" anyone for alleged wrongdoings. *Id.* Policing and enforcement powers are reserved for the executive and the judiciary. The subjects of legislative subpoenas "retain common law and constitutional privileges," throughout the course of the investigation. *Id.* at 2032.

47. The scapegoating of Massad and the disclosure of his private records during a public hearing is indicative of the Committee's strategy with regards to its inquiries into antisemitism. The Committee trampled over Massad's rights to privacy and confidentiality for the political spectacle of forcing then-President Shafik to publicly testify as to her handling of his employment—an extremely sensitive topic. The Committee essentially "tried" and "punished" Massad for the alleged wrongdoing of antisemitism, without any good faith inquiry into context, intent, or rationale as to Massad's statements or scholarship. The Committee publicly forced the issue of Massad's employment.

48. Furthermore, the Committee sent a threatening message regarding what could happen to individuals if it determines engage in protected speech that it finds distasteful or express viewpoints with which it disagrees with the intent to suppress such speech.

49. In her haste to persuade the Committee that she was committed to taking serious action to combat antisemitism, former President Shafik also showed a complete disregard for Massad's rights to privacy and confidentiality.

50. Shafik made further commitments to curtail student speech and demonstrations by imposing heavy consequences for alleged antisemitic activity. The hearing was a race to punish

and to humiliate Columbia's own faculty members and student body—the very faculty members and students the University chose to hire and admit *because* of their identities, perspectives, and political stances.

**B.  Columbia University's decision to invite the New York Police Department ("NYPD") to clear the first Gaza Solidarity Encampment was prompted by the Congressional Hearing on April 17, 2024.**

51. As then-President Shafik testified before the Committee, students began pitching tents on the University's South Lawn in an action that has since become known as the "first Gaza Solidarity Encampment." Students rejected Shafik's painting of the campus movement opposing Israel's war crimes and decrying the loss of Palestinian lives as antisemitic and expressed their frustration with Shafik's willingness to agree to punish them in an effort to appease the Committee.

52. In line with her representations to the Committee that she would crack down on campus demonstrations, on April 18, 2024, Shafik took the extraordinary step of summoning the New York Police Department ("NYPD") to clear the encampment and arrest 108 individuals on or near the University's South Lawn. Shafik's decision to call the NYPD is widely believed to have been politically driven by the commitments she made to the Committee during the hearing, which took place one day before the April 18th mass arrest.[37]

**C.  The Committee's investigation into the disciplinary processes of Columbia University has involved several government probes into private records.**

53. The Committee's February 13, 2025, Letter is not the first of such inquiries into the disciplinary processes of Columbia University and should not be viewed in isolation. The Committee sent a similar letter dated February 12, 2024, which requested a broad swath of University's records, citing "grave concerns" over Columbia University's "response to

---

[37] Brian Mann, *NYPD Breaks Up Pro-Palestinian Protest at Columbia University,* NPR (Apr. 18, 2024), https://www.npr.org/2024/04/18/1245642588/nypd-breaks-up-pro-palestinian-protest-at-columbia-university.

antisemitism on its campus and its failure to protect Jewish students."[38] The request for information contained in the February 12, 2024, Letter was even broader than the Committee's more recent request. A brief sample of the types of records requested include:

- All documents and communications since January 1, 2021, referring and relating to antisemitism, involving the Office of the President, Office of the Provost, and/or University Senate;

- All Columbia Board of Trustees meeting minutes and/or summaries whether formal or informal, since January 1, 2021, including minutes of meetings of any components, such as committees, subcommittees, and/or task forces;

- All documents and communications since January 1, 2021, referring and relating to antisemitism, involving the Columbia Board of Trustees (including all members);

- Any meeting minutes, circulated materials, and/or readouts from Columbia's Task Force on Antisemitism, and documents sufficient to show any findings and recommendations by the Task Force and any responses and reactions to such findings and recommendations by the Task Force and any responses and reaction to such findings and recommendations by the President, Provost, deans of Columbia's various schools, and the staffs of the aforementioned university officials[.][39]

54. The February 12, 2024, Letter made twenty-five requests in total, many of which were

---

[38] *See* Letter from H. Comm. on Educ. & Workforce to Dr. Minouche Shafik, Columbia Univ. President, Ms. Claire Shipman & Mr. David Greenwald, Co-Chairs of Trs. Columbia Univ. (Feb. 12, 2024), https://edworkforce.house.gov/uploadedfiles/2-12-24_foxx_letter_to_columbia_ university.pdf.

