**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAHMOUD KHALIL, et al,

       *Plaintiffs.*

v.

COMMITTEE ON EDUCATION AND
WORFORCE, U.S. HOUSE OF
REPRESENTATIVES, et al,


       *Defendants.*

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER**

**ORAL ARGUMENT REQUESTED**

Civil Case No. 1:25-cv-02079-AS

Hon. Judge Arun Subramanian

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................. 2

    A. The Committee's Unveiled Efforts to Censor and Punish Plaintiffs' Protected Speech. ... 2

    B. The Committee Has Exerted Extensive Pressure on Columbia to Comply with Its Censorship Campaign. ............................................................................. 5

    C. Federal Agencies Condition Funding on Columbia University's Compliance with the Government's Demands. ................................................................ 7

    D. Plaintiffs Have Been Actually Harmed by Past Disclosures and Reasonably Expect Future Harm from Future Disclosures. ................................................ 9

STANDARD OF LAW ................................................................................... 15

ARGUMENT .................................................................................................. 15

    I.    *Vullo* Controls; This Is Illegal Jawboning at Its Worst. ........................................ 16

    II.    Plaintiffs' First Amendment Rights Prohibit Columbia University from Disclosing Records that Detail Their Protected Associations and Speech. .................................................. 19

    A. Plaintiffs Make Out a Prima Facie Case Because the Disciplinary Records Sought Regard Their Speech and Associations on a Matter of Immense Public Concern. ...................... 20

        1.    The Compelled Disclosure of the Disciplinary Information Sought by the Government Violates the Students' Association and Anonymous Speech Rights. .......... 20

        2.    The Compelled Disclosure of the Private Disciplinary Records Would Unconstitutionally Chill Plaintiffs' Speech. ...................................................... 25

    B. The Government Has an Illicit Purpose to Punish Students Saying Things It Doesn't Like. ................................................................................. 26

    III.    In Addition to the Injunction Sought, Declaratory Relief Is Also Appropriate Here.    27

CONCLUSION ............................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021)................................... 20, 22, 23

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ........................................................17, 18

*Buckley v. Valeo*, 424 U.S. 1, 74 (1976)........................................................................ 19

*Cornelio v. Conn.*, 32 F.4th 160 (2d Cir. 2022) ...................................................20, 21, 22, 23

*Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357 (2d Cir. 2003) ............................................. 28

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................. 16

*Friend v. Gasparino*, 61 F.4th 77 (2023) ...................................................................... 24

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006) ................................ 16

*Laird v. Tatum*, 408 U.S. 1 (1972) .............................................................................. 25

*Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992) ............................................................. 25

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)................................................. 22

*Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449 (1958) ....................................................................................................................... 20

*New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989) ........................ 19

*New York State NOW v. Terry*, 886 F.2d 1339 (2d Cir. 1989) ............................................. 19

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................... 16

*Quinn v. United States*, 349 U.S. 155 (1955).................................................................. 27

*Schiller v. City of New York*, No. 04CIV.7921(KMK)(JCF), 2006 WL 3592547 (S.D.N.Y. Dec. 7, 2006) ........................................................................................................ 19

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577 (S.D.N.Y. 2002) ................................................................................................................... 15

*Students for Just. in Palestine, at Univ. of Houston v. Abbott*, No. 1:24-CV-523-RP, 2024 WL 4631301 (W.D. Tex. Oct. 28, 2024) ........................................................................ 17

*The New York Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006) ..................................... 28

*Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020). .......................................................... 26

*United States v. Citizens State Bank*, 612 F.2d 1091 (8th Cir. 1980).................................... 19

*United States v. Stevens*, 559 U.S. 460 (2010)................................................................. 24

*Watkins v. United States*, 354 U.S. 178 (1957) ...........................................................26, 27

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .................................. 15

## INTRODUCTION

When federal officials at the Department of Education and other federal agencies wrote to Columbia University on March 13th, 2025, they clearly articulated their intent and efforts to violate the Free Speech Clause of the First Amendment. There is no reading between the lines here. The constitutional violation is plainly laid out within the four corners of the letter. And without the Court's immediate intervention, Columbia University is getting prepared to capitulate fully to the federal government's demands as soon as tomorrow—March 20, 2025[1].

In that March 13th letter, federal officials commanded Columbia University to suppress a specific viewpoint with which it disagrees. Dole out suspensions and expulsions against those who gathered and spoke out last year, the government bellowed. And within hours, campus officials complied.

Without the Court's intervention, this pattern will repeat. Given the hundreds of millions of dollars the federal government intends to withhold as ransom, campus officials will surely comply with every one of the federal government's demands. That includes, among other things, the federal government's order that Columbia University adopt an Israel-specific speech code that would punish students for criticizing Israel in the common and typical ways people criticize foreign countries.

What is true of the March 13th letter is also true of the U.S. House of Representatives Committee on Education and Workforce's February 13, 2025, demands for documents and information. In its February 13th letter, the Committee demands documents that would reveal

---

[1] Douglas Belkin, *Columbia Is Nearing Agreement to Give Trump What He Wants*, Wall Street Journal, (March 19, 2025), https://www.msn.com/en-us/news/us/columbia-is-nearing-agreement-to-give-trump-what-he-wants/ar-AA1BfBq8?ocid=BingNewsSerp

the identities of students who took part in an art exhibition, various peaceful protests critical of Israel, or who wore masks to anonymize their speech and associations in anticipation of the hysteria that has now engulfed us all. Without the Court's intervention, the House Committee will receive whatever information it demands from Columbia University, exposing the students suing here to further sanctions and public scorn that the Defendants are fomenting. Like a mafia boss during a shakedown, the House Committee's letter firmly reminds Columbia University that it "receives billions in federal funding," an existential quantity of money Chairman Tim Walberg is leveraging to subordinate campus officials to his will.

All of this is illegal. No federal official can browbeat a private intermediary to do indirectly what the First Amendment forbids the government from doing directly.  *See NRA v. Vullo*, 602 U.S. 175, 190 (2024).  The Supreme Court reminded us of this basic point of law less than one year ago in *Vullo*. *Id.* And this Court can rely on *Vullo*'s fresh guidance to enjoin Defendants from their assault against the First Amendment rights of Mahmoud Khalil and his fellow students at Columbia University.

## FACTUAL BACKGROUND

Plaintiffs incorporate and adopt the factual allegations set forth in their Amended Complaint, and the Declarations filed under seal with this Motion, and pursuant to the requests made in Plaintiffs' Motion for Leave to Proceed Using Pseudonyms and to File Under Seal Certain Exhibits with Personally Identifying Information.

