# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

MAHMOUD KHALIL, *et al.*,

                *Plaintiffs,*

   v.

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, *et al.,*

                *Defendants.*

Case No. 1:25-cv-02079-AS

**OPPOSITION OF CONGRESSIONAL DEFENDANTS THE COMMITTEE ON EDUCATION AND THE WORKFORCE OF THE UNITED STATES HOUSE OF REPRESENTATIVES AND TIM WALBERG TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

MATTHEW BERRY
   *General Counsel*
TODD B. TATELMAN
   *Deputy General Counsel*
ANDY T. WANG
   *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
matthew.berry@mail.house.gov

*Counsel for Congressional Defendants*

March 24, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 1

ARGUMENT ................................................................................................................ 8

  I.   Plaintiffs Cannot Show Likelihood of Success on the Merits ............................ 9

      A.  Plaintiffs Have Not Established Standing ..................................................... 9

      B.  The Speech or Debate Clause Bars Plaintiff's Suit and Requested Relief ................. 11

           1.   The Speech or Debate Clause ............................................................. 11

           2.   Fact-Finding, Information-Gathering, and the Legislative Use of that Information Are Legislative Acts ........................................................ 13

           3.   The Speech or Debate Clause Renders the Congressional Defendants Immune and Precludes the Court from Granting Plaintiffs' Requested Relief ................. 14

           4.   Plaintiffs' Attacks on the Committee's Inquiry Are Unavailing ........................ 18

      C.  Both of Plaintiffs' First Amendment Claims Fail ....................................... 21

  II.  Plaintiffs Have Failed To Establish a Likelihood of Irreparable Harm ........................... 26

  III.  The Balance of Equities and Public Interest Favor Congressional Defendants ............... 27

CONCLUSION ............................................................................................................ 28

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*3M Co. v. Performance Supply, LLC*,
    458 F. Supp. 3d 181 (S.D.N.Y. 2020) ................................................................. 8

*Ass'n of Am. Physicians & Surgeons v. Schiff*,
    518 F. Supp. 3d 505 (D.D.C. 2021), *aff'd*,
    23 F.4th 1028 (D.C. Cir. 2022) ................................................................. 14, 25

*Barenblatt v. United States*,
    360 U.S. 109 (1959) ................................................................................. 13

*Bragg v. Jordan*,
    669 F. Supp. 3d 257 (S.D.N.Y. 2023), *appeal dismissed sub nom.*
    *Bragg v. Pomerantz*, No. 23-615, 2023 WL 4612976 (2d Cir. Apr. 24, 2023) ............ 19, 21

*Brown & Williamson Tobacco Corp. v. Williams*,
    62 F.3d 408 (D.C. Cir. 1995) .......................................................... 15, 17, 18

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ...................................................................................... 24

*Comm. on Judiciary, U.S. House of Representatives v. Miers*,
    558 F. Supp. 2d 53 (D.D.C. 2008) .............................................................. 27

*Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury*,
    575 F. Supp. 3d 53 (D.D.C. 2021) .............................................................. 19

*Doe v. McMillan*,
    412 U.S. 306 (1973) .................................................................. 12, 16, 17, 27

*Dombrowski v. Burbank*,
    358 F.2d 821 (D.C. Cir. 1966) ................................................................... 18

*Dombrowski v. Eastland*,
    387 U.S. 82 (1967) .................................................................................... 12

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975) ...................................... 12, 13, 19, 20, 24, 25, 27, 28

*Elrod v. Burns*,
    427 U.S. 347 (1976) .................................................................................. 27

*Exxon Corp. v. FTC*,
   589 F.2d 582 (D.C. Cir. 1978) .................................................................24, 26, 28

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009) ..................................................................................26

*Gravel v. United States*,
   408 U.S. 606 (1972) .........................................................................................12, 13

*Hearst v. Black*,
   87 F.2d 68 (D.C. Cir. 1936) .............................................................................17, 18

*Helstoski v. Meanor*,
   442 U.S. 500 (1979) ................................................................................................12

*Hentoff v. Ichord*,
   318 F. Supp. 1175 (D.D.C. 1970) ..........................................................................18

*Horne v. Flores*,
   557 U.S. 433 (2009) ..................................................................................................9

*Judicial Watch, Inc. v. Schiff*,
   998 F.3d 989 (D.C. Cir. 2021) .........................................................................13, 14

*Linde Thompson Langworthy Kohn & Van Dyke, P.C. v. Resol. Tr. Corp.*,
   5 F.3d 1508 (D.C. Cir. 1993) .................................................................................28

*Lujan v. Defs. of Wildlife.*,
   504 U.S. 555 (1992) .........................................................................................9, 10, 11

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ..................................................................................................9

*McGrain v. Daugherty*,
   273 U.S. 135 (1927) ................................................................................................19

*McSurely v. McClellan*,
   553 F.2d 1277 (D.C. Cir. 1976) (en banc) ............................................................14

*Miller v. Transamerican Press, Inc.*,
   709 F.2d 524 (9th Cir. 1983) .................................................................................15

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................................27

*NRA v. Vullo*,
    602 U.S. 175 (2024)................................................................................21

*Sabri v. United States*,
    541 U.S. 600 (2004)................................................................................20

*SEC v. Comm. on Ways & Means*,
    161 F. Supp. 3d 199 (S.D.N.Y. 2015).....................................................15

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
    856 F.3d 1080 (D.C. Cir. 2017) ..................................................15, 17, 18

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976)..................................................................................11

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)................................................................................10

*Tenney v. Brandhove*,
    341 U.S. 367 (1951)................................................................................19

*United States v. Biaggi*,
    853 F.2d 89 (2d Cir. 1988)......................................................................14

*United States v. Brewster*,
    408 U.S. 501 (1972)................................................................................12

*United States v. Helstoski*,
    442 U.S. 477 (1979)................................................................................12

*United States v. Raheja*,
    No. 19-CR-559, 2020 WL 7769725 (N.D. Ohio Dec. 30, 2020)............25

*United States v. Shkreli*,
    No. 15-CR-637, 2017 WL 3608252 (E.D.N.Y. May 16, 2017) ...............25

*Utica Mut. Ins. Co. v. INA Reinsurance Co.*,
    No. 12-CV-00194, 2012 WL 12874471 (N.D.N.Y. Nov. 6, 2012) .........26

*Watkins v. United States*,
  354 U.S. 178 (1967)............................................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)....................................................................................9, 26, 27

**Legislative Authorities**

*Columbia in Crisis: Columbia University's Response to Antisemitism: Hearing*
  *Before the H. Comm. on Education and the Workforce*, 118th Cong. (2024)
  (Committee Hearing), https://perma.cc/ST8M-2MDW......................................6, 21

Rules of the House of Representatives,
  119th Cong. (2025), https://perma.cc/QD7D-WRAX ............................................5

House Rule X.1(e) ...................................................................................................5

House Rule X.2(a) ...................................................................................................5

House Rule X.2(b) ...................................................................................................5

House Rule X.2(b)(1)...............................................................................................5

PROTECT Jewish Student and Faculty Act, H.R. 406, 119th Cong. (2025),
  https://www.congress.gov/bill/119th-congress/house-bill/406/text .......................20

Protecting Students on Campus Act of 2024, H.R. 7735, 118th Cong. (2024),
  https://www.congress.gov/bill/118th-congress/house-bill/7735/text .....................21

