UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAHMOUD KHALIL, *et al.,*

                              Plaintiffs,

              v.

COMMITTEE ON EDUCATION AND
WORKFORCE, U.S. HOUSE OF
REPRESENTATIVES, *et al.*,

                              Defendants.

---

No. 25 Civ. 2079 (AS)

**EXECUTIVE BRANCH DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:    (212) 637-2695
*Attorney for Executive Branch Defendants*

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

JEFFREY OESTERICHER
*Assistant United States Attorney*
        - Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................3

   I.    COMMUNICATIONS WITH COLUMBIA REGARDING FEDERAL FUNDING .........3

   II.   THE CURRENT ACTION ........................................................................8

LEGAL STANDARD ........................................................................................9

ARGUMENT ..................................................................................................10

   I.    PLAINTIFFS LACK ARTICLE III STANDING ............................................10

      A.   Plaintiffs Fail to Establish a Cognizable Injury-in-fact ...............11

      B.   Plaintiffs Fail to Establish Causation or Redressability................14

   II.   A TEMPORARY RESTRAINING ORDER IS UNWARRANTED ...............................16

      A.   Plaintiffs Fail to Demonstrate Irreparable Harm........................17

      B.   Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits ........20

      C.   The Balance of Equities and Public Interest Weigh in Favor of the Executive Branch Defendants........................................................22

CONCLUSION................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdel-Razeq v. Alvarez & Marsal, Inc.,*
No. 14 Civ. 5601 (HBP), 2015 WL 7017431 (S.D.N.Y. Nov. 12, 2015) ...............................23

*Agudath Israel of Am. v. Cuomo,*
983 F.3d 620 (2d Cir. 2020)..............................................................................................17

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.,*
766 F.2d 715 (2d Cir. 1985)...............................................................................................18

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)............................................................................................................21

*B&L Prods., Inc. v. Newsom,*
104 F.4th 108 (9th Cir. 2024).............................................................................................20

*Bloch v. Bouchey,*
No. 23 Civ. 209 (CR), 2023 WL 9058377 (D. Vt. Dec. 28, 2023) ....................................17, 23

*Boaz Hous. Auth. v. United States,*
141 Fed. Cl. 74 (2018)........................................................................................................22

*Branch of Citibank, N.A. v. De Nevares,*
74 F.4th 8 (2d Cir. 2023)......................................................................................................9

*Church of American Knights of KKK v. Kerik,*
356 F.3d 197 (2d Cir. 2004)...............................................................................................13

*Church v. Biden,*
573 F. Supp. 3d 118 (D.D.C. 2021).....................................................................................19

*Citibank, N.A. v. Citytrust,*
756 F.2d 273 (2d Cir. 1985)..........................................................................................17, 18

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ....................................................................................... 11, 14, 15, 16

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
596 U.S. 212 (2022)............................................................................................................22

*Doninger v. Niehoff,*
527 F.3d 41 (2d Cir. 2008)..................................................................................................17

*Estate of Landers v. Leavitt,*
    545 F.3d 98 (2d Cir. 2009)........................................................................21

*FDA v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) ....................................................................... 11, 14

*Flast v. Cohen,*
    392 U.S. 83 (1968) ...................................................................................16

*Gazzola v. Hochul,*
    88 F.4th 186 (2d Cir. 2023)......................................................................10

*Geller v. de Blasio,*
    613 F. Supp. 3d 742 (S.D.N.Y. 2020).......................................................10

*Gill v. Whitford,*
    585 U.S. 48 (2018) ...................................................................................15

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007).................................................................17, 20

*Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency,*
    77 F.3d 26 (2d Cir. 1996)..........................................................................21

*Hankard v. Town of Avon,*
    126 F.3d 418 (2d Cir. 1997)................................................................19, 22

*Hatfill v. Gonzales,*
    519 F. Supp. 2d 13 (D.D.C. 2007) .............................................................1

*Jermosen v. Coughlin,*
    878 F. Supp. 444 (N.D.N.Y. 1995)............................................................22

*Kuklachev v. Gelfman,*
    629 F. Supp. 2d 236 (E.D.N.Y. 2008).......................................................18

*Laird v. Tatum,*
    408 U.S. 1 (1972) ....................................................................................14

*Lewis v. Casey,*
    518 U.S. 343 (1996) .................................................................................15

*Local 1814, Int'l Longshoreman's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n,*
    965 F.2d 1224 (2d Cir. 1992)....................................................................10

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)...............................................................................9, 11

*M.S. v. Brown*,
  902 F.3d 1076 (9th Cir. 2018) ................................................................................16

*Manning v. City of New York*,
  No. 24 Civ. 4747 (LGS), 2024 WL 3377997 (S.D.N.Y. July 11, 2024).............................9, 10

*Munaf v. Geren*,
  553 U.S. 674 (2008) ................................................................................10

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ................................................................................passim

*Nachshen v. E. 14 Realty, LLC*,
  18 Civ. 8304 (AJN), 2019 WL 5460787 (S.D.N.Y. Oct. 9, 2019) ................................19

*National Rifle Association v. Vullo*,
  602 U.S. 175 (2024) ................................................................................20

*New York v. United States Dep't of Homeland Sec.*,
  969 F.3d 42 (2d Cir. 2020) ................................................................17, 18

*Nieves v. Bartlett*,
  587 U.S. 391 (2019) ................................................................................21

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................10, 22

*Pennhurst State School and Hospital v. Halderman*,
  451 U.S. 1 (1981) ................................................................................22

*Penthouse Intern., Ltd. v. McAuliffe*,
  702 F.2d 925 (11th Cir. 1983) ................................................................................20

*Raines v. Byrd*,
  521 U.S. 811 (1997) ................................................................................10

*Riddick v. Maurer*,
  730 F. App'x 34 (2d Cir. 2018) ................................................................................1

*Rodriguez ex rel. Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999) ................................................................................17

*Rothstein v. City of New York*,
  18 Civ. 5106 (VEC), 2019 WL 977878 (S.D.N.Y. Feb. 28, 2019) ................................1

