P3PNKHAO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MAHMOUD KHALIL, *et al.*,

4             Plaintiffs,

5        v.               25 Civ. 2079 (AS)

6   THE TRUSTEES OF COLUMBIA
    UNIVERSITY IN THE CITY OF NEW
7   YORK, *et al.*,

8            Defendants.       Oral Argument

9   ------------------------------x
                          New York, N.Y.
10                       March 25, 2025
                       2:00 p.m.
11

    Before:
12

13                HON. ARUN SUBRAMANIAN,

14                          District Judge

15                     APPEARANCES

16   DRATEL & LEWIS
        Attorneys for Plaintiffs
17   BY:  AMY E. GREER
          and
18   CAIR LEGAL DEFENSE FUND
        Attorneys for Plaintiffs
19   BY:  GADEIR E. ABBAS

20   HECKER FINK LLP
        Attorneys for Columbia Defendants
21   BY:  GABRIELLE TENZER
        MARSHALL L. MILLER
22        ZACHARY J. PIAKER
        TRISHA ANDERSON
23

24   OFFICE OF GENERAL COUNSEL, U.S. HOUSE OF REPRESENTATIVES
        Attorneys for House Defendants
   BY:  MATTHEW B. BERRY
25        ANDY WANG
        TODD B. TATELMAN

P3PNKHAO

1

2                          APPEARANCES (Continued)

3    U.S. DEPARTMENT OF JUSTICE
          Attorneys for Executive Defendants
4    BY:  HARRY GRAVER

5    MATTHEW D. PODOLSKY
          Acting United States Attorney for the
6         Southern District of New York
     JEFFREY S. OESTERICHER
7         Assistant United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P3PNKHAO

1          THE COURT:  We are here for a hearing in 25 Civ. 2079.

2          Let's have appearances, starting with the plaintiff.

3          MR. ABBAS:  Good afternoon your Honor, appearing for

4     the plaintiffs is myself Gadeir Abbas, and I'll be speaking,

5     and as well Amy Greer.

6          THE COURT:  Good afternoon.

7          And for the defendants, let's start with the

8     Congressional defendants.

9          MR. TATELMAN:  Good afternoon, your Honor.  Todd

10    Tatelman on behalf of the Congressional defendants.

11         With me is Matthew Berry and Andy Wang.

12         THE COURT:  All right.

13         For the Executive Branch defendants?

14         MR. GRAVER:  Harry Graver, for the Executive Branch

15    defendants.

16         THE COURT:  Good afternoon.

17         And for Columbia?

18         MR. MILLER:  Marshall Miller, for the Columbia

19    defendants, your Honor, from the Hecker Fink law firm.

20         I'm joined by my colleagues Gabrielle Tenzer and

21    Trisha Anderson and Zachary Piaker.

22         THE COURT:  Good afternoon.

23         Mr. Abbas, let me start with you.

24         As I noted from the e-mail today, I will be asking a

25    few questions to all the parties.  Then after that's done, I am

P3PNKHAO

1    happy to hear any presentation or any points that anyone would
2    like to raise.
3            MR. ABBAS:  Thank you, your Honor.
4            THE COURT:  The first question is what do you want as
5    we stand here today?
6            I have the proposed order on the TRO.  I understand
7    that there have been certain discussions concerning the relief
8    that's been sought.  There might be some modifications to what
9    you are seeking.  So I want to figure out what is it that you
10   are looking for right now on this application.
11           MR. ABBAS:  Yes, your Honor.
12           To begin with, we're looking to enjoin the Columbia
13   University defendants from providing records to any of the
14   defendants regarding the outstanding requests that have been
15   made.
16           So that's the committee's record request, the
17   February 12 record request, and we're also asking for --
18           THE COURT:  Let me stop you there.
19           MR. ABBAS:  Yes.
20           THE COURT:  That's paragraph 1 in your proposed order.
21           MR. ABBAS:  Yes, your Honor.
22           THE COURT:  In terms of the records, those are the
23   records for your clients?
24           MR. ABBAS:  Your Honor, they are all the records, not
25   just for our clients, because the committee's demands for

P3PNKHAO

1  records sounds in both the *New York State NOW v. Terry*

2  methodology, which there's look a *prima facie* showing --

3           THE COURT:  We'll get to that.

4           MR. ABBAS:  Also, your Honor, it sounds in jawboning.

5  The records are being demanded as part of an effort to

6  coerce --

7           THE COURT:  We are going to get to all of that.

8           All the records?

9           MR. ABBAS:  All the records.

10          THE COURT:  Can you move that microphone closer to

11  you?

12          MR. ABBAS:  Yes, sir.

13          THE COURT:  Much better.

14          Anything else?

15          MR. ABBAS:  No, your Honor.  All records from Columbia

16  University.

17          THE COURT:  Is that the only relief you are seeking.

18          MR. ABBAS:  Not -- no, your Honor.  In addition to all

19  the records not being produced by Columbia, we are also asking

20  that Columbia University be enjoined from complying with

21  demands made in the March 13, 2025 request.  That's from the

22  federal agency defendants to Columbia University, and that's

23  the list that --

24          THE COURT:  Let me stop you right there again.  I

25  apologize, but in the interest of time and the issues that we

P3PNKHAO

 1    have to go over, I just want to confirm.

 2              You are still seeking all the relief that is in your

 3    proposed order?

 4              MR. ABBAS:  Yes, your Honor.

 5              I think there are some caveats with regards to the

 6    Speech or Debate Clause perhaps.  There's some nips and tucks

 7    that can be done to the executive order that would allow the --

 8    would not impose, like, a prior restraint, but, yes, your

 9    Honor, we are seeking --

10              THE COURT:  What are the modifications?

11              MR. ABBAS:  Well, we take the point that for this

12    Court to impose a prior restraint on a committee or on the

13    chair of that committee, that is an extraordinary act.

14              THE COURT:  So 3 is out?

15              MR. ABBAS:  Congressional defendants are not -- no,

16    your Honor.

17              THE COURT:  I am saying paragraph 3 in your proposed

18    order, which applies to the Congressional defendants and

19    enjoins them from pressuring or taking further coercive

20    measures against the Columbia defendants, is that in or out?

21              MR. ABBAS:  It is in, your Honor.

22              The nip or the tuck that I'm suggesting, your Honor,

23    may be that the application of pressure that the Congressional

24    defendants apply, there may need to be some accounting for does

25    that enjoin them on the house floor.  And we think there might

P3PNKHAO

1    be some, like a caveat that this Court could put into place to

2    say that it is preliminarily enjoining the Congressional

3    defendant, consistent with the Speech or Debate Clause.

4           So to the extent that the existing pressure and

5    requests from the Congressional defendants extends beyond the

6    valid legislative purpose we think that they lack, then it can

7    be constrained in that way.

8           THE COURT:  Any other nips or tucks as you put it?

9           MR. ABBAS:  No, your Honor.

10          THE COURT:  All right.

11          Attorney General Bondi and Mr. Terrell, are they out

12   of this case as the defendants suggest?

13          MR. ABBAS:  No, your Honor.  We think that they're in

14   the case.

15          THE COURT:  On what basis?

16          MR. ABBAS:  The press release on March 3, I believe,

17   that initially announced the effort to pause funding or

18   threatened the pause of the funding, that was the Department of

19   Justice-led effort, Attorney General Bondi played a role in

20   that.

21          I think, your Honor, the reason that Attorney General

22   Bondi played a role in that is because under Title VI, if you

23   are -- as they are -- asserting some regulatory gravitas via

24   Title VI, the Department of Justice has a special role to play

25   in Title VI enforcement actions.

P3PNKHAO

```
1        So we think that their involvement is not
2   coincidental.  It is not incidental that Attorney General Bondi
3   set this in motion.  She is the one, I believe, that convened
4   the task force that set this into motion.
5        THE COURT:  All right.
6        A couple more housekeeping questions.  Then we are
7   going to get into some of the merits.
8        Next question:  Do you have an intent at this moment
9   to amend your complaint?
10       MR. ABBAS:  No, your Honor.  We do not have an intent.
11  If your Honor feels that there's some defect that can be
12  addressed by amendment that needs to be addressed --
13       THE COURT:  I am going ask you that question at the
14  end of this hearing.
15       MR. ABBAS:  All right.
16       THE COURT:  Some of the defendants have noted that
17  there are materials that you've submitted to the Court ex
18  parte.  Do you object to those materials being furnished to the
19  defendants on a counsel-of-record-only basis at the very least?
20       MR. ABBAS:  We do, your Honor.
21       We think that the record, the unredacted portions of
22  the record give this Court and the parties everything that they
23  would need to adjudicate the standing issues.
24       THE COURT:  How are the defendants supposed to respond
25  if they are not privy to the declarations and other materials
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P3PNKHAO

1    that have been only submitted on an ex parte basis?

2              MR. ABBAS:  Well, I think, your Honor, that the

3    statement of facts that we have in the preliminary injunction

4    motion faithfully relays the nonsensitive portions of the

5    declarations, and those nonsensitive portions of the

6    declarations themselves create and confer standing.  They show

7    everything that our plaintiffs would need to show.

8              THE COURT:  Fair enough.

9              You are going to live or die on what is in the PI

10   motion?

11             MR. ABBAS:  No, your Honor.  We do not want to live or

12   die on what is in the PI motion.  If your Honor feels

13   differently, we are prepared to provide redacted versions of

14   the declarations to the attorneys.

15             THE COURT:  See what you can provide to the defendants

16   within the next 24 hours.

17             MR. ABBAS:  Yes, your Honor.

18             THE COURT:  Because I don't believe that the

19   defendants can properly be heard if there are ex parte

20   materials that you are relying on in support of your

21   application.

22             In addition, if you are furnishing those materials to

23   the defendants on a counsel-only basis there should not be any

24   prejudice, because if any of the attorneys in this room violate

25   my order, there will be severe consequences.  I think everyone

P3PNKHAO

1    understands that, and I expect everyone to act in good faith.

2            MR. ABBAS:  Yes, your Honor.  We will provide them

3    with the redacted copies -- I'm sorry, the declarations you

4    asked for.

5            THE COURT:  Provide those materials to the defendants.

6    If there are any issues with what you received, if you don't

7    think they are sufficient, you can make an application to the

8    Court.

9            All right.  Now let's get to a little bit of the

10   substance.

11           First question:  Do any of your clients actually have

12   records that are the subject of the February 13 letter, which

13   is limited, as you know, to 11 specific incidents?

14           MR. ABBAS:  Yes, your Honor.  Our clients have been

15   subject to disciplinary proceedings as enumerated in those 11

16   incidents.  And not only have they -- they are currently

17   subject to ongoing disciplinary processes.

18           THE COURT:  All right.  Which ones?

19           You can use the pseudonyms, but do you know right here

20   which ones have records that they reasonably believe are the

21   subject of the February 13 letter?

22           MR. ABBAS:  I don't, your Honor, have the list, but

23   that's something that we can furnish to the other side as well

24   as these are the persons that we are alleging have past

25   disciplinary or ongoing disciplinary proceedings.

P3PNKHAO

1          THE COURT:  Keep a running tab.  At the end of this I

2    will allow all the parties to submit a short letter after the

3    hearing.  So this is one of the things that I would like to

4    know, which is which of your clients actually have records that

5    they believe are the subject of the February 13 letter.

6          MR. ABBAS:  Your Honor, if you will allow, I would

7    like to pass it to my colleague just to speak to this

8    particular issue.

9          MS. GREER:  Your Honor, we obviously do not know

10   entirely, even though the listed 11 events are the records that

11   are being requested, we obviously don't know the extent of how

12   they are interpreting those specific incidents.

13         Some of them lasted for quite some time.  They

14   involved a lot of different people.  So, depending on how they

15   are being interpreted, I believe all of our plaintiffs would be

16   impacted by at least one or two of the incidents listed in the

17   11 events.

18         THE COURT:  So this goes to an issue that the

19   defendants have raised on the standing issue, which is I

20   understand what you are saying right now, but what you are

21   saying now is not reflected in either the complaint or the

22   declarations that have been submitted in that kind of

23   specificity.

24         Since it is the plaintiffs' burden to establish

25   standing for the relief that they are seeking, the defendants

P3PNKHAO

1    point that out as a defect.

2              That's why I asked at the beginning whether there was

3    any intent to amend the complaint, because the defendants have

4    raised certain pleading deficiencies, right?

5              So there's the substantive issue of whether these

6    things actually happened, whether there is actually a risk of

7    harm or a fear of the chilling of any First Amendment activity

8    in the future.  That is substantive.

9              But they also raise the procedural issue that it is

10   the plaintiffs' burden to make out these showings and the

11   complaint on some of the issues does not address some of these

12   things.

13             So I will leave that with you.

14             We will hear from the defendants.

15             Now, the declarations as I read them and the motion is

16   focused on the disclosure of the student records.  They don't

17   address any harm from the actions in the March 13 letter.

18             So isn't that fatal to the claim of standing or any

19   claim of irreparable harm relating to the March 13 letter?

20             MR. ABBAS:  No, your Honor.

21             What gives all of our plaintiffs standing with regards

22   to the March 13 letter is that the March 13 letter is an effort

23   to suppress a particular viewpoint.  It is an effort to

24   suppress a viewpoint that our plaintiffs have held and do hold

25   now and intend to express in the future.

P3PNKHAO

| 1 | So just like in *Vullo*, it was like an advocacy

2 | organization, that their ability to speak was compromised by

3 | the illegal pressure of a state governmental body.  Here it's

4 | the students, our students, the plaintiffs in this case, who

5 | bear the brunt of the government's intervention in this

6 | political debate.

7 | And the intervention that they made in the political

8 | debate would have been just fine if the government was simply

9 | expressing its own views about the --

10 | THE COURT:  Let me stop you right there.

11 | MR. ABBAS:  Yes, sir.

12 | THE COURT:  But *Vullo* focused on the merits of the

13 | claim at issue and did not focus on the issue of standing or on

14 | an application like this one, irreparable harm.

15 | So connect the dots for me between what is in the

16 | March 13 letter or the March 21 announcement from Columbia and

17 | the actual harm that your clients would endure.  Because

18 | there's some things that I don't think you are challenging are

19 | going to cause your clients harm, for instance, the actions

20 | taken with respect to the Middle East and South Asian and

21 | African studies department, which is focused on an academic

22 | department and not the protest activity that's at issue here.

23 | So which parts of the March 13 letter or the March 21

24 | actions are you trying to connect the dots to?

25 | MR. ABBAS:  Let's start with I think the primary

P3PNKHAO

1  thing, which is the damages of the anti-Semitism definition

2  that the March 13 letter demands the Columbia University adopt.

3          So you see that on page 2 of the March 13 letter

4  formalize, adopt, and promulgate a definition of anti-Semitism.

5  That is the IHRA definition of anti-Semitism.

6          There's only one federal court that has adjudicated

7  the constitutionality of that anti-Semitism definition.  We

8  cite that court case in our brief, and I think it is worth a

9  read.  Basically, as I'm pulling it up, basically what the

10  Court did there is --

11          THE COURT:  Give me the case name.

12          MR. ABBAS:  Yes, it's *Students for Justice in*

13  *Palestine at University of Houston v. Abbott*.

14          And we cite that case on 17 of our brief --

15          THE COURT:  Okay.

16          MR. ABBAS:  In that case -- and, your Honor, I could

17  show you if you would like, the actual definition of

18  anti-Semitism, if I could, your Honor --

19          THE COURT:  You can approach.  Just hand it to Ms. Yu

20  here.

21          MR. ABBAS:  Okay.

22          If you see the first -- I'm sorry.  Page 2.  You have,

23  adopt the following nonlegally binding working definition of

24  anti-Semitism, and then you have this general definition of

25  anti-Semitism.  Anti-Semitism is a certain perception of Jews

P3PNKHAO

1 which may be expressed as hatred of Jews -- and it goes on and

2 on.

3   The issue that this Texas, Western District of Texas

4 had with this definition comes in the examples of anti-Semitism

5 that are provided on page 3.

6   The examples of anti-Semitism provided on page 3 turn

7 the common and typical criticisms that people have about

8 foreign countries into and label it as bigotry, label it as

9 anti-Semitism.  For example, this is what they define as

10 anti-Semitism, accusing -- I'm sorry, on page 4.  For example,

11 drawing comparisons of contemporary Israeli policy to that of

12 the Nazis.

13   In the United States, as per our political discourse,

14 comparisons get made to Nazi Germany as like this is the evil

15 that everybody agrees is most extreme.  It's the baseline of

16 evil.  We compare our country, we compare governors, we compare

17 presidents, political officials have compared these protestors

18 to Nazis.

19   So you can see if you forbid comparisons to Nazi

20 Germany for just one country on just one topic, you are

21 embedding viewpoint discrimination into the very definition of

22 anti-Semitism.

23   THE COURT:  So I hear you on what you are saying.

24   Let me make sure I understand maybe at a higher level

25 of generality.

P3PNKHAO

