# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

MAHMOUD KHALIL, JANE JOE,
SALLY ROE, NED NOE, LUCY LOE,
SAM SOE, WILL MOE, and KAM KOE,
students at Columbia University and
Barnard College, suing under pseudonyms,

       *Plaintiffs.*

v.

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW
YORK;

COLUMBIA UNIVERSITY IN THE
CITY OF NEW YORK;

CLAIRE SHIPMAN, in her dual official
capacities as Interim President of Columbia
University, as Co-Chair of the Trustees of
Columbia University in the City of New
York;

COMMITTEE ON EDUCATION AND
WORKFORCE, U.S. HOUSE OF
REPRESENTATIVES;

TIM WALBERG, in his official capacity as
Chairman of the Committee on Education
and  Workforce;

PAM BONDI, in her official capacity as
Attorney General, and in her individual
capacity;

LINDA MCMAHON, in her official
capacity as the Secretary of the Department
of Education, and in her individual
capacity;

**SECOND AMENDED
COMPLAINT AND JURY
DEMAND**

Civil Case No. 1:25-cv-02079-AS

Hon. Judge Arun Subramanian

LEO TERRELL, in his official capacity as
the head of the Department of Justice
Taskforce to Combat Anti-Semitism, and in
his individual capacity;

SEAN KEVENEY, in his official capacity
as Acting General Counsel of the U.S.
Department of Health and Human
Services, and in his individual capacity;

JOSH GRUENBAUM, in his official
capacity as the Federal Acquisition Service
Commissioner of the General Services
Administration, and in his individual
capacity,

       *Defendants.*

## SECOND AMENDED COMPLAINT

PLAINTIFFS, Mahmoud Khalil, Jane Joe, Sally Roe, Ned Noe, Lucy Loe, Sam Soe, Will Moe, and Kam Koe,[1] by their ATTORNEYS, bring this Complaint against DEFENDANTS: Columbia University ("Columbia"); the Trustees of Columbia University; Columbia University Interim President and Co-Chair of the Trustees Claire Shipman, in her official capacities; Representative Tim Walberg, in his official capacity; the U.S. House of Representatives Committee on Education and the Workforce; Attorney General Pam Bondi, in her official capacity and individual capacity; Secretary of the Department of Education, Linda McMahon in her official capacity and individual capacity; Head of the Department of Justice Taskforce to Combat Anti-Semitism, Leo Terrell, in his official capacity and individual capacity; Acting General Counsel of the U.S. Department of Health and Human Services, Sean Keveney in his official capacity and individual capacity; and allege as follows:

### INTRODUCTION

1. The Government Defendants have successfully enlisted a private, third-party intermediary—Columbia University and the defendants affiliated with it—to punish and suppress the viewpoints held and expressed by Plaintiff Mahmoud Khalil and the seven other students suing here.

2. The Government Defendants have done so via a series of demands. One is for student disciplinary records—a February 13, 2025 letter[2] (the "Feb. 13 Letter") issued by the U.S. House of Representatives Committee on Education and the Workforce (the "Committee") to

---

[1] This Court has granted Plaintiffs' motion to proceed pseudonymously and under seal. *See* March 18, 2025, Order (ECF #12).

[2] Letter from U.S. H.R. Rep. Comm. Educ. & Workforce to Dr. Katrina Armstrong, then-Interim President of Columbia Univ., Mr. David Greenwald & Ms. Claire Shipman, Co-Chairs of the Trs. Columbia Univ. (Feb. 13, 2025), https://edworkforce.house.gov/uploadedfiles/2.13.25_columbia_letter.pdf [hereinafter the "Feb. 13 Letter"].

Columbia University. Another is a command through a March 13, 2025 letter (the "March 13 Letter") issued by three agency members of the newly formed Joint Task Force to Combat Anti-Semitism[3] to extinguish from campus the viewpoint Plaintiffs express, lest the federal government zero out the billions of dollars of federal funding the University receives.

3.    The Committee's demand for individual student records and the federal government's demand that the University change or implement numerous policies "as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government"[4] are coercive because these governmental entities are threatening to, and indeed have withheld millions of dollars from Columbia unless the University suppresses a viewpoint held by its own students that the government disfavors. These actions are improper uses of the federal government's powers, particularly its investigative and economic powers, to "do indirectly what [they] are barred from doing directly,"[5] which is to chill and suppress speech and association based on the viewpoint expressed.

4.    The Committee and the federal agencies' demands are clearly intended to chill the protected speech of the University's students through three primary means: (1) by exposing the students, including through mask bans and heightened police presence on campus, to federal actors, to negative publicity and investigation, pervasive and persistent harassment, doxing, and threats to their safety, lives, and ability to learn and work in the United States,

---

[3] Press Release, U.S. Dep't Justice, Justice Department Announces Formation of Task Force to Combat Anti-Semitism (Feb. 3, 2025), available at https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism.
[4] Letter from the GSA, U.S. Dept. HHS, and the U.S. Dept. Educ. to Dr. Katrina Armstrong, Interim President of Columbia Univ., David Greenwald & Claire Shipman, Co-Chairs of the Trs. Columbia Univ. (Mar. 13, 2025), available at https://s3.documentcloud.org/documents/25577971/31325-letter-to-columbia.pdf [hereinafter the "March 13 Letter"].
[5] *NRA v. Vullo*, 602 U.S. 175, 190 (2024).

(2) by compelling the University to discipline and punish students, including the eight Plaintiffs, as well as to turn over those students' (along with faculty and staff's) private disciplinary records, which includes information about their *protected* speech and associations, and (3) by intervening in the University's freedom "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study," that in turn negatively impacts and degrades the education received by Plaintiffs.[6] [7] This unlawful governmental attempt to circumvent the First Amendment is typically called "jawboning."[8] Indeed, as the U.S. Supreme Court recently reiterated, "[g]overnment officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors."[9]

5.    The coercive effect of the Committee's and the federal government's actions is very real. Given the plentitude of evidence of members of Congress, federal agency heads, and

---

[6] *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 263, 77 S. Ct. 1203, 1218 (1957).

[7] Notably, within the past week, the federal government has publicly threatened Columbia University with seeking a consent decree from a federal court, though it appears that Columbia rejected such interference. Dan Bauman, "The Feds Want to Cement Change at Columbia With a Consent Decree. How Would That Work?," *The Chronicle of Higher Education* (Apr. 11, 2025), available at https://www.chronicle.com/article/the-feds-want-to-cement-change-at-columbia-with-a-consent-decree-heres-how-that-would-work. Notwithstanding, Columbia has apparently continued to engage with the government in "dialogue" as the government persists in withholding funds and threatening the University into compliance. *See*, *e.g.*, Josh Moody, "Columbia Appears to Reject Consent Decree," *Inside Higher Ed* (Apr. 16, 2025), available at https://www.insidehighered.com/news/quick-takes/2025/04/16/columbia-appears-reject-consent-decree.

[8] "Jawboning" has been recognized as a phenomenon by First Amendment scholars since the late 1970s. *See*, e.g., Paul R. Verkuil, *Jawboning Administrative Agencies: Ex Parte Contacts by the White House*, 80 COLUM. L. REV. 943, 943 (1980). Scholars have theorized jawboning as a practice of not only the executive branch, but also U.S. Congress, as is the case here. *See* Jeffrey A. Love & Arpit K. Garg, 112 MINN. L. REV. 1195, 1233 (2014). *See also* Genevieve Lakier, *Enforcing the First Amendment in an Era of Jawboning*, U. CHI. L. REV., Forthcoming (2026).

[9] *Vullo*, 602 U.S. at 180.

President Trump actively attempting to strip universities and others of funding,[10] to roll back contractual obligations to entities whose work play critical roles in democracy,[11] to threaten law firms and lawyers that challenge the constitutionality and legality of the Administration's actions in court with punitive action if they do not cease their efforts,[12] and to ban certain media outlets from the White House because the President does not like what they publish,[13]

---

[10] As an example beyond the Columbia context, in addition to Department of Homeland Security Secretary Kristi Noem cutting $2.7 million in grants while demanding Harvard University turn over the student records of its international students, President Trump is threatening Harvard University with the removal of its tax-exempt status "and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?'" Evan Perez, Alayna Treene and Marshall Cohen, "IRS making plans to rescind Harvard's tax-exempt status," *CNN* (Apr. 16, 2025), available at https://www.cnn. com/2025/04/16/politics/irs-harvard-tax-exempt-status/index.html?iid=cnn_build ContentRecirc_end_recirc; Press Release, U.S. Dept Homeland Sec., *Secretary Noem Terminates $2.7 Million in DHS Grants; Orders Harvard to Prove Compliance with Foreign Student Requirements* (Apr. 16, 2025), available at https://www.dhs.gov/news/2025/04/16/ secretary-noem-terminates-27-million-dhs-grants-orders-harvard-prove-compliance-0.

[11] *See* Press Release, U.S. Dept. Educ., *ED, HHS, and GSA Announce Additional Measures to End Anti-Semitic Harassment on College Campuses* (Mar. 3, 2025), https://www.ed.gov/about /news/press-release/ed-hhs-and-gsa-announce-additional-measures-end-anti-semitic-harassment-college-campuses.

[12] Exec. Order No. 14230, 90 Fed. Reg. 11781 (Mar. 11, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-llp/; Exec. Order No. 14237, 90 Fed. Reg. 13039 (Mar. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/; Donald J. Trump, President of the United States, Memorandum on Preventing Abuses of the Legal System and the Federal Court (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/; Devlin Barrett, With New Decree, Trump Seeks to Cow the Legal Profession, The New York Times (March 22, 2025), https://www.nytimes.com/2025/03/22/us/politics/trump-memo-lawyers.html; Michael Birnbaum, Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks, The Washington Post (March 25, 2025), https://www.washingtonpost.com/politics/2025/03/25/trump-law-firms/; Daniel Ortner, Trump's Attack on Law Firms Threatens the Foundations of Our Justice System, Foundation For Individual Rights And Expression (Mar. 18, 2025), https://www.thefire.org/news/trumps-attack-law-firms-threatens-foundations-our-justice-system.

[13] *See* James Oliphant, *White House Bars AP, Reuters and Other Media from Covering Trump Cabinet Meeting*, REUTERS (Feb. 26, 2025), https://www.reuters.com/world/us/white-house-bars-ap-reuters-other-media-covering-trump-cabinet-meeting-2025-02-26/.

entities like the University feel compelled to cooperate with and act in lockstep with the government in its efforts to chill and punish protected speech and protest activity so that they may save themselves from public and administrative derision, loss of funding, and other forms of exclusion from the marketplace.

6.  To that end, on March 3, 2025, a U.S. Department of Education press release announced: "Given Columbia's ongoing inaction in the face of relentless harassment of Jewish students, the Federal Government's Task Force to Combat Anti-Semitism is considering Stop Work Orders for $51.4 million in contracts between Columbia University and the Federal Government. The task force will also conduct a comprehensive review of the more than $5 billion in federal grant commitments to Columbia University to ensure the university is in compliance with federal regulations, including its civil rights responsibilities."[14] Four days later, on March 7, 2025, the Trump administration stated that it has, in fact, "canceled ~$400M in federal grants to Columbia over its failure to protect Jewish students from antisemitic harassment."[15]

7.  In relation to this Complaint, and as discussed **post**, this Committee and the federal government are now collaborating to reanimate the methodologies used by the 1950s House Un-American Activities Committee ("HUAC")  in the Committee's "wide-reaching and intensive investigation"[16] to compel universities around the country to turn over massive

---

[14] Press Release, U.S. Dep't Educ., *ED, HHS, and GSA Announce Additional Measures to End Anti-Semitic Harassment on College Campuses* (Mar. 3, 2025), https://www.ed.gov/about/news/press-release/ed-hhs-and-gsa-announce-additional-measures-end-anti-semitic-harassment-college-campuses.

[15] The White House (@WhiteHouse), X (Mar. 7, 2025, 3:02 PM), available at https://x.com/whitehouse/status/1898101850169393451?s=46.   *See also* Jennifer Peltz, "Trump administration cancels $400M in grants and contracts with Columbia University," *AP News* (Mar. 7, 2025), available at https://apnews.com/article/columbia-university-protests-antisemitism-palestine-israel-9c209ce040e4b60d2702b40b9c2fb321.

[16] *See* Feb. 13 Letter, **ante** at 1 n.2.

quantities of private student, faculty, and staff records – 400,000 pages of documents as of October 31, 2024[17] – and the federal agencies' withholding of federal funding unless and until the University complies – for the clear purpose of exposing the identities, identifying membership rolls of student groups, and seeking to suppress their protected speech with threats of blacklisting, arrest, and deportation, either from their podium in Congress, with other federal actors such as the Department of Homeland Security,[18] or by deputizing a mass of third-party individuals and organizations who gladly take on the role of doxing and harassing the students until they are too afraid to speak.

8.   Critically, Plaintiffs chose to attend Columbia University because of its "cherished traditions of free expression and open debate," along with its "long tradition of valuing dissent and controversy and in welcoming the clash of opinions onto the campus." *See* Columbia University, Rules of University Conduct, Affirmative Statement §440.  It has served as a place to engage in rigorous intellectual inquiry and the "marketplace of ideas" with a diverse student body.  These are the promises—and in fact contractual obligations—that the University makes to every student it recruits, admits, and matriculates.

9.   During this critical moment of an unfolding genocide and protest of that genocide,[19] and critical discussion regarding matters of great national and international public concern,

---

[17] *Id.*

[18] As described **post**, at ¶¶ 117-118, Harvard has refused to capitulate, and Secretary Noem's response in the April 16 Press Release threatened: "'Harvard bending the knee to antisemitism — driven by its spineless leadership — fuels a cesspool of extremist riots and threatens our national security,' said Secretary Noem. 'With anti-American, pro-Hamas ideology poisoning its campus and classrooms, Harvard's position as a top institution of higher learning is a distant memory. America demands more from universities entrusted with taxpayer dollars.'"

[19] *See Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel), Provisional Measures, Order of 26 January 2024*, para. 54 (finding that the facts provided by South Africa were sufficient to conclude that intervention was necessary to present a plausible risk of genocide).

the University, due to political pressures from the Committee and other governmental actors, has subjected its students, faculty and staff to investigations in an attempt to repress their views critical of Israel and/or in support of Palestinian human rights generating hundreds of disciplinary records. The harm caused by the University's discriminatory system of discipline is now two-fold: students, faculty and staff associated with demonstrations critical of Israel are facing not only constant surveillance and disciplinary interventions by the University, but also viewpoint-based investigations by Government Defendants, all of which infringe upon the students' First Amendment rights and violate the University's contractual obligations to its students.

10. As detailed **post**, at ¶¶ 143-156, each of the Plaintiffs has been directly and indirectly harmed by the University's previous provision of their student records to the Committee, and based on that experience, have every reason to believe that further and irreparable harm will occur should the University turn over more of their private student records. Similarly, the federal government's willingness to withdraw funding from Columbia University unless its demands are met puts all students expressing a disfavored view at great peril.

11. Critically, some of the Plaintiffs have advanced in their studies since the first records disclosure and are now at critical junctures in their transition from higher education into the workforce.  This puts them at an even greater risk of reputational and economic harm should the Committee persist in compelling the student records and should the University comply by providing those records, and, as discussed in full **post**, even if some of these Plaintiffs graduate during the pendency of this litigation, their concerns are actually magnified, not mooted, as Columbia has persisted in disciplining "active alumni" and thus continue to generate records that could be turned over to Congress, and such exposure could cost them the ability to obtain and/or maintain employment and earn the necessary salary to meet basic needs. Others have

just begun their collegiate experience and are terrified that they will experience academic and economic harm should the federal government continue to persist in its effort to chill speech and academic freedom through coercive economic measures.

