# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MAHMOUD KHALIL, *et al.*,

                *Plaintiffs*,

   v.

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, *et al.,*

                *Defendants.*

Case No. 1:25-cv-02079-AS

## MEMORANDUM IN SUPPORT OF
## CONGRESSIONAL DEFENDANTS' MOTION TO DISMISS[*]

MATTHEW BERRY
   *General Counsel*
TODD B. TATELMAN
   *Deputy General Counsel*
ANDY T. WANG
   *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
matthew.berry@mail.house.gov

*Counsel for Congressional Defendants*

May 23, 2025

---

[*] Pursuant to Section 8(G)(i) of the Court's Individual Practices, a non-argumentative chart identifying the pleading deficiencies in Plaintiffs' Second Amended Complaint is appended to this filing as Exhibit A.

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

ARGUMENT ............................................................................................................... 8

I.   The Court Should Dismiss Claims I and III of Plaintiffs' Second Amended Complaint for Lack of Subject Matter Jurisdiction Under Fed. R. Civ. P. 12(b)(1) ................................. 8

A.   The Speech or Debate Clause Bars Plaintiffs' Suit and Requested Relief Against Congressional Defendants ................................................................................. 8

1.   Legislative Purpose ................................................................................ 11

2.   The Committee's Motivations ................................................................ 14

3.   Illegal and Unconstitutional Legislative Acts ........................................ 15

B.   Because Congressional Defendants Are Necessary Parties Under Rule 19, Claim III Must Be Dismissed ........................................................................ 16

1.   Congressional Defendants Are Required Parties ................................... 17

2.   Congressional Defendants Are Immune from Suit ................................. 17

3.   The Rule 19(b) Factors Favor Congressional Defendants ..................... 20

C.   Plaintiffs' Suit for Damages Is Barred by Sovereign Immunity ..................... 21

D.   Plaintiffs (Still) Lack Standing ...................................................................... 22

II.  The Court Should Dismiss Claims I and III of Plaintiffs' Second Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted Under Fed. R. Civ. P. 12(b)(6) ............................................................................................. 24

A.   Columbia Is Not a State Actor ...................................................................... 24

B.   Plaintiffs Do Not Plausibly Allege Coercion ................................................. 27

CONCLUSION .......................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................................24

*Ass'n of Am. Physicians & Surgeons v. Schiff,*
   518 F. Supp. 3d 505 (D.D.C. 2021), *aff'd,*
   23 F.4th 1028 (D.C. Cir. 2022) .................................................................9, 10, 16

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................24

*Bogan v. Scott–Harris,*
   523 U.S. 44 (1998) ..............................................................................................11

*Bragg v. Jordan,*
   669 F. Supp. 3d 257 (S.D.N.Y. 2023), *appeal dismissed sub nom.*
   *Bragg v. Pomerantz*, No. 23-615, 2023 WL 4612976 (2d Cir. Apr. 24, 2023) .....12, 13, 14, 15

*Budowich v. Pelosi,*
   610 F. Supp. 3d 1 (D.D.C. 2022) ......................................................................26

*Canel v. Art Inst. of Chi.,*
   No. 23-cv-17064, 2025 WL 564504 (N.D. Ill. Feb. 20, 2025) ..............................13

*Clyde v. Walker,*
   No. 22-5263, 2023 WL 6939987 (D.C. Cir., Oct. 20, 2023) ...................................9

*Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury,*
   575 F. Supp. 3d 53 (D.D.C. 2021) .......................................................................11

*ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.,*
   102 F.3d 677 (2d Cir. 1996) .................................................................................17

*Cooper v. U.S. Postal Serv.,*
   577 F.3d 479 (2d Cir. 2009) .................................................................................24

*CP Solutions PTE, Ltd. v. Gen. Elec. Co.,*
   553 F.3d 156 (2d Cir. 2009) .................................................................................20

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
   601 U.S. 42 (2024) ..............................................................................................21

*Deschutes River All. v. Portland Gen. Elec. Co.*,
   1 F.4th 1153 (9th Cir. 2021) ..............................................................................18

*Doe v. McMillan*,
   412 U.S. 306 (1973)......................................................................................9, 19

*Eastland v. U.S. Servicemen's Fund*,
   421 U.S. 491 (1975)..................................................1, 8, 9, 10, 11, 12, 14, 15, 19

*Errico v. Stryker Corp.*,
   281 F.R.D. 182 (S.D.N.Y. 2012) ........................................................................20

*Equal Vote Am. Corp. v. Cong.*,
   397 F. Supp. 3d 503 (S.D.N.Y. 2019), *aff'd in part, remanded in part sub nom.*
   *Liu v. U.S. Cong.*, 834 F. App'x 600 (2d Cir. 2020)............................................21

*Fakhreddine v. Univ. of Pennsylvania*,
   No. 24-cv-1034, 2025 WL 345089 (E.D. Pa. Jan. 30, 2025)..................................25

*Fluent v. Salamanca Indian Lease Auth.*,
   928 F.2d 542 (2d Cir. 1991)...............................................................................18

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*,
   No. 24-cv-2669, 2025 WL 401109 (S.D.N.Y. Feb. 5, 2025) .................................13

*Gravel v. United States*,
   408 U.S. 606 (1972)..........................................................................................8, 9

*Grossman v. United States*,
   No. 19-cv-9191, 2019 WL 5887365 (S.D.N.Y. Nov. 8, 2019)................................22

*Howard v. Off. of Chief Admin. Officer of U.S. House of Representatives*,
   720 F.3d 939 (D.C. Cir. 2013) ...........................................................................10

*Kestenbaum v. President & Fellows of Harvard Coll.*,
   743 F. Supp. 3d 297 (D. Mass. 2024) .................................................................13

*Kickapoo Tribe of Indians of Kickapoo Rsrv. in Kan. v. Babbitt*,
   43 F.3d 1491 (D.C. Cir. 1995) ...........................................................................18

*Lane v. Pena*,
   518 U.S. 187 (1996)...........................................................................................22

*Liu v. U.S. Cong.*,
  834 F. App'x 600 (2d Cir. 2020) ...................................................................22

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................23

*Maarawi v. U.S. Cong.*,
  24 F. App'x 43 (2d Cir. 2001) .......................................................................21

*Manhattan Cmty. Access Corp. v. Halleck*,
  587 U.S. 802 (2019) ........................................................................................24

*Marvel Characters, Inc. v. Kirby*,
  726 F.3d 119 (2d Cir. 2013) ...........................................................................17

*McGrain v. Daugherty*,
  273 U.S. 135 (1927) ..................................................................................14, 15

*Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL–CIO*,
  860 F.2d 1022 (11th Cir. 1988) .....................................................................24

*NRA v. Vullo*,
  602 U.S. 175 (2024) ..................................................................................27, 28

*Papasan v. Allain*,
  478 U.S. 265 (1986) ........................................................................................24

*Provident Tradesmens Bank & Tr. Co. v. Patterson*,
  390 U.S. 102 (1968) ........................................................................................18

*Rangel v. Boehner*,
  785 F.3d 19 (D.C. Cir. 2015) .........................................................................16

*Republic of Philippines v. Pimentel*,
  553 U.S. 851 (2008) ........................................................................................19

*Seneca Nation of Indians v. New York*,
  383 F.3d 45 (2d Cir. 2004) .............................................................................18

*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976) ..........................................................................................23

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)...............................................................................22, 23

*Tenney v. Brandhove*,
  341 U.S. 367 (1951)........................................................................................11

