UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MAHMOUD KHALIL, *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, *et al.*,<br><br>Defendants. | No. 25 Civ. 2079 (AS) |

## MEMORANDUM OF LAW IN SUPPORT OF THE EXECUTIVE BRANCH DEFENDANTS' MOTION TO DISMISS

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:    (212) 637-2695/2691
*Attorney for Executive Branch Defendants*

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

JEFFREY OESTERICHER
ALLISON ROVNER
Assistant United States Attorneys
        - Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

   I.    The Federal Government's Grants and Contracts with Columbia ..................................... 3

   II.   Communications with Columbia Regarding Federal Funding ........................................... 4

   III.  The Current Action .......................................................................................................... 7

LEGAL STANDARD ................................................................................................................. 8

ARGUMENT ........................................................................................................................... 9

   I.    Plaintiffs Lack Article III Standing................................................................................. 9

       A.   Plaintiffs Fail to Establish a Cognizable Injury-in-fact ................................................ 10

       B.   Plaintiffs Fail to Establish Causation or Redressability................................................ 13

       C.   The Tucker Act Precludes This Court from Exercising Jurisdiction Over Plaintiffs' Claims................................................................................................................... 15

       D.   Plaintiffs' APA Claim Is Unreviewable Because the Decision to Withdraw Funding Is Committed to the Agencies' Discretion ......................................................................... 22

   II.   Plaintiffs Fail to State a Claim ....................................................................................... 23

       A.   Plaintiffs Fail to State a First Amendment Claim ........................................................28

       B.   Plaintiffs Fail to State an APA Claim ..........................................................................29

       C.   Plaintiffs Fail to State a Claim Against the Executive Branch Defendants in Their Individual Capacities .................................................................................................29

CONCLUSION........................................................................................................................ 29

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004) ................................................................. 16

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................... 9, 25, 28

*Atterbury v. U.S. Marshals Serv.*,
  805 F.3d 398 (2d Cir. 2015) ........................................................ 16, 20, 21

*B.K. Instrument, Inc. v. United States,*
  715 F.2d 713 (2d Cir.1983) ................................................................. 21

*B&L Prods., Inc. v. Newsom*,
  104 F.4th 108 (9th Cir. 2024) .............................................................. 25

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ........................................................................... 27

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................... 9, 29

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ......................................................................... 21

*Cameron v. Johnson*,
  390 U.S. 611 (1968) ......................................................................... 25

*Cantor Fitzgerald Inc. v. Lutnick*,
  313 F.3d 704 (2d Cir. 2002) ............................................................... 29

*Carter v. HealthPort Techs., LLC*,
  822 F.3d 47 (2d Cir. 2016) ................................................................... 8

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ................................................................. 9

*Church of American Knights of KKK v. Kerik*,
  356 F.3d 197 (2d Cir. 2004) ............................................................ 12, 28

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .................................................................. 10, 11, 13

*Columbus Reg. Hosp. v. United States,*
   990 F.3d 1330 (Fed. Cir. 2021) ................................................................................ 16

*Consol. Edison Co. of New York v. U.S., Dep't of Energy,*
   247 F.3d 1378 (Fed. Cir. 2001) ................................................................................ 20

*Ctr. for Auto Safety v. Dole,*
   846 F.2d 1532 (D.C. Cir. 1988) ................................................................................ 22

*De Jesus v. Sears, Roebuck & Co., Inc.,*
   87 F.3d 65 (2d Cir. 1996) ......................................................................................... 29

*Dep't of Educ. v. California,*
   145 S. Ct. 966 (2025) ..................................................................................... 15, 16, 21

*Egbert v. Boule,*
   596 U.S. 482 (2022) .................................................................................................. 29

*Estate of Landers v. Leavitt,*
   545 F.3d 98 (2d Cir. 2009) ....................................................................................... 26

*Falls Riverway Realty, Inc. v. City of Niagara Falls,*
   754 F.2d 49 (2d Cir. 1985) ....................................................................................... 17

*FDA v. Alliance for Hippocratic Med.,*
   602 U.S. 367 (2024) ........................................................................................... 10, 13

*Feldman L. Grp. P.C. v. Liberty Mut. Ins. Co.,*
   819 F. Supp. 2d 247 (S.D.N.Y. 2011) ...................................................................... 28

*First Nationwide Bank v. Gelt Funding Corp.,*
   27 F.3d 763 (2d Cir. 1994) ......................................................................................... 9

*G.L. Christian & Assocs. v. United States,*
   312 F.2d 418 (Ct. Cl. 1963) ...................................................................................... 18

*Giammatteo v. Newton,*
   452 Fed. Appx. 24 (2d Cir. 2011) .............................................................................. 9

*Great-West Life & Annuity Ins. Co. v. Knudson,*
   534 U.S. 204 (2002) ........................................................................................... 15, 21

*Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency,*
   77 F.3d 26 (2d Cir. 1996) ......................................................................................... 25

*Hankard v. Town of Avon,*
   126 F.3d 418 (2d Cir. 1997) ..................................................................................... 26

iii

*Hatfill v. Gonzales*,
   519 F. Supp. 2d 13 (D.D.C. 2007) ........................................................................... 29

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................................. 22

*Henke* v. *U.S. Dep't of Com.*,
   83 F.3d 1445 (D.C. Cir. 1996) ................................................................................ 16

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
   953 F. Supp. 2d. 495 (S.D.N.Y. 2013) ...................................................................... 9

*Holowecki v. Fed. Exp. Corp.*,
   440 F.3d 558 (2d Cir. 2006) .................................................................................... 28

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985) ............................................................................ 16, 19

*Jefferson v. Harris*,
   170 F. Supp. 3d 194 (D.D.C. 2016) ........................................................................ 29

*Jermosen v. Coughlin*,
   878 F. Supp. 444 (N.D.N.Y. 1995) .......................................................................... 26

*L–7 Designs, Inc. v. Old Navy, LLC*,
   647 F.3d 419 (2d Cir. 2011) .................................................................................... 28

*Laird v. Tatum*,
   408 U.S. 1 (1972) ..................................................................................................... 11

*Lincoln* v. *Vigil*,
   508 U.S. 182 (1993) ........................................................................................... 22, 23

*Luckett v. Bure*,
   290 F.3d 493 (2d Cir. 2002) ...................................................................................... 3

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................. 10

*Lunney v. United States*,
   319 F.3d 550 (2d Cir. 2003) .................................................................................... 23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ................................................................................................. 15

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ........................................................................... 16, 20

*Metadure Corp. v. United States*,
  490 F. Supp. 1368 (S.D.N.Y. 1980) ...................................................................... 20

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ............................................................................. 23

*Morrison v. Nat'l Austl. Bank Ltd.*,
  547 F.3d 167 (2d Cir. 2008) .................................................................................. 8

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ........................................................................... 10, 11, 13, 14

*National Rifle Association v. Vullo*,
  602 U.S. 175 (2024) .................................................................................... 24, 25

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013) .................................................................................. 7

*Nieves v. Bartlett*,
  587 U.S. 391 (2019) ............................................................................................ 25

*Overview Books, LLC v. United States*,
  755 F. Supp. 2d 409 (E.D.N.Y. 2010) ................................................................. 19

*Penthouse Intern., Ltd. v. McAuliffe*,
  702 F.2d 925 (11th Cir. 1983) ............................................................................. 25

*Perry Capital LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) ............................................................................. 16

*Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of HUD.*,
  175 F.3d 132 (2d Cir. 1999) .......................................................................... 15, 21

