**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Mahmoud Khalil, et al.,

     *Plaintiffs,*

v.

Columbia University and the Trustees of
Columbia University, et al.,

     *Defendants.*

Civil Case No. 1:25-cv-02079-AS

Hon. Judge Arun Subramanian

## PLAINTIFFS' OPPOSITION TO AGENCY DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES.......................................................................................... iv

INTRODUCTION ........................................................................................................ 1

STATEMENT OF RELEVANT ALLEGATIONS ....................................................... 1

    I.    Agency Defendants Cancel Millions in Grant Funding to Columbia Because of Pro-Palestine Demonstrations on Campus. .......................................................................... 1

    II.    Agency Defendants Demand That Columbia Punish and Suppress Pro-Palestine Speech to Restore Funding. ........................................................................................... 2

    III.    Agency Defendants Press Columbia to Adopt a Definition of Anti-Semitism That Prohibits Criticism of Israel. .......................................................................................... 2

    IV.    Defendants Press Columbia to Impose Name and Identity Disclosure Requirements on Student Protesters. ............................................................................... 3

    V.    Defendants Demand Columbia Reform its Middle East Studies Department and its Curriculum. .................................................................................................................... 4

    VI.    Plaintiffs Are Columbia Students Directly Harmed By Agency Defendants' Actions. ......................................................................................................................... 4

ARGUMENT ................................................................................................................ 5

    I.    PLAINTIFFS HAVE STATED PLAUSIBLE FIRST AMENDMENT CLAIMS AGAINST THE AGENCY DEFENDANTS ............................................................... 5

        A.    Plaintiffs Have Plausibly Alleged That Agency Defendants Economically Coerced Columbia to Violate Plaintiffs' Core First Amendment Rights. .................. 5

        B.    Defendants Compelling Columbia to Impose Identity Disclosure Requirements Violates the First Amendment Right to Anonymous Speech. ................................. 9

        C.    Defendants Are Urging Columbia to Violate Plaintiffs' Right to Receive Information—Which is a Protected Right of Students Under the First Amendment. 10

        D.    Defendants Have Intentionally Coerced Columbia to Censor Plaintiffs—Which Establishes a First Amendment Violation Whether or Not the Restrictions at Issue Implicate Protected Speech. ..................................................................................... 12

        E.    Plaintiffs Have Clearly Alleged Article III Standing to Pursue Their First Amendment Claims Against Defendants. ..................................................................... 13

            1.    The Agency Defendants Ignore Plaintiffs' Pre-Enforcement Injuries, which independently establish injury-in-fact .................................................................. 13

2.    Plaintiffs' injuries are ongoing, because Columbia's campus policies causing those injuries are ongoing ................................................................. 14

3.    Plaintiffs Have Sufficiently Articulated Causation and Redressability. ........ 16

II.    PLAINTIFFS HAVE STATED PLAUSIBLE APA CLAIMS AGAINST THE AGENCY DEFENDANTS ..................................................................................... 17

III.    THE TUCKER ACT DOES NOT APPLY AND THIS COURT CLEARLY HAS JURISDICTION UNDER BINDING SECOND CIRCUIT PRECEDENT.... 22

# TABLE OF AUTHORITIES

## Cases

*A.B.A. v. United States DOJ*, 2025 U.S. Dist, at *17 (D. D.C. May 14, 2025) ................28, 29

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, 2025 U.S. Dist. at *9 (D.D.C. Mar. 10, 2025)....................................................................................................................... 28

*Alvarado Hosp., LLC v. Price*, 868 F.3d 983 (Fed. Cir. 2017) ............................................... 30

*Aryan v. Mackey*, 462 F. Supp. 90 (N.D. Tex. 1978)............................................................... 10

*Ass'n of Am. Univs. v. DOE*, 2025 U.S. Dist. at *22 (D. Mass. May 15, 2025) .................... 32

*Atterbury v. United States Marshals Serv.*, 941 F.3d 56 (2d Cir. 2019)................................... 18

*B.K. Instrument, Inc. v. United States,* 715 F.2d 713 (2d Cir.1983) ........................................ 33

*Bishops v. U.S. Dep't of State*, No. 25 at *5 (D.D.C. Mar. 11, 2025).................................... 33

*Board of Educ. v. Pico*, 457 U.S. 853 (1982) ........................................................................ 12

*Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276 (2d Cir. 2023) ...................14, 15

*Bowen v. Massachusetts*, 487 U. S. 879 (1988).................................................................... 30

*Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999)........................ 9

*Cal. v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). ................................................27, 30

*Cerame v. Slack*, 123 F.4th 72 (2d Cir. 2024) ...................................................................... 14

*Chi. Women in Trades v. Trump*, No. 25 at *16 (N.D. Ill. Mar. 26, 2025) ......................13, 14

*Church of the Am. Knights of the KKK v. Kerik*, 356 F.3d 197 (2d Cir. 2004) ........................ 10

*Cmty. Legal Servs. in E. Palo Alto v. United States HHS*, 2025 U.S. App. at *10 (9th Cir. May 14, 2025)...............................................................................................................27, 32

*Consol. Edison Co. of New York v. U.S., Dep't of Energy*, 247 F.3d 1378 (Fed. Cir. 2001) ............. 27

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099 (D.C. Cir. 2022) ................... 33

*Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988)...................................... 23

*Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) ............................................................... 27

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ................................................................. 17

*Fox v. Board of Trustees of State*, 841 F.2d 1207 (2d Cir. 1988)............................................ 12

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, No. 2025, at *8-*9 (S.D.N.Y. Feb. 25, 2025)....................................................................................................................... 6

*Ghafari v. Municipal Court for the San Francisco Judicial Dist. of the City*, 87 Cal. App. 3d 255 (Cal. Ct. App. 1978)............................................................................................ 10

*Hajro v. United States Citizenship & Immigration Servs.*, 811 F.3d 1086 (9th Cir. 2016).......... 30

*Hankard v. Town of Avon*, 126 F.3d 418 (2d Cir. 1997)........................................................ 8

*Jermosen v. Coughlin*, 878 F. Supp. 444 (N.D.N.Y. 1995) ..................................................... 8

*Lincoln* v. *Vigil*, 508 U.S. 182 (1993) ................................................................................. 23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................. 20

*Maine v. U.S. Dept. of Agric.*, 2025 U.S. Dist. LEXIS 69373, at *72 (D. Me. Apr. 11, 2025)  19

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012)....... 20

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995).......................................................... 8

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ................................................25, 29

*Metadure Corp. v. United States*, 490 F. Supp. 1368 (S.D.N.Y. 1980) .................................. 26

*Metro. Transp. Auth. v. Duffy*, No. 25-cv-1413, at \* 77 (S.D.N.Y. May 28, 2025) ............... 27

*Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479 (1998) ........................ 19

*Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682 (2d Cir. 2013) ...................................... 14

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ............................................................ 13

*Normandy Apts., Ltd. v. HUD*, 554 F.3d 1290 (10th Cir. 2009) .............................................. 30

*Overview Books, LLC v. United States*, 755 F. Supp. 2d 409 (E.D.N.Y. 2010) ...................... 26

*Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62 (D.D.C. 2018) .......................................22, 23

*Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of HUD.*, 175 F.3d 132 (2d Cir. 1999) ............ 33

*Rhode Island v. Trump*, 2025 U.S. Dist. at \*5 (D.R.I. May 6, 2025) .................................... 31

*Ryan v. County of DuPage*, 45 F.3d 1090 (7th Cir. 1995) ........................................................ 9

*Sch. Dist. v. Sec'y of the United States Dep't of Educ.*, 584 F.3d 253 (6th Cir. 2009) ................ 17

*See Do No Harm v. Pfizer Inc.*, 126 F.4th 109 (2d Cir. 2025) ................................................. 20