[39] *See id.* at 13.

broken down further into related sub-requests.

55. On July 9, 2024, the Committee sent an electronic message to the University expressing concern over the "unsatisfactory and limited nature of Columbia's production, including Columbia's ongoing failure to produce documents from long-requested custodians."[40]

56. The Committee followed up on its July 9, 2024, electronic message with another letter, sent on August 1, 2024, again discussing Columbia's failure to "produce priority items requested by the Committee."[41] At issue in the August 1, 2024, letter were "text messages, electronic messages, and emails from non-Columbia University systems from a set of eight administrators and a set of an estimated ten members of Columbia's Board of Trustees; notes, summaries, and recordings of Board of Trustees meetings since April 17; and updated and more detailed information on disciplinary actions relating to the encampment."[42]

**D. The Committee's requests for disciplinary records are a blatant attempt to expose for exposure's sake individuals whose viewpoints it seeks to chill.**

57. On October 31, 2024, the House Committee on Education and the Workforce produced a 325-page report ("Report") titled "Antisemitism on College Campuses Exposed."[43] The Report detailed the Committee's findings from its almost year-long, "wide-reaching and intensive investigation" into what it describes as an "explosion of campus antisemitism."[44]

58. The Committee itself recognized that its investigation was "unprecedented in its depth

---

[40] E-mail from H. Comm. on Educ. & Workforce to Counsel for Columbia Univ. (Jul. 9, 2024) (on file with Committee).

[41] *See* Letter from H. Comm. Educ. & Workforce to Dr. Minouche Shafik, Columbia Univ. President, Mr. David Greenwald & Claire Shipman, Trs. Columbia Univ. (Aug. 1, 2024), https://edworkforce.house.gov/uploadedfiles/8-1-24_foxx_letter_to_columbia.pdf.

[42]  *See id.* at 2.

[43] *See* Republican Staff Report, ante, at n.12.

[44] *See id.* at 1.

and scope."[45]  For the first time in its 157-year history, the Committee issued subpoenas to institutions of higher education, collecting "more than 400,000 pages of documents."[46]

**E.  The potential harm of the Committee's repeated requests for sensitive, private records is not speculative; prior requests and disclosures provide a roadmap for harms to come.**

59. The Committee devotes a significant amount of the Report's contents on Columbia University and Barnard College's disciplinary records obtained through six subpoenas issued to the Columbia University administration on August 21, 2024.[47] The Report contained and often misrepresented information including specific descriptions of student events, organizations, and social media posts.

60. The Report generated significant controversy and media coverage, characterizing the protests in a negative light and condemning students as antisemitic.[48]

61. Columbia and Barnard DEFENDANTS admit they did not consent to the publication of the Report.[49]

---

[45] *Id.* at 1.

[46] *Id.*

[47] *See* H. Comm. on Educ. & Workforce, Subpoenas to Columbia Univ. (Aug. 21, 2024), https://edworkforce.house.gov/uploadedfiles/8.21.24_education_and_the_workforce_committee_six_subpoenas_to_columbia_university_leadership.pdf.

[48] *See, e.g.*, Andrew Bernard, '*Astounding' Government Failures, House GOP Report on Jew-Hatred Says* (Dec. 19, 2024), JNS, https://www.jns.org/astounding-government-failures-house-gop-report-on-jew-hatred-says/ (asserting that the Republican Staff Report demonstrates that "universities across the country likely violated in the civil rights of Jews in their handling of anti-Israel campus protests"); Alan Wooten, *Universities Scorched in Republican Congressional Report,* THE CENTER SQUARE (Nov. 4, 2024) (summarizing the Republican Staff Report as finding that "[c]oncessions were made for illegal encampments, support was withheld from Jewish students, discipline was absent for those engaged in antisemitic conduct, and congressional oversight was rejected as a nuisance with hostility").

[49] *See* Shea Vance, *Columbia 'Did Not Consent' to Publication of Confidential Documents in Congressional Report, Spokesperson Says*, COLUMBIA SPECTATOR (November 3, 2024), https://www.columbiaspectator.com/news/2024/11/03/columbia-did-not-consent-to-publication-

62. PLAINTIFFS were among the many identified through the publication of the Report. Despite redacting student names, Columbia's disclosure included "information such as organization and school affiliations in addition to detailed descriptions of social media posts, copies of emails, and narratives of the alleged incidents."[50] This information facilitated the identification of disciplined students, demonstrating the failure of any redactions to sufficiently protect student privacy.