### A. The Committee's Unveiled Efforts to Censor and Punish Plaintiffs' Protected Speech.

Issued by the U.S. House of Representatives Committee on Education and the

Workforce (the "Committee"), the February 13, 2025, Letter (the "Feb. 13 Letter") demands that Columbia University (the "University") produce *all* student or student-worker disciplinary records to the Committee relating to eleven specific incidents, which likely involves the records of hundreds of students. *See* Exhibit A.

Among the records requested were those that regard "all past disciplinary charges, proposed sanctions, and enacted sanctions" of individuals "implicated" in incidents ranging from a "protest of a class taught by former Secretary Hillary Clinton" to general "[t]hreats and incitement directed at Columbia University trustees." Am. Compl. at ¶ 11, n.20; Exhibit A at 5. The Committee's request is extraordinarily broad. To fully comply with the Committee's request, the University would need to turn over entire private files of potentially hundreds of its students, faculty, and staff.

The Committee's political agenda is apparent in its Feb. 13 Letter to Columbia. In the Feb. 13 Letter, Exhibit A at 1, the Committee accuses students who organized a rally in recognition of "Martyrs' Day" rather than Veterans' Day of "promot[ing] terrorism and vilify[ing] the U.S. military." Am. Compl. at ¶ 3; Exhibit A at 3. To accuse a student vigil for "Martyr's Day" of justifying or promoting terrorism evidences the deep Islamophobia of the House Committee; in Islam, the concept of "martyrdom" refers to the "willingness to sacrifice one's life for the sake of resisting injustice and oppression," and represents "devotion to righteous causes expressed through courageous confrontation of injustice, not indiscriminate violence." *Id.* at ¶ 3, n.8. The Committee's Feb. 13 Letter is not the first of such inquiries into the disciplinary processes of Columbia University and should not be viewed in isolation.

The Committee sent a similar letter dated February 12, 2024, which requested a broad swath of University's records, citing "grave concerns" over Columbia University's "response

to antisemitism on its campus and its failure to protect Jewish students." *Id.* at ¶ 72, n.43. That letter, as outlined fully in the Complaint, made twenty-five requests in total, many of which were broken down further into related sub-requests. On July 9, 2024, the Committee sent an electronic message to the University expressing concern over the "unsatisfactory and limited nature of Columbia's production, including Columbia's ongoing failure to produce documents from long-requested custodians." *Id.* at ¶ 74, n.45. The Committee followed up on its July 9, 2024, electronic message with another letter, sent on August 1, 2024, again discussing Columbia's failure to "produce priority items requested by the Committee." *Id.* at ¶ 75, n.46. At issue in the August 1, 2024, letter were "text messages, electronic messages, and emails from non-Columbia University systems from a set of eight administrators and a set of an estimated ten members of Columbia's Board of Trustees; notes, summaries, and recordings of Board of Trustees meetings since April 17; and updated and more detailed information on disciplinary actions relating to the encampment." *Id.* at ¶ 75, n.47.

On October 31, 2024, the House Committee on Education and the Workforce produced a 325-page report ("Report") titled "Antisemitism on College Campuses Exposed." *Id.* at ¶ 76, n.48. The Report detailed the Committee's findings from its almost year-long, "wide-reaching and intensive investigation" into what it describes as an "explosion of campus antisemitism." *Id.* at ¶ 76, n.49.

The Committee itself recognized that its investigation was "unprecedented in its depth and scope." *Id.* at ¶ 77, n.50. For the first time in its 157-year history, the Committee issued subpoenas to institutions of higher education, collecting "more than 400,000 pages of documents." *Id.* The Committee devotes a significant amount of the Report's contents on the University's disciplinary records obtained through six subpoenas issued to the Columbia University administration on August 21, 2024. *Id.* at ¶ 78, n.52. The Report contained and

often misrepresented information, including specific descriptions of student events, organizations, and social media posts.

**B.** **The Committee Has Exerted Extensive Pressure on Columbia to Comply with Its Censorship Campaign.**

The mechanisms of coercion the Committee and Taskforce employ are many. To start, the federal government has threatened, and is beginning to make good on that threat, to withdraw billions of dollars in federal funds if the University does not comply with its demands. A March 3, 2025, U.S. Department of Education press release announced: "Given Columbia's ongoing inaction in the face of relentless harassment of Jewish students, the Federal Government's Task Force to Combat Anti-Semitism is considering Stop Work Orders for $51.4 million in contracts between Columbia University and the Federal Government. The task force will also conduct a comprehensive review of the more than $5 billion in federal grant commitments to Columbia University to ensure the university is in compliance with federal regulations, including its civil rights responsibilities." *Id.* at ¶ 6, n.14. Four days later, on March 7, 2025, the Trump administration stated that it has, in fact, "canceled ~$400M in federal grants to Columbia over its failure to protect Jewish students from antisemitic harassment." *Id.* at ¶ 6, n.15.

In addition to extreme financial pressure, the Committee has held hearings that have devolved into fearmongering and the public shaming of the University's students, faculty, and staff based on false accusations, viewpoint discrimination, and bigotry instead of addressing its stated interest in remedying antisemitism. The public disclosures at these hearings have resulted in harassment, doxing, and loss of employment. For example, because of the Committee's December 5, 2023, hearing, titled "Holding Campus Leaders Accountable and Confronting Antisemitism," then-University of Pennsylvania President Liz

McGill (*Id.* at ¶ 42, n.23) and then-Harvard University President Claudine Gay (*Id.* at ¶ 42, n.24) were forced to resign.

Attempting to avoid a similar fate, then-Columbia University President Minouche Shafik took a drastically different tone when she was called to appear before the Committee on April 17, 2024. The hearing called into question the university's handling of student protests criticizing Israeli apartheid and denouncing the genocide. *Id.* at ¶ 43, n.26. In response, then-President Shafik promised there would be consequences for speech and demonstrations deemed by the Committee to be antisemitic. *Id.* at ¶ 43, n.27. Examples of antisemitism offered by members of the Committee predominantly related to speech, such as protest songs and slogans.

U.S. Representative Lisa McClain grilled Shafik, asking her three times whether phrases like "from the river to the sea, Palestine will be free" or "long live the Intifada"[2] — language commonly used by supporters of Palestinian liberation to indicate liberation for all, not the subjugation of some — qualified as antisemitism. *Id.* at ¶ 44, n.28. After Shafik's first two responses—"when I hear those terms, I find them very upsetting" and "I hear them as such, some people don't"—Representative McClain pressed for a yes or no answer, to which Shafik responded affirmatively that the phrases were antisemitic. *Id.* at ¶ 44, n.29.