Protecting Students on Campus Act of 2025, S. 163, 119th Cong. (2025),
  https://www.congress.gov/bill/119th-congress/senate-bill/163/text.......................21

Staff of H. Comm. on Education and the Workforce, 118th Cong., Rep. on
  Antisemitism on College Campuses Exposed (Comm. Print. 2024)
  (Committee Report), https://perma.cc/268S-8FPZ ......................................7, 17, 20

Staff of H. Comm. on Education and the Workforce, et al., 118th Cong., Rep. on
  Antisemitism (Comm. Print 2024) (Staff Report), https://perma.cc/9SBA-
  HUMK ...................................................................................................................7

**Constitution**

U.S. Const. art. I, § 5, cl. 2......................................................................................5

U.S. Const. art. I, § 6, cl. 1.................................................................................11, 12

**Other Authorities**

Amira McKee et al., *Dozens occupy Hamilton Hall as pro-Palestinian protests spread across campus*, Columbia Spectator (Apr. 30, 2024, 6:27 AM), https://perma.cc/MQG6-XC4W ........................................................................................4

Ayana Archie et al., *Police enter Columbia University's Hamilton Hall amid pro-Palestinian protests*, NPR (Apr. 30, 2024, 10:33 PM), https://perma.cc/NQ5W-7EK9 ...........................................................................................3

Ctr. for Student Success and Intervention, *Standards and Discipline*, Columbia Univ. (Aug. 22, 2022), https://perma.cc/C8ZY-LYN9 .........................................................10

Jesse Rodriguez & Phil Helsel, *Smashed windows, stacked furniture left after occupation of Hamilton Hall at Columbia University*, NBC News (May 1, 2024, 12:52 AM), https://perma.cc/MK5H-6CX2 ...................................................................3

John F. Kennedy, 35th President of the United States, Special Message to the Congress on Civil Rights and Job Opportunities (June 19, 1963), https://perma.cc/8UEZ-C665 .......................................................................................4

Judy Goldstein & Joseph Zuloaga, *In Focus: The first 24 hours of the 'Gaza Solidarity Encampment,'* Columbia Spectator (Apr. 18, 2024, 10:20 PM), https://perma.cc/FXL2-ZUZ6 ......................................................................................3

News Release, U.S. Dep't of Def., Statement by Secretary of Defense Lloyd J. Austin III Marking One Year Since Hamas' October 7th Terrorist Assault on the State of Israel (Oct. 7, 2024), https://www.defense.gov/News/Releases/Release/Article/3927710/statement-by-secretary-of-defense-lloyd-j-austin-iii-marking-one-year-since-ham/ ..............................2

Rebecca Massel, *'I am a target': Dozens of Jewish students report feeling unsafe on campus*, Columbia Spectator (Nov. 2, 2023, 7:00 PM), https://perma.cc/DC48-HZ65 ........................................................................................4

Statement from Columbia University President Minouche Shafik (Apr. 29, 2024), https://president.columbia.edu/news/statement-columbia-university-president-minouche-shafik-4-29 ................................................................................................3

Univ. Senate, *The Guidelines to the Rules of University Conduct*, Columbia Univ. (effective Aug. 23, 2024), https://perma.cc/9H25-SYS3 ...............................................10

## INTRODUCTION

The Speech or Debate Clause of the U.S. Constitution absolutely bars Plaintiffs from bringing suit against the Committee on Education and the Workforce of the U.S. House of Representatives (Committee) and its Chairman Tim Walberg for the legislative act of seeking, by letter, specific information from Columbia University as part of a Committee investigation into antisemitism on college campuses.  Similarly, well-established separation of powers principles prevent this Court from granting the extraordinary relief that Plaintiffs seek in their Motion for a Temporary Restraining Order and Preliminary Injunction.  For example, it may not enjoin the Committee and its Chairman from subpoenaing records from Columbia, considering legislation that would impact federal funding for Columbia, or sending Columbia additional letters seeking the production of records, all activities that would run afoul of paragraph 3 of the Plaintiffs' Proposed Order.  ECF No. 18 at 2.  This Court also lacks the authority to enjoin the Congressional Defendants from issuing a report that includes student disciplinary information it has already obtained from Columbia or disclosing such information during a congressional hearing or on the floor of the House, all activities that would violate paragraph 5 of the Plaintiffs' Proposed Order.  *Id.*  In sum, the relief requested by Plaintiffs is unconstitutional.

Nothing in the Constitution requires duly-elected Members of Congress to sit idly by as a wave of antisemitism sweeps over our nation's college campuses, leading to discrimination against Jewish students at institutions of higher education receiving billions of dollars in federal funds.  Indeed, Columbia's then-president admitted last year that a hostile environment for Jewish students existed at the university in violation of Title VI of the Civil Rights Act.  Rather, the Committee—to which the House has delegated jurisdiction over education generally—is empowered to investigate the nature of the problem and how universities are addressing this

crisis so that it may assess the need for legislative reforms and develop appropriate solutions. That is precisely what the Committee is doing here, and its actions raise no constitutional concerns.

## BACKGROUND

On October 7, 2023, Hamas terrorists attacked Israel, killing over a thousand innocent civilians and taking hundreds hostage.[1]  Instead of supporting their beleaguered and bereaved Jewish classmates and colleagues, Hamas-sympathizing Columbia students, faculty, and staff besieged them.  Beginning after the October 7 attacks and into this year, a series of antisemitic incidents rocked Columbia and shattered any illusion of safety for Jews on Columbia's campus. As outlined in several letters the Committee has sent to Columbia, these incidents include:

- On "October 11, 2023, an individual outside Columbia's main library began yelling 'free Palestine!' at an Israeli undergraduate wearing a Star of David necklace. The individual told the undergraduate he was yelling 'because you are a Jew' and pointed to the Star of David. According to multiple eyewitnesses, the individual then yelled 'fuck the Jews' multiple times."  Decl. of Todd B. Tatelman (Decl.), Ex. A at 3 (footnote omitted).

- The same day, "an Israeli Columbia student was beaten with a stick by a former Columbia undergraduate whom the victim had confronted about ripping down flyers of Israeli hostages.  The assailant shouted, 'Fuck you. Fuck all you prick crackers.'" The perpetrator was criminally charged with hate crime assault charges.  *Id*. (footnote omitted).

- "At an October 12, 2023, anti-Israel protest by Columbia's chapters of [Students for Justice in Palestine] and [Jewish Voice for Peace], students chanted 'from the river to the sea' and held a 'die-in.'  Following the rally, the crowd of protestors moved toward the university's Kraft Center for Jewish Life, causing the building to be locked down and Jewish students to shelter inside.  During the protest, a Jewish student wearing an Israeli flag was yelled at and called a 'murderer,' while another …

---

[1] News Release, U.S. Dep't of Def., Statement by Secretary of Defense Lloyd J. Austin III Marking One Year Since Hamas' October 7th Terrorist Assault on the State of Israel (Oct. 7, 2024), https://www.defense.gov/News/Releases/Release/Article/3927710/statement-by-secretary-of-defense-lloyd-j-austin-iii-marking-one-year-since-ham/.

leaving the protest had an Israeli flag he was wearing torn off and thrown down a subway staircase." *Id.* (footnote omitted).

- "On October 27, 2023, a swastika was found drawn on a bathroom wall in Columbia's School of International and Public Affairs building." *Id.* at 4.