*Shain v. Ellison*,
  356 F.3d 211 (2d Cir. 2004) ................................................................................19

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................................................16

*State v. Musk*,
   No. 25 Civ. 429 (TSC), 2025 WL 520583 (D.D.C. Feb. 18, 2025) ........................19

*Superb Motors Inc. v. Deo*,
   No. 23 Civ. 6188 (OEM) (ST), 2023 WL 5952145 (E.D.N.Y. Aug. 25, 2023) .......19

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .................................................................................. 9, 10, 11

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ................................................................................................16

*We The Patriots USA, Inc. v. Hochul*,
   17 F.4th 266 (2d Cir. 2021) ...................................................................................10

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................................................10

Defendants Pamela Bondi, in her official capacity as United States Attorney General; Linda McMahon, in her official capacity as Secretary of the United States Department of Education ("ED"); Leo Terrell, in his official capacity as the head of the Department of Justice Taskforce to Combat Anti-Semitism; Sean Keveney, in his official capacity as Acting General Counsel for the United States Department of Health and Human Services ("HHS"); and Josh Gruenbaum, in his official capacity as the Federal Acquisition Service Commissioner of the General Services Administration ("GSA") (together, the "Executive Branch Defendants")[1] submit this Memorandum of Law in Opposition to Plaintiffs' Motion for a Temporary Restraining Order (Dkt. No. 17).[2]

## PRELIMINARY STATEMENT

Columbia University explicitly acknowledged that parts of its campus became a hostile environment for Jewish students and others following the Hamas terrorist attacks on Israel on October 7, 2023. Pursuant to President Trump's Executive Order, "Additional Measures to Combat Anti Semitism," on February 3, 2025, a multi-agency Taskforce to Combat Anti-Semitism was created. In recent months, the Taskforce has investigated Columbia University for possible violations of antidiscrimination laws stemming from the University's failure to protect students and faculty from antisemitic violence and harassment. On March 13, 2025, GSA, HHS, and ED

---

[1] Plaintiffs purport to sue the Executive Branch Defendants in their official and individual capacities, *see generally* Am. Compl., and further seek to enjoin them in both capacities, *see* Dkt. No. 18. At this time, the undersigned represents the Executive Branch Defendants only in their official capacities because the relief sought for the alleged infringement of Plaintiffs' constitutional rights "can only be obtained from government officers in their official capacities." *See, e.g.*, *Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 27 (D.D.C. 2007); *see also Rothstein v. City of New York*, 18 Civ. 5106 (VEC), 2019 WL 977878, at *6 n.8 (S.D.N.Y. Feb. 28, 2019).

[2] The Court should construe Plaintiffs' motion as one for a preliminary injunction because notice and an opportunity to respond was given to the Executive Branch Defendants, and Plaintiffs' motion seeks much of the same relief requested in their underlying complaint. *See Riddick v. Maurer*, 730 F. App'x 34, 36–37 (2d Cir. 2018).

sent Columbia University ("Columbia" or the "University") a letter (the "March 13 Letter") outlining necessary steps the University must take to protect students and faculty from antisemitic violence and harassment, as a precondition for formal negotiations regarding the University's continued financial relationship with the United States Government.

On March 19, 2025, Plaintiffs, a group of University students, filed an Amended Complaint in this matter to add the Executive Branch Defendants, alleging that the March 13 Letter has had the effect of chilling their speech. Plaintiffs seek a temporary restraining order enjoining the Executive Branch Defendants from "freezing or withholding any funds from Columbia or taking further measures to coerce Columbia into complying with" the March 13 Letter's "demands" for the pendency of this litigation. *See* Dkt. No. 18.

This Court should deny Plaintiffs' request for a temporary restraining order for several fundamental reasons. As a threshold matter, Plaintiffs lack standing. Plaintiffs have not suffered a cognizable Article III injury—they have not identified any concrete and imminent harm they will likely suffer—and they fail to sufficiently allege causation or redressability. Moreover, even if this Court were to conclude that Plaintiffs have standing to seek preliminary injunctive relief, none of the injunctive-relief factors weighs in favor of granting that relief. *First*, Plaintiffs have not shown that they face imminent irreparable harm. In particular, they have not identified any protected speech that is contemplated, let alone at risk of being immediately censored as a result of the actions of the Executive Branch Defendants. *Second*, Plaintiffs are unlikely to succeed on the merits of their claims against the Executive Branch Defendants because they have failed to state a cognizable First Amendment claim. *Finally*, in light of the strong public policy in favor of enforcing antidiscrimination laws, both the equities and the public interest weigh against granting

the requested relief. For all these reasons, Plaintiffs' motion for a temporary restraining order should be denied.

## BACKGROUND

### I.    Communications with Columbia Regarding Federal Funding

On February 3, 2025, the United States Department of Justice ("DOJ") announced the formation of a multi-agency Task Force to Combat Anti-Semitism, coordinated through DOJ's Civil Rights Division. Press Release, Justice Department Announces Formation of Task Force to Combat Anti-Semitism (February 3, 2025), *available at* https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism. One month later, on March 3, 2025, GSA sent a Memorandum to Columbia, stating that it was "leading a Task Force comprehensive review of its Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment, including Columbia University." *See* Declaration of Jeffrey Oestericher ("Oestericher Decl.") ¶ 2 & Ex. 1. GSA explained that this action was in response to concerns regarding recent antisemitism at the University. The Memorandum highlighted that, "[a]ccording to the U.S. House of Representatives Staff Report on Antisemitism, 'Columbia University explicitly acknowledged that its campus became a hostile environment in violation of Title VI [of the Civil Rights Act of 1964]' following the Hamas terrorist attacks on Israel on October 7, 2023." *Id*. at 1. The Memorandum further referenced an "extensive pattern of . . . failures to enforce University rules to address antisemitic conduct," and findings by a Columbia task force that Israeli students were frequently targeted on the basis of their national origin, and "[v]isibly observant [Jewish] students, like ones who wear traditional head coverings, have been frequently met with extreme hostility." *Id*. at 2 n. 1 (alterations in original). GSA attached a schedule of contracts for which it was "ready to work with each appropriate contracting agency on the potential issuance of Stop Work Orders,"

and advised that "alongside our fellow agencies, we will also be reviewing the greater than $5 billion of active grants between Columbia University, its affiliates and the Federal Government for potential compliance concerns, false claims or other infractions." *Id.* at 2.[3]