```
 1              The provisions in the March 13 letter and as reflected
 2    in the March 21 actions that go to disciplining of students or
 3    I suppose the identification of people in protests for purposes
 4    of discipline, those are the aspects of those two documents
 5    that are centrally at issue.
 6              MR. ABBAS:  Centrally at issue, your Honor, yes.
 7              But this is a comprehensive effort to manifest as
 8    viewpoint discrimination.  You can't separate, your Honor, I
 9    think the mask ban from the putting the Middle Eastern studies
10    department into receivership, all of these are an effort to
11    intervene in the debate and ensure a different kind of outcome.
12              THE COURT:  You have to connect all the dots.  So I
13    understand what your position is in terms of what you are
14    challenging.
15              How do you track back to your plaintiffs and their
16    First Amendment rights?
17              MR. ABBAS:  Well, I think that Western District of
18    Texas case was, it was in a similar situation to this case
19    here, where the definition of anti-Semitism that contained the
20    viewpoint discrimination had not yet been applied to any
21    student in any disciplinary proceedings.  But, you know, this
22    is also a case the Supreme Court decided last term, *Moody v.*
23    *NetChoice*.  There is a special solicitude for the First
24    Amendment and free speech kinds of claims where you can
25    challenge it it's subject to challenge because of the chill
```

P3PNKHAO

1    even before the discipline arrives.

2                THE COURT:  This goes back to the procedural point.

3           Wouldn't you have to put something in your complaint

4    and something in the declarations that say my speech is going

5    to be chilled by these things for this reason?

6           Whether or not that's true, that's for the defendants

7    to challenge.  But the defendants are saying there isn't any of

8    that in any of the papers that we have before us on the

9    temporary restraining order motion.  That is one of the

10   arguments that they're making.

11          I looked and I didn't see anything.  If I missed it,

12   please let me know.  But if it is not there, then it would seem

13   that, absent an amendment to the complaint, there is a basic

14   problem in terms of the pleadings.

15              MR. ABBAS:  Your Honor, I disagree.

16          To begin with, the assessment of whether there is a

17   chill or isn't a chill does not depend on whether we use that

18   word in the complaint.  It is an assessment.

19          It is also not an assessment about what these

20   plaintiffs did.  This is, the chill exists if a reasonable

21   person would be deterred from speaking.  Here a reasonable

22   person would be deterred from speaking because the government,

23   through the executive agencies, the Congressional committees,

24   is making very, very clear that they don't want people talking

25   about Palestine.  They don't want people criticizing Israel,

P3PNKHAO

1   and they are expressing that in a variety of different policy

2   proposals.

3              THE COURT:  You are getting back to the merits.

4              MR. ABBAS:  Yes.  I'm sorry.

5              THE COURT:  The defendants cite, for instance,

6   *National Organization for Marriage v. Walsh*.  That is a Second

7   Circuit case from 2013 that notes that to have standing there

8   needs to be a real and imminent fear of such chilling of

9   speech, meaning that an abstract subjective fear of chill is

10  not enough.

11             So what they are saying is, even granting that what

12  you are saying is true in terms of the intent or motive behind

13  the policies, there has to be at least some allegation at this

14  stage, since we are at the pleading stage and there hasn't been

15  discovery, that the defendants' actions would cause a real and

16  imminent fear of chilling.

17             So could you speak to that.

18             MS. GREER:  Yes, your Honor, if I may.

19             I think that we address this in a few ways.

20             First of all, we talk about the October 31 House

21  report, and how the students -- collective students not

22  necessarily our plaintiffs, although it did indicate some of

23  our plaintiffs, they were identifiable based on how the

24  information was distributed in a public forum.  The students

25  can connect that the increase of harassment that they

P3PNKHAO

1  personally experienced both online and in person increased

2  following the release of that report.

3          I would also just point out that the pressure that

4  these entities, the defendants have put on Columbia and then

5  Columbia has enacted on the students has involved a significant

6  amount of surveillance on campus.  Students identified their

7  fear of even wearing a keffiyeh as a Palestinian, as a

8  Palestinian person on campus, where they felt afraid to even

9  hold their own ethnic and national identity for fear of

10  targeting by Columbia officials as well as other students on

11  campus.

12          I think that when entities like these federal agencies

13  and Congress demonize the protected speech and, frankly, the

14  identities, the Palestinian, Arab, South Asian, Muslim

15  identities of so many students on campus as well as some of the

16  students who are our plaintiffs, it does chill speech.  They

17  feel targeted.

18          When you also target an entire department, where some

19  of them identify as being from that region or identify as some

20  kind of connection to who they are as people, including some of

21  our students of color who are African-American, you know, they

22  are frightened when they see that their own identities are

23  somehow vilified or require intervention from the federal

24  government.

25          So I think that we have -- I take the Court's critique

P3PNKHAO

1    that perhaps we have not pulled the thread all the way through

2    for you, but I would just say, as somebody who works with

3    students every day, including some of our plaintiffs, including

4    all of our plaintiffs, that there has been a profound impact.

5         The last thing that that I will just say is even in the

6    cases of some students who are still brave enough to keep

7    speaking, it has taken an immense mental toll.

8         They have had to seek therapy and counseling.  They

9    have experienced posttraumatic stress from violent arrests.

10   They have been afraid to speak their mind in the classroom for

11   fear it might be considered discriminatory, even though they

12   believe it's protected speech.

13        All of these things are happening every day.

14        I would just argue also that some of the chilling

15   happens in microbits, you know, microbites, where sometimes in

16   a classroom a student might pause before they speak something

17   that might have previously felt like part of a robust debate in

18   the classroom.  They might hesitate to take a class for fear

19   that they be somehow perceived in a certain way within the

20   classroom.

21        These are being sanctioned, and they are coming down

22   through these Congressional hearings, where some of the members

23   of Congress didn't even speak the language properly, calling it

24   "infitada" instead of "intifada," really implying that just the

25   speaking of an Arabic word holds multitudes beyond what the

P3PNKHAO

1   spear themselves intended, so these are the ways that the

2   chilling is happening.

3          THE COURT:  I appreciate that.

4          I think that what you just articulated is perhaps not

5   reflected in the pleadings that have been submitted.

6          Again, as the defendants point out, it is your burden

7   to make out standing and irreparable harm with respect to the

8   temporary restraining order application, so you might consider

9   that in terms of potential amendment.

10         Mr. Abbas or Ms. Greer, as to the disclosure of

11  information about other students, how would you have standing

12  to challenge the disclosure of information of people who are

13  not your clients, given that this is not a class action?

14         Even if there were issues of chill related to

15  disciplinary measures and the other aspects of the March 13

16  letter, how would you have standing to challenge the disclosure

17  of other students' records absent any kind of class allegation

18  here?

19         MR. ABBAS:  Sure, your Honor.

20         To begin with, the problem with the records is not

21  only that they disclose our plaintiffs' identities to the

22  government or to the other side.  It is also that they disclose

23  the associations among the students.

24         The disclosure of those associations, whether it

25  includes our students or doesn't include our students, affects

P3PNKHAO

1    our students because the disclosure of associations that

2    undergird the expression of a particular viewpoint is protected

3    by the First Amendment.

4            So our clients will suffer, the public debate will,

5    the campus debate will be skewed in the government's direction

6    because the disclosure of the associations associated with the

7    specific viewpoint that our clients hold will deter people from

8    maintaining those associations, your Honor.

9            THE COURT:  And I guess that part of the issue from

10    your perspective is that you don't have visibility into what

11    these records are and what is actually being disclosed by the

12    defendants.

13            So it may be that there are student records that don't

14    relate to your clients, but which reveal associations, might

15    even reveal your clients' names.  It is just that they are not

16    the subject of those records and so crafting an order that

17    would dodge all these issues would be difficult.

18            That's why you are seeking that form of relief?

19            MR. ABBAS:  Exactly, your Honor.

20            I think it is consistent even with *Vullo* in the

21    viewpoint discrimination context.  At the heart of the First

22    Amendment free speech clause is the direct admission that

23    viewpoint discrimination is uniquely harmful to a free and

24    democratic society, and governmental actions to suppress a

25    speaker's particular views are presumptively unconstitutional.

P3PNKHAO

1              That is the basis of the standing.  They're trying to

2      suppress our clients' viewpoints through the disclosure of

3      association, through the disclosure of their identity, and that

4      gives rise to, your Honor, we would assert a viewpoint-based

5      discrimination standing.

6              THE COURT:  Let's move to the Speech or Debate Clause.

7              The defendants have pointed to a number of cases which

8      indicate that the immunity provided by the Speech or Debate

9      Clause is broad and categorical.

10             You've read the cases.  I don't need to recite them to

11     you.  But I did not see from the plaintiffs any case that would

12     allow the type of claim you are advancing under these

13     circumstances against Congressional defendants, meaning the

14     committee and the chairman.

15             So what is your best case pointing in the other

16     direction.  I am looking at *Doe v. McMillan*, *The Association of*

17     *American Physicians and Surgeons* case from the D.C. district

18     court.  The list goes on and on of cases that foreclose even

19     constitutional claims that might otherwise lie where they are

20     directed to members of Congress, and I think fairly this would

21     include the committee.

22             So what is your case that says the opposite?

23             MR. ABBAS:  Your Honor, I think all of those cases and

24     you may be familiar, *Watkins v. United States* articulates it

25     most fully.

P3PNKHAO

1          All those cases acknowledge that there are limitations

2     to what Congress can do.  One of the limitations is that

3     Congress, in order to exercise its legislative power, needs to

4     have a valid legislative purpose.

5          THE COURT:  All right.  But the *Eastland* case says

6     that kind of review is narrow.

7          MR. ABBAS:  It is narrow.

8          THE COURT:  I think, fairly read, the *Eastland* case

9     indicates that it is exceedingly narrow, because even in that

10    case the type of review that the Supreme Court engaged in was a

11    facial inquiry.  If there was an articulated legislative

12    purpose, that was enough for the Supreme Court in the *Eastland*

13    case.

14         Here, the Congressional defendants in their briefing

15    have pointed to a valid legislative purpose on its face at

16    least, which is that identified the targeting, harassment, and

17    other illegal activity directed towards Jewish students.

18         They understand that the federal government is funding

19    these institutions, so they have a legislative issue, which is

20    whether there is anything to be done about the situation.  They

21    have articulated that particular objective.  They've pointed to

22    legislation that has been introduced that is along these lines.

23         Why wouldn't that satisfy the *Eastland* inquiry?

24         MR. ABBAS:  For two reasons, your Honor.

25         I think on the face of it, the house committee is

P3PNKHAO

1    saying that we're trying to tackle anti-Semitism.  But they are

2    using a particular definition of anti-Semitism, your Honor.

3    They are not just using it colloquially.

4         When they say anti-Semitism they what they mean is the

5    IHRA working definition of anti-Semitism that labels calling

6    the state of Israel a racist state as anti-Semitic.  It labels

7    applying to Israel standards that you might not apply to

8    everybody else, a special focus on Israel as anti-Semitic, and

9    they include in the definition of anti-Semitism that idea that

10   you can't make a certain kind of comparison to Nazi Germany and

11   Israel, and if do you that's anti-Semitic.

12        So on its face, your Honor, what the House committee

13   is interested in doing is they're interested in legislating,

14   like, a specific speech code that's applicable only to one

15   foreign country.  That is not a valid purpose.

16        But there is a second point, too, your Honor.

17        The House committee is asserting its, like, regulatory

18   interest in its role in Title VI oversight.  But no one's

19   talking about what Title VI actually says.

20        Section 602 of Title VI outlines a statutory scheme of

21   remedies that involves the House committee.  It involves the

22   federal agencies.  There's notice, there's report requirements,

23   and there's an enumerated list of steps that the committee and

24   the agencies take.

25        None of that was followed.  None of it at all was

P3PNKHAO

1    followed.

2            THE COURT:  What is your best case that says that I

3    can peer behind the curtain in that manner to discern whether

4    the legislative purpose that the Congressmen have is a valid

5    legislative purpose in light of those types of arguments that

6    you have raised, and that if they're not, that the Speech or

7    Debate Clause would not provide immunity.

8            Because as the Court has said, it's absolutely

9    immunity.

10            MR. ABBAS:  Yes.

11            THE COURT:  What is your case?

12            MR. ABBAS:  We agree with what your Honor's framework

13    is, but you don't have to look, and we are not asking you to

14    impute or look, you know, under the surface for their intent.

15            Again, they are trying to regulate anti-Semitism, but

16    when they say anti-Semitism, what they are really meaning is

17    they're trying to prohibit certain kinds of criticisms of

18    Israel.

19            And then the process, your Honor, that's like -- you

20    don't have to look behind the curtain, or you don't have to

21    assess anybody's motivations to -- if you look at Title VI,

22    602, Section 602 and 603, 602 and 603 outline if the government

23    wants to terminate, if they want to pause funding, they have to

24    do X, Y, and Z things.  And they don't do any of those things.

25            So that is a deviation from what would normally be,

P3PNKHAO