12. Therefore, Plaintiffs seek an injunction enjoining Government Defendants from illegally enlisting Columbia University into punishing and suppressing a viewpoint federal officials do not like. Plaintiffs also seek an injunction enjoining University Defendants from complying with any unlawful federal coercion in a manner that effectively renders them a tool of the state in fulfilling its unconstitutional aims.

## PARTIES

13. Plaintiff MAHMOUD KHALIL is an individual who resides in New York, New York, and recently completed his studies at Columbia University, with an anticipated graduation date of Spring 2025. He is a lawful permanent resident of the United States married to a citizen of the United States, and he is currently being unlawfully detained in Louisiana by Immigration and Customs Enforcement.[20]

14. Plaintiff JANE JOE is an individual who resides in New York, New York, and is a graduate student at Columbia University, with an anticipated graduation date of Spring 2025.

15. Plaintiff SALLY ROE is an individual who resides in New York, New York, and is an undergraduate student at Columbia University, with an anticipated graduation date of Spring 2025.

16. Plaintiff NED NOE is an individual who resides in New York, New York, and is an undergraduate student at Columbia University, with an anticipated graduation date of Spring 2025.

---

[20] *See Khalil v. Trump, et al.*, Amended Habeas Petition (ECF #162), No. 25-cv-01963 (MEF-MAH) (D.N.J. Apr. 3, 2025).

17. Plaintiff LUCY LOE is an individual who resides in New York, New York, and is an undergraduate student at Barnard College, with an anticipated graduation date of Spring 2025.

18. Plaintiff SAM SOE is an individual who resides in New York, New York, and is an undergraduate student at Columbia University, with an anticipated graduation date of Spring 2027.

19. Plaintiff WILL MOE is an individual who resides in New York, New York, and is an undergraduate student at Columbia University, with an anticipated graduation date of Spring 2025.

20. Plaintiff KAM KOE is an individual who resides in New York, New York, and is an undergraduate student at Columbia University, with an anticipated graduation date of Spring 2028.

21. Defendant TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK is the legal name of Columbia University in the City of New York ("Columbia University" or "Columbia"), a private education institution with a campus in upper Manhattan where the actions alleged in this complaint occurred.

22. Defendant COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK ("Columbia University" or "Columbia") is a private educational institution with a campus in upper Manhattan where the actions alleged in this complaint occurred.

23. Defendant CLAIRE SHIPMAN is the Interim President and Co-Chair of the Trustees of Columbia University and is sued in her official capacities.

24. Defendant the COMMITTEE ON EDUCATION AND WORKFORCE is a committee of the U.S. House of Representatives.

25. Defendant TIM WALBERG is a Republican member of the U.S. House of Representatives and serves as the Chairperson of the Committee on Education and Workforce, and is sued in his official capacity.

26. Defendant PAM BONDI is sued in both her official capacity as the Attorney General of the Department of Justice, and in her individual capacity.

27. Defendant LINDA MCMAHON is sued in both her official capacity as the Secretary of the Department of Education, and in her individual capacity.

28. Defendant LEO TERRELL is sued in both his official capacity as the head of the Department of Justice Taskforce to Combat Anti-Semitism, and in his individual capacity.

29. Defendant SEAN KEVENEY is sued in both his official capacity as Acting General Counsel of the U.S. Department of Health and Human Services, and in his individual capacity.

30. Defendant JOSH GRUENBAUM is sued in both his official capacity as the Federal Acquisition Service Commissioner of the General Services Administration, and in his individual capacity.

## JURISDICTION AND VENUE

31. This Court has subject matter jurisdiction because the claims arise under the Constitution and the laws of the United States, *see* 28 USC 1331. This Court has personal jurisdiction over Columbia University because it is located and operated in New York, New York. F. R. Civ. P. 4(k)(1)(A). Claire Shipman, in her official capacities, resides in New York, New York; as such this Court also has personal jurisdiction over her. *Id.*

32. This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, under Title 28, Sections 2201 and 2202 of the United States Code, and

under the All Writs Act.

33. Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and where Columbia University is located.  Representative Tim Walberg, the House Committee on Education and Workforce of the House of Representatives, and each of the Executive Branch Agency Defendants, Attorney General Pam Bondi, Secretary Linda McMahon, Head of the Department of Justice Taskforce to Combat Anti-Semitism Leo Terrell, Acting General Counsel Sean Keveney, are officers of the United States sued in their official capacity, *see* 28 U.S.C. § 1391(e)(1).

## STATEMENT OF FACTS

**A. Plaintiffs are Columbia and Barnard students who face extreme campus repression and risks because of their activism related to Palestine**

34. All pseudonymous Plaintiffs are current Columbia or Barnard University students who have spoken out in support of Palestinian human rights, including by characterizing Israel's founding as a racist endeavor and a colonial-settler state, Israel's assault on Gaza as a genocide, and/or comparing Israel's actions in Gaza to that of Nazi Germany, using protest chants such as "from the River to the Sea, Palestine will be free," and participating in student groups that aim to bring awareness and accountability to broader social justice initiatives, including those related to Palestine.

35. Plaintiffs chose to pursue an education at Columbia University in part because of its promise to embrace principles of academic freedom, free speech, and rich and uncomfortable dialogue in service of learning, principles which have largely been abandoned.

36. Indeed, all Plaintiffs relied on these promises during a moment of great national and international concern as numerous human rights bodies have declared that the state of Israel

is committing a genocide against the people of Palestine.[21] Some Plaintiffs are themselves Palestinian, and feel compelled to advocate for Palestinian human rights and self-determination, as well as ending genocide and war, and most Plaintiffs believe that they are obligated under international law to hold governments and institutions to account in order to prevent further violations of the Convention on the Prevention and Punishment of the Crime of Genocide and international humanitarian law.

37. As part of Plaintiffs' sense of duty, they have engaged in political actions on and off campus, including but not limited to pressing Columbia University to divest from Israel, through participation in protests and sit-ins, hosting different kinds of events, and co-creating art exhibitions.

38. All Plaintiffs have participated in at least one demonstration on Columbia University campus since October 8, 2023, and have been, currently are, or fear that they will be involved in disciplinary proceedings because of their prior and intended future activism before, at minimum, one of the three bodies that have been disciplining students: University Judicial Board (UJB), Center for Student Success and Intervention (CSSI), and the Office of Institutional Equity (OIE),[22] or informally, through required meetings with administrators.

39. Most Plaintiffs attended or were affiliated with at least one of the eleven events

---

[21] International Court of Justice, "Legal Consequences arising from the Polices and Practice of Israel in the Occupied Palestinian Territory" No. 2024/57 (July 19, 2024) available at https://www.icj-cij.org/sites/default/files/case-related/186/186-20240719-pre-01-00-en.pdf ; Amesty International, "You feel like you are subhuman: Israel's Genocide against Palestinians in Gaza," (December 5, 2024), available at https://www.amnesty.org/en/documents/mde15/8668/2024/en/. *See also* "Responsibility to Protect," Office on Genocide Prevention and the Responsibility to Protect, United Nations, available at https://www.un.org/en/genocide-prevention/responsibility-protect/about.

[22] Despite one Plaintiff being a Barnard student, a group with which they are affiliated was subject to Columbia University's disciplinary process.

specifically targeted by the Committee's February 13, 2025, Letter, further described below in Section B(1).

40. Plaintiffs have experienced and/or fear doxing, harassment, and violence because of their activism in support of Palestine, and fear that the measures Columbia has taken in response to federal pressure will cause them further harm. Plaintiffs have taken extensive steps to protect their identities and limit their speech for fear of retribution by private and state actors.

41. These fears are not abstract. Columbia University students have faced some of the most life-changing and extreme consequences because of their activism on Palestine. Plaintiff Mahmoud Khalil is the first of now at least four non-citizen Columbia students who have been detained or targeted because of their activism. Since the initial filing of this suit, PhD candidate Ranjani Srinivasan's visa was revoked after being labeled as a "terrorist sympathizer" for her attendance at pro-Palestine demonstrations.[23] ICE attempted to detain lawful permanent resident Yunseo Chung four days after she participated in a sit-in supporting Palestine at Barnard College.[24] Most recently, Columbia student and lawful permanent resident Mohsen Mahdawi, a Palestinian human rights advocate, was arrested by ICE during his U.S. citizenship interview.[25] And, through Secretary of State Marco Rubio's

---

[23] Gloria Pamzmino, "Another Columbia student targeted by ICE says she wasn't involved in protests on the night of her arrest," CNN (March 16, 2025) available at https://www.cnn.com/2025/03/16/us/ranjani-srinivasan-columbia-university/index.html.
[24] Maanvi Singh, "The lawsuit of Yunseo Chung, whose green card was revoked, asks: what limits remain on the Trump administration's power?" The Guardian (March 25, 2025), available at https://www.theguardian.com/us-news/2025/mar/25/columbia-gaza-protester-yunseo-chung-lawsuit.
[25] Akela Lacy, "Palestinian student leader was called in for citizenship interview—then arrested by ICE" The Intercept (April 14, 2024), available at https://theintercept.com/2025/04/14/ice-columbia-student-mohsen-mahdawi-citizenship-interview/

"Catch and Revoke" initiative, hundreds if not thousands of students are having their visas revoked. DHS is also implementing ideological monitoring of social media accounts as part of immigration applications.[26]

42. Furthermore, as described **ante**, at Note 10, DHS Secretary Noem has demanded that Harvard University provide to DHS "detailed records on Harvard's foreign student visa holders' illegal and violent activities by April 30, 2025, or face immediate loss of Student and Exchange Visitor Program (SEVP) certification."[27]  Based on recent reporting on Mr. Khalil's and Rümeysa Ozturk's cases,[28] the "illegal and violent activities" referred to by Secretary Noem are, in fact, students' exercise of their protected speech, and arguably, their legally necessary speech against the genocide in Gaza.  There is good reason to believe that Secretary Noem could demand that Columbia provide a similar list of international students.

43. These immigration enforcement actions represent one aspect of a multi-pronged, multi-actor assault on student protestors speaking out in support of Palestinian human rights and self-determination.

---

[26] Press Release, U.S. Dept of Homeland Security, *DHS to Begin Screening Aliens' Social Media Activity for Antisemitsm* (Apr. 9, 2025), available at https://www.uscis.gov/newsroom/news-releases/dhs-to-begin-screening-aliens-social-media-activity-for-antisemitism.

[27] *See* Press Release, U.S. Dept Homeland Sec., *Secretary Noem Terminates $2.7 Million in DHS Grants; Orders Harvard to Prove Compliance with Foreign Student Requirements* (Apr. 16, 2025), available at https://www.dhs.gov/news/2025/04/16/secretary-noem-terminates-27-million-dhs-grants-orders-harvard-prove-compliance-0.

[28] *See, e.g.*, Press Release, ACLU-New Jersey, *Secretary of State Letter to Immigration Court Confirms Mahmoud Khalil Solely Targeted for Protected Speech in Support of Palestinian Rights* (Apr. 10, 2025), available at https://www.aclu-nj.org/en/press-releases/secretary-state-letter-immigration-court-confirms-mahmoud-khalil-solely-targeted; Chloe Atkins, "Government's case against Mahmoud Khalil is reliant on tabloid accounts, review of evidence shows," *NBC* (Apr. 15, 2025), available at https://www.nbcnews.com/news/us-news/governments-case-mahmoud-khalil-shaky-reliant-tabloid-accounts-review-rcna201254; John Hudson, "No evidence linking Tufts student to antisemitism or Hamas, State Dept. office found," *The Washington Post* (April 15, 2025), available at https://www.washingtonpost.com/national-security/2025/04/13/tufts-student-rumeysa-ozturk-rubio-trump/.

44. The Senate Committee on Health, Education, Labor, and Pensions has begun its own investigation into protests and student groups like Students of Justice in Palestine (SJP) at Columbia University.[29] University Defendants disclosed its plan to begin complying with this Committee's demands in its April 9, 2025, Letter (ECF # 59) to this Court.

45. Congressional and Executive bodies, including non-defendants, have taken a keen interest in Columbia University. These federal actors are following the lead of Government Defendants in this case to continue to coerce Columbia University into submission to fulfill unconstitutional aims of suppressing protected speech it disfavors. Federal bodies are relying on its ability to compel Columbia to do what it cannot do directly: violate students' First Amendment Rights.

46. Plaintiffs are terrified that all Defendants in this suit and other federal actors alike will continue to be emboldened to take drastic, life-altering measures to punish speech they do not like, even as such speech may be required under both U.S. and international law. As discussed in more depth below, Plaintiffs have taken exhaustive steps to protect their safety as a direct result of their fear of harm because of their activism.

**B.  The Committee on Education and Workforce's pressure campaign**

47. The Committee on Education and Workforce ("The Committee" or "Committee Defendants"), of which Defendants Tim Walberg is the Chairman, has been exerting extensive pressure on Columbia University through information requests and congressional hearings since early 2024.

48. Columbia University has capitulated to the Committees' demands, including but not

---

[29] Senate Committee Letter to Interim President Armstrong (March 26, 2025), available at https://cdn01.dailycaller.com/wp-content/uploads/2025/03/2025-03-26-BC-to-Columbia.pdf

limited to calling in the New York Police Department on its students, making its disciplinary

processes harsher, and complying with all of the Committee's information requests.

1. The Committee Makes Demands of Columbia, Including for the Release of Student Records.

49. The Committee recently sent an information request letter on February 13, 2025, but

it is not the first of such inquiries into the disciplinary processes of Columbia University and

should not be viewed in isolation. The Committee sent a similar letter dated February 12,

2024, which requested a broad swath of University's records, citing "grave concerns" over

Columbia University's "response to antisemitism on its campus and its failure to protect

Jewish students."[30] The request for information contained in the February 12, 2024, Letter

was even broader than the Committee's more recent request. A brief sample of the types of

records requested include:

- All documents and communications since January 1, 2021, referring and relating to antisemitism, involving the Office of the President, Office of the Provost, and/or University Senate;

- All Columbia Board of Trustees meeting minutes and/or summaries whether formal or informal, since January 1, 2021, including minutes of meetings of any components, such as committees, subcommittees, and/or task forces;

- All documents and communications since January 1, 2021, referring and relating to antisemitism, involving the Columbia Board of Trustees (including all members);

- Any meeting minutes, circulated materials, and/or readouts from Columbia's Task Force on Antisemitism, and documents sufficient to show any findings and recommendations by the Task Force and any responses and reactions to such findings and recommendations by the Task Force and any responses and reaction to such findings and recommendations by the President, Provost, deans of Columbia's various schools, and the staffs of the aforementioned

---

[30] *See* Letter from H. Comm. on Educ. & Workforce to Dr. Minouche Shafik, Columbia Univ. President, Ms. Claire Shipman & Mr. David Greenwald, Co-Chairs of Trs. Columbia Univ. (Feb. 12, 2024), https://edworkforce.house.gov/uploadedfiles/2-12-24_Foxx _letter_to_columbia_university.pdf.

university officials[.][31]

50. The February 12, 2024, Letter made twenty-five requests in total, many of which were broken down further into related sub-requests.