*United States v. Biaggi*,
  853 F.2d 89 (2d Cir. 1988).............................................................................9

*United States v. Brewster*,
  408 U.S. 501 (1972)........................................................................................8

*United States v. Johnson*,
  383 U.S. 169 (1966)..................................................................................9, 19

*United States v. Mitchell*,
  463 U.S. 206 (1983)......................................................................................22

*United States v. Shkreli*,
  No. 15-cr-637, 2017 WL 3608252 (E.D.N.Y. May 16, 2017).................................26

*Wichita & Affiliated Tribes of Okla. v. Hodel*,
  788 F.2d 765 (D.C. Cir. 1986) ...........................................................18, 20, 21

**Legislative Authorities**

*Columbia in Crisis: Columbia University's Response to Antisemitism: Hearing
  Before the H. Comm. on Education and the Workforce*, 118th Cong. (2024)
  (Committee Hearing), https://perma.cc/ST8M-2MDW......................................5, 12

Rules of the House of Representatives,
  119th Cong. (2025), https://perma.cc/QD7D-WRAX

  House Rule X.1(e) ..........................................................................................4

  House Rule X.2(a) ..........................................................................................5

  House Rule X.2(b) ..........................................................................................5

  House Rule X.2(b)(1).......................................................................................5

Staff of H. Comm. on Education and the Workforce, 118th Cong., Rep. on
Antisemitism (Comm. Print 2024) (Committee Staff Report),
https://perma.cc/9SBA-HUMK ...........................................................................6, 12

Staff of H. Comm. on Education and the Workforce, et al., 118th Cong., Rep. on
Antisemitism on College Campuses Exposed (Comm. Print 2024) (U.S.
House of Representatives Staff Report), https://perma.cc/268S-8FPZ ....................................6

**Constitution**

U.S. Const. art. I, § 5, cl. 2.....................................................................................................4

U.S. Const. art. I, § 6, cl. 1.....................................................................................................8

**Statutes & Rules**

42 U.S.C. § 2000d................................................................................................................13

Fed. R. Civ. P.

    19(a) ................................................................................................................................17

    19(a)(1) ............................................................................................................................17

    19(a)(1)(B) .......................................................................................................................17

    19(b)...........................................................................................................17, 18, 19, 20

**Other Authorities**

Amira McKee et al., *Dozens occupy Hamilton Hall as pro-Palestinian protests
spread across campus*, Columbia Spectator (Apr. 30, 2024, 6:27 AM),
https://perma.cc/MQG6-XC4W.........................................................................................3

Compl., *Torres v. Carlson*,
No. 25-cv-3474 (S.D.N.Y. April 25, 2025), ECF No. 1 .......................................................3, 4

Ex. 1 to Decl. of David Gringer, *Fakhreddine v. Univ. of Pennsylvania*,
No. 24-cv-1034, 2025 WL 345089 (E.D. Pa. Jan. 30, 2025), ECF No. 47-2 .........................25

Jesse Rodriguez & Phil Helsel, *Smashed windows, stacked furniture left after
occupation of Hamilton Hall at Columbia University*, NBC News (May 1,
2024, 12:52 AM), https://perma.cc/MK5H-6CX2..................................................................3

Statement from Columbia University President Minouche Shafik (Apr. 29, 2024)
(President Shafik Statement), https://perma.cc/Y32M-ZZXE.................................................3

## INTRODUCTION

Plaintiffs have now made their third attempt at suing the Committee on Education and Workforce of the U.S. House of Representatives (Committee) and its Chairman Tim Walberg (collectively, Congressional Defendants). But the third time is not the charm. Plaintiffs' Second Amended Complaint suffers from many of the same defects as their two prior complaints and Motion for a Temporary Restraining Order and Preliminary Injunction (TRO/PI). For example, Plaintiffs' original Complaint, First Amended Complaint, and Motion for a TRO/PI all sought relief directly against Congressional Defendants. However, in its Order denying Plaintiffs' Motion for a TRO/PI, this Court correctly recognized that because "plaintiffs seek relief against the Congressional defendants themselves[,] the [Speech or Debate] Clause acts as a jurisdictional bar against such requests." ECF No. 54 at 2. Nevertheless, two weeks later, Plaintiffs unveiled their Second Amended Complaint, and once again seek relief against Congressional Defendants. The Speech or Debate Clause not only prevents this Court from granting such relief, it also renders Congressional Defendants immune from this lawsuit.

For over a year, Congressional Defendants have been working diligently to investigate the rising tide of antisemitism on our nation's college campuses so that it may fashion legislative remedies needed to protect Jewish students from discrimination, prejudice, and harm. But because of this suit, the "legislative inquiry has been frustrated … ." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 511 (1975). Preventing such hindrances is why the Framers included the Speech or Debate Clause in the Constitution. *See id.* ("The Clause was written to … forbid invocation of judicial power to challenge the wisdom of Congress'[s] use of its investigative authority.").

1

The time has therefore come for this Court to dismiss Plaintiffs' claim against Congressional Defendants (Claim I). The Court must also dismiss Plaintiffs' claim that Columbia's compliance with Congressional Defendants' records request violates the First Amendment (Claim III). Congressional Defendants are necessary parties to Claim III under Federal Rule of Civil Procedure 19 but immune from this suit under the Speech or Debate Clause. As a result, this claim cannot proceed any further. Moreover, in responding to Congressional Defendants' records request, Columbia is not a state actor and so it cannot violate the First Amendment. In sum, all First Amendment claims related to Congressional Defendants' antisemitism investigation must be dismissed.

## BACKGROUND

As set forth in Congressional Defendants' Opposition to Plaintiffs' Motion for a TRO/PI, a wave of antisemitic incidents has deluged college campuses since the October 7, 2023 terrorist attacks in Israel. ECF No. 31 at 2–4. Columbia's Jewish population has not been spared; they have been harassed, accosted, and even physically assaulted. *Id.*; *see also* Decl. of Todd B. Tatelman (Decl.), Ex. A at 3–5. For example, one "Israeli Columbia student was beaten with a stick by a former Columbia undergraduate whom the victim had confronted about ripping down flyers of Israeli hostages. The assailant shouted, 'Fuck you. Fuck all you prick crackers.'" Decl., Ex. A at 3 (footnote omitted). In another incident, a student shouted, "'fuck the Jews' at a Jewish student wearing a yarmulke in the kosher section of a campus dining hall." *Id.*

In April 2024, protesters formed an illegal encampment on campus. As the Committee explained, the encampment "resulted in widespread antisemitic harassment and intimidation, assaults, frequent celebration of terrorism, and major disruptions of Columbia's learning environment." Decl., Ex. B at 2. Indeed, according to a lawsuit filed by two of Columbia's

janitorial staff who, as discussed below, were taken hostage by the protesters mere weeks later, the encampment "was a hotbed of virulent anti-Semitism.  There, Jewish students were barred from entry, physically assaulted, and subjected to calls of 'Yahoodim, yahoodi [Jews, Jew], fuck you,' 'stop killing children,' 'go back to Poland,' 'Nazi bitches,' and 'go to a synagogue.'"[1] Columbia's then-President also agreed, publicly declaring that the encampment "created an unwelcoming environment for many of our Jewish students and faculty [and] contributed to creating a hostile environment in violation of Title VI [of the Civil Rights Act of 1964]."[2]

Just two weeks after the encampment was formed, protesters occupied Hamilton Hall, a campus building, caused extensive property damage,[3] and took the two innocent janitors hostage.[4]  According to the janitors' complaint against the protesters:

> a highly coordinated mob (the "Occupiers") donned masks and hoods to conceal their identities, armed themselves with rope, zip ties, and crow bars, and smashed their way through the doors and windows of Columbia University's Hamilton Hall. Once inside, the masked invaders encountered two janitors who were working the overnight shift cleaning the building's classrooms and bathrooms.  The Occupiers terrorized the two men into the early morning of April 30th, assaulted and battered them, held them against their will, and derided them as "Jew-lovers" and "Zionists."