*Robbins v. U.S. Bureau of Land Mgmt.*,
  438 F.3d 1074 (10th Cir. 2006) ........................................................................... 20

*Rothbein v. City of New York*,
  No. 18 Civ. 5106 (VEC), 2019 WL 977878 (S.D.N.Y. Feb. 28, 2019) ................... 29

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ............................................................................................ 27

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) ............................................................................. 19

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992) ............................................................................. 20

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................................................ 10

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
  136 F.3d 641 (9th Cir. 1998) .................................................................................. 19

*United States Conf. of Cath. Bishops v. U.S. Dep't of State*,
  No. 25 Civ. 465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ...................................... 21

*Up State Fed. Credit Union v. Walker*,
  198 F.3d 372 (2d Cir. 1999) .............................................................................. 16, 17, 19

*Younger v. Harris*,
  401 U.S. 37 (1971) .................................................................................................. 25

Statutes

5 U.S.C. § 701(a)(2) ................................................................................................ 22
5 U.S.C. § 702 ............................................................................................... 15, 21, 22
28 U.S.C. § 1491(a)(1) ......................................................................................... 15, 20
42 U.S.C. § 2000d-2 ............................................................................................... 17, 28
2 C.F.R. § 200.1 ......................................................................................................... 3
2 C.F.R. § 200.340 ............................................................................................ *passim*
42 C.F.R. § 52.2 .......................................................................................................... 3
42 C.F.R. § 52.6(a) ..................................................................................................... 3
48 C.F.R. § 2.101 ................................................................................................. 18, 23
48 C.F.R. § 49.101 .................................................................................................... 18

Defendants Pamela Bondi, in her official capacity as United States Attorney General; Linda McMahon, in her official capacity as Secretary of the United States Department of Education ("ED") and in her individual capacity; Leo Terrell, in his official capacity as the head of the Department of Justice Taskforce to Combat Anti-Semitism; Sean Keveney, in his official capacity as Acting General Counsel for the United States Department of Health and Human Services ("HHS") and in his individual capacity; and Josh Gruenbaum, in his official capacity as the Federal Acquisition Service Commissioner of the General Services Administration ("GSA") and in his individual capacity (collectively, the "Executive Branch Defendants")[1] submit this memorandum of law in support of their motion to dismiss as against them the Second Amended Complaint (Dkt. No. 62) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

Columbia University ("Columbia" or "University") has acknowledged that, following the October 7, 2023, Hamas terrorist attacks on Israel, parts of its campus became a hostile environment for students, and there have been legitimate concerns regarding discrimination, harassment, and antisemitic acts. In light of these concerns, over the past few months, various Federal departments and agencies, including HHS and ED, have been reviewing Federal grants to and contracts with Columbia for potential termination on the grounds that the funding is inconsistent with agency priorities. As part of that process, HHS and ED have terminated certain funding, and the Executive Branch Defendants have outlined steps for the University to take as a precondition for continued Federal funding. Plaintiffs, who are Columbia students, contend that

---

[1] This Office represents ED Secretary Linda McMahon, Acting HHS General Counsel Sean Keveney, and GSA Commissioner Josh Gruenbaum in their individual capacities, and is working to obtain authorization to represent the remaining Executive Branch Defendants in their individual capacities, but does not currently have such authorization.

1

the threatened loss of Columbia's federal funding has chilled their First Amendment rights—even though they were not direct recipients of the revoked funding, and the conduct and policies that they allege have suppressed their speech were implemented by Columbia (not by the Executive Branch Defendants) and were underway well before the Executive Branch Defendants' demands.

Plaintiffs' claims fail as a matter of law. As a threshold matter, Plaintiffs lack standing for several independent reasons. They have not adequately alleged a cognizable Article III injury-in-fact, pointing instead to self-censorship based on vague and speculative concerns unrelated to actual or imminent actions by the University, let alone actions in response to the Executive Branch Defendants. Plaintiffs also fail to sufficiently allege the other, related standing requirements of causation and redressability—they cannot show that the Executive Branch Defendants' funding requirements and determinations have caused them injury, or that an injunction regarding that funding will address the alleged harm. Further, this Court lacks subject matter jurisdiction to adjudicate the appropriation of federal grant and contract money, an issue properly heard exclusively in the Federal Court of Claims.

Even if Plaintiffs could overcome these hurdles, their claims against the Executive Branch Defendants still should be dismissed for the independent reason that they fail to state a claim on which relief could be granted. With respect to their First Amendment claim, Plaintiffs make the threadbare assertion that the Executive Branch Defendants coerced Columbia to take certain actions that chilled their speech. But, as illustrated by its own public statements, which are incorporated into the Second Amended Complaint, Columbia was not coerced; the University's actions were part of a comprehensive effort to address concerns raised by various stakeholders, and it did not take all of the actions demanded by the Executive Branch Defendants. Further, the Executive Branch Defendants' demands specifically identified by the Second Amended Complaint

and implemented by the University are viewpoint neutral and a legitimate exercise of the Government's authority to act directly upon a regulated entity because of *that entity's* own conduct.

With respect to the Administrative Procedure Act ("APA"), Plaintiffs' entire claim is premised on the unsupported assertion that the Government terminated Columbia's funding pursuant to Title VI. However, as indicated by the termination letters which are integral to the APA claim—the Government did not terminate Columbia's funding pursuant to Title VI; rather, it terminated the funding as inconsistent with agency priorities and for convenience pursuant to the terms and conditions of the grants and contracts. Plaintiffs' claims against the Executive Branch Defendants should therefore be dismissed.

## BACKGROUND

### I.    The Federal Government's Grants and Contracts with Columbia

The Government, through various agencies, provides funding to institutions of higher learning, including Columbia, using contracts and grants that are subject to specified terms and conditions. For example, the National Institutes of Health ("NIH"), an agency within HHS, awards grants to institutions that designate a principal investigator to lead the scientific and technical direction of research projects funded under the grant. 2 C.F.R. § 200.1, 42 C.F.R. § 52.2; Declaration of Jon Lorsch ("Lorsch Decl."), ¶ 8.[2] NIH exercises broad discretion in awarding and administering grants. *Id*. ¶ 8. The Secretary awards grants "to those applicants whose approved projects will in the Secretary's judgment best promote the purposes of the statute authorizing the grant and the regulations of this part." 42 C.F.R. § 52.6(a); *see also* Lorsch Decl. ¶ 8.

---

[2] Because the facts in the declarations cited herein bear on the issue of jurisdiction raised in this motion, the Court may consider them. *See Luckett v. Bure*, 290 F.3d 493, 496-497 (2d Cir. 2002). ("In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings.").

When NIH awards a grant, it agrees to support the recipient with a specified level of funding for a specific period. Lorsch Decl. ¶ 10. The award document requires recipients of NIH grant funds to comply with all Federal statutes, regulations, policies, and the terms and conditions stated in the Notice of Award. *Id*. NIH's Grants Policy Statement ("GPS") is a term and condition applicable to all NIH awards. *Id.* ¶ 11. The GPS, in turn, incorporates 2 C.F.R. § 200.340, which therefore is a term and condition of the notice of award. *Id*. As incorporated, that regulation permits NIH to terminate a grant if it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Other agencies, such as ED, similarly awarded grants directly to Columbia University or the University's Teachers College, *see* Declaration of Jeffrey Oestericher ("Oestericher Decl.") Exs. A-B, and various Government agencies also contract with Columbia, Declaration of Josh Gruenbaum ("Gruenbaum Decl.") ¶ 7.