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019) ................................................................ 18

*Southern Educ. Found. v. United States Dep't of Educ.*, No.  2025 U.S. Dist. at \*24 (D. D.C. May 21, 2025)....................................................................................................................... 31

*Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985)................................ 26

*State of New York v. Trump*, 2025 U.S. Dist. at \*16 (D.R.I. Apr. 14, 2025)............................ 28

*State v. United States Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025) ........................................ 22

*Student Members of SAME v. Rumsfeld*, 321 F. Supp. 2d 388 (D. Conn. 2004)........... 11, 12, 17

*Student Press Law Center v. Alexander*, 778 F. Supp. 1227 (D. D.C. 1991) ........................... 17

*Students for Just. in Palestine, at Univ. of Houston v. Abbott*, at \*10 (W.D. Tex. Oct. 28, 2024) .. 7

*Talley v. California*, 362 U.S. 60 (1960) .................................................................................. 9

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) .................................................................... 19

*Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641 (9th Cir. 1998) ........................ 26

*United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 25 at \*5 (D.D.C. Mar. 11, 2025) ....................................................................................................................................... 32

*Up State Fed. Credit Union v. Walker*, 198 F.3d 372 (2d Cir. 1999)...................................... 26

*Vullo*, 602 U.S. at 196. .......................................................................................................... 13

*Widakuswara v. Lake*, 2025 U.S. Dist. at \*9 (D.D.C. Apr. 22, 2025) .................................... 28

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 2025 U.S. Dist. at \*14 (D.R.I. Apr. 15, 2025)........................................................................................................................ 32

*Younger v. Harris*, 401 U.S. 37 (1971) .................................................................................... 8

**Statutes**

2 C.F.R. §§ 200.300(a) ........................................................................................................... 23

34 CFR § 100.2 ...................................................................................................................... 22

34 CFR § 100.8(c)................................................................................................................... 22

45 CFR § 80.2 ........................................................................................................................ 22

45 CFR § 80.8(c) ................................................................................................ 22

*Amawi*, 373 F. Supp. 3d at 749 ..................................................................... 10

*Jordahl*, 336 F. Supp. 3d at 1048 .................................................................. 10

## INTRODUCTION

The claims against the Agency Defendants are straightforward. The Agencies paused Columbia's funding so that the school would have no choice but to cave to the Agencies' demands. If Columbia wanted a chance to get its money back, the Agencies wrote, then campus officials needed to agree to the Agencies' demands. Columbia gave in—almost immediately.

The Agency Defendants' use of unrelated federal funding to coerce Columbia into adopting new campus policies is a constitutional violation of the first order. It may have been successful in coercing Columbia, but by overwhelming the school's independence, the University Defendants have become state actors constrained by the First Amendment's Free Speech Clause.

## STATEMENT OF RELEVANT ALLEGATIONS

### I.    Agency Defendants Cancel Millions in Grant Funding to Columbia Because of Pro-Palestine Demonstrations on Campus.

On March 3, 2025, Agency Defendants—including the Department of Education (ED), Department of Health and Human Services (HHS), and the General Services Administration (GSA)— announced that Columbia's "unlawful encampments and demonstrations […] depriv[e] Jewish students of learning opportunities" in violation of Title VI. SAC at ¶ 100, n. 88; *see also* ECF 87-1. Agency Defendants demanded immediate action from Columbia and threatened to pause $51.4 million in contracts and $5 billion in federal grants. SAC at ¶ 101. Agency Defendants then proceeded to immediately cancel $400 million in federal grants to Columbia—citing "its failure to protect its Jewish students from antisemitic harassment." *Id.* ¶ 103 & n.90.

## II.    Agency Defendants Demand That Columbia Punish and Suppress Pro-Palestine Speech to Restore Funding.

On March 13, 2025, Agency Defendants issued a series of demands to Columbia "as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States Government." *Id.* ¶ 106 & n.91. The letter required Columbia to "ensure and document compliance" to restore its grant funding. *Id.* Defendants asserted that these changes were necessary to "protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964." *Id.*

Columbia announced its intention to comply with Agencies' demands in a letter on March 21, 2025. *Id.* at ¶ 123. The Agencies celebrated Columbia's response as an effort "to comply with" the March 13 demands. U.S. DEP'T OF ED., *ED, HHS, and GSA Respond to Columbia University's Actions to Comply with Joint Task Force Pre-Conditions* (March 24, 2025); *see also* Dkt. 86 at ¶ 124.

## III.    Agency Defendants Press Columbia to Adopt a Definition of Anti-Semitism That Prohibits Criticism of Israel.

As a condition of further funding, Agency Defendants demanded that Columbia adopt a definition of antisemitism that prohibits speech critical of Israel. *See* Dkt. 86 at ¶ 106, n. 91, at 2. In their demand, Agency Defendants referred Columbia to the IHRA definition, which prohibits speech critical of Israel. IHRA, *Working definition of antisemitism* (2025) ("Manifestations [of discrimination] might include the targeting of the state of Israel"; or claims that the "State of Israel is a racist endeavor" or "requiring of it a behavior not expected or demanded of any other democratic nation").

2

In response, Columbia adopted a definition of antisemitism that prohibits speech critical of Israel. *See Id.* ¶ 195. That definition encompasses "anti-Israel rhetoric" and "anti-Zionism.". *Id.* ¶ 89, n.76, at 47.

Columbia has assured the administration that it will enforce this policy against its students. *Id.* ¶ 123, n.100, at 2 (Columbia responding that it is "committed to rigorous […] enforcement of its rules and antidiscrimination policies" and that it has "special officers who will have the ability to remove individuals from campus and/or arrest them when appropriate"). That is what Agency Defendants requested of Columbia. *Id.* at ¶ 106, n. 91, at 2

## IV. Defendants Press Columbia to Impose Name and Identity Disclosure Requirements on Student Protesters.

As another condition of further funding, Agency Defendants instructed Columbia to "ban masks that are intended to conceal identity." *Id.* at ¶ 106, n. 91, at 2. Defendants' purpose in ordering the mask ban was to ensure that "recognized student groups and individuals" are punished for their pro-Palestine speech. *Id.*

In response, Columbia agreed to adopt a policy prohibiting anonymous protest— including a requirement that protesters disclose their names and identities. *Id.* at ¶ 123, n.100, at 1 ("All individuals who engage in protests or demonstrations […] must, when asked, present their University identification"). The policy also includes Defendants' requested mask prohibition. *Id.* ¶ 123, n.100, at 2 ("face masks or face coverings are not allowed for the purpose of concealing one's identity").

## V.    Defendants Demand Columbia Reform its Middle East Studies Department and its Curriculum.

Agency Defendants also instructed Columbia to begin the process of putting its MESAAS department in academic receivership—with the purpose of reforming instruction in the department. *Id.* at ¶ 106, n. 91, at 2.

In response, Columbia did just that. The University announced the appointment of a new administrator to review the department's curriculum and operations. This review for "balance" and "fairness" in the Middle East Studies curriculum reflects a regime of academic censorship at the behest of Agency Defendants. *Id.* ¶ 131

Columbia has already agreed to remove several faculty members from their classrooms as a result of pro-Palestine views expressed by those faculty members. *Id* ¶ 71& n.62 ("Massad had been removed as chair of the Faculty of Arts and Sciences"); *id.* ¶ 73 ("investigations have been opened over the conduct of several Columbia University professors accused of making […] anti-Israel comments"); *id.* ¶ 73 n.66 (Columbia letter investigating as discriminatory professor's statement that "Israeli students […] are coming right out of their military service and have been known to harass Palestinian and other students on our campus").