63. PLAINTIFFS can correlate being personally threatened and having their safety endangered by the disclosure of their sensitive educational records to the House Committee on Education and Workforce ("the Committee").

64. PLAINTIFFS and similarly situated parties have experienced increased reported doxxing, harassment, online targeting, and hostilities on campus correlated with the release of student disciplinary records.  This includes but is not limited to hate speech, misogynistic slurs, racially derogatory comments, and character attacks. In addition to the associated mental and emotional health concerns stemming from these hostilities, Plaintiffs and similarly situated parties suffered loss of career and academic opportunities for false attacks on their character.

65. University DEFENDANTS did not notify students of their released records or provide any support for navigating the publication of their sensitive disciplinary records. Despite having a policy against doxxing, DEFENDANTS did not take adequate measures to support affected students.

66. This disclosure was widely viewed to violate both Columbia's community norms and

---

of-confidential-documents-in-congressional-report-spokesperson-says/ (reporting a comment from University spokesperson Samantha Slater that Columbia intended materials submitted as part of the University's response to the August 21, 2024 subpoenas would "be treated as confidential and not disclosed outside of the Committee and its staff") (last visited Mar. 3, 2025).

[50] *Id.*

self-governance. An article in the *Columbia Spectator* highlights the stakeholder opposition to this release: "In their Nov 19 statement, members of the University Senate Student Affairs Committee wrote that, '[i]f confirmed, we believe these actions would betray the students' right to privacy and confidentiality' and that 'these actions would jeopardize the integrity and fairness of disciplinary processes.'"[51]  Faculty expressed concern about the identifying information provided in the Report as well: "At the Nov. 22 senate plenary, Joseph Howley, Associate Professor of Classics, asked Interim University President Katrina Armstrong about legal risk surrounding potential Family Educational Rights and Privacy Act violations on behalf of students.[52] Howley observed that "some of these reports identify alleged perpetrators in very identifiable ways, and the House has now published student identifying information."[53]

67. PLAINTIFFS and similarly situated parties continue to face doxxing for their alleged participation in campus activism.[54]

68. On October 31, 2024, the United States House of Representatives Staff Report on Anti-Semitism ("Staff Report") was released. The Staff Report specifically singled out Columbia University, contributing to national focus and reporting on Columbia University protests and

---

[51] Shea Vance, *Columbia 'Did Not Consent' to Publication of Confidential Documents in Congressional Report, Spokesperson Says*, COLUMBIA SPECTATOR (November 3, 2024), https://www.columbiaspectator.com/news/2024/11/03/columbia-did-not-consent-to-publication-of-confidential-documents-in-congressional-report-spokesperson-says/ (last visited Mar. 3, 2025).

[52] *See* Sarah Huddleston, *Columbia's Production of Disciplinary Cases in Congressional Subpoena Raises Privacy Concerns*, COLUMBIA SPECTATOR (Dec. 3, 2024), https://www.columbiaspectator.com/news/2024/12/03/columbias-production-of-disciplinary-cases-in-congressional-subpoena-raises-privacy-concerns/.

[53] *Id.*

[54] Joseph Zuloaga, C*onservative Media Group Behind 'Doxxing Truck' Returns to Columbia, Launches New Website,* COLUMBIA SPECTATOR (Jan. 31, 2024), https://www.columbiaspectator.com/news/2024/01/31/conservative-media-group-behind-doxxing-truck-returns-to-columbia-launches-new-website/.

conflating student activism with anti-Semitism.[55]

69. PLAINTIFFS and similarly situated parties face online harassment targeting their immigration status and attempting to report Plaintiffs to Immigration and Customs Enforcement ("ICE")[56].

70. University DEFENDANTS acknowledge doxxing is a pervasive issue for pro-Palestine protestors.

71. University DEFENDANTS failed to maintain their own doxxing policies, leading to the harassment of a student Senator.[57]

72. University DEFENDANTS recognize the harm to students facing the disclosure of their disciplinary records.

---

[55] U.S. H.R. Staff Rep. on Antisemitism 5 (Dec. 18, 2024), https://www.speaker.gov/wp-content/uploads/2024/12/House-Antisemitism-Report.pdf.