Representative (now Chairman) Tim Walberg initiated the line of questioning regarding Professor of Middle Eastern, South Asian, and African studies, Joseph Massad, and the controversial article he published in the Electronic Intifada. He asked whether Shafik condemned the article and whether the University had taken any steps to discipline Massad.

---

[2] In fact, Representative McClain's prejudice toward Arabic words and her ignorance as to what "intifada" means was evidenced by her repeated mispronouncing of the word as "in*fitada*."

*Id.* at ¶ 45, n.30. In response, Shafik disclosed several private details of Professor Massad's ongoing disciplinary matter, including that Massad had been removed as chair of the Faculty of Arts and Sciences. *Id.* at ¶ 45, n.31.

In the face of persistent questioning by Representative Stefanik, Shafik promised to take Massad out of the classroom and dismiss him from his position as a visiting professor. *Id.* at ¶ 46, n.32.

The same day as the congressional hearing, a nonprofit news organization posted "[a] confidential letter obtained by the *Forward* [which] shows that investigations have been opened over the conduct of several Columbia University professors accused of making antisemitic and anti-Israel comments in the aftermath of Hamas' Oct 7 attacks." *Id.* at ¶ 47, n.33. The article confirms that the letter was included in the materials Columbia provided to Congress. *Id.* at ¶ 47, n.34. In a comment to *Inside Higher Ed*, Professor Massad stated, "he wasn't aware of the investigation" and learned about from the public congressional hearing. *Id.* at ¶ 47, n.35.

## C. Federal Agencies Condition Funding on Columbia University's Compliance with the Government's Demands.

On March 13, 2025, senior officials from the General Services Administration, the United States Department of Health and Human Services, and the United States Department of Education issued a formal letter ("March 13 Letter")[3] addressed to the Interim President of Columbia University, Katrina Armstrong, and the Co-Chairs of the Columbia Board of Trustees, David Greenwald and Claire Shipman. *See* Exhibit B. The March 13 Letter demands

---

[3] Letter from the GSA, U.S. Dept. HHS, and the U.S. Dept. Educ. to Dr. Katrina Armstrong, Interim President of Columbia Univ., David Greenwald & Claire Shipman, Co-Chairs of the Trs. Columbia Univ. (Mar. 13, 2025), available at https://s3.documentcloud.org/documents/25577971/31325-letter-to-columbia.pdf

compliance with a set of policy changes as a precondition for continued federal funding. *See Id.* at 1. The letter followed an earlier communication on March 7, 2025, in which the government paused some funding and threatened to fully terminate federal funding to the university. *Id.* The March 13 letter outlined specific mandates with a compliance deadline of close of business on March 20, 2025. *Id.*

The March 13 Letter directed Columbia University to enforce disciplinary policies against students involved in protests at Hamilton Hall and campus encampments. *Id.* Meaningful discipline, as defined by the letter, is expulsion or multi-year suspension. *Id.* Notably, hours later, the University meted out just such punishments.

The Letter also required the abolishment of the University Judicial Board (UJB), a function of the Faculty Senate,[4] in order to centralize all disciplinary authority within the Office of the President. *Id.* If the UJB is abolished, any neutral or independent review of disciplinary actions would be eliminated, curtailing procedural protections for students and faculty accused of misconduct. Critically, the numerous rights and protections afforded students facing disciplinary proceedings would be severely eroded if not eliminated altogether.

Furthermore, in an act of viewpoint-based academic suppression, the March 13 Letter demanded that Columbia University place the Middle East, South Asian, and African Studies (MESAAS) department under "academic receivership" for a minimum of five years. *Id.* at 2. The mandate provides no justification other than the department's subject matter.

---

[4] "The University Judicial Board is the five-member, University-wide panel that hears charges of violations under the Rules of University Conduct and provides sanctions. The Tenured and Tenure-Track and Off-Track Faculty caucuses, Student Affairs Committee, and Noninstructional Officers (Research Officers, Librarians and Administrative Staff) each nominate nonsenator members to the University Judicial Board." *See* "Other Governance Bodies," Columbia University, available at https://senate.columbia.edu/content/other-governance-bodies.

Next, the March 13 Letter also imposed a broad ban on masks, prohibiting any facial coverings "intended to conceal identity or intimidate others." *Id.* While purporting to include exceptions for religious or health reasons, the ban directly targets student activists engaged in protests, restricting their ability to engage in protected anonymous speech and expressive association.

Finally, the letter directed Columbia to "formalize, adopt, and promulgate a definition of antisemitism" consistent with President Trump's Executive Order 13899 and the International Holocaust Remembrance Alliance ("IHRA") definition, *id.*, which reconceptualizes the common and typical criticisms of Israel as antisemitic. The definition, if adopted, would compel Columbia to enforce speech restrictions that apply to only one particular foreign country.

### D. Plaintiffs Have Been Actually Harmed by Past Disclosures and Reasonably Expect Future Harm from Future Disclosures.

*Ned Noe*

Plaintiff Ned Noe is indirectly involved in pro-Palestine organizing at Columbia University. Decl. of Ned Noe at ¶ 1. Ned Noe is part of an organization that ████████████ ████████████████████████ *Id.* at ¶¶ 4-5. ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* at ¶¶ 6-7. Since the start ████████████████ Ned Noe's organization and its members have been the target of a pervasive doxxing and harassment campaign. *Id.* at ¶¶ 7-8. As a result, Ned Noe's organization has turned down requests to hold events out of fear for students' safety, and Ned Noe has chosen to live off campus out of fear of his own safety. *Id.* at 9-13. Ned Noe

has even ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ as a result of the harassment. *Id.* at ¶¶ 15-16.

     Plaintiff Ned Noe's history of being doxed and harassed leads him to believe that he will be irreparably harmed by members of Congress and their staff if Columbia is allowed to disclose his private disciplinary records. *Id.* at ¶¶ 18-19. Members of Congress have misrepresented the actions, intentions, and speech of pro-Palestine protestors since the start of Israel's assault on Gaza, so Ned Noe expects even worse misrepresentation if disciplinary records are revealed. *Id.* at ¶¶ 19-20. Ned Noe further believes that students associated with his organization will face the same harm. *Id.* at ¶ 20.