- "On November 9, 2023, a student shouted 'fuck the Jews' at a Jewish student wearing a yarmulke in the kosher section of a campus dining hall." *Id.* at 5.

Perhaps the most infamous events occurred in April 2024. On April 17, the so-called "Gaza Solidarity Encampment" illegally formed on Columbia's campus.[2] The actions of those involved in the encampment were so extreme and hostile, in the words of Columbia's then-President Dr. Minouche Shafik, it "created an unwelcoming environment for many of our Jewish students and faculty [and] contributed to creating a hostile environment in violation of Title VI [of the Civil Rights Act of 1964]."[3] Then, at the end of April, Columbia students and other protesters broke into and occupied the campus administrative building, Hamilton Hall. *See* Decl., Ex. E at 2. Not only did the protesters cause extensive property damage,[4] police had to use an armored vehicle and officers in riot gear to dislodge them,[5] but not before at least one

---

[2] Judy Goldstein & Joseph Zuloaga, *In Focus: The first 24 hours of the 'Gaza Solidarity Encampment,'* Columbia Spectator (Apr. 18, 2024, 10:20 PM), https://perma.cc/FXL2-ZUZ6.

[3] Statement from Columbia University President Minouche Shafik (Apr. 29, 2024), https://president.columbia.edu/news/statement-columbia-university-president-minouche-shafik-4-29.

[4] Jesse Rodriguez & Phil Helsel, *Smashed windows, stacked furniture left after occupation of Hamilton Hall at Columbia University*, NBC News (May 1, 2024 12:52 AM), https://www.nbcnews.com/news/us-news/smashed-windows-piled-furniture-left-occupation-hamilton-hall-columbia-rcna150154.

[5] Ayana Archie et al., *Police enter Columbia University's Hamilton Hall amid pro-Palestinian protests*, NPR (Apr. 30, 2024, 10:33 PM), https://perma.cc/NQ5W-7EK9.

janitor stated that the protesters kept him from leaving the building and had "held [him] hostage" there.[6]

These are just a few of the dozens of recorded and documented antisemitic incidents that have occurred on Columbia's campus since October 7, 2023.  As a result, not only have Jewish students been assaulted, harassed, and accosted while at Columbia, but they attend an institution that self-admittedly has been noncompliant with federal anti-discrimination laws.  It is no surprise then that when Columbia's student newspaper interviewed over 50 Jewish students, 34 students reported feeling unsafe on campus, 13 reported incidents where they felt attacked or harassed, 10 reported avoiding or fully staying off campus, and 12 said that they have tried to hide or veil their Jewish status.[7]

Columbia is a recipient of federal grants and contracts to the tune of billions of dollars. ECF No. 13 at 6–7.  As President John F. Kennedy stated in calling for the enactment of the Civil Rights Act of 1964:

> justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination.  Direct discrimination by Federal, State, or local governments is prohibited by the Constitution.  But indirect discrimination, through the use of Federal funds, is just as invidious; and it should not be necessary to resort to the courts to prevent each individual violation.[8]

In this vein, responding to the numerous antisemitic incidents that have occurred on America's college campuses, and to ensure that Jewish students do not have to "resort to the courts" just so

---

[6] Amira McKee et al., *Dozens occupy Hamilton Hall as pro-Palestinian protests spread across campus*, Columbia Spectator (Apr. 30, 2024, 6:27 AM), https://perma.cc/MQG6-XC4W.

[7] Rebecca Massel, *'I am a target': Dozens of Jewish students report feeling unsafe on campus*, Columbia Spectator (Nov. 2, 2023, 7:00 PM), https://perma.cc/DC48-HZ65.

[8] John F. Kennedy, 35th President of the United States, Special Message to the Congress on Civil Rights and Job Opportunities (June 19, 1963), https://perma.cc/8UEZ-C665.

that they can freely and safely attend class, the Committee began investigating antisemitism in higher education which, of course, includes Columbia's handling of such incidents.

Pursuant to the Constitution's Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2, the House has delegated its extensive legislative powers related to education to the Committee. *See* Rule X.1(e), Rules of the House of Representatives, 119th Cong. (2025) (House Rules), https://perma.cc/QD7D-WRAX. House Rules also delegate to the Committee "general oversight responsibilities" intended to enable it "to assist the House in" reviewing "the application, administration, execution, and effectiveness of Federal laws," "conditions and circumstances that may indicate the necessity or desirability of enacting new or additional legislation," and the "formulation, consideration and enactment of changes in Federal laws." House Rule X.2(a)-(b). To do that, the Committee must, among other things, examine how existing laws are being administered and how effective they are. *See* House Rule X.2(b)(1).

The Committee began that process with respect to Columbia on February 12, 2024, during the 118th Congress, when it sent a letter to Columbia's leadership requesting categories of information relating to antisemitic incidents that have occurred on Columbia's campus, and how Columbia has responded to them. *See* Decl., Ex. A. As the Committee explained in that letter, the requested information would "assist the Committee in understanding antisemitism at Columbia and the university's response to it," and "[u]nder House Rule X, the Committee has legislative and oversight jurisdiction over 'education ... generally.'" *Id.* at 11, 16.

Then, on April 17, 2024, Columbia's then-President, Dr. Minouche Shafik, and Ms. Claire Shipman and Mr. David Greenwald, Co-Chairs of the Trustees of Columbia, testified

before the Committee.[9]  The purpose of the hearing was for the Committee to "conduct its solemn oversight duty of postsecondary education," *id*. at 4, especially because "a taxpayer funded institution [becoming] a forum for the promotion of terrorism raises serious questions," *id*. at 3.  Legislators also asked the witnesses about "the kind[s] of legislation that gives us more data, and a mechanism to fight antisemitism."  *Id*. at 61.  Indeed, one Committee Member raised H.R. 7921, the Countering Antisemitism Act, *id*., a bill introduced in the 118th Congress.  During the hearing, President Shafik admitted that "Columbia has seen a rise in antisemitic incidents."  *Id*. at 11.

The Committee continued its investigative efforts.  In an April 21, 2024 letter to Columbia, the Committee again expressed its concern about the "severe and pervasive hostile environment for Jewish students at Columbia."  Decl., Ex. B at 1.  The letter noted, for example, that protesters were screaming "go back to Poland!" and "yehudim, yehudim [which translates to Jews, Jews]" at Jewish Columbia students who were trying to leave campus.  *Id*. at 2.  Then in August, the Committee followed up with Columbia about its February 12 requests for information, asking Columbia to produce various "priority items requested by the Committee."  Decl., Ex. C at 1.  Eventually, this culminated in the Committee issuing subpoenas to Columbia for some of the requested documents.  *See* Decl., Ex. D.  Columbia produced responsive documents throughout 2024 in a rolling fashion, but the documents contained redactions that Columbia believed were necessary under the Family Educational Rights and Privacy Act.

---

[9] *Columbia in Crisis: Columbia University's Response to Antisemitism: Hearing Before the H. Comm. on Education and the Workforce*, 118th Cong. (2024) (Committee Hearing), https://perma.cc/ST8M-2MDW.