The Executive Branch Defendants had ample cause for concern that the University had become a hostile environment for certain students, as documented in media reports. For example, on October 7, 2024, Jewish students who set up an art installation honoring victims of Hamas were harassed. *See* Dkt. No. 15-1 at 3. In November 2024, students marched on Columbia's center for Jewish life, harassed students entering the building, and chanted "long live the Intifada." *Id.* In December 2024, a Jewish student carrying an Israeli flag was punched in the face. *Id.* And in January 2025, students disrupted an Israeli history class, distributing flyers stating "THE EMEMY WILL NOT SEE TOMORROW" and depicting a boot stepping on a Star of David with the words "CRUSH ZIONISM." *Id.* at 4.

On March 7, 2025, DOJ, HHS, ED, and GSA announced the "immediate cancellation of approximately $400 million in federal grants and contracts to Columbia University due to the school's continued inaction in the face of persistent harassment of Jewish students." Press Release, DOJ, HHS, ED, and GSA Announce Initial Cancellation of Grants and Contracts to Columbia University Worth $400 Million (March 7, 2025), *available at* https://www.hhs.gov/about/news/2025/03/07/doj-hhs-ed-gsa-announce-initial-cancellation-

---

[3] That same day, HHS, ED, and GSA publicly announced, "a comprehensive review of Columbia University's federal contracts and grants in light of ongoing investigations for potential violations of Title VI of the Civil Rights Act." Press Release, *HHS, ED, and GSA Announce Additional Measures to End Anti-Semitic Harassment on College Campuses* (March 3, 2025), *available at* https://www.hhs.gov/about/news/2025/03/03/hhs-ed-gsa-announce-additional-measures-end-anti-semitic-harassment-college-campuses.html. The announcement noted that this review was triggered by "Columbia's ongoing inaction in the face of relentless harassment of Jewish students." *Id.*

grants-contracts-columbia-university-worth-400-million.html. On March 13, 2025, GSA, HHS, and ED sent a letter to Columbia and, at the request of its counsel, outlined the "steps that [the Government] regard[s] as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government." March 13, 2025, Letter, Dkt. No. 15-2 ("March 13 Letter" or "Mar. 13 Ltr."). The letter enumerated nine such steps:

- **Enforce existing disciplinary policies**. The University must complete disciplinary proceedings for Hamilton Hall and encampments. Meaningful discipline means expulsion or multi-year suspension.

- **Primacy of the president in disciplinary matters**. Abolish the University Judicial Board (UJB) and centralize all disciplinary processes under the Office of the President. And empower the Office of the President to suspend or expel students with an appeal process through the Office of the President.

- **Time, place, and manner rules.** Implement permanent, comprehensive time, place, and manner rules to prevent disruption of teaching, research, and campus life.

- **Mask ban.** Ban masks that are intended to conceal identity or intimidate others, with exceptions for religious and health reasons. Any masked individual must wear their Columbia ID on the outside of their clothing (this is already the policy at Columbia's Irving Medical Center).

- **Deliver plan to hold all student groups accountable.** Recognized student groups and individuals operating as constituent members of, or providing support for, unrecognized groups engaged in violations of University policy must be held accountable through formal investigations, disciplinary proceedings, and expulsion as appropriate.

- **Formalize, adopt, and promulgate a definition of antisemitism.** President Trump's Executive Order 13899 uses the IHRA definition.[4] Anti-"Zionist" discrimination against Jews in areas unrelated to Israel or Middle East must be addressed.

- **Empower internal law enforcement.** The University must ensure that Columbia security has full law enforcement authority, including arrest and removal of agitators who foster an

---

[4] Executive Order 13899 references an International Holocaust Remembrance Alliance ("IHRA") definition: "Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities." Executive Order 13899, Combating Anti-Semitism (December 11, 2019), *available at* https://www.govinfo.gov/content/pkg/DCPD-201900859/pdf/DCPD-201900859.pdf.

unsafe or hostile work or study environment, or otherwise interfere with classroom instruction or the functioning of the university.

- **MESAAS Department – Academic Receivership.** Begin the process of placing the Middle East, South Asian, and African Studies department under academic receivership for a minimum of five years. The University must provide a full plan, with date certain deliverables, by the March 20, 2025, deadline.

- **Deliver a plan for comprehensive admissions reform.** The plan must include a strategy to reform undergraduate admissions, international recruiting, and graduate admissions practices to conform with federal law and policy.

Mar. 13 Ltr. at 1–2 (emphasis omitted). The letter required documented compliance by March 20, 2025.

On March 21, 2025, Columbia released a memorandum entitled, "Advancing Our Work to Combat Discrimination, Harassment and Antisemitism at Columbia" (the "March 21 Memo"), *available at* https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf. In the memo, Columbia announced various actions, many of which align with the steps in the March 13 memo. For example, the University stated that "[s]tudents who violated our rules during Columbia's first encampment or at Hamilton Hall have been suspended, expelled, or had their degrees temporarily revoked. Disciplinary proceedings against other encampment participants are ongoing." *Id.* at 1. In certain areas in which the March 13 Letter requested adoption or implementation of rules or standards, the March 21 Memo articulated such standards. For example, with respect to "time, place, and manner restrictions," the March 21 Memo "clarif[ies] that . . . protests in academic buildings, and other places necessary for the conduct of University activities, are generally not acceptable under the Rules of University Conduct because of the likelihood of disrupting academic activities." *Id.* at 1. Columbia also stated that relevant policies

will "incorporate the definition of antisemitism recommended by Columbia's Antisemitism Taskforce in August 2024." *Id.* at 2.[5]