```
1    like, a valid legislative exercise, where they're overseeing
2    their obligation or how Title VI is playing out.  That is not
3    what they are doing.  They are deviating from that process.
4           THE COURT:  Do you have the case that you think
5    reflects those principles that you have just talked about?
6           Look, if you need to do some homework and put it in a
7    letter and submit it after the hearing, that's fine.  If you've
8    got a case right now, I would like to be able to take a look at
9    it.
10          MS. GREER:  So, your Honor, in RNC v. Pelosi, which I
11    think I may have actually handed to Gadeir earlier, the judge
12    actually walked through a pretty intensive fact determination
13    as to the Speech or Debate Clause.
14          It is true that in that particular case the Court did
15    find that the January 6 subcommittee had a valid legislative
16    purpose.  But the judge investigated that determination heavily
17    because there was concern that one party was investigating the
18    political view-- another party to, you know, chill or challenge
19    the views of that particular party.
20          That judge walked through a fairly intensive review of
21    the Speech or Debate Clause as well as the purpose that the
22    January 6 committee had for demanding records of the RNC via
23    Salesforce, which was another sort of jawboning argument.
24          What the Court ultimately found there was that
25    Congress, that both parties were involved in the process, that
```

P3PNKHAO

1    there was a legitimate event that they were asking questions

2    about.

3          But I do think that the fact that the Court was very

4    careful in examining, could this be considered the act of one

5    political party on another, you know, to get information about

6    their political strategy, etc., you know, could have some

7    analogies here to what my colleague here was describing.

8          In this case it would be viewpoint discrimination.

9    That would be the issue that required great care and concern as

10   to chilling and suppressing, using multiple legislative

11   mechanisms as well as the full brunt of the purse and the purse

12   strings to challenge and suppress a very particular viewpoint

13   of great public concern in this nation right now.

14         THE COURT:  And the *Pelosi* case was vacated, but not

15   on the Speech or Debate Clause.

16         MS. GREER:  Not on this ground.  It was mootness.

17         THE COURT:  Switching gears a little bit to the two

18   counts that are at issue here.

19         They are both First Amendment claims.  Both are

20   grounded in the Supreme Court's decision in *Vullo*.  Fair to say

21   that they're mirror images of each other, but one is directed

22   to the governmental defendants and one is directed to Columbia?

23         MR. ABBAS:  Yes, your Honor.

24         There does seem to be a slightly different method for

25   dealing with Congressional subpoenas.  So we think that's the

P3PNKHAO

*NOW* case*, new York State NOW v. Terry*, that outlines if we make

a *prima facie* showing, it moves to the government to satisfy

the burden after that.

        THE COURT:  There is no subpoena here.

        MR. ABBAS:  I am sorry.  There was also no subpoena in

*New York State NOW v. Terry* case.  It was an information

request.  So they looked past that distinction between whether

it is a subpoena or an information request.

        THE COURT:  All right.

        But other than that, the two claims are the same?

        MR. ABBAS:  Yes, your Honor.  They're very close.

        THE COURT:  As to Count Two, that is directed to

Columbia.  In their brief Columbia focused on the state action

issue.

        MR. ABBAS:  Yes.

        THE COURT:  They say there is a requirement of state

action.  They are not a state actor.  There are three limited

exceptions.  This case doesn't fall into any of them.

        How do you respond to that?

        What is your case that says, no, this actually does

fit into one of those exceptions?

        Or, alternatively, you could say it doesn't matter.

Maybe Columbia is just in this case a necessary party to effect

the relief that you are seeking here, which is a separate

argument.  But you tell me which one it is.

P3PNKHAO

1          MR. ABBAS:  I think it is a little bit of both, your

2    Honor.  Columbia University is, I think, on the hook a hundred

3    percent for ceasing to operate independently and just doing the

4    bidding of the government.  And when it is compelled to do

5    that, that is when they can be held liable.

6          I think the best indication of that is, again, going

7    back to the anti-Semitism definition that Columbia University

8    does adopt.  And your Honor, if it's all right, they cite this

9    in their, in Columbia University's opposition on page 7.  In

10   the footnote they cite the definition of anti-Semitism that

11   they are adopting.  I would like to just show you a part they

12   left off, if that's all right your Honor.

13          Could I share a copy with you?

14          THE COURT:  You may approach.

15          MR. ABBAS:  This is among the best pieces of evidence

16   that Columbia University is not acting independently, that

17   they're just doing what they are being commanded to do by the

18   federal government.

19          So you see on page 44, they are aware, Columbia

20   University officials are obviously aware of the demand that

21   they adopt the IHRA definition of anti-Semitism.  Academics

22   understand the viewpoint discrimination issues with it.

23          So they come up with basically a summary of the

24   definition of anti-Semitism that incorporate anti-Semitic

25   tropes and symbols Holocaust denial targeting Jews or Israel --

P3PNKHAO

1          THE COURT:  You have to read slowly when you're

2     reading.  I am sure the court reporter --

3          MR. ABBAS:  Yeah.

4          Holocaust denial, targeting Jews or Israelis for

5     violence or celebrating violence them, exclusion or

6     discrimination based on Jewish identity or ancestry or real or

7     perceived ties to Israel and certain double standards applied

8     to Israel.

9          In the March 21 letter that's what they refer to, this

10    definition, and they copy and paste this definition into their

11    briefs.

12         But look at what comes right after that definition:

13    We have developed this guidance solely for educational purposes

14    and not to limit speech.

15         That's really important.  Columbia University on their

16    own said we should not be using this definition in disciplinary

17    proceedings.  Columbia University, subsequent to the demands of

18    March 13, jettisoned what it wanted to do, and it didn't want

19    to use definitions that enshrined viewpoint discrimination as

20    the basis of discipline.  But that is exactly what the March 21

21    Columbia University letter did.

22         THE COURT:  How does that pertain to the state action

23    question?

24         MR. ABBAS:  It shows that they have been coerced.  It

25    shows this they wanted to do one thing in August 2024.  They

P3PNKHAO

1    wanted to have a definition of anti-Semitism that was just

2    educational.  Basically they wanted a definition to communicate

3    their own view as to what is and what isn't anti-Semitism.

4            THE COURT:  What you are saying is, just to make it

5    simpler, if you have a properly pleaded claim under *Vullo*, then

6    you necessarily have a claim against both the coercing

7    government entity and the coerced private entity.

8            Is that right?

9            MR. ABBAS:  Exactly, your Honor.

10           THE COURT:  Is there a case that says that or

11   something close to it?

12           MR. ABBAS:  Yes.

13           MS. GREER:  Again, I think the situation that we're

14   dealing with, with universities in this particular moment in

15   time is a little unique, but I would point again to the *RNC*

16   case, because in that case the Court did find Salesforce, the

17   third party in that case, to be a state actor because they were

18   compelled under a subpoena.

19           We recognized here that Columbia this time has not

20   been compelled by a subpoena, but they were last time.  And I

21   would argue that given the prior compulsion as well as the

22   continuous and escalatory nature of the coerciveness, Columbia

23   has been more than willing to comply and has basically, I would

24   argue it could be, it could be argued I would say that they

25   have remained compelled as a state actor since the issuance of

P3PNKHAO

1    that subpoena and that they have continually, according to the

2    papers that we've received, been in communication with Congress

3    and potentially the federal actors as well and have remained

4    ultimately compelled.

5            Even though there has not yet been a subpoena issued

6    in this case, based on what we know, they have willingly

7    complied.  My guess would be that they want to follow the law.

8    You know, they're not seeking to violate any laws, and I have

9    empathy for that.  They want to be a law-abiding corporation.

10           At the same time, I would argue that perhaps that

11   former compulsion, the residue of that remains in place now.

12   Therefore, they retained that state actor.

13           I don't think it's that far of a leap again based on

14   the very thorough analysis that the judge in that case, in *RNC*

15   did to hold Salesforce accountable even after it dropped the

16   case against Congress.

17           THE COURT:  All right.

18           We will take a look at that decision.

19           Thank you very much.  I will come back to you if you

20   have any further issues after the defendants have had their

21   chance.

22           Let me turn to the Congressional defendants.

23           Maybe you can help with just some context of where we

24   are in terms of the information that has been provided by

25   Columbia and whether or not in light of everything that's

P3PNKHAO

 1  transpired, including the March 21, =announcement, whether any

 2  further information is requested by the committee at this time.

 3          MR. TATELMAN:  So, your Honor, at this point Columbia

 4  has produced a sizeable amount of information to the committee.

 5  The committee is currently reviewing that information.

 6          I don't have any information for you at this time

 7  about what the committee's future intentions might be.  I think

 8  a lot will depend on their review of the Columbia production.

 9          Columbia has also made a couple of supplemental

10  productions since their initial one, and ongoing discussions

11  and negotiations with the university over the scope of that

12  production and the contents of it will I think inform the

13  committee's future actions.

14          But I couldn't represent to you at this time what the

15  committee may or may not do in the future.  It is going to

16  continue to conduct its investigation and will follow leads

17  wherever they may lead it.  But at this time I don't think

18  there is an intention to seek additional information beyond

19  what they've gotten until they have had a chance to review what

20  they already have.

21          THE COURT:  All right.  That's helpful.

22          What do your clients intend to do with this

23  information that's coming out of these student records?  In

24  particular, I mean, there is an information gathering function,

25  and I understand that from your papers.

P3PNKHAO

 1          I'm really focused on the identities of the students

 2   in these records, meaning there is the general what did

 3   Columbia do in response to these events that are outlined in

 4   the February 13 letter?  Then, more specifically, there is the

 5   identities of the students.

 6          As you saw in the plaintiffs' papers, it is the

 7   identities this that they are most centrally concerned about.

 8          So what you are your clients planning to do with those

 9   identities?

10          MR. TATELMAN:  First of all, your Honor, I don't know

11   that the committee at this point in time has any of the

12   identities of the students.  I haven't reviewed the documents

13   myself.  The committee has not informed us that they have

14   received the identity of any particular students, so I don't

15   know the status of whether they have them or not.

16          So, to change your question slightly, your question

17   would then be, assuming that the committee did obtain

18   identities of students, what might they do with that?

19          Again, I think the answer to that is that the identity

20   of students under certain circumstances in certain contexts may

21   help inform the committee about potential legislative actions

22   that it might take.

23          In reviewing how the university has responded to the

24   various instances that the committee is interested in, one

25   issue might arise to see how Columbia has dealt with potential

P3PNKHAO

1    repeat offenders.

2             Are there possible people who have repeatedly violated

3    laws, harassed students, committed vandalism, done some of the

4    other conduct that the committee is interested in doing?

5             Are there pervasive harassment or violations of Title

6    VI by specific individuals over a lengthy period of time?

7             That type of information could inform potential

8    legislative reforms, could help the committee and other members

9    decide appropriations or funding levels.  That is the type of

10   thing that the committee could do if it has that information,

11   but again I don't have information to suggest that it does at

12   this time.

13            THE COURT:  Okay.  That is helpful.  There's no intent

14   to publicize student names for the sake of publication, right?

15            MR. TATELMAN:  No.  To my knowledge, no, your Honor.

16            THE COURT:  There is no intent to take student

17   information to the extent it's ever provided to your clients

18   and then turn it over to an administrative agency for some kind

19   of enforcement effort or process of that kind.

20            Is that fair?

21            MR. TATELMAN:  Your Honor, that is not a typical

22   action of Congressional committees.  I have no reason to

23   believe that that would be the type of thing that the committee

24   would be interested in doing.

25            THE COURT:  But you can't rule it out?

P3PNKHAO

1          MR. TATELMAN:  At this point I could not rule anything

2     out, your Honor.  Again, the committee is still in the very

3     early stages of conducting an investigation.

4          It has, you know, a two-year window in which to

5     consider legislation, enact legislative reforms, publish

6     reports, all of the things that are within its purview and

7     powers to do.

8          I don't know at this point what the committee would

9     do, but I think I can safely assure you that it is not

10     intending to disclose information for the sake of disclosure,

11     which the Supreme Court has specifically told us we are not

12     permitted to do and as a practice we do not do.

13          THE COURT:  All right.

14          The February 13 letter, unlike the March 13 letter --

15     and you make this argument -- does not suggest that there would

16     be a consequence of any loss of funding if there were no

17     response to the letter.  And I understand that argument.

18          MR. TATELMAN:  That is correct, your Honor.

19          THE COURT:  Are you saying that that is not a

20     consequence that your clients would consider if there was not a

21     response to these letters, meaning if Columbia decided that

22     they believed their response to these letters was sufficient to

23     date and they were not going to further provide any information

24     your clients would not consider a consequence of suggesting or

25     recommending the halting or pausing of funding to Columbia.

P3PNKHAO

1          Is that fair?

2          MR. TATELMAN:  I believe that is fair, your Honor,

3     because that is not the way that the process itself functions,

4     right?

5          The committee is charged with investigating and

6     legislating.  Part of the legislative process is an annual

7     appropriations process, to which funding for various -- funding

8     allocations for various programs are made.

9          So there might be an effect that would be had in that

10     process, but it is not if you don't give us these things we are

11     going to pull your funding.  That is not the way the