51. On July 9, 2024, the Committee sent an electronic message to the University expressing concern over the "unsatisfactory and limited nature of Columbia's production, including Columbia's ongoing failure to produce documents from long-requested custodians."[32]

52. The Committee followed up on its July 9, 2024, electronic message with another letter, sent on August 1, 2024, again discussing Columbia's failure to "produce priority items requested by the Committee."[33] At issue in the August 1, 2024, letter were "text messages, electronic messages, and emails from non-Columbia University systems from a set of eight administrators and a set of an estimated ten members of Columbia's Board of Trustees; notes, summaries, and recordings of Board of Trustees meetings since April 17; and updated and more detailed information on disciplinary actions relating to the encampment."[34]

53. On October 31, 2024, the House Committee on Education and the Workforce produced a 325-page report ("Report") titled "Antisemitism on College Campuses Exposed."[35] The Report detailed the Committee's findings from its almost year-long, "wide-reaching and intensive investigation" into what it describes as an "explosion of campus antisemitism."[36]

---

[31] *See id.* at 13.
[32] E-mail from H. Comm. on Educ. & Workforce to Counsel for Columbia Univ. (Jul. 9, 2024) (on file with Committee).
[33] *See* Letter from H. Comm. Educ. & Workforce to Dr. Minouche Shafik, Columbia Univ. President, Mr. David Greenwald & Claire Shipman, Trs. Columbia Univ. (Aug. 1, 2024), https://edworkforce.house.gov/uploadedfiles/8-1-24_foxx_letter_to_columbia.pdf.
[34] *See Id.* at 2.
[35] *See* Republican Staff Report, ante, at n.12.
[36] *See Id.* at 1.

54. The Committee publicized this report despite the fact that Columbia University "did not consent" to the publication of the confidential documents and that they "requested confidential treatment of the information [they] provided."[37]

55. The Committee itself recognized that its investigation was "unprecedented in its depth and scope."[38] For the first time in its 157-year history, the Committee issued subpoenas to institutions of higher education, collecting "more than 400,000 pages of documents."[39]

56. The Committee is continuing its efforts as evidenced by the February 13, 2025, Letter. Among the records requested were "*[a]ll* disciplinary records," including "all past disciplinary charges, proposed sanctions, and enacted sanctions" of individuals "implicated" in incidents ranging from a "protest of a class taught by former Secretary Hillary Clinton" to general "[t]hreats and incitement directed at Columbia University trustees."[40] While the Committee's request may seem reasonable on its face given that it is confined to a discrete list of enumerated incidents, in actual fact, it is extraordinarily broad. The February 13 Letter relies on mischaracterizations and false accusations of antisemitism to cast a wide net. To fully comply with the Committee's request, the University would need to turn over entire private files of hundreds of its students, faculty, and staff.

57. The Committee's political agenda is apparent in its February 13, 2025, Letter to Columbia, just as it is in the Agency Defendants' March 13, 2025, letter. In the February 13 Letter, at 1, the Committee accuses students who organized a peaceful rally in recognition of

---

[37] Shea Vance, *Columbia 'did not consent' to publication of confidential documents in congressional report, spokesperson says,* Columbia Spectator (November 3, 2024), available at https://www.columbiaspectator.com/news/2024/11/03/columbia-did-not-consent-to-publication-of-confidential-documents-in-congressional-report-spokesperson-says/.
[38] *Id.* at 1.
[39] *Id.*
[40] *See id.*, at 5 (emphasis added).

"Martyrs' Day" over Veterans' Day of "promot[ing] terrorism and vilify[ing] the U.S. military." To accuse a student vigil for "Martyr's Day" of justifying or promoting terrorism evidences the deep Islamophobia of the House Committee, as well as intentional and erroneous misconstrual of the purpose of the event. In Islam, the concept of "martyrdom" refers to the "willingness to sacrifice one's life for the sake of resisting injustice and oppression," and represents "devotion to righteous causes expressed through courageous confrontation of injustice, not indiscriminate violence."[41] To that end, Martyrs' Day was an event to honor and grieve the thousands of Palestinians killed in Gaza, who student activists decried being "killed by the 'Israel-US war machine.'"[42] Further, even if students could be said to have been "vilifying" the U.S. military, expressing views critical of the U.S. military—or any military—is protected political speech, and as discussed herein, quite possibly legally necessary speech under international law. The Committee's attempt to force the University to chastise and intimidate student organizers for protected speech is an abuse of its investigative powers.

58. These records contain, at a minimum, demographic, academic, and financial information, and at most, personally identifying information,[43] student group affiliations and

---

[41] *See* Islamic Circle of North America (ICNA), *Martyrdom in Islam*, https://icna.org/martyrdom-in-Islam/#:~:text=In%20Islam%2C%20the%20concept%20of,civil%20disobedience%20against%20authoritarian%20rule. It is important to note that martyrdom in Islam is "not limited to those who die in battle," but also includes "those who lose life prematurely by natural causes, accidents, or illnesses, and even mothers who lose their lives while giving birth." *Id.*

[42] *See, e.g.,* "Columbia U. pro-Palestinian students hold 'anti-Veteran Day', protesting 'Israel-US war machine'", *Jerusalem Post* (Nov. 12, 2024), available at https://www.jpost.com/international/article-828683.

[43] To be clear, and as noted elsewhere in this Complaint, Plaintiffs understand that in previous disclosures to Congress, Columbia complied with its legal obligations under FERPA when supplying student records to Congress. However, the spirit of FERPA and the ultimate privacy protections it was intended to offer were violated by Congress's release of information that made it easy for third parties to identify individual students and then target those students in large scale harassment campaigns.

associations, and related private information that could be and have been used to harass, make threats against, and dox the individuals whose records are turned over to the Committee, and whose personal privacy and safety would be jeopardized by the Committee's politically charged investigation.

59. With regard to the Committee's investigation and request for individual student records, which threatens to significantly infringe on the First Amendment rights of those students, the Committee fails to "convincingly show a *substantial relation* between the information sought and a *subject of overriding and compelling state interest*."[44] As with all other forms of hatred and discrimination, antisemitism is unacceptable and should be confronted. The urgency of this issue is not disputed here. However, the records demanded by the Committee are not substantially related to antisemitism.[45] Rather, the Committee has instrumentalized accusations of antisemitism to attack ideas it ideologically opposes. It traffics in anti-Palestinian, anti-Arab, and Islamophobic dog whistles to justify unjustifiable intrusions on First Amendment rights of Columbia's students.

60. Additionally, Committee leaders have made several concerning statements regarding the extent of their interest in higher education. The House Committee is led by U.S. Representative Tim Walberg, who has stated that we are "going to KO the bad actors and the

---

[44] *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963) (emphasis added).

[45] Notably, in the Committee's Opposition to Plaintiffs' Preliminary Injunction (ECF # 31), 2-3, the Committee cites a number of examples of plausible anti-Semitic conduct, however they do not in any way connect those apparently isolated incidents with the eleven student actions for which it seeks all student disciplinary records. Moreover, the Committee did not discuss how or why law enforcement was not involved in those incidents, or whether Columbia had taken disciplinary actions in those incidents. Notwithstanding, and to reiterate, there is no connection between these incidents and the eleven events for which records were sought, and even if these actions occurred during such events, requiring that *all* student disciplinary records be turned over when these incidents involved one-on-one interactions is excessive and cannot be justified by any legitimate legislative purpose.

activities and the results that go on in education."[46] Additionally, Chairman Walberg stated that "[i]f you want to continue receiving federal funds, you will do away with DEI programs."[47] Another key member and the former Chairwoman, Representative Foxx, has stated that the Committee's inquiries could broaden to include the University's diversity, equity and inclusion policies, as well as their "learning environments."[48] Representative Burgess Owens, who serves as the chairperson of the House higher education subcommittee, "think[s] DEI is a fraud and what we're seeing now on campuses is proof of that," and that "Offices of Diversity, Equity and Inclusion steeped deeply in the doctrine of Marxism are anything but inclusive for Jews."[49] Critically, this nation is seeing a new wave of repression by this Congress and this new Administration that pose a great threat to the First Amendment, akin to the threat that McCarthyism and the broad overreach of the role of the House Unamerican Activities Committee posed fifty years ago.

61. Moreover, the Committee's production demand seeks to compel the University to produce otherwise confidential documents—which contain information that Congress itself recognized as sensitive when it passed the Family Educational Rights and Privacy Act

---

[46] *Id.*

[47] Bianca Quilantan and Madi Alexander, 'None of these goals are illegal': Universities struggle to respond to funding threats," *Politico* (Apr. 16, 2025), available at https://www.politico.com/news/2025/04/16/trumps-dei-backlash-ripples-across-the-nations-flagship-universities-00288742.

[48] *See* Katherine Knott, *'You Are in the Crosshairs': Higher Ed Braces for Another Antisemitism Hearing*, INSIDE HIGHER ED (Apr. 16, 2024), https://www.insidehighered.com/news/government/2024/04/16/higher-ed-braces-another-round-congressional-grilling (last visited Mar. 3, 2025). Investigations into "learning environments" of universities have already occurred at Harvard, MIT, and Penn. *See, e.g.,* Jordain Carney, *House Education Chair Says Campus Antisemitism Probe Will Continue After Harvard President Resignation*, POLITICO (Jan. 3, 2024), https://www.politico.com/live-updates/2024/01/03/congress/foxx-reacts-to-harvard-ouster-00133650 (last visited Mar. 3, 2025).

[49] Katherine Knott, "House Republicans Blame DEI Programs for Rise in Campus Antisemitism," *Inside Higher Ed* (Nov. 15, 2023), available at https://www.insidehighered.com/news/government/2023/11/15/house-republicans-blame-dei-programs-campus-antisemitism.

("FERPA"), 20 U.S.C.S. § 1232(g). FERPA prohibits educational institutions, including Columbia, from disclosing "personally identifiable information in education records" without written consent. 20 U.S.C.S. § 1232(g)(a). The Committee's past actions have shown that it has no regard for those same privacy rights, as it readily released a multitude of easily identifiable personal information in its October 31, 2024, Report.[50]  As discussed below, the information shared in this report led to intense surveillance, doxing, and harm to Plaintiffs and other student protestors.

62. Ultimately, the Committee's Letter demands that the University violate its own contractual obligations to its students, as well as its obligations to protect student privacy under FERPA, and, in effect, coerces the University to ignore the law by making oblique threats to the "billions in federal funding" the University receives.[51]

63. The University has now responded to the Committee's Letter,[52] and the victim of governmental overreach becomes the enabler and acts as an arm of the government in order to chill and suppress the speech of its own students, faculty, and staff that is undoubtedly protected by both the First Amendment and the University's own Rules of University Conduct.

64. The Committee's vague and overbroad demand letter to the University exceeds the Committee's purported goal of confronting antisemitism, as the Letter is clearly intended to chill the First Amendment rights of speech, expression, and association of the University's student body *through* a third-party. In fact, by the Committee's own acknowledgement in its October 31, 2024, Report, there has already been considerable factfinding conducted, so what

---

[50] *See* H. Comm. on Educ. & Workforce, Republican Staff Report, *Antisemitism on College Campuses Exposed* (Oct. 31, 2024), https://edworkforce.house.gov/uploadedfiles/ 10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf [hereinafter "Republican Staff Report"].
[51] *See* Feb. 13 Letter, **ante** at 1 n.2.
[52] See ECF nos. 32-6, 32-7 and 32-8.

other possible legitimate legislative purpose could they have for demanding hundreds of personal disciplinary records? And, if the Committee's alleged purpose is aimed at the University's actions, or lack thereof—though this would still be unlawful jawboning—why is it demanding *student* disciplinary records instead of higher-level University records that do not identify specific students and/or their associations?

65. The Committee has since sent analog request letters to at least five additional universities, including Sarah Lawrence College, Barnard University, Bowdoin University, Pomona College, and Northwestern University, requiring them to comply by April 10, 2025.[53]

### 2. The Committee Efforts are a Naked Attempt to Attack and Harass Individuals who Expressed Viewpoints Critical of Israel.

66. Under the leadership first of Chairwoman Foxx and now of Chairman Walberg, the U.S. House of Representatives Committee on Education and the Workforce ("the Committee") has held several high-profile hearings on antisemitism on college campuses.[54] Doing nothing to address the actual problem of antisemitism, most of the Committee's hearings have devolved into fearmongering and the public shaming of University students, faculty and staff based on false accusations, viewpoint discrimination, anti-Palestinian racism, Islamophobia, and anti-Semitism toward anti-zionist Jewish students.

67. As a result of the Committee's December 5, 2023, hearing, titled "Holding Campus Leaders Accountable and Confronting Antisemitism," then-University of Pennsylvania

---

[53] Press Release, "Walberg, Owens Demand Answers from Five Colleges Following Their Lackluster Response to Antisemitism," Committee on Education and Workforce (March 27, 2025), available at https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=412306.

[54] *See generally* Robin D.G. Kelley, *UCLA'S Unholy Alliance*, BOSTON REV. (May 18, 2024), https://www.bostonreview.net/articles/uclas-unholy-alliance (last visited Mar. 4, 2025).

President Liz McGill[55] and then-Harvard University President Claudine Gay[56] were forced to resign. McGill and Gay stumbled in response to Representative Elise Stefanik's disturbing line of questioning regarding whether calls for the genocide of Jews violated their respective university policies.[57]

68. Attempting to avoid a similar fate, then-Columbia University President Minouche Shafik took a drastically different tone when she was called to appear before the Committee on April 17, 2024. The hearing, titled "Columbia in Crisis: Columbia University's Response to Antisemitism," called into question the university's handling of student protests criticizing Israeli apartheid and denouncing the genocide.[58] In response, then-President Shafik promised there would be consequences for speech and demonstrations deemed by the Committee to be antisemitic.[59] Examples of antisemitism offered by members of the Committee predominantly related to protected speech, such as protest songs and slogans.

69. U.S. Representative Lisa McClain grilled Shafik, asking her three times whether phrases like "from the river to the sea, Palestine will be free" or "long live the Intifada" —

---

[55] Kanishka Singh, *University of Pennsylvania president resigns after antisemitism testimony*, REUTERS (Dec. 10, 2023), https://www.reuters.com/world/us/university-pennsylvania-president-liz-magill-resigns-after-antisemitism-2023-12-09/.

[56] Max Matza, *Claudine Gay resigns as Harvard University president*, BBC NEWS (January 2, 2024), https://www.bbc.com/news/world-us-canada-67868280.

[57] Noah Bernstein & Esha Karam, *The House Committee Tried to Make Shafik Trip Over Her Own Testimony But It Failed to Fully Corner Her*, COLUMBIA SPECTATOR (Apr. 18, 2024), https://www.columbiaspectator.com/news/2024/04/18/the-house-committee-tried-to-make-shafik-trip-over-her-own-testimony-but-it-failed-to-fully-corner-her/.

[58] As noted above, Plaintiffs use this terminology based on recent opinions issued by the International Court of Justice. *See, e.g.*, *Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel), Provisional Measures, Order of 26 January 2024*, para. 54 (finding that the facts provided by South Africa were sufficient to conclude that intervention was necessary to present a plausible risk of genocide).

[59] Noah Bernstein, Sarah Huddleston, Shea Vance & Esha Karam, *'Columbia in Crisis:' Shafik Testifies Before Congress About Antisemitism at Columbia*, COLUMBIA SPECTATOR (April 21, 2024), https://www.columbiaspectator.com/news/2024/04/21/columbia-in-crisis-shafik-testifies-before-congress-about-antisemitism-at-columbia.

language commonly used by supporters of Palestinian liberation to indicate liberation for all, not the subjugation of some — qualified as antisemitism.[60] After Shafik's first two responses— "when I hear those terms, I find them very upsetting" and "I hear them as such, some people don't"—Representative McClain pressed for a yes or no answer, to which Shafik responded affirmatively that the phrases were antisemitic.[61]

70. During this hearing, Representative Rick Allen stated that "it's pretty clear it was the covenant that God made with Abraham, and that covenant was real clear: if you bless Israel, I will bless you; if you curse Israel, I will curse you." He then asked whether Shafik wanted God to curse Columbia, to which she replied, "definitely not."[62]

71. Representative (now Chairman) Tim Walberg initiated the line of questioning regarding Professor of Middle Eastern, South Asian, and African studies, Joseph Massad, and the controversial article he published in the Electronic Intifada. He asked whether Shafik condemned the article and whether the University had taken any steps to discipline Massad.[63] In response, Shafik disclosed several private details of Professor Massad's ongoing disciplinary matter, including that Massad had been removed as chair of the Faculty of Arts and Sciences.[64]

72. In the face of persistent questioning by Representative Stefanik, Shafik promised to

---

[60]*Id.* In fact, Representative McClain's prejudice toward Arabic words and her ignorance as to what "intifada" means was evidenced by her repeated mispronouncing of the word as "in*fit*ada."