---

[1] Complaint ¶ 12, *Torres v. Carlson*, No. 25-cv-3474 (S.D.N.Y. April 25, 2025), ECF No. 1 (Janitors Compl.).

[2] Statement from Columbia University President Minouche Shafik (Apr. 29, 2024) (President Shafik Statement), https://perma.cc/Y32M-ZZXE.

[3] Jesse Rodriguez & Phil Helsel, *Smashed windows, stacked furniture left after occupation of Hamilton Hall at Columbia University*, NBC News (May 1, 2024, 12:52 AM), https://perma.cc/LNX9-E88U.

[4] Amira McKee et al., *Dozens occupy Hamilton Hall as pro-Palestinian protests spread across campus*, Columbia Spectator (Apr. 30, 2024, 6:27 AM), https://perma.cc/MQG6-XC4W; *see generally* Janitors Compl, *supra* note 1.

Janitors Compl. ¶ 1.  The actions of the protesters were highly coordinated, complete with maps, manuals, and targets.  *Id.* ¶¶ 98–131.  Worse yet, the protesters repeatedly assaulted both captive janitors, injured them, and made them fear for their lives.  *See id.* ¶¶ 112–131.  Neither janitor has returned to work since that night as both are dealing with ongoing injuries "sustained during and as a result of the attacks and terror they endured during the Occupation," including "PTSD." *Id.* ¶¶ 139–41.

Moreover, frequent messages of "intifada" and "from the River to the Sea, Palestine will be free" were bellowed out during middle-of-the-night protests and written on the floor of dorm rooms where Jewish students slept.  Decl., Ex. B at 4, 5.  This is just part of the backdrop to the Committee's investigation into antisemitism on our nation's college campuses generally, and at Columbia specifically.

The Committee's investigation started during the 118th Congress.  On February 12, 2024, the Committee wrote to Columbia to request documents relating to various antisemitic incidents that have occurred on Columbia's campus and how Columbia has responded to them.  *See* Decl., Ex. A.  As the Committee explained in that letter, the requested information would "assist the Committee in understanding antisemitism at Columbia and the university's response to it," and "[u]nder House Rule X, the Committee has legislative and oversight jurisdiction over 'education … generally.'"  *Id.* at 11, 16.[5]  After that initial letter, the Committee followed up with additional

---

[5] Pursuant to the Constitution's Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2, the House has delegated its extensive legislative powers over education to the Committee.  *See* Rule X.1(e), Rules of the House of Representatives, 119th Cong. (2025) (House Rules), https://perma.cc/QD7D-WRAX.  House Rules also delegate to the Committee "general oversight responsibilities" to enable it "to assist the House in" reviewing "the application, administration, execution, and effectiveness of Federal laws," "conditions and circumstances that may indicate the necessity or desirability of enacting new or additional legislation," and the "formulation,

inquiries.  On April 21, 2024, the Committee wrote to Columbia again expressing concern about the "severe and pervasive hostile environment for Jewish students at Columbia."  Decl., Ex. B at 1.  Then, in August, the Committee asked Columbia to emphasize the production of various "priority items" that the Committee had initially requested in its February 12 letter.  Decl., Ex. C at 1.  Eventually, this culminated in the Committee issuing subpoenas to Columbia for some of the requested documents.  *See* Decl., Ex. D.  Columbia produced responsive documents throughout 2024, subject to redactions.

During the last Congress, the Committee also held a hearing at which it heard directly from Columbia's leaders.[6]  The purpose of the hearing was for the Committee to "conduct its solemn oversight duty of postsecondary education," *id*. at 4, especially because "a taxpayer funded institution [becoming] a forum for the promotion of terrorism raises serious questions," *id*. at 3.  Members also asked Columbia's leaders about "the kind[s] of legislation that gives us more data, and a mechanism to fight antisemitism."  *Id*. at 61.  Indeed, one Committee Member raised H.R. 7921, the Countering Antisemitism Act, *id*., a bill introduced in the 118th Congress to strengthen federal efforts to oppose antisemitism in the United States, including in higher education.  During the hearing, President Shafik admitted that "Columbia has seen a rise in antisemitic incidents."  *Id*. at 11.

---

consideration and enactment of changes in Federal laws."  House Rule X.2(a)-(b).  To do that, the Committee must, among other things, examine how existing laws are being administered and how effective they are.  *See* House Rule X.2(b)(1).

[6] *Columbia in Crisis: Columbia University's Response to Antisemitism: Hearing Before the H. Comm. on Education and the Workforce*, 118th Cong. (2024) (Committee Hearing), https://perma.cc/ST8M-2MDW.

Finally, the Committee's investigation during the last Congress led to the issuance of two reports. The first report[7] explained "the Committee's interest [was] in ensuring colleges and universities comply with Title VI," and that "the Committee's investigation will inform potential legislative reforms to existing federal law" because the "outbreak of vicious antisemitism in postsecondary education" "is a subject on which legislation 'could be had.'" *Id.* at 7. The Committee Staff Report extensively documented the pervasive antisemitism infecting Columbia and other college campuses, notably concluding that the "totality of circumstances on these campuses demonstrate an environment hostile to Jewish students likely in violation of Title VI." *Id.* at 122. The Committee also contributed to the U.S. House of Representatives Staff Report on Antisemitism, which was released on December 18, 2024, and included legislative recommendations for combatting antisemitism on college campuses.[8]

The Committee's investigation continues in the 119th Congress. To further its understanding of the way universities have responded to antisemitic acts and to effectively evaluate the need for and shape of potential legislation, on February 13, 2025, the Committee requested disciplinary records relating to 11 specific incidents that occurred on Columbia's campus within the past year, beginning with the takeover of Hamilton Hall. *See* Decl., Ex. E at 5. Another incident that the Committee highlighted in its letter occurred on November 21, 2024, when "students marched on Columbia's Hillel, the school's center for Jewish life, harassed

---

[7] *See* Staff of H. Comm. on Education and the Workforce, 118th Cong., Rep. on Antisemitism on College Campuses Exposed (Comm. Print 2024) (Committee Staff Report), https://perma.cc/268S-8FPZ.

[8] *See* Staff of H. Comm. on Education and the Workforce, et al., 118th Cong., Rep. on Antisemitism 18–19 (Comm. Print 2024) (U.S. House of Representatives Staff Report), https://perma.cc/9SBA-HUMK.

Jewish students entering the building, chanted 'long live the Intifada,' and called on Columbia to sever ties with Hillel." *Id*. at 3. Columbia responded to the February 13 letter and produced records, subject to redactions, on February 27, March 7, and March 19. *See* Decl., Exs. F–H.