## II.    Communications with Columbia Regarding Federal Funding

On February 3, 2025, the United States Department of Justice ("DOJ") announced the formation of a multi-agency Task Force to Combat Anti-Semitism. *See* Gruenbaum Decl. ¶ 5. On March 3, 2025, the General Services Administration ("GSA") sent a memorandum to Columbia, stating that it was "leading a Task Force comprehensive review of its Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment, including Columbia University." *See Id*. ¶ 6 & Ex. A. GSA attached a schedule of contracts for which it was "ready to work with each appropriate contracting agency on the potential issuance of Stop Work Orders," and advised that "alongside our fellow agencies, we will also be reviewing the greater than $5 billion of active grants between Columbia University, its affiliates and the Federal Government for potential compliance concerns, false claims or other infractions." *Id*.

4

On March 7, 2025, DOJ, HHS, ED, and GSA announced the "immediate cancellation of approximately $400 million in Federal grants and contracts to Columbia." *Id.* ¶ 9. That same day, HHS placed a hard funds restriction on all Columbia grant awards to prevent Columbia from drawing down funds. Lorsch Decl. ¶ 16. On March 10, 2025, and again on March 14, 2025, NIH notified Columbia of grants to be terminated for nonalignment with agency priorities to fund safe research environments. *Id.* ¶ 17 & Exs. B-C. Similarly, on March 7, 2025, ED terminated awards for grants to Columbia. *See* Oestericher Decl. Exs. A-B. ED's grant terminations were generally made pursuant to the terms and conditions of each award and the Office of Management and Budget ("OMB") regulation, 2 C.F.R. § 200.340(a). *Id.* Finally, the Government terminated certain federal contracts pursuant to the Federal Acquisition Regulation ("FAR"), which allows the Government to terminate contracts for convenience when it is in the Government's interest to do so. Gruenbaum Decl. ¶¶ 10-11. The termination notices generally provided Columbia (the fund recipient) with appeal rights, and the time for Columbia to appeal has been extended. *See* Lorsch Decl. ¶ 20; Oestericher Decl. Exs. A-B. Negotiations between the Government and Columbia to restore funding are ongoing. *See* Gruenbaum Decl. ¶ 12; Lorsch Decl. ¶ 19.

On March 13, 2025, GSA, HHS, and ED sent a letter to Columbia outlining the "steps that [the Government] regard[s] as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government." SAC ¶ 106 (citing letter available at https://s3.documentcloud.org/documents/25577971/31325-letter-to-columbia.pdf) ("March 13 Letter" or "Mar. 13 Ltr."). The nine steps enumerated in the letter included, among other actions, enforcement of existing disciplinary policies; abolition of the University Judicial Board ("UBJ"); banning of masks intended to conceal identity or intimidate others (with exceptions for religious and health reasons); adoption of a definition of antisemitism

5

(though the letter did not mandate any particular definition); and placement of the Middle East, South Asian, and African Studies ("MESAAS") department under academic receivership. Mar. 13 Ltr. at 1-2.

On March 21, 2025, Columbia released a memorandum entitled, "Advancing Our Work to Combat Discrimination, Harassment and Antisemitism at Columbia." SAC ¶ 123 (citing a memorandum available at https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf) (the "March 21 Memo"). It announced various actions, many of which align with the steps in the March 13 Letter. For example, Columbia stated that relevant policies will "incorporate the definition of antisemitism recommended by Columbia's Antisemitism Taskforce in August 2024." *Id.* at 2. But certain actions announced in the March 21 Memo differ from the demands in the March 13 Letter. For example, with respect to mask restrictions, the March 21 Memo stated that masks would be prohibited only "for the purpose of concealing one's identity in the commission of violations of University policies or state, municipal, or federal laws." *Id*.

Columbia has explained that the actions it announced on March 21 were underway in advance of the March 13 Letter. At the March 25, 2025, hearing on Plaintiffs' Motion for a Temporary Restraining Order ("TRO"), counsel for the University represented that "all [of] the 18 actions that were announced on March 21 were . . . under review and work and development for many months. . . . [The March 13 Letter] essentially crystallized those lines of effort and affected timing. But all of those lines of efforts were in play and were ongoing for some significant periods of time before the March 13 letter and ultimate March 21 announcement." Oestericher Decl. Ex. C, March 25, 2025, Tr. at 65:1-8 ("Tr.").

6

### III.    The Current Action

Plaintiffs filed their Complaint in this matter on March 13, 2025, against, *inter alia*, Columbia, its President, its Trustees, the U.S. House Committee on Education and Workforce (the "Committee"), and the Committee Chairman. *See* Dkt. No. 1. On March 19, 2025, Plaintiffs filed an Amended Complaint, adding the Executive Branch Defendants. *See* Dkt. No. 13. Plaintiffs also filed a Motion for a TRO, Dkt. Nos. 15 & 17, and the Court held a hearing on that motion on March 25, 2025.

On April 4, 2025, the Court denied Plaintiffs' motion for a TRO without prejudice, and granted leave for Plaintiffs to amend their complaint. Dkt. No. 54. Among other deficiencies, the Court noted that "plaintiffs' submissions don't address their standing to challenge the government's March 13, 2025 letter threatening funding cuts or Columbia's response announcing measures to curb antisemitism." *Id*. at 1. The Court observed that "'[a] plaintiff must allege something more than an abstract, subjective fear that his rights are chilled in order to establish a case or controversy.'" *Id*. (quoting *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013)).

Plaintiffs filed the Second Amended Complaint on April 18, 2025, asserting two claims against the Executive Branch Defendants: first, that the March 13 Letter seeks to "control, suppress, and chill the speech, expressive, and associational rights of Plaintiffs," SAC ¶ 177, in violation of the First Amendment, *id*. ¶¶ 175-81, and second, that the withholding of federal funds "violates the APA and Title VI," *id*. ¶¶ 198-207.[3] The allegations relating to the Executive Branch Defendants are focused on the March 13 Letter and threatened termination of funding. *See* SAC

---

[3] The Second Amended Complaint also pleads additional claims against defendants other than the Executive Branch Defendants.

¶¶ 100-114. Plaintiffs highlight a handful of the steps identified in the March 13 letter—those relating to enforcing existing disciplinary policies regarding Hamilton Hall and encampments, *id.* ¶ 109; placing the MESAAS department into a receivership, *id.* ¶ 110; banning masks intended to conceal identity or intimidate others, *id.* ¶ 111; "empower[ing] internal law enforcement," *id.* ¶ 112; and adopting a definition of antisemitism, *id.* ¶ 113. But while Plaintiffs conclusorily allege that the Executive Branch Defendants have enlisted Columbia to "punish and suppress" speech, *see, e.g.*, *id.* ¶¶ 1, 176, 180, Plaintiffs do not allege a single, concrete instance of the Executive Branch Defendants targeting protected speech by any of the Plaintiffs—either directly or through Columbia. Instead, Plaintiffs rely on threadbare allegations that the March 13 Letter and threat of further funding cuts have chilled their speech and speech-related activities, *see, e.g.*, SAC ¶¶ 114, 129-130, 134, 150, without adequately tying the alleged harm to the Executive Branch Defendants' demands.