## VI.    Plaintiffs Are Columbia Students Directly Harmed By Agency Defendants' Actions.

Plaintiffs are all students at either Columbia University or Barnard College. SAC at ¶¶ 13-20.  Plaintiffs are therefore "directly affected by Columbia losing its federal funding as Columbia students that benefit from the federal funds [Agency] Defendants have suspended and terminated." *Id.* ¶ 207. All Plaintiffs have spoken out about Palestine and intend to speak out in the future. *Id.* at ¶¶ 143-44. Plaintiffs have also attended pro-Palestine events where students expressed anti-Israel views that would violate the new definition of antisemitism

Columbia adopted to comply with Agency Defendants' demands. *Id.* at ¶ 148. Some Plaintiffs have already limited their own speech to comply with the University's new policy—including no longer attending protests that express an anti-Israel or pro-Palestine message. *Id.* at ¶¶ 134, 150, 153. All Plaintiffs, when attending future pro-Palestine events or any other protest, can no longer express their view anonymously, per Columbia's new rules. *Id.* at ¶ 151.

## ARGUMENT

### I. PLAINTIFFS HAVE STATED PLAUSIBLE FIRST AMENDMENT CLAIMS AGAINST THE AGENCY DEFENDANTS

### A. Plaintiffs Have Plausibly Alleged That Agency Defendants Economically Coerced Columbia to Violate Plaintiffs' Core First Amendment Rights.

The parties agree that the test to determine whether Columbia is a state actor is the compulsion test and the joint action test. With regards to the Agency Defendants' decision to pause funding and demand campus policy changes in exchange for possibly unpausing Columbia's funding, Columbia fails both tests. That test is applied in Plaintiffs' Opposition to Columbia's Motion to Dismiss (at 9-16) and is incorporated by reference here.

1. <u>Agency Defendants Pressed Columbia to Adopt an Overbroad, Viewpoint-Based Definition of Anti-Semitism That Violates' Plaintiffs' First Amendment Rights.</u>

The Agency Defendants make much out of not demanding *which* definition of antisemitism Columbia must adopt. Dkt. 86 at 35 ("the March 13 letter does not demand the adoption of any specific definition of antisemitism—just that a definition be adopted"). But this actually cuts against the Agency Defendants' coercion argument, because the Agency Defendants got Columbia to do exactly what they demanded: adopt a definition of antisemitism. And the definition Columbia adopted was one Columbia's own officials opposed using for the discipline, because they believe it proscribes protected speech and violates Title VI. Dkt. 62 at ¶195.

Columbia understood that the Agency Defendants were demanding that Columbia adopt a definition of antisemitism that prohibits speech critical of Israel. *See* Dkt 62 at ¶ 106, n. 91; Dkt. 15-2 at 2 (ordering Columbia to "[f]ormalize, adopt, and promulgate a definition of antisemitism" and declaring that "anti-Zionist discrimination […] must be addressed" by that definition). Defendants referred Columbia to President Trump's definition of anti-Semitism. *Id.* ("President Trump's Executive Order 13899 uses the IHRA definition"). That definition specifically prohibits critique of Israel. *See* IHRA, *Working definition of antisemitism* (2025), *available at* https://holocaustremembrance.com/resources/working-definition-antisemitism ("Manifestations [of discrimination] might include the targeting of the state of Israel"; or claims that the "State of Israel is a racist endeavor" or "requiring of it a behavior not expected or demanded of any other democratic nation"). Plaintiffs specifically allege that—as a result— Agency Defendants sought to establish an "Israel-specific speech code." Dkt. 62 at ¶ 113.

Columbia responded to the Agency Defendants a week later—and declared that it would enforce a definition of anti-Semitism effectively the same as the IHRA definition. Dkt. 62 at ¶ 123, n.100; Dkt. 40-1 at 2 (Columbia reporting to Defendants on "[i]mplementation of effective antidiscrimination policies" to include "the ability to sanction" and specifically incorporating "the definition of antisemitism recommended by Columbia's Antisemitism Taskforce"); *see also* Dkt. 62 at ¶ 89, n.76, at 44 (definition including "prejudice […] based on real or perceived ties to Israel; and certain double standards applied to Israel"); *id.* ¶ 89, n.76, at 47 (suggesting that "anti-Israel rhetoric" and "anti-Zionism" are included in the discrimination to be addressed). Plaintiffs specifically allege that Columbia adopted this new definition of discrimination because it was imposed by the Agency Defendants. *Id.* ¶ 195 ("the

University has adopted an expansive definition of antisemitism [...] overwhelmed by the coercive impact of the Committee and Agency Defendants").

Columbia's new definition of antisemitism makes pro-Palestine speech punishable. *Id.* at ¶¶ 150, 148 ("these expressions violate the overly expansive definition of antisemitism Defendants have coerced Columbia into adopting"). The new definition violates the First Amendment because—as this District Court has observed—it conflates antisemitism with Plaintiffs' protected political expression criticizing Israel. *See*, *e.g.*, *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, No. 2025 U.S. Dist. LEXIS 33977, at *8-*9 (S.D.N.Y. Feb. 25, 2025) ("Title VI does not reach instances of pure speech by pro-Palestinian members of Cooper Union's community [...] under the First Amendment"); *Students for Just. in Palestine, at Univ. of Houston v. Abbott*, No. 1:24-CV-523-RP, 2024 WL 4631301, at *10 (W.D. Tex. Oct. 28, 2024) ("the Court finds the incorporation of this specific definition of antisemitism is viewpoint discrimination" because it "labels calling the State of Israel a racist endeavor and drawing comparisons of contemporary Israeli policy to that of the Nazis as antisemitic");

Defendants' sole argument in response is that the government has a legitimate interest in protecting Jewish students from discrimination. *See* Mot. at 26. That argument is specious—particularly because Plaintiffs allege that Jewish students at Columbia have also been forceful critics of Israel, *see* SAC ¶ 84 ("Speech critical of Israel as a state and Zionism as a political ideology is not bigoted. In fact, Israelis and Jews are critical of Israel and Zionism in all the ways that Plaintiffs are critical of Israel and Zionism"); *id.* ¶ 88 (proscribing an anti-Israel exhibit "by a Jewish artist"); *id.* ¶ 133 (identifying protest at Columbia by "a group of

Jewish students"), and because Jewish students have been among those severely punished for their advocacy.[1]

Defendants are also wrong as a matter of law. Courts have repeatedly rejected that the government has any legitimate interest in suppressing anti-Israel speech—which is core political speech subject to First Amendment protection. *See, e.g.*, *Amawi*, 373 F. Supp. 3d at 749 (a law requiring contractors to not advocate for a boycott of Israel was "a viewpoint-based restriction intended not to combat discrimination on the basis of national origin, but to silence speech with which Texas disagrees"); *Jordahl*, 336 F. Supp. 3d at 1048 (a state law penalizing individuals who advocate for boycotting Israel "suggests that the goal of the Act is to penalize the efforts of those engaged in political boycotts of Israel");

The cases Defendants cite to the contrary are all distinguishable. *See* Mot. at 25-26. In *Younger,* the Supreme Court was dealing with a law that "d[id] not directly abridge free speech." *Younger v. Harris*, 401 U.S. 37 (1971). And in *Hankard*, the Second Circuit was dealing with litigants who had "not engaged in conduct which implicates First Amendment protection." (unlike here, the "statute d[id] not directly abridge free speech"); *Hankard v. Town of Avon*, 126 F.3d 418, 423 (2d Cir. 1997) (unlike here, "plaintiffs have not engaged in conduct which implicates First Amendment protection"). Plaintiffs' speech is protected speech, and not the "threatening and abusive language" the Agency Defendants attempt to describe it as. *Jermosen v. Coughlin*, 878 F. Supp. 444, 450–51 (N.D.N.Y. 1995).