[56] Natasha Lennard & Akela Lacy, *The Columbia Network Pushing Behind the Scenes to Deport and Arrest Student Protesters*, THE INTERCEPT (Feb. 15, 2025), https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/ (last visited Mar. 3, 2025); *Trump's Order on Antisemitism Threatening to Deport Non-Citizen Campus Activists Divides Jewish Groups*, JEWISH TELEGRAPHIC AGENCY (Jan. 30, 2025), https://www.jta.org/2025/01/30/politics/trumps-order-on-antisemitism-suggests-deporting-non-citizen-campus-activists-dividing-jewish-groups (last visited Mar. 3, 2025). *See also* David Pozen & Joshua Mitts, *In Defense of Our Shared Values*, COLUMBIA SPECTATOR (Feb. 13, 2025) ("This weaponization of deportation is the latest in a series of increasingly virulent online attacks on Columbia students. Although many of these attacks claim to be combating antisemitism, others have targeted Jewish and Israeli students.").

[57] *See* Molly Bordoff, *'A Chilling Effect': University Senate Discusses Nonconsensual Recordings at Plenary*, COLUMBIA SPECTATOR (Dec. 23, 2024), https://www.columbiaspectator.com/news/2024/12/23/a-chilling-effect-university-senate-discusses-non-consensual-recordings-at-plenary/ (last visited Mar. 3, 2025); Information Security Charter, University Policies, https://universitypolicies.columbia.edu/content/information-security-charter (Oct. 2023); Acceptable Usage of Information Resources Policy, University Policies, https://universitypolicies.columbia.edu/content/acceptable-usage-information-resources-policy (Oct. 2023).

## CLAIM I

### (The Committee's record request violates the First Amendment.)

73. Plaintiffs restate the foregoing paragraphs as is set forth fully herein.

74. Stated plainly, "[c]oercion of a third party can be the means by which the government violates the First Amendment rights of another." *National Rifle Association v. Vullo*, 602 U.S. 175, 200 (2024) (Brown Jackson, J., concurring). Indeed, "the critical takeaway" from *Vullo* "is that the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries." *Vullo*, 602 U.S. at 198.

75. The Court has long recognized that the First Amendment guarantees the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 467 U.S. 609, 622 (1984). *See also Americans for Prosperity Foundation (APF) v. Bonta*, 594 U.S. 595, 606 (2021). Indeed, "privacy in group association" is "indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

76. In *APF*, the U.S. Supreme Court issued the reminder that "'[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action.'" 594 U.S. at 606, *quoting NAACP*, 357 U.S. at 462.

77. As the *AFP* Court cautioned: "the government may regulate in the [First Amendment] area only with narrow specificity, and compelled disclosure regimes are no exception[,] [thus] [w]hen it comes to a person's beliefs and associations broad and sweeping state inquiries into these protected areas ... discourage citizens from exercising rights protected by the Constitution."

24

*Id.*, at 610 (cleaned up).

78. Therefore, "[w]hen it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The *risk of a chilling effect* on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" *APF*, 594 U.S. at 618-19 (*quoting NAACP v. Button,* 371 U.S. 415, 433 (1963)) (emphasis added).

79. The First Amendment proscribes the Government not only from directly infringing upon those rights but also from infringing upon them indirectly through the use of techniques like jawboning. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). "Such a strategy allows government officials to 'expand their regulatory jurisdiction to suppress the speech of organizations that they have no direct control over.'" *Vullo*, 602 U.S. at 197-98. *See also id.*, at 180 (a government entity's threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression of disfavored speech violates the First Amendment.") (cleaned up).

80. The Court further reasoned, and of particular relevance in this case, jawboning "allows government officials to be more effective in their speech-suppression efforts '[b]ecause intermediaries will often be less invested in the speaker's message and thus less likely to risk the regulator's ire." *Id.*, at 198.

81. Certainly, a member of Congress "can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead[,]" but she may not "use the power of the State to punish or suppress disfavored expression." *See Vullo*, 602 U.S. at 188.

82. The *Vullo* Court recently explained: "To state a claim that the government violated the

25

First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id*. at 191. Such is the case here.