### *Sally Roe*

     Plaintiff Sally Roe is actively involved in pro-Palestine organizing at Columbia University. Sally Roe Decl. at ¶¶ 1, 3-5. ▉▉▉▉▉▉▉▉▉▉▉▉, Sally Roe feels compelled to speak for Palestine. *Id.* at ¶¶ 2-3. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉ *Id.* at ¶ 5. Sally Roe avoided identifying herself publicly out of fear of reprisal until Columbia ▉▉▉▉▉▉ and misrepresented its activism as antisemitism. *Id.* at ¶ 6. Sally Roe then spoke publicly in an attempt to correct Columbia's misrepresentations. *Id.* After speaking publicly, Sally Roe became the subject of a pervasive doxxing and harassment campaign. *Id.* at ¶¶ 7-8. She was called a terrorist while wearing a Keffiyeh and followed around campus by ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *Id.* at ¶ 7.

     Columbia wrongfully complied with Congress's last records request and disclosed Sally Roe's private disciplinary records to Congress. *Id.* at ¶ 11. Congress used the records to associate and misrepresent Sally Roe's speech and displays of national and ethnic identity as antisemitism and pro-terrorism. *Id.* After this disclosure and the subsequent

misrepresentation of her speech and associations by Congress, the harassment campaign intensified. On one occasion, ███████████ followed Sally Roe around with a camera and called her a "terrorist." *Id.* at ¶¶ 7, 14. On another, ███████████████ said that she wished Sally Roe would be raped and killed. *Id.* at ¶ 14. ███████████████ ████████████████████████████████████████ Due to the pervasive and persistent attacks, she no longer feels safe wearing her keffiyeh in public out of fear of reprisal. *Id.* at ¶ 18.

Sally Roe reasonably fears that she will suffer irreparable harm if Columbia discloses her private disciplinary records. *Id.* at ¶ 21. Her reasonable fear is colored by her own experiences and the unprecedented crackdown against pro-Palestinian advocacy, including the arrest and planned deportation of ███████████ co-Plaintiff, Mahmoud Khalil. *Id.*

### Jane Joe

Plaintiff Jane Joe is active in pro-Palestine advocacy at Columbia University. Jane Joe Decl. at ¶¶ 1-4. Earlier this year, █████████████████████████████████ ████████████████████████████████ *Id.* Jane Joe has been the subject of a pervasive doxing and harassment campaign ████████████████████████████ ████████████ *Id.* at ¶¶ 4, 6. In addition to ████████████████ Columbia has also previously wrongfully disclosed Jane Joe's private disciplinary record to members of Congress pursuant to that body's prior demands. *Id.* at ¶ 9. She has received death threats, rape threats, and has been called a terrorist. *Id.* Due to the ongoing harassment, ██████████████████████ ████████████████████████ *Id.* at ¶ 7.

Jane Joe reasonably fears that she will be irreparably harmed if Columbia discloses

11

her private disciplinary records. *Id.* at ¶ 5. Jane Joe's experiences of being doxed and harassed because of her speech make this fear reasonable. *Id.* at ¶ 9. She further fears that the disclosure of her private disciplinary records will irreparably damage her professional and academic reputation because of the lies being spread about her speech and associations. *Id.* at ¶ 10.

### *Mahmoud Khalil*

Plaintiff Mahmoud Khalil completed his coursework at Columbia University and anticipates graduating in May 2025. Khalil Decl. at ¶¶ 2-3. Since student protests began following Israel's assault on Gaza, Khalil has served as a mediator and negotiator between protesting students and the University. *Id.* at ¶ 5. Khalil reasonably believes that Columbia has previously illegally disclosed his private student records upon request from members of Congress. *Id.* at ¶¶ 8, 11. As a result, Khalil was the subject of a pervasive harassment and doxxing campaign. *Id.* at ¶ 9. A number of anti-Palestinian people and organizations misstated and misattributed statements to Khalil that he neither said nor believed. *Id.* at ¶ 10. He received death threats, racist comments, and even calls for his deportation. *Id.* Because of this harassment and doxing campaign, Khalil felt unsafe on campus. Id. at ¶ 12. He believed he could be the target of federal government action, so he avoided even leaving his home. *Id.* He also feared for his wife's safety. *Id.* His own friends avoided being around him out of fear of being roped into the harassment and doxing. *Id.*

Later, the OIE announced an investigation against Khalil. *Id.* at ¶ 13. Despite allegations against Khalil, OIE has failed to make any findings of responsibility. *Id.* Shortly after the OIE announced its investigation, anti-Palestinian groups posted the allegations—which were supposed to be private—nearly verbatim on Twitter/X. *Id.* Khalil believes this was part of a coordinated campaign to assist the Government in deporting pro-Palestinian

students.[5] *Id.* Khalil was, in fact, detained by the Government on March 8, 2025, and the Government has expressed its intent to deport him for his pro-Palestine speech.[6] Indeed, the Government has been unambiguous that it targets Khalil for what it calls "pro-terrorist, anti-Semitic, *anti-American activity*," not for any crime.[7]

Khalil believes that he will suffer irreparable harm if Columbia discloses his private student records. *Id.* at ¶ 15. He fears that the misrepresented and misattributed statements associated with him will affect his ability to receive employment, harm his reputation, and otherwise hinder his ability to live peaceably in the United States. *Id.*

**_Lucy Loe_**

Plaintiff Lucy Loe is active in pro-Palestine advocacy at Barnard College. Lucy Loe Decl. at ¶ 1. In the aftermath of Khalil's arrest and intended deportation, Lucy Loe was doxed ███████████████████████ *Id.* at ¶ 2. As a result, Lucy Loe has been the subject of a pervasive harassment campaign. *Id.* at ¶¶ 3-7. People have called for her to be deported and, even worst, raped or harmed. *Id.* at ¶¶ 4-5. Lucy Loe reasonably believes she will suffer irreparable harm if Columbia discloses her private student records and as a result of the likely mischaracterization of her speech and associations by Congress, that she and her family will be targeted for further harassment. *Id.* at ¶¶ 7, 10, 13.

---

[5] See Akela Lacy, "A Well-Connected NYU Parent Is Trying to Get Students Deported," The Intercept (Jan. 31, 2025), available at https://theintercept.com/2025/01/31/nyu-gaza-protesters-deport-maca-antisemitism/; Natasha Lennard and Akela Lacy, "The Columbia Network Pushing Behind the Scenes to Deport and Arrest Student Protesters," The Intercept (Feb. 15, 2025), available at https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/.
[6] Ray Sanchez, 'Rules aren't clear anymore': Trump crackdown on student protesters sends shock waves across universities, CNN, https://www.cnn.com/2025/03/16/us/mahmoud-khalil-columbia-protests-free-speech/index.html, accessed March 16, 2025.
[7] *Id.*

### *Sam Soe*

Plaintiff Sam Soe is active in pro-Palestine advocacy at Columbia University. Sam Soe Decl. at ¶¶ 1-2. Sam has not been doxed or harassed, as their identity has not yet been made public by either Columbia, the Government, or any private organizations that have doxed students. Aware of what has happened to their fellow students, Sam Soe reasonably fears irreparable harm if Columbia discloses their private disciplinary records. *Id.* at ¶ 13. Sam Soe has already changed their online behavior because of the threat of doxing from the disclosure of private disciplinary records. *Id.* at ¶ 12.