On October 31, 2024, the Committee released a report, "Antisemitism on College Campuses Exposed," which included information gleaned from the records sent by Columbia.[10] The Committee Report explained "the Committee's interest [was] in ensuring colleges and universities comply with Title VI," and that "the Committee's investigation will inform potential legislative reforms to existing federal law" because the "outbreak of vicious antisemitism in postsecondary education" "is a subject on which legislation 'could be had.'" *Id*. at 7. The Committee Report extensively documented the pervasive antisemitism infecting Columbia and other college campuses, notably concluding that the "totality of circumstances on these campuses demonstrate an environment hostile to Jewish students likely in violation of Title VI." *Id*. at 122. The Committee also contributed to the U.S. House of Representatives Staff Report on Antisemitism, which was released on December 18, 2024, and included legislative recommendations for combatting antisemitism on college campuses.[11]

Building on the work of the Committee in the 118th Congress, the Committee in the 119th Congress is actively considering numerous legislative reforms aimed at combatting the rise of antisemitic behavior on college campuses. To further its understanding of the way certain institutions of higher education have responded to particular antisemitic acts and to effectively evaluate the need for and shape of potential legislation, on February 13, the Committee sent a new records request to Columbia. *See* Decl., Ex. E. This time, the Committee requested only student disciplinary records related to 11 specifically delineated incidents that occurred on

---

[10] *See* Staff of H. Comm. on Education and the Workforce, 118th Cong., Rep. on Antisemitism on College Campuses Exposed (Comm. Print. 2024) (Committee Report), https://perma.cc/268S-8FPZ.

[11] *See* Staff of H. Comm. on Education and the Workforce, et al., 118th Cong., Rep. on Antisemitism 18–19 (Comm. Print 2024) (Staff Report), https://perma.cc/9SBA-HUMK.

Columbia's campus, one of which was the takeover of Hamilton Hall.  *Id.* at 5.  On February 27, Columbia responded and produced records responsive to the Committee's inquiry.  *See* Decl., Ex. F.  Additionally, on March 7, Columbia produced more information, *see* Decl., Ex. G, and on March 19, Columbia provided supplemental disciplinary files for the Hamilton Hall takeover and related events, *see* Decl., Ex. H.  To date, the Committee has not publicly released any of the records received from Columbia in response to its February 13 letter.

On March 13, 2025, Plaintiffs, eight current Columbia and Barnard College students, sued their schools' officials and the Congressional Defendants.  *See* ECF No. 1.  On March 19, Plaintiffs filed an amended complaint that dropped Barnard College officials as defendants, but added several Executive Branch officials.  *See* ECF No. 13.  Plaintiffs also filed their Motion for a Temporary Restraining Order and Preliminary Injunction and supporting memorandum of law, *see* ECF Nos. 15 & 17, requesting relief that includes enjoining the Congressional Defendants "from pressuring or taking further coercive measures against Columbia Defendants regarding student disciplinary records" or "from releasing in any form the names, social media posts/handles, or any other identifying information of any Columbia or Barnard student included in any records or materials such entities have already received for the pendency of this litigation,"  ECF No. 18 at 2.  This Court ordered all Defendants to respond by noon on March 24, 2025, and set a hearing on Plaintiffs' motion for the following day.  ECF No. 20.

## ARGUMENT

Plaintiffs' motion for a temporary restraining order and preliminary injunction should be denied.  The same legal standard governs the issuance of preliminary injunctions and temporary restraining orders.  *See, e.g.*, *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y. 2020).  A preliminary injunction is an "extraordinary and drastic remedy, one that

should not be granted unless the movant, by a clear showing, carries the burden of persuasion."

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and quotation marks and citation

omitted). To meet that burden, a plaintiff "must establish that he is likely to succeed on the

merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Plaintiffs here meet none of these factors. They cannot prevail on the merits and have not

demonstrated that they will suffer any harm (much less irreparable harm). Additionally, an

injunction would impede a congressional investigation into a matter of serious public concern

and handicap the functioning of the legislative branch of government, which would be contrary

to the public interest.

## I.    Plaintiffs Cannot Show Likelihood of Success on the Merits

Far from having any likelihood of success in this case, Plaintiffs have not established

standing to even seek relief from this Court. Furthermore, the Speech or Debate Clause

absolutely bars their suit against the Congressional Defendants, and this Court, consistent with

the separation of powers, cannot give the Plaintiffs their requested relief. Finally, neither the

Committee's February 13 letter nor Columbia's production of responsive records violates the

First Amendment.

### A.    Plaintiffs Have Not Established Standing

The "threshold issue of standing [is] 'an essential and unchanging part of the case-or-

controversy requirement of Article III,'" and must be met for a court's jurisdiction to vest.

*Horne v. Flores*, 557 U.S. 433, 445 (2009) (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560

(1992)). To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is

9

fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[T]he party invoking federal jurisdiction[] bears the burden of establishing these elements." *Id*.

The Plaintiffs have failed to meet their burden. They have not alleged any cognizable injury whatsoever. "To establish injury in fact, a plaintiff must show that he ... suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 339 (quoting *Lujan*, 504 U.S. at 560).

The Committee's February 13 letter requests that Columbia provide to the Committee student disciplinary records related to 11 specific incidents occurring in 2024 and January 2025. *See* Decl., Ex. E at 5. However, nowhere in their Amended Complaint or publicly available Memorandum of Law in Support of the Motion for a Temporary Restraining Order and Preliminary Injunction do any of the Plaintiffs specifically allege that the requested records involve them. Plaintiffs would know if they were being disciplined for any of these incidents because Columbia, consistent with due process, informs students of pending disciplinary hearings.[12] At the very least, Plaintiffs could have alleged that they participated in the events described in the Committee's February 13 letter, which would raise the possibility that Columbia has some responsive records pertaining to them, but they fail to allege even that. And to the extent that Plaintiffs claim that they would be harmed by the production of other students' disciplinary records, any such injury would be far too speculative and remote for Article III

---

[12] *See* Ctr. for Student Success and Intervention, *Standards and Discipline*, Columbia Univ. at 16 (Aug. 22, 2022), https://perma.cc/C8ZY-LYN9 (explaining that "[f]or a Dean's Discipline hearing, notice will be sent via University e-mail."); Univ. Senate, *The Guidelines to the Rules of University Conduct*, Columbia Univ. at 10 (effective Aug. 23, 2024), https://perma.cc/9H25-SYS3 (explaining that "[t]he Rules Administrator will give the respondent a written explanation of their rights and options as soon as possible after an incident is reported").

standing purposes. *See Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) ("[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent") (internal quotation marks and citation omitted).

As a result, Plaintiffs have failed to meet their burden of establishing that they suffered any cognizable injury whatsoever by Columbia producing student disciplinary records to the Committee, or that they would suffer any such injury if Columbia continues to do so.[13]

**B.    The Speech or Debate Clause Bars Plaintiffs' Suit and Requested Relief**

The Speech or Debate Clause absolutely bars the Plaintiffs' suit and requested relief. Because of this core constitutional immunity, Plaintiffs cannot establish a likelihood of success on the merits.