Certain actions announced in the March 21 Memo differ from the requirements in the March 13 Letter. For example, the March 21 Memo did not abolish the UJB, but announced that it would "be situated within and overseen by the Office of the Provost, who reports to the President of Columbia." *Id.* at 1. With respect to mask restrictions, the March 21 Memo stated that "face masks or face coverings are not allowed for the purpose of concealing one's identity in the commission of violations of University policies or state, municipal, or federal laws," but "are always allowed for religious or medical reasons," *id.* at 2. Moreover, while the March 13 Letter requested that the MESAAS Department be placed under academic receivership, the March 21 Memo stated that Columbia is promoting a "Senior Vice Provost . . . with a focus on promoting excellence in Regional Studies" who will "conduct a thorough review of the portfolio of programs in regional areas across the University, starting immediately with the Middle East. This review will include the Center for Palestine Studies; the Institute for Israel and Jewish Studies; Middle Eastern, South Asian, and African Studies; the Middle East Institute; the Tel Aviv and Amman global hubs; the School of International and Public Affairs Middle East Policy major; and other University programs focused on the Middle East." *Id.* at 3.

---

[5] This definition referenced in Columbia's March 21 Memo states: "Antisemitism is prejudice, discrimination, hate, or violence directed at Jews, including Jewish Israelis. Antisemitism can manifest in a range of ways, including as ethnic slurs, epithets, and caricatures; stereotypes; antisemitic tropes and symbols; Holocaust denial; targeting Jews or Israelis for violence or celebrating violence against them; exclusion or discrimination based on Jewish identity or ancestry or real or perceived ties to Israel; and certain double standards applied to Israel." Task Force on Antisemitism, *Report #2, Columbia University Student Experiences of Antisemitism and Recommendations for Promoting Shared Values and Inclusion* (August 2024), at 6, *available at* https://president.columbia.edu/sites/default/files/content/Announcements/Report-2-Task-Force-on-Antisemitism.pdf.

## II.     The Current Action

Plaintiffs filed their Complaint in this matter on March 13, 2025, against, *inter alia*, Columbia, its President, its Trustees (together, the "University Defendants"), the U.S. House Committee on Education and Workforce (the "Committee"), and the Committee Chairman. *See* Dkt. No. 1. On March 19, 2025, Plaintiffs filed an Amended Complaint, adding the Executive Branch Defendants. *See* Dkt. No. 13 ("Amended Complaint" or "Am. Compl.").

The allegations in the Amended Complaint relating to the Executive Branch Defendants are limited and focused on the March 13 Letter. *See* Am. Compl. ¶¶ 56–71. Plaintiffs highlight four of the steps identified in the March 13 letter—those relating to enforcing disciplinary policies regarding Hamilton Hall and encampments, *id.* ¶ 65; placing the MESAAS department into a receivership *id.* ¶ 66; banning masks intended to conceal identity or intimidate others, *id.* ¶ 67; and adopting a definition of antisemitism, *id.* ¶ 68. While the Amended Complaint repeatedly and conclusorily alleges that the Executive Branch Defendants have enlisted Columbia to "punish and suppress" speech, *see, e.g.*, Am. Compl. ¶¶ 1, 5, 19, 69, 102, 114, Plaintiffs do not allege a single, concrete instance of the Executive Branch Defendants referencing protected speech at all, to say nothing of targeting such speech by any of the Plaintiffs—either directly or through Columbia. Instead, Plaintiffs rely on vague and threadbare allegations that the March 13 Letter has chilled their speech and speech-related activities. *See, e.g.*, Am. Compl. ¶¶ 2, 18, 114. Based on these allegations, Plaintiffs assert a single claim against the Executive Branch Defendants, alleging that the March 13 Letter "chill[s] associational and speech rights" and thus violates the First Amendment "on its face." *Id.* ¶ 114; *see also id.* ¶¶ 92–114.[6]

---

[6] The Amended Complaint pleads two addition claims, which are asserted solely against the University Defendants. Claim II alleges that Columbia's compliance with the Government's "demands" violates the First Amendment, Am. Compl. ¶¶ 115–24, and Claim III alleges that Columbia has breached its contract with Plaintiffs, *id.* ¶¶ 125–35.

On the same day that Plaintiffs filed their Amended Complaint, they also filed a Motion for a Temporary Restraining Order, Dkt. No. 17, and accompanying Memorandum of Law in Support of Motion for Temporary Restraining Order, Dkt. No. 15 ("Br.").[7] As relevant to the Executive Branch Defendants, Plaintiffs' Proposed Order seeks to preliminarily enjoin them,[8] for the pendency of this litigation, from "freezing or withholding any funds from Columbia or taking further measures to coerce Columbia into complying with the demands in [the] March 13 Letter." Dkt. No. 18.[9]

## LEGAL STANDARD

Before addressing the merits of a temporary restraining order application, "the Court must evaluate whether it has subject matter jurisdiction." *Manning v. City of New York*, No. 24 Civ. 4747 (LGS), 2024 WL 3377997, at *2 (S.D.N.Y. July 11, 2024) (citing *Branch of Citibank, N.A. v. De Nevares*, 74 F.4th 8, 15 (2d Cir. 2023)). Plaintiffs bear the burden of demonstrating subject-matter jurisdiction, including Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Because "'standing is not dispensed in gross,'" "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*,

---

[7] Plaintiffs filed their Brief and supporting declarations ex parte, with a redacted version of the Brief publicly available. The Executive Branch Defendants do not have access to the unredacted filings at this time, and Plaintiffs have represented that they will not provide them. *See* Dkt. No. 16. The Executive Branch Defendants cite to the publicly available motion papers throughout this opposition brief and premise their arguments on the information contained therein.

[8] The Proposed Order seeks to enjoin the "Taskforce Defendants," which is an undefined term that the Executive Branch Defendants assume refers to them.