12     Congressional process functions.

13          We would have to consider and legislate and make

14     decisions based on that.  Could there be adverse inferences

15     drawn from somebody's failure to produce records or things of

16     that nature?  Yes.

17          That may have a persuasive effect on some members when

18     voting on future legislative proposals, future appropriations

19     proposals, but it is not a one-to-one correlation like what you

20     are suggesting.  It's not, if you don't give us the information

21     we are seeking you lose funding.  That's not the way the

22     process works.

23          THE COURT:  But it could have some impact in terms of

24     the appropriations that take place at the end of the day?

25          MR. TATELMAN:  Just about anything could have an

P3PNKHAO

 1   impact on decisions that members make with respect to

 2   appropriations.  There is lot of people who need money and only

 3   so much money to go around.  The members have to make difficult

 4   decisions based on a number of factors, yes.

 5            THE COURT:  That is a fair point.

 6            I understand the plaintiffs' argument is that under

 7   these circumstances, given the March 13 letter and the other

 8   overtures from understandably the Executive Branch and not your

 9   clients, that given what you have said, they believe that there

10   will be the specter of potential appropriations consequences

11   for a failure to respond to the letter at issue.

12            MR. TATELMAN:  No, your Honor.  I don't think the

13   letter can reasonably be interpreted or put out there as

14   implying any kind of a threat or making any sort of a threat at

15   all.

16            The statement in the letter that's quoted by the

17   plaintiffs is simply a statement of fact.  It is a statement of

18   compliance with the antidiscrimination law.

19            The line it is untenable because you receive federal

20   funds is a reflection of the fact that maintaining a position

21   in violation of Title VI puts those -- is untenable when you're

22   receiving federal funds because that is a condition of Title

23   VI.

24            I don't think there's any way that it could be

25   interpreted as threatening any sort of future action for

P3PNKHAO

1    failure to comply.  So, no, I don't think there's any kind of

2    implied or even stated threat in the letter.

3              THE COURT:  All right.

4          I will let you respond to the *RNC* case that was cited

5    by the plaintiffs on the Speech or Debate Clause if you want

6    to.

7              MR. TATELMAN:  Yes, your Honor.

8          I think that procedurally that case sits in a very,

9    very different posture.

10          In that case, the committee, the January 6 Committee

11   had subpoenaed a third party for records related to the

12   Republican National Committee.  The Republican National

13   Committee brought a suit directly against the committee and

14   various members of the Congress trying to quash that subpoena.

15          The issue that was raised was if the Congressional

16   defendants were dismissed from that case pursuant to the Speech

17   or Debate Clause, as we argued that they should have been, just

18   as we're arguing they should have been here.  What effect, if

19   any, would that have on the Court's ability to grant relief to

20   the *RNC v. Salesforce*?

21          I don't think the posture here is the same.  Because

22   the *RNC* case raised the question of were we necessary parties

23   under Rule 19 under the joinder rules.  Because the Court found

24   that we were necessary parties, there was an adverse effect on

25   its ability to grant relief.

P3PNKHAO

1          That is not the situation that we have here.  We are

2     entitled to dismissal and no injunction being issued against us

3     in this case because of the Speech or Debate Clause.  But

4     unlike *RNC v. Pelosi*, we don't think this raises the

5     joinder-of-necessary-party questions that that case raised.

6          So the analysis that the Court did in looking at the

7     First Amendment implications and all of the things like that

8     flowed from the joinder problem that the posture of case

9     raised.  It didn't flow from the substantive addressing of the

10    Speech or Debate Clause.

11         THE COURT:  All right.

12         Other than that case, are you aware of any case where

13    a Court has rejected immunity under the Speech or Debate Clause

14    where claims were directed at either a Congressional committee

15    or Congressmen under these circumstances?

16         MR. TATELMAN:  I am not aware of a case under these

17    circumstances where there was a valid legislative act, like an

18    information gathering letter, that was issued by a committee.

19    I am not aware of a case in which a Court has not found that

20    that was protected by the Speech or Debate Clause and immunity

21    was upheld.

22         THE COURT:  Thank you.

23         Let's turn to the Executive Branch defendants.  That

24    would be -- let me make sure I have the right person here.

25         MR. GRAVER:  I am Harry Graver.

P3PNKHAO

1        THE COURT:  Mr. Graver, in your brief you identify a

2    number of threshold procedural issues with the plaintiffs'

3    case.  As you saw, I explored some of those with the plaintiffs

4    here.

5        I want to see if you can help me out, though, on the

6    substantive issue of the Supreme Court's decision in *NRA v.*

7    *Vullo*.  Let me give you what I understand to be the context of

8    that case and then you can explain to me how this case is

9    different.

10        So in that case the Supreme Court made clear that the

11    First Amendment prohibits government officials from relying on

12    means of coercion to achieve the suppression of disfavored

13    speech, right?

14        And they cannot coerce a private party to punish or

15    suppress disfavored speech on their behalf, right?

16        And here the plaintiffs say that $400 million in

17    funding is at least arguably coercion.  You have heard what

18    Mr. Abbas has said in terms of the nexus to speech.  That is at

19    least what's been alleged in the case.

20        In *Vullo* it did not matter that the insurance programs

21    that the government targeted were illegal.  They were

22    concededly illegal in that case.  The Court held that whether

23    or not that was the case, the government could not take action

24    to punish or suppress the NRA'S protected expression.

25        Here the plaintiffs say there is a plausible argument

P3PNKHAO

1    that even if the conduct at issue, the threats and the

2    harassment were illegal, the government took action to suppress

3    a category of speech.

4              That's the plaintiff's position that's been

5    articulated in their complaint.

6              Finally, in *Vullo* it didn't matter that the

7    government's actions targeted business practices and

8    relationships which were nonexpressive activity.  The key was

9    that the allegation in the complaint was that their actions

10   were aimed at punishing or suppressing speech.

11             *Vullo* was at the complaint stage, and a lot of what's

12   in the Supreme Court's opinion was disputed.  But the Court

13   accepted it as true under *Twombly* and *Iqbal* and said that there

14   was a plausible claim of First Amendment coercion.

15             Similarly here, we are at the pleading stage.  There

16   are certain other showings that need to be made for a temporary

17   restraining order, but the posture of the case is we are at the

18   pleading stage.

19             Why doesn't this case fit the mold of *Vullo* at least

20   in terms of the merits?

21             MR. GRAVER:  I will walk through -- obviously, one

22   very brief note at the start.  *Vullo* was a

23   motion-to-dismiss-case.  You need more than allegation for a PI

24   or TRO.  I am just flagging that.

25             THE COURT:  You heard me talking to Mr. Abbas about

P3PNKHAO

1    that.  I totally understand that.

2            MR. GRAVER:  All right.

3            So putting that all to the side, I think the key

4    difference -- I agree with your whole recounting of *Vullo*.  I

5    think the key difference here is probably twofold, again,

6    remaining within the four corners of the complaint.

7            The first part is that *Vullo* stands for the

8    proposition that the government cannot use coercive measures of

9    any stripe to censor protected speech.  One key difference here

10   is that the object of all of the actions issue within the four

11   corners of the March 13 letter and the four corners of the

12   March 21 response has nothing to do with protected speech.

13           Everything contemplated is unlawful conduct.  It is

14   targeting anti-Semitism harassment and violence within the four

15   corners of all of those documents.

16           So, again, you don't have an instance here where the

17   object of the action at issue involves protected expression at

18   all.  What we are dealing with is unlawful conduct.

19           THE COURT:  How is that different than *Vullo*, where

20   similarly, in terms of the context of the government action, it

21   was directed at these illegal insurance programs.

22           No one questioned they were totally illegal.  That's

23   what the defendant said, is that we are targeting illegal

24   insurance programs that no one questions are illegal.

25           How does that differ?

P3PNKHAO

1          MR. GRAVER:  Yeah.

2          The point that we are making is not that -- and this

3     is the argument lost in *Vullo* -- is that a legitimate

4     enforcement action is a blanket defense in all instances.

5          That is not the key point.  I think this kind of goes

6     to the second thing that I was going to raise, is that what's

7     the big difference between this complaint -- if you look at

8     where we are discussed in the complaint, it is paragraphs 56

9     and 71, which essentially just state the contents of the

10    March 13 letter and that's sort of it.

11         The key difference is that *Vullo* had a lot of

12    objective allegations that informed a plausible inference that

13    what was really going on is the censoring of speech.

14         There was a lot of rhetoric in the TRO filings and

15    today.  But if you look at allegations in the complaint,

16    there's nothing to substantiate that sort of charge.

17         I think what you then have, and I think the way to

18    sort of think about this a bit is, is this an *Iqbal* case or is

19    this a *Vullo* case?

20         In both instances you have facially legitimate

21    enforcement actions.  In *Iqbal* what you had was an enforcement

22    action in the aftermath of the war on terror.  You had

23    deportations.

24         Within the four corners of the actions themselves,

25    they all looked legitimate.  But what the complaint said, much

P3PNKHAO

as what you heard this evening, is, well, what was actually
going on was something rather nefarious.

The entire holding of *Iqbal* is that naked charge,
standing alone, does not turn an otherwise legitimate
enforcement action into a plausible claim of discrimination.

That's the exact same thing as this case.

Every single piece of objective material before you,
even the allegations about us within the complaint, all involve
enforcement actions, none of which involved protected speech.
A naked allegation that, hey, what was really happening there
was something pretty bad, that is not, without more, enough to
state a *Vullo* claim.

THE COURT:  So what would the plaintiffs need here?

This is not the *Iqbal* issue that you are talking
about, but it is a separate issue of plausible pleadings.

So what would the plaintiffs need to allege here?

I don't want you to kind of tell them what they need
to do to beat you, but what is that showing that you would need
to support a *Vullo* claim.

MR. GRAVER:  I think the best example is probably the
Lloyds meeting from *Vullo*, just the nature of the sort of
allegations that tip you over the ledge.

There you had a meeting between New York and Lloyds,
and what they said we are going to overlook these unrelated
insurance infractions if you cut ties with gun groups.  The

P3PNKHAO

1    reason that gave an inference that this was really about speech

2    is that this was about gun groups writ large.

3         Yes, it included the NRA, but it's like we don't like

4    these guys.  We want to put them out of business.  This is

5    outside of traditional regulatory ambit, but we are going to

6    use this leverage over here for you to go after that.

7         As you said at the start, the parties fiercely

8    disputed what happened at the Lloyds meeting.  But taking the

9    Lloyds meeting as true, that's the sort of thing that pulls you

10   out of the mold of the garden-variety enforcement action and

11   gives a plausible allegation that this might be about speech.

12        THE COURT:  All right.  That is helpful.

13        Now, one of the issues you raised in your briefing is

14   the argument that chill is not enough.  You have to have

15   something more.

16        So what is that something more?

17        Because Mr. Abbas says, look, it's just plain on the

18   face that the types of measures that we are talking about are

19   going to have a chilling effect on the speech of students who

20   are involved in the pro-Palestine movement or political

21   advocacy, those types of things.

22        Maybe it could have been done in a clearer way, but

23   that is the general thrust, and that is a chill that will be

24   experienced by any students based on the implementation of

25   these measures.

P3PNKHAO

1          You say that is not enough.

2          Why is that?

3          MR. GRAVER:  Yeah.  I think a helpful case with this,

4   I think, is *Murthy*, where you have a very kind of similar

5   structure where the government was sort of putting a lot of

6   pressure on social media platforms.  Those platforms might

7   adopt certain policies and might have downstream effects on

8   speech.

9          But I think the basic point about -- no one is saying,

10  I think, the idea that chill can't be a cognizable Article III

11  injury, like, of course it can.

12         But what you can't do is run into the trap, I think as

13  Justice Barrett put it in *Murthy* as having a bird's-eye view of

14  standing, or a bird's-eye view of chill.

15         What you need is kind of a concrete, plausible and

16  imminent fear of enforcement that gives rise to a chill.  What

17  that would look like here -- again, is this is how the Court

18  put it in *Murthy* -- is you need specific causation.  You can't

19  just have all thee things going around.  You need to concretize

20  your claim in governmental action.

21         So here it would be -- the way in which I see the

22  chain working for the plaintiffs is that on March 13 the

23  government recommended certain policies on their face geared

24  towards conduct.

25         Then Columbia may respond with policies,

P3PNKHAO

1    antidiscrimination, antiharassment policies on their face

2    geared towards conduct.

3        Those policies might be applied in the future to the

4    plaintiffs here.  And they might be applied in the future to

5    the plaintiffs here in a way that picks up protected speech,

6    speech of which, as you noted before, is nowhere in the

7    publicly available filings.

8        So I think the point here is that chill, like any

9    other Article III injury, needs to be actual and imminent.  It

10   needs to be concrete.  It needs to be identifiable.

11       So that's the basic point we're submitting here, is

12   that it can't be the sort of high-level speculative chain of

13   events that the plaintiffs are relying on at this present time.

14       THE COURT:  So if, for example, one of the plaintiffs

15   were subject to ongoing disciplinary proceedings that would be

16   impacted by the changes to the disciplinary apparatus at

17   Columbia that are outlined in both the March 13 letter and the

18   March 21 announcement, would that be the kind of thing that

19   would get you closer to that line?

20       MR. GRAVER:  It's closer, but the critical piece of it

21   is all of the actions at issue here are geared towards unlawful

22   conduct.  It is harassment, it is actions that make Jews feel

23   unsafe on campus.

24       So I don't think being subject to disciplinary

25   proceedings is enough to state a First Amendment claim.  What

P3PNKHAO