[61] *Id.*

[62] Chance Bonar, 'Do You Want Columbia To Be Cursed By God?' — Alarming Exchanges In Congress And Beyond Highlight The Desperate Need For Religious Literacy, Religion Dispatches (April 30, 2024) 'Do You Want Columbia to be Cursed by God?' — Alarming Exchanges in Congress and Beyond Highlight the Desperate Need for Religious Literacy | Religion Dispatches.

[63] *Id.*

[64] *Id.*

take Massad out of the classroom and dismiss him from his position as a visiting professor.[65]

73. Concerningly, on April 17, 2024, the same day as the congressional hearing, a nonprofit news organization posted "[a] confidential letter obtained by the *Forward* [which] shows that investigations have been opened over the conduct of several Columbia University professors accused of making antisemitic and anti-Israel comments in the aftermath of Hamas' Oct 7 attacks."[66] The article confirms that the letter was included in the materials Columbia provided to Congress.[67] In a comment to *Inside Higher Ed*, Professor Massad stated "he wasn't aware of the investigation" and learned about from the public congressional hearing.[68]

74. The scapegoating of Massad and the disclosure of his private records during a public hearing is indicative of the Committee's strategy with regards to its inquiries into antisemitism. The Committee trampled over Massad's rights to privacy and confidentiality for the political spectacle of forcing then-President Shafik to publicly testify as to her handling of his employment—an extremely sensitive topic. The Committee essentially "tried" and "punished" Massad for the alleged wrongdoing of antisemitism, without any good faith inquiry into context, intent, or rationale as to Massad's statements or scholarship. The Committee publicly forced the issue of Massad's employment.

75. Furthermore, the Committee sent a threatening message regarding what could happen

---

[65] *Id.*

[66] Jacob Kornbluh, "Confidential letter shows Columbia professor who called Hamas attack 'awesome' is under investigation," *The Forward* (Apr. 17, 2024), available at https://forward.com/fast-forward/603775/columbia-president-professor-hamas-israel-congress/.

[67] *Id.*

[68] *See* Ryan Quinn, "Columbia President Accused of Dishonest Testimony, Throwing Professors 'Under the Bus'," *Inside Higher Ed* (Apr. 19, 2024), available at https://www.insidehighered.com/news/faculty-issues/academic-freedom/2024/04/19/columbia-president-accused-throwing-profs-under-bus.

to individuals if it determines engage in protected speech that it finds distasteful or express viewpoints with which it disagrees with the intent to suppress such speech.

76. In her haste to persuade the Committee that she was committed to taking serious action to combat antisemitism, former President Shafik also showed a complete disregard for Massad's rights to privacy and confidentiality.

77. Shafik made further commitments to curtail student speech and demonstrations by imposing heavy consequences for alleged antisemitic activity. The hearing was a race to punish and to humiliate Columbia's own faculty members and student body—the very faculty members and students the University chose to hire and admit *because* of their identities, perspectives, and political stances.

78. In addition to these Congressional hearings, Committee members have made public statements that highlight their laser focus of chilling speech it does not like under the guise of Title VI "antidiscrimination" measures. Representative Walburg has also said that Gaza "should be like Nagasaki and Hiroshima. Get it over quick."[69] Speaker Johnson held a press conference at Columbia University where he said, "American people are demanding accountability…we want this Administration and the administration of every University campus around the country to bring this [encampment] to account and bring this lawlessness to an end."[70]

   3.  Columbia Sacrifices Its Students and Succumbs to the Committee's Pressure.

79. As then-President Shafik testified before the Committee in April 2024, students began

---

[69] Kelly Garrity, "GOP Congressman tempers 'Nagasaki and Hiroshima' comments on Gaza: 'I used a metaphor," *Politico* (March 31, 2024), available at https://www.politico.com/news/2024/03/31/gop-congressman-nagasaki-hiroshima-comments-gaza-00149862.

[70] "Speaker Johnson Asked: 'What Is Your Message To The Students Inside The Encampment Right Now?'" *Forbes* (Apr. 24, 2024), available at https://www.youtube.com/watch?v=LeXClxCnGDQ.

pitching tents on the University's South Lawn in an action that has since become known as the "first Gaza Solidarity Encampment."  Students rejected Shafik's negative accusations of antisemitism in the campus movement opposing Israel's war crimes and decrying the loss of Palestinian lives and expressed their frustration with Shafik's willingness to agree to punish them in an effort to meet the Committee's demands for viewpoint suppression.

80. In line with her representations to the Committee that she would crack down on campus demonstrations, on April 18, 2024, Shafik took the extraordinary step of summoning the New York Police Department ("NYPD") to clear the encampment and arrest 108 individuals on or near the University's South Lawn. Shafik's decision to call the NYPD is widely believed to have been politically driven by the commitments she made to the Committee during the hearing, which took place one day before the April 18th mass arrest.[71]

81. As described above, Columbia University has already produced thousands of records to the Committee, a step that exposed its students to extreme scrutiny by the federal government and harm by private actors. The inquiry into these disciplinary records paved the way for Government Defendants to scrutinize and command Columbia to more harshly discipline students speaking out against atrocities in Palestine.

82. Since Congress and the Committee began pressuring Columbia to crackdown hard on students speaking out for Palestinian human rights,[72] the University also has initiated a series of changes to its disciplinary proceedings. As of October 7, 2023, Columbia's main student

---

[71] Brian Mann, *NYPD Breaks Up Pro-Palestinian Protest at Columbia University,* NPR (Apr. 18, 2024),        https://www.npr.org/2024/04/18/1245642588/nypd-breaks-up-pro-palestinian-protest-at-columbia-university.

[72] *See* Letter from H. Comm. on Educ. & Workforce to Dr. Minouche Shafik, Columbia Univ. President, Ms. Claire Shipman & Mr. David Greenwald, Co-Chairs of Trs. Columbia Univ. (Feb. 12, 2024), https://edworkforce.house.gov/uploadedfiles/2-12-24_Foxx _letter_to_columbia_university.pdf.

disciplinary body was the University-Senate-supervised[73] University Judicial Board ("UJB"), which allowed an attorney or faculty advisor to attend, and in which decisions were made by a panel including faculty and students. Additionally, the UJB adhered to the Rules of University Conduct, which traditionally, pursuant to § 446, provided a fairly robust set of rights and protections for student-respondents. This body was capable of some neutral and fair outcomes, including dismissing charges that were not substantiated by sufficient evidence or deemed retaliatory in nature. Given the relatively democratic and egalitarian approach of the UJB, along with the fairly robust protections for student-respondents, it is particularly notable that one of Agency Defendants' March 13th demands was to dissolve the UJB in its current iteration, based in the University Senate, and remove it to the Provost's Office, where dispositions will be controlled by the administration, as Columbia has now effectively done as of March 21, 2025.

83. Notably, the University-Senate that runs UJB was subject to extensive criticism by Committee Defendants as part of its October 31, 2024, Report. Committee Defendants' core issue with the University-Senate and the UJB process was that it did not punish students severely enough for speech and conduct related to Israel and Zionism, speech that the Committee Defendants characterize as antisemitic.

84. Speech critical of Israel as a state and Zionism as a political ideology is not bigoted. In fact, Israelis and Jews are critical of Israel and Zionism in all the ways that Plaintiffs are critical of Israel and Zionism.[74]

---

[73] The University Senate is made up of elected faculty, staff, administrators, and students. There are "111 senators [who] represent the 17 schools of Columbia, and Barnard College, Teachers College, and Union Theological Seminary." *See* "University Senate," Columbia University, last accessed on Mar. 31, 2025: https://senate.columbia.edu/senators.

[74] *See*, *e.g.*, Statement, Jewish Voice for Peace, *On Antisemitism, Anti-Zionism and Dangerous Conflations*, available at https://www.jewishvoiceforpeace.org/2023/11/09/antisemitism-

85. In Spring 2024, as the clamor grew greater to punish students for criticism of Israel and support of Palestinian human rights, Columbia began sending more cases to the Center for Student Success and Intervention ("CSSI"). There, students are called in for "interviews." They cannot have an attorney present. Sanctions are determined by a single administrator. Unsurprisingly, outcomes were inevitably much harsher. CSSI had previously been involved mainly with grade and performance matters, and faculty and students objected to its creeping role in protest-related discipline matters. The faculty Senate operated UJB, which had a continuing reputation as a somewhat fair and neutral entity which sometimes dismissed charges. CSSI has functioned more as a rubber stamp for a predetermined result. The Agency Defendant's March 13 Letter in fact demanded that UJB, likely because it is perceived as being too fair to the students, be dissolved. Instead, Columbia transferred the UJB from the control of the University Senate to direct supervision by the provost in order to acquiesce to the Agency Defendants' demands that disciplinary authority be centralized, an outcome Agency Defendants sought in order to directly and more easily exercise control Columbia's disciplinary process.

86. In response to the intense pressure campaign by the Committee in Spring 2024, Columbia formed a new office called the Office of Institutional Equity ("OIE"), ostensibly to address what the University appears to believe are its obligations under Title VI,[75] such that the OIE investigates allegations of discrimination, discriminatory harassment, and related

---

dangerous/; "British-Israeli academic Avi Shlaim on anti-Zionism and antisemitism, *Middle East Eye* (Oct. 31, 2023), available at https://www.middleeasteye.net/live-update/british-israeli-academic-avi-shlaim-anti-zionism-and-antisemitism; Bill Bigelow, "No, Anti-Zionism Is Not Antisemitism," *Rethinking Schools* (Spring 2024), available at https://rethinkingschools.org/articles/no-anti-zionism-is-not-antisemitism/.

[75] *AAUP & AFT v. U.S. Dep't of Justice, et al.,* No. 1:25-cv-02429, Complaint, ECF #1 (S.D.N.Y. Mar. 25, 2025), available at https://protectdemocracy.org/wp-content/uploads/2025/03/AAUP-AFT-v-DOJ-Complaint.pdf.

issues. OIE investigators, the majority of whom appear to be attorneys, can interview students, faculty, and staff in regards to the allegations, but in order for the student-respondent to engage in the process and see the full extent of the evidence against them, they and their advisor must sign a non-disclosure agreement ("NDA") which prohibits them from speaking publicly about not just the identities of complainants and witnesses (an understandable prophylactic), but also about the broader discovery, the reasoning behind the determination, and the basis for the determination. This is so *even when the student is alleged to have hung a poster on a generic pinboard or posted something on Instagram that does not target any specific individual(s).* In other words, the NDA is required even when the alleged speech was not directly targeted at any particular person, did not constitute a threat, or did not directly discriminate or harass an individual or group. If a student refuses to sign the NDA, they lose access to any and all evidence against them that is not in the public domain and may not even be privy to the reasoning and bases for the determination made against them.

87. If this office finds that the student has engaged in discriminatory or harassing behavior, a Determination Letter and Summary of Findings are sent to the dean of the student's school, who in consultation with the OIE investigators, will determine the sanction for the student or the student group, which can include anything from a mandatory training to suspension (both of individual or group) to expulsion and/or degree revocation. This is a departure from typical investigations, where Title VI offices did not have the power to directly sanction students.

88. Upon information and belief, under OIE's jurisdiction students have received Notices of Allegations for the use of the term "Israeli genocide" or other terms to criticize Israel and its policies, hanging posters on bulletin boards designated as "free speech zones," for posting stickers around campus, hosting events with art by a Jewish artist that depicted a bloodied

Star of David, or distributing flyers informing students of where to donate money, hosting art exhibitions, and posting about Palestinian human rights on Instagram.

89. Of critical import to the role of the OIE is the constantly changing definition and interpretation of "Protected Class," which, as of March 21, 2025, incorporates an expansive version of the IHRA definition of anti-Semitism.[76] The new definition of antisemitism Columbia is now using effectively labels as antisemitic the common and typical criticisms Plaintiffs and others make about Israel, as they would the U.S., and other governments—that it is a racist state, led by war criminals, and/or comparable to Nazi Germany in some ways.

90. Moreover, the OIE has now created a mandatory reporting component, which means that certain Columbia community members *must* report speech or conduct incidents that *could* be interpreted as discriminatory or harassing, even if they themselves do not see the situation in that way, or else face potential allegations of "failure to report" or applying a neutral policy that has a disparate impact on a protected class. Stated differently, the OIE and its policies have created an environment where students, faculty, and staff are not clear about what constitutes a protected class, discrimination, discriminatory harassment, or actual threats because the definitions and goalposts keep shifting, thus chilling protected speech that does not fall under any of those categories, and where they can be brought before the OIE for *not reporting* something that, to them, did not rise to the level any of these definitions, thus encouraging community members to report each other just to inoculate themselves from potential disciplinary action, *even when* the speech is protected or the incident does not rise to

---

[76] Task Force on Antisemitism, Report #2: Columbia University Student Experiences of Antisemitism and Recommendations for Promoting Shared Values and Inclusion (Aug. 2024), at 44-45, available at https://www.columbia.edu/content/report-2-task-force-antisemitism (describing this speech as protected under *both* first amendment and Affirmative statement §440).

any of the parameters defined under Title VI.[77]

91. Critically, based on information and belief by counsel, students at Columbia could potentially face proceedings in front of the UJB, CSSI, and OIE simultaneously for the same incident. These bodies have also been used inconsistently, generating confusion about what conduct may be subject to what kind of punishment by which office. For example, Columbia University announced that it was disciplining students for a March 5 sit-in on Barnard campus under the CSSI, which does not allow students to have an attorney or present witnesses, instead of the typical site for such disciplinary review, the UJB. The CSSI has previously been reserved for academic interventions, not student conduct.[78]

92. Columbia's disciplinary process has only become harsher with time, likely generating thousands of pages of records regarding hundreds of Columbia students, and, with Columbia's March 21 capitulation, will now become a tool through which Government Defendants can wield its power through the cudgel that is Columbia's Office of the Provost.

4. <u>Record Disclosures and Extensive Surveillance Cause Plaintiffs Reputational, Emotional, and First Amendment Harms.</u>

93. Given that Columbia University has revealed that it has disclosed records to the Committee, some Plaintiffs fear that they will face the same harassment, doxing, and surveillance that they faced when their information was released in fall of 2024.

94. Based on this Committee's previous actions in publicizing personal information of

---

[77] Notably, the examples offered on the OIE's website are those commonly used by the Department of Education's Office of Civil Rights, but in practice, these are not the types of incidents or speech that OIE actually addresses. *See* "Student Scenarios," Student Anti-Discrimination and Discriminatory Harassment, Office of Institutional Equity, Columbia University, available at https://institutionalequity.columbia.edu/content/student-scenarios.
[78] Tulasi Cherukuri and Ria Vasishtha, "Columbia to adjudicate Milstein sit-in cases without witnesses or legal representation for student hearings," Columbia Spectator (April 8, 2025), available at https://www.columbiaspectator.com/news/2025/04/08/columbia-to-adjudicate-milstein-sit-in-cases-without-witnesses-or-legal-representation-for-student-hearings/.

those with similar viewpoints with the clear intent to chill protected speech, it likely intends to expose Plaintiffs' and other students' identities and associations for the sake of exposure—both of which will undoubtedly cause irreparable reputational harm, as well as expose the University's students to reprisals, harassment, doxing, and perhaps even physical harm. When the University previously complied with the Committee's requests, student records were leaked to the press,[79] students' identities were not properly safeguarded in the Committee's October 31, 2024, Report, and members of Congress or their staffers posted students' private information on social media sites and identified students and faculty on the public record during congressional hearings in December 5, 2023, April 17, 2024, and May 3, 2024—all of which led to widespread economic and reputational harm, as well as increased incidents of doxing and harassment.