Plaintiffs filed their initial complaint on March 13, ECF No. 1, but amended it on March 19, ECF No. 13, and on the same day filed their Motion for a TRO/PI and supporting memorandum of law, ECF Nos. 15 & 17. Congressional Defendants filed their opposition on March 24, ECF Nos. 31 & 32, and the Court heard arguments the next day, March 25[9]. On March 26, Plaintiffs sought leave to file a second amended complaint. ECF No. 46. On March 27, Congressional Defendants submitted a letter to the Court containing supplemental authorities and arguments in support of its Opposition to Plaintiffs' Motion for a TRO/PI. ECF No. 47. On April 4, the Court denied Plaintiffs' motion for a TRO/PI, granted Plaintiffs leave to file a second amended complaint by April 18, and ordered all Defendants to move to dismiss within "fourteen days after service of the amended complaint." ECF No. 54 at 2. Plaintiffs filed their Second Amended Complaint on April 18. ECF No. 62. Congressional Defendants moved for a three-week extension of time to respond, from May 2 until May 23, ECF No. 67, which the Court granted, ECF No. 69.

As to Plaintiffs' Second Amended Complaint, Claim I is lodged directly against Congressional Defendants, ECF No. 62 ¶¶ 157–74, and Claim III hinges on allegations against Congressional Defendants, claiming that Columbia's compliance with the Committee's records request would violate the First Amendment, *id*. ¶¶ 182–97. Among other things, Plaintiffs seek damages for documents already produced to the Committee, "a permanent injunction enjoining

---

[9] *See* Hr'g Tr., Mar. 25, 2025.

Congress from compelling the University to provide disciplinary records," and "a permanent injunction enjoining Columbia from complying with the February 13 Letter, as to such documents not already produced." *Id*. at 72 (Prayer for Relief).

## ARGUMENT

Claims I and III of Plaintiffs' Second Amended Complaint should be dismissed because the Court lacks subject matter jurisdiction, and because they do not state claims upon which relief can be granted.

**I.     The Court Should Dismiss Claims I and III of Plaintiffs' Second Amended Complaint for Lack of Subject Matter Jurisdiction Under Fed. R. Civ. P. 12(b)(1)**

The Court lacks subject matter jurisdiction over Claims I and III for four reasons.  *First*, the Speech or Debate Clause absolutely shields Congressional Defendants from this suit (Claim I).  *Second*, Congressional Defendants are necessary parties under Rule 19 for purposes of Plaintiffs' First Amendment claim against Columbia (Claim III).  But because Congressional Defendants are immunized from suit by the Speech or Debate Clause, they cannot be joined, and this Court may not adjudicate Claim III.  *Third*, sovereign immunity bars Plaintiffs' claim for damages.  *Finally*, Plaintiffs (still) lack standing.

**A.     The Speech or Debate Clause Bars Plaintiffs' Suit and Requested Relief Against Congressional Defendants**

The Speech or Debate Clause mandates that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."  U.S. Const. art. I, § 6, cl. 1.  The Clause "free[s] the legislator from executive and judicial oversight that realistically threatens to control his conduct," *Gravel v. United States*, 408 U.S. 606, 618 (1972), "preserve[s] the independence and … integrity of the legislative process," *United States v. Brewster*, 408 U.S. 501, 524 (1972), and "reinforc[es] the separation of powers," *Eastland*, 421

U.S. at 502 (citing *United States v. Johnson*, 383 U.S. 169, 178 (1966)).  Because of its importance, the Supreme Court has repeatedly, and "[w]ithout exception, … read the Speech or Debate Clause broadly to effectuate its purposes."  *Eastland*, 421 U.S. at 501.

The Speech or Debate Clause provides, among other things, immunity from prosecutions or civil lawsuits with respect to all actions "within the 'legislative sphere.'"  *Doe v. McMillan*, 412 U.S. 306, 312 (1973) (quoting *Grave*l, 408 U.S. at 624–25).  "[T]he Speech or Debate Clause operates as a jurisdictional bar when 'the actions upon which a plaintiff [seeks] to predicate liability [are] legislative acts' … and prohibits the judiciary from 'question[ing]' speech, debate, or legislative acts that fall within the Clause's coverage."  *Clyde v. Walker*, No. 22-5263, 2023 WL 6939987, at *2 (D.C. Cir., Oct. 20, 2023) (citations omitted).  The types of legislative acts protected by the Speech or Debate Clause include much more than just speaking or debating on the House floor and participating in committee hearings.  As relevant here, the Supreme Court has found that the "power to investigate" is within the legitimate legislative sphere.  *See Eastland*, 421 U.S. at 504.  That is so because a "legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change."  *Id*. (citation omitted).  As a result, legislative acts protected by the Clause include all forms of congressional information-gathering, whether that be, as here, informal letters requesting a response, *see Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 518 (D.D.C. 2021), *aff'd*, 23 F.4th 1028 (D.C. Cir. 2022), or, as the Committee did last Congress, formal subpoenas compelling information, *see Eastland*, 421 U.S. at 504.  Indeed, the Second Circuit has recognized that "factfinding activity" during Member travel is protected by the Clause.  *See United States v. Biaggi*, 853 F.2d 89, 102–03 (2d Cir. 1988).

Further, the Clause's "absolute" protection of legislative acts includes even those that are "unconstitutional or … contrary to criminal or civil statutes." *Eastland*, 421 U.S. at 501, 510. In *Eastland*, for example, a Senate Subcommittee was investigating the United States Servicemen's Fund (USSF). *Id*. at 493. The Subcommittee issued a subpoena for "all records" to a bank where USSF had an account. *Id*. at 494. USSF sued several congressional actors and the bank arguing, like Plaintiffs do here, that the subpoena was an "unconstitutional abuse of the legislative power of inquiry," designed to "force 'public disclosure of beliefs, opinions, expressions and associations of private citizens which may be unorthodox or unpopular,'" and meant to "harass, chill, punish and deter (USSF and its members) in their exercise of" their First Amendment rights. *Id*. at 495. Also, as here, USSF sought a permanent injunction against both the Subcommittee and the bank. *Id*. at 496. The Supreme Court held that the congressional actors were "protected by the Speech or Debate Clause" and brushed aside USSF's argument "that once it is alleged that First Amendment rights may be infringed by congressional action the Judiciary may intervene to protect those rights," holding that USSF's "approach … ignores the absolute nature of the speech or debate protection." *Id*. at 501, 509–10; *see also Ass'n of Am. Physicians & Surgeons*, 518 F. Supp. 3d at 509–10, 517–20 (granting motion to dismiss because allegations of First Amendment violations were not sufficient to overcome Speech or Debate Clause immunity).

Here, in denying Plaintiffs' Motion for a TRO/PI, this Court held that because "plaintiffs seek relief against the Congressional defendants themselves[,] … the Clause acts as a jurisdictional bar against such requests." ECF No. 54 at 2 (citing *Howard v. Off. of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 941 (D.C. Cir. 2013)). Nothing in Plaintiffs' Second Amended Complaint provides any reason to change that conclusion. Plaintiffs

still seek relief against Congressional Defendants *for the same legislative act*: its February 13 request for records. In fact, Plaintiffs' requests for relief against Congressional Defendants in all three of its complaints are identical. *Compare* ECF No. 1 at 35 (requesting "the issuance of a permanent injunction enjoining Congress from compelling the University to provide disciplinary records"), *and* ECF No. 13 at 41 (same), *with* ECF No. 62 at 72 (same).

Each of Plaintiffs' three attempts to plead around the Clause (described below) fails. As the Supreme Court has recognized, "absolute immunity would be of little value if legislators could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader." *Bogan v. Scott–Harris*, 523 U.S. 44, 54 (1998) (brackets, quotation marks, and citation omitted).