## LEGAL STANDARD

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted). "When the Rule 12(b)(1) motion is facial, i.e., based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the "Pleading"), the plaintiff has no evidentiary burden." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). "Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading." *Id.* at 57 (internal citations and quotation marks omitted); see also *Morrison*, 547 F.3d at 170 ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may

8

consider evidence outside the pleadings."). The plaintiff "has the burden of proving by a preponderance of the evidence that jurisdiction exists." *Giammatteo v. Newton*, 452 Fed. Appx. 24, 27 (2d Cir. 2011).

On a Rule 12(b)(6) motion, the Court must accept all well-pleaded allegations contained in the complaint as true and draw all reasonable inferences in favor of the plaintiffs. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. Mere "conclusions of law or unwarranted deductions of fact" need not be accepted as true. *First Nationwide Bank v. Gelt Funding Corp*., 27 F.3d 763, 771 (2d Cir. 1994) (internal citation and quotation omitted). Legal conclusions "must be supported by factual allegations," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failure to state a claim. *Id*. at 679. Further, "[a] court may take into account any written instrument attached to the complaint, as well as statements and documents 'incorporated in the complaint by reference' without converting a motion to dismiss into one for summary judgment." *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 953 F. Supp. 2d. 495, 496 n.1 (S.D.N.Y. 2013) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).

**ARGUMENT**

## I.    Plaintiffs Lack Article III Standing

The allegations in the Second Amended Complaint fall well short of overcoming Plaintiffs' standing deficiencies. At its "irreducible constitutional minimum," Article III standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a "concrete and particularized" injury-in-fact that is "actual or imminent, not conjectural or hypothetical,"

9

(2) "a causal connection" between the injury and defendant's conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted); *see also Murthy v. Missouri*, 603 U.S. 43, 44 (2024).

### A.    Plaintiffs Fail to Establish a Cognizable Injury-in-fact

To satisfy the first standing requirement, injury-in-fact, Plaintiffs must allege an injury that is "concrete—that is, real, and not abstract," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (internal quotation marks omitted). The injury must also be "actual or imminent, not speculative— meaning that the injury must have already occurred or be likely to occur soon." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024) [hereinafter *Alliance*]. If the harm has not come to pass, it must be "*certainly impending*"; "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and alterations omitted); *see also Murthy*, 603 U.S. at 43, 58 (holding, in the First Amendment context, that "because the plaintiffs request forward-looking relief, they must face a real and immediate threat of repeated injury" (internal quotation marks omitted)). Plaintiffs have failed to meet that burden here.

The allegations in the Second Amended Complaint do not establish a concrete, imminent harm that Plaintiffs themselves have suffered or will suffer as the result of any of the alleged actions attributable to the Executive Branch Defendants. Plaintiffs do not allege that they were impacted directly by the loss of funding—there is no allegation that Plaintiffs were themselves receiving federal funding that was cut or threatened, or even that any of the Plaintiffs were working on a project that benefited from the grant or contract funding at issue. Instead, Plaintiffs allege that the Executive Branch Defendants' threat of funding cuts has harmed them by inducing Columbia to institute policies that chill their speech. *See, e.g.*, SAC ¶¶ 2, 150-56. But importantly, Columbia's

response to the March 13 Letter—which Plaintiffs characterize as "compliance with Agency Defendants' demands," *id*. ¶ 134—does not infringe on Plaintiffs' protected speech.

Plaintiffs' allegations that their speech has been chilled, *see, e.g.,* SAC ¶ 4, are insufficient to satisfy Article III. Plaintiffs assert, for example, that several of them "no longer wear[] a keffiyeh on campus" and avoid using certain words, like "Israel," and consider more carefully what views they express and in what context. *See Id*. ¶ 150. But there are no allegations that these changes align with Executive Branch Defendant demands—the March 13 Letter does not demand restrictions on wearing a keffiyeh or generally expressing views supportive of the Palestinian cause, and "plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" *Murthy*, 603 U.S. at 73 (quoting *Clapper*, 568 U.S. at 416); *see also Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

Plaintiffs' specific complaints regarding the Executive Branch Defendants focus on student discipline, "mask bans," "heightened police presence on campus," and alleged "intervening in the University's freedom." *See* SAC ¶ 4. But Plaintiffs do not explain how the Executive Branch Defendants' specific demands curtailed their protected speech or otherwise harmed them. With respect to student discipline, for example, not one Plaintiff specifically alleges that University disciplinary proceedings were commenced against them after March 13, or that the result of any proceedings against them were impacted by the March 13 Letter. Plaintiffs' conclusory assertion that certain Plaintiffs "expect that they will" be subject to University disciplinary proceedings in the future "due to their history of attending protests," "intent to continue to engage in activism," "and the new definition of antisemitism," SAC ¶ 153, is entirely vague and speculative. Nor do

11

Plaintiffs explain how Columbia's enforcement of its existing disciplinary policies would affect their protected speech. And Plaintiffs similarly fail to explain how their protected speech is impacted by what they characterize, summarily, as "heightened police presence." *See* SAC ¶ 4.

Plaintiffs have also not established that they have a cognizable constitutional interest that is implicated by the mask policy announced by Columbia on March 21. The March 21 Memo restricts mask wearing only "for the purpose of concealing one's identity in the commission of violations of University policies or state, municipal, or federal laws," March 21 Memo at 2, and Plaintiffs do not allege any plan to commit such violations. In any event, bans on face coverings are constitutionally permissible means to guard against harassment and intimidation. *See Church of American Knights of KKK v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004) (finding New York's anti-mask statute facially constitutional, noting that, "the individual's right to speech must always be balanced against the state's interest in safety, and its right to regulate conduct that it legitimately considers potentially dangerous").[4]

Plaintiffs similarly fail to allege any concrete harm they have suffered or will suffer in the future from the Executive Branch Defendants' demands regarding the MESAAS Department. The Second Amended Complaint alleges that two Plaintiffs "intended to take" classes in the MESAAS department, SAC ¶ 154, but there is no allegation that they cannot still do so. Two other Plaintiffs are alleged to have limited their interaction with the department due to fear of "targeting" or "scrutiny," SAC ¶ 154-55, but Plaintiffs fail to allege any plausible tie between their decisions to

---

[4] Plaintiffs also note that, under the University policy described in the March 21 Memo, "individuals who engage in protests or demonstrations, including those who wear face masks or face coverings, must, when asked, present their University identification to the satisfaction of a University Delegate or Public Safety officer." SAC ¶ 130 (quoting March 21 Memo). Plaintiffs, however, do not allege that this requirement to show identification was a demand in the Executive Branch Defendants' March 13 Letter.

engage with the MESAAS Department and the Executive Branch Defendants' demands in the March 13 Letter. Plaintiffs also fail to establish any actual or imminent harm to themselves from the Executive Branch Defendants' demand that Columbia adopt a definition of antisemitism, or the other demands in the March 13 Letter. In the absence of these allegations, Plaintiffs lack Article III standing to assert their claims.