---

[1] *See, e.g.*, Grant Miner, "Columbia Expelled Me for My Palestine Activism, but I Won't Be Silenced," *The Nation* (Mar. 26, 2025), available at https://www.thenation.com/article/activism/grant-miner-columbia-expelled-palestine/. *See also Khalil v. Trump*, 25-cv-01935-JMF, ECF #284-8, Exhibit H (D.N.J. June 4, 2025) (including declarations of Jewish Columbia students describing the chill and punishment they are experiencing due to their advocacy for Palestinian rights and dignity), available at https://www.nyclu.org/uploads/2025/03/284-8-EXHIBIT-H-Columbia-University-Students-Declarations.pdf.

**B. Defendants Compelling Columbia to Impose Identity Disclosure Requirements Violates the First Amendment Right to Anonymous Speech.**

The Supreme Court has long recognized that the First Amendment protects the right to speak anonymously—specifically to avoid government and public censure. *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, (1995) ("Anonymity is a shield from the tyranny of the majority"). *Talley v. California*, 362 U.S. 60, 65 (1960) ("identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance").

Agency Defendants have used Columbia to violate that First Amendment right. Defendants specifically instructed Columbia to "ban masks that are intended to *conceal identity*." Dkt. 62 at ¶ 106, n. 91, at 2 (emphasis added). Defendants' goal in demanding the mask ban was to ensure that "*recognized* student groups and *individuals*" are punished for their pro-Palestine speech. *Id.* In response, Columbia now requires all student protestors to identify themselves to campus officials—whether they are wearing a mask or not. Dkt 62 at ¶ 151

This rule is a presumptive violation of the First Amendment subject to strict scrutiny—because it conditions Plaintiffs' participation in a protest on their willingness to identify themselves to campus officials. No court has ever upheld a rule requiring protestors to provide their name to authorities or be banned from attending. The Supreme Court has held the opposite. *See Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 200 (1999) ("The injury to speech is heightened for the petition circulator because the badge requirement compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest").

Federal courts have repeatedly recognized that the government violates the First Amendment when it bans the wearing of masks so that it can identify, target, and retaliate against dissenting voices. *See*, *e.g.*, *Ryan v. County of DuPage*, 45 F.3d 1090, 1095 (7th Cir.

1995) (noting that "there is no real conflict" as to "whether prohibitions against appearing masked in a public place violate the First Amendment"); *citing Aryan v. Mackey*, 462 F. Supp. 90, 92 (N.D. Tex. 1978) (finding that "serious First Amendment question arise, however, when there is such a nexus between anonymity and speech that a bar on the first is tantamount to a prohibition on the second" in an anti-mask case); *Ghafari v. Municipal Court for the San Francisco Judicial Dist. of the City*, 87 Cal. App. 3d 255, 260, 150 Cal. Rptr. 813 (Cal. Ct. App. 1978) (striking law flatly prohibiting anonymous public appearances as "inhibiting the exercise of free speech or exposes the speaker who dares, to retaliation").

This is consistent with Second Circuit precedent. Dkt. 86 at 35. In fact, the Second Circuit has explicitly recognized that the disclosure of names and identities violates Plaintiffs' First Amendment rights to anonymous speech. *See Church of the Am. Knights of the KKK v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004) ("These Supreme Court decisions establish that the First Amendment is implicated by government efforts to compel disclosure of names in numerous speech-related settings"). In *Kerik*, the Second Circuit declined to strike down a mask ban precisely because the only injury at issue was that plaintiffs' faces were revealed—not that their names and identities were being collected for reprisal based on the content of their speech. Columbia's disclose-your-identity-to-the-police-before-you-protest rule is contrary to *Kerik*.

### C. Defendants Are Urging Columbia to Violate Plaintiffs' Right to Receive Information—Which is a Protected Right of Students Under the First Amendment.

Agency Defendants instructed Columbia to place a disfavored department on academic receivership—with the express purpose of reforming instruction in the department. Dkt. at ¶ 106, n. 91, at 2 (noting that Columbia should "provide a full plan, with date certain

deliverables" for reformation of the department). Columbia has now announced that it has done effectively the same thing—appointing a new administrator to: (1) conduct an immediate review of all Middle East Programs to ensure "the educational offerings are […] balanced"; (2) "review all aspects of […] curriculum"; and (3) present on "necessary changes" and "academic restructuring." *Id.* at ¶ 123, n.100, at 3. This supposed review—which specifically contemplates imposing "balance" and making changes to the curriculum over the voices of expert faculty teaching about the Middle East—is a forthcoming regime of academic censorship at the behest of Agency Defendants. *Id.* at ¶ 131 ("Columbia University also is altering its curriculum—what gets taught and who does the teaching—in line with the Agency Defendants' demand that they place [a disfavored department] under academic receivership").

Courts in this Circuit make clear that Agency Defendants violate the First Amendment right to academic freedom when a curriculum is reviewed and censored based on government preferences. *See*, *e.g.*, *Student Members of SAME v. Rumsfeld*, 321 F. Supp. 2d 388, 395 (D. Conn. 2004) ("The Supreme Court has called the right to receive information "an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution […] The Supreme Court has applied this right in contexts where the government obstructs a message from a willing speaker"); *see also Board of Educ. v. Pico*, 457 U.S. 853, 868 (1982) (the right to receive ideas and information "prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members"). Indeed, "the Second Circuit has found that right to be particularly important for students, and applicable to the receipt of ideas in the educational context." *Student Members of SAME*, 321

F. Supp. 2d at 394, *citing Fox v. Board of Trustees of State*, 841 F.2d 1207, 1212 (2d Cir. 1988), *rev'd on other grounds* 499 U.S. 469 (1989).

Plaintiffs specifically allege that they wish to learn from MESAAS faculty teaching the facts surrounding the Israeli occupation of Gaza—and that Defendants have pressured Columbia to change that curriculum to prevent delivery of that message. SAC ¶ 154 ("Plaintiffs have enrolled in or wish to enroll in classes in the MESAAS department specifically to learn more about the politics of Israel and Palestine"), ¶ 131, ¶ 155. They therefore state a claim for the right to receive information under the First Amendment. *Student Members of SAME*, 321 F. Supp. 2d at 394 ("The students have alleged that they are recipients of the faculty's message, [...] and that, but for the Solomon Amendment and the defendant's application of it, they would receive that message").

### D. Defendants Have Intentionally Coerced Columbia to Censor Plaintiffs—Which Establishes a First Amendment Violation Whether or Not the Restrictions at Issue Implicate Protected Speech.

Although Plaintiffs have demonstrated at least three independent intrusions on their protected speech and associations, Defendants' suppressive intent establishes an independent First Amendment violation whether or not protected speech is at issue. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 178, 196 (2024) (noting that the government "violated the First Amendment by invoking legal sanctions to suppress disfavored publications, some of which may or *may not contain protected speech*" even where the government targeted admittedly "nonexpressive" conduct) (emphasis added); *id.* at 196 ("[T]he conceded illegality of the NRA-endorsed insurance programs does not insulate Vullo from First Amendment scrutiny"); *see also Chi. Women in Trades v. Trump*, No. 25 C 2005, 2025 U.S. Dist. LEXIS 57299, at *16 (N.D. Ill. Mar. 26, 2025) (district court rejecting as irrelevant under *Vullo* the

federal government's contention that there was no protected speech at issue), *citing Vullo*, 602 U.S. at 196.