83. As outlined **ante**, at ¶¶ 35-47, the Committee has repeatedly pressured the University to suppress and punish student, faculty, and staff pro-Palestine speech that the Committee itself disfavors and has issued threats of withholding or withdrawing "billions in federal funding" to the University to compel its compliance. *See* Feb. 13 Letter, at 1.

84. Furthermore, as evidenced by the results of the three congressional hearings held before the Committee in the spring of 2024, as described **ante**, at ¶¶ 35-53, the frankly absurd line of questioning in combination with the threats made against university presidents and trustees, that *in fact*, led to two university presidents' resignations,[58] the firing and/or suspending of numerous faculty members, *see* ¶¶ 39, 40, 43[59], and the pervasive and severe doxing and harassment of numerous administrators, faculty, staff, and students at these institutions by members of

---

[58] Following the Committee's public attacks on former Harvard University President Claudine Gay, Dr. Gay, like many other students and faculty members, "faced death threats and was called the N-word during a weeks-long attack on her character designed to end her presidency." Matt Egan, "Harvard's Claudine Gay says she faced death threats and was called the N-word as critics pushed 'tired racial stereotypes'," *CNN* (Jan. 3, 2024), available at https://www.cnn.com/ 2024/01/03/business/harvard-claudine-gay-new-york-times-op-ed/index.html. Indeed, also akin to the experiences of Plaintiffs and numerous students and faculty members, an *ABCNews* article discusses a broad campaign to dox and harass Dr. Gay in order to force either her resignation or her dismissal. *See* Kiara Alfonseca, "The forces behind Harvard President Claudine Gay's resignation," *ABC News* (Jan. 5, 2024), available at https://abcnews.go.com/US/forces-harvard-president-claudine-gays-resignation/story?id=106071191.

[59] Notably, the three professors named by this Committee are no longer employed by Columbia, whether by firing, failure to renew their contract, or a resignation by agreement. *See also*, Ryan Quinn, "Columbia President Accused of Dishonest Testimony, Throwing Professors 'Under the Bus'," *Inside Higher Ed* (Apr. 19, 2024), available at: https://www.insidehighered.com/ news/faculty-issues/academic-freedom/2024/04/19/columbia-president-accused-throwing-profs-under-bus.

Congress, their staff, and third-party individuals and entities. The outcome of these hearings, and of the October 31 Report, make evident that this Committee's threats have real, life-altering consequences for both the universities and members of their communities, and particularly for these four Plaintiffs.

85. Thus, even just the veiled threats of funding cuts or stoppages, whether or not the Committee intends to or indeed can follow through, creates such fear in these universities that they apparently feel compelled to comply with whatever the Committee demands in order to insulate their own survival as institutions.

86. The Committee's Letter requests what would amount to hundreds of pages of disciplinary records for likely hundreds of students, which infringe upon the Plaintiffs', and all students' privacy of association that is "indispensable" to their freedom of association, without a clear nexus as to how these records aid any legitimate legislative purpose.

87. The language of the Committee's February 13, 2025, Letter explicitly demonstrates its viewpoint discrimination toward any speech or expression that opposes Israel's actions against Palestinian people, and it reveals their political intent to target this political speech and association.[60] *See* **ante**, at ¶¶ 54-55.

88. When viewing the totality of these circumstances, it can "be reasonably understood" the Committee's Letter and continued focus on the University, and by proxy these Plaintiffs, is intended "to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech," *NRA*, 602 U.S. at 191, based on the viewpoints of that speech.

---

[60] Notably, the Committee's violation of the First Amendment is not saved by the possibility that *some* of the conduct or speech included in the listed incidents falls within their purview under Title VI. The *Bantam Books* Court clearly held that the government body in that case "violated the First Amendment by invoking legal sanctions to suppress disfavored publications, *some of which may or may not contain protected speech* (*i.e.*, nonobscene material)." *Vullo*, 602 U.S. at 196 (emphasis added), *citing Bantam Books*, 372 U.S. at 67.

89. Furthermore, the Committee are not immune from these allegations under the Speech and Debate Clause, which has the express "purpose [] 'to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the *integrity of the legislative process.*" *Republican National Committee v. Pelosi*, 602 F.Supp.3d 1, 17 (D.D.C. 2022) (emphasis added), *vacated on mootness grounds by Republican National Committee v. Pelosi,* No. 22-5123, 2022 WL 4349778 (D.C. Cir. September 16, 2022) (quoting *United States v. Brewster*, 408 U.S. 501, 524 (1972)).