### *Will Moe*

Plaintiff Will Moe is active in pro-Palestine advocacy at Columbia University. Will Moe Decl. at ¶ 1. Will has witnessed the consequence of doxing from some of his classmates due to their pro-Palestine speech, including the destruction of their property. *Id.* at ¶¶ 4-6. An organization that Will Moe is involved with was falsely accused of promoting terrorism, and the organization has subsequently been targeted for harassment. *Id.* at ¶ 6. Will Moe has self-censored out of fear of consequence for his speech. *Id.* at ¶¶ 7-8.

Will Moe reasonably fears irreparable harm if Columbia discloses his private disciplinary records. *Id.* at ¶ 2. He fears the disclosure ██████████████████ given threats the Government to punish pro-Palestinian speech. *Id.* at ¶¶ 10-12.

### *Kam Koe*

Plaintiff Kam Koe is a first-year student at Columbia University, Kam Koe Decl. at ¶ 1, who has watched a friend "endure the traumatic experience of being doxed while at Columbia." *Id.* at ¶ 5.   Additionally, since arriving on campus, Koe has "witnessed a campaign of political targeting that has left students afraid to speak, afraid to organize, and

afraid to participate in activism." Id. at ¶ 7. I have watched upperclassmen and even faculty members face: Harassment and online threats; Professional blacklisting; [and,] Public exposure of their names in government reports." *Id.*

Because of this experience, Koe states: "Although I haven't been personally targeted, I can't help but feel the weight of what happened to [my friend]. It has left me hesitant to get involved, as I fear for the safety of those I care about. The terror of knowing that our private information could be weaponized against us at any time is something that haunts me. The fear of what might happen next lingers in my mind." *Id.* at ¶ 6.

## STANDARD OF LAW

District courts may grant injunctive relief pursuant to Federal Rule of Civil Procedure 65(b) in the form of a temporary restraining order ("TRO") or a preliminary injunction ("PI"). "The standard for granting a temporary restraining order and a preliminary injunction . . . are identical." *See Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002).

## ARGUMENT[8]

Plaintiffs are entitled to a preliminary injunction because they satisfy their burden to prove four things: (1) a likelihood of success on the merits, (2) a substantial threat of irreparable harm, (3) that the injunction sought is in the public interest, and (4) the threat of injury outweighs any harm the injunction may cause. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

---

[8] Plaintiffs seek a temporary restraining order only as to Counts I and II of the amended complaint.

Here, adjudication of the first factor subsumes the next three because the injuries for which the Plaintiff seeks the Court's relief concern their right to free speech and irreparable harm is presumed if the constitutional injury is proven. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Similarly, the fact that Plaintiff's free speech claim is against the government means that "the third and fourth factors, harm to the opposing party and the public interest, merge." *Nken v. Holder,* 556 U.S. 418 (2009). And that is because "neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance." See, e.g., *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Thus, this motion turns on Plaintiff's likelihood of success on the merits of their claims, which is extremely high. That analysis follows below.

## I.     <u>Because This Is Illegal Jawboning at its worst, *Vullo* Controls</u>

Not too long ago, Columbia University lauded itself for the strength of its commitment to free speech—no matter the topic, even if hurt feelings ensued. *See* Am. Compl. at ¶ 127, n.69, ("the University cannot and will not rule any subject or form of expression out of order on the ground that it is objectionable, offensive, immoral, or untrue"). The University has recently taken a different tack, bandying about the tough punishments its officials will mete out to students who express viewpoints the Government does not like. What changed?

The House Committee's and the Taskforce's demands for more information from Columbia University and the threat to take away 400 million dollars is the cause. Threatening the loss of about a half billion dollars, the Government wielded its official position, not to communicate its own views, but to browbeat Columbia University into punishing a viewpoint Defendants do not like. With so much of Columbia University's funding at stake, Defendants

have fully subordinated campus officials to their will. This, the Free Speech Clause forbids: "the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries." *NRA v. Vullo*, 602 U.S. 175, 198 (2024).

The Supreme Court, in a unanimous ruling not yet one year old, made clear that the First Amendment gives plaintiffs these protections. *Id.* The Government cannot use the "threat of invoking legal sanctions and other means of coercion against a third party to achieve the suppression of disfavored speech." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 (1963). That is exactly what the Government has done here. The Government demands Columbia University impose specific punishments against specific students and put an entire academic department—with leading intellectuals like Rashid Khalidi and Joseph Massad— under receivership in order to exterminate a viewpoint from campus. Indeed, the Government is demanding that Columbia University use a definition of antisemitism that, if adopted by the Government directly, would violate the First Amendment. *Students for Just. in Palestine, at Univ. of Houston v. Abbott,* No. 1:24-CV-523-RP, 2024 WL 4631301, at *10 (W.D. Tex. Oct. 28, 2024) ("the Court finds the incorporation of this specific definition of antisemitism is viewpoint discrimination" because it "labels calling the State of Israel a racist endeavor and drawing comparisons of contemporary Israeli policy to that of the Nazis as antisemitic."); *see also Commack Self-Serv. Kosher Meats, Inc. v. Weiss,* 294 F.3d 415, 426 (2d Cir. 2002) (state law enforcing Orthodox Jewish standards for foods sold as "kosher" violated First Amendment by privileging one Jewish group over others).

By following through on a threat to pause hundreds of millions of dollars of contracts and grants, Defendants have cowed Columbia University officials into submission, and those

officials are now scrambling to do whatever the Government demands in order retrieve just under half a billion dollars back into their hands.