**1.    The Speech or Debate Clause**

The Speech or Debate Clause mandates that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, §

---

[13] Further, "the injury has to be 'fairly … trace[able] to the challenged action of the defendant.'" *Lujan*, 504 U.S. at 560 (alterations in original) (quoting *Simon*, 426 U.S. at 41–42). Here, Plaintiffs conflate the actions of the Defendants. Plaintiffs claim that "Defendants appear poised to enact their constitutional violations as early as tomorrow, Plaintiffs respectfully request that the Court enter a temporary restraining order before those violations are executed." ECF No. 15 at 30 (footnote omitted). But Plaintiffs cite a news article stating that Columbia appears poised to respond to actions requested of them by the Executive Branch Defendants, not the Congressional Defendants. *See id.* at 30, n.20. Similarly, Plaintiffs' discussion of "jawboning" in Section I of their Argument focuses on alleged threats made by the Executive Branch Defendants and contains no explanation linking any alleged injuries stemming from this purported jawboning to the Congressional Defendants' request for records. *See id.* at 16–19. Thus, Plaintiffs are piggybacking the potential harms asserted against the Executive Branch Defendants to get injunctive relief against the Congressional Defendants. Not only is that improper, but it also demonstrates that the harms raised by the Plaintiffs are not "fairly traceable" to the Congressional Defendants.

6, cl. 1.  By "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct," *Gravel v. United States*, 408 U.S. 606, 618 (1972), the Clause both "preserve[s] the independence and ... integrity of the legislative process," *United States v. Brewster*, 408 U.S. 501, 524 (1972), and "reinforc[es] the separation of powers," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975) (citation omitted).

The Speech or Debate Clause's absolute immunity extends to all civil actions.  *See id*. at 503.  The Clause protects federal legislators "not only from the consequences of litigation's results but also from the burden of defending themselves."  *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967).  "The purpose of the [Speech or Debate] Clause is to insure that the legislative function the Constitution allocates to Congress may be performed independently. … [T]he central role of the Clause is to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary."  *Eastland*, 421 U.S. at 502 (quotation marks and citation omitted).  The Supreme Court "has reiterated the central importance of the Clause for preventing intrusion by [the] Executive and Judiciary into the legislative sphere."  *United States v. Helstoski*, 442 U.S. 477, 491 (1979).

Because "the guarantees of th[e] Clause are vitally important to our system of government," they "are entitled to be treated by the courts with the sensitivity that such important values require."  *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979).  Accordingly, the Supreme Court has repeatedly, and "[w]ithout exception, … read the Speech or Debate Clause broadly to effectuate its purposes."  *Eastland*, 421 U.S. at 501.  The Speech or Debate Clause provides, among other things, immunity from prosecutions or civil lawsuits with respect to all actions "within the 'legislative sphere.'"  *Doe v. McMillan*, 412 U.S. 306, 312 (1973) (quoting *Gravel*, 408 U.S. at 624–25).  The protections of the Clause apply to both Members and

Committees. *See, e.g.*, *Judicial Watch, Inc. v. Schiff*, 998 F.3d 989, 991–93 (D.C. Cir. 2021)

(affirming dismissal on Speech or Debate Clause grounds without distinguishing between the

committee and its chairman, both of which were named defendants). And the Supreme Court

has stated unequivocally that when the challenged "actions of the [Committee] fall within the

sphere of legitimate legislative activity," legislators "shall not be questioned in any other Place

about those activities since the prohibitions of the Speech or Debate Clause are absolute."

*Eastland*, 421 U.S. at 501 (internal quotation marks and citation omitted); *see also id.* at 503, 509

n.16, 509–10; *Gravel*, 408 U.S. at 623 n.14.

### 2.    Fact-Finding, Information-Gathering, and the Legislative Use of that Information Are Legislative Acts

The types of "legislative activity" protected by the Speech or Debate Clause include

much more than just speaking or debating on the House floor or participation at committee

hearings. The "cases have plainly not taken a literalistic approach in applying the privilege. …

Committee reports, resolutions, and the act of voting are equally covered… ." *Gravel*, 408 U.S.

at 617. Relevant here, the Supreme Court has found that the "power to investigate" is within the

legitimate legislative sphere. *See Eastland*, 421 U.S. at 504. That is so because a "legislative

body cannot legislate wisely or effectively in the absence of information respecting the

conditions which the legislation is intended to affect or change." *Id*. (citation omitted). To

formulate legislation, or to understand the topics debated in committee hearings or on the House

floor, legislators must have all relevant information. And thus, the "power of the Congress to

conduct investigations is inherent in the legislative process." *Watkins v. United States*, 354 U.S.

178, 187 (1957). In fact, "[t]he scope of [Congress's] power of inquiry ... is as penetrating and

far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt*

*v. United States*, 360 U.S. 109, 111 (1959).

13

Courts have also consistently held that all modes of congressional information-gathering, from informal data collection to the issuance of subpoenas, are legislative acts absolutely protected by the Speech or Debate Clause. *See, e.g.*, *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 518 (D.D.C. 2021) ("[I]nformation gathering letters constitute protected legislative acts."), *aff'd*, 23 F.4th 1028 (D.C. Cir. 2022); *Judicial Watch*, 998 F.3d at 992 ("[T]he Committee's issuance of subpoenas … was a legislative act protected by the Speech or Debate Clause."); *United States v. Biaggi*, 853 F.2d 89, 102–03 (2d Cir. 1988) (legislative fact-finding during congressional trip protected by Clause); *McSurely v. McClellan*, 553 F.2d 1277, 1286–87 (D.C. Cir. 1976) (en banc) ("The acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege so that congressmen are able to discharge their constitutional duties properly.").

### 3.     The Speech or Debate Clause Renders the Congressional Defendants Immune and Precludes the Court from Granting Plaintiffs' Requested Relief

The Congressional Defendants are absolutely immune from Plaintiffs' lawsuit, and the relief Plaintiffs seek in their motion is squarely foreclosed by the Constitution; the Speech or Debate Clause protects the legislative acts the Committee has undertaken, specifically, the Committee's investigation, its fact-gathering in support of that investigation (*i.e.*, its February 13 letter to Columbia), and its legislative use of the acquired information.

To begin with, the Committee's February 13 information-gathering letter is a legislative act protected by the Speech or Debate Clause for which the Congressional Defendants may not be sued. *See Ass'n of Am. Physicians & Surgeons*, 518 F. Supp. 3d at 518. Additionally, Plaintiffs' request that this Court enjoin the Congressional Defendants "from pressuring or taking further coercive measures against Columbia Defendants regarding student disciplinary records," ECF No. 18 at 2, is a demand for patently unconstitutional relief that would interfere with the

14

legitimate exercise of Congress's legislative powers.  Any future efforts by the Committee to obtain such records would constitute "[c]ongressional information gathering activities" to which the protections of the Speech or Debate Clause would clearly extend.  *SEC v. Comm. on Ways & Means*, 161 F. Supp. 3d 199, 236 (S.D.N.Y. 2015); *see also Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) ("Obtaining information pertinent to potential legislation or investigation is one of the things generally done in a session of the House" (quotation marks and citation omitted)).

Indeed, if this Court were to enter Plaintiffs' proposed order, the Committee's ability to send additional informal requests for information to Columbia, subpoena Columbia, or pass spending bills that would affect Columbia—all of which are core legislative acts absolutely protected by the Speech or Debate Clause—would be restricted.  In fact, Plaintiffs' proposed order would even bar Chairman Walberg from *speaking out on the floor of the House* about this issue, which would represent an unprecedented usurpation of Congressional prerogatives and be in direct conflict with the plain text of the Speech or Debate Clause.

Likewise, Plaintiffs' request that this Court enjoin the Congressional Defendants "from releasing in any form the names, social media posts/handles, or any other identifying information of any Columbia or Barnard student included in any records or materials such entities have already received for the pendency of this litigation," ECF No. 18 at 2, asks this Court to violate the Constitution.  That is because the Speech or Debate Clause "affords Congress a 'privilege to use materials in its possession without judicial interference.'"  *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1086 (D.C. Cir. 2017); *see also Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995).