[9] The Proposed Order also seeks to enjoin all defendants from releasing "in any form" identifying information of "any Columbia or Barnard student included in any records or materials such entities have already received."

594 U.S. 413, 431 (2021)). And the "standing inquiry [must be] especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997). After all, "[f]ederal courts do not exercise general legal oversight of the Legislative and Executive Branches." *TransUnion*, 594 U.S. at 423–24.

Issuance of a temporary restraining order "is an 'extraordinary and drastic remedy' that is 'never awarded as of right.'" *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). As such, it may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain this relief, a plaintiff "'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023) (quoting *Winter*, 555 U.S. at 20); *see also Geller v. de Blasio*, 613 F. Supp. 3d 742, 746 (S.D.N.Y. 2020) ("The standard for determining whether to grant a motion for a temporary restraining order is the same as used in evaluating a motion for a preliminary injunction." (citing *Local 1814, Int'l Longshoreman's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n*, 965 F.2d 1224, 1228 (2d Cir. 1992))). When "the Government is the opposing party," the assessment of the balance of the equities and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Plaintiffs Lack Article III Standing

As a threshold matter, the Court should deny Plaintiffs' request for a temporary restraining order because they lack standing. *See, e.g., Manning*, 2024 WL 3377997, at *2. At its "irreducible constitutional minimum," Article III standing requires a plaintiff, as the party invoking the Court's

jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, and not conjectural or hypothetical, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560; *see also Murthy*, 603 U.S. at 44.

### A.    Plaintiffs Fail to Establish a Cognizable Injury-in-fact

With regard to the first standing requirement—injury-in-fact—Plaintiffs must allege harm that is "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not come to pass, it must be "*certainly impending*"; "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and alterations omitted). And it must be "concrete—that is, real, and not abstract." *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted); *see also Murthy*, 603 U.S. at 43, 58 (holding, in the First Amendment context, that "because the plaintiffs request forward-looking relief, they must face a real and immediate threat of repeated injury" (internal quotation marks omitted)). Plaintiffs have failed to meet that burden here.

The Amended Complaint and Plaintiffs' motion papers do not establish a concrete, imminent harm Plaintiffs themselves will suffer as a result of any one of the alleged actions attributable to the Executive Branch Defendants. Importantly, *none* of those actions target protected speech at all, but instead focus on unlawful conduct, like harassment. Plaintiffs assert that their speech is nonetheless chilled by these contemplated reforms; but those concerns are speculative and ultimately insufficient to satisfy Article III.

Plaintiffs first note that the March 13 Letter referenced student discipline. Br. at 8. But Plaintiffs do not allege they would be directly impacted by the letter's request that the University "[e]nforce *existing* disciplinary policies [and] *complete* disciplinary proceedings for Hamilton Hall

and encampments." Mar. 13 Ltr. at 1 (emphases added). Nor do they even attempt to explain why Columbia's enforcement of its existing disciplinary policies—geared toward preventing harassment, and complying with federal law (including Title VI)—would affect any protected expression, let alone the intended speech of these Plaintiffs.[10]

Plaintiffs next turn to the potential abolition of the UJB. But that is even more speculative. Plaintiffs broadly and conclusorily assert that "[i]f the UJB is abolished, any neutral or independent review of disciplinary actions would be eliminated, curtailing procedural protections for students and faculty accused of misconduct." Br. at 8. To start, Plaintiffs' concern that certain disciplinary measures *might* follow *if* a certain administrative process is scrapped does not give rise to an actual or imminent First Amendment harm. This is especially so because there are no allegations that any of the Plaintiffs are currently or anticipate being subject to future disciplinary actions before the UJB or otherwise. And in all events, Columbia's March 21 Memo responding to the March 13 Letter outlined changes to the UJB rather than its abolition. Mar. 21 Memo at 1.

Next are Plaintiffs allegations about a potential "academic receivership" for the MESAAS department. For one, Plaintiffs do not allege that this step would involve censorship of any stripe. And more fundamentally, even if it did, Plaintiffs have not offered any allegations establishing that they have standing to raise that concern. The Amended Complaint does not allege that any of the Plaintiffs work for that department, have concrete plans to study with that department, or would otherwise be impacted by changes to that department, let alone that they would be immediately harmed by a "receivership." Additionally, Columbia's March 21 Memo does not place the

---

[10] Even if Plaintiffs were to make such an assertion, it is unclear what discipline any of the Plaintiffs received and whether the conduct which formed the basis of the speech constituted protected speech.

department in receivership, rendering any harm Plaintiffs could identify from a potential receivership even more hypothetical.

Plaintiffs also fail to establish any actual or imminent harm to themselves from the Government's requirements relating to mask wearing, the adoption of a definition of antisemitism, or the other preconditions in the March 13 Letter.

With regard to masks, bans on face coverings are well-established measures to help guard against harassment and intimidation (among other things). *See, e.g.*, *Church of American Knights of KKK v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004). Plaintiffs have not identified a cognizable constitutional interest that is implicated by the contemplated mask-reform here. Moreover, Plaintiffs do not allege that, in the absence of the March 13 Letter, they would want to protest with a face covering in order to conceal their identity. And here, the University's March 21 Memo makes Plaintiffs' concerns even more speculative, given that it restricts mask wearing only "for the purpose of concealing one's identity in the commission of violations of University policies or state, municipal, or federal laws." March 21 Memo at 2.

Similarly, Plaintiffs' vague and conclusory assertions that an adoption of a definition of antisemitism "would compel Columbia to enforce speech restrictions that apply to only one particular foreign country," *id.*, is unfounded and speculative. Nor do Plaintiffs identify any specific protected speech that would be barred by the campus adopting such a definition. Plaintiffs take issue with the definition of antisemitism adopted by President Trump; but those complaints are not only baseless, but also irrelevant—given that Columbia adopted a different one on March 21. March 21 Memo at 2.