```
 1    you need to be saying among other things is that I have done

 2    things that are otherwise protected speech, so not storming a

 3    building, not keeping Jews out of the certain areas on campus.

 4    I am doing things that are otherwise protected speech that are

 5    then getting swept up because of these changes in policies.

 6            That's the other key critical ingredient.

 7            THE COURT:  All right.  Thank you.

 8            Let's turn to Columbia.

 9            Mr. Miller.

10            MR. MILLER:  Yes, your Honor.

11            THE COURT:  So, first, on state action, Mr. Abbas

12    says, look, in a case of this kind, the state action

13    requirement is necessarily going to be satisfied.  He, I think,

14    rationalized it or put it in the bucket of government

15    compulsion.

16            There's also the close-nexus test, which some courts

17    have looked at.

18            Is that hogwash, or what's the best case that says

19    that, under these circumstances where Columbia is being sued on

20    a theory of coercion, that they would not be proper defendants

21    in a case of this kind?

22            MR. MILLER:  Sure.  Thank you, your Honor.

23            I would like to come back on a couple of factual

24    points just to ensure that the Court has the full factual

25    record.
```

P3PNKHAO

1           THE COURT:  I will give everyone a chance to say

2    whatever is on their mind.

3           MR. MILLER:  Thank you.  Yes, indeed.

4           I think there is a number of cases that we cited in

5    our brief that stand for the proposition that, beginning with

6    the voluntary production of information to government actors,

7    there is a number of Second Circuit cases that say that such

8    voluntary production does not constitute state action.

9           THE COURT:  They say it is not voluntary.  They say

10   that you are coerced.

11          MR. MILLER:  Well, your Honor, I think --

12          THE COURT:  Let me put it this way.

13          Is it Columbia's position that they would have turned

14   over all this information whether or not there was any kind of

15   funding consequence for Columbia?

16          Is that your position?

17          And if we get all the e-mails and texts and everything

18   in discovery, that's what it would show?

19          MR. MILLER:  I believe that that's the case, your

20   Honor.  I think that generally Columbia responds to oversight

21   from Congressional and other legislative bodies by trying to

22   cooperate with that oversight, so long as it doesn't run afoul

23   of other legal principles.

24          At times that comes in the form of subpoenas.  At

25   times that comes in the form of letters that make requests.

P3PNKHAO

1          This is the latter.  As the letter, if you go through

2     the letter, it ends with "please provide the following

3     information."

4          We, as the record reflects, provided information.  I

5     did want to add that we provided anonymized information, so

6     some of the concerns the Court had and the plaintiffs had about

7     personally identifying information were not at play here in

8     terms of the information that was provided.

9          I think the plaintiffs actually even recognized that

10    in their amended complaint, that these were anonymized

11    information.

12          THE COURT:  That's helpful.

13          Just to understand the state of play, to date in terms

14    of Columbia's submissions to the Congressional committees,

15    those have been anonymized?

16          MR. MILLER:  That's exactly right, your Honor.

17    Columbia has taken significant steps to ensure and take steps

18    to do everything they can to anonymize.

19          THE COURT:  At this point is there any intent or has

20    there been any request to provide the actual identities of any

21    of these individuals?

22          MR. MILLER:  We have not done so.  There is no intent

23    to do so, and that has been communicated to the Congressional

24    defendants and the staff of the committee.

25          I would also add, to take it one step further, it is

P3PNKHAO

1    not just that there's not a name on it, but there's not

2    personal identifying information of any kind.  That is the

3    effort that Columbia goes through in each of its productions in

4    order to comply with FERPA, the law that applies to this sort

5    of information provision.

6            Again, that's in the plaintiffs' complaint.  They

7    acknowledge that that's how Columbia has produced these

8    materials.  So this is not a disputed fact.

9            THE COURT:  All right.  Understood.

10           I derailed you, I apologize, from addressing the state

11   action doctrinal.

12           MR. MILLER:  Yes.  Thank you, your Honor.

13           THE COURT:  Let me reframe it.

14           You are saying that it is voluntary, so you can't fit

15   it into the compulsion framework.  You couldn't fit it into the

16   joint-action framework.  You can't fit it into any of those

17   exceptions.

18           But this is not a jurisdictional question, right?

19           It goes to the merits.  Is that fair?

20           MR. MILLER:  Yes.  I believe that's correct, your

21   Honor.

22           I just want to also add there is case law in this

23   district, including in this district, that stands for the

24   proposition that responding to a subpoena, including a

25   Congressional subpoena, also does not render the responder a

P3PNKHAO

1    state actor.

2           That would otherwise put responders to subpoenas in a

3    very awkward position, where they would either have to refuse

4    to respond potentially to a Congressional subpoena or

5    potentially then be viewed as a state actor whenever they did

6    so.

7           Entities and individuals across the country respond to

8    subpoenas every day.  If we were to create a system where each

9    one of those folks becomes a government actor for the purpose

10   of any constitutional claim, that would be a significant shift

11   in the way that entities and individuals interact with their

12   government, whether on the Congressional side or on the agency

13   side.

14          Then the third part of this, your Honor, is that

15   there's case law in this district -- I am thinking of the

16   *Gilman* case that we cited in our brief, *Gilman v. Marsh &*

17   *McLennan*, that says that when private entities take action in

18   response to a government action that has as one of its goals

19   obtaining better treatment from the government, that does not

20   amount to state action.

21          I believe that came about in connection with a Fifth

22   Amendment claim that a cooperating company that essentially was

23   providing information to the government agency, enforcement

24   agency somehow became a state actor for Fifth Amendment

25   purposes.

P3PNKHAO

1              But I believe the same principle applies here, that

2       where an entity is interacting -- now I am thinking not of the

3       Congressional inquiry but of the agency letter from March 13,

4       that just because that agency letter stated certain high-level

5       principles that they felt warranted attention from Columbia, as

6       my colleague over there for the agency defendants described it,

7       to meet the university's obligations under Title VI, that even

8       if, under the *Gilman* case, one purpose of responding to those

9       government actors was to obtain better treatment, that would

10      not amount to state action.

11             So I think that in those cases they made clear that

12      under pre-*Vullo* case law -- all of that was pre-*Vullo*, under

13      pre-*Vullo* case law, provision of information, whether pursuant

14      to subpoena or voluntary, or actions taken in connection with

15      interactions with the government did not render a private

16      entity a state actor.

17             The *Vullo* case we believe doesn't change the posture.

18      It doesn't change the legal landscape with respect to the state

19      action area.  In *Vullo* there was no constitutional claim, no

20      First Amendment claim lodged by the National Rifle Association

21      against those insurance companies that were referenced earlier.

22             Rather, the only constitutional claims were lodged

23      against the state governmental actors, the governor of New

24      York, the head of the department of financial services, and I

25      think the department itself.

P3PNKHAO

1          Tellingly, in fact, when the NRA did bring actions

2    against at least one insurance company, they brought contract

3    claims.  They didn't bring constitutional First Amendment

4    claims.  They brought those against the proper party that was

5    at issue that was really at issue, which was the state

6    government.

7          THE COURT:  Let me make sure I understand.

8          So when we are talking about the letter or any

9    potential subpoena, your position would be you can't have any

10   claim of any sort because the cases have recognized that

11   private parties are required to respond to these things.

12         It just doesn't fit with any conception of the First

13   Amendment or state action doctrine.

14         Is that fair?

15         MR. MILLER:  I think that's fair in the agency area.

16         I am particularly focused on the situation where the

17   interaction between the government and the entity is in the

18   posture of a regulated entity and a regulating or enforcing

19   government agency where incoming requests, as in the *Gilman*

20   situation, relate to the entity's posture.  Providing

21   information back to the government does not render the entity a

22   state actor.

23         I think that's the key point here, and this is very

24   much on all fours with the *Gilman* case.

25         The point that I wanted to make on *Vullo* was, because

P3PNKHAO

1    of that posture, nothing in *Vullo* shifts the third-party

2    doctrine as it relates to state actor and the coercion way of

3    making the third-party state actor because it wasn't at issue.

4    The *Vullo* case had nothing to say on that point because of the

5    posture.  I think that's an important point.

6           I also think it's important to recognize that *Vullo*

7    went to great pains, the court, the *Vullo* court, to say they

8    weren't breaking knew ground doctrinally either, that they were

9    essentially applying *Bantam Books* and that they weren't

10   breaking new ground beyond *Bantam Books*.

11          So I think those two points together mean that the

12   case law that existed pre-*Vullo* with respect to third-party

13   status and whether or not the third party could be treated

14   essentially as the government for these purposes, all of that

15   case law is still live and applicable and the same as it was

16   pre-*Vullo*, and all of that case law, we believe, supports

17   treating Columbia as a private entity and not as a state actor.

18          The one other point that I would like to make that you

19   asked about, your Honor, in your order from this morning was

20   whether there were any cases that had addressed this issue.

21          We haven't seen cases that have addressed the

22   application of *Vullo* to the third-party status issue and

23   coercion issue that I mentioned, in part I think because of

24   what I just said, because it wasn't at play in that case.

25          But we have seen post-*Vullo* cases where some of these

P3PNKHAO

1   very issues were raised before courts and courts continued to

2   apply the pre-*Vullo* case law around what makes a third-party

3   entity, a private entity a state actor through coercion.

4           One of those cases was a case in the Eastern District

5   of Pennsylvania, the *Fakhreddine* case that was cited in our

6   brief.  It was, I believe, filed pre-*Vullo*, I believe, but the

7   decision was made in January of this year.

8           In that case, this precise fact pattern as it relates

9   at least to the Congressional request side was presented.

10  There was a Congressional request from this very committee,

11  although in the past, not in this session of Congress, the last

12  session of Congress, but this same committee with the same

13  general structure of the letter saying to the University of

14  Pennsylvania, Please provide records relating to anti-Semitic

15  conduct.

16          The University of Pennsylvania was going to produce

17  those records.  A lawsuit was brought, arguing that the

18  University of Pennsylvania essentially became a state actor

19  under the coercion theory announced by the Supreme Court.

20          The Eastern District of Pennsylvania court applied

21  faithfully the Supreme Court's coercion test and found there

22  was no state action by the university in providing that

23  information to the Congressional committee and thus no First

24  Amendment violation under those circumstances.  We believe that

25  maps on very neatly and accurately to the current posture, at

P3PNKHAO

1    least with respect to the Congressional part of this case.

2            THE COURT:  Let me try to understand practically

3    speaking what that means here.

4            So let's assume for a moment that if you got past

5    immunity there would be a valid claim under *Vullo* against the

6    Congressional defendants.  Let's just say, just assume that

7    you're get over the immunity bar so you could bring a case of

8    this kind.

9            Under those circumstances, Columbia would be a proper

10   party to the case under the necessary party rule, maybe not a

11   defendant on a claim, but a party to the case since it's

12   Columbia who would be turning over documents, right?

13           So if you were going to have an injunction, you would

14   be the person that injunction would apply to.  So even though

15   no other relief in the form of damages or anything else could

16   be sought from Columbia, you would be a proper party to the

17   case.

18           Is that fair or am I wrong about that?

19           MR. MILLER:  I believe that's fair, your Honor.

20           I do want to say one more quick thing.  I think it

21   gets at a point that is underlying this.

22           As your Honor saw from the meet-and-confer and from

23   Columbia's position there, our position on the provision of

24   information is that we have no interest in providing, even

25   anonymized and without PII, student information independently.

P3PNKHAO

1          So were there to be an injunction or some other order

2     to any of these other defendants, Columbia is not looking to

3     provide such information.  We provide such information to the

4     oversight committee, in this oversight function I should say,

5     to the committee here, because we think that's the lawful and

6     right thing to do because of the incoming request.

7          If there were to be an injunction here against one of

8     the governmental parties, we think, of course, we would be

9     charged with obeying that injunction.  I just want to make sure

10    we don't get put in the position which courts have talked

11    about, the position where we could run afoul and be in contempt

12    of Congress at the same time if we don't produce materials down

13    the road if there were to be a subpoena and then if there were

14    to be no provision of information, but at the same time

15    potentially run afoul of an order from the court that would put

16    us in contempt of an injunction.  So that's really the

17    conundrum that we most want to avoid.

18         THE COURT:  I had started off mentioning the

19    close-nexus test you may have read the Fifth Circuit's decision

20    in *Missouri v. Biden* before it went up to the Supreme Court.  I

21    will just note in that case the court had said this, "To sum

22    up, under the close-nexus test, a private party's conduct may

23    be state action if the government coerced or significantly

24    encouraged it."

25         I understand that ultimately the case went up to the

P3PNKHAO

1    Supreme Court and the Fifth Circuit's decision was modified as

2    a result.  But maybe you can take a look at that doctrine and

3    just see what potential application it would have here.

4            Because based on our colloquy, this case raises an

5    issue that if there were a claim relating to the February 13

6    letter as to the Congressional defendants, they are arguing

7    that they are protected by immunity.

8            As to the Columbia defendants, you are arguing that

9    you are protected because you are not a state actor, so even if

10   there were a valid claim on the merits and the plaintiffs would

11   otherwise have standing, there is no relief to be had.

12           It would seem in some of the cases there have been

13   doctrines created to prevent that kind of consequence.  So I am

14   interested in understanding just how the mechanics of that

15   might work in a way that would be protective of everyone's

16   rights, but then wouldn't have this kind of catch-22 situation

17   that would apply to the plaintiffs.

18           I take it from your comments that you have no interest

19   in providing information response to these subpoenas or letters

20   that would in any way jeopardize the situation of any student,

21   because you have seen what the plaintiffs have said in terms of

22   doxing, in terms of potential immigration consequences,

23   everything of that kind.

24           I will give you a chance to address that.

25           MR. MILLER:  Sure.  Understood, your Honor.

P3PNKHAO

1          Of course not.  That is one of the reasons that we

2     work hard to anonymize any productions and remove personal

3     identifying information, because we have no interest in that.

4          I think the description of some of the experiences of

5     the students that were described the student's council is quite

6     concerning of course.  The university wants to protect the

7     privacy and works to protect the privacy of its students.

8          At the same time, we also recognize the importance of

9     responding appropriately to government inquiries about our

10    compliance, the university's compliance with antidiscrimination

11    laws.  We work as a university very hard to integrate a strong

12    and effective antidiscrimination policy and set of procedures

13    with some of the other policies and procedures we have to

14    integrate as well:  Protecting academic liberty, protecting

15    free expression, protecting the security of our students and

16    our faculty and our staff.

17         So it's a complex effort that the university needs to

18    make, and I think it's also critically important for the

19    university leadership to be able to have the discretion to be

20    able to manage that complicated interweaving of principles and

21    responsibilities that it faces.

22         I do think it is important to put that into the mix,

23    because a TRO or injunctive relief that essentially limits the

24    university's ability to comply with a federal civil rights law,

25    that limits its ability to manage these interweaving

P3PNKHAO

```
1    considerations and rights and responsibilities and principles

2    would be very difficult from the point of view of managing a

3    complex institution.

4                THE COURT:  Okay.

5                If Columbia became aware that information it was

6    providing in response to these letters and subpoenas was being

7    used in those ways that I have just discussed, that would

8    present a different situation than what we're dealing with in

9    this case from the university's perspective.

10               Is that fair?

11               MR. MILLER:  Yes, your Honor.

12               THE COURT:  To put it colloquially, you might find

13   yourself on the other side of the V if a case like that arose?

14               MR. MILLER:  It would certainly be very concerning,

15   your Honor, and we would have to look that the situation very

16   carefully.

17               I know that we're putting asides the merits here, but,

18   you know, I would be happy to address why we don't think on the

19   merits that we're in a place where a properly pleaded *Vullo*

20   claim has been put forth in the papers.