95. The Committee devotes a significant amount of the Report's contents on Columbia University's disciplinary records obtained through six subpoenas issued to the Columbia University administration on August 21, 2024.[80] The Report contained and often misrepresented information including specific descriptions of student events, organizations, and social media posts.[81]

---

[79] Though this is not the case for these Plaintiffs in this case, based on information and belief of counsel, at least one student's records were leaked to the press, and based on news reporting described **ante**, faculty disciplinary records were also leaked to the press.

[80] *See* H. Comm. on Educ. & Workforce, Subpoenas to Columbia Univ. (Aug. 21, 2024), https://edworkforce.house.gov/uploadedfiles/8.21.24_education_and_the_workforce_com mittee_six_subpoenas_to_columbia_university_leadership.pdf.

[81] This type of misrepresentation by both Columbia and Committee Defendants of the speech and events included in the disciplinary records has real consequences. For example, based on recent reporting, it appears that the recent arrest and detention of Mohsen Mahdawi was based on this mischaracterization of Mr. Mahdawi's speech and activism. *See* Meghnad Bose, "The State Department Relied on Columbia University's Mischaracterization of Protests to Arrest Mohsen Mahdawi," *Drop Site News* (Apr. 17, 2025), available at

96. The Report generated significant controversy and media coverage, erroneously characterizing the protests in a negative light and condemning students as antisemitic.[82]

97. Some Plaintiffs were among the many identified through the publication of the Report. Despite redacting student names, Columbia's disclosure included "information such as organization and school affiliations in addition to detailed descriptions of social media posts, copies of emails, and narratives of the alleged incidents."[83] This information facilitated the identification of disciplined students, including some Plaintiffs, demonstrating the failure of any redactions to sufficiently protect student privacy.

98. Columbia University understood that doxing is a pervasive issue for student protestors but has ultimately failed to fulfill its obligations of maintaining and enforcing its doxing policies.[84] The University failed to notify relevant students, including some Plaintiffs, that

---

https://www.dropsitenews.com/p/mohsen-mahdawi-arrest-columbia-university-trump-legal-justification. The same is true with Mr. Khalil. *See, e.g.*, Press Release, ACLU-New Jersey, *Secretary of State Letter to Immigration Court Confirms Mahmoud Khalil Solely Targeted for Protected Speech in Support of Palestinian Rights* (Apr. 10, 2025), available at https://www.aclu-nj.org/en/press-releases/secretary-state-letter-immigration-court-confirms-mahmoud-khalil-solely-targeted; Chloe Atkins, "Government's case against Mahmoud Khalil is reliant on tabloid accounts, review of evidence shows," *NBC* (Apr. 15, 2025), available at https://www.nbcnews.com/news/us-news/governments-case-mahmoud-khalil-shaky-reliant-tabloid-accounts-review-rcna201254.

[82] *See, e.g.*, Andrew Bernard, *'Astounding' Government Failures, House GOP Report on Jew-Hatred Says* (Dec. 19, 2024), JNS, https://www.jns.org/astounding-government-failures-house-gop-report-on-jew-hatred-says/ (asserting that the Republican Staff Report demonstrates that "universities across the country likely violated in the civil rights of Jews in their handling of anti-Israel campus protests"); Alan Wooten, *Universities Scorched in Republican Congressional Report,* THE CENTER SQUARE (Nov. 4, 2024) (summarizing the Republican Staff Report as finding that "[c]oncessions were made for illegal encampments, support was withheld from Jewish students, discipline was absent for those engaged in antisemitic conduct, and congressional oversight was rejected as a nuisance with hostility").

[83] *Id.*

[84] *See* Molly Bordoff, *'A Chilling Effect': University Senate Discusses Nonconsensual Recordings at Plenary,* COLUMBIA SPECTATOR (Dec. 23, 2024), https://www.columbiaspectator.

sensitive information was furnished to the federal government and subsequently published.

99. This disclosure was widely viewed to violate both Columbia's community norms and self-governance. An article in the *Columbia Spectator* highlights the stakeholder opposition to this release: "In their Nov 19 statement, members of the University Senate Student Affairs Committee wrote that, '[i]f confirmed, we believe these actions would betray the students' right to privacy and confidentiality' and that 'these actions would jeopardize the integrity and fairness of disciplinary processes.'"[85]  Faculty expressed concern about the identifying information provided in the Report as well: "At the Nov. 22 senate plenary, Joseph Howley, Associate Professor of Classics, asked then- Interim University President Katrina Armstrong about legal risk surrounding potential Family Educational Rights and Privacy Act violations on behalf of students.[86] Howley observed that "some of these reports identify alleged perpetrators in very identifiable ways, and the House has now published student identifying information."[87]

---

com/news/2024/12/23/a-chilling-effect-university-senate-discusses-non-consensual-recordings-at-plenary/ (last visited Mar. 3, 2025); Information Security Charter, University Policies, https://universitypolicies.columbia.edu/content/information-security-charter (Oct. 2023); Acceptable Usage of Information Resources Policy, University Policies, https://universitypolicies.columbia.edu/content/acceptable-usage-information-resources-policy (Oct. 2023).

[85] Shea Vance, *Columbia 'Did Not Consent' to Publication of Confidential Documents in Congressional Report, Spokesperson Says*, COLUMBIA SPECTATOR (November 3, 2024), https://www.columbiaspectator.com/news/2024/11/03/columbia-did-not-consent-to-publication-of-confidential-documents-in-congressional-report-spokesperson-says/ (last visited Mar. 3, 2025).

[86] *See* Sarah Huddleston, *Columbia's Production of Disciplinary Cases in Congressional Subpoena Raises Privacy Concerns*, COLUMBIA SPECTATOR (Dec. 3, 2024), available at https://www.columbiaspectator.com/news/2024/12/03/columbias-production-of-disciplinary-cases-in-congressional-subpoena-raises-privacy-concerns/.

[87] *Id.*

## C. Agency Defendants make their demands to Columbia University clear

  1. <u>The Agency Defendants Try to Force Columbia to Comply with their Demands.</u>

100.     On March 3, 2025, the U.S. Department of Health and Human Services (HHS), the Department of Education (ED), and the General Services Administration (GSA) announced a comprehensive review of Columbia University's federal contracts and grants, citing ongoing investigations for potential violations of Title VI of the Civil Rights Acts.[88]

101.     HHS, ED, and GSA threatened to issue Stop Work Orders affecting $51.4 million in contracts and pledged to conduct a comprehensive review of more than $5 billion in federal grant commitments to Columbia University to ensure Columbia's "compliance with federal regulations, including its civil rights responsibilities." The GSA has also been tasked with facilitating the review of federal funding received by Columbia, encompassing grant and contract reviews across the federal government.

102.     These federal agencies' actions were taken as part of the Task Force to Combat antisemitism, established by President Trump's Executive Order 14188, "Additional Measures to Combat Anti-Semitism."

103.     On March 7, 2025, the White House, through its official social media account on X (formerly Twitter), announced that the Trump Administration, led by the Department of Education and the Task Force to Combat Anti-Semitism, has canceled or paused "~$400M in federal grants" to Columbia University over "its failure to protect Jewish students from antisemitic harassment."[89]

---

[88] Press Release, U.S. Gen. Servs. Admin., *HHS, ED, and GSA Announce Additional Measures to End Anti-Semitic Harassment on College Campuses* (Mar. 3, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/hhs-ed-and-gsa-announce-additional-measures-to-end-antisemitic-harassment-03032025?utm_medium=email&utm_source.
[89] The White House (@WhiteHouse), X (Mar. 7, 2025, 3:02 PM), available at https://x.com/whitehouse/status/1898101850169393451?s=46.

104.     In a press release issued immediately following the announcement, the Task Force ensured that these cancellations represent the first round of action, and additional cancellations are expected to follow.[90]

105.     The press release stated that it will continue to review and coordinate across federal agencies to identify additional cancelations that could be made swiftly. *Id.*

106.     On March 13, 2025, Defendants Josh Gruenbaum, Sean Keveney, and Linda McMahon from, respectively, the GSA, HHS, and the ED issued a formal letter ("March 13 Letter") addressed to then- Interim President of Columbia University, Katrina Armstrong, and the Co-Chairs of the Columbia Board of Trustees, David Greenwald and Claire Shipman.[91]

107.     The March 13 Letter demands compliance with a set of policy changes as a precondition for continued federal funding. *See* March 13 Letter at 1. It was a follow up to an earlier communication on March 7, 2025, in which the government threatened to pause or terminate federal funding to the university. *Id.*

108.     The March 13 Letter outlined specific mandates with a compliance deadline for the close of business on March 20, 2025. *Id.*

---

[90] Press Release, U.S. Dep't Educ., *DOJ, HHS, ED, and GSA Announce Initial Cancelation of Grants and Contracts to Columbia University Worth $400 Million: Members of the Joint Task Force to Combat Anti-Semitism take swift action to protect Jewish students in response to inaction by Columbia University* (Mar. 7, 2025), https://www.ed.gov/about/news/press-release/doj-hhs-ed-and-gsa-announce-initial-cancelation-of-grants-and-contracts-columbia-university-worth-400-million.

[91] Letter from the GSA, U.S. Dept. HHS, and the U.S. Dept. Educ. to Dr. Katrina Armstrong, Interim President of Columbia Univ., David Greenwald & Claire Shipman, Co-Chairs of the Trs. Columbia Univ. (Mar. 13, 2025), available at https://s3.documentcloud.org/documents/2 5577971/31325-letter-to-columbia.pdf [hereinafter the "March 13 Letter"].

109.    The March 13 Letter directed Columbia University to enforce disciplinary policies against students involved in protests at Hamilton Hall and campus encampments. *Id.* Meaningful discipline, as defined by the letter, is expulsion or multi-year suspensions. *Id.* It also required that Columbia University eliminate its University Judicial Board (UJB) in order to centralize all disciplinary authority within the Office of the President.[92] *Id.*

110.    Additionally, in an act of blatant viewpoint-based discrimination and suppression, the March 13 Letter demanded that Columbia University place the Middle East, South Asian, and African Studies ("MESAAS") department under "academic receivership" for a minimum of five years. *Id.* at 2. The mandate provides no justification other than the department's subject matter.

111.    The March 13 Letter also imposed a broad ban on masks, prohibiting any facial coverings "intended to conceal identity or intimidate others." *Id.* While it purports to include exceptions for religious or health reasons, the ban directly targets student activists engaged in protests.  The mask ban would also require people to disclose health conditions if pressed about the purpose of wearing their mask.

112.    The Agency Letter also directed Columbia to "empower internal law enforcement" and ensure that security officers have "full law enforcement authority, including arrest and removal of agitators who foster an unsafe or hostile work or student environment, or otherwise interfere with classroom instruction or the functioning of the university."  *See* March 13 Letter.

---

[92] Critically, the UJB is a function of the Faculty Senate, members of which oversee the process, and ensures that student disciplinary proceedings are heard before a panel made up of faculty members, staff, and students.  While the process is certainly not perfect, it provides significant protections for student-respondents in disciplinary cases and until recently, appeared less inclined to be motivated by external political pressure, or even internal fiscal pressure.

113.    Finally, the letter directed Columbia to "formalize, adopt, and promulgate a definition of antisemitism" consistent with President Trump's Executive Order 13899 and the IHRA definition, *id.*, which is tantamount to an Israel-specific speech code that subjects students to punishment for making common and typical criticisms of one particular country, Israel, but not when they level those same types of critiques at the U.S. and other foreign governments.

114.    On its face, the March 13 Letter represents a coordinated federal campaign to coerce Columbia University into suppressing student activism by reshaping its academic programs and altering its disciplinary policies to align with the federal government's priorities, all under the threat of a loss of federal funding.

115.    Agency Defendants have indicated that this is not the end of their pressure campaign. On March 25, 2025, The Washington Post reported that attorneys within the Department of Education have been directed to acquire the names and nationalities of student protestors across universities, including Columbia University.[93]

116.    Agency Defendants have since paused billions of dollars in funding, collectively, from Cornell University, Princeton University, Harvard University, Northwestern University because of a supposed deficiency in addressing antisemitism on campus.[94]

---

[93] Laura Meckler, "New Trump Demand to colleges: Name protesters—and their nationalities," The Washington Post (March 25, 2024), available at https://www.washingtonpost.com/education/2025/03/25/trump-administration-campus-antisemitism-investigations/.

[94] Steve Holland and Kanishka Singh, "Trump Administration freezes funding for Cornell, Northwestern Universities, USA Today (April 9, 2025), available at https://www.usatoday.com/story/news/nation/2025/04/09/cornell-northwestern-

117.     On April 14, 2025, Harvard University announced that it would refuse to comply with federal government demands that in considered unlawful. These demands included mask bans, reduction of student and faculty power over university affairs, require reporting of international students to the federal government, eliminate diversity, equity, and inclusion programs, and several others.[95] Because Harvard did what Columbia University did not – that is, refuse to be compelled by federal threats – the Agency Defendants froze $2.2 billion the very same day Harvard announced its decision.[96]

118.     The consequences extend beyond the frozen funds.  On April 16, 2025, the Department of Homeland Security threatened to revoke Harvard's eligibility to host international students if it does not disclose student records by April 30, 2025.[97]  The New York Times also reported on April 16, 2025, that the Internal Revenue Service is considering revoking Harvard's tax-exempt status.[98]

---

university-funding-frozen/83004868007/ ; Sareen Habeshian, "Princeton University grants pulled, president says," Axios (April 1, 2025), available at https://www.axios.com/2025/04/01/trump-princeton-university-funding-paused.

[95] Vimal Patel, "Trump Administration Will Freeze $2 Billion After Harvard Refuses Demands," The New York Times (April 14, 2025), available at https://www.nytimes.com/2025/04/14/us/harvard-trump-reject-demands.html?smid=nytcore-ios-share&referringSource=articleShare&sgrp=p&pvid=69990CD8-4534-41B7-9B88-7E16A4D0A851.

[96] Press Release, Joint Task Force to Combat Anti-Semitism Statement Regarding Harvard University (April 14, 2024), available at https://www.ed.gov/about/news/press-release/joint-task-force-combat-anti-semitism-statement-regarding-harvard-university.

[97] Taylor Romine, et. Al "DHS threatens to revoke Harvard's eligibility to host foreign students amid broader battle over universities' autonomy" CNN (April 17, 2025), available at https://www.cnn.com/2025/04/16/us/harvard-kristi-noem-international-students/index.html.

[98] Evan Perez, Alayna Treene, and Marshall Cohen, "IRS making plans to rescind Harvard exempt status" CNN (April 16, 2025), available at https://www.cnn.com/2025/04/16/politics/irs-harvard-tax-exempt-status/index.html.

119.    Agency Defendants and other federal actors have therefore made stakes clear to Columbia University: comply with their demands immediately or they will unleash wave after wave of retribution until campus officials do comply.

2.    <u>Columbia University Yields to Agency Defendants in an Attempt to Recover $400 Million.</u>

120.    In an effort to avoid the wrath of the federal government, Columbia University agreed to begin fulfilling Agency Defendants' demands.

121.    The same day Columbia University received the Taskforce letter, it announced that the University Judicial Board made findings and issued sanctions ranging from multi-year suspensions to temporary degree revocations and expulsions related to protests at Hamilton Hall in the spring of 2024.[99]

122.    It also maintained that students returning after being suspended will be overseen by Columbia's University Life Office, stating that it is "committed to enforcing the University's Rules and Policies and improving [its] disciplinary processes."

123.    One week later, on March 21, 2025, Columbia University issued a letter in direct response to the "preconditions" the Agency Defendants set out, titled "Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia."[100] (Hereinafter, "March 21 Letter").