### 1.    Legislative Purpose

Plaintiffs first attempt to plead around the Clause by alleging that the Committee's request for student disciplinary records "does not substantially relate to any compelling interest." ECF No. 62 ¶ 171. But the only permissible judicial inquiry here is an exceedingly narrow and deferential assessment of whether "the investigation upon which the [Committee] had embarked concerned a subject on which 'legislation could be had.'" *Eastland*, 421 U.S. at 506 (citation omitted). "[T]he legitimate legislative purpose bar is a low one, and the purpose need not be clearly articulated." *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury*, 575 F. Supp. 3d 53, 64 (D.D.C. 2021) (summarizing relevant Supreme Court precedent). Thus, "courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Eastland*, 421 U.S at 506 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951)).

In any case, the Committee has an important legislative interest here. As this Court has recognized:

> Congressional defendants … have pointed to a valid legislative purpose … which is that [they have] identified the targeting, harassment, and other illegal activit[ies] directed towards Jewish students. They understand that the federal government is funding these institutions, so they have a legislative issue, which is whether there is anything to be done about the situation. … They've pointed to legislation that has been introduced that is along these lines.

Hr'g Tr. at 24 (referencing ECF No. 31 at 20–21). Plaintiffs themselves concede that the "Committee … does have the ability to investigate issues relating to Title VI, including antisemitism which clearly falls under its purview." *See* ECF No. 62 ¶ 172. Thus, the Committee's legislative purpose of conducting oversight of Columbia's application of Title VI and researching if further legislation is needed to stem the tide of antisemitism on college campuses[10] more than satisfies this Court's "exceedingly narrow … facial inquiry." Hr'g Tr. at 24 (referencing *Eastland*, 421 U.S. 491).

The Committee's February 13 requests for disciplinary records directly relate to this legislative purpose. "Congress may conduct inquiries into the administration of existing laws, studies of proposed laws, and [particularly relevant here,] surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Bragg v. Jordan*, 669 F. Supp. 3d 257, 267 (S.D.N.Y. 2023) (alteration in original) (internal quotation

---

[10] For example, the Committee Staff Report explained that "the Committee's interest [was] in ensuring colleges and universities comply with Title VI," and that "the Committee's investigation will inform potential legislative reforms to existing federal law" because the "outbreak of vicious antisemitism in postsecondary education" is a "subject on which legislation 'could be had.'" Committee Staff Report, *supra* note 7, at 7 (citation omitted). Likewise, during the April 17, 2024, Committee Hearing with Columbia's leadership, a Member asked about H.R. 7921, the Countering Antisemitism Act, and whether a witness would "support the kind of legislation that gives us more data, and a mechanism to fight antisemitism?" Committee Hearing, *supra* note 6, at 61.

marks and citation omitted), *appeal dismissed sub nom. Bragg v. Pomerantz*, No. 23-615, 2023 WL 4612976 (2d Cir. Apr. 24, 2023). The February 13 requests are an "inquir[y] into the administration of [Title VI]," as well as a "survey[] of [the handling of antisemitism on college campuses]." *Id.*

Title VI states that schools receiving federal funds may not discriminate against anyone on the "ground of race, color, or national origin," 42 U.S.C. § 2000d, which, of course, includes Jewish students, *see Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, No. 24-cv-2669, 2025 WL 401109, at *2 (S.D.N.Y. Feb. 5, 2025) (Jewish Cooper Union students); *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 303 (D. Mass. 2024) (Jewish and Israeli Harvard students).

*Gartenberg* and *Kestenbaum* hold that "conduct that allegedly targeted Jewish students— such as demonstrators chanting the phrase '[f]rom the river to the sea, Palestine will be free' at Jewish students … ; and vandals graffiti-ing the phrase on bathroom walls … and tearing down posters that Jewish students hung to commemorate hostages taken by Hamas" or "protests that were, at times, confrontational and physically violent towards Jewish students" "could constitute a hostile environment claim under Title VI." *Canel v. Art Inst. of Chi.*, No. 23-cv-17064, 2025 WL 564504, at *9 (N.D. Ill. Feb. 20, 2025) (summarizing *Gartenberg* and *Kestenbaum*). The actions of Columbia's protesters therefore potentially trigger Columbia's obligations under Title VI to take action to protect its Jewish students. *See Gartenberg*, 2025 WL 401109, at *6 ("actionable discrimination includes an institution's 'deliberate indifference' to known instances of student-on-student harassment"); *Kestenbaum*, 743 F. Supp. 3d at 308 ("deliberate indifference means … [that] plaintiffs must plead that the school 'either did nothing or failed to

take additional reasonable measures after it learned that its initial remedies were ineffective.'"
(citation omitted)).

Thus, because a Title VI violation requires antisemitic incidents taking place at Columbia
*and* Columbia's deliberate indifference to those incidents, for the Committee to "inquir[e] into
the administration [of Title VI]," as well as "survey" Columbia's handling of antisemitism on its
campus, the Committee needs information both on antisemitic incidents and how Columbia has
responded to such incidents. *Bragg*, 669 F. Supp. 3d at 267. That is why the Committee has
inquired about disciplinary records, and why its February 13 letter noted that "Columbia's
continued failure to address the pervasive antisemitism that persists on campus is untenable,
particularly given that the university receives billions in federal funding." Decl., Ex. E at 1.
That statement was not a "veiled threat[] of funding cuts or stoppages," ECF No. 62 ¶ 165; it was
a factual statement of federal civil rights law.

### 2.    The Committee's Motivations

Plaintiffs also allege that the Committee is seeking the records not because it is
"concern[ed] with actual incidents of antisemitism," but because of "its intent to 'expose for the
sake of exposure' based solely on the viewpoints held by those individuals." ECF No. 62 ¶ 172;
*see also id.* ¶ 174. The Supreme Court, however, has cautioned that courts must assume "that the
action of the legislative body was with a legitimate object, if it is capable of being so construed,
and [the court] ha[s] no right to assume that the contrary was intended." *McGrain v. Daugherty*,
273 U.S. 135, 178 (1927) (citation omitted). As is the case here, when a Congressional
Committee asserts that it is investigating in aid of legislating, "the presumption should be
indulged that this was the real object." *Id.*; *see also Eastland*, 421 U.S. at 508 ("Our cases make
clear that in determining the legitimacy of a congressional act we do not look to the motives

alleged to have prompted it."); *Bragg*, 669 F. Supp. 3d at 269 ("The Court is required to presume that a congressional committee's stated legislative object is the real object. … [E]ven if [Plaintiffs'] hypotheses about the Committee's *real* motivations were correct, they are irrelevant. It is not a court's function to invalidate a congressional investigation that serves a legislative purpose." (internal quotation marks and citations omitted)).

Here, for the reasons explained above, the Committee's February 13 letter is easily "capable of being [] construed" as a request for information in support of its investigation into antisemitism on college campuses and the administration of Title VI. *McGrain*, 273 U.S. at 178 (citation omitted). The "mere allegation that [the Committee's] valid legislative act was undertaken for an unworthy purpose [cannot] lift the protection of the Clause, [because] then the Clause simply would not provide the protection historically undergirding it." *Eastland,* 421 U.S. at 508–09. Indeed, in these "times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and [just] as readily believed. [But] [t]he wisdom of congressional approach or methodology is not open to judicial veto." *Id*. at 509 (internal quotation marks and citations omitted).

Notwithstanding Plaintiffs' allegations regarding the Committee's "motive or intent," the Speech or Debate Clause bars Plaintiffs' claim against Congressional Defendants.