### B.       Plaintiffs Fail to Establish Causation or Redressability

Plaintiffs' allegations also fail to establish, as they must, that any alleged harm or risk of future harm is traceable to the Executive Branch Defendants. *See Alliance*, 602 U.S. at 380. For Plaintiffs to establish causation, they must demonstrate that their ability to engage in First Amendment protected activity has been, or is likely to be, suppressed or chilled by the University's action *in response to* pressure from the Executive Branch Defendants. *See Murthy*, 603 U.S. at 70 (holding that plaintiff lacked standing because he had not established that his future social media posts would likely contain content that the FBI would pressure the platform to remove, and the platform would suppress the post "at least partly" in response to the FBI, rather than its own content-moderation policy). Here, as in *Murthy*, Plaintiffs posit a causal chain that is overly speculative. Plaintiffs primarily allege that they engage in self-censorship, *see, e.g.*, SAC ¶¶ 150-55, but the speech and conduct that they allege is impacted—for example, no longer attending Palestine-related protests, or not taking classes in the MESAAS department—does not appear to be in violation of any current or certainly impending University policy, let alone one responsive to a demand from the Executive Branch Defendants. Plaintiffs allude to vague concerns regarding "targeting" and avoiding certain speech, but there are no particularized allegations that Columbia has punished Plaintiffs' protected speech at the behest of the Executive Branch Defendants or is likely to do so in the future; Plaintiffs cannot "satisfy [their] burden with such conjecture." *Murthy*, 603 U.S. at 70 ; *see also Clapper*, 568 U.S. at 414 (a "speculative chain of possibilities does not

13

establish that injury based on potential future [action] is certainly impending or is fairly traceable").

Further, much of the University conduct of which Plaintiffs complain predates the Executive Branch Defendants' March 13 Letter and any alleged threat of funding cuts. For example, Plaintiffs allege that the University Judicial Board "made findings and issued sanctions" on "[t]he same day Columbia University received the Taskforce letter." SAC ¶ 121. Based on this timing, it is very likely that the disciplinary process that resulted in those findings predated the March 13 Letter and, as the Second Amended Complaint acknowledges, "Columbia has maintained that it made these determinations prior to" the March 13 Letter. *Id*. ¶ 121 n.99. Indeed, Columbia represented to the Court at the March 25 hearing that "that disciplinary process was a months-long process involving the university judicial board that culminated earlier in the day on March 13, before the university received that letter. So there's no way that the discipline that came before the letter could possibly have been the product of the letter." Tr. 86:4-8. Plaintiffs therefore cannot establish that any harm they suffered from this disciplinary action was coerced by pressure from the Executive Branch Defendants. Indeed, Columbia has indicated that this is true for all of the University policies outlined in the March 21 Memo of which Plaintiffs now complain. *See* Tr. at 65:1-8 ("[The March 13 Letter] essentially crystallized those lines of effort and affected timing. But all of those lines of efforts were in play and were ongoing for some significant periods of time before the March 13 letter and ultimate March 21 announcement.")

Related to these causation issues, Plaintiffs also "have a redressability problem." *Murthy*, 603 U.S. at 46. Because Plaintiffs have failed to establish that the harms they allege are traceable to ongoing pressure from the Executive Branch Defendants, it is also unclear that an injunction against the Executive Branch Defendants would ameliorate Plaintiffs' alleged injuries.

14

Accordingly, Plaintiffs' lack Article III standing, and their claims against the Executive Branch Defendants should be dismissed on that basis.

### C.    The Tucker Act Precludes This Court from Exercising Jurisdiction Over Plaintiffs' Claims

This Court lacks subject matter jurisdiction for an additional reason: Plaintiffs' claims against the Executive Branch Defendants pursuant to the APA and First Amendment—which seek to restore funds withheld from Columbia pursuant to agreements between the Government and the University, *see, e.g.*, SAC ¶¶ 2-3, 5-7, 10, 100-56, 175-81, 198-207—are in essence contract claims that can only be brought in the Court of Federal Claims. *See Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of HUD.*, 175 F.3d 132, 143 (2d Cir. 1999) ("Where a claim arises out of a contract with the United States, the Tucker Act 'impliedly forbids' relief other than the remedy provided by the Court of Federal Claims.").

Although the APA provides a limited waiver of sovereign immunity for claims "seeking relief other than money damages," 5 U.S.C. § 702, that waiver of sovereign immunity does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,'" *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 215 (2012).

"[T]he APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" as Plaintiffs seek here. *See California*, 145 S. Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).  This jurisdictional

15

divide ensures that contract claims against the Government are channeled to the court that has "unique expertise" in that area. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). In *California*, the Supreme Court recently applied these principles and concluded that the Government was likely to succeed in showing that the district court lacked jurisdiction over a challenge to the Government's termination of education-related grants with similar termination provisions to those at issue here. *See California*, 145 S. Ct. at 968.[5]

Accordingly, regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in 'its essence' contractual." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004). "Whether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both 'the source of the rights upon which the plaintiff bases [his] claims, and . . . the type of relief sought.'" *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (quoting *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999) and *Megapulse*, 672 F.2d at 968). Here, both prongs establish that Plaintiffs' APA and First Amendment claims are in essence contractual claims for payment of the terminated funding.

First, though Plaintiffs style their claims against the Executive Branch Defendants as stemming from the First Amendment and APA, the core of their claims is that the Executive Branch Defendants should not have placed certain restrictions on Columbia's allocated grant and contract

---

[5] Particularly in light of *California*, there can be no dispute that the grants here are in essence contracts. *See also, e.g.*, *Columbus Reg. Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) ("grant agreements [are] contracts when the standard conditions for a contract are satisfied"); *Henke* v. *U.S. Dep't of Com.*, 83 F.3d 1445, 1450-51 (D.C. Cir. 1996) (federal grant had the "essential elements of a contract"); Lorsch Decl. ¶¶ 10-11.

funding. *See, e.g.,* SAC ¶ 206 (alleging, for APA claim, that "suspension and termination of $400 million of funds to Columbia is final agency action"). The source of the right Plaintiffs are asserting is therefore the grant and contract agreements themselves, and not an "independent, non-contractual source." *Up State Fed. Credit Union*, 198 F.3d at 376. Plaintiffs challenge "the federal government's willingness to withdraw funding from Columbia University" and "to roll back contractual obligations." *See, e.g.*, SAC ¶¶ 2-3, 5-7, 10, 100-56, 175-81, 198-207. In the absence of the grants and contracts, "'it is likely that no cause of action would exist at all.'" *Up State Fed. Credit Union*, 198 F.3d at 377 (quoting *Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 55 (2d Cir. 1985)).

With respect to the APA, Plaintiffs challenge the Government's "termination of $400 million of funds to Columbia" allegedly without making an express finding on the record or following proper procedures pursuant to Title VI. *See* SAC ¶¶ 198-207. Plaintiffs' focus on Title VI with respect to their APA claim is misplaced. *See Id.* ¶¶ 135-42, 198-207.[6] The grants and contracts with Columbia were not terminated pursuant to Title VI, which is therefore inapplicable.[7] Lorsch Decl. ¶¶ 11, 17; Gruenbaum Decl. ¶ 10; Oestericher Decl. Exs. A-B. Rather, the Government terminated the grants and contracts with Columbia pursuant to the terms and conditions of their award. *Id.*

With respect to grants, the terms governing termination are contained in OMB regulation 2 C.F.R. § 200.340. NIH, for example, incorporated this regulation by reference into the awards.

---

[6] Although Plaintiffs' Second Amended Complaint is not clear on this point, Title VI provides for judicial review under the APA (assuming, unlike here, other jurisdictional requirements are met and the plaintiff has otherwise stated a claim). *See* 42 U.S.C. § 2000d-2.

[7] Although the agencies' communications with Columbia regarding termination of the grants and contracts referenced potential Title VI violations, they did not cite or rely on Title VI as the mechanism for termination.