Agency Defendants purport that Plaintiffs have not plausibly alleged their suppressive intent. Dkt. 86 at 32. That is false. Plaintiffs specifically assert that Defendants acted with coercive intent to suppress speech critical of Israel and used their regulatory authority to enforce that suppression. *See, e.g.*, Dkt. 62 at ¶ 176; ¶ 179, ¶ 181 ("Because the Taskforce's March 13 Letter […] endeavors to chill and suppress speech it disfavors by coercing Columbia into punishing and removing that speech from its campus, the Agency Defendants violate the First Amendment"); *Id.* at ¶ 106, n. 91, at 2 (Defendants' letter mandating "immediate compliance with these critical next steps"). The March 13 letter's contents make the Agencies' suppressive intention indisputable. These suppressive actions under regulatory authority establish a First Amendment violation *per se. See, e.g., Chi. Women in Trades*, 2025 U.S. Dist. LEXIS 57299, at *17-*18 ("there are explicit adverse consequences for noncompliance with the J20 Order: termination of federally funded grants or contracts"). On this basis alone, Plaintiffs state a claim for First Amendment relief.

### E. Plaintiffs Have Clearly Alleged Article III Standing to Pursue Their First Amendment Claims Against Defendants.

Defendants make a series of standing arguments regarding Plaintiffs' First Amendment claims. Dkt. 62 at 16-22. Each misses the mark for the reasons identified below.

1. The Agency Defendants Ignore Plaintiffs' Pre-Enforcement Injuries, which independently establish injury-in-fact

The Agency Defendants do not make any effort to address Plaintiffs' *pre-enforcement* challenge—where the rules of standing are relaxed. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) ("[W]e assess pre-enforcement First Amendment claims . . .

under somewhat relaxed standing and ripeness rules"). In fact, Defendants fail to even reference the *Susan B. Anthony* factors required by the Second Circuit. *See Cerame v. Slack*, 123 F.4th 72, 81 (2d Cir. 2024) ("we apply the three-pronged test that the Supreme Court set forth in *Susan B. Anthony List* to assess the existence of a cognizable injury in fact in the context of a pre-enforcement First Amendment challenge"). Columbia, however, does dispute Plaintiffs' pre-enforcement challenge, and Plaintiffs' Opposition to Columbia's Motion to Dismiss is incorporated here by reference.

2.  Plaintiffs' injuries are ongoing, because Columbia's campus policies causing those injuries are ongoing

An injury in fact must be "concrete, particularized, and actual or imminent." *Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276, 280 (2d Cir. 2023). The Agency Defendants argue that Columbia has inflicted no injury on Plaintiffs yet and none is "certainly impending." Dkt. 86 at 10. But that misunderstands Plaintiffs' claims. Because of the constitutionally protected views and associations Plaintiffs currently hold and plan to express in the future, the classes they plan to take, and the anonymous protesting they would like to do, Plaintiffs' injuries exist now. Because the policies restricting them from doing those things are ongoing, those injuries will persist in the future. *Id.* at 288 (citing *Susan B. Anthony List*, 573 U.S. at 158).

The Agency Defendants' March 13 demands—accepted by Columbia on March 21—restrict Plaintiffs' speech and conduct now, and will for however long the March 21 policy changes persist. Searching for a way out, Defendants claim that Plaintiffs don't explain "how the Agencies' specific demands curtailed their protected speech." Dkt. 86 at 11. But the Complaint does so—exhaustively.

14

The centerpiece of Plaintiffs' explanation is the definition of antisemitism the Agency Defendants coerced Columbia to adopt. That definition exposes all Plaintiffs to punishment because all Plaintiffs have sharply criticized Israel. *Id.* at ¶¶ 113, 148, 179, 195. *All* Plaintiffs have spoken out in support of Palestine, including by characterizing Israel as a racist endeavor and a colonial-settler state, Israel's assault on Gaza as a genocide, or comparing Israel's actions in Gaza to that of Nazi Germany, using protest chants such as "from the River to the Sea, Palestine will be free," and participating in student groups that aim to bring awareness and accountability to broader social justice initiatives, including those related to Palestine. *Id.* at ¶¶ 34, 147-48. These protected political expressions violate the antisemitism definition the Agency Defendants compelled Columbia to adopt. *See* See *Id.* at ¶ 69 (Columbia's former president describing a political slogan all Plaintiffs use as "antisemitic").

The Agency Defendants' argument that they never demanded "restrictions on wearing a keffiyeh or generally expressing views supportive of the Palestinian cause" ignores Columbia's own explanation of the antisemitism definition Plaintiffs challenge. See Dkt. 86 at 18. The definition of antisemitism adopted uses an "inductive approach," which means that it is "based on the reported experiences of Jews and Israelis at Columbia." Task Force on Antisemitism, Report #2: Columbia University Student Experiences of Antisemitism and Recommendations for Promoting Shared Values and Inclusion, at 44 & Appendix C (August 2024), available at: https://www.columbia.edu/content/sites/default/files/content/about/Task%20Force%20on%20Antisemitism/Report-2-Task-Force-on-Antisemitism.pdf.  In other words, Columbia is letting some of the students offended by Plaintiffs' speech decide whether or not the speech is punishable.

In an attempt to avoid such violations, Plaintiffs have altered what they say and do so as not to be targeted by the University or the Government. Dkt. 62 at ¶ 150. For instance, Plaintiffs Roe, Loe, Noe, and Joe no longer wear keffiyehs, *Id.* Others cannot protest anonymously without facing punishment. *Id.* at ¶ 151. And the Agency Defendants' demands to put an academic department in "receivership" are aimed at altering that department's curriculum, which many Plaintiffs seek to learn from. *Id.* at ¶ 154. These injuries are ongoing and, absent this Court's intervention, will persist.

3. <u>Plaintiffs Have Sufficiently Articulated Causation and Redressability.</u>

Plaintiffs' injuries are directly traceable to Defendants' demands and their ongoing threats to Columbia's funding if they do not suppress Plaintiffs' speech. In these circumstances—where the federal government applies funding pressure to a third party to violate plaintiffs' rights—causation and redressability against the government are established *per se. See, e.g.*, *Sch. Dist. v. Sec'y of the United States Dep't of Educ.*, 584 F.3d 253, 278 (6th Cir. 2009) ("And enjoining the Secretary from withholding federal funds for failing to comply with the Act's requirements will redress the threatened injury"); *Student Press Law Center v. Alexander*, 778 F. Supp. 1227, 1231-32d (D. D.C. 1991) ("the universities would release the information but for the risk of losing federal funds"); *Student Members of SAME*, 321 F. Supp. 2d at 397 (D. Conn. 2004) (student harms were "fairly traceable" to the Department of Defense's regulation denying federal funding to universities because the "threat" had "forced" the university to suspend its nondiscrimination policy).

Contrary to Defendants' assertions, there is nothing "speculative" about the chain of events. Mot. at 13. The evidence of coercion is substantial, with even the Agency Defendants themselves describing the March 21 policy changes as Columbia's efforts "to comply with"

the Agency Defendants' demands. U.S. DEP'T OF ED., *ED, HHS, and GSA Respond to Columbia University's Actions to Comply with Joint Task Force Pre-Conditions* (March 24, 2025). One thing caused the other, and for standing purposes, traceability includes the "predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

Furthermore, Defendants cannot rely on *Murthy* to assert a redressability problem—because here there is "proof of an ongoing [government] pressure campaign." *Murthy*, 603 U.S. at 68. Plaintiffs still face the speech restrictions that they seek to enjoin.

## II. PLAINTIFFS HAVE STATED PLAUSIBLE APA CLAIMS AGAINST THE AGENCY DEFENDANTS

### A. The Second Amended Complaint States Valid APA Claims Under Both the First Amendment and Title VI.

The APA permits suit whenever a final agency action is either "contrary to a constitutional right" or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(B), (D). The Amended Complaint alleges both. It asserts a substantive APA claim under the First Amendment and a procedural APA claim under Title VI. *See* Dkt. 62 at ¶¶ 199-200 and ¶¶ 201-204. The final agency actions at issue are the "suspension and termination of $400 million of funds [as the] final outcome of Agency Defendants' decision making" and the March 13 letter that "reflects the outcome of a decision-making process to coerce Columbia specifically and universities more generally into disfavoring students and staff who express pro-Palestine views." *Id.* ¶¶ 199, 206.