90. The overly broad Letter from February 13, 2025, compelling the University to produce thousands of pages of private student disciplinary records does not substantially relate to any compelling interest. On its face, the Committee on Education and Workforce does have the ability to investigate issues relating to Title VI, including antisemitism which clearly falls under its purview. However, this Letter, and the previous subpoena compelling the production of private student records, along with this Committee's subsequent actions, including but not limited to the Republican Staff Report released on October 31, 2024, and the doxing of students and faculty on social media platforms, demonstrates its lack of concern with actual incidents of antisemitism and its intent to "expose for the sake of exposure" based solely on the viewpoints held by those individuals.

91. As the U.S. Supreme Court held in *Gibson*, "it is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest." The disclosure of the private records of students engaged in protests for Palestinian liberation is neither substantially related to nor does it serve the compelling interest of addressing antisemitism.

92. As the Supreme Court in *Gibson* recognized, "[t]o permit legislative inquiry to proceed on less than an adequate foundation would be to sanction unjustified and unwarranted intrusions into the very heart of the constitutional privilege to be secure in associations in legitimate organizations engaged in the exercise of First…Amendment rights."[61]

93. As the U.S. Supreme Court held in *Watkins v. United States*, 354 U.S. 178 (1957), "[t]here is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress." *Id.* at 200.

94. Moreover, there can be no legitimate legislative purpose when the Committee is engaging in prohibited conduct, which is to improperly suppress protected speech because of the viewpoints expressed through a third-party actor.  As stated in *National Rifle Association v. Vullo*, "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." 602 U.S. 175, 187 (2024)*.*

95. Because the Committee's February 13, 2025, Letter is predicated on clear viewpoint discrimination, endeavors to deploy unlawful jawbone tactics to suppress protected speech based on that viewpoint through a third-party actor, and can be reasonably seen as a clear intent to chill associational and speech rights, the Committee's Letter serves no legitimate purpose and violates the First Amendment.

## CLAIM II

### The University's compliance with the Committee's record request is violative of the First Amendment.

96. Plaintiffs restate the foregoing paragraphs as is set forth fully herein.

97. As  a  third  party  whose  interests  are  served  by  cooperating  with  the  Committee's

---

[61] *Gibson*, 372 U.S. at 558.

scapegoating, Columbia University can be sued by the students, faculty and staff threatened with the release of their sensitive, private information. *Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019) (holding "[n]o dispute that Plaintiffs had standing . . . to challenge the lawfulness of the Committees' subpoenas by seeking injunctive relief . . . .").

98. Here, the Committee Letter's potential to infringe on the Plaintiff's political association rights.  Though the Committee has not yet issued a legally compelling subpoena, the action against the University is timely because (1) the University was compelled to produce previous disclosures, (2) the University appears poised to comply with the Letter without a subpoena, the email referenced in ¶ 15, *see* Exhibit 1, and (3) members of the University's leadership have made "private promises" to "Members of Congress" that indicate the ongoing sharing of information between the two bodies.  *See* Feb. 13 Letter, at 1.

99. As noted **ante**, at ¶¶ 76-79, jawboning is an effective if unlawful mechanism for the Committee to deploy in chilling "disfavored" student speech "because intermediaries," such as Columbia and Barnard, are "less invested in the speaker's message and thus less likely to risk the regulator's ire[,]" *Vullo*, 602 U.S. at 197-98 (cleaned up), and indeed, that has borne itself out over the past year.

100.    Indeed, through the cooperation of Columbia and Barnard, this Committee has effectively created a "system of informal censorship" as it provides "no safeguards whatever against the suppression of . . . constitutionally protected[] matter[,] [and instead] is a form of regulation that creates hazards to protected freedoms[.]"  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

101.    As outlined **ante**, the Committee is engaging in this "system of informal censorship" in its Feb. 13 Letter, and Columbia and Barnard, by cooperating with, and indeed participating in the Committee's gross infringement on Plaintiffs' First Amendment rights, are

aiding and abetting those violations when they provide the Committee with private student records.

102.    Columbia and Barnard, by cooperating with the Committee, are in effect becoming the tool and instrumentality used by a government actor—thereby becoming a government actor itself.  For this reason, Plaintiffs have a unique right to protect their First Amendment rights from a private actor who colludes with a state actor to infringe upon their speech and association rights.[62]

103.    The Committee, Columbia, and Barnard are engaging in and threatening two egregious violations of Plaintiffs' First Amendment rights by retaliating against Plaintiff's based on their viewpoint and their associations, and in the case of these Plaintiffs, their identities.