The First Amendment protection against indirect coercion is not new, and the Supreme Court last term simply "reaffirm[ed] what it said" in *Bantam Books* "six decades ago." *Vullo*, 602 U.S. at 180 (citing *Bantam Books*, 372 U.S. at 67, 83). In *Bantam Books,* the local commission was pressuring a book seller to take disfavored publications out of circulation. *Bantam Books*, 372 U.S. at 67. Though the Commission was "limited to informal sanctions" and the book seller was technically free to do as it saw fit, the constitutional problem ran deeper—by pressuring a third party into doing its bidding, the government had established a "scheme of state censorship effectuated by extralegal sanctions." *Id. a*t 72. That is against the rules. *See Vullo,* 602 U.S. at 190 ("Ultimately, *Bantam Books* stands for the principle that a government official cannot do indirectly what she is barred from doing directly . . . .").

The Government's claim to be investigating violations of Title VI or Title VII does not excuse its violation of the First Amendment. The unlawful actor in *Bantam Books* was also "target[ing] the distribution and display of material that, in its view, violated" the law. *Vullo*, 602 U.S. at 196. The constitutional problem, however, was not remedied by an asserted purpose to investigate illegal conduct. The First Amendment protection against a government "invoking legal sanctions to suppress disfavored publications" persisted, even though the targeted books "may or may not contain protected speech." *Id.*

Here, Defendants could have lawfully "pursue[d] violations" of the law, but that is not what they have done; rather, Defendants canceled grants and contracts "in order to punish or suppress…protected expression." *Id.; See* Exhibit B at 1 (demanding Hamilton Hall

punishment and being specific about their expectations—"Meaningful discipline means suspensions and expulsions"); *See* Exhibit C (announcing suspension and expulsion of said students).

## II.    Plaintiffs' First Amendment Rights Prohibit Columbia University from Disclosing Records that Detail Their Protected Associations and Speech.

In order for non-parties to challenge a subpoena directed to someone else, the non-parties must make "a prima facie showing that disclosure would infringe on its First Amendment rights." *New York State NOW v. Terry*, 886 F.2d 1339 (2d Cir. 1989). The challenging party can meet this "initial burden" by mustering facts that show an "arguable First Amendment violation." *United States v. Citizens State Bank*, 612 F.2d 1091, 1094 (8th Cir. 1980). This is a "minimal burden of proof." *Schiller v. City of New York*, No. 04CIV.7921(KMK)(JCF), 2006 WL 3592547, at *6 (S.D.N.Y. Dec. 7, 2006). And the Second Circuit made it so to reflect the "crucial place speech and associational rights occupy under our constitution." *Id.* at 5. *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989). *See also Buckley v. Valeo,* 424 U.S. 1, 74, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("the evidence offered need show only a reasonable probability that the compelled disclosure" will cause "threats, harassment, or reprisals.").

Once this prima facie case has been made, the "burden shifts to [the party that issued the subpoena] to demonstrate the necessary compelling interest in having discovery." *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989). It is not enough for the issuing party to have a "legitimate and substantial purpose;" even with an adequate aim, "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Buckley*, 424 U.S. at 238–39, 96 ; *see*

19

*also Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460–461 (1958) ("state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny")

**A. Plaintiffs Make Out a Prima Facie Case Because the Disciplinary Records Sought Regard Their Speech and Associations on a Matter of Immense Public Concern.**

It is not only that the records sought by the Government are demanded as part of this century's greatest jawboning effort, *see supra* at Sec. I, the records themselves contain information traditionally protected by the First Amendment, because those disciplinary records, in the aggregate, amount to membership rolls of those holding disfavored views. The records, if divulged, will also act to de-anonymize speech and associations Plaintiffs and others have tried hard to shield from public exposure.

   1.  *The Compelled Disclosure of the Disciplinary Information Sought by the Government Violates the Students' Association and Anonymous Speech Rights.*

"When it comes to a person's beliefs and associations, broad and sweeping state inquiries into these protected areas discourage citizens from exercising rights protected by the Constitution." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 610 (2021) (cleaned up). Compelled disclosure of an organization's membership list is the hallmark information protected by this right. *Id.* at 606 (citing *NAACP*, 357 U.S. at 462-63). But it is not the only "compelled disclosure" protected. Rather, any time the "vital relationship between freedom to associate and privacy in one's associations" is threatened in a way where a "risk of reprisals" from association "became known," *id.*, strict scrutiny applies.

Similarly, the right to speak anonymously is protected by the First Amendment. *Cornelio v. Conn.*, 32 F.4th 160, 169-70 (2d Cir. 2022). Forced disclosure of the identity of

anonymous speech is likewise core protected First Amendment rights. Indeed, the Second Circuit in *Cornelia* found no distinction between the right to anonymous association in *Americans for Prosperity* and the right to anonymous free speech. *Id.*

As a result, compelled disclosures of documents that provide the identity of students that gathered—whether that gathering was within the rules or against the rules—to express their views are protected from disclosure unless the Government can satisfy strict scrutiny. That is because the identities of students gathering for expressive purposes is tantamount to the membership rolls of an organization established for expressive purposes. Likewise, documents or information that de-anonymizes speech (such as the owner of an IP address or a user handle or the identity of someone who is masked[9]) violates the First Amendment.

Here, the Committee enumerates eleven items for which it seeks to obtain disciplinary records. Exhibit A at 5. Though the Committee couches its requests in an ostensible effort to combat antisemitism, each of the requests violates the anonymous speech and association rights of students. Take the following as examples.

     i.       *The "takeover and occupation of Hamilton Hall"*

The letter seeks disciplinary records related to the "takeover and occupation of Hamilton Hall," which implicate the association and anonymous speech rights of the students. Just after midnight on April 30, 2024, dozens of students entered Hamilton Hall to

---

[9] Indeed, the March 13 Letter includes specific demands for Columbia to enforce a mask ban in order to make it easier for the Taskforce and others to identify people who espouse speech they do not like.

protest while other students gathered outside.[10] They chanted, held up signs, and unfurled banners in and around the building. The students chose Hamilton Hall because of its historical significance—it was the site for several weeks-long occupations by students in protest of things like racial segregation and Columbia's investment in apartheid South Africa, protests the school now celebrates.[11] Students wore masks or otherwise covered their faces to protect their identity.[12] Later that same evening, at the request of Columbia's then-President Shafik, police violently swept the building and arrested over 100 protestors. Ultimately, charges survived against *only 15 protestors*, as there was not sufficient evidence that most protestors were trespassing or otherwise caused property damage or personal injury.[13]

   The students—the vast majority of whom did not commit any crimes—took steps to conceal their identity. Compelled disclosure of the students' identities runs directly against the core purpose of the First Amendment: its protection of "'unpopular individuals from retaliation—and the suppression of their ideas.'" *Cornelio*, 32 F.4th at 170 (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). The anonymity of the students is itself a form of protected expression, *id.* at 169, so compelling Columbia to reveal the students' identity violates their First Amendment rights.