Indeed, once information is in Congress's possession, courts may not curtail legislators' use of that information within the legislative sphere. *Doe v. McMillan* is particularly instructive here. In *Doe*, a House committee investigated the Washington, D.C. public school system and published its findings and recommendations in a report. 412 U.S. at 307–08. The report contained "copies of absence sheets, lists of absentees, copies of test papers, and documents relating to disciplinary problems of certain *specifically named students*." *Id*. at 308 (emphasis added). Indeed, the report "named students," some of whom cut class, but others who had "disciplinary problems" that included "deviant conduct [involving] sexual perversion and criminal violations." *Id*. at 308 n.1. Parents sued, alleging that "by disclosing, disseminating, and publishing the information contained in the report, the defendants had violated the petitioners' and their children's statutory, constitutional, and common-law rights to privacy and that such publication had caused and would cause grave damage to the children's mental and physical health and to their reputations, good names, and future careers." *Id*. at 309. They sought "an order enjoining the defendants from further publication, dissemination, and distribution of any report containing the objectionable material and for an order recalling the reports to the extent practicable." *Id*. at 309–10.

The Supreme Court flatly rejected this request, stating that "it is plain to us that the complaint in this case was barred by the Speech or Debate Clause." *Id*. at 312. The Court explained that "[t]he Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate and deliberation without intimidation or threats," and that the Clause "includes within its protections anything generally done in a session of the House by one of its members in relation to the business before it." *Id*. at 311 (quotation marks and citation omitted). As a result, the Court held that "[a]lthough we might disagree with the

16

Committee as to whether it was necessary, or even remotely useful, to include the names of individual children in the ... Committee Report, we have no authority to oversee the judgment of the Committee in this respect." *Id.* at 313.[14]

Moreover, in *Hearst v. Black*, the plaintiff sought to enjoin a Senate Committee from "keeping" or "making any use of" allegedly illegally seized messages. 87 F.2d 68, 68–71 (D.C. Cir. 1936). As here, the plaintiff argued that the congressional investigation violated his Constitutional rights. *See id.* at 68–69. While the D.C. Circuit accepted all the plaintiff's allegations as true and even held that the seizure of the messages had been unlawful, a unanimous panel held that the "universal rule, so far as we know it, is that the legislative discretion in discharge of its [C]onstitutional functions, whether rightfully or wrongfully exercised, is not a subject for judicial interference." *Id.* at 71.

The principle of non-interference in congressional investigations espoused in *Hearst* has been consistently applied. First, in *Brown and Williamson*, the D.C. Circuit declined to enforce subpoenas directed to Members of Congress seeking the return of allegedly stolen documents, recognizing that a "corollary—to [its] right to pursue investigations is Congress'[s] privilege to use materials in its possession without judicial interference." 62 F.3d at 416. Similarly, in *Ferrer*, the D.C. Circuit denied the plaintiff's request for an order directing the return or

---

[14] In fact, in *Doe*, the published report "stated that these materials were included to give a realistic view of a troubled school and the lack of administrative efforts to rectify the multitudinous problems there, to show the level of reading ability of seventh graders who were given a fifth-grade history test, and to illustrate suspension and disciplinary problems." *Id.* at 308–09 (internal quotation marks omitted). That rationale, which the Court thought plainly was within the legislative sphere, is the same rationale partially animating the publication of the Committee's October 31 report, which states that it is meant to "highlight[] . . . evidence of a broader environment on these campuses that is hostile to Jewish students." Committee Report, *supra* note 10 at 1.

destruction of documents previously provided to the subcommittee.  856 F.3d at 1086.  *Ferrer* expressly reaffirmed both *Hearst* and *Brown and Williamson*, holding that if the Court were to issue such an order, it would "destroy" "the independence of the Legislature" and "invade" "the constitutional separation of powers."  *Id.* (quotation marks and citation omitted).

Plaintiffs' citation to a single district court opinion for the proposition that "[i]f a report has no relationship to any existing or future proper legislative purpose and is issued solely for sake of exposure or intimidation, then it exceeds the legislative function of Congress," ECF No. 15 at 26 (quoting *Hentoff v. Ichord*, 318 F. Supp. 1175, 1182 (D.D.C. 1970)), is misleading and inapposite.  However, the *Hentoff* court also clearly stated that it was "tak[ing] no action which limits the use that individual Congressmen choose to make of the Report or its contents *on or off the floor of Congress*" because the "protection afforded individual Congressmen by the Speech or Debate Clause" means that "[n]o injunction is appropriate against any Congressman."  318 F. Supp. at 1179–80 (emphasis added).  The injunction issued in that case was applied instead to the "Public Printer."  *Id*. at 1183.  Of course, an injunction against the Committee and its Chairman is exactly what Plaintiffs request from this Court.

In sum, the Committee has engaged in a *lawful* exercise of congressional power, absolutely protected by the Speech or Debate Clause.  If Courts cannot constrain "a congressional committee from using information it had obtained by illegal means," *Dombrowski v. Burbank*, 358 F.2d 821, 824 (D.C. Cir. 1966) (describing the *Hearst* decision), *rev'd in part on other grounds*, then it cannot constrain the Committee here.

### 4.    Plaintiffs' Attacks on the Committee's Inquiry Are Unavailing

Plaintiffs attempt to malign the Committee's motives by claiming that it has an "[i]llicit [p]urpose," ECF No. 15 at 26, fail.  Contrary to Plaintiffs' assertions, the Committee is engaged in a legitimate investigation into antisemitism on college campuses, springing from its oversight

of federal laws and funding, and its assessment of the need for new legislation.  The Supreme

Court has cautioned that courts must assume "that the action of the legislative body was with a

legitimate object, if it is capable of being so construed, and [the court] ha[s] no right to assume

that the contrary was intended."  *McGrain v. Daugherty*, 273 U.S. 135, 178 (1927) (citation

omitted).  As is the case here, when Congressional committees assert they are investigating in aid

of legislating, "the presumption should be indulged that this was the real object."  *Id.*; *see also*

*Eastland*, 421 U.S. at 508 ("Our cases make clear that in determining the legitimacy of a

congressional act we do not look to the motives alleged to have prompted it."); *Bragg v. Jordan*,

669 F. Supp. 3d 257, 269 (S.D.N.Y. 2023) ("The Court is required to presume that a

congressional committee's stated legislative object is the real object. ... [E]ven if [Plaintiffs']

hypotheses about the Committee's *real* motivations were correct, they are irrelevant.  It is not a

court's function to invalidate a congressional investigation that serves a legislative purpose.")

(internal quotation marks and citations omitted), *appeal dismissed sub nom. Bragg v. Pomerantz*,

No. 23-615, 2023 WL 4612976 (2d Cir. Apr. 24, 2023)).

   The only permissible judicial inquiry here is a deferential assessment of whether "the

investigation upon which the [Committee] had embarked concerned a subject on which

'legislation could be had.'"  *Eastland*, 421 U.S. at 506 (citation omitted).  But "the legitimate

legislative purpose bar is a low one, and the purpose need not be clearly articulated."  *Comm. on*

*Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury*, 575 F. Supp. 3d 53, 64

(D.D.C. 2021) (summarizing relevant Supreme Court precedent).  Thus, "courts should not go

beyond the narrow confines of determining that a committee's inquiry may fairly be deemed

within its province."  *Eastland*, 421 U.S at 506 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 378

(1951)).