Finally, to the extent Plaintiffs attempt to establish the existence of imminent harm by asserting that government action "has left students afraid to speak, afraid to organize, and afraid

to participate in activism," Br. at 14–15, these assertions are completely unsupported, and not specifically tied to anything in the March 13 Letter or any specific act by any of the Executive Branch Defendants. And even if they were, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972); *cf. Murphy*, 603 U.S. at 73 ("plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" (quoting *Clapper*, 568 U.S. at 416)). In the absence of allegations of specific present objective harm or a threat of specific future harm, Plaintiffs cannot satisfy Article III standing. *Laird*, 408 U.S. at 13–14.

### B. Plaintiffs Fail to Establish Causation or Redressability

Plaintiffs also fail to establish the necessary element of causation—that any alleged harm or risk of future harm is traceable to the Executive Branch Defendants. *See Alliance*, 602 U.S. at 380. Plaintiffs allege their First Amendment rights will be impacted through actions taken by Columbia. Therefore, to establish standing, Plaintiffs must show that the University "will likely react in predictable ways" to the March 13 Letter. *See Murthy*, 603 U.S. at 57–58 (holding that plaintiffs suing social media platforms for suppressing speech in response to government pressure were required to show the platforms' likely response). But Columbia's March 21 Memo suggests that the University may not implement all of the steps in the March 13 Letter. Plaintiffs have also not shown a likelihood that any chilling of protected campus speech is attributable to the Executive Branch Defendants specifically, as opposed to independent considerations of the University.[11]

---

[11] Plaintiffs' motion is most obviously deficient with respect to Executive Branch Defendants Bondi and Terrell, as the Amended Complaint appears to be focused on the March 13 Letter, which was only signed by individuals from GSA, HHS, and ED. *See Murthy*, 603 U.S. at 69 (rejecting plaintiffs' treatment of the government defendants as a "monolith" and admonishing courts to confirm that "*each* Government defendant . . . engage[s] in the challenged conduct").

In short, for Plaintiffs to establish causation, they must establish a likelihood that they will want to engage in First Amendment protected action, and they will be chilled from doing so or their ability to do so will be suppressed by the University's action *in response to* the Executive Branch Defendants' pressure. *See Murthy*, 603 U.S. at 70 (holding that a plaintiff in that action lacked standing because he had not established that his future social media posts would likely contain content that the FBI would pressure the platform to remove, and the platform would suppress the post "at least partly" in response to the FBI, rather than its own content-moderation policy). Here, as in *Murthy*, the Plaintiffs cannot "satisfy [their] burden with such conjecture." *Id.*; *see also Clapper*, 568 U.S. at 414 (a "speculative chain of possibilities does not establish that injury based on potential future [action] is certainly impending or is fairly traceable"). In other words, Plaintiffs' conclusory and speculative assertions that the Executive Branch Defendants' communications with Columbia might result in the University taking steps that potentially could impact the Plaintiffs' speech rights at some unspecified future time in some unspecified way are insufficient to establish causation.

Plaintiffs also "have a redressability problem." *Murthy*, 603 U.S. at 46. A sought remedy must "be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018). Indeed, an injunction must be limited to restraining the defendants' conduct towards the particular plaintiffs before the court, and the Supreme Court has consistently disapproved relief that "improper[ly]" "grant[ed]" a remedy beyond what was necessary to provide relief to [the injured parties]." *Lewis v. Casey*, 518 U.S. 343, 360 (1996). But the relief Plaintiffs seek with respect to the Executive Branch Defendants cannot be reconciled with those limitations because it would extend to conduct that has not been sufficiently alleged to have "harmed any plaintiff in this lawsuit, and hence . . . [is] not the proper object of th[e court's] remediation." *Id.* As discussed

above, Plaintiffs seek an order preliminarily enjoining the Executive Branch Defendants from taking *any* measures to ensure that Columbia implements the steps outlined in the March 13 Letter, but that proposed order is not appropriately tailored to the specific speech activities of these Plaintiffs. *See* Dkt. No. 18.

Plaintiffs' proposed injunction would also take the Court beyond the limits of Article III and would require for its enforcement that this Court curtail the Executive Branch's enforcement of antidiscrimination laws on college campuses. "[I]n the context of Article III standing," however, "federal courts must respect their 'proper—and properly limited—role . . . in a democratic society.'" *M.S. v. Brown*, 902 F.3d 1076, 1087 (9th Cir. 2018) (citation omitted); *see also Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) ("The importance of [Article III standing] should not be underestimated as a means of 'defin[ing] the role assigned to the judiciary in a tripartite allocation of power.'" (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968))). According to Plaintiffs, full redress of their purported harms would require the Court to flatly enjoin government officials from taking steps that may be deemed necessary to ensure that educational institutions comply with antidiscrimination laws. If "the law of Article III standing" is to "serve[] to prevent the judicial process from being used to usurp the powers of the political branches," then it must preclude the Court from issuing such broad injunctive relief. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Clapper*, 568 U.S. at 408).

## II.    A Temporary Restraining Order Is Unwarranted

As discussed above, the Court need not consider the merits of Plaintiffs' claim against the Executive Branch Defendants and may deny Plaintiffs' request for a temporary restraining order based on a lack of standing alone. To the extent the Court does reach the merits of Plaintiffs' claim,

however, it should deny their request for a temporary restraining order because each of the *Winter* factors weighs against granting that extraordinary relief.

### A.    Plaintiffs Fail to Demonstrate Irreparable Harm

First, Plaintiffs have not made any showing that they would suffer irreparable harm absent a temporary restraining order enjoining the Executive Branch Defendants. As the Second Circuit has recognized, "perhaps the single most important prerequisite for the issuance of a [temporary restraining order] is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985) (citations omitted). "Irreparable harm is injury that is neither remote nor speculative," *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020), but rather is "actual and imminent," *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). Given the primacy of irreparable harm in the temporary restraining order analysis, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Grand River Enter. Six Nations*, 481 F.3d at 66 (citation and internal quotation marks omitted). Plaintiffs cannot meet that burden.