21               THE COURT:  I will ask you one question along those

22   lines, and in fairness I will come back to Mr. Abbas, and I

23   will give everyone a chance to address -- the question is, as

24   to the March 21 announcement, is it the university's position

25   that it would have taken those measures in the absence of the
```

P3PNKHAO

1   suggestions that funding would be either withdrawn or paused if

2   those measures were not taken by March 20?

3        MR. MILLER:  Your Honor, many of those measures were

4   the product of months and months of work.  I think it is also

5   important for the record that everyone understands that these

6   things don't match up one to one.

7        THE COURT:  That's why I said it the way I did.

8        Is it the university's position that it would have

9   taken the steps outlined in the March 21 announcement whether

10  or not there had been any indication that federal funding would

11  have been withdrawn?

12       Yes or no.

13       MR. MILLER:  Well, your Honor, I mean, it is a

14  hypothetical that I think I would want to make sure --

15       THE COURT:  I don't think it is a hypothetical.  It's

16  just asking what the university's position is on what actually

17  happened.

18       There was the March 21 announcement of those steps.

19       Would that have been done whether or not there had

20  been any indication from the Executive Branch defendants that

21  funding would be withdrawn?

22       MR. MILLER:  May I have a moment, your Honor.

23       THE COURT:  You may.

24       (Pause)

25       MR. MILLER:  I think, your Honor, the best way to put

P3PNKHAO

1      it was that all the 18 actions that were announced on March 21

2      were actions that were under review and work and development

3      for many months.

4              I think the letter from the government essentially

5      crystallized those lines of effort and affected timing.  But

6      all of those lines of effort were in play and were ongoing for

7      some significant periods of time before the March 13 letter and

8      ultimate March 21 announcement.

9              THE COURT:  Right.

10             So it is at least Columbia's position here that the

11     steps outlined in the March 21 announcement would have been

12     taken regardless of any suggestion relating to funding?

13             MR. MILLER:  I think it's -- I think that -- I just

14     want to be careful about the timing particularly, your Honor.

15             The university recognized that actions needed to be

16     taken.  The university engaged in a significant amount of work.

17     I would be happy to -- I think it would be useful to talk about

18     the definition, for example --

19             THE COURT:  I don't want to get -- I will let you

20     speak to that.  Let me just make sure I understand.

21             You are saying that we were talking about a lot of

22     these things.  It may be that the timing and the precise

23     substance of these things were related to the March 13 letter

24     and the suggestion about funding.  That might have sped up how

25     we were doing things.  It may have affected the particular

P3PNKHAO

1  inquiries that we had.  But, generally speaking, the university

2  was looking into some of these issues.

3          Is that a fair characterization?

4          MR. MILLER:  Yes.  And looking into it with a degree

5  of urgency as well.

6          I don't want to make it seem like the university was

7  dithering.  It wasn't.  It was looking at them with diligence

8  and with care.

9          But in terms of the precise timing of the announcement

10 of them and the crystallization of them into these actions, I

11 do want to be, you know, clear that the March 13 letter did

12 have an impact.

13         THE COURT:  All right.  Okay.

14         So, Mr. Abbas, I will throw it back to you.  Then we

15 will cycle around and give each -- let's try to do it five

16 minutes or so.

17         And I'll let you cover anything you need to, just so

18 we can try to wrap up by 4 p.m.

19         And I will have some next steps for everybody.

20         MR. ABBAS:  Yes, your Honor.

21         Ms. Greer is going take from it here.

22         MS. GREER:  I had prepared some remarks here, but I

23 won't read all of it because I think it will take us a little

24 too long.

25         But I would like to take a moment to think about the

P3PNKHAO

*Bantam* line of cases, because what is being alleged by

particularly the governmental, the agencies and the

Congressional bodies, that all of the speech involved in the

seeking of student records as well as what is bringing down the

financial hammer on Columbia, all of that speech falls under or

would fall under the auspices of Title VI, that is false.

     And I think it's important, in *Bantam Books*, that case

held that the commission violated the First Amendment by

invoking legal sanctions to suppress disfavored publications,

some of which may or may not contain protected speech, in that

case obscene material.

     I would argue that a significant number of the events

listed on the February 13 letter as well as a number of the

actions proposed by the many agency defendants cover all speech

related to Palestine, all speech critical of Israel, Hind's

Hall, for example, one of the incidents listed, certainly there

can be legitimate questions about time, place, and manner, even

about legality regarding potential trespass or being -- you

know, the harm to the building, damage to the building.  In

none of that do we hear a description of discrimination,

harassment, or anti-Semitism, in none of that.  It is all

conduct related.

     And we can disagree, agree on the actions students

took in that moment.  We can agree and disagree on their

tactics.  But what we can't say is that that act as a whole,

P3PNKHAO

every student involved, and involved many, many students both

inside and outside of the building, that all of them were

engaged in discriminatory action, that all of them were engaged

in harassing Jewish students.  That is patently false.

        I also think what's critical to note is that a number

of the people involved in, a huge number of the people involved

in many of these incidents are themselves Jewish and have

deeply held beliefs that what is happening in Palestine in Gaza

offends their perception and their deeply held religious

beliefs.

        So to then inherently say that any speech they engage

in is inherently anti-Semitic I would argue is in fact

anti-Semitic by telling a group of Jewish students how to

practice their religion.

        So, each of these incidences, we can talk about

tactics, we can talk about strategies, we can even talk about

trespass or, you know, destruction to facilities, etc.

        But that is not what these agencies and what this

Congress says it's investigating.  They say they are

investigating discrimination, harassment, and anti-Semitism.

        I think that they are using a hammer or a shovel, or I

don't know what kind of tool, to basically suppress all speech

critical of Israel, all speech critical of Palestine.

        I think that when we look at the *Bantam* line, of which

*Vullo* a direct descendant, it becomes very clear that a

P3PNKHAO

1    plaintiff must plausibly allege -- and we've heard your

2    critiques, your Honor -- that, viewed in context, the actions

3    of the government could reasonably be understood to convey a

4    threat.

5            I will just be clear on *Bantam Books*.  That included a

6    letter written on letterhead, not a subpoena.  Just that act by

7    a governmental agency, putting something on letterhead, caused

8    booksellers to change how they did their business.

9            While Columbia I think is suggesting here that they

10    were imagining some of the things they've put into place prior

11    to the March 13 letter, I think it's indicative that some of

12    what they've put into place is a direct result of that March 13

13    letter and/or perhaps conversations that were happening prior

14    to that letter being released.

15            I would also just like to circle back to the idea that

16    the government defendants are suggesting that no protected

17    speech is being chilled.  That is also patently false.

18            As my colleague here addressed, students are afraid to

19    associate with each other they are afraid to be seen in public

20    together for fear of certain negative implications for both of

21    them.

22            We have students who have been pilloried on Twitter

23    and other places for holding certain beliefs that are allegedly

24    terroristic in nature.

25            Members of the committee that are asking for students

P3PNKHAO

1   records have labeled all of these students as pro-Hamas, all of

2   these students as anti-American, and cast aspersions on all of

3   their character.

4           While they can use their public forum, you know, their

5   public dais to speak however they want, to speak persuasively,

6   as Justice Sotomayor said in *Vullo*, they can speak as an

7   individual all they want.  They can say that the wrath of God

8   will come down on Columbia if they don't take action to protect

9   Israel and Jewish students.  They can say all of that from

10  bully pulpit.

11          What they cannot do is hold Columbia hostage for $400

12  million, and they cannot demand individual student records in

13  order to suppress speech they disfavor.  To think about this

14  outside of this broader context would be a huge error I think.

15          Our students, the students that I work with on a

16  regular basis are experiencing profound mental harm.  Their

17  speech has been chilled.

18          Some of them, not necessarily our plaintiffs, but

19  other students who were too afraid to be plaintiffs because of

20  their immigration status are, like, having food deliveries to

21  their room because they're afraid to walk around campus due to

22  ICE's presence and because of their prior speech regarding

23  Palestine.  That is protected.

24          THE COURT:  What is your response to the defendants'

25  indication that, at least with respect to the February 13

P3PNKHAO

1  letter, the data has all been anonymized with no personally

2  identifying information.

3         At least in this context, maybe differently than what

4  had happened in 2024, there's not any present risk of that kind

5  of impact because there's just no individual information here?

6         MS. GREER:  I think I would refer your Honor to look

7  to the appendix of the October 31, 2024, committee report on

8  anti-Semitism.

9         I cannot be angry at Columbia for following FERPA to

10 the letter.  We did mention that in our complaint.  They did

11 redact students names, and they did redact personally

12 identifying information.

13        This is where context is critical.  This campus and

14 the students on it, particularly who are engaged in protected

15 speech for Palestinian human rights, are most surveilled people

16 in our country right now, by private actors not just

17 governmental actors.

18        That is a very real component here, which means that

19 even if their names are removed, even if certain personally

20 identifying information is removed, by placing them in certain

21 times and places, by physically describing them, even by the

22 color of their keffiyeh, some of these students are so

23 identifiable by these third-party people who are harassing them

24 and reporting them to ICE to Rubio, to all kinds of people,

25 they are so identifiable that even when you take all of those

P3PNKHAO

1    FERPA-protected pieces of information out, somebody is going to

2    recognize them.

3            I believe -- and I don't want to cast aspersions

4    necessarily on the committee, but I believe they knew that, and

5    that's why they put that information out there.  Even if the

6    committee didn't do it themselves, it made it possible for a

7    lot of large organizations, like Betar, like Canary Mission,

8    and like a number of others to target specific students for

9    their protected speech.

10           THE COURT:  All right.

11           Any last point?

12           Then we will turn to the Congressional defendants.

13           MS. GREER:  I rest my case.  No, I am just kidding.

14           I don't think there's anything more than to say at

15   this moment other than we have taken under advisement your

16   Honor's advice.

17           Thank you.

18           THE COURT:  Let's turn to the Congressional

19   defendants.

20           You don't have to have anything further if you don't

21   have anything, but I will give you the opportunity to address

22   any point you would like to.

23           MR. TATELMAN:  No.  Thank you, your Honor.  We do

24   appreciate that.

25           I do have some a few quick points.

P3PNKHAO

1          First, I want to start by reminding everybody that

2     while the Jewish students at Columbia don't have an attorney in

3     court here today, I think it can easily be said and it should

4     not be forgotten that Columbia itself has already admitted that

5     there was a pervasively hostile environment at their

6     university, in violation of Title VI.

7          And Congress, and the committee in particular that's

8     been delegated jurisdiction over this subject matter, the

9     committee before this Court, has and clearly has a legitimate

10    legislative purpose in investigating that.

11         Once that legitimate legislative purpose is

12    established, there's no work-around, no emotional appeal, no

13    possibility of any way to avoid the application of the Speech

14    or Debate Clause, and once the Speech or Debate Clause has been

15    found to apply, its protections have been held to be absolute.

16         I think it is important for the Court to look at the

17    long line of cases that we provided in our brief, you know,

18    starting with *Doe*, going through *Eastland*, going through the

19    recent D.C. Circuit opinions, all of which have established a

20    clear and unambiguous application of that clause to the very

21    activity, the very legislative activity that is at issue here,

22    the information-gathering letter that was sent by the committee

23    on February 13.

24         The second point I would like to make is that -- a

25    couple more things with respect to *RNC v. Pelosi* that I want to

P3PNKHAO

1   draw the Court's attention to.  I am certain you will take look

2   at that case when you have a chance.

3        But I would draw your attention specifically to docket

4   No. 33, which is the Court's opinion.  I don't have the actual

5   reporter cite, but if you take a look at the docket, it's ECF

6   33.  Particularly, I want to draw the Court's attention to two

7   quotes.  One is page 35, where Judge Kelly in that case

8   specifically says that the Court was assuming, without

9   deciding, that for purposes of the joinder --

10        THE COURT:  I have that quote here on my screen.

11        MR. TATELMAN:  -- that Salesforce was state actor.

12        So, again, the Court didn't actually make that

13   holding.  It made an assumption and moved from there.

14        The other thing I want to point to is on page 14,

15   where Judge Kelly says that he has no trouble concluding that

16   speech or debate immunized the House defendants from suit and

17   they must be dismissed.

18        I think that that posture and that holding is

19   consistent with the other cases that we've cited, and it's

20   consistent with the cases that we've relied upon.

21        We see no reason why and no work-around for the

22   possibility that there can be no relief granted here against

23   the Congressional defendants.  The Speech or Debate Clause is

24   absolute.  It applies.  I think the Court is required to find

25   no ability to enjoin any of its activities here.

P3PNKHAO

1          Last, finally, I want to clarify some of my comments

2     from earlier with respect to the threat in the February 13

3     letter.

4          There's absolutely no threat, as I said, in that

5     letter.  There's no reason to believe and no connection between

6     failing to respond and a loss of funding.

7          People fail to respond to Congressional requests and

8     subpoenas all the time.  There is no consequence of loss of

9     funding that flows from that.

10          The Committee has a number of alternative ways of

11     remedying loss or failure to comply with its requests.  It can

12     issue subpoenas.  It can pursue contempt.  It can do a number

13     of different things.  The connection between those two simply

14     doesn't exist.  There's no mechanism --

15          THE COURT:  When you say it doesn't exist, don't we

16     have to take a holistic view of what has been occurring in the

17     first quarter of 2025, including the non-Congressional

18     announcements that have been made regarding Columbia's funding,

19     meaning understanding that the latter itself, the four corners

20     of the letter did not threaten any funding consequence,

21     wouldn't you, under *Twombly* and *Iqbal*, have to consider the

22     broader context that there had been suggestions that funding

23     might be paused if there was a failure to take certain steps

24     and that in that context there was a request for information

25     from the committee?

P3PNKHAO

1          MR. TATELMAN:  I think that's the sort of, you know,

2    bootstrapping that I don't think is permissible here, your

3    Honor.

4          I mean, the Congressional defendants and Executive

5    Branch defendants operate in separate spheres.  They were

6    operating completely independently.  There's certainly overlap

7    with respect to some things that they might do, but I don't

8    think there's any reason to bootstrap the Executive Branch's

9    positions with respect to allocations of certain funding onto

10   what the Congressional committee was after in its February 13

11   letter.

12         The February 13 letter should be contained to its four

13   corners.  It doesn't make any threats.  There's no consequences

14   with respect to funding that would flow from that.  I think

15   that's the end of that inquiry.

16         In addition, I think, you know, again, going back to

17   the Speech or Debate Clause, which prohibits looking behind the

18   things, into the motives or things like that, would also

19   preclude that kind of an inquiry.  I think the letter should

20   speak for itself, and it clearly does.

21         THE COURT:  All right.

22         Thank you very much.

23         Mr. Graver.

24         MR. GRAVER:  Thank you, your Honor.  I think just two