---

[99] Statement from Columbia University, Office of Public Affairs, University Statement Regarding UJB Determinations (March 13, 2025) available at https://s3.documentcloud.org/documents/25577971/31325-letter-to-columbia.pdf.    Notably, Columbia has maintained that it made these determinations prior to the Agencies' letter withholding funds, however, the evidence of the Federal Government's pressure campaign certainly indicates that it may, at minimum, have been a factor in determining the sanctions for these students.
[100] "Office of the President, "Advancing Our Work to Company Discrimination, Harassment, and Antisemitism at Columbia" (March 21, 2025), available at https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf.

124.    On March 21, 2025, describing Columbia's March 21 Letter, Committee Defendants posted the following on X: "Columbia FOLDS."[101]

125.    Columbia University agreed to the Agency Defendants' demand that students who were involved in the first encampment had been or would be suspended, expelled, or have their degrees temporarily revoked. *See* March 21 Letter.

126.    Columbia University agreed to the Agency Defendants' demand to change, yet again, its disciplinary process to centralize decision-making within the Office of the Provost, who reports to the University President. Agency Defendants sought this change to allow them to dictate the minutiae of student discipline on campus.  *See* March 21 Letter.

127.    In addition to Agency defendants inserting themselves into the minutiae of Columbia's disciplinary processes, the March 13th demands successfully caused Columbia to institute a mask ban that protestors, including the majority of the Plaintiffs, use to prevent the harassment, doxing, and at times violence perpetrated by third-party actors, and sometimes fellow students that has come with being vocal on campus. Columbia University cites the "important instances in the recent past where individuals unaffiliated with the University have caused significant disruptions on our campus." March 21 Letter, at 2. While identifying unauthorized individuals on campus may be a legitimate purpose, the University has been on lockdown such that no unauthorized person can even enter the premises without being approved to enter.[102]

---

[101] House Committee on Education & Workforce (@EdWorkforceCmte), X (Mar. 21, 2025, 5:28 PM), available at https://x.com/EdWorkforceCmte/status/1903197127389450301.

[102] *See, e.g.*, "Public Safety: Morningside Campus Access Levels," Columbia University, available at https://publicsafety.columbia.edu/content/morningside-campus-access-updates; David Klion, "When They Came for Columbia University, *The Nation* (Mar. 19, 2025), available at https://www.thenation.com/article/culture/trump-attacks-higher-education-columbia/;    Avion

128.     In a telling display of the power of the federal government over now former-President Armstrong, after the March 21 letter, Armstrong privately represented to concerned faculty that there was no actual mask ban.[44] But when pressed by members of the Trump administration, she reaffirmed that there was in fact a mask ban.[45] Thereafter, on March 28, Armstrong announced her resignation.[103]

129.     With the mask ban, students must choose between being disciplined for wearing a mask, and thus potentially subjecting them to record disclosure and other sanctions, or reveal their identities and be exposed regardless to rampant discrimination, harassment, potential federal intervention, and in some cases, physical assault.

130.     In addition to the mask ban, Columbia University now requires that "[a]ll individuals who engage in protests or demonstrations, including those who wear face masks or face coverings, must, when asked, present their University identification to the satisfaction of a University Delegate or Public Safety officer." These officers "will have the ability to remove individuals from campus and/or arrest them when appropriate." March 21 Letter.

131.     Columbia University also is altering its curriculum—what gets taught and who does the teaching—in line with the Agency Defendants' demand that they place under academic receivership the Middle Eastern, South Asian, and African Studies ("MESAAS"). It is simultaneously appointing new faculty to the Institute for Israel and Jewish studies and the departments of Economics, Political Science, and School for International and Public

---

Muñoz, "Students face logistic hurdles and disappointment amid heightened campus security," *Columbia Spectator* (Sept. 27, 2024), available at https://www.columbiaspectator.com/news/2024/09/27/students-face-logistic-hurdles-and-disappointment-amid-heightened-campus-security/.

[103] Alan Blinder, Katherine Rosman, and Sharon Otterman, "Columbia President is Replaced as Trump Threatens University's Funding," *The New York Times* (March 28, 2025) https://www.nytimes.com/2025/03/28/us/columbia-universitys-president-resigns.html

Affairs, while claiming that these departments will reinforce "fairness" in Middle East studies. Columbia University is also launching programming for the University's Tel Aviv Global Hub this year. (March 21 Letter).

132.    Columbia University also adopted the Agency's demand to empower internal campus law enforcement by adding thirty-six new special officers "who will have the ability to remove individuals from campus and/or arrest them when appropriate." March 21 Letter. These officers were appointed by the NYPD "subject to the orders of the police commissioner" pursuant to New York State's Peace Officers Law.[104] This is a marked and alarming departure from Columbia University's preexisting security apparatus.

133.    On April 2, 2025, officers physically removed a group of Jewish students who had chained themselves to a fence as students demanded that Defendants Columbia Board of Trustees reveal which of the Trustees provided Plaintiff Mahmoud Khalil's information to the federal government that ultimately led to his abduction and ongoing political imprisonment in Louisiana.[105] While the newly minted officers had not yet been active, this use of physical force marked a substantial departure from prior interactions between

---

[104] Jonathan Allen, "Columbia University ads 36 new campus patrol officers with powers of arrest," Reuters (April 5, 2025), available at https://www.reuters.com/world/us/columbia-universitys-new-campus-patrol-officers-appointed-by-new-york-police-2025-04-04/.

[105] *See* Stella Ragas, et al., "In Focus: Jewish students chain themselves to gates in protest of Mahmoud Khalil arrest," *The Columbia Spectator* (Apr. 7, 2025), available at https://www.columbiaspectator.com/photo-essays/2025/04/07/in-focus-jewish-students-chain-themselves-to-gates-in-protest-of-mahmoud-khalil-arrest/; "Jewish Students Chain Themselves to Columbia Gates to Protest ICE Jailing of Mahmoud Khalil," *Democracy Now!* (Apr. 3, 2025), available at https://www.democracynow.org/2025/4/3/ice_students_immigrants_mahmoud_khalil.

Columbia students and security, where physical force was extremely rarely used in part because of the militarization of protests in 1968.[106]

134.    As described in more depth below, the impact on Plaintiffs of Columbia University's compliance with Agency Defendants' demands has been immediate. Plaintiffs who wore masks to protect their safety can no longer do so without exposing themselves to discipline and likely exposure to federal agencies, one of the very purposes of wearing a mask in the first place. Plaintiffs who hoped to enroll in classes in the MESAAS department fear they will no longer be able to. Plaintiffs have changed or suppressed their own speech even further due to the University's apparent adoption of an expansive IHRA definition of antisemitism for fear of disciplinary action or other forms of reprisal.

## D. Defendants' Actions Do Not Comply with Title VI, Pointing to an Impermissible Motivation for Their Behavior.

135.    While Defendants have turned to Title VI obligations as justification for issuance and compliance with various demands, their actions do not comport with the requirements of the statute or Defendants' own regulations.[107]

136.    Title VI does not require higher education institutions to provide to the Department of Education, or any federal agency, personally identifiable information or

---

[106] Sharon Otterman and Troy Closson, "Columbia Displays More Aggressive Posture in Dealing With Demonstrators," New York Times (April 4, 2025), available at https://www.nytimes.com/2025/04/04/nyregion/columbia-security-protesters-removed.html.

[107] Notably, the American Association of University Professors and the American Federation of Teachers initiated a lawsuit against many of the same heads of federal agencies on March 25, 2025. Their complaint went into great detail as to what steps federal agencies are required to undertake pursuant to Title VI in order to withhold or stop funds. Plaintiffs refer the Court to this exhaustive overview. *See AAUP & AFT v. U.S. Dep't of Justice, et al.,* No. 1:25-cv-02429, Complaint, ECF #1 (S.D.N.Y. Mar. 25, 2025), available at https://protectdemocracy.org/wp-content/uploads/2025/03/AAUP-AFT-v-DOJ-Complaint.pdf.

specific disciplinary records of individual students or faculty. Agencies may investigate whether regulated entities are in fact complying with the Title VI nondiscrimination mandate but are not intended to determine whether students and faculty who attend schools have violated civil rights laws. *See* 34 C.F.R. § 100.3 (specifying the various ways that federally-funded institutions may violate the statute). The Second Circuit confirms that "an agency is not entitled to information sought in connection with an investigation that 'overreaches the authority Congress has given" and that "these concerns are particularly acute…where the demand for information arguably implicates constitutionally protected rights." *United States v. Univ. Hosp., State Univ. of New York at Stony Brook,* 729 F.2d 144, 150 (2d Cir. 1984) (quoting *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 217 (1946).

137.    Section 602 provides that any "termination or refusal [to grant or to continue assistance under Title VI] *shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found*." *Id.* (emphasis added).

138.    When Agency Defendants paused and suspended Columbia's funding under Section 602, they did not make the required findings that there were Title VI violations found in each grant or contract that was paused or suspended. For example, the Agency Defendants paused grants related to research conducted in campus labs but made no finding that a Title VI violation has arisen at any specific campus lab.

139.    It is clear that the regulations intend to cover information that is aggregate data and related to policies and practices, not individualized information about students or how exactly the school has disciplined them, and certainly not their nationalities.[108] Requests for

---

[108] *Id.*

the type of disclosure and compliance from federal agencies—or any other government officials—and the provision of that information to the government cannot be construed as a necessary means of enforcing Title VI, nor can Agency Defendants' preconditions for reinstatement of 400 million dollars.

### E. Agency Defendants Failed to Satisfy the Procedural Requirements of Title VI.

140.    Section 602 Title VI also lays out the remedies available to the Government and procedural requirements the Government must take before effectuating those remedies.

141.    In relevant part, Section 602 requires notice, a hearing, and a written report and states that no remedies, including the termination of funding, can become effective until thirty days after the filing of a report with Congress.

142.    Agency Defendants provided four days' notice, no hearing, and no written report prior to canceling $400 million in federal funding to Columbia University. Instead, Agency Defendants moved almost immediately. Agency Defendants threatened to cancel $5 billion worth of grants on March 3. On March 7, they announced that $400 million in funds would be paused, citing Title VI. This is clearly contrary to Title VI's statutory scheme.

### F. Impacts of Government's Jawboning and Columbia's Compliance on Students' Rights to Speech, Expression, and Association Under the First Amendment

143.    For more than a year, Plaintiffs have experienced and are experiencing myriad and persistent harms to their First Amendment rights as a result of the federal government's – including all governmental Defendants – coercive actions to force Columbia to suppress any and all speech critical of Israel and/or supportive of Palestinian human rights.

144.    All Plaintiffs intend to speak out about Palestine in the future.

145.    All Plaintiffs, in different ways, hold deep convictions and are highly motivated to speak out against the atrocities being perpetrated in Palestine because of their personal

connection to oppression, their commitment to human rights, their interest in understanding how to be an activist in times of repression, and discontent funding an institution they view to be complicit in a genocide.

146.    All Plaintiffs decided to attend either Columbia or Barnard University in part because of its academic rigor, commitment to intellectual debate, and robust and diverse student networks that would allow them to stay committed to their social justice values while pursuing their education.

     1.   <u>Plaintiffs' Past Speech, Expression, and Associations are Implicated by the Government's Demands to Columbia.</u>

147.    Plaintiffs, *except for* Jane Joe, Mahmoud Khalil, and Kam Koe, have been members or leaders of student groups that have organized or aim to organize events in support of Palestine. Such groups include those mentioned in the Committee's February 13th letter and the Agency Defendants' March 13 letter.

148.    All Plaintiffs have attended pro-Palestine events where students expressed the view that Israel is a racist state and is led by war criminals. Because these expressions violate the overly expansive definition of antisemitism Defendants have coerced Columbia into adopting, Plaintiffs' prior conduct may be subject to investigation by Columbia University or by the Government Defendants under the asserted purpose of preventing antisemitism.

149.    Plaintiffs Mahmoud Khalil, Ned Noe, Lucy Loe, Will Moe, and Sally Roe were each present at or attended expressive events on campus specifically identified by the Committee's February 13th letter.

     2.   <u>Plaintiffs Have Limited or Changed Their Speech and Expression to Avoid Punishment in Response to the Government's Demands.</u>

150.    Because the Committee and Agency Defendants have successfully coerced Columbia into suppressing Plaintiffs' views, Plaintiffs have taken steps to change or limit their speech and expression to avoid repercussions for themselves and for their associates and loved ones. These steps include:

- Sally Roe no longer wears a keffiyeh on campus despite it being an important symbol of her identity and ancestry. She now refrains from using the word "Israel" for fear of reprisal;

- Lucy Loe no longer wears a keffiyeh on campus. She now hides stickers on her journal that express support of Palestine. She attends fewer demonstrations in support of Palestine than she would like to. She avoids using specific words like "genocide" when describing what Israel has done in Gaza despite believing that's what Israel is doing;

- Ned Noe no longer wears a keffiyeh on campus. He no longer attends Palestine related protests and events. He avoids walking by protests out of fear that he may be associated with the protestors, or the protestors may be associated with him. On the limited occasion that he speaks about Palestine on campus, he is less likely to be critical of Israel because he fears he'll be accused of antisemitism and face repercussions as a result;

- Will Moe stopped hosting regular gatherings where students could come together and support Palestinians through different forms of expression. He does not communicate about his Palestine activism in any public forum out of fear it will be discovered and he will be targeted. He has even purchased VPN services, deactivated all of his social media, and turned off face ID on his electronic devices;

- Sam Soe does not walk directly to protests from class out of fear of being identified and will not go at all if they cannot wear a mask. Soe does not discuss what student organizations they are associated with because of Congressional investigations. They do not discuss Palestine in classes where it is relevant out of fear of targeting. Sam Soe has changed how they discuss Israel because of the changing and broad definitions of antisemitism. They also take precautions on who they associate with out of fear that those with less stable immigration status will be targeted because of their association with them;

- Jane Joe no longer wears a keffiyeh despite the importance it holds to her as a Palestinian. Despite feeling a personal responsibility to speak about the genocide in Gaza, she is selective about discussing Gaza, or otherwise rephrases what she previously planned to say to avoid being accused of antisemitism, and then be targeted for it through doxing and/or disciplinary proceedings. For example, she no longer uses words and phrases that are culturally important to her, like

"intifada" (Arabic for "uprising") or "from the river to the sea." She wears a mask when walking on campus to protect her identity.

- Mahmoud Khalil is currently a political prisoner being detained in an ICE facility in Louisiana solely because of his speech advocating for Palestinian human rights and against war, genocide, and his University's financial and research contributions to weapons manufacturing that contribute to the harms perpetrated against Palestinians and others in the U.S. and around the world.

151.    Six Plaintiffs have previously worn masks to protect their identity at protests and would like to do so again in the future. All Plaintiffs, when attending future pro-Palestine events or any other protest, now must choose whether they reveal their identities and risk discrimination, targeting, and harassment through exposing their face or through risking school discipline and being exposed that way.

152.    Plaintiffs Ned Noe, Sally Roe, Jane Joe, and Mahmoud Khalil have directly been subject to Columbia University disciplinary processes based on allegations of direct and/or indirect involvement in at least one of the eleven events outlined in the Committee's February 13 Letter, and therefore expect that their records have been or will be disclosed to Government Defendants, even as the Plaintiffs dispute both the allegations and/or the characterizations of the events, firmly understanding their speech to be protected by both the First Amendment and Affirmative Statement §440.

153.    Some Plaintiffs have not yet been subject to disciplinary proceedings but expect that they will due to their history of attending protests, intent to continue to engage in activism on and off campus, and the new definition of antisemitism that encompasses things Plaintiffs have already done and said and plan to do and say again in the future.