### 3.    Illegal and Unconstitutional Legislative Acts

Lastly, Plaintiffs allege that "there can be no legitimate legislative purpose when the Committee is engaging in prohibited conduct." ECF No. 62 ¶ 173; *see also id*. ¶ 174 (the "February 13 Letter … serve[s] no legitimate legislative purpose and violates the First Amendment."). While Congressional Defendants vigorously dispute any allegations that its

inquiry or investigative methods are anything but lawful and legitimate, Plaintiffs' argument runs

headlong into *Eastland*. As the D.C. Circuit explained, the assertion that

> defendants' conduct cannot be "legislative" because it [is], in [Plaintiffs'] view,
> illegal [is a] "familiar" argument — made in almost every Speech or Debate Clause
> case — [that] has been rejected time and again. An act does not lose its legislative
> character simply because a plaintiff alleges that it violated the House Rules, or even
> the Constitution. Such is the nature of absolute immunity, which is — in a word
> — absolute. Although absolute immunity creates "a potential for abuse," that
> potential "was the conscious choice of the Framers buttressed and justified by
> history." Instead of looking into the defendants' "motive or intent," the standard
> for determining whether an act is legislative "turns on the nature of the act" itself.

*Rangel v. Boehner*, 785 F.3d 19, 24 (D.C. Cir. 2015) (citations omitted).

Thus, because the "nature of the act" here is a letter request for information in support of

a congressional inquiry into a topic on which legislation can be had, and such requests are

legislative acts, *see Ass'n of Am. Physicians & Surgeons*, 518 F. Supp. 3d at 518, the Speech or

Debate Clause bars Plaintiffs' First Amendment claim against Congressional Defendants,

notwithstanding allegations of illegality or illegitimacy.

### B. Because Congressional Defendants Are Necessary Parties Under Rule 19, Claim III Must Be Dismissed

Claim III is also based on the Committee's February 13 requests to Columbia; Plaintiffs'

claim that Columbia's compliance with the Committee's requests violates the First Amendment

rises or falls upon their allegations against the Committee. *See* ECF No. 62 ¶¶ 184, 185, 187–94,

197. Therefore, Congressional Defendants are necessary parties under Federal Rule of Civil

Procedure 19. But, as discussed above, Congressional Defendants are absolutely immune from

being included in this suit by the Speech or Debate Clause. And because the Rule 19 factors

weigh decisively against proceeding without them, Claim III of the Second Amended Complaint,

which affects Congressional Defendants' rights, must be dismissed.

Rule 19(a) establishes a three-part test for determining whether joinder is required.  First, a court must determine whether, as set forth in Rule 19(a)(1), the party is necessary for a just adjudication.  *See ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.*, 102 F.3d 677, 681 (2d Cir. 1996).  Second, a court must evaluate whether joinder of that party is feasible.  *See id*. Third, if joinder is not feasible, the court then turns to Rule 19(b), which "requires courts to consider whether, 'in equity and good conscience,' the party is one without whom the action between the remaining parties cannot proceed."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 132 (2d Cir. 2013) (quoting Fed. R. Civ. P. 19(b)).

### 1.    Congressional Defendants Are Required Parties

A party is "required" if that party "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P. 19(a)(1)(B).  Because the February 13 letter forms the basis of Claim III of Plaintiffs' suit, Congressional Defendants have "an interest relating to the subject of the action" and are required parties.  *Id*.  Further, because enjoining Columbia from responding to the Committee's requests for records would frustrate the Committee's investigation, the absence of Congressional Defendants from this suit would impair the Committee's ability to protect its interests, which are distinct from Columbia's.  Thus, Congressional Defendants are required parties here.

### 2.    Congressional Defendants Are Immune from Suit

Congressional Defendants must be dismissed from this suit for the reason explained above: they are absolutely immune under the Speech or Debate Clause.  Joinder of

Congressional Defendants is therefore not feasible under Rule 19.  Rule 19(b) provides that if a party "who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  In similar cases where, as here, "an indispensable party is immune from suit, there is very little room for balancing of other factors set out in [r]ule 19(b), because immunity may be viewed as one of those interests compelling by themselves." *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 548 (2d Cir. 1991) (internal quotation marks and citation omitted); *see also Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 118–19 (1968).  Indeed, according to the Second Circuit, immunity can be dispositive "in the weighing of [R]ule 19(b) factors" because the inability to join the absent party does not stem from "some procedural defect such as venue," but from the substantive choice "to shield [the absent party] from suit."  *Fluent*, 928 F.2d at 548 (internal quotation marks and citation omitted).

Courts regularly dismiss cases under Rule 19 when a necessary party is immune from suit.  *See, e.g.*, *Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1163 (9th Cir. 2021) ("[T]here is a 'wall of circuit authority' in favor of dismissing actions in which a necessary party cannot be joined due to tribal sovereign immunity"); *Seneca Nation of Indians v. New York*, 383 F.3d 45, 48 (2d Cir. 2004) (noting other Rule 19(b) factors were "outweighed by the paramount importance to be accorded to … immunity from suit" (internal quotation marks and citation omitted)); *Kickapoo Tribe of Indians of Kickapoo Rsrv. in Kan. v. Babbitt*, 43 F.3d 1491, 1493 (D.C. Cir. 1995) (dismissing complaint because Kansas was a necessary party but could not be joined due to state sovereign immunity); *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 776 (D.C. Cir. 1986) ("It is wholly at odds with the policy of tribal immunity to put the

tribe … between waiving its immunity or waiving its right not to have a case proceed without it.").

There is no reason that Speech or Debate Clause immunity should function differently from sovereign immunity for Rule 19 purposes. The Clause affords absolute immunity from suit when, as here, "the actions upon which [a plaintiff] sought to predicate liability were legislative acts." *McMillan*, 412 U.S. at 312. Like sovereign immunity, the Speech or Debate Clause provides an immunity from suit, not just from liability. *See, e.g.*, *Eastland*, 421 U.S. at 503. Moreover, because Speech or Debate Clause immunity, unlike sovereign immunity, is explicitly mentioned in the Constitution, if there is a difference between the two for Rule 19 purposes, the weight given to Congress under Rule 19(b) should be greater, not lesser, than that given to Tribes, States, or foreign nations. As a result, to paraphrase what the Supreme Court said in a case involving Rule 19 and foreign sovereign immunity, because the Speech or Debate Clause "immunity is asserted, and the claims of the [Congressional Defendants] are not frivolous, dismissal of the action must be ordered" because "there is a potential for injury to the interests of [Congressional Defendants]." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008).

To be sure, the Supreme Court has acknowledged that "[d]ismissal under Rule 19(b) will mean, in some instances, that plaintiffs will be left without a forum for definitive resolution of their claims." *Id.* at 872. This substantive choice, however, was made by the Framers of the Constitution, who—mindful of English parliamentary history—chose to enshrine in the Speech or Debate Clause immunity from suit for Congress to protect it against encroachment from the other branches. *See Johnson*, 383 U.S. at 177–79 (discussing the origins of the Clause).

### 3.    The Rule 19(b) Factors Favor Congressional Defendants

Even setting aside the overriding importance of immunity in the Rule 19 context, the Rule 19(b) factors favor dismissal of Claim III.  "Rule 19(b) specifies four factors: (1) whether a judgment rendered in a person's absence might prejudice that person or parties to the action, (2) the extent to which any prejudice could be alleviated, (3) whether a judgment in the person's absence would be adequate, and (4) whether the plaintiff would have an adequate remedy if the court dismissed the suit."  *CP Solutions PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156, 159 (2d Cir. 2009).