Lorsch Decl. ¶ 11. Under 2 C.F.R. § 200.340, the Government may terminate a grant "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Similarly, under the prior, 2020 version of the regulation, the Government could terminate an award, "if an award no longer effectuates the program goals or agency priorities" or "pursuant to termination provisions included in the Federal award." Guidance for Grants and Agreements, 85 Fed. Reg. 49506-01 (August 13, 2020). The NIH Grants Policy Statement, a term and condition of grant awards, has cited to 2 C.F.R. Part 200, including § 200.340, since 2021. Lorsch Decl. ¶ 11. The NIH grants that represent much of the stopped funding were terminated under 2 C.F.R § 200.340 as no longer aligning with agency priorities. *Id*. ¶ 17. By its own terms, the OMB regulation reinforces the contractual nature of the terminations by referencing the terms and conditions of the award.

Similarly, the Government terminated the contracts with Columbia pursuant to express or implied contract provisions, included pursuant to the FAR, that broadly allow the Government to terminate contracts for convenience whenever it is in the Government's interest to do so—not pursuant to Title VI. *See* Gruenbaum Decl. ¶¶ 10-11; 48 C.F.R. § 2.101 (defining "termination for convenience" as "the exercise of the Government's right to completely or partially terminate performance of work under a contract when it is in the Government's interest"); 48 C.F.R. §§ 49.101, 49.501-05, 52.249-1-5 (requiring agencies to include clauses in contracts regarding termination for convenience); *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426-27 (Ct. Cl. 1963) (reading termination clause into contract as a matter of law); Congressional Research Service, "Terminating Contracts for the Government's Convenience: Answers to Frequently Asked Questions" (Dec. 18, 2015), at 1-6, *available at* https://www.everycrsreport.com/files/20151218_

R43055_4eb3d254b321283211d130864b6a688c33852dc8.pdf (last visited May 21, 2025) (indicating that "[t]erminations in almost any . . . circumstance[] could . . . be found to be in the government's interest"). Although the grant and contract provisions incorporate OMB and FAR regulations, that "does not transform the action into one based solely on those regulations." *Ingersoll-Rand Co.*, 780 F.2d at 78; *see also, e.g.*, *Up State Fed. Credit Union*, 198 F.3d at 377 (rejecting attempt "to characterize . . . action as an APA challenge rather than a contract dispute" by citing to a regulation where "the source of the right at issue" was contract); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (holding that where the Government violates a statute but "[t]he right to [] payments is created in the first instance by the contract," the claim is based in contract and falls within the Tucker Act).

Plaintiffs' First Amendment claim is also premised on the notion that the Government has a contractual obligation to provide funding. *See, e.g.*, SAC ¶¶ 175-81 (alleging coercive suppression of speech by the Executive Branch Defendants resulting from the Government's "pausing and terminating federal funding" and demanding compliance with certain conditions by Columbia to "continue[] [its] financial relationship with the United States government") (internal quotation marks omitted). If the Government has no such obligation, it owes no duty to Columbia (or to the Plaintiffs) giving rise to an alleged constitutional violation. In short, "[b]ecause the United States's obligation is in the first instance dependent on the contract, these claims are contractually-based" and "the district court lacks jurisdiction under the Tucker Act." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding that district court lacked jurisdiction under the Tucker Act over a constitutional claim because it was contractually based); *see also, e.g.*, *Overview Books, LLC v. United States*, 755 F. Supp. 2d 409, 416 (E.D.N.Y. 2010) ("[I]f the Court of Federal Claims finds a basis independent of the First

19

Amendment for bringing a monetary claim (e.g., the Takings Clause of the Fifth Amendment), the court then has collateral jurisdiction to consider a plaintiff's First Amendment claim within the context of considering the independent claim."), *aff'd*, 438 F. App'x 31 (2d Cir. 2011); *Consol. Edison Co. of New York v. U.S., Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir. 2001) (directing court in this District to transfer case asserting constitutional claims to the Court of Federal Claims in a case sounding in contract because "the Court of Federal Claims can supply an 'adequate remedy' to prevent the constitutional wrongs alleged by [plaintiff]"); *Metadure Corp. v. United States*, 490 F. Supp. 1368, 1370, 1373 (S.D.N.Y. 1980) (in finding a lack of jurisdiction over plaintiff's due process claims, stating: "[Plaintiff] may not, by the simple expedient of lumping its contract claims together and denominating them a constitutional violation, escape the procedural limitations of the Tucker Act.").[8] The Court should not allow Plaintiffs to invoke its jurisdiction by disguising contract claims as constitutional.[9]

Second, the remedies Plaintiffs seek also plainly sound in contract. Plaintiffs request "the issuance of a permanent injunction enjoining the Taskforce and related federal agencies from

---

[8] *Atterbury v. U.S. Marshals Service, et al.*, 805 F.3d 398 (2d Cir. 2015), is not to the contrary. In *Atterbury*, the court held that a contract between the court security officer plaintiff and a contractor who employed him provided the plaintiff with a protected property interest and due process rights relating to his employment independent from a contract his employer had with the Government. *Id.* at 406-09. Here, by contrast, Plaintiffs' claims are grounded in Columbia's contracts and grants *with the Government*. Without these grants and contracts providing funding, Plaintiffs would not be able to assert APA or constitutional violations. *But cf., e.g.*, *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610-11 (D.C. Cir. 1992); *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1083-84 (10th Cir. 2006) (both concluding that district court had jurisdiction over constitutional claims relating to a contract).

[9] Whether Plaintiffs could bring a breach of contract claim against the Government in the Court of Federal Claims is immaterial. The Tucker Act gives the Claims Court jurisdiction not just over breach of contract claims, but over all claims "founded either upon the Constitution . . . or upon any express or implied contract." 28 U.S.C. § 1491(a)(1). Consistent with that broad language, any "essentially contractual" claim—as reflected by the claim's "source" and the "relief sought"— falls within the Claims Court's jurisdiction. *See Megapulse*, 672 F.2d at 967-68.

withholding federal funding in order to coerce Columbia into chilling the constitutionally protected academic freedom, speech and association of its students based on viewpoint." *See* SAC Prayer for Relief. However, the Tucker Act "specifically bar[s] . . . any 'injunctive, mandatory or declaratory relief against government officials when the result would be the equivalent of obtaining money damages.'" *Presidential Gardens Assocs.*, 175 F.3d at 143 (quoting *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 727 (2d Cir.1983)). Where, as here, "'the prime objective of the plaintiff is to obtain money from the Government,'" this Court lacks jurisdiction. *See id.* (quoting *B.K. Instrument, Inc.,* 715 F.2d at 727); *see also United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 25 Civ. 465 (TNM), 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025), *appeal dismissed,* No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025) (where Government terminated funding pursuant to an agreement, concluding court lacked jurisdiction, in part because "this Court cannot order the Government to pay money due on a contract"); *Presidential Gardens Assocs.*, 175 F.3d at 143 ("Actions seeking specific performance of a contract, brought in order to avoid the Tucker Act's limitation on money judgments, are not allowed to be brought against the United States.").[10]

---

[10] To the extent *Atterbury* suggested that a ruling regarding a Government decision made discretionary by contract would not result in a court impermissibly requiring specific performance of a contract, 805 F.3d at 408, it is distinguishable because that case involved employment termination. *Presidential Gardens Assocs.*, 175 F.3d at 143, which involved a claim that the government breached a settlement agreement, is more apt in prohibiting the district court from in essence ordering specific performance of a contract. Moreover, the Supreme Court's recent decision in *California*, 145 S. Ct. at 968, makes clear that grant-based APA claims are contract claims that cannot be brought in district court pursuant to the Tucker Act. Likewise, *Bowen v. Massachusetts*, 487 U.S. 879 (1988), also does not help Plaintiffs here. That case concerned states' entitlement to federal funding under a statute and addressed the APA's exclusion from its waiver of sovereign immunity for suits for "money damages." *See* 5 U.S.C. § 702. As the Supreme Court has explained, its jurisprudence addressing that distinct carve-out from the APA's waiver of sovereign immunity "has no bearing" on the ability of private parties to obtain injunctions to enforce contractual obligations against the Federal Government. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002).