Plaintiffs' substantive APA claim mirrors their First Amendment claim both as to standing and liability. *See, e.g., Atterbury v. United States Marshals Serv.*, 941 F.3d 56, 62 (2d Cir. 2019) (noting that an "APA claim under section 706(2)(B)" depends upon whether there is a

"constitutionally protected" interest); *Sierra Club v. Trump*, 929 F.3d 670, 703-04 (9th Cir. 2019) ("Plaintiffs either have an equitable cause of action to enjoin a constitutional violation, or they can proceed on their constitutional claims under the Administrative Procedure Act, or both"); *Trudeau v. FTC*, 456 F.3d 178, 188 (D.C. Cir. 2006). Plaintiffs have standing to assert their substantive APA challenge for the same reasons that they have Article III standing to pursue their standalone First Amendment claims. *See supra* Section I(B).

Meanwhile, Plaintiffs' procedural APA claim rests on Defendants' failure to follow the statutory requirements of Title VI prior to terminating federal funding. *See* SAC ¶¶ 201-204, 42 U.S.C. § 2000d-1; *see also Maine v. U.S. Dept. of Agric.*, No. 1:25-CV-00131-JAN, 2025 U.S. Dist. LEXIS 69373, at *72 (D. Me. Apr. 11, 2025) ("the Court concludes that prior to freezing a portion of the State's Title IX funds, the Federal Defendants acted without observance of procedure required by law, so as to be in violation of the APA"). Plaintiffs have standing to pursue this claim because they are within Title VI's "zone of interests." *See Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 488 (1998) ("For a plaintiff to have prudential standing under the APA, the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question"). Congress mandated the notice and hearing provisions under Title VI to ensure that all participants in a federally funded program (like Plaintiffs)—and not just the formal recipients of federal funds (like Columbia)—are protected from unnecessary funding termination. *See* CONGRESSIONAL RECORD - HOUSE OF REPRESENTATIVES (Feb. 7, 1964), *available at* https://www.congress.gov/bound-congressional-record/1964/02/07/house-section. This direct evidence of congressional purpose is far more than is required for Plaintiffs to demonstrate APA standing. *See Match-E-Be-Nash-She-Wish*

*Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) ("We do not require any indication of congressional purpose to benefit the would-be plaintiff").

Agency Defendants' suggest—in a single sentence without authority—that Plaintiffs lack Article III standing for this claim because "Plaintiffs do not allege that they were impacted directly by the loss of funding." Dkt. 86 at 17. That is false. Plaintiffs allege that they are *directly* affected by Columbia's loss of $400 million in grant funding—and that they certainly will be impacted by Defendants' ongoing threats to eliminate as much as $5 billion in promised grants without following the appropriate procedures under Title VI. *See* Dkt. 62 at ¶¶ 101, 142, and 207. That is all that is required at this early stage of the litigation. *See Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 114 (2d Cir. 2025), *citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice").

**B. The Agency Defendants invoked invoked Title VI repeatedly as the legal basis for their demands, and the Agency Defendants cannot now deny this.**

Agency Defendants make the specious claim that Plaintiffs cannot pursue an APA claim under Title VI because Defendants did not terminate any government grants on the basis of suspected Title VI violations. Dkt. 86 at 24. That is false. Agency Defendants admit that they froze or terminated Columbia's federal grants *specifically* because they determined that Columbia "promote[s] or take[s] part in initiatives that unlawfully discriminate on the basis of race" and that the University "violate[d] either the letter or purpose of Federal civil rights law." Dkt. 87-1, 87-2; *see also* Dkt. 89, ¶ 10 ("these contracts were terminated […] in light of Columbia University's insufficient response to antisemitism at the University"); Dkt. 88, at ¶ 11 ("antisemitism and actions concerning the safety and wellbeing of Jewish students taking place at Columbia University and Columbia University's inaction" acknowledged as

19

the reasons for fund termination). Defendants also admit that "the agencies' communications with Columbia regarding termination of the grants and contracts referenced potential Title VI violations." Dkt. at 24 n.7.

Defendants did more than just reference Title VI—they invoked it as the basis for grant review and for grant termination. *See* Dkt. 86 at ¶ 104 n. 90 (Defendants declaring a "comprehensive review of the university's federal contracts […]  in light of ongoing investigations under Title VI of the Civil Rights Act" because "[c]haos and anti-Semitic harassment have continued"). The Columbia Defendants agree with Plaintiffs. *See* ECF No. 84, at 21 ("Columbia is subject to regulatory oversight under Title VI […] the Agency Defendants stated that they were acting pursuant to that regulatory power over Columbia").

Agency Defendants cannot say they cancelled contracts on the basis of unlawful race discrimination and then pretend that Title VI does not apply. Defendants' own regulations require that they follow Title VI cancellation procedures *for every single contract* cancelled based on purported race discrimination. *See* 34 CFR § 100.2 ("This regulation applies to *any program* to which Federal financial assistance is authorized […] It applies to money paid, property transferred, or other Federal financial assistance extended after the effective date of the regulation") (emphasis added); 34 CFR § 100.8(c) ("*No order* suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until […] there has been an express finding on the record, after opportunity for hearing") (emphasis added); 45 CFR § 80.2 (similar); 45 CFR § 80.8(c) (similar); *see also* 42 U.S.C. § 2000d-1.

Where, as here, Agency Defendants blatantly violate federal law and their own implementing regulations, the APA provides a clear remedy. *See Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 75-78 (D.D.C. 2018) ("agencies themselves frequently cabin their own

discretionary funding determinations by generating formal regulations or other binding policies that provide meaningful standards for a court to employ when reviewing agency decisions under the APA"). This Court should not allow Agency Defendants to do an end-run around the mandatory procedures in Title VI.

### C. Agency Defendants' Refusal to Disburse Awarded Funds is a Reviewable Agency Action Under the APA And Not Within Agency Discretion.

Although Defendants are correct that appropriation and allocation decisions are exempt from the APA as a function of agency discretion, the APA still applies to agency decisions that pause or terminate *previously awarded* federal funding. *Compare* Mot. at 22, *with State v. United States Dep't of Educ.*, 132 F.4th 92, 97-98 (1st Cir. 2025) ("The Department also contends that these terminations are part of the narrow class of agency actions that are unreviewable in federal court […] But here, applicable regulations cabin the Department's discretion as to when it can terminate existing grants"), *citing* 2 C.F.R. §§ 200.300(a) ("Federal agency or pass-through entity must manage and administer the Federal award […] in full accordance with the U.S. Constitution, applicable Federal statutes and regulations—including provisions protecting free speech").[2]

That is because—as Agency Defendants acknowledge—"regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for

---

[2] Terminating funding is a reviewable agency action under the APA. *See Woonasquatucket River Watershed Council v. United States Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 U.S. Dist. LEXIS 71378, at *45  (D. R.I. Apr. 15, 2025) (finding a pause on "already awarded" funds to not be "the unreviewable type of agency decision committed to agency discretion by law); *Commonwealth v. Kennedy*, No. 25-10814-WGY, 2025 U.S. Dist. LEXIS 90135, at *32-*33 (D. Mass. May 12, 2025) (noting that the freezing of extant grants is not a "funding decision […] committed to agency discretion by law," and that instead applicable regulatory protections apply that enable APA review); *Ass'n of Am. Univs. v. DOE*, No. 25-cv-10912-ADB, 2025 U.S. Dist. LEXIS 92726, at *35 n.2 (D. Mass. May 15, 2025) (same).

judicial review." Dkt. 86 at 29, *citing Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988). Section § 200.300(a), which governs the administration of all federal awards and requires compliance with the U.S. Constitution and federal law, is one such regulation that provides a clear standard of review for Agency Defendants' conduct in this case.