104.    Columbia and Barnard, acting at the behest of the Committee, are punishing and suppressing the "disfavored expression" of Plaintiffs, and others on its campus, in order to chill their expression of viewpoints, which violates the First Amendment.  *See NRA*, 602 U.S. at 188.

105.    By allowing itself to be used as the Committee's cudgel, and to serve as the "jawbone" in the Committee's concerted and effective efforts to chill Plaintiffs' rights to free speech and association, the University's actions are in contravention to the First Amendment.

## CLAIM III
### (The University's compliance with the Committee's Letter constitutes a breach of contract.)

106.    Plaintiffs restate the foregoing paragraphs as is set forth fully herein.

107.    Columbia made specific promises and assertions to all Plaintiffs regarding diversity, freedom of speech, academic freedom, and good faith and fair dealing, in its contracts,

---

[62] *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019) (finding that when Congress subpoenas information from a third party with no interest in the information sufficient to resist the subpoena, the law allows the person whose information is threatened to pursue an injunction or declaratory judgement aimed at blocking the subpoena's issuance, service on, or enforcement against the third party).

student and faculty manuals, on its websites, and in pronouncements and assertions in writing by officers and others authorized to speak for Columbia.[63]

108.    Columbia University Rules of Conduct contains Section §440. Affirmative Statement, which states:

> To be true to these principles, the University cannot and will not rule any subject or form of expression out of order on the ground that it is objectionable, offensive, immoral, or untrue. Viewpoints will inevitably conflict, and members of the University community will disagree with and may even take offense at both the opinions expressed by others and the manner in which they are expressed. But the role of the University is not to shield individuals from positions that they find unwelcome. Rather, the University is a place for received wisdom and firmly held views to be tested, and tested again, so that members of the University community can listen, challenge each other, and be challenged in return."[64]

109.    The University Provost reiterated this promise after October 7, 2023, writing on October 11, 2023, that "[a]t this challenging time, when so many in our community are affected deeply by global events, I write to remind everyone that freedom of expression is a core University value and it is our collective

---

[63] *See, e.g.*, Columbia University, Rules of University Conduct §440 ("The Rules of University Conduct, found in Chapter XLIV of the Statutes of Columbia University, are intended to ensure that all members of our community may engage in our cherished traditions of free expression and open debate."); Columbia University, Notice of Nondiscrimination, https://universitypolicies.columbia.edu/content/notice-nondiscrimination ("Nothing in University Policy and OIE Policies & Procedures shall be construed to abridge academic freedom and inquiry, principles of free speech, or the University's educational mission.") (last updated Sept. 6, 2024). *See also* Columbia University, Approach to Rules and Policies, University Life, https://universitylife.columbia.edu/content/approach-rules-and-policies ("'Rules' at the University has a specific meaning and importance. The Rules of University Conduct were created to ensure protection of free speech and oversee demonstrations and protests at Columbia.") (last visited Feb. 24, 2024).
[64] Columbia University, Rules of University Conduct, https://senate.columbia.edu/sites/default/files/content/Committee_Rules%20of%20University%20Conduct/Rules%20of%20University%20Conduct.pdf (Sept. 29, 2019).

responsibility to uphold the principles of civic debate and discourse."[65]

110.    These statements constitute material and specific commitments made by Columbia to its faculty members and students that are enforceable by law.[66]

111.    Plaintiffs relied on these promises as students by paying tuition to Columbia and Graduate students by entering employment agreements with Columbia.

112.    By cooperating with and disclosing information about them to the Committee, Columbia and Barnard are intentionally exposing Plaintiffs to public threats, hate speech and physical danger as an act of retaliation and of viewpoint discrimination against them for their First Amendment-protected criticism of Israel and their pro-Palestinian expression, or simply their good faith efforts to facilitate thoughtful inquiry into various viewpoints on Palestine.

113.    Columbia and Barnard must carry out the duties they assumed towards Plaintiffs by these binding terms and conditions of its contracts, manuals and materials, and under its obligation of good faith and fair dealing towards them.[67]

114.    Columbia and Barnard have failed to maintain their own doxxing and privacy

---

[65] *See* Columbia University, Office of the Provost, *Ensuring Safety and Free Expression on Campus* (Oct. 11, 2023), https://provost.columbia.edu/news/ensuring-safety-and-free-expression-our-campus (last visited Mar. 3, 2025).