---

[10] Amira McKee et al., In Focus: When Hamilton Hall Became 'Hind's Hall', Colum. Spectator (May 12, 2024), https://www.columbiaspectator.com/main/2024/05/12/in-focus-when-hamilton-hall-became-hinds-hall/.

[11] *Id.*

[12] *Id.*

[13] Jonathan Dienst et al., Manhattan DA Drops Charges Against Columbia University Protesters in Hamilton Hall Occupation, NBC News (May 15, 2024), https://www.nbcnews.com/news/us-news/manhattan-da-drops-charges-columbia-university-protesters-hamilton-hal-rcna157976.

Similarly, the compelled disclosure inhibits the students' right to freely associate because their association with groups that advocate for Palestine put them at "risks for reprisals." *Bonta*, 594 U.S. at 610. Not only does the disclosure of the disciplinary records reveal the students' associations, but it is the Government itself that has threatened to punish the students for their associations. Am. Compl. at ¶ 2; *see generally* Exhibit A and Exhibit B. The Government effectively seeks to both compel the associations of students, then use the students' associations to punish them. *Id.*

ii.        *The "Hind's House" Exhibition*

The letter also seeks disciplinary records for an art exhibition held in the Brownstones, a building for Fraternity & Sorority Life Housing.[14] Exhibit A at 5. The exhibition had artwork, music, and speeches all meant to commemorate the victims of Israeli atrocities in Gaza.[15] The Letter does not even claim that any crimes or otherwise illegal activity occurred at this exhibition. Instead, the letter justifies its claim for any disciplinary records related to Hind's House explicitly on disfavored expression. Exhibit A at 3.

The demanded disciplinary records that relate to the Hind's House exhibition run into the same issues as the records demanded for the Hamilton Hall protests. Any compelled disclosure of student identity violates the students' rights to anonymous speech, *see Cornelio*, 32 F.4th at 170, and their rights to freely associate. *See Bonta*, 594 U.S. at 610.

---

[14] Emily Chen, Hinds House Collective's Multimedia Exhibit Explores the Pro-Palestinian Movement with Art from Around the World, Colum. Spectator (Nov. 13, 2024), https://www.columbiaspectator.com/main/2024/11/13/hinds-house-collectives-multimedia-exhibit-explores-the-pro-palestinian-movement-with-art-from-around-the-world/.
[15] *Id.*

23

iii.      *Other Examples*

The Letter is replete with demands predicated on the false claim the students held violent protests and then used those false characterizations as the basis for accessing the students' disciplinary records. However, the Government makes claims that have no factual basis. For example, the Government cites a Washington Free Beacon article for its claim that a September 3, 2024, protest involved "harassment of Jewish students."[16] Exhibit A at 3. Though the article is not generous to the students, nowhere does it claim that the protesting students harassed Jewish students.[17] The Government invents a claim of harassment as a means to justify the disclosure. The Government, of course, does this because it cannot simply state that it seeks information related to legitimate protests. So, instead, it offers invented, pretextual reasons to violate the students' First Amendment rights.

Falsities and inventions notwithstanding, all of the Government's demands run into the same issues as above. The Government demands private disciplinary information that, if disclosed, would violate the association rights and anonymous speech rights of the students. This is true in every instance where no underlying crime is committed. *See also Friend v. Gasparino*, 61 F.4th 77 (2023) (finding that speech lacks First Amendment protection if "integral to criminal conduct.") (citing *United States v. Stevens*, 559 U.S. 460, 468 (2010)). But under *Vullo*, it is true even for the categories of information that regard alleged criminal activity. *Nat'l Rifle Ass'n of Am. v. Vullo,* 602 U.S. 175, 196 (2024) ("the conceded illegality of

---

[16] Jessica Costescu, Chaos at Columbia: Pro-Hamas Students Block Entry to Campus, Vandalize Statue on First Day of Classes, Wash. Free Beacon (Sept. 3, 2024), https://freebeacon.com/campus/chaos-at-columbia-pro-hamas-students-block-entry-to-campus-vandalize-statue-on-first-day-of-classes/.
[17] *Id.* (The article, in fact, does not make a single mention of Jewish students despite the House Committee's claim that it supports the allegation that Jewish students were attacked.)

the NRA-endorsed insurance programs does not insulate [the government official] from First Amendment scrutiny under the Bantam Books framework.")

### 2. The Compelled Disclosure of the Private Disciplinary Records Would Unconstitutionally Chill Plaintiffs' Speech.

Government action violates the First Amendment when it impermissibly chills a person's free exercise of speech. *Laird v. Tatum*, 408 U.S. 1, 11 (1972). Subjective chilling of speech is not enough. *Id.* at 13-14. Instead, a Plaintiff must demonstrate that the government has threatened discipline for protected speech. See *Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992) (holding that the "threat of discipline by a state actor is sufficient to "create a judicially cognizable chilling effect….").

By accessing the otherwise private disciplinary records of students, the Government unconstitutionally chills the speech of students engaged in the same expressive activities outlined above. *See Levin*, 966 F.2d at 89. The Government has openly touted its plan to punish students for their Palestine advocacy, highlighted most disturbingly by the recent arrest and intended deportation of Plaintiff Mahmoud Khalil, a lawful permanent resident who has never been convicted of a crime.[18] The Government has openly bragged, without any actual evidence, through its social media accounts, that Khalil was arrested and will be deported for engaging in "pro-terrorist, anti-Semitic, *anti-American* activity."[19] Now, the Government demands, through its letter, the identity of potentially hundreds more students engaged in Pro-Palestinian advocacy. Exhibit A at 5. The looming threat of discipline is apparent. The

---

[18] Ana Ley, Trump and Rubio Target Mahmoud Khalil Amid Columbia Student Protests, N.Y. Times (Mar. 10, 2025), https://www.nytimes.com/2025/03/10/us/trump-rubio-khalil-columbia-student-protests.html.
[19] *Id.*

Government demands the identity of Pro-Palestine advocates and promises to punish them upon discovery. Thus, the Government not only subjectively chills the speech of Plaintiffs, but it has actually threatened Plaintiffs and possesses the authority necessary to carry out its threats. See *Levin*, 966 F.2d.at 89 (finding that a state actor that has "authority to bring disciplinary charges" can engage in conduct that chills speech).