Here, there can be no question that the Committee's investigation, and its requests for information from Columbia, concern "a subject on which 'legislation could be had.'" *Eastland*, 421 U.S. at 506 (citation omitted).  The Committee requested student disciplinary records from Columbia because that information is relevant to fulfilling its legislative, investigative, and oversight responsibilities.  Consistent with its jurisdiction over "education," the Committee is conducting a wide-ranging investigation into a pressing issue of national importance: antisemitism on college campuses.

For one thing, given that Congress holds the power of the purse, it may examine whether federal funds are flowing to institutions that are not taking adequate steps to remedy a pervasively hostile environment for Jewish students.  That alone is a subject upon which "legislation could be had," *see Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures and on the reliability of those who use public money is bound up with congressional authority to spend in the first place."),[15] and student disciplinary records involving antisemitic incidents are plainly relevant to that inquiry.

The Committee is also concerned with ensuring compliance with federal anti-discrimination laws, such as Title VI, and researching additional legislation that may stem the rising tide of antisemitism on college campuses.[16]  "Congress may conduct inquiries into the

---

[15] *See* PROTECT Jewish Student and Faculty Act, H.R. 406, 119th Cong. (2025) (requiring universities, as a condition of receiving federal student aid, to adopt a standard definition of antisemitism and prohibit such conduct on campus), https://www.congress.gov/bill/119th-congress/house-bill/406/text.

[16] For example, the Committee Report explained that "the Committee's interest [was] in ensuring colleges and universities comply with Title VI," and that "the Committee's investigation will inform potential legislative reforms to existing federal law" because the "outbreak of vicious antisemitism in postsecondary education" is a "subject on which legislation 'could be had.'"  Committee Report, *supra* note 10 at 7 (citation omitted).  Likewise, during the April 17, 2024, Committee Hearing with Columbia's leadership, a Member asked about H.R.

20

administration of existing laws, studies of proposed laws, and [particularly relevant here,] surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Bragg*, 669 F. Supp. 3d at 267 (alteration in original) (internal quotation marks and citation omitted). In fact, in the 118th Congress, H.R. 7735, the Protecting Students on Campus Act, was introduced, which would require institutions of higher education receiving federal funds to submit an annual report to the Department of Education's Inspector General that includes information and analysis related to complaints received by the institution under Title VI of the Civil Rights Act.[17] That bill has been reintroduced in the 119th Congress in the Senate.[18]

### C.    Both of Plaintiffs' First Amendment Claims Fail

Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction only pertains to Counts I and II of their Amended Complaint, which sets forth First Amendment claims against the Congressional Defendants and Columbia, respectively. Plaintiffs argue that the Committee's alleged threats constitute "jawboning" and violate the First Amendment pursuant to *NRA v. Vullo*, 602 U.S. 175 (2024). ECF No. 15 at 16–19. They then argue that Columbia's "compelled" disclosure of documents would infringe their privacy in association rights and chill their speech. *Id*. at 19–26. Neither claim has merit.

---

7921, the Countering Antisemitism Act, and whether a witness would "support the kind of legislation that gives us more data, and a mechanism to fight antisemitism?" Committee Hearing, *supra* note 9 at 61.

[17] Protecting Students on Campus Act of 2024, H.R. 7735, 118th Cong. (2024), https://www.congress.gov/bill/118th-congress/house-bill/7735/text.

[18] Protecting Students on Campus Act of 2025, S. 163, 119th Cong. (2025), https://www.congress.gov/bill/119th-congress/senate-bill/163/text.

As an initial matter, the facts do not support any reasonable claim against the Congressional Defendants of jawboning, an infringement on privacy in association rights, or the chilling of speech.  In terms of jawboning, Plaintiffs traffic in hysterics, claiming that "[l]ike a mafia boss during a shakedown, the House Committee's letter firmly reminds Columbia University that it 'receives billions in federal funding,' an existential quantity of money Chairman Tim Walberg is leveraging to subordinate campus officials to his will."  ECF No. 15 at 2.  But that quote in full reads: "Columbia's continued failure to address the pervasive antisemitism that persists on campus is untenable, particularly given that the university receives billions in federal funding."  Decl., Ex. E at 1.  Read without Plaintiffs' misleading context, the reference to funding simply means it is untenable that Columbia receives federal funding while maintaining a pervasively hostile environment for Jewish students, which is a statement of federal antidiscrimination law.  We have truly stepped through the looking glass if the Committee can be found to have violated the First Amendment by expressing its view that Columbia should comply with federal civil rights law.

Coming back through the mirror, Plaintiffs have not alleged that the Committee has made any statement specifying that it is considering stripping Columbia of funding unless Columbia provides the records requested in its February 13 letter.  Nor have Plaintiffs provided any citation for their false assertion that "[t]he Committee admits that its purpose here is to force Columbia University into expelling, suspending, and otherwise punishing students that expressed views critical of Israel."  ECF No. 15 at 26.

As discussed above, the Committee is seeking information as part of an oversight investigation to better inform its legislative decision-making.  And the records it seeks relate to how Columbia is addressing conduct that is alleged to be contributing to a pervasively hostile

environment for Jewish students on campus: "obstruction of Columbia's entrance," "harassment of Jewish students," "assault," "antisemitic acts of vandalism," etc.  Decl., Ex. E at 5.  Among other things, it takes chutzpah to argue that the Committee's efforts to obtain information about how Columbia disciplined students participating in the unlawful occupation of a university building where a custodian was taken hostage and property was damaged somehow infringes Plaintiffs' free speech rights.

Moreover, the Committee does not seek the membership lists of any organization. Rather, it has asked for disciplinary records related to specific antisemitic conduct.  Neither does the Committee even seek records related to events in which there could be any reasonable expectation of privacy.  For example, if one chooses to engage in vandalism, unlawfully occupy a building, harass fellow students, or take a hostage, one cannot assume that one's conduct will remain private.  Nor do Plaintiffs establish any link between the Committee's request for records and any law enforcement or immigration enforcement activity by the Executive Branch.  *See* ECF No. 15 at 25–26.

In any event, Plaintiffs' fears that their privacy of association rights or free speech rights are being infringed or chilled are far too speculative and remote.  Plaintiffs' claims boil down to a fear that *if* Columbia turns documents over to the Committee, and *if* the Committee releases them publicly, and *if* a third-party pieces together the information sufficiently to identify the Plaintiffs, and *if* that third-party decides to harass the Plaintiffs, then their privacy of association rights and free speech rights will be infringed or chilled.  But the October Committee report upon which Plaintiffs claim to base their fears did not release the name of any Columbia student subject to the school's disciplinary process, and Plaintiffs do not cite any external evidence of any Columbia student being publicly identified for the first time due to the report.  A First

23

Amendment injury of this sort requires demonstrating a "reasonable probability that the *compelled disclosure* ... will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Buckley v. Valeo*, 424 U.S. 1, 74 (1976) (emphasis added). Not only is the potential for harm too attenuated, but the Committee has not utilized compulsory process. Further, the "release of information to the Congress does not constitute 'public disclosure,' … [and] courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties." *Exxon Corp. v. FTC*, 589 F.2d 582, 589 (D.C. Cir. 1978). Finally, Plaintiffs must demonstrate that protected First Amendment speech would be chilled. To the extent that they would be deterred from harassing Jewish students, engaging in vandalism or assault, or occupying buildings, to give a few relevant examples, that would not be a cognizable injury.