As an initial matter, Plaintiffs are mistaken that they need not demonstrate irreparable harm because they allege First Amendment violations. *See* Br. at 16. While Plaintiffs are correct that "[t]he loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury," *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (internal quotation marks omitted), they cannot satisfy the irreparable harm requirement merely by invoking the First Amendment, *see Bloch v. Bouchey*, No. 23 Civ. 209 (CR), 2023 WL 9058377, at *19 (D. Vt. Dec. 28, 2023) ("'[E]ven when a complaint alleges First Amendment injuries, . . . irreparable harm is not presumed and must still be shown.'" (quoting *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008))). Rather, they must demonstrate that the alleged loss of First Amendment freedoms is actual

and imminent, *New York*, 969 F.3d at 86, such that "there is an urgent need for speedy action to protect [their] rights," *Citibank*, 756 F.2d at 276; *see Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 766 F.2d 715, 722 (2d Cir. 1985) (concluding that appellees' First Amendment rights were implicated, but they had nonetheless failed to establish irreparable harm because they "failed to allege a clearcut infringement of first amendment rights which, absent preliminary injunctive relief, either has occurred or will occur in the future"). And they must make that demonstration as to each defendant they seek to temporarily restrain. *See, e.g.*, *Kuklachev v. Gelfman*, 629 F. Supp. 2d 236, 250–53 (E.D.N.Y. 2008) (assessing irreparable harm on a defendant-by-defendant basis and concluding that plaintiff demonstrated irreparable harm as to some but not all defendants), *aff'd*, 361 F. App'x 161 (2d Cir. 2009).

Here, Plaintiffs have failed to demonstrate irreparable harm in the form of an actual or imminent loss of First Amendment freedoms caused by the Executive Branch Defendants. Indeed, as discussed above, Plaintiffs' threadbare allegations as to the Executive Branch Defendants do not plead a single, concrete instance of protected speech that has or will be punished or suppressed by the Executive Branch Defendants—either directly or through Columbia—and they instead rely on allegations that the March 13 Letter has chilled their speech and speech-related activities. *See supra* Background, Section II. Moreover, this chill that Plaintiffs claim to suffer follows an attenuated series of events, which would allegedly only come to pass if (1) the Executive Branch Defendants continued to withhold funding from Columbia; (2) Columbia responded to this withholding by implementing the steps outlined in the March 13 Letter (which the University otherwise did not intend to do on its own);[12] (3) Plaintiffs have imminent plans to engage in

---

[12] As discussed above, the March 21 Memo indicates that Columbia has implemented some but not all of these steps. *See supra* Background, Section I.

specific protected speech-related activities; (4) those protected speech-related activities are implicated by the steps outlined in the March 13 Letter; and (5) as a result of Columbia having implemented those steps, Plaintiffs were chilled from engaging in the intended speech-related activities.

That does not work. Plaintiffs do not identify a *single* contemplated policy that is targeted toward protected speech; instead, the entire chain of events is premised on *potential* measures to combat harassment and unlawful discrimination *possibly* affecting speech in some manner. Worse, Plaintiffs make no attempt to support this "highly attenuated chain of possibilities," *Superb Motors Inc. v. Deo*, No. 23 Civ. 6188 (OEM) (ST), 2023 WL 5952145, at *4 (E.D.N.Y. Aug. 25, 2023) (internal quotation marks omitted), with the evidence that is necessary at this juncture to demonstrate that irreparable harm is likely. Without such evidence, it is not possible to make *any* assessment regarding both the likelihood of the course of events identified above coming to pass and these Plaintiffs suffering the First Amendment chill claimed as a result. Accordingly, because Plaintiffs' theory of irreparable harm as to the Executive Branch Defendants is premised on "an accumulation of inferences," it "is simply too speculative and conjectural to supply a predicate for prospective injunctive relief." *Nachshen v. E. 14 Realty, LLC*, 18 Civ. 8304 (AJN), 2019 WL 5460787, at *2 (S.D.N.Y. Oct. 9, 2019) (citing *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004)); *see also Hankard v. Town of Avon*, 126 F.3d 418, 424 (2d Cir. 1997) ("The chilling effect alleged by the plaintiffs is speculative, indirect and remote."); *State v. Musk*, No. 25 Civ. 429 (TSC), 2025 WL 520583, at *3 (D.D.C. Feb. 18, 2025) (denying to preliminarily enjoin certain government defendants from accessing systems and terminating employees or placing them on leave because "the 'possibility' that Defendants may take actions that irreparably harm Plaintiffs 'is not enough.'") (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 138 (D.D.C. 2021))).

**B.     Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits**

Though Plaintiffs' failure to establish irreparable harm is, by itself, fatal to their motion, *see Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 63 (2d Cir. 2007), the Court should also deny their motion because Plaintiffs have also failed to demonstrate a likelihood of success on the merits of their claim against the Executive Branch Defendants.

Plaintiffs principally rely on *National Rifle Association v. Vullo*, 602 U.S. 175, 198 (2024) ("*Vullo*"), *see* Br. at 2, 16–18, but that case is different in kind. *Vullo* stands for the proposition that the government may not take an "adverse . . . action in order to punish or suppress [a] plaintiff's speech." *Id.* at 191. There, as alleged, the government (among other things) offered to drop "unrelated" infractions against an insurance company, in exchange for it cutting ties with gun groups, because of their speech. *Id.* at 192–93.

That is nothing like this case for three basic and independent reasons. First, this case is outside the mold of *Vullo*, because it does not involve the government threatening coercive action against one party to get at the protected speech of a third; instead, the government is using its enforcement authority to act directly upon a regulated entity because of *that entity's* own conduct. In other words, the actions taken here – unlike in *Vullo* – relate to the University's own malfeasance (*i.e.*, failing to comply with, *inter alia*, Title VI of the Civil Rights Act of 1964). *See Penthouse Intern., Ltd. v. McAuliffe*, 702 F.2d 925, 927–28 & n.6 (11th Cir. 1983); *cf. B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 n.16 (9th Cir. 2024) (instructing that *Vullo* was inapplicable to First Amendment claim because in *Vullo* the government "did not have the authority to accomplish the result it sought by direct regulation"). And as both the Supreme Court and the Second Circuit have held, "governmental entities may act properly in furtherance of legitimate state interests" even

where there is an incidental effect on speech. *Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996).