25   quick points.  Maybe two on the merits, and then two maybe more

P3PNKHAO

1    housekeeping-ish things.

2            The first is I just wanted to return to the standing

3    point.

4            One of the main points I want to emphasis is that I

5    lot of the rhetoric that comes towards the standing argument

6    treats the government as a they, I think operates with a rather

7    high level of generality.

8            I think that is the specific error that *Murthy*

9    corrected.  Justice Barrett said the government is not a

10   monolith.  You need to tie your action to concrete governmental

11   acts that will result in identifiable injuries.

12           I think you put it well, in that you need to connect

13   the dots.  I think as the record stands now that just isn't

14   there.

15           One of the best examples of it, it seems that the best

16   example folks have from the March 13 letter is the

17   anti-Semitism definition.  Just two quick things on that.

18           One is that the argument before just rests on a faulty

19   premise.  Everyone keeps saying that we charged them to adopt a

20   specific definition.

21           You can look at the letter.  It says adopt "a

22   definition."  Then you can look at what Columbia did, which is

23   adopt its own definition.

24           Even putting that, though, totally to the side, again,

25   you still need to connect the dots to a concrete injury.  You

P3PNKHAO

1    need to explain how the adoption of a definition folded into

2    disciplinary proceedings that may be applied in the future will

3    in some manner affect your protected speech.

4            That is not just not present on the allegations as

5    they stand here.

6            So that's the standing point I think.

7            On the *Vullo* point, I think it is the same theme.  It

8    is that there needs to be some separation between allegations

9    and rhetoric.

10           What we have, at least within the four corners of the

11   complaint, the letters that they cite, and the available

12   materials here, as the government has articulated its

13   rationale, it has been consistent and careful that this is

14   about anti-Semitic harassment and violence.

15           Again and again and again the touchstone has been

16   anti-Semitic harassment and violence.  I think that's

17   important -- at least, again, the materials that are present

18   before this Court.

19           The *Vullo* claim that essentially turns on, all of that

20   a ruse.  There is no plausible allegation on the available

21   materials that can substantiate any of that.

22           So those are the two substantive points.

23           The housekeeping, more points that I want to turn to,

24   there's been discussions a bit about letters to explore, or I

25   think weighty legal issues, things to flesh out a bit more.

P3PNKHAO

1          I think that the plaintiffs' burden for a TRO and PI

2    have not been met.  If we want to cross the road about amending

3    the complaint, possibly figuring out a briefing schedule for

4    that, but a TRO and preliminary injunction motion are

5    extraordinary relief.

6          The Supreme Court has emphasized you need to make a

7    clear showing when you file that you are entitled to that

8    remedy.  I do not think that is present here, and I think that

9    stage of the case should be put behind us.

10          The last thing I would say, too, is just as we are

11   talking about allegations that may be lacking, things that

12   might get changed in the future, the plaintiffs, without any

13   specific allegations, have named Executive Branch defendants in

14   their individual capacities.

15          I don't spot any individual-capacity allegations in

16   the complaint.  When the complaint asks for damages, it's

17   limited to the House.

18          Naming someone in their personal capacity presents a

19   meaningful burden on those individuals.  It is a weighty

20   charge.  There is nothing in this complaint that should allow

21   those claims to last a day longer.

22          Those are the four points I wanted to make.

23          THE COURT:  Mr. Abbas, there any basis to be suing the

24   defendants in their individual capacities?

25          MR. ABBAS:  Yes, your Honor.

P3PNKHAO

1          I believe *Vullo* is ultimately a qualified immunity

2     case about whether it's clearly established, this idea that you

3     can accomplish -- you can't accomplish -- that a government

4     official is prevented from doing indirectly what he is

5     otherwise prevented from doing directly.

6          At the Supreme Court that was the question.  Is it

7     clearly established?  And the answer was absolutely it is

8     clearly established.  We are not breaking any new ground at

9     all.

10          I think it is appropriate, and it might be -- it might

11     end up being critical for this court to exercise individual

12     jurisdiction over defendants that are engaging in the jawboning

13     if they flaunt the judge's order or if they don't follow the

14     judge's --

15          THE COURT:  I think your answer to that question is

16     that you are continuing to seek preliminary injunction in their

17     individual capacities.

18          MR. ABBAS:  Yes.

19          THE COURT:  Mr. Graver, I assume you will make an

20     application if you want those claims to be dismissed, and then

21     we will address that at the time.

22          On the standing point, if there was an allegation and

23     supporting declaration from a student who said that they were

24     restricted to lawful protesting, but they were feared to death

25     of engaging in that kind of activity, given the prospect of

P3PNKHAO

 1   discipline, arrest, identification, the types of things that

 2   are in the March 21 announcement, at least for standing

 3   purposes -- you argue that it wouldn't be a substantive claim

 4   on the merits, but at least for standing purposes, would that

 5   get you through the door in terms of the *Lujan* factors?

 6        MR. GRAVER:  It gets you closer.  Again, I would point

 7   back to *Murthy*, where that argument ultimately did not carry

 8   the day.  Individuals there were essentially saying they were

 9   self-censoring because they were worried that the platforms

10   were going to go after them.

11        THE COURT:  Wasn't *Murthy* a little bit different

12   because, even there was some initial government coercion, there

13   was no showing that there was continued government coercion

14   such that the private action would be affected by the coercion?

15        Here, the plaintiffs say that the March 13 letter

16   itself says if you don't take these steps we are not even going

17   to sit down at the table for you, but all we are giving you is

18   the opportunity to sit down at the table with us and discuss

19   the prospect of future funding.

20        So at least at a pleading stage and for standing

21   purposes at this stage, wouldn't that be enough to get them

22   through that?.

23        MR. GRAVER:  I think the only point I am trying to

24   make, just dealing the hypothetical, is that when you involve

25   an independent third-party actor who had pre-existing policies

P3PNKHAO

1    in the same space and may have made decisions based on those

2    existing policies already, there are traceability and causation

3    questions that attach.

4           So I don't want to commit a hundred percent to it, but

5    I do think that you certainly get closer than you are here, but

6    then the issue is going to be traceability.

7           THE COURT:  Understood.

8           And, lastly, Mr. Miller.

9           MR. MILLER:  Thank you, your Honor.

10          I did want to say a few points about the March 13

11   letter and the March 21 actions announced by Columbia.

12          I think it's important to understand in connection

13   with those that those, as I mentioned before, were not only the

14   product of months of development, but they also reflect not

15   just internal considerations at Columbia but also analysis of

16   best practices at universities across the nation.

17          So with many, if not almost all of these

18   announcements, they are reflective of and consistent with what

19   Columbia found was the best practices at other universities.

20   We could go through the list and go through them.

21          Again, what I think this shows and what I think is

22   important here is there were nine areas that were identified in

23   the March 13 letter as areas where the government agencies felt

24   improvement needed to be made by Columbia.

25          At the same time, Columbia went above and beyond those

P3PNKHAO

nine areas and announced 18 different actions, actions that we know had to have been done in advance.

I will give you just one example.  It announced that there were 36 already newly hired officers who were nearing completion of their training as of March 21.  So it is impossible to hire officers and complete training in the eight days since March 13.

That is an ongoing effort that is clear from the face of the announcement that it's been going on for a significant amount of time.

That is true for many of those other points as well. I could go back to the definition.  This is a definition that, as plaintiffs recognized, was recommended by a task force on anti-Semitism, an internal Columbia task force on anti-Semitism, and was under review as to whether to adopt more broadly.

I think there are a couple of important points about that that were lost in the discussion earlier.  Not only is it a different definition from the one I identified as a possibility by the March 13 letter.

Not only is it a definition from the university's own task force of internal professors who look at this question with great care and thoroughness, but also it's quite different from the definition that was referenced in that case, I think *students for Justice* case that was cited.

P3PNKHAO

1          That was the subject of a government executive order

2     that was applicable to the University of Texas by virtue of the

3     fact that it was a public university implementing a public

4     executive order from the state of Texas.  So that puts a very

5     different context on the state action situation.  The judge in

6     that case did not grant a preliminary injunction.

7          One more thought, and then I will stop on the

8     definition, is the very concerns that were raised by plaintiffs

9     about these examples, there are no examples in the definition

10    that the anti-Semitism task force, the internal Columbia

11    anti-Semitism task force recommended.

12         So I it just doesn't map on to the concerns that were

13    raised in ways that show that -- this is Columbia responding,

14    yes, to oversight actors and regulatory actors who see areas

15    for improvement, but reacting in ways that were developed

16    internally that don't map on one to one at all to the letter.

17    But rather show that Columbia has been engaged, as you would

18    expect it would be, in very careful and thorough thinking about

19    how best to deal with the interplay between protecting its

20    students from discrimination, but also ensuring academic and

21    religiously liberty.

22         THE COURT:  What Mr. Abbas' argument that if you look

23    at the recommendations from the task force, they recommended

24    that the definition not be used in disciplinary procedures and

25    not be used to limit speech.

P3PNKHAO

1          So his point was, even accepting everything that you

2     are saying, there's that difference that they believe lends

3     plausible support to their allegations of coercion and that the

4     actions taken were the result of governmental coercion?

5          MR. MILLER:  Well, I think your Honor, that a task

6     force that makes recommendations, I think some recommendations

7     are employed, some recommendations are not, some are tweaked.

8          This one was employed in part in the sense that the

9     definition was adopted.  And the administrators and leaders of

10    the university determined that it would be more effective to be

11    used more across the component or across agency, across

12    university.

13         THE COURT:  To be clear, that definition that was

14    adopted as part of the March 21 announcement, it is to be used

15    in disciplinary procedures.

16         Is that fair?

17         MR. MILLER:  I think it is to be used across the

18    university.

19         THE COURT:  Including in disciplinary procedures?

20         MR. MILLER:  I believe so, your Honor, but we will

21    double check that.

22         You know, I think I do just want to make one other

23    point, because I think it is an important factual point that is

24    misunderstood or misstated, I think, in the papers that are

25    before your Honor.

P3PNKHAO

1    With respect to the discipline which was alleged in

2    the original papers as being the product of this March 13

3    letter, I think there I do think it's important to understand

4    that that disciplinary process was a months-long process

5    involving the university judicial board that culminated earlier

6    in the day on March 13, before the university received that

7    letter.  So there's no way that the discipline that came before

8    the letter could possibly have been the product of the letter.

9    So I do just want to make sure that is clarified for

10   the record, I think as another example of how the context is

11   important, of course, and as the case law requires, must be

12   factored in.  But also care needs to be taken as to the

13   context, because that is a good example of those things

14   happening close in time, but not in the sequence that I think

15   folks jumped to the conclusion of because they felt that the

16   context suggested that.

17   THE COURT:  All right.  Thank you very much.

18   Thank you, everyone, for your argument here today.

19   Here are the next steps.

20   Mr. Abbas, within the next 24 hours you should inform

21   the parties and Court whether you intend to amend the

22   complaint.  You should speak with the defendants to see if

23   there's any opposition to your amendment.

24   As Mr. Graver indicated, this may be independent of

25   any of the proceedings on the pending motion, but given what

P3PNKHAO

1    we've discussed today, I would like to see whether there is

2    going to be an amendment to the complaint.

3            Otherwise, by Thursday at 5:00 p.m. each of the

4    parties will be permitted to submit a letter of no more than

5    five pages that indicates any additional authorities or

6    citations to the record they want to bring to the Court's

7    attention.

8            What is most helpful for the Court are cases and the

9    quotes from those cases that you think are the most compelling.

10            What's least helpful is rhetoric.

11            It is going to help me to see the cases that you are

12    relying on and the quotes from those cases.  If you have

13    citations to the record on the motion that you think I should

14    be focused on, then you should point me to those citations,

15    and, if possible include those quotations.

16            So we will have those by Thursday at 5:00 p.m., and

17    then we will make our ruling promptly on the pending motion.

18            In terms of the injunction that the Court had entered

19    pending this hearing, based on my understanding, the Columbia

20    defendants are not planning to produce any further information,

21    especially not information that bears the identities of the

22    plaintiffs.

23            For the Congressional defendants, they are not seeking

24    any further information, at least right now while they review

25    what has been produced.

P3PNKHAO

1          So we are going to leave that in place.

2          But, of course, if any party seeks modification to

3    what the Court has in place, pending the court's decision on

4    the motion, they can bring an application to the Court and we

5    will, of course, consider it.

6          THE COURT:  With that any further questions from

7    anyone?

8          MR. BERRY:  Your Honor, does the part of the pending

9    injunction relating to restricting the activities of the

10   committee in terms of what it does with the information remain

11   in place?

12         Because we think that that pretty clearly is

13   prohibited by the Speech or Debate Clause.

14         THE COURT:  All right.  I will consider that.

15         Why don't you do this:  In connection with your

16   Thursday submission, I would include that and include a request

17   for that modification of the order.

18         To be fair, is there any contemplated action with

19   respect to the information that's been received that would

20   impact the immediate term here?

21         MR. BERRY:  There is not, your Honor.

22         It is just a matter that we believe it is some kind of

23   an unconstitutional injunction.

24         THE COURT:  That is fair.

25         Please include it in that Thursday letter, and I will

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P3PNKHAO

1    take a look at that.  It's a fair point to raise.

2              I don't think anyone thinks that it's going to have a

3    practical ramification here given what we've discussed, but we

4    will address that.

5              THE COURT:  Anything further?

6              MR. MILLER:  One question, your Honor, with respect to

7    the ex parte materials that we began the hearing discussing and

8    that your Honor ordered that counsel furnish some version of

9    those ex parte materials.

10             I do again want to correct the record insofar as in

11   the motions relating and the papers relating to the question of

12   pseudonymity, there was in those papers a contention that the

13   defendants actually know the identity of the particular

14   currently pseudonymous plaintiffs and thus would not be

15   prohibited from engaging in the analysis to necessary to

16   address things like standing, I want to make sure the record is

17   clear that we don't know who those pseudonymous individuals

18   are, the individual plaintiffs that are offered under

19   pseudonyms.

20             I am not sure if your Honor expects that the provision

21   of the ex parte materials would include the identification by

22   name or whether that is not part of the unredaction that would

23   be provided attorneys' eyes only with the Court's order that no

24   further use be made other than for these proceedings and

25   otherwise kept confidential.

P3PNKHAO