154.    Some Plaintiffs have enrolled in or wish to enroll in classes in the MESAAS department specifically to learn more about the politics of Israel and Palestine and now fear

that they will be unable to because the Government Defendants have ordered review and receivership of the department:

- Kam Koe intended to take classes in the MESAAS department and in fact came to the university with this specific goal;

- Sam Soe intended to take Joseph Massad's class in the MESAAS department because it was highly recommended by friends, but now fears that will not be possible due to Columbia and Agency Defendants' actions;

- Lucy Loe enrolled for a class in MESAAS then withdrew because she feared discussions in class could lead to targeting.

155.    Jane Joe has feared engaging with faculty in the MESAAS department for fear that it would amplify the already intense scrutiny both that Plaintiff and the faculty members in that department are already under.

156.    All Plaintiffs are also participants—as speakers and listeners—in the campus and public debates about Palestine and Israel. As participants in these debates, they are affected by the effort to suppress pro-Palestine views on campus both because they are editing their words, thoughts, and comments for fear of reprisal or disciplinary action, and because the fear of that reprisal and discipline has silenced others of their peers such that they no longer have the benefit of hearing those points of view and contributions to the debate.[109]

### CLAIM I
### The Committee Defendants' demand that Columbia University relinquish to it individual student records violates the First Amendment
### (Against Committee Defendants)

157.    Plaintiffs restate the foregoing paragraphs as is set forth fully herein.

158.    Stated plainly, "[c]oercion of a third party can be the means by which the government violates the First Amendment rights of another." *National Rifle Association v.*

---

[109] *AAUP, et al. v. Marco Rubio, et al.,* No. 1:25-cv-10685, Complaint, ECF #1 (D.Mass., March 3, 2025), available at https://knightcolumbia.org/documents/pwkvocf6z4.

*Vullo*, 602 U.S. 175, 200 (2024) (Brown Jackson, J., concurring).  Indeed, "the critical takeaway" from *Vullo* "is that the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries."  *Vullo*, 602 U.S. at 198.

159.    The Court has long recognized that the First Amendment guarantees the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  *Roberts v. U.S. Jaycees*, 467 U.S. 609, 622 (1984).  *See also Americans for Prosperity Foundation (APF) v. Bonta*, 594 U.S. 595, 606 (2021).  Indeed, "privacy in group association" is "indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

160.    As the *AFP* Court cautioned: "the government may regulate in the [First Amendment] area only with narrow specificity, and compelled disclosure regimes are no exception[,] [thus] [w]hen it comes to a person's beliefs and associations broad and sweeping state inquiries into these protected areas ... discourage citizens from exercising rights protected by the Constitution."  *Id.*, at 610 (cleaned up).

161.    Therefore, "[w]hen it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The *risk of a chilling effect* on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'"  *APF*, 594 U.S. at 618-19 (*quoting NAACP v. Button*, 371 U.S. 415, 433 (1963)) (emphasis added).

162.    The First Amendment proscribes the Government not only from directly infringing upon those rights but also from infringing upon them indirectly through the use of

techniques like jawboning. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). "Such

a strategy allows government officials to 'expand their regulatory jurisdiction to suppress the

speech of organizations that they have no direct control over.'" *Vullo*, 602 U.S. at 197-98.

*See also id.*, at 180 (a government entity's threat of invoking legal sanctions and other means

of coercion' against a third party 'to achieve the suppression of disfavored speech violates the

First Amendment.") (cleaned up).

163.        As outlined **ante**, at ¶¶ 47-92, the Committee Defendants have repeatedly

pressured the University to suppress and punish student, faculty, and staff *protected,* and quite

possibly legally required,[110] speech regarding Palestinian human rights that the Committee

disfavors and have issued threats of withholding or withdrawing "billions in federal funding"

to the University to compel its compliance. *See* Feb. 13 Letter, at 1.

164.        Furthermore, as evidenced by the results of the three congressional hearings

---

[110] *See* Convention on the Prevention and Punishment of the Crime of Genocide, Art. 1 and Art. V, Dec. 9, 1948, 78 U.N.T.S. 277 ("The Contracting Parties confirm that genocide, whether committed in time of peace or in time of war, is a crime under international law which they undertake to prevent and to punish.") ("The Contracting Parties undertake to … provide effective penalties for persons guilty of genocide or any of the other acts enumerated in article III); International Covenant on Civil and Political Rights, art. 2, Dec. 16, 1966, 999 U.N.T.S. 171 ("Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."); Guiding Principles on Business and Human Rights, United Nations Human Rights Office of the        High        Commissioner,        numbered        pages        13-15, https://www.ohchr.org/sites/default/files/documents/publications/guidingprinciplesbusi nesshr_en.pdf; Champions of Prevention, United Nations Office on Genocide Prevention and the Responsibility to Protect, https://www.un.org/en/genocide-prevention/champions-of-prevention#:~:text=According%20to%20international%20law%2C%20the,victims%20of%2 0this%20egregious%20crim (last accessed on April 18, 2025) ("The obligation to prevent genocide and other international crimes falls primarily on States. Despite this, individuals and organizations across the world have been assuming the responsibility to take positive action to promote a culture of peace and non-violence that includes the respect for diversity and non-discrimination).

held before the Committee in the spring of 2024, as described **ante**, at ¶¶ 66-77, the frankly absurd line of questioning in combination with the threats made against university presidents and trustees, that *in fact*, led to two university presidents' resignations,[111] the firing and/or suspending of numerous faculty members, *see* ¶¶ 71-73,[112] and the pervasive and severe doxing and harassment of numerous administrators, faculty, staff, and students at these institutions by members of Congress, their staff, and third-party individuals and entities. The outcome of these hearings, and of the October 31 Report, make evident that this Committee's threats have real, life-altering consequences for both the University and members of its communities, and particularly for these eight Plaintiffs.

165.    Thus, even just the veiled threats of funding cuts or stoppages, whether or not the Committee intends to or indeed can follow through, created such fear in this University that they apparently feel compelled to comply with whatever the Committees demand in order to insulate their own survival as institutions.

---

[111] Following the Committee's public attacks on former Harvard University President Claudine Gay, Dr. Gay, like many other students and faculty members, "faced death threats and was called the N-word during a weeks-long attack on her character designed to end her presidency." Matt Egan, "Harvard's Claudine Gay says she faced death threats and was called the N-word as critics pushed 'tired racial stereotypes'," *CNN* (Jan. 3, 2024), available at https://www.cnn.com/2024/01/03/business/harvard-claudine-gay-new-york-times-op-ed/index.html. Indeed, also akin to the experiences of Plaintiffs and numerous students and faculty members, an *ABCNews* article discusses a broad campaign to dox and harass Dr. Gay in order to force either her resignation or her dismissal. *See* Kiara Alfonseca, "The forces behind Harvard President Claudine Gay's resignation," *ABC News* (Jan. 5, 2024), available at https://abcnews.go.com/US/forces-harvard-president-claudine-gays-resignation/story?id=106071191.

[112] Notably, the two of the three professors named by this Committee are no longer employed by Columbia, whether by firing, failure to renew their contract, or a resignation by agreement. *See also*, Ryan Quinn, "Columbia President Accused of Dishonest Testimony, Throwing Professors 'Under the Bus'," *Inside Higher Ed* (Apr. 19, 2024), available at: https://www.insidehighered.com/news/faculty-issues/academic-freedom/2024/04/19/columbia-president-accused-throwing-profs-under-bus.

166.     The Committee's Letter requests what would amount to hundreds of pages of disciplinary records for likely hundreds of students, which infringe upon the Plaintiffs', and all students' privacy of association that is "indispensable" to their freedom of association, without a clear nexus as to how these records aid any legitimate legislative purpose.[113]

167.     The language of the Committee's February 13th Letter explicitly demonstrate its viewpoint discrimination toward any speech or expression that opposes Israel's actions against Palestinian people and/or that lift up the human rights of the Palestinian people, and they reveal their political intent to target this political speech and association.[114] *See* **ante**, at ¶ 57.

168.     The Committee is using and is pushing Columbia to use a definition of antisemitism that labels as bigoted and discriminatory the common and typical criticisms people, including Plaintiffs, make about Israel—that it is a racist state, led by war criminals, and/or similar to Nazi Germany in some ways—even as they do not attach such negative labels and consequences when such criticism is leveled against the U.S. or other foreign governments. Plaintiffs challenge that definition facially and as-applied.

169.     When viewing the totality of these circumstances, it can "be reasonably understood" the Committee Letter, and Congress's continued focus on the University, and by proxy these Plaintiffs, is intended "to convey a threat of adverse government action in

---

[113] *See AAUP & AFT v. U.S. Dep't of Justice, et al.,* No. 1:25-cv-02429, Complaint, at ¶¶ 114-84, ECF #1 (S.D.N.Y. Mar. 25, 2025).

[114] Notably, the Committee and Taskforce's violations of the First Amendment are not saved by the possibility that *some* of the conduct or speech included in the listed or identified incidents falls within their purview under Title VI.  The *Bantam Books* Court clearly held that the government violated the First Amendment in that case "violated the First Amendment by invoking legal sanctions to suppress disfavored publications, *some of which may or may not contain protected speech* (*i.e.*, nonobscene material)."  *Vullo*, 602 U.S. at 196 (emphasis added), *citing Bantam Books*, 372 U.S. at 67.

order to punish or suppress the plaintiff's speech," *NRA*, 602 U.S. at 191, based on the viewpoints of that speech.

170.     Furthermore, the Committee Defendants are not immune from these allegations under the Speech and Debate Clause, which has the express "purpose [] 'to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the *integrity of the legislative process.*" *Republican National Committee v. Pelosi*, 602 F.Supp.3d 1, 17 (D.D.C. 2022) (emphasis added), *vacated on mootness grounds by Republican National Committee v. Pelosi*, No. 22-5123, 2022 WL 4349778 (D.C. Cir. September 16, 2022) (quoting *United States v. Brewster*, 408 U.S. 501, 524 (1972)).

171.     The overly broad Letter from February 13, 2025, compelling the University to produce thousands of pages of private student disciplinary records, along with the Senate Committee's March 26, 2025, Letter compelling the University to produce what amounts to membership rolls and private organizational records that likely include the names and personally identifying information of individual students, including some Plaintiffs, does not substantially relate to any compelling interest.

172.     On its face, the Committee on Education and Workforce does have the ability to investigate issues relating to Title VI, including antisemitism which clearly falls under its purview. However, the February 13 Letter, and the previous subpoena compelling the production of private student records, along with this Committee's subsequent actions, including but not limited to the Republican Staff Report released on October 31, 2024, and the doxing of students and faculty on social media platforms, demonstrates its lack of concern with actual incidents of antisemitism and its intent to "expose for the sake of exposure" based solely on the viewpoints held by those individuals.

173.     Moreover, there can be no legitimate legislative purpose when the Committee is engaging in prohibited conduct, which is to improperly suppress through a third actor protected speech because of the viewpoints expressed.

174.     Because the House Committee's February 13 Letter, along with the Senate Committee's March 26 Letter, are predicated on clear viewpoint discrimination, endeavor to deploy unlawful jawbone tactics to suppress through a third party protected speech based on that viewpoint, and can be reasonably seen as a clear intent to chill associational and speech rights, the Committees' Letters serve no legitimate legislative purpose and violates the First Amendment.

## CLAIM II
**The Taskforce Defendants' demands that Columbia University punish students and implement changes that infringe upon Plaintiffs' protected speech rights or lose billions of dollars of funding violates the First Amendment**
**(Against Agency Defendants)**

175.     Plaintiffs restate the foregoing paragraphs as is set forth fully herein, and specifically incorporate ¶¶ 158-163 regarding the First Amendment's prohibition on jawbone tactics.

176.     As outlined **ante**, at ¶¶ 100-119, the Taskforce Defendants have repeatedly pressured the University to suppress and punish student, faculty, and staff *protected,* and quite possibly legally required,[115] speech regarding Palestinian human rights that the Executive Branch agencies disfavor regarding Palestinian human rights by "pausing and terminating federal funding," March 13 Letter, at 1, and, "as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government," demanding that the University "ensure and document compliance" with its

---

[115] *See* **ante**, at Note 110.

demands, *id.*

177.    As a "precondition" for Columbia to even engage in negotiations to renew funding, or to prevent further funding "pause[s] or termina[tions] by the Agency Defendants, the Agency Defendants demand Columbia into ceding *its* "four freedoms,"[116] as described **ante**, at ¶¶ 120-134, along with the First Amendment rights of Plaintiffs and the broader Columbia community, through the *federal government's* proscribed changes to disciplinary proceedings, definition of antisemitism to be used to bring disciplinary proceedings, mask bans, expanding law enforcement presence on campus, hiring determinations, and curriculum determinations. In other words, the Agency Defendants seek to effectively remove the very essence of academic freedom from Columbia's campus, and, in so doing, to control, suppress, and chill the speech, expressive, and associational rights of Plaintiffs.

178.    The language of Taskforce's March 13 Letter explicitly demonstrates their viewpoint discrimination toward any speech or expression that opposes Israel's actions against Palestinian people and/or that lift up the human rights of the Palestinian people, and they reveal their political intent to target this political speech and association.[117]  *See* **ante**, at ¶¶ 100-119.  This is particularly evident in the Agency Defendant's demands regarding the adoption of the IHRA definition and receivership of the Middle East, South Asian, and African Studies Department.

---

[116] *Sweezy,* 354 U.S. at 263.

[117] As noted previously, the Taskforce's violations of the First Amendment are not saved by the possibility that *some* of the conduct or speech included in the listed or identified incidents falls within their purview under Title VI.  The *Bantam Books* Court clearly held that the government body in that case "violated the First Amendment by invoking legal sanctions to suppress disfavored publications, *some of which may or may not contain protected speech* (*i.e.*, nonobscene material)."  *Vullo*, 602 U.S. at 196 (emphasis added), *citing Bantam Books*, 372 U.S. at 67.

179.     The Agency Defendants demand that Columbia adopt a definition of antisemitism that labels as bigoted and discriminatory the common and typical criticisms people, including Plaintiffs, make about Israel—that it is a racist state, led by war criminals, and/or similar to Nazi Germany in some ways—even as they do not attach such negative labels and consequences when such criticism is leveled against the U.S. or other foreign governments. Plaintiffs challenge that definition facially and as-applied.

180.     When viewing the totality of these circumstances, it can "be reasonably understood" the Taskforce Letter, and the Federal Government's continued focus on the University, and by proxy these Plaintiffs, is intended "to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech," *NRA*, 602 U.S. at 191, based on the viewpoints of that speech.

181.     Because the Taskforce's March 13 Letter is predicated on clear viewpoint discrimination and endeavors to chill and suppress speech it disfavors by coercing Columbia into punishing and removing that speech from its campus, the Agency Defendants violate the First Amendment.

## CLAIM III
**The University Defendants' compliance with the Committee Defendant's record request and the Agency Defendant's demands violate the First Amendment.**
**(against Columbia Defendants)**

182.     Plaintiffs restate the foregoing paragraphs as is set forth fully herein.

183.     As a third party whose interests are served by cooperating with the Committee and Agency Defendant's scapegoating of Columbia's student body, Columbia University can be sued by the students, faculty and staff threatened with the release of their sensitive, private information. *Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019) (holding "[n]o dispute that Plaintiffs had standing . . . to challenge the lawfulness of the Committees'

subpoenas by seeking injunctive relief.").

184.    Plaintiffs can challenge the actions taken by the University to appease federal officials seeking to compel campus officials to punish and suppress pro-Palestine speech and associations.

185.    Here, the Committees' Letters' potential to infringe on the Plaintiff's political association rights is profound.  Though the Committee has not yet issued a legally compelling subpoena, the action against the University is timely because (1) the University was compelled to produce previous disclosures, and the residual impact of that compulsion likely remains in effect, (2) the University appears poised to comply, and in fact has complied with the House Committee's February 13 Letter without a subpoena, and (3) members of the University's leadership have made "private promises" to "Members of Congress" that indicate the ongoing sharing of information between the two bodies.  *See* Feb. 13 Letter, at 1.