The first Rule 19(b) factor "overlaps considerably with the Rule 19(a) analysis, as both require the Court to determine the potential for prejudice to existing and absent parties." *Errico v. Stryker Corp.*, 281 F.R.D. 182, 187 (S.D.N.Y. 2012).  Since Congressional Defendants are required parties under Rule 19(a), a judgment in Plaintiffs' favor on Claim III would prejudice the Committee's investigation.  Under the second factor, any prejudice to Congressional Defendants cannot be alleviated.  Plaintiffs seek to prevent Columbia from responding to the Committee's records requests.  *See* ECF No. 62 at 72.  It is impossible to mitigate the impact of such an injunction.  As to the third factor, even if Plaintiffs would be satisfied with an order enjoining Columbia from producing records to the Committee, which does not require Congressional Defendants' presence in the suit, this factor "cannot be given dispositive weight when the efficacy of the judgment would be at the cost of [Congressional Defendants'] rights to participate in litigation that critically affect their interests."  *Hodel*, 788 F.2d at 777.  As to the fourth factor, Plaintiffs do have another forum before which they could seek relief: Congress.

Indeed, Plaintiffs could have raised their concerns about the February 13 letter with the Committee before filing this suit.[11]

In sum, Rule 19 requires that Congressional Defendants be parties here, but because they are immune from suit, Claim III cannot proceed without them and must be dismissed.

### C.    Plaintiffs' Suit for Damages Is Barred by Sovereign Immunity

Apart from being barred by the Speech or Debate Clause, Plaintiffs' request for damages is barred by sovereign immunity.  Plaintiffs demand damages "as to documents referencing them already produced to the House Committee."  ECF No. 62 at 72.  But here, "Plaintiffs ignore [the] well-established rule[] that shield[s] [Congressional] Defendants' actions from jurisdiction (let alone liability)[:] The shield of sovereign immunity protects not only the United States but also its agencies and officers when the latter act in their official capacities."  *Equal Vote Am. Corp. v. Cong.*, 397 F. Supp. 3d 503, 511–12 (S.D.N.Y. 2019), *aff'd in part, remanded in part sub nom. Liu v. U.S. Cong.*, 834 F. App'x 600 (2d Cir. 2020).  "Under [Supreme Court] precedents, … the United States, as sovereign, is generally immune from suits seeking money damages."  *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024).  As a result, sovereign immunity bars Plaintiffs' damages "claim[] against the United States Congress as a body of the federal government or against the legislators who make up the Congress."  *Maarawi v. U.S. Cong.*, 24 F. App'x 43, 44 (2d Cir. 2001).

---

[11] Even if Plaintiffs would not have an adequate remedy before Congress or elsewhere, this factor cannot outweigh the fact that Congressional Defendants are absolutely immune under the Speech or Debate Clause.  *Cf. Hodel*, 788 F.2d at 777 ("Although we are sensitive to the problem of dismissing an action where there is no alternative forum, we think the result is less troublesome in this case than in some others.  The dismissal of this suit is mandated by the policy of tribal immunity.  This is not a case where some procedural defect such as venue precludes litigation of the case.  Rather, the dismissal turns on the fact that society has consciously opted to shield Indian tribes from suit … ." (footnote omitted)).

Plaintiffs here have sued Congressional Defendants in their official capacity, *see* ECF No. 62 at 1, 3, 12, and 13, so sovereign immunity applies. While sovereign immunity can be waived, any such waiver cannot be implied but "must be unequivocally expressed in statutory text." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citation omitted). Plaintiffs "bears the burden to show that Congress waived sovereign immunity … ." *Grossman v. United States*, No. 19-cv-9191, 2019 WL 5887365, at *2 (S.D.N.Y. Nov. 8, 2019) (citing *United States v. Mitchell*, 463 U.S. 206, 212 (1983)). Because Plaintiffs have failed to point to any potentially relevant waiver of sovereign immunity, their claim for damages is precluded.

### D.    Plaintiffs (Still) Lack Standing

To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). For "a motion to dismiss for lack of standing, [this Court] ask[s] whether the plaintiff plausibly alleged the existence of each of the three elements." *Liu*, 834 F. App'x at 602. Here, Plaintiffs have not done so.

*First*, Plaintiffs' prior two complaints failed to allege that any of the disciplinary records requested by the Committee pertained to them. Now, Plaintiffs allege that only four of the eight Plaintiffs have been subject to disciplinary proceedings involving any of the eleven incidents identified by the February 13 letter. ECF No. 62 ¶ 152. Thus, the other four Plaintiffs have failed to plausibly allege the existence of any injury.

*Second*, all Plaintiffs have failed to plausibly allege traceability. Traceability is a "causal connection between the injury and the conduct complained of," that is, "the injury has to be 'fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the

22

independent action of some third party not before the court.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (alterations in original) (quoting *Simon v. E. Ky. Welfare Rts. Org*., 426 U.S. 26, 41–42 (1976)). Here, Plaintiffs allege that their injury is "negative publicity and investigation, pervasive and persistent harassment, doxing, and threats to their safety, lives, and ability to learn and work in the United States," which has allegedly led to a stifling of their speech. ECF No. 62 ¶ 4. But those records already turned over to the Committee were redacted to protect students' identities. *See id*. ¶¶ 58 n. 43; 97; *see also* ECF No. 54 at 2 (this Court noting that "all personally identifying information" was "scrubbed" from prior productions).

Instead, Plaintiffs allege that it is "third-party individuals and organizations who gladly take on the role of doxing and harassing the students until they are too afraid to speak." ECF No. 62 ¶ 7. Indeed, Plaintiffs' theory is that "Congress's release of information … made it easy for *third parties* to identify individual students and then target those students in large scale harassment campaigns." *Id*. ¶ 58 n. 43 (emphasis added); *see also id.* ¶ 127 ("harassment, doxing, and at times violence perpetrated by third-party actors"). Thus, Plaintiffs have failed to plausibly plead traceability because their own allegations reflect that their injury "is th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560.

Finally, all Plaintiffs have failed to plausibly allege redressability. As explained above, the Speech or Debate Clause absolutely protects the Committee's right to request information, including disciplinary records. Thus, Plaintiffs cannot as a matter of law plausibly allege that their injury is "likely to be redressed by a favorable judicial decision." *Spokeo,* 578 U.S. at 338.

II.  **The Court Should Dismiss Claims I and III of Plaintiffs' Second Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted Under Fed. R. Civ. P. 12(b)(6)**

Even if this Court were able to get beyond the Speech or Debate Clause, joinder, sovereign immunity, and standing problems discussed above, the Second Amended Complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, the specific allegations must "nudge[] … claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Although well-pleaded facts must be accepted as true for purposes of deciding whether the Second Amended Complaint fails to state a claim for relief, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Here, Plaintiffs' First Amendment Claims (Claims I and III) should be dismissed because (1) Columbia is not a state actor, and (2) Plaintiffs do not plausibly allege that the Committee has unlawfully coerced Columbia into producing the records.

A.  **Columbia Is Not a State Actor**

Plaintiffs admit that Columbia is a private university. ECF No. 62 ¶ 21. But "the First … Amendment[ ], do[es] not apply to private parties unless those parties are engaged in activity deemed to be 'state action.'" *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009) (quoting *Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL–CIO*, 860 F.2d 1022, 1024 (11th Cir. 1988)). State action can occur when "the government compels the private entity to take a particular action." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019). While that is the exception that Plaintiffs rely upon here, *see, e.g.*, ECF No. 62 ¶ 12 ("University

24

Defendants [are subject to] unlawful federal coercion in a manner that effectively renders them a tool of the state"), Plaintiffs have not plausibly alleged coercion.