**D.    Plaintiffs' APA Claim Is Unreviewable Because the Decision to Withdraw Funding Is Committed to the Agencies' Discretion**

Even assuming Plaintiffs could establish standing and subject matter jurisdiction (which they cannot), withdrawal of funding is quintessential agency action "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). While the APA establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected by either final agency action or an agency's failure to act, 5 U.S.C. §§ 702, 706(1)-(2), the waiver of sovereign immunity is limited. It does not apply in circumstances where "agency action is committed to agency discretion by law," *id.* § 701(a)(2). Review under the APA therefore is unavailable "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where the statute does not provide any judicially manageable standard, "regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review." *Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988).

The Supreme Court has long recognized that an agency's determination of how to allocate appropriated funds among competing priorities and recipients—precisely what Plaintiffs challenge here—is classic discretionary agency action. *See Lincoln* v. *Vigil*, 508 U.S. 182, 193 (1993). In *Lincoln*, the Court explained that there is no waiver of sovereign immunity where agency action requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether "resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* (citations and internal quotation marks omitted). An "agency is far better equipped than

22

the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* So long as the agency abides by the relevant statutes (and whatever obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.*[11]

Here, the decision to terminate funding was peculiarly within the agencies' expertise and discretion. As discussed above, the Government generally stopped grant payments as inconsistent with agency priorities, *see* 2 C.F.R. § 200.340, and terminated contracts for convenience for not being in the Government's interest, *see* 48 C.F.R. §§ 2.101, 49.101, 49.501-505, 52.249-1-5. These regulations are broadly drawn and provide the Court with no meaningful standards by which to evaluate the agencies' decisions. Therefore, the Court lacks jurisdiction over Plaintiffs' APA claim. *See Lunney v. United States*, 319 F.3d 550, 557-58 (2d Cir. 2003).

## II.    Plaintiffs Fail to State a Claim

Plaintiffs' claims against the Executive Branch Defendants should also be dismissed pursuant to Rule 12(b)(6) for the independent reason that they fail to state a claim under either the First Amendment or APA.[12]

### A.  Plaintiffs Fail to State a First Amendment Claim

Plaintiffs allege violation of the First Amendment based on a coercion theory, claiming that the termination of funding and the demands in the March 13 Letter coerced the University to take

---

[11] Although *Lincoln* involved lump-sum appropriations, its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed." *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Id.* at 752 (citation omitted).

[12] As required by Your Honor's Individual Practices In Civil Cases ¶ 8(G), "a non-argumentative chart . . . identifying the elements not plausibly alleged" is attached as Exhibit A to this Memorandum of Law.

actions that chilled Plaintiffs' speech. *See* SAC ¶¶ 175-181. "To state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *National Rifle Association v. Vullo*, 602 U.S. 175, 198 (2024). But Plaintiffs fail to plausibly allege coercion of Columbia by the Executive Branch Defendants, that the Executive Branch Defendants' actions were taken to punish or suppress Plaintiffs' speech, or that the speech at issue is constitutionally protected.

Plaintiffs have failed to credibly plead that Columbia University was coerced by the March 13 Letter to take any action that impacted Plaintiffs' constitutionally protected activity. In fact, Plaintiffs' pleading establishes the opposite by incorporating both the Executive Branch Defendants' March 13 Letter, SAC ¶ 3 n.4, and Columbia's March 21 Memo, *id*. ¶ 123 n.100. A comparison of the two establishes that Columbia did *not* follow all the Executive Branch Defendants' demands. For example, Columbia did not place the MESAAS department into academic receivership. *See* March 21 Memo. Further, Columbia's March 21 Memo states that its actions were not directly in response to the March 13 Letter but, rather a result of the University "work[ing] hard to address the legitimate concerns raised both from within and without our Columbia community, including by our regulators, with respect to the discrimination, harassment, and antisemitic acts our Jewish community has faced in the wake of October 7, 2023." *Id*. The March 21 Memo also notes that items listed in the letter all "have been underway and are intended to further Columbia's basic mission." *Id*.

Plaintiffs seek to rely on *Vullo*, *see* SAC ¶¶ 3 n.5, 4 n.9, 178 n.117, but the allegations here are materially different. *Vullo* stands for the proposition that the Government may not take an "adverse . . . action in order to punish or suppress [a] plaintiff's speech." *Id*. at 191. There, as

24

alleged, the government (among other things) offered to drop "unrelated" infractions against an insurance company, in exchange for the insurance company agreeing to cut ties with gun groups. *Id.* at 192–93. But this case, unlike *Vullo*, does not involve the Government threatening coercive action against one party (the insurance company) to get at the protected speech of a third party (the gun groups); instead, the Government is using its enforcement authority to act directly upon a regulated entity that receives federal funding (Columbia) because of *that entity's* own conduct. In other words, the actions taken here—unlike in *Vullo*—relate to the University's own actions (i.e., failing to take sufficient action to combat antisemitism). *See Penthouse Intern., Ltd. v. McAuliffe*, 702 F.2d 925, 927–28 & n.6 (11th Cir. 1983); *cf. B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 n.16 (9th Cir. 2024) (instructing that *Vullo* was inapplicable to First Amendment claim because in *Vullo* the government "did not have the authority to accomplish the result it sought by direct regulation").

Further, as both the Supreme Court and the Second Circuit have held, "governmental entities may act properly in furtherance of legitimate state interests" even where there is an incidental effect on speech. *Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996) (citing *Younger v. Harris*, 401 U.S. 37, 51 (1971) and *Cameron v. Johnson*, 390 U.S. 611, 619 (1968)). And, here, unlike in *Vullo*, there are no plausible allegations that any of the actions specifically taken by the Executive Branch Defendants were done "in order to" suppress or punish protected speech, rather than to pursue a legitimate interest. Plaintiffs offer little more than *ipse dixit* assertions that facially legitimate actions were in fact prompted by improper censorious motives. Such assertions not only run headlong into the presumption of regularity, *see Nieves v. Bartlett*, 587 U.S. 391, 400–02 (2019), but they also fail to satisfy the basic requirements of pleading, *Iqbal*, 556 U.S. at 682 (plaintiff must marshal

allegations that "invidious discrimination" was more plausible than "obvious alternative explanation[s]").

This is especially so because all the information referenced in the Second Amended Complaint supports that the Executive Branch Defendants had—and still have—a legitimate basis for taking the actions at issue here, ensuring that taxpayer dollars are not used to support research at an institution that has demonstrated a lack of concern for the wellbeing of Jewish students. For example, the Republican Staff Report incorporated into the Second Amended Complaint, SAC ¶ 61 n.50, found that "Columbia University was the site of some of the most disturbing and extreme antisemitic conduct violations in the country, including the criminal takeover of a campus building and numerous incidents of antisemitic harassment and disruption." *Id*. at 59. Requiring Columbia to take steps to ensure that students are not subjected to disruptive and antisemitic speech is entirely appropriate. *Estate of Landers v. Leavitt*, 545 F.3d 98, 113 (2d Cir. 2009).