Defendants' sole case authorities to the contrary are distinguishable because they did not involve binding agency regulations. *Compare Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 75-78 (D.D.C. 2018) ("HHS's regulations expressly address—and limit—the agency's discretion to "terminate" monetary awards"), *with Lincoln* v. *Vigil*, 508 U.S. 182, 193 (1993) ("Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes").

### III. THE TUCKER ACT DOES NOT APPLY AND THIS COURT CLEARLY HAS JURISDICTION UNDER BINDING SECOND CIRCUIT PRECEDENT.

Agency Defendants argue that Plaintiffs are pursuing contract claims that can only be brought in the Court of Federal Claims. Dkt. 86 at 22. That is false. As Defendants acknowledge, this Court has jurisdiction unless: (1) the source of the rights at issue is a U.S. government contract; and (2) the remedy sought is monetary damages. *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) ("Whether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both 'the source of the rights upon which the plaintiff bases [his] claims, and . . . the type of relief sought"). Neither circumstance applies here.

### A. The Source of Plaintiffs' Rights Are the First Amendment and Title VI—Not a Government Contract.

Plaintiffs assert that Agency Defendants have cancelled or threatened to cancel various federal grants in order to pressure Columbia to impose a series of speech, conduct, and

disciplinary measures that violate Plaintiffs' First Amendment rights. SAC ¶¶ 175-181. Plaintiffs separately assert that Defendants terminated federal funding without following the statutory requirements of Title VI. *Id.* ¶¶ 198-207. Neither claim identifies, invokes, or relies upon the terms of any specific grant or contract. Nor do Plaintiffs have standing to pursue breach of contract—because they are not parties to a federal grant. The *exclusive* sources of law for Plaintiffs' claims are the First Amendment and Title VI. *See id.* ¶¶ 181, 206.

The Second Circuit agrees. In *Atterbury v. U.S. Marshals Serv.*, the Court found that the plaintiff was not party to a federal contract and had stated an independent claim for relief under the U.S. Constitution. *See Atterbury*, 805 F.3d at 407 ("Atterbury is not a party to the Akal-USMS contract and has no standing to assert that it was breached"); *id.* at 406 ("he grounds his alleged right […] in the Due Process Clause of the Fifth Amendment"). On this basis, the Second Circuit held that the District Court had jurisdiction to hear the plaintiff's claims. *Id.* at 406, 409 ("Atterbury does not ground his claim in any provision of Akal's contract with USMS [… so] it does not fall within the scope of the Tucker Act"). This Court is bound to find the same here.

Defendants argue that Plaintiffs' claims are contractual because they relate to Columbia's federal grants. *See* Mot. at 5, 17-18. The Second Circuit has already considered and rejected Defendants' argument. *Atterbury*, 805 F.3d at 406. Plaintiffs did not ground their claims in the terms of any government grant—nor are they required to do so. *Id.* at 407 ("[J]urisdiction does not turn on whether the plaintiff *could conceivably* have based his claim on a government contract").

In fact, Plaintiffs allege that Defendants summarily cancelled federal grants to coerce viewpoint discrimination *regardless of the terms* in each contract. SAC ¶¶ 114, 177. That

23

distinction is dispositive in the Second Circuit. *See Atterbury*, 805 F.3d at 406, *citing Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) (the claim "is validly based on grounds other than a contractual relationship with the government").

Defendants fail to cite a single case to the contrary. *See* Mot. at 19-20. They only rely on cases where a contract *was* the source of the rights at issue. *See*, *e.g.*, *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999) ("Because the adjudication of this dispute *requires* an interpretation of the expired land lease, we conclude that the source of the right at issue here is the contract") (emphasis added); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (plaintiff demonstrated "no such right in the absence of the contract itself"); *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) ("If the […c]ontract imposes no such obligation, the United States owes no duty"); *Metadure Corp. v. United States*, 490 F. Supp. 1368, 1370, 1373 (S.D.N.Y. 1980) ("An adjudication of most of these claims depends upon an interpretation of Metadure's contracts with the United States").[3]

Defendants' remaining authorities are simply inapposite. *See*, *e.g.*, *Overview Books, LLC v. United States*, 755 F. Supp. 2d 409, 416 (E.D.N.Y. 2010) (finding that because plaintiff was already "bringing a monetary claim," then the Court of Claims had "collateral jurisdiction to consider plaintiff's First Amendment claim"); *Consol. Edison Co. of New York v. U.S., Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir. 2001) (not addressing the source of rights inquiry at all). Defendants offer no further opposition.

---

[3] Defendants make a misleading reference to the D.C. Circuit's holding in *Ingersoll-Rand*. *See* Mot. at 19. But that was also a breach of contract case based on the terms of the contract itself. *See SRS Technologies v. United States*, 843 F. Supp. 740, 742 (D. D.C. 1994) ("In *Ingersoll-Rand*, one of the key points of contention was a regulation that had been incorporated into the contract itself, which meant that the entire case could have been brought under the contract," *citing Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

The Supreme Court's recent administrative stay in *California* does not change this analysis. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). In *California*, it was clear that "the terms and conditions of each individual grant award [were] at issue." *Cal. v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025). That is not the case here. On this basis—in the wake of *California*—numerous federal courts have retained jurisdiction to prohibit Defendants from violating the Constitution and federal law in connection with government grants. *See, e.g.*, *Cmty. Legal Servs. in E. Palo Alto v. United States HHS*, No. 25-2808,  2025 U.S. App. LEXIS 11745, at *10 (9th Cir. May 14, 2025) ("*Department of Education* has no application where, as here, the claims sound in statute, rather than contract […] "); *Metro. Transp. Auth. v. Duffy*, No. 25-cv-1413, at * 77 (S.D.N.Y. May 28, 2025) ("This is not a case in which the terms and conditions of some individual grant are at issue") *A.B.A. v. United States DOJ*, No. 25-cv-1263, 2025 U.S. Dist. LEXIS 92016, at *17-*18 (D. D.C. May 14, 2025) ("The Supreme Court's recent per curiam opinion in *Department of Education v. California* […] does not compel a contrary result […] Defendants terminated its cooperative agreements in retaliation for protected speech, an act that would violate the First Amendment regardless of the agreements' terms"); *State of New York v. Trump*, No. 1:25-cv-39-JJM-PAS, 2025 U.S. Dist. LEXIS 71893, at *16 (D.R.I. Apr. 14, 2025) ("In this case, the terms and conditions of each individual grant that the States receive from the Agency Defendants are not at issue […] Therefore, the Court's orders addressing the categorical funding freeze were *not* enforcing a contractual obligation"); *Widakuswara v. Lake*, No. 25-cv-1015, 2025 U.S. Dist. LEXIS 76500, at *9 (D.D.C. Apr. 22, 2025) ("In *California*, the source of the rights relied on by the plaintiffs were contained *in the grant agreements* […] Here, by contrast, the source of the [plaintiffs]' rights is not rooted in the grant agreements"); *AIDS Vaccine Advoc. Coal. v. United States Dep't*

25

*of State*, 2025 U.S. Dist. LEXIS 42875, 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025) ("[I]t would be quite extraordinary to consider Plaintiffs claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach"). This Court should do the same.

**B. Plaintiffs Seek Varied Forms of Declaratory and Injunctive Relief—Not Contract Damages.**

Because Plaintiffs do not assert any contract claims about the agreements between Columba and the Agency Defendants, this Court need not examine whether Plaintiffs seek contract damages. *See Atterbury*, 805 F.3d at 406 ("Because Atterbury's claim is not based on rights derived from a contract with the United States, the first prong of the *Megapulse* test is determinative in this case"), *citing Megapulse*, 672 F.2d at 971 ("[S]o long as an action brought against the United States or an agency thereof is not one that should be classified from the outset as a 'contract action' for Tucker Act purposes, its remedies are also not contract-related"); *see also A.B.A.*, 2025 U.S. Dist. LEXIS 92016, at *17 ("even if the relief sought were characterized as contractual in nature […] that alone is not enough to bring the claim within the scope of the Tucker Act given that the ABA's First Amendment claim has an independent source"). Nonetheless, having dismissed the individual capacity defendants from this suit, Plaintiffs do not now seek damages of any kind.