[66] S*ee Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81 (2d Cir. 2011) ("Under New York law, an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree."); *Vought v. Teachers Coll., Columbia Univ.*, 127 A.D.2d 654, 654 (N.Y. App. Div. 2d Dep't 1987) (finding that the terms of the implied contract are "contained in the university's bulletins, circulars and regulations made available to the student").

[67] *See, e.g.*, *Vought v. Teachers Coll., Columbia Univ.*, 127 A.2d 654, 655 (N.Y. App. Div. 2d Dep't 1987) (holding that "[w]hen a student is admitted to a university, an implied contract arises between the parties" and that the "rights and obligations of the parties as contained in the university's bulletins, circulars and regulations made available to the student, become a part of this contract"); *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413–14 (N.Y. 1980) (finding that implicit in a University's contract is the requirement that the institution "act in good faith in its dealing with its students").

policies.  On November 1, 2023, then-President of the University Minouche Shafik and Barnard

College President Laura Rosenbury announced the creation of a "Doxing Resource Group,"

asserting that the "deliberate harassment and targeting of members of our community by doxing,

a dangerous form of intimidation, is unacceptable" and that both schools "ha[d] retained experts

in the field of digital threat investigation and privacy scrubbing to support our impacted

community members."[68]

115.     While Columbia and Barnard recognize the seriousness of the aforementioned

harm to Plaintiffs, their policies fail to adequately protect Plaintiffs. The failure to fulfill their

expressed commitment to protect Plaintiffs from these harms despite repeatedly expressing a

commitment to protect students from this harm constitutes a breach of contract.  Moreover,

Columbia and Barnard have actively contributed to the doxing and harassment experienced by

students by turning over their private information to Congress without adequately ensuring that

Congress will in turn protect the students' information.

116.     Whereas Plaintiffs relied both upon the repeated and explicit commitment from

Defendants to uphold speech protections, including political and controversial speech, and then

failed to fulfill the commitments in the affirmative statement on free speech contained in the

Rules of University Conduct.[69]  Defendants are in breach of contract with Plaintiffs.

WHEREFORE, on all Causes of Action, Plaintiffs demand damages in an amount to be

determined by this Court, as to documents referencing them already produced to the House

---

[68] Columbia University, Office of the President, *Announcing Doxing Resource Group* (Nov. 1, 2023), https://president.columbia.edu/news/announcing-doxing-resource-group. *See also* Columbia University, Office of the President, *Standing in Solidarity* (Oct. 27, 2023), https://president.columbia.edu/news/standing-solidarity (detailing that the University "takes [incidents of doxing] seriously and they are being investigated").
[69] Rules of University Conduct, §440, Affirmative Statement.

Committee; the issuance of a permanent injunction enjoining Congress from compelling the

University to provide disciplinary records; Columbia and Barnard from complying with the Feb.

13 Letter, as to such documents not already produced; a declaratory judgment pursuant to

F.R.C.P. 57 and 28 U.S. Code § 2201, declaring the rights and other legal relations of the

parties; together with such other and further relief as may be just and proper.

Dated: March 13, 2025                    Respectfully Submitted,

/s/  Amy E. Greer

Amy E. Greer  (NY 5910179)
**Dratel & Lewis**
29 Broadway, Suite 1412
New York, NY 10006
(212) 732-8805
agreer@dratellewis.com

**CAIR NATIONAL**
**LEGAL DEFENSE FUND**
/s/Lena Masri
Lena Masri
Gadeir Abbas (VA 81161)*
453 New Jersey Ave SE
Washington, DC 20003
(202) 742-6420

**COUNCIL ON AMERICAN ISLAMIC**
**RELATIONS – NEW YORK**
/s/Lamya Agarwala
Lamya Agarwala (NY 5736061)
80 Broad Street, 5th Floor
New York, NY 10009
(646) 665-7599
lagarwala@cair.com

**Jonathan Wallace**
/s/ Jonathan Wallace
Jonathan Wallace (NY 1733757)
PO #728
Amagansett NY 11930
(917) 359-6234
jonathan.wallace80@gmail.com

*Licensed in VA, practice limited to federal matters

*Attorneys for Plaintiffs*