### B. The Government Has an Illicit Purpose to Punish Students Saying Things It Doesn't Like.

The Committee's investigative power is limited. It is hemmed in by the legislative process itself, because the power to investigate is "justified solely as an adjunct to the legislative process." *Watkins v. United States*, 354 U.S. 178, 196–97 (1957). Congressional demands for information, therefore, cannot be made "for the purpose of law enforcement," a power assigned to the other branches of government. *Trump v. Mazars USA, LLP*, 591 U.S. 848, 863 (2020). *See also Hentoff v. Ichord,* 318 F. Supp. 1175, 1182 (D.D.C. 1970) ("If a report has no relationship to any existing or future proper legislative purpose and is issued solely for sake of exposure or intimidation, then it exceeds the legislative function of Congress.").

But punishment is exactly the Committee's purpose. The Committee's request is plainly focused on the penalties levied against individual students for their constitutionally protected expressions and associations *because of their viewpoints*. Defendants seek records about pure speech—students gathering for lawful purposes, generally within campus rules, and even when students used amplified sound or political slogans Defendants don't like, their student conduct violations rarely rose to the level criminal conduct. *See Supra* Sec. II(A)(1).

The Committee admits that its purpose here is to force Columbia University into expelling, suspending, and otherwise punishing students that expressed views critical of Israel.

26

Rather than pursuing facts in furtherance of a legislative purpose, the Committee's request complains that students "used bullhorns inside an academic building during a course taught by former Secretary of State Hillary Clinton," and campus officials did not punish students involved. Am. Compl. at ¶ 11, n.20; Exhibit A at 2. But this gathering was a peaceful sit-in criticizing a former presidential candidate for contributing to "genocide propaganda and the militarization of our campus."[11] Public reports indicate that the sit-in did not disrupt the class itself.[12] This kind of micromanagement of campus discipline is not within the purview of the Committee's legislative powers.

Neither is an art exhibition about the destruction of Gaza and the response to it on campus. Or a protest marking October 7, 2024, as the first anniversary of the start of a twenty-first-century genocide in Gaza.

Investigations cannot "inquire into private affairs unrelated to a valid legislative purpose," nor "extend to an area in which Congress is forbidden to legislate." *Quinn v. United States*, 349 U.S. 155, 161 (1955). That includes the speech and associations protected by the First Amendment, which "may be invoked against infringement of the protected freedoms by law or by lawmaking"). *Watkins*, 354 U.S. at 196–97.

### III.    <u>In Addition to the Injunction Sought, Declaratory Relief Is Also Appropriate Here.</u>

This matter is fit for resolution by declaratory judgment. A declaratory judgment may issue when the judgment would help "clarif[y] or settl[e] the legal issues involved" and ultimately "finalize the controversy and offer relief from uncertainty." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir. 2003). If, however, the declaratory judgment is sought as part of a "procedural fencing" effort, the Court should decline to involve itself. *Id.*

Other factors—the availability of another remedy and the potential for comity issues between "sovereign legal systems" to arise—can factor into a court's analysis, but in this case, do not. *Id.*

While the House Committee has issued a letter, rather than a subpoena, for information and the Taskforce has paused, rather than suspended, funds, the Second Circuit has made clear that a court can look past this technical difference to issue a declaratory judgment. In *New York Times Co. v. Gonzalez,* the Second Circuit was also dealing with a letter seeking information rather than a subpoena. *The New York Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006). There, it was enough for the Court to find that: (1) that there is a substantial controversy, (2) that the parties have adverse legal interests, and (3) that the controversy has sufficient immediacy and reality. *Id.*

Those findings are unavoidable in this case. Defendants have conditioned Columbia University's receipt of hundreds of millions of dollars on its willingness to suppress a disfavored viewpoint. That viewpoint is held by Mahmoud Khalil, who is now detained a thousand miles away and facing deportation for the views he has expressed, as well as his co-plaintiffs, who fear what might happen to them next, including their own possible detention based solely on viewpoint relevant to a matter of great public concern. The controversy is of singular significance, with the parties' interests at odds, and existential-level ramifications looming over every person and entity before the Court – will this Nation continue to abide by the Constitution, and by the amendment the Framers' determined was so critical to our Nation's fabric that it must come first? Or, will we allow the federal government to engage in what is a blatant attempt to curb speech and association rights for us all?

28

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for a temporary restraining order and enter the relief.

Dated: March 19, 2025                    Respectfully Submitted,

/s/  Amy E. Greer

Amy E. Greer  (NY 5910179) (lead counsel)
**Dratel & Lewis**
29 Broadway, Suite 1412
New York, NY 10006
(212) 732-8805
agreer@dratellewis.com

**CAIR NATIONAL**
**LEGAL DEFENSE FUND**
/s/Lena Masri
Lena Masri
Gadeir Abbas (VA 81161)*
453 New Jersey Ave SE
Washington, DC 20003
(202) 742-6420

**COUNCIL ON AMERICAN ISLAMIC**
**RELATIONS – NEW YORK**
/s/Lamya Agarwala
Lamya Agarwala (NY 5736061)
80 Broad Street, 5th Floor
New York, NY 10009
(646) 665-7599
lagarwala@cair.com

**Jonathan Wallace**
/s/ Jonathan Wallace
Jonathan Wallace (NY 1733757)
PO #728
Amagansett NY 11930
(917) 359-6234
jonathan.wallace80@gmail.com

*Licensed in VA, practice limited to federal matters*
*Attorneys for Plaintiffs*

29

<u>Certification of Efforts to Notify Defendants of this Motion</u>

In accordance with Rule 65(b)(1)(B), counsel for Plaintiffs hereby certifies that it has made extensive efforts to notify Defendants of this motion. Plaintiffs emailed a copy of this motion to the Deputy General Counsel of the House Committee and its Chairman, who has previously agreed to accept service of process via email. Plaintiffs' counsel has also emailed attorneys who represent the University Defendants and have previously agreed to waive service, and four Department of Justice, who in other matters have appeared in federal courts on behalf of the agencies that are Defendants here. Because Defendants appear poised to enact their constitutional violations as early as tomorrow[20], Plaintiffs respectfully request that the Court enter a temporary restraining order before those violations are executed.

> **CAIR NATIONAL**
> **LEGAL DEFENSE FUND**
> <u>/s/Gadeir Abbas</u>
> Gadeir Abbas (VA 81161)*
> 453 New Jersey Ave SE
> Washington, DC 20003
> (202) 742-6420

---

[20] Douglas Belkin, *Columbia Is Nearing Agreement to Give Trump What He Wants*, Wall Street Journal, (March 19, 2025), https://www.msn.com/en-us/news/us/columbia-is-nearing-agreement-to-give-trump-what-he-wants/ar-AA1BfBq8?ocid=BingNewsSerp