Moreover, the Speech or Debate Clause bars any First Amendment claim against the Congressional Defendants. The Supreme Court in *Eastland* rejected an organization's argument that a Congressional subpoena's purpose was to "'harass, chill, punish, and deter' [it] in the exercise of [its] First Amendment rights," explaining that such a claim "ignores the absolute nature of the speech or debate protection and our cases which have broadly construed that protection." *Eastland*, 421 U.S. at 509–10 (citation and footnote omitted). More recently, a court rejected the application of jawboning to a Member of Congress. In *Ass'n of Am. Physicians & Surgeons*, plaintiffs alleged that letters from Congressman Schiff to Google and Facebook requesting information regarding the actions the companies had taken to address inaccurate and misinformation about vaccines were jawboning and lacked any legislative purpose because they "were intended to put the technology companies on notice that they would need to comply with Congressman Schiff's position or risk his undertaking [adverse] legislative

action." 518 F. Supp. 3d at 510 (quotation marks and citation omitted).  The court held that the Congressman's "information gathering letters constitute protected legislative acts" and that "Supreme Court and D.C. Circuit precedent make clear that investigating and information gathering enjoy protection under the Clause." *Id.* at 518.[19]

*Third*, Plaintiffs appear to allege that Columbia will violate the First Amendment if it complies with the Committee's request.  *See* ECF No. 15 at 19.  While this claim fails for many of the reasons explained above, it suffers from another flaw.  Columbia's voluntary decision to produce records to the Committee does not transform the private university into a state actor for First Amendment purposes.  Columbia has no legal obligation to respond to the Committee's letter.  But even if that were not the case, in the Fourth Amendment context, just because a private entity "must respond to the government's inquiries and requests for information does not transform it into an agent of the government." *United States v. Raheja*, No. 19-CR-559, 2020 WL 7769725, at *3 (N.D. Ohio Dec. 30, 2020).  Indeed, "[t]he production of files in a corporation's possession and control in response to a valid government subpoena … is not corporate conduct governed … by the Fourth Amendment … Nor does corporate compliance with a government subpoena transform the complying entity into a government agent." *United States v. Shkreli*, No. 15-CR-637, 2017 WL 3608252, at *6 (E.D.N.Y. May 16, 2017).  If responding to a subpoena does not transform a private entity into a state actor, then Columbia is not one when it voluntarily responds to a non-compulsory letter from the Committee.

---

[19] Even if the Committee's February 13 letter constitutes jawboning, Plaintiffs still cannot prevail.  The Committee is "immune from liability for their actions within the 'legislative sphere,' ... even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Eastland*, 421 U.S. at 510 (citation omitted).

## II.     Plaintiffs Have Failed To Establish a Likelihood of Irreparable Harm

A plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.  The injury cannot be "remote nor speculative," but rather must be "actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  Further, a plaintiff must provide evidentiary support of irreparable harm; bare allegations and conclusory statements are insufficient. *See id.* at 118–20.  Here, Plaintiffs' irreparable harm claims fail for many reasons.

*First*, as explained in Section I.A above, Plaintiffs have failed to specifically allege that Columbia has disciplinary records of theirs relating to any of the eleven incidents in question or even that they were present at any of them.  That, by itself, makes Plaintiffs' claims of harm too remote and speculative.  Relatedly, given that Plaintiffs demand the vastly overbroad remedy that Columbia be "enjoined from providing any student records," ECF No. 18 at ¶ 1, as opposed to just Plaintiffs' own records, it is unclear how the disclosure of other students' records would "imminently" harm Plaintiffs.

*Second*, Plaintiffs fail to allege any facts showing that the Committee will do anything with their records, even if it has them, and that the Committee will take that action "imminently". *Cf. Utica Mut. Ins. Co. v. INA Reinsurance Co.*, No. 12-CV-00194, 2012 WL 12874471, at *5 (N.D.N.Y. Nov. 6, 2012) (no irreparable harm because plaintiff presented "nothing more than conclusory statements that … it has privileged information").  In any case, the "release of information to the Congress does not constitute 'public disclosure,' … [and] courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties." *Exxon*, 589 F.2d at 589.

*Third*, Plaintiffs claim that "the injuries for which the Plaintiff seeks the Court's relief concern their right to free speech and irreparable harm is presumed if the constitutional injury is proven." ECF No. 15 at 16 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) for the proposition that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Plaintiffs fail to mention that in *Eastland*, the plaintiff also claimed that the subpoena violated numerous First Amendment rights, and that the Supreme Court rejected that claim because it "ignores the absolute nature of the speech or debate protection and our cases which have broadly construed that protection." 421 U.S. at 509–10.

## III.    The Balance of Equities and Public Interest Favor Congressional Defendants

In weighing the balance of equities and public interest, because Congressional Defendants are the federal government, these last two factors "merge." *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court "must balance the competing claims of injury," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

While Plaintiffs fail to show that they would suffer any harm, much less irreparable harm, without a preliminary injunction, such an injunction would hamper the Committee's ongoing investigation, inflicting the harm of loss of information. *See Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 71 (D.D.C. 2008). In this case, such harm could have additional consequences. As outlined by the Committee's letters to Columbia and its October 30 report, the rise of antisemitism has had dire physical and emotional effects on Jewish students, both at Columbia and other campuses. Any delay in Congress's investigation to "give a realistic view of a troubled school and the lack of administrative efforts to rectify the multitudinous problems there," *Doe*, 412 U.S. at 308–09 (quotation marks omitted), could

27

impact the timing of any eventual legislative remedy, leading to unnecessary injuries to and discrimination against Jewish students.

There is also a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress," and "the investigatory power is one that the courts have long perceived as essential to the successful discharge of the legislative responsibilities of Congress." *Exxon Corp.*, 589 F.2d at 594.  Even in the less-pressing context of administrative investigations, which derive from statutory authority (while Congress's power of investigation is derived from the Constitution itself), there is "a strong public interest in having [such] investigations proceed 'expeditiously and without impediment.'" *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resol. Tr. Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (citation omitted).  The public interest in expeditious and unimpeded Congressional investigations is even more compelling.  *Cf. Exxon Corp.*, 589 F.2d at 593–94.  The requested relief would, itself, improperly usurp the Committee's constitutional power to investigate and conduct oversight.  No outside entity or individuals, including Plaintiffs, have a right to challenge "[t]he wisdom of the congressional approach or methodology." *Eastland*, 421 U.S. at 509.

## CONCLUSION

The Plaintiffs' motion for a temporary restraining order and preliminary injunction should be denied.

28

Respectfully submitted,

*/s/ Matthew Berry*
MATTHEW BERRY
   *General Counsel*
TODD B. TATELMAN
   *Deputy General Counsel*
ANDY T. WANG
   *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
matthew.berry@mail.house.gov

*Counsel for Congressional Defendants*

March 24, 2025

**CERTIFICATE OF SERVICE**

I certify that on March 24, 2025, I caused the foregoing document to be filed via this

Court's CM/ECF system, which I understand caused service on all registered parties.  I further

certify that the foregoing document contains 8,749 words, which is compliant with Local Civil

Rule 7.1(c).


/s/ *Matthew Berry*
Matthew Berry