Second, unlike in *Vullo*, there are no plausible allegations that any of the actions taken by the Executive Branch Defendants were done "in order to" suppress or punish speech, rather than to pursue a legitimate interest. Here, Plaintiffs offer little more than *ipse dixit* assertions that facially legitimate actions were in fact prompted by improper censorious motives. Such assertions not only run headlong into the presumption of regularity, *see Nieves v. Bartlett*, 587 U.S. 391, 400–01 (2019), but they also fail to satisfy the basic requirements of pleading, *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (plaintiff must marshal allegations that "invidious discrimination" was more plausible than "obvious alternative explanation[s]").

This is especially so because all of the available information supports that the Executive Branch Defendants had—and still have—a legitimate basis for taking the actions at issue here, acting properly in furtherance of the legitimate government interest in enforcing antidiscrimination laws. In fact, Columbia *itself* has acknowledged that its campus became a hostile environment for certain students following the Hamas terrorist attacks on Israel on October 7, 2023. Oesteriecher Decl. & Ex. 1 at 1. Moreover, a government taskforce found an "extensive pattern of . . . failures to enforce University rules to address antisemitic conduct" on campus following the October 7 attack, and a Columbia University task force similarly found that Israeli students were frequently targeted on the basis of their national origin, and "[v]isibly observant [Jewish] students, like ones who wear traditional head coverings, have been frequently met with extreme hostility," *id*. at 2 n. 1 (alterations in original). Requiring Columbia to take steps to ensure compliance with the law is entirely appropriate and entitled to a presumption of regularity. *Estate of Landers v. Leavitt*, 545 F.3d 98, 113 (2d Cir. 2009). And to the extent Plaintiffs allege any effect on their speech rights,

they allege only an incidental chill pursuant to the government's legitimate interest in ensuring compliance with federal law.[13]

Third, Plaintiffs fail to identify any *actually* protected speech allegedly being targeted here. *Hankard v. Town of Avon*, 126 F.3d 418, 423 (2d Cir. 1997). The March 13 Letter explicitly addresses "antisemitic violence and harassment," Mar. 13 Ltr. at 1, which generally are not shielded by the First Amendment. *See, e.g.*, *Jermosen v. Coughlin*, 878 F. Supp. 444, 450–51 (N.D.N.Y. 1995) ("[T]hreatening and abusive language . . . finds little protection under the [F]irst [A]mendment. Furthermore, threats of violence fall within a category of speech unprotected by the First Amendment." (citation omitted)). Plaintiffs' suit rests on conflating an effort to combat unlawful discrimination with one to suppress protected expression; that foundation is fundamentally mistaken, and once removed, their claim against the Executive Branch Defendants collapses.

## C.    The Balance of Equities and Public Interest Weigh in Favor of the Executive Branch Defendants

The final two factors, balance of equities and the public interest, also weigh strongly against temporarily restraining the Executive Branch Defendants. *See Nken v. Holder*, 556 U.S. 418, 434–35 (2009). Plaintiffs assert that these factors are satisfied because "neither the

---

[13] That the Executive Branch Defendants have sought to enforce the antidiscrimination laws by withholding funding from Columbia is wholly proper. Indeed, "Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds. '[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022) (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 (1981)). Title VI, in particular, forbids funding recipients from discriminating on the basis of "race, color, and national origin . . . in federally funded programs or activities." *Id.* at 218. If Columbia itself took issue with the Executive Branch Defendants' enforcing antidiscrimination laws in this way, it could bring suit in the Court of Federal Claims, which "has the power to award money damages on contract claims under the Tucker Act." *Boaz Hous. Auth. v. United States*, 141 Fed. Cl. 74, 81 (2018), *aff'd*, 994 F.3d 1359 (Fed. Cir. 2021). Columbia has not done so.

government nor the public has any legitimate interest in enforcing an unconstitutional ordinance," Br. at 16 (quotation marks omitted), but as discussed above, the relief requested by the Plaintiffs would impair a legitimate public interest in preventing unlawful discrimination at the University.

The decision in *Bloch v. Bouchey* is instructive. There, the plaintiff—a public school employee who challenged a school policy that he claimed unconstitutionally restricted his speech—asserted that "the balance of hardships and the public interest tip[ped] in his favor because securing First Amendment rights is in the public interest and because Defendants, as government officials, d[id] not have an interest in enforcing unconstitutional policies." *Bloch*, 2023 WL 9058377, at *29. The court weighed the wide-ranging preliminary injunctive relief requested by the plaintiff, which "would sweep far broader than his personal circumstances," against the school's "important educational goals," which were "consistent" with state antidiscrimination laws and would be undermined by the requested relief, and concluded that, "[o]n balance, the balance of hardships and the public interest weigh[ed] in favor of Defendants and against Plaintiff." *Id.* at 30. So too here. The breadth of the equitable relief sought by Plaintiffs, *see supra* Argument, Section I.B, would stymie the Executive Branch Defendants' enforcement of antidiscrimination laws at Columbia, thereby undermining the "strong public policy in favor of enforcing" such laws and tipping the balance of equities in the Executive Branch Defendants favor. *Abdel-Razeq v. Alvarez & Marsal, Inc.*, No. 14 Civ. 5601 (HBP), 2015 WL 7017431, at *6 (S.D.N.Y. Nov. 12, 2015).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order.

Dated: New York, New York
        March 24, 2025

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
*Attorney for Executive Branch Defendants*

By:    */s/ Jeffrey Oestericher*
       JEFFREY OESTERICHER
       Assistant United States Attorney
       86 Chambers Street, 3rd Floor
       New York, New York 10007
       Tel: (212) 637-2695


YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 7,598 words.

*/s/ Jeffrey Oestericher*
Assistant United States Attorney