```
 1            THE COURT:  Mr. Abbas, I am not seeing any reason why
 2   the materials can't just be provided to counsel under these
 3   circumstances.
 4            Do you agree?
 5            MR. ABBAS:  I think I will.  Ms. Greer, what do you
 6   think?  Can I confer with counsel?
 7            THE COURT:  You agree personally?
 8            Let me put it this way:  Whether you agree or not, if
 9   there's not some basis not to have those documents provided to
10   counsel, I am going to order that.
11            MR. ABBAS:  Just to clarify, you want us to provide
12   unredacted versions of the --
13            THE COURT:  What you filed, you should provide that to
14   the defendants.
15            Let me make sure.
16            Everyone on the defense side, you understand this is
17   being provided for counsel in this case for no other purpose,
18   not to be shared with anyone else.
19            Do you have that, Mr. Graver?
20            MR. GRAVER:  Yes.
21            THE COURT:  For the Congressional defendants?
22            MR. TATELMAN:  Yes.
23            THE COURT:  For the Columbia defendants?
24            MR. MILLER:  Yes, your Honor.
25            THE COURT:  All right.
```

P3PNKHAO

1          There you go.

2          MS. GREER:  That is fine.  There was personal medical

3   information.  That's why I was listening carefully.

4          That's fine, your Honor.  Thank you.

5          THE COURT:  All right.

6          Anything further?

7          MS. GREER:  No, your Honor.

8          THE COURT:  Thank you very much.

9          I really appreciate it.  We are adjourned.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25