186.    Additionally, Agency Defendant's, by pausing and threatening to pause or terminate millions of dollars, have now further coerced Columbia into acting as its deputy to chill the speech of Plaintiffs and its student body by listing specific demands with which it must comply, or else, s*ee* **ante, at ¶¶** 100-119, and Columbia has complied at every turn. Indeed, the Agency Defendants are attempting to coerce campus officials into agreeing to a consent decree that would legally require Columbia meet the March 13 Letter's demands.[118]

187.    Jawboning becomes an effective if unlawful mechanism for the Committee and Agency Defendants to deploy in chilling "disfavored" student speech "because intermediaries," such as Columbia, are "less invested in the speaker's message and thus less likely to risk the regulator's ire[,]" *Vullo*, 602 U.S. at 197-98 (cleaned up), and indeed, that has

---

[118] *See* **ante**, at Note 7.

borne itself out over the past year.

188.    Indeed, the Committee and the federal government, in its myriad letters between 2024 and 2025, have effectively created a "system of informal censorship" as it provides "no safeguards whatever against the suppression of . . . constitutionally protected[] matter[,] [and instead] is a form of regulation that creates hazards to protected freedoms," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963), and Columbia, by cooperating with, and indeed participating in the Government's gross infringement on Plaintiffs' First Amendment rights, is aiding and abetting those violations when it provides the Committee with private student records and acquiesces to the Agency Defendants unconstitutional demands.

189.    Columbia has complied at every turn, and indeed Agency and Congressional defendants have inserted themselves—with the acquiescence of campus officials—into the minutiae of Columbia's operation, including by dictating how its disciplinary proceedings should be run, what definitions should be used, which programs it wants put under academic receivership, that it must enforce a mask ban, among other things. *See* March 13 and March 21 Letters.  As noted **ante**, Columbia has repeatedly complied with Congress's and the Agency's demands instead of fighting back on behalf of its own integrity and First Amendment rights as an institution of higher education that purports itself to be committed to academic freedom and intellectual inquiry, and on behalf of its student body, to whom they owe a duty of care, not just under the law, but as an entity that recruited, admitted, and celebrated these very same students for their intellect, capabilities, and diversity.

190.    Columbia, by cooperating with the Committee and bowing to the federal government's demands for punishment and suppression, is, in effect, the tool and instrumentality used by a government actor—thereby becoming a government actor itself.

191.     For this reason, Plaintiffs have a unique right to protect their First Amendment rights from a private actor who colludes with a state actor to infringe upon their speech and association rights.[119]

192.     The Committee, the federal government, and Columbia are engaging in and threatening future egregious violations of Plaintiffs' First Amendment rights by retaliating against Plaintiffs based on their viewpoint and their associations.

193.     Columbia, acting at the behest of the Committee and the federal government, is punishing and suppressing the "disfavored expression" of Plaintiffs and others on its campus in order to chill their expression of viewpoints, which violates the First Amendment. *See NRA*, 602 U.S. at 188.

194.     By allowing itself to be used as the Committee's cudgel, and to serve as the "jawbone" in the Committee's concerted and effective efforts to chill Plaintiffs' rights to free speech and association, the University's actions are in contravention to the First Amendment.

195.     For example, the University has adopted an expansive definition of antisemitism, which contravenes the University's Task Force on Antisemitism's second Report, issued in August of 2024, noting that the broad definition of antisemitism would infringe on Columbia community members' First Amendment rights.[120]  The Report goes on: "To be clear, we do not think that a statement should be impermissible just because it qualifies

---

[119] *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019) (finding that when Congress subpoenas information from a third party with no interest in the information sufficient to resist the subpoena, the law allows the person whose information is threatened to pursue an injunction or declaratory judgement aimed at blocking the subpoena's issuance, service on, or enforcement against the third party).

[120] Task Force on Antisemitism, Report #2: Columbia University Student Experiences of Antisemitism and Recommendations for Promoting Shared Values and Inclusion (Aug. 2024), at 44-45, available at https://www.columbia.edu/content/report-2-task-force-antisemitism.

as antisemitic under this definition. Offensive statements generally are protected under the University's rules, so the University can encourage vibrant debate. *The purpose of this definition is to educate, not to ban.* . . But this definition should not be used to impose discipline."[121] However, overwhelmed by the coercive impact of the Committee and Agency Defendants, Columbia has now exposed students to punishment via a definition of antisemitism that the school's own taskforce acknowledges would infringe on speech rights under the First Amendment.

196.     Plaintiffs challenge this definition of antisemitism facially and as-applied to them.

197.     Alternatively, Columbia is a necessary party, pursuant to Fed. R. Civ. P. Rule 19(a)(1)(A), because "in [Columbia's] absence, the court cannot accord complete relief among existing parties" as Columbia is the sole owner of the disciplinary records at issue, and it is the sole entity that is being coerced by the federal government and Congress to take measures that chill the protected speech of Plaintiffs.

## CLAIM IV
### The Government Defendants' Withholding of Funds Violates the APA and Title VI
### (Against Agency Defendants)

198.    The APA requires courts to "set aside agency action" when the action is, among other things, "not in accordance with law," "in excess of statutory jurisdiction, authority or limitations, or short of statutory right," and "*without observance of procedure required by law.*" 5 U.S.C. § 706 (emphasis added).

199.    The Agency Defendants have taken agency action against Columbia University in order to suppress Plaintiffs' speech and associations about Palestine and Israel in violation

---

[121] *Id.*, at 45.

of the First Amendment. This agency action reflects the outcome of a decision-making process to coerce Columbia specifically and universities more generally into disfavoring students and staff who express pro-Palestine views. This multi-pronged effort is reflected in the Agency Defendants' March 13 Letter and Columbia's March 21 response.

200.    Although the Agency Defendants assert that, by suspending funds to Columbia University, they are exercising their authority under Title VI, the Agency Defendants acted in excess of the statute by targeting students because of their viewpoints, rather than because of matters related to race, ethnicity, or national origin—the only protected classes under the law.

201.    Although the Agency Defendants assert that, by suspending funds to Columbia, they are exercising their authority under Title VI, the Agency Defendants follow none of the procedural steps Title VI requires them to take before withdrawing funding.

202.    Title VI does give federal agencies the authority to enforce the law's terms by suspending or pausing funding but only once an agency makes an "express finding on the record, after opportunity for hearing, of a failure to comply" with "rules, regulations, or orders of general applicability" issued to implement Title VI. 42 U.S.C. 2000d-1.

203.    The Agency Defendants did not make an express finding on the record and did not conduct a hearing as Title VI requires. The Agency Defendants did not issue any rules, regulations or orders of general applicability nor identify to Columbia or to anyone else any existing rules, regulations, or orders the University Defendants are violating.

204.    Title VI also requires the head of any agency seeking to pause or suspend an entity's funds to "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and

grounds for such an action." 42 U.S.C. 2000d-1. Under Title VI, the pause or suspension

of funds "shall [not] become effective until thirty days have elapsed since the filing of such

report." *Id.*

205.    The Agency Defendants have not submitted a report to any congressional committee,

a necessary prerequisite to suspending funds to a recipient.

206.    The Agency Defendants' suspension and termination of $400 million of funds to

Columbia is final agency action in excess of Title VI's authority because it is the final

outcome of the Agency Defendants' decision making, at the end of which the agencies

decided to disregard the procedural steps that an agency must take before it withdraws

funds from an institution.

207.    Because Plaintiffs are students committed to expressing their views about Palestine

and Israel in the future and are directly affected by Columbia losing its federal funding as

Columbia students that benefit from the federal funds Defendants have suspended and

terminated.

### CLAIM V
**The University's compliance with the Committee's and federal government's demands
constitutes a breach of contract.
(Against University Defendants)**

208.    Plaintiffs restate the foregoing paragraphs as is set forth fully herein.

209.    Columbia made specific promises and assertions to all Plaintiffs regarding

diversity, freedom of speech, academic freedom, and good faith and fair dealing, in its

contracts, student and faculty manuals, on its websites, and in pronouncements and assertions

in writing by officers and others authorized to speak for Columbia.[122]

210.    Columbia University Rules of Conduct contains Section §440. Affirmative

Statement, which states:

> To be true to these principles, the University cannot and will not rule
> any subject or form of expression out of order on the ground that it
> is objectionable, offensive, immoral, or untrue. Viewpoints will
> inevitably conflict, and members of the University community will
> disagree with and may even take offense at both the opinions
> expressed by others and the manner in which they are expressed. But
> the role of the University is not to shield individuals from positions
> that they find unwelcome. Rather, the University is a place for
> received wisdom and firmly held views to be tested, and tested again,
> so that members of the University community can listen, challenge
> each other, and be challenged in return."[123]

211.    The University Provost reiterated this promise after October 7, 2023, writing

on October 11, 2023, that "[a]t this challenging time, when so many in our community are

affected deeply by global events, I write to remind everyone that freedom of expression is a

core University value and it is our collective responsibility to uphold the principles of civic

---

[122] *See, e.g.*, Columbia University, Rules of University Conduct §440 ("The Rules of University Conduct, found in Chapter XLIV of the Statutes of Columbia University, are intended to ensure that all members of our community may engage in our cherished traditions of free expression and open debate."); Columbia University, Notice of Nondiscrimination, https://universitypolicies.columbia.edu/content/notice-nondiscrimination ("Nothing in University Policy and OIE Policies & Procedures shall be construed to abridge academic freedom and inquiry, principles of free speech, or the University's educational mission.") (last updated Sept. 6, 2024). *See also* Columbia University, Approach to Rules and Policies, University Life, https://universitylife.columbia.edu/content/approach-rules-and-policies ("'Rules' at the University has a specific meaning and importance. The Rules of University Conduct were created to ensure protection of free speech and oversee demonstrations and protests at Columbia.") (last visited Feb. 24, 2024).
[123] Columbia University, Rules of University Conduct, https://senate.columbia.edu/sites /default/files/content/Committee_Rules%20of%20University%20Conduct/Rules%20of%2 0University%20Conduct.pdf (Sept. 29, 2019).

debate and discourse."[124]

212.     These statements constitute material and specific commitments made by Columbia to its faculty members and students that are enforceable by law.[125]

213.     Incorporating the facts in Claim II, the University's Task Force on Antisemitism's second Report acknowledged that such an expansive definition of anti-Semitism, used as it is now for disciplinary purposes, infringes on speech rights under the University's Affirmative Statement §440.

214.     Plaintiffs relied on these promises as students by paying tuition to Columbia and Graduate students by entering employment agreements with Columbia.

215.     By cooperating with and disclosing information about them to the Committee, and otherwise capitulating to the illegal demands of the federal government, Columbia is intentionally exposing Plaintiffs to public threats, hate speech, and physical danger as an act of retaliation and of viewpoint discrimination against them for their First Amendment-protected criticism of Israel and their pro-Palestinian expression, or simply their good faith efforts to facilitate thoughtful inquiry into various viewpoints on Palestine.

216.     Columbia must carry out the duties it assumed towards Plaintiffs by these binding terms and conditions of its contracts, manuals, and materials, and under its obligation

---

[124] *See* Columbia University, Office of the Provost, *Ensuring Safety and Free Expression on Campus* (Oct. 11, 2023), https://provost.columbia.edu/news/ensuring-safety-and-free-expression-our-campus (last visited Mar. 3, 2025).

[125] *See Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81 (2d Cir. 2011) ("Under New York law, an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree."); *Vought v. Teachers Coll., Columbia Univ.*, 127 A.D.2d 654, 654 (N.Y. App. Div. 2d Dep't 1987) (finding that the terms of the implied contract are "contained in the university's bulletins, circulars and regulations made available to the student").

of good faith and fair dealing towards them.[126]

217.    Columbia has failed to maintain its own doxing and privacy policies.  On November 1, 2023, then-President of the University Minouche Shafik announced the creation of a "Doxing Resource Group," asserting that the "deliberate harassment and targeting of members of our community by doxing, a dangerous form of intimidation, is unacceptable" and that Columbia "ha[d] retained experts in the field of digital threat investigation and privacy scrubbing to support our impacted community members."[127]

218.    While Columbia recognizes the seriousness of the aforementioned harm to Plaintiffs, its policies fail to adequately protect Plaintiffs. The failure to fulfill its expressed commitment to protect Plaintiffs from these harms despite repeatedly expressing a commitment to protect students from this harm constitutes a breach of contract.  Moreover, Columbia has actively contributed to the doxing and harassment experienced by students by turning over their private information to Congress without adequately ensuring that Congress will, in turn, protect the students' information.

219.    Whereas Plaintiffs relied both upon the repeated and explicit commitment from Defendants to uphold speech protections, including political and controversial speech, and

---

[126] *See, e.g.*, *Vought v. Teachers Coll., Columbia Univ.*, 127 A.2d 654, 655 (N.Y. App. Div. 2d Dep't 1987) (holding that "[w]hen a student is admitted to a university, an implied contract arises between the parties" and that the "rights and obligations of the parties as contained in the university's bulletins, circulars and regulations made available to the student, become a part of this contract"); *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413–14 (N.Y. 1980) (finding that implicit in a University's contract is the requirement that the institution "act in good faith in its dealing with its students").

[127] Columbia University, Office of the President, *Announcing Doxing Resource Group* (Nov. 1, 2023), https://president.columbia.edu/news/announcing-doxing-resource-group. *See also* Columbia University, Office of the President, *Standing in Solidarity* (Oct. 27, 2023), https://president.columbia.edu/news/standing-solidarity (detailing that the University "takes [incidents of doxing] seriously and they are being investigated").

then failed to fulfill the commitments in the affirmative statement on free speech contained in the Rules of University Conduct.[128] Defendants are in breach of contract with Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, on all Causes of Action, Plaintiffs demand damages in an amount to be determined by this Court, as to documents referencing them already produced to the House  Committee; the issuance of a permanent injunction enjoining Congress from compelling the University to provide disciplinary records; the issuance of a permanent injunction enjoining Agency defendants from compelling the University to provide disciplinary records and adopt specific policies or suffer further loss of funding; the issuance of a permanent injunction enjoining the Taskforce and related federal agencies from withholding federal funding in order to coerce Columbia into chilling the constitutionally protected academic freedom, speech and association of its students based on viewpoint; the issuance of a permanent injunction enjoining Columbia from complying with the February 13 Letter, as to such documents not already produced; the issuance of a permanent injunction enjoining  Columbia from complying with the March 13 Letter in all respects; a declaratory judgment pursuant  to F.R.C.P. 57 and 28 U.S. Code § 2201, declaring the rights and other legal relations of the  parties; together with such other and further relief as may be just and proper.

---

[128] Rules of University Conduct, §440, Affirmative Statement.

Dated: April 18, 2025
New York, NY

Respectfully Submitted,

/s/  Amy E. Greer

Amy E. Greer  (NY 5910179)
**Dratel & Lewis**
29 Broadway, Suite 1412
New York, NY 10006
(212) 732-8805
agreer@dratellewis.com

**CAIR NATIONAL**
**LEGAL DEFENSE FUND**
/s/Lena Masri
Lena Masri
Gadeir Abbas (VA 81161)*
Nadia Bayado (DC 90023648)
453 New Jersey Ave SE
Washington, DC 20003
(202) 742-6420

**COUNCIL ON AMERICAN ISLAMIC**
**RELATIONS – NEW YORK**
/s/Lamya Agarwala
Lamya Agarwala (NY 5736061)
80 Broad Street, 5th Floor
New York, NY 10009
(646) 665-7599
lagarwala@cair.com

**Jonathan Wallace**
/s/ Jonathan Wallace
Jonathan Wallace (NY 1733757)
PO #728
Amagansett NY 11930
(917) 359-6234
jonathan.wallace80@gmail.com

*Licensed in VA, practice limited to federal matters*

*Attorneys for Plaintiffs*