For example, earlier this year, in a case with nearly identical facts, the U.S. District Court for the Eastern District of Pennsylvania held that a private university responding to a letter request from the Committee was not a state actor because it had not been coerced. *See Fakhreddine v. Univ. of Pennsylvania*, No. 24-cv-1034, 2025 WL 345089, at *5–*6 (E.D. Pa. Jan. 30, 2025). In *Fakhreddine*, the Committee sent a letter to the University of Pennsylvania requesting documents relevant to its investigation into antisemitism on college campuses. Ex. 1 to Decl. of David Gringer, No. 24-cv-1034, 2025 WL 345089 (E.D. Pa. Jan. 30, 2025), ECF No. 47-2. That letter, like the February 13 letter here, simply requested the university to "please produce the following items … ." *Compare id.* at 9, *with* Decl., Ex. E at 5. Neither letter demanded the records nor mentioned any legal consequences for failing to comply. The *Fakhreddine* plaintiffs, like Plaintiffs here, brought First Amendment claims against the university, seeking to stop it from responding. *Fakhreddine*, 2025 WL 345089, at *1–*2. The court, however, held that the university was not a state actor because the Committee had not "coerced" the university. *Id.* at *5–*6. The judge specifically stated, "I do not find th[e] language [of the letter] coercive and apparently, neither do Plaintiffs." *Id.* (citing plaintiffs' concession in their complaint that the letter "is not a subpoena and has no legal compulsory effect" and the university's response that it was "voluntarily" complying with the letter). Here too, Plaintiffs concede in their Second Amended Complaint that "the Committee has not yet issued a legally compelling subpoena" for student disciplinary records, ECF No. 62 ¶ 185, and Columbia has stated that its production of such records was "voluntary," Hr'g Tr. at 51.

Indeed, even if the Committee had subpoenaed Columbia, compliance with a government subpoena does not turn a private party into a state actor. In *Budowich v. Pelosi*, the House Select Committee to Investigate the January 6th Attack on the United States Capitol issued a subpoena to JPMorgan Bank (JPMorgan) for records of plaintiff, Taylor Budowich. 610 F. Supp. 3d 1, 8–11 (D.D.C. 2022). While JPMorgan complied with the congressional subpoena, Mr. Budowich sued for the return of those documents, alleging various constitutional violations, including First Amendment violations. *Id*. Judge Boasberg *easily* rejected the First Amendment claim, holding that "it is plain that JPMorgan did not engage in state action when it complied with the congressional subpoena." *Id*. at 19. Notably, Judge Boasberg stated that his holding was "common-sense" because "otherwise … all private parties that comply with a government subpoena would become state actors … Such a sweeping holding could force subpoena recipients to choose between facing penalties … for non-compliance or being sued for constitutional violations." *Id*. at 20. Judge Boasberg concluded by noting that he would not be the "first" court to hold otherwise, suggesting that no federal court has ever held that a subpoena recipient becomes a state actor. *Id*. at 20; *see, e.g.*, *United States v. Shkreli*, No. 15-cr-637, 2017 WL 3608252, at *6 (E.D.N.Y. May 16, 2017) (a private actor's "production of files … in response to a valid government subpoena … is not … governed … by the Fourth Amendment … Nor does … compliance with a government subpoena transform the complying entity into a government agent."). If compulsory legal process does not convert private actors into state actors, then *a fortiori* Columbia responding to a voluntary request for information does not change it into a state actor.

### B.        Plaintiffs Do Not Plausibly Allege Coercion

Plaintiffs allege that because the Committee does not like Plaintiffs' "viewpoints," the Committee is coercing Columbia to "punish or suppress" Plaintiffs' speech.  *See* ECF No. 62 ¶ 169.  Plaintiffs further allege that based on *NRA v. Vullo*, 602 U.S. 175 (2024), because the Committee cannot suppress their speech "directly," the Committee is also forbidden from doing so "indirectly" through Columbia.  *See* ECF No. 62 ¶¶ 3, 162.  Under *Vullo*, "[t]o state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech."  602 U.S. at 191.  Plaintiffs' *Vullo*-based claim here fails.

Nowhere in the Second Amendment Complaint do Plaintiffs plausibly allege that the Committee has coerced Columbia to produce disciplinary records (as opposed to purportedly coercing Columbia to take steps to address antisemitism).  Plaintiffs' theory is that Columbia's disclosure of the records to the Committee, followed by the Committee's release of that information, would allow third parties to identify and harass Plaintiffs, and then consequently chill their speech.  Therefore, to plausibly allege that the Committee is seeking to indirectly suppress Plaintiffs' speech through Columbia's production of student records, Plaintiffs need to allege that the Committee's request for those records is itself coercive.  But here, the most Plaintiffs allege is that February 13 letter "coerces the University to ignore the law by making oblique threats to the 'billions in federal funding' the University receives."  ECF No. 62 ¶ 62.  That reference in the letter states in full: "Columbia's continued failure to address the pervasive antisemitism that persists on campus is untenable, particularly given that the university receives billions in federal funding."  Decl., Ex. E at 1.  That statement is not coercive because, as

explained above, it is purely a statement of federal antidiscrimination law. But even if it were regarded as coercive, it is at most coercing Columbia to address antisemitism on campus, not to produce the requested records. Thus, Plaintiffs' coercion claim is fundamentally deficient as there is no plausible allegation that the February 13 letter, or any other letter the Committee has sent to Columbia for that matter, threatens Columbia with loss of funding if Columbia does not comply with the Committee's request for information.[12] Indeed, the House did not take any steps to cut Columbia's federal funding last Congress when the university did not voluntarily produce all records requested by the Committee, eventually leading it to issue subpoenas.

Relatedly, Plaintiffs do not plausibly allege that the February 13 letter coerced Columbia to take any action regarding Plaintiffs. *Vullo* concerned a state actor that sought to act unlawfully upon a private party through an intermediary. Mapped out, *Vullo*'s framework requires a state actor, coercing a private entity, to take adverse action against another private entity. However, the Committee's February 13 letter here makes no ask of Columbia regarding Plaintiffs; the letter acts only upon Columbia by asking Columbia to produce student records.

## CONCLUSION

For all of these reasons, this Court should dismiss Claims I and III of Plaintiffs' Second Amended Complaint.

---

[12] For the same reason, Plaintiffs' citations to comments made by individual Members, some of which reference funding, are of no matter. *See* ECF No. 62 ¶ 60. All the comments are about other issues and not about the student records requested by the February 13 letter. In any case, "the government can say what it wishes and select the views that it wants to express. …When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others, and thus does not need to maintain viewpoint-neutrality when its officers and employees speak about that venture." *Vullo*, 602 U.S. at 187 (citations and quotation marks omitted).

Respectfully submitted,

*/s/ Matthew Berry*
MATTHEW BERRY
    *General Counsel*
TODD B. TATELMAN
    *Deputy General Counsel*
ANDY T. WANG
    *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
matthew.berry@mail.house.gov

*Counsel for Congressional Defendants*

May 23, 2025

29

**CERTIFICATE OF SERVICE**

I certify that on May 23, 2025, I caused the foregoing document to be filed via this

Court's CM/ECF system, which I understand caused service on all registered parties.  I further

certify that the foregoing document contains 8,719 words, which is compliant with Local Civil

Rule 7.1(c).

/s/ *Matthew Berry*
Matthew Berry