To the extent Plaintiffs allege any effect on their speech rights, they allege only an incidental chill pursuant to the government's legitimate interest in ensuring that taxpayer funds are not used to support an institution that has failed to protect Jewish students. *Younger*, 401 U.S. at 51 ("Moreover, the existence of a chilling effect even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action.") (internal quotation marks omitted). Indeed, Plaintiffs fail to identify any *actually* protected speech allegedly being targeted here. *See Hankard v. Town of Avon*, 126 F.3d 418, 423 (2d Cir. 1997). Antisemitic harassment is not shielded by the First Amendment. *See, e.g.*, *Jermosen v. Coughlin*, 878 F. Supp. 444, 450–51 (N.D.N.Y. 1995) ("[T]hreatening and abusive language . . . finds little protection

under the [F]irst [A]mendment. Furthermore, threats of violence fall within a category of speech unprotected by the First Amendment." (citation omitted)).[13]

Importantly, the March 13 Letter does not restrict protected speech or expression on the basis of viewpoint. *See* SAC ¶ 3 n.4. Rather, it advises Columbia to take steps to target certain content-neutral conduct on campus. For example, the March 13 Letter states that Columbia should institute "[t]ime, place, and manner rules" in order to "prevent disruption of teaching, research, and campus life." March 13 Letter at 2. This type of time, place, and manner regulation is "not beyond the Government's regulatory reach." *Snyder v. Phelps*, 562 U.S. 443, 456-57 (2011). Nonetheless, Plaintiffs make the barebones, and erroneous, allegation that the March 13 Letter discriminates on viewpoint claiming that "[t]his is particularly evident in the [Executive Branch Defendants'] demands regarding the adoption of the IHRA definition [of antisemitism] and receivership of the [MESAAS] Department. SAC ¶¶ 178-79. But the March 13 Letter does not demand the adoption of any specific definition of antisemitism—just that a definition be adopted, *see* March 13 Letter, and the March 21 Memo does not suggest that the MESAAS Department has been placed into academic receivership, *see* March 21 Memo.

Plaintiffs also make the conclusory allegations that the demand in the March 13 Letter, to ban the use of masks (with exceptions for religious and health reasons) could chill their speech. SAC ¶ 151. But a mask ban is, again, viewpoint neutral. Further, "the Supreme Court has never

---

[13] Plaintiffs argue that the Government's actions to protect students and faculty from antisemitic violence and harassment are akin to the behavior found unconstitutional in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). SAC ¶ 178 n.117. But *Bantam Books* involved the creation of a commission to review publications for obscenity and to make recommendations for criminal prosecution of publishers that did not follow the commissions' guidance. *Bantam Books*, 372 U.S. at 62. Here, in contrast, the Executive Branch Defendants are demanding lawful conduct from an entity that they directly fund (the University); they are not subjecting others, such as faculty and students, to "prior administrative restraints." *Id*. at 70.

held that freedom of association or the right to engage in anonymous speech entails a right to conceal one's appearance in a public demonstration. Nor has any Circuit found such a right." *Church of American Knights of the KKK*, 356 F.3d at 209. Accordingly, the Court should dismiss Claim II (First Amendment) for failure to state a claim pursuant to Rule 12(b)(6).

## B. Plaintiffs Fail to State an APA Claim

The Court should also dismiss the APA claim (Claim IV) because Plaintiffs have failed to state a claim. Plaintiffs appear to make the unsupported assertion that the Executive Branch Defendants terminated Columbia's funding pursuant to Title VI and that this was unlawful and therefore violated the APA. SAC ¶¶ 135-42, 198-207; *see also* 42 U.S.C. § 2000d-2 (providing for judicial review of certain Title VI claims under the APA). However, as discussed above—and as indicated by the termination letters which are integral to the APA claim alleged in the Second Amended Complaint—the Government did not terminate Columbia's funding pursuant to Title VI; rather, it terminated the funding as inconsistent with agency priorities and for convenience pursuant to the terms and conditions of the grants and contracts, which incorporated OMB regulations and the FAR. Lorsch Decl. ¶¶ 11, 17 & Exs. B-C; Oestericher Decl. Exs. A-B; *Holowecki v. Fed. Exp. Corp.*, 440 F.3d 558, 565 (2d Cir. 2006) (court may consider document "integral to the complaint" in considering a motion to dismiss), *aff'd*, 552 U.S. 389 (2008).

Given that Plaintiffs' vague and conclusory "[a]llegations made within the complaint [] are 'contradicted by more specific allegations or documentary evidence,'" they "are not entitled to a presumption of truthfulness" regarding the basis for the Executive Branch Defendants' funding termination. *See Feldman L. Grp. P.C. v. Liberty Mut. Ins. Co.*, 819 F. Supp. 2d 247, 258 (S.D.N.Y. 2011) (quoting *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 421-22 (2d Cir. 2011) (internal quotation marks omitted)), *aff'd*, 476 F. App'x 913 (2d Cir. 2012); *see also, e.g.*, *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

28

statements, do not suffice.") (citing *Twombly*, 550 U.S. at 555); *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 709 (2d Cir. 2002) (a court need not give "credence to [a] plaintiff's conclusory allegations"); *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."). Accordingly, the Court should dismiss Claim IV for failure to state a claim pursuant to Rule 12(b)(6).

### C. Plaintiffs Fail to State a Claim Against the Executive Branch Defendants in Their Individual Capacities

Although Plaintiffs purport to sue the Executive Branch Defendants in both their official and individual capacities, the injunctive relief Plaintiffs seek "can only be obtained from government officers in their official capacities." *See* SAC ¶¶ 26-30, Prayer for Relief; *Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 27 (D.D.C. 2007); *see also, e.g., Rothbein v. City of New York*, No. 18 Civ. 5106 (VEC), 2019 WL 977878, at *6 n.8 (S.D.N.Y. Feb. 28, 2019). Further, any claim for money damages under the First Amendment or APA would fail as a matter of law. "[T]he APA does not provide for individual-capacity claims[] or money damages," *Jefferson v. Harris*, 170 F. Supp. 3d 194, 217 (D.D.C. 2016) (citation and internal quotation marks omitted), and there is no *Bivens* damages remedy against an individual federal official for First Amendment violations, *see, e.g., Egbert v. Boule*, 596 U.S. 482, 498-500 (2022). Accordingly, the Court should dismiss any claims that Plaintiffs have brought against the Executive Branch Defendants in their individual capacities.

### CONCLUSION

For all of the foregoing reasons, the Court should dismiss the claims of the Second Amended Complaint as against the Executive Branch Defendants.

Dated: New York, New York
   May 23, 2025

           Respectfully submitted,

           JAY CLAYTON
           United States Attorney for the
           Southern District of New York
           *Attorney for Defendants*

    By:  */s/ Jeffrey Oestericher*
           JEFFREY S. OESTERICHER
           ALLISON ROVNER
           Assistant United States Attorneys
           86 Chambers Street, 3rd Floor
           New York, New York 10007
           Tel: (212) 637-2695/2691

           YAAKOV M. ROTH
           Acting Assistant Attorney General
           Civil Division

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the word-count and page limitation enlargement granted by the Court. *See* ECF No. 65. As measured by the word processing system used to prepare it, this memorandum contains 9,641 words.

*/s/ Jeffrey Oestericher*
Assistant United States Attorney