Instead, Plaintiffs seek declaratory and injunctive relief to stop Agency Defendants from: (1) pressuring Columbia to discipline students based solely on the expression of pro-Palestinian political speech (ECF No. 62, ¶¶ 4, 109, 126, 195); (2) demanding Columbia to adopt a definition of antisemitism that classifies protected pro-Palestinian political speech as discrimination (¶¶ 86, 89, 179, 213); (4) demanding that Columbia impose overbroad speech

26

restrictions, including a mask ban at protests (¶¶ 129, 134, 151, 177); (5) demanding Columbia surrender the academic independence of its Middle East Studies department (¶¶ 110, 131, 134, 154); (6) imposing measures to further chill Plaintiffs' free speech and associational rights (¶¶ 176, 181, 187); (7) violating the procedural requirements of Title VI (¶¶ 198-207); and (8) withholding federal funds or threatening to withdraw federal funds for impermissible, viewpoint-based reasons (¶¶4, 158-163, 175, 187).

The Court of Claims cannot provide Plaintiffs with this complex array of injunctive relief because it bears no relationship to traditional contract remedies and Plaintiffs are not parties to any contract. The District Court therefore must retain jurisdiction. *See, e.g.*, *Alvarado Hosp., LLC v. Price*, 868 F.3d 983, 999 (Fed. Cir. 2017) ("The Tucker Act does not generally confer jurisdiction for actions seeking declaratory or injunctive relief"); *Hajro v. United States Citizenship & Immigration Servs.*, 811 F.3d 1086, 1100 (9th Cir. 2016) ("USCIS's invocation of the Tucker Act is a red herring. The Tucker Act does not apply to contract claims primarily seeking injunctive relief"); *Normandy Apts., Ltd. v. HUD*, 554 F.3d 1290, 1300 (10th Cir. 2009);

Again, the Supreme Court's administrative stay decision is not to the contrary. In *California*, the Supreme Court reaffirmed that—where contract damages are not at issue—district courts have jurisdiction under the APA to compel the disbursement of government funds. *See California*, 145 S. Ct. at 968 ("a district court's jurisdiction is not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds"), *citing Bowen v. Massachusetts*, 487 U. S. 879, 910 (1988).

That is why—even after *California*—numerous federal courts have issued orders that will require the Agency Defendants to disburse grant funds. *See, e.g.*, *Rhode Island v. Trump*, No. 1:25-CV-128-JJM-LDA, 2025 U.S. Dist. LEXIS 86024, at *5 (D.R.I. May 6, 2025)

(granting injunctive relief enjoining a Trump Administration Executive Order even though "the scope of the relief the States seek implicates enjoining the unlawful terminations of their grants," because "the Supreme Court reaffirmed, in *California*, that a district court's jurisdiction is not barred by the possibility that an order […] may result in the disbursement of funds"); *Southern Educ. Found. v. United States Dep't of Educ.*, No. 2025 U.S. Dist. LEXIS 97014, at *24-*25 (D. D.C. May 21, 2025) ("While an order enjoining the Department from terminating SEF's grant would effectively require the government to keep funding the grant, that is a mere by-product of [this] court's primary function of reviewing the Secretary's interpretation of federal law").

Here, Plaintiffs seek even more limited relief. They seek an injunction to prevent federal agencies "from withholding federal funding to coerce Columbia into chilling the constitutionally protected academic freedom, speech and association of its students." Dkt. 62 at 72. Such an order does not require Defendants to pay Plaintiffs any monetary settlement. Nor does it preclude Defendants from cancelling their contracts with Columbia for any permissible reason based on the terms of those contracts or as allowed by federal law. An injunction would merely require that Defendants no longer condition current and future grant payments on Columbia punishing Plaintiffs for their political expression. This is fundamentally equitable, non-monetary relief. *See, e.g., Ervin*, 33 F. Supp. at 12 ("Ervin seeks an order prohibiting the government from retaliating against him by terminating its relationship with him as a contractor […] This Court has jurisdiction to award the relief Ervin requests"); *Veda*, 111 F.3d at 40 (order requiring the government to either "continue ordering services" or "resolicit proposals" did not amount to an order to pay damages).

28

Even after *California*, courts continue to hold that the prospective relief Plaintiffs seek against Agency Defendants does not sound in contract damages. *See, e.g.*, *Ass'n of Am. Univs. v. DOE*, 2025 U.S. Dist. LEXIS 92726, at *22 (D. Mass. May 15, 2025) ("Plaintiffs do not bring claims for past pecuniary harms [...] their claims are to preserve their ongoing and prospective agreements with the DOE and [...] to avoid various irreparable harms unrelated to any monetary relief"); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-cv-00097, 2025 U.S. Dist. LEXIS 71378, at *14 (D.R.I. Apr. 15, 2025) (same); *see also Cmty. Legal Servs. in E. Palo Alto*, 2025 U.S. App. LEXIS 11745, at *5 (granting injunctive relief because, as here, "no contract exists between plaintiffs and the Government"); *cf. United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 25 Civ. 465 (TNM), 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) ("from implementing, enforcing, or otherwise giving effect to any rule . . . preventing the obligation or disbursement of appropriated funds").

None of the cases the Agency Defendants cite contemplate a different result. Dkt. 86 at 28. In fact, they make clear that this Court has jurisdiction precisely because Plaintiffs have no contract rights. *See B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 727 (2d Cir.1983) (district court had jurisdiction because "the Court of Claims has held that it had no power to award damages in a case like this, since no contract with BK had ever come into existence"); *Bishops v. U.S. Dep't of State*, No. 25 Civ. 465 (TNM), 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) ("the plaintiff had no contractual relationship with GSA itself, so any remedy afforded against GSA could neither be construed as damages nor specific performance"), *citing Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1112 (D.C. Cir. 2022); *cf. Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of HUD.*, 175 F.3d 132, 143 (2d Cir. 1999) (no jurisdiction because "Plaintiffs' equitable claims arise out of a contract claim"). It is therefore

clear that this Court has jurisdiction to hear both Plaintiffs' First Amendment and statutory claims and to grant Plaintiffs the relief they seek.

Dated: June 20, 2025

Respectfully Submitted,

/s/  Amy E. Greer

Amy E. Greer (NY 5910179) (lead counsel)
**Dratel & Lewis**
29 Broadway, Suite 1412
New York, NY 10006
(212) 732-8805
agreer@dratellewis.com

**CAIR NATIONAL**
**LEGAL DEFENSE FUND**
/s/Lena Masri
Lena Masri
Gadeir Abbas (VA 81161)*
Nadia Bayado (DC 90023648)
453 New Jersey Ave SE
Washington, DC 20003
(202) 742-6420

**COUNCIL ON AMERICAN ISLAMIC**
**RELATIONS – NEW YORK**
/s/Lamya Agarwala
Lamya Agarwala (NY 5736061)
80 Broad Street, 5th Floor
New York, NY 10009
(646) 665-7599
lagarwala@cair.com

**Jonathan Wallace**
/s/ Jonathan Wallace
Jonathan Wallace (NY 1733757)
PO #728
Amagansett NY 11930
(917) 359-6234
jonathan.wallace80@gmail.com

*Licensed in VA, practice limited to federal matters*

30

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this opposition contains 8,837 words.

/s/ *Gadeir Abbas*

Gadeir Abbas