**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Mahmoud Khalil, et al.,

  *Plaintiffs,*

v.

Columbia University and the Trustees of
Columbia University, et al.,

  *Defendants.*

 Civil Case No. 1:25-cv-02079-AS

Hon. Judge Arun Subramanian

## PLAINTIFFS' OPPOSITION TO COLUMBIA DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... ii

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 1

    A.    The government compels Columbia to provide student disciplinary records and restrict students' speech on Palestine. .......................................................... 1

    B.    Plaintiffs have been harmed by Columbia's attacks on their speech. ................. 4

    C.    University Defendants contract with their students to protect their private records. .................................................................................................................. 6

LEGAL STANDARD ................................................................................................. 6

ARGUMENT ............................................................................................................... 7

    I.    Columbia is a state actor liable for violating Plaintiffs' First Amendment rights. ...... 7

    A.    Columbia's disclosure of individual and associational records pursuant to the Committee's February 13 letter is state action ........................................... 9

    B.    Columbia's March 21 policy changes and subsequent enforcement constitute state action ...................................................................................................... 12

    II.    Plaintiffs have standing to bring their First Amendment claims against Columbia.. 16

    III.    PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM FOR BREACH OF CONTRACT ............................................................................................................. 22

    C.    Columbia made specific, enforceable promises to Plaintiffs. ............................ 23

    D.    Columbia breached the promises it made to Plaintiffs. ...................................... 25

CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Act Now to Stop War & End Racism Coal. v. D.C.*, 589 F.3d 433 (D.C. Cir. 2009) ................. 20

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999) ...................................................... 14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................... 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................... 6

*Blum v. Yaretsky*, 457 U.S. 991, 1014, 102 S. Ct. 2777 (1982) ............................................. 8

*Cornelio v. Connecticut*, 32 F.4th 160 (2d Cir. 2022) ............................................................. 7

*Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105 (2d Cir. 2003) .......................................... 7

*Cuesnongle v. Ramos,* 713 F.2d 881 (1st Cir. 1983) ............................................................... 23

*Evans v. Newton*, 382 U.S. 296, (1966) ................................................................................. 11

*Fabrikant v. French*, 691 F.3d 193 (2d Cir. 2012) .................................................................. 8

*Fisher v. United States*, 425 U.S. 391 (1976) ........................................................................ 12

*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023) ................................................................... 19

*Int'l Longshoremen's Ass'n, AFL-CIO, v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267 (2d Cir. 1981) ............................................................................................................................. 12

*Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2014) ............................................................... 19

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ................................................................. 8

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...................................................................... 7

*Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802 (2019) ............................................ 7

*McGugan v. Aldana-Bernier*, 752 F.3d 224 (2d Cir. 2014) ................................................... 10

*Meyer v. Grant*, 486 U.S. 414 (1988). ............................................................................ 19, 20

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ................................................. 12

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ........................................................... 9

*Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353 (S.D.N.Y. 2016) ................................... 25

*Olsson v. Bd. of Higher Educ.,* 49 N.Y.2d 408 N.E.2d 1150 (1980) ...................................... 24

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81 (2d Cir. 2011) ................. 24

*Peace Ranch, LLC v. Bonta*, 93 F.4th 482 (9th Cir. 2024) ................................................... 20

*Picard v. Magliano*, 42 F.4th 89 (2d Cir. 2022) ................................................................... 21

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .......................................................................... 7

*Sybalski v.Indep. Grp. Home Living Program*, 546 F.3d 255 (2d Cir. 2008) ...................... 10, 14

*Tapinekis v. Pace Univ.*, No. 22 Civ. 1058 (2d Cir. May 30, 2024) ...................................... 23

*Thornhill v. Alabama,* 310 U.S. 88 (1940) ........................................................................... 23

*Trump v. Deutsche Bank AG*, 943 F.3d 627 (2d Cir. 2019) .................................................... 11

*Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020) ................................................................. 11

*United States v. Hansen*, 599 U.S. 762 (2023) ...................................................................... 23

*Univ. of Houston Students for Justice in Palestine  v. Abbott,*  756 F.Supp.3d 410 (W.D. Tex. 2024) ...................................................................................................................................... 21

*Vought v. Teachers Coll., Columbia Univ.,* 127 A.D.2d 654 (2d Dep't 1987) .......................... 24

*Warth v. Seldin*, 422 U.S. 490, 501 (1975) ............................................................................ 7
]

## INTRODUCTION

Columbia University is under the thumb of the House Committee and federal agencies sued here. So, when it comes to campus affairs, Columbia is just taking orders. Columbia's claim that it is responding to routine regulatory oversight is plain misdirection. The University has been subject to a lengthy campaign by Government Defendants to transform Columbia into a source of information on and a way of punishing pro-Palestine students. The campaign has worked.

The University's long history of rich debate and dissent is a primary reason many Plaintiffs chose to attend Columbia. Plaintiffs and other pro-Palestine students embraced that tradition, speaking out about a matter of great public and international concern. Together, their campus activism garnered the world's attention.

But because the Committee and the Agencies disfavor Plaintiffs' pro-Palestine views, they took steps to make Columbia suppress them. The Government Defendants used Columbia's authority over its students as a tool of repression and have applied relentless pressure to make Columbia punish its students. The University, when faced with the choice of fighting or capitulating, chose capitulation. This choice transformed the University into an arm of the government for purposes of this lawsuit, and the University—unable to hide behind the guise of a private entity—must be held to account.

## FACTUAL BACKGROUND

### A. The government compels Columbia to provide student disciplinary records and restrict students' speech on Palestine.

On February 13, 2025, the U.S. House of Representatives Committee on Education and the Workforce ("the Committee") sent a letter to Columbia University ("the University") to demand the production of **all** "disciplinary records" related to eleven specific events

1

involving protected political expressions about Palestine and Israel. Dkt. 62 at ¶ 56. This request continued a months-long campaign by the Committee to compel Columbia to disclose student disciplinary records and otherwise punish students protesting Israel's war on Gaza. *Id.* at ¶¶ 49-55. Though Columbia first produced responsive documents to the Committee on February 27, the school's response is ongoing. That is because Columbia will continue to create new records responsive to the February 13 letter for as long as disciplinary proceedings remain ongoing. *See* Dkt. 82-6 at 2 ("As further developments related to these matters occur, we welcome further conversations with your staff to provide updates.").

On March 3, 2025, the Agency Defendants followed up the Committee's February 13 demands with a press release that threatened to cancel up to $5 billion in federal grants to Columbia to "ensure [Columbia] is in compliance with federal regulations, including its civil rights responsibilities." *Id.* at ¶¶ 100-101. Several days later, on March 7, the Agency Defendants declared the "immediate cancellation of approximately $400 million in federal grants and contracts to Columbia University" over "its failure to protect its Jewish students from antisemitic harassment." *Id.* at ¶ 103. The letter stated that the cancellation represented "the first round of action and additional cancellations are expected to follow." *Id.* at ¶ 104.

On March 13, 2025, the Agencies sent Columbia a list of demands. *Id.* at ¶ 106. In the March 13 Letter, the Agencies enumerated a set of preconditions that Columbia must meet before negotiations about its federal funding could resume. Those preconditions include: 1) punishing particular students (2) altering campus disciplinary processes (3) putting a disfavored department in "academic receivership," (4) imposing a ban on masks, and (5) adopting a definition of antisemitism like the International Holocaust Remembrance Alliance's ("IHRA"). *Id.* at ¶¶ 108-113.

Columbia immediately began capitulating to the Government's demands. The same day the March 13 letter was issued, Columbia announced sanctions ranging from muti-year suspensions to temporary degree revocations and expulsions related to protests at Hamilton Hall. *Id.* at ¶ 121. Columbia did so in response to the Agency Defendants' decision to pause the University's federal funding on March 7, 2025. *Id.* at ¶ 120. Just as the Agency Defendants demanded.

Then, on March 21, Columbia announced its direct response to the Government's preconditions. *Id.* at ¶ 123. In that March 21 letter, Columbia agreed to the following demands made by the Agencies: (1) punish the students the Agencies disfavor; (2) alter campus disciplinary processes; (3) ban anonymous protesting, (4) begin the process of putting a disfavored department in academic receivership by appointing an official to make recommendations about its operations and curriculum, (6) empower internal campus law enforcement by adding new special officers with the power to remove individuals from campus and even arrest them "when appropriate"; and (7) incorporate a new definition of antisemitism, which makes criticisms of Israel punishable. *Id.* at ¶¶ 125-134.

While the definition of antisemitism that Columbia adopted is not the IHRA definition the Agencies mention in their March 13 letter, the one Columbia did adopt is similarly expansive. *Id.* at ¶ 89, n. 76. Columbia's definition suggests the following as examples of antisemitism: statements like "Zionist trustees and donors keep your hands off our university"; calling for divestment solely from Israel; alleged threats from Israeli veterans; and double standards applied to Israel. Task Force on Antisemitism, *Report #2: Columbia University Student Experiences of Antisemitism and Recommendations for Promoting Shared Values and Inclusion*

(Aug. 2024), at 44-45, available at https://www.columbia.edu/content/report-2-task-forceantisemitism.

In fact, Columbia's Task Force on Antisemitism explained that its definition is a "working" definition that is only for "pedagogy and training purposes." *Id.* That is because "it is likely to evolve based on further research" and "might also evolve over time to take into account the way that the Department of Education and the courts interpret and apply Title VI." Columbia University Taskforce Report at 44, n. 91. As Columbia acknowledges in the same report, Executive Order 13899 directs agencies enforcing Title VI to consider the IHRA's "non-legally binding working definition of Anti-Semitism and its "Contemporary Examples of antisemitism." *Id.* at 45, n. 93.

In response to Columbia's March 21 letter directly complying with the Government's demands, the Committee posted the following on X: "Columbia FOLDS," acknowledging that Columbia was capitulating. 2AC at ¶ 124. The Agency Defendants similarly described the March 21 letter, stating that the letter "outlin[ed] actions the university is taking *in response* to the…March 13[th] letter detailing 9 preconditions for formal negotiations to restore canceled federal grants and contracts." HHS Press Office, *HHS, ED, and GSA Respond to Columbia University's Actions to Comply with Joint Task Force Pre-Conditions* (March 24, 2025), available at: https://www.hhs.gov/press-room/columbia-comply-anti-semitism-task-force-preconditions-met.html.

**B. Plaintiffs have been harmed by Columbia's attacks on their speech.**

Plaintiffs are all students at either Columbia University or Barnard College. Dkt. 62 at ¶¶ 13-20. All Plaintiffs are harmed by Columbia's still-pending obligations to disclose individual and associational student records responsive to the Committee's February 13 letter.

All Plaintiffs are harmed by Columbia's changed campus policies, and those harms will persist so long as the policies that cause them persist.

All Plaintiffs have spoken out about Palestine and intend to speak out in the future. *Id.* at ¶¶ 143-44. All Plaintiffs have attended pro-Palestine events where students express views that would violate Columbia's new, expansive definition of antisemitism because students single out Israel for its atrocities in Gaza. *Id.* at ¶ 148. In fact, some Plaintiffs have changed what they do and say to comply with Columbia's new definition of antisemitism. *Id.* at ¶¶ 134, 150. For instance, Plaintiffs Roe, Loe, Noe, and Joe no longer wear Keffiyeh. *Id.*

Plaintiffs Roe, Loe, Noe, Moe, Soe, and Joe have all either started avoiding discussing the subject altogether or changed the way they discuss Israel—whether through rephrasing their opinions, not using the words "Israel" or "genocide," or not sharing any criticisms they may have of Israel—because of Columbia's new definition. *Id.* at ¶ 150.

Plaintiff Loe now hides stickers on her journal that express support of Palestine and attends fewer demonstrations in support of Palestine than she would like to. *Id.* at ¶ 150. Along the same lines, Plaintiff Noe also no longer attends Palestine-related protests and events and even avoids walking by protests out of fear that he may be associated with the protestors, or the protestors may be associated with him. *Id.* When Plaintiff Soe attends protests, they avoid walking directly from class to the protest out of fear of being identified. *Id.*

Plaintiffs Mahmoud Khalil, Ned Noe, Lucy Loe, Will Moe, and Sally Roe were each present at or attended expressive events specifically identified by the Committee's February 13 Letter. *Id.* at ¶ 149. Plaintiffs Ned Noe, Sally Roe, Jane Joe, and Mahmoud Khalil have all directly been subjected to the disciplinary process based on allegations of direct/indirect involvement with at least one event outlined in the February 13 letter. *Id.* at ¶ 152.

Furthermore, several Plaintiffs are affected by Columbia's compelled changes to the MESAAS department. Kam Koe and Sam Soe intended to take classes in the MESAAS department but are deterred by the threat of receivership. *Id.* at ¶ 154. Lucy Loe enrolled in a class in MESAAS but later withdrew because she feared discussions in class could lead to targeting. *Id.* Jane Joe fears even engaging with faculty at MESAAS out of fear that it would subject her and the MESAAS faculty to additional scrutiny. *Id.* at ¶ 155.

### C. University Defendants contract with their students to protect their private records.

Columbia made specific, enforceable promises to students regarding speech and academic freedom, including through the Columbia University Code of Conduct, which states that Columbia "will not rule any subject or form of expression out of order on the ground that it is objectionable, offensive, immoral, or untrue." *Id.* at ¶ 210; *see id.* at ¶ 211-212. The University has breached these promises by, among other things, infringing on Plaintiffs' speech rights in violation of the Columbia University Code of Conduct. *Id.* at ¶ 213.

## LEGAL STANDARD

To survive a dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *id.* at 556).

To survive dismissal under a Rule 12(b)(1) motion to dismiss for lack of standing, plaintiffs must establish that they have standing by alleging facts that affirmatively and plausibly demonstrate (1) a concrete and particularized injury in fact, (2) that is fairly traceable to the defendant's conduct, and (3) likely to be redressed by a favorable decision. *Lujan v. Defs.*

*of Wildlife*, 504 U.S. 555, 560–61 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). And when assessing standing, courts "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Additionally, where standing and state action are fact-intensive inquiries— as they are here—motions to dismiss are generally disfavored. *See Cornelio v. Connecticut*, 32 F.4th 160, 172 (2d Cir. 2022) ("[t]he dismissal of a claim challenging a law that abridges protected speech "will rarely, if ever, be appropriate at the pleading stage. Instead, factual development will likely be indispensable to the assessment of whether [such a law] is constitutionally permissible").

## ARGUMENT

### I.    Columbia is a state actor liable for violating Plaintiffs' First Amendment rights.

Columbia acknowledges that it is liable on the same terms as the Government if its conduct is "fairly attributable to the state." ECF 84 at 18; *See Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 111 (2d Cir. 2003). And the parties agree that conduct is fairly attributable to the state under two tests relevant here: the compulsion test and the close nexus test. The compulsion test finds state action "when the government compels the private entity to take a particular action," *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019). The close nexus test finds state action "when the state provides significant encouragement" to the private party to act or when the private party is a "willful participant in joint activity with the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012). Columbia is a state actor under either test.

Columbia asserts that its response to the Committee and the Agencies is nothing more than a private party "responding at arms-length to government inquiries, requests, or

7

demands." Dkt. 84 at 19. But the question of state action is a "necessarily fact-bound inquiry," regardless of which test the Court applies. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982). Here, the Government Defendants have not just threatened regulatory action but have inserted themselves into the minutiae of Columbia's operations. That includes by, for example, dictating how its disciplinary proceedings work and against whom, what definitions Columbia must adopt, which programs the school must put under academic receivership, and whether students can protest anonymously. The "imprint of state power" on these campus policies is undeniable. *Blum v. Yaretsky*, 457 U.S. 991, 1014, 102 S. Ct. 2777, 2791(1982). Even Columbia acknowledges that the Government Defendants' conduct "crystalized efforts that were already underway," a concession substantial enough to defeat Columbia's state action arguments at the motion to dismiss stage. Dkt. 84 at 23.

To coerce Columbia into suppressing a disfavored view, the Committee has required Columbia to open up a pipeline of information generated by the school's disciplinary process, a process that is more punitive and far-reaching after Columbia capitulated to the Agencies' March 13 demands.  Dkt. 62 at ¶¶ 49-57. And, because of the many forms of coercion, Columbia capitulated and participated directly in the rights violations alleged in this case. The University conveniently ignored these facts and instead characterized the letters and their responses in isolation from the context in order to avoid constitutional responsibility as a state actor. Such characterization betrays what the University aims to hide: that they are under the thumb of Government Defendants and will continue to engage in rights violations undercover as "private" entities. This is the result of successful and effective jawboning, which "allows government officials to be more effective in their speech-suppression efforts 'because

8

intermediaries will often be less invested in the speaker's message and thus less likely to risk the regulator's ire.'" *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024)

Even if this Court were to find that Columbia is not a state actor, it is still on the hook for the constitutional violations alleged as they are the custodians of the records sought.

**A. Columbia's disclosure of individual and associational records pursuant to the Committee's February 13 letter is state action**

Columbia describes its response to the Committee's February 13 letter as "a private party's mere furnishing of information to government officials." Dkt. 84 at 19. But Columbia has done much more than this. The February 13 letter explains that the Committee expects Columbia to fulfill their "promises and commitments" to punish students in a manner which the Committee deems appropriate. And the demand for records is a way for the Committee to ensure Columbia complies. This intent is not speculative. It is what the February 13 letter says. And the Committee has made clear—through numerous hearings, previous records requests, publications, and continued pressure on the University to fulfil its promises "to end or curb" disfavored expressions—that the Committee means what the February 13 letter says. Dkt. 62 at ¶¶ 185; Dkt. 82-5.

With this in mind, Columbia downplays the extent of the Committee's demands in the February 13 letter. Dkt 84 at 9. The text of the Committee's February 13 letter makes clear that it is aimed at remedying Columbia's "fail[ure] to uphold its commitments"— commitments made via "public and private promises to…Members of Congress"—to use its campus rules to suppress pro-Palestine speech. Dkt. 82-5 at 2-3. And, this letter is just the most recent of similar information requests about individual and associational records, and it escalates the amount of information and degree of control the Committee seeks over Columbia. Dkt. 62 at ¶¶ 49-64. Thus, the February 13 letter is but one attempt of many to

confirm that Columbia has done what the Committee has ordered it to do: punish and suppress pro-Palestine speech.

This satisfies the compulsion test, because it is the Committee—by demanding the punishment—that is "compelling the conduct." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014). Indeed, on March 19, Columbia provided disciplinary records the Committee did not ask for, because Columbia believed "the Committee will be interested in the disciplinary measures taken" against pro-Palestine students. Dkt. 82-8 at 2. In short, Columbia is already imposing the punishments it knows the Committee expects it to.

But these facts more easily satisfy the close nexus test, which requires only that the Committee provide "significant encouragement" to Columbia to punish pro-Palestine students or for Plaintiffs to demonstrate that campus officials have become "willful participant[s] in joint activity with the state." *Sybalski*, 546 F.3d at 257. Having demanded records about ongoing disciplinary proceedings regarding disfavored expressions, the Committee has become enmeshed in Columbia's campus affairs. *See* Dkt. 82-6 (explaining that Columbia is producing the "existing" case files and that "as further developments" occur the school can "provide updates"). This entanglement between Columbia and the Committee makes the school a state actor. *See Evans v. Newton*, 382 U.S. 296, (1966) ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action").

And contrary to Columbia's characterization, *Fakhreddine v. Univ. of Pa.* did not involve "distinctly similar constitutional claims." No. 24 Civ. 1034, 2025 WL 345089 (E.D. Pa. Jan. 30, 2025); Dkt. 84 at 10. *Fakhreddine* centered on a single House Committee information

10

request, with no demands for the university to punish anyone. The depth and breadth of the demands here necessitate an outcome different than *Fakhreddine*.

But Columbia's disclosure of individualized disciplinary records, which contain associational and other identifiable information about pro-Palestine students, implicates Plaintiffs' First Amendment rights—whether or not Columbia is a state actor. Even if the Court overlooks the Committee's demand for student punishment, Plaintiffs can challenge Columbia's production of records directly. In the Second Circuit, a third party has standing to challenge the records produced by a custodian. *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019), *vacated and remanded sub nom. Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020) ("there is no dispute that Plaintiffs had standing in the District Court to challenge the lawfulness of the Committees' subpoenas by seeking injunctive relief against the Banks as custodians of the documents"). Even where "government-compelled disclosure is directed at a third party," "First Amendment rights are implicated." *See Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO, v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 271 (2d Cir. 1981) (collecting cases). That is, the Plaintiffs' constitutionally protected information in Columbia's possession is "entitled to the same protection" as if it were possessed by the Plaintiffs themselves. *Id. see also Fisher v. United States*, 425 U.S. 391, 401 (1976) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). "This is so because the constitutionally protected right, freedom to associate freely and anonymously, will be chilled equally whether the associational information is compelled from the organization itself *or from third parties.*" *In re First Nat'l Bank, Englewood, Colo.*, 701 F.2d 115, 118 (10th Cir. 1983) (emphasis added).

Here, the Court need not look any further than Columbia's response to the Government Defendants' demands. In response to the Committee's February 13 Letter,

Columbia has already turned over the private student records of Plaintiffs or those associated with Plaintiffs, inflicting the injury upon dissemination. Dkt. 62 at ¶¶ 93-99. And Columbia acknowledges that the information disclosed is broader than what was requested, stating that "certain [disclosed] case files may include information related to other incidents." Dkt. 82-6. Columbia will create more records responsive to the February 13 letter as disciplinary proceedings continue. Dkt. 82-6 (welcoming the opportunity "to provide updates" to the Committee "[a]s further developments related to these matters occur"). And a party whose "private information has been disclosed to third parties has standing to sue regardless of whether the third parties used that information to cause additional harm." *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 573 (S.D.N.Y. 2024). That the Committee decided (this time)-to use a letter request instead of a subpoena does not undermine compulsory nature of the information request and absolve Columbia of liability. As explained at length, the Government Defendants have not hidden their expectation that production of these records is mandatory.

## B. Columbia's March 21 policy changes and subsequent enforcement constitute state action

The Agency Defendants' March 13 Letter was not a mere "request" for information or "regulatory demand," as Columbia argues. Dkt. 84 at 21. And the University's March 21 policy changes were not merely routine compliance with government oversight. The Agency letter was a list of nine directives—ranging from specific disciplinary outcomes such as "expulsion or multi-year suspension" for certain student protestors to the abolition of the University Judicial Board. Dkt. 62 at ¶¶ 106-114. The letter describes Columbia's compliance with all of these directives as a "precondition for formal negations regarding Columbia

University's continued financial relationship with the United States government." *Id.* at ¶¶ 107, 123, 176-177; Dkt. 15-2.

The Agencies delivered this ultimatum to Columbia after already informing the school on March 7 that it "would be pausing or terminating federal funding." 2AC at ¶ 6, 103. This is coercion, and the Agency Defendants who made the demands acknowledge it. U.S. Dep't of Health & Hum. Servs., Press Release, HHS, ED, and GSA Respond to Columbia University's Actions to Comply with Joint Task Force Pre-Conditions (Mar. 24, 2025), available at: https://www.hhs.gov/press-room/columbia-comply-anti-semitism-task-force-preconditions-met.html (explaining that "Columbia's compliance with the Task Force's preconditions is only the first step in rehabilitating its relationship with the government"). The Committee Defendants acknowledge it too. (exclaiming "Columbia FOLDS!" and linking to the March 21 policy changes). Dkt. 62 at ¶ 124.

The fact that other universities have been changing their policies in ways similar to Columbia has no bearing on whether Columbia's conduct is "fairly attributable to the state." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). To the contrary, some universities cited by Columbia are subject to similar coercion by the federal government. Indeed, one of those schools—Harvard—decided to sue rather than capitulate.

Plaintiffs are also not asserting a generalized kind of coercion but rather allege that the University "was involved with the *activity that caused the injury* giving rise to the action." *Sybalski v.Indep. Grp. Home Living Program*, 546 F.3d 255, 257-58 (2d Cir. 2008). Here, the University is directly responsible for the harm.

First, Plaintiffs challenge the definition of antisemitism Columbia adopted in response to the Governments' demand that they do so. Plaintiffs make this challenge because

Columbia's antisemitism definition recasts Plaintiffs' past speech and conduct as antisemitic harassment punishable under campus rules. Dkt. 62 at ¶¶ 34, 150, 153 (explaining that Columbia's definition "encompasses things Plaintiffs have already done and said and plan to do and say again in the future"). They did so against the advice of its own taskforce, which correctly warned that Title VI does not allow a school to "offer some protected classes more protection than others." Columbia University Taskforce Report at 45. This, the taskforce explained, would violate Title VI's most basic principle: that "all protected classes [] receive the same treatment." *Id.* By doing so, Columbia has created an ongoing restriction on Plaintiffs' ability to say things Columbia's rules now forbid. Just as the Agency Defendants demanded in their March 13 letter.

Second, the Agencies' ongoing demands to alter campus disciplinary processes affect Plaintiffs who are subject to ongoing disciplinary proceedings. The Agency Defendants demanded that Columbia "centralize all disciplinary processes under the Office of the President." Dkt. 62 at ¶¶ 85, 109, 126. On March 21, Columbia complied, rejiggering its processes so the President's direct report—the Provost—would oversee University Judicial Board processes instead of the Student Senate, making the disciplinary process easier to control. *Id.* These procedures affect Plaintiffs Noe, Ro, Joe, and Mahmoud Khalil who have ongoing disciplinary matters pending at Columbia that regard them, their student groups, or the expressive events they participating in. *Id.* at ¶ 152. The success of these demands is attributable to the Government Defendants' repeated efforts to exert control over how Columbia disciplines its students and faculty.

Columbia's new rule against anonymous protests and a corollary increase of law enforcement power on campus shows this control as well. The Agency Defendants demanded

a mask ban on March 13th, and Columbia gave them one the following week that applies only to "individuals who engage in protests or demonstrations." *Id.* at ¶ 129. Many plaintiffs are among those who wear masks at protests and demonstrations to protect their safety given the high risk of coming under federal scrutiny simply for speaking about Palestine. *Id.* at ¶ 151. The mask ban and heightened enforcement power represents the University's clear attempt to help the Government Defendants identify pro-Palestine students who refuse to self-censor. *Id.* at ¶¶ 134, 151.

Likewise, the Agency Defendants demanded that Columbia "begin the process of placing [a disfavored academic department] under academic receivership." March 13 Letter at 2. Eight days later, Columbia did just that—"we are appointing a new Senior Vice Provost this week"—and there are "recommendations…about necessary changes" in the works. Dkt. 40-1. The interference with this academic program affects Plaintiffs directly who have taken classes in this department and seek to do so again in the future. Dkt. 62 at ¶ 154.

In the face of this mountain of evidence, Columbia relies on *Gilman v. Marsh & McLennan Cos.* and *Fakhreddine* to cloud the relationship between the Agency Defendants' March 13 demands and related federal pressure and Columbia's March 21 policy changes. But this reliance is misplaced. *Gilman* involved a company's internal employment decisions in the context of a government investigation into its own potential wrongdoing, where the company had "supremely reasonable, independent interests for … cooperating." 826 F.3d at 77. Here, Columbia is not seeking "better treatment" but is acting under the direct and explicit threat of losing hundreds of millions, potentially billions, in federal funding if it fails to implement specific government-dictated policies aimed at suppressing student speech. This is

not cooperation for leniency. It is capitulation to compulsion, with the target being the disfavored views of pro-Palestine students.

**II.    Plaintiffs have standing to bring their First Amendment claims against Columbia.**

In making their arguments against Plaintiffs' standing, Columbia urges the Court to assess its conduct in response to the Committee's February 13 letter separately from its conduct in response to the Agency Defendants' March 13 demands, Dkt. 84 at 16, and in isolation from the context in which Columbia made its decisions to comply with both. Such a characterization obfuscates the extent to which the school has been overtaken by the Government Defendants. To be clear: at the direction of the Committee and the Agencies, Columbia has decided to suppress the views of pro-Palestine students the Government Defendants disfavor.

While the February 13 letter demands documents and the March 13 letter demands policy changes, both call for discipline and the suppression of Plaintiffs' speech. The Committee's efforts and the Agencies' efforts complement each other. The Agency Defendants' March 13 demands reference the Committee's investigation, Dkt. 15-2, and the Committee's February 13 letter references the federal funding the Agency Defendants would soon pause and terminate. Dkt. 82-5. The production of student discipline records and the alteration of disciplinary processes work in concert to make punishing Plaintiffs and other students easier, faster, and verifiable to the Government Defendants. This impacts all Plaintiffs who are already subject to ongoing disciplinary proceedings. Dkt. 62 at ¶ 152. It also impacts those who have done and said things (or plan to do and say things) that Columbia has now made punishable—in accordance with their new definition of antisemitism. *Id.* at ¶¶ 150, 153. Columbia is directly responsible for this. The harm that follows—the restraints on Plaintiffs' pro-Palestine speech—are traceable to Columbia's conduct.

Furthermore, the injury is actual because Columbia has already produced records and imminent because its response to the February 13 letter is ongoing. *Eletson Holdings, Inc.*, 731 F. Supp. 3d at 573 ("A party whose "private information has been disclosed to third parties has standing to sue regardless of whether the third parties used that information to cause additional harm"). As Columbia acknowledges, disciplinary proceedings about the Hind's House art exhibit are still "being investigated and adjudicated." Dkt. 82-7 at 7. The same goes for other pro-Palestine campus events. *Id.* Once these records are created, they will be responsive to the February 13 letter. And Columbia is eager "to provide updates" whenever there are "further developments related to these matters." Dkt. 82-6.

These injuries are based on the release of students' private information, including as to their protected speech and associations. The injuries are ongoing because Columbia's response to the February 13 Letter is ongoing. *See* Dkt. 56 (Columbia explains that the Committee has "posed follow-up questions"). With regards to the Hind's House art exhibit, for example, Columbia compiled a file "covering multiple incidents and numerous reports," but just one day prior to producing disciplinary records to the Committee, Columbia created a disciplinary record to turn over: "a determination letter…finding the student group respondent responsible for conduct amounting to discriminatory harassment." ECF 82-7 at 7. The announcement that "sanctions [regarding the Hind's House exhibition] are forthcoming" is a future injury this Court's intervention can avoid. *Id.*

Indeed, only this Court's Order is currently restraining Columbia's production of individual student records to an additional congressional committee. *See* Dkt. 56, 58. With at least two congressional requests for Columbia's records currently pending and sure to increase in number, the injury to Plaintiffs and their peers is ongoing and imminent.

Furthermore, as Columbia acknowledges, Plaintiffs bring their challenge "in a pre-enforcement posture," which makes Columbia's conduct actionable so long as Plaintiffs can show "an intention to engage in a course of conduct that arguably affects a constitutional interest" and a "credible threat of prosecution." *See Gazzola v. Hochul*, 88 F.4th 186, 202 (2d Cir. 2023). Plaintiffs easily satisfy the standing elements for a pre-enforcement challenge.

First, Plaintiffs have all participated in the public debate about Palestine and Israel, even at great personal cost, which makes their future intentions easy to discern. Dkt. 62 at ¶¶ 34, 37, 40-42, 143-46, 150, 152-53. They have spoken about Palestinian human rights, gathered in protest on campus, organized events commemorating the victims of Israeli atrocities in Gaza, and otherwise sought to listen and speak about a matter of international political importance. *Id.* at ¶¶ 34, 37, 40-42, 143-46, 150, 152-53. These are all expressive activities protected by the First Amendment, and their "past enthusiastic participation" in campus politics is strong evidence of their future plans to again exercise their First Amendment rights in the same way again. *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014). The U.S. Supreme Court has long considered "interactive communication concerning political change" to be "core political speech." *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). Thus, this intended[1] political speech has an obvious constitutional interest.

All Plaintiffs have the intention to speak out about Palestine in the future, and all Plaintiffs, in different ways, hold deep convictions and are highly motivated to speak out

---

[1] Plaintiffs have all exercised their First Amendment so in the past, and in the absence of Defendants' conduct, Plaintiffs would all do so again in the future. *See Peace Ranch LLC v. Bonta* 93 F. 4th 482, 488 (9th Cir. 2024) (explaining that, under *SBA,* "[t]he concept of 'intention is more counterfactual than practical…would [plaintiffs] have the intention to engage in proscribed conduct, were it not proscribed'").

against the atrocities being perpetrated in Palestine because of their personal convictions and discontent funding an institution they view to be complicit in a genocide. *Id.* at ¶¶ 144-45. This "credible statement…of intent to commit violative acts" coupled with a "conventional background expectation" of enforcement is enough to satisfy this prong. *See Act Now to Stop War & End Racism Coal. v. D.C.*, 589 F.3d 433, 435 (D.C. Cir. 2009).

Likewise, six Plaintiffs have worn masks in the past to engage in protected protest activity in order to prevent doxing and harassment. Dkt. 62 at ¶¶ 150-51. Those Plaintiffs would wear masks again for the same reasons, but because the Agency Defendants, as a form of viewpoint discrimination, demanded a ban on anonymous protesting, Plaintiffs are on a collision course with Columbia's new rules and further disciplinary action. *Id.*

Other plaintiffs have been successfully deterred from expressing forbidden ideas about Palestine and Israel, which also satisfies this prong. *Id.* The fact that Plaintiffs "feel forced to speak less openly" on topics they've discussed in the past "is more than enough at the pleading stage to assert their desire to engage in a course of conduct affected with a constitutional interest." *Cerame*, 123 F.4[th] at 83. Indeed, "courts must ask whether the plaintiff would have the intention to engage in the prescribed conduct, were it not proscribed." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024). Here, each Plaintiff deterred makes clear that it is the suppressive efforts of Defendants that are causing them to alter their conduct. Dkt. 62 at ¶¶ 150 (Roe no longer wears keffiyeh despite it being an important symbol of her ancestry, and she now refrains from even saying or writing the words Israel, let alone critiquing its government, for fear of reprisal; (Moe no longer holds expressive events that support Palestine; Joe no longer wears a Keffiyeh or expresses her Palestinian identity and she also is selective about discussing Gaza, or otherwise rephrases what she previously planned to say

to avoid being accused of antisemitism; Loe no longer wears a Keffiyeh, avoids attending demonstrations, and avoids using specific words when describing what is happening in Palestine; Noe avoids discussing Palestine, takes extraordinary measures when he does discuss Palestine, and no longer wears a Keffiyeh; Soe avoids discussing Palestine or criticizing Israel in class, and is careful about what she says about demonstrations).

Finally, there is a credible and sufficiently imminent threat of prosecution. *Susan B. Anthony List*, 573 U.S. at 159. A threat of prosecution is presumed when what is challenged "facially restrict[s] expressive activity." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022). Here, Columbia's new definition of antisemitism restricts expressive activity on its face. 2AC at ¶ 195. It prohibits students from criticizing Israel for having undue influence on our country's politics – long considered a trope by pro-Israel groups – despite significant evidence as to this issue.[2] It would prohibit students from criticizing Israel as a racist state for giving greater Israeli citizenship rights to a Jewish person born and raised in New York City than a Palestinian born and raised in Jerusalem, despite the International Court of Justice making such a finding. Dkt. 62 at n.21. Columbia's definition of antisemitism is so extreme that it could find a speech code violation each time a student calls out Israel's genocide in Gaza but does not mention the one in Sudan. *See Univ. of Houston Students for Justice in Palestine v. Abbott*, 756 F.Supp.3d 410, 427. (W.D. Tex. 2024) (holding that a university's policies implementing the IHRA definition of antisemitism "impose impermissible viewpoint discrimination that chills speech in violation of the First Amendment"). In short, Columbia's definition of

---

[2] *See, e.g.*, Walt, Stephen and John J. Mearsheimer, *The Israel Lobby and U.S. Foreign Policy,* KSG Faculty Research Working Paper Series RWP06-011, March 2006.

antisemitism facially restricts certain views about Israel that Plaintiffs hold and want to express.

Furthermore, "past enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." *Susan B. Anthony List*, 573 U.S. at 164). Here, Mahmoud Khalil is in prison for his speech, which is similar in content to that expressed by other plaintiffs. Dkt. 62 at ¶ 150. Defendants have all done things to suppress the pro-Palestine views of Plaintiffs—either directly or via the student groups with which they associate— because Defendants disfavor that view.

Columbia has touted the severe punishments they have meted out to students, making it clear that campus officials remain committed to serving as the state's cudgel in suppressing the viewpoints held and speech expressed by Plaintiffs. In the March 21 letter, the University Defendants appeared to brag about the punishments imposed to date—highlighting that students who violated Columbia's rules "during the first encampment or at Hamilton Hall have been suspended, expelled, or had their degrees temporarily revoked" Dkt. 40-1 at 1; Dkt 62 at ¶¶ 109, 125—and assured the Agencies that additional disciplinary proceedings were "ongoing." ECF 56 at 1. By all measures, Columbia Defendants are committed to their course of action. Dkt. 62 at ¶¶ 123-34. The threat of future enforcement is extremely high.

Consequently, for Plaintiffs who have engaged in similar past activism but have not yet been disciplined, their past speech is now punishable in light of Columbia's new definition of antisemitism. *Id.* at ¶¶ 152-53. The imminence of this injury is amplified by the fact that Columbia has a practice of disciplining "active alumni" for past conduct, demonstrating an ongoing disciplinary reach based on Columbia's practices. *Id.* at ¶ 11.

More broadly, the Government Defendants' demands on Columbia have warped the campus debate in which Plaintiffs—as speakers and listeners—participate. *See Cuesnongle v. Ramos,* 713 F.2d 881, 884 (1st Cir. 1983) (there is "a zone of First Amendment protection for the educational process itself, which, in proper circumstances, must include not only students and teachers but their host institutions as well"). Plaintiffs, other students, and faculty will continue censoring themselves to avoid violating the Israel-specific speech code Columbia has adopted, a problem that gives rise to Plaintiffs' facial challenge. *See United States v. Hansen*, 599 U.S. 762, 770 (2023) ("the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak."). Thus, Defendants are engaging in censorship that is a "pervasive threat" that poses a "danger to freedom of discussion," *Thornhill v. Alabama,* 310 U.S. 88, 97 (1940). Because this injury is ongoing, it is both actual and imminent.

## III. PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM FOR BREACH OF CONTRACT.

In its Motion to Dismiss, Columbia alleges that its repeated promises of free expression and academic freedom were mere "general statement[s] of policy" or "puffery" not amounting to enforceable contractual obligations. ECF 84 at 24 (quoting *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 421 (S.D.N.Y. 2021) (cleaned up), *aff'd sub nom. Tapinekis v. Pace Univ.*, No. 22 Civ. 1058, 2024 WL 2764146 (2d Cir. May 30, 2024)). This interpretation of the governing law and Columbia's role and responsibilities towards its students misapprehends New York law and the specific nature of the commitments Columbia has made.

"Under New York law, an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and

completes the required courses, the university must award him a degree. *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (internal citations omitted). The "terms of the implied contract are 'contained in the university's bulletins, circulars and regulations made available to the student.'" *Id.* (quoting *Vought v. Teachers Coll., Columbia Univ.,* 127 A.D.2d 654, 654, 511 N.Y.S.2d 880 (2d Dep't 1987)). Importantly, "implicit in the contract" between student and university "is the requirement that the institution 'act in good faith in its dealing with its students.' *Id.* (quoting *Olsson v. Bd. of Higher Educ.,* 49 N.Y.2d 408, 413–14, 426 N.Y.S.2d 248, 402 N.E.2d 1150 (1980)). So, while New York courts do afford deference to universities in academic matters, *see* ECF 84 at 2, this deference does not extend to ignoring specific and enforceable promises to students.

### C. Columbia made specific, enforceable promises to Plaintiffs.

Columbia made specific promises to all Plaintiffs regarding diversity, freedom of speech, academic freedom, and good faith and fair dealing in its contracts, student and faculty manuals, on its websites, and in written pronouncements and assertions by officers and others authorized to speak for Columbia. 2AC at ¶ 209. Plaintiffs easily identify specific, material promises made by Columbia in its Rules of University Conduct, Section 440 ("Affirmative Statement"), which states:

> To be true to these principles, the University cannot and will not rule any subject or form of expression out of order on the ground that it is objectionable, offensive, immoral, or untrue. Viewpoints will inevitably conflict, and members of the University community will disagree with and may even take offense at both the opinions expressed by others and the manner in which they are expressed. But the role of the University is not to shield individuals from positions that they find unwelcome. Rather, the University is a place for received wisdom and firmly held views to be tested, and tested again, so that members of the University community can listen, challenge each other, and be challenged in return."

23

*Id.* at at ¶ 210. Contrary to what University defendants try to contend, this is not a "general statement of policy" akin to those found insufficient in cases like *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016). In *Nungesser*, the court found a general statement in the university's gender-based misconduct policy about being "committed to providing an environment free from gender-based discrimination and harassment" to be too general to form the basis of a contract claim challenging the outcome of a specific internal disciplinary process. *Id.* The present case here is plainly distinguishable. Plaintiffs here point to the explicit and foundational commitments in §440 of the Rules of University Conduct, which declare that "the University cannot and will not rule any subject or form of expression out of order on the ground that it is objectionable, offensive, immoral, or untrue" and that its role "is not to shield individuals from positions that they find unwelcome." Dkt. 62 at ¶ 210. This is not a general commitment to an "environment," but a specific, actionable *limitation* on the University's power to regulate speech and a core component of the academic experience promised to students. In fact, many Plaintiffs attended Columbia because of its commitment to free speech and freedom of expression, as it is maintained in Section 440. *Id.* at ¶¶ 8, 146.

Additionally,  on October 11, 2023 (in response to October 7, 2023), the University Provost reiterated the promises made in Section 440, writing that "[a]t this challenging time, when so many in our community are affected deeply by global events, I write to remind everyone that freedom of expression is *a core University value* and it is our collective responsibility to uphold the principles of civic debate and discourse." *Id.* at ¶ 211 (emphasis added). Furthermore, Columbia reiterated this commitment in its March 21 Announcement, stating that "[f]reedom of expression is what enables the rigorous debate and free inquiry *on which our academic mission depends*." March 21 Announcement at 1 (emphasis added).

24

As illustrated above, the breach alleged by Plaintiffs is not merely dissatisfaction with a routine disciplinary outcome like the cases Columbia attempted to use as a shield but a calculated and systemic abandonment of these explicitly promised rules concerning expression, which was compelled by external government pressure and resulted in the University doing precisely what Section 440 states it "cannot and will not" do. Such specific and fundamental promises, central to the university-student relationship, are indeed enforceable commitments upon which the Plaintiffs relied when choosing to attend and pay tuition to Columbia.

### D. Columbia breached the promises it made to Plaintiffs.

Throughout the entirety of their Second Amended Complaint, and within this Opposition, Plaintiffs have repeatedly illustrated how Columbia breached the specific promises that it made to Plaintiffs. By capitulating to the Committee's February 13 demands and the Agencies March 13 demands, Columbia has "rule[d] ... subject[s] or form[s] of expression out of order on the ground that [they are] objectionable," Dkt. 62 at ¶ 210. Columbia is actively "shield[ing] individuals" (namely, those who object to pro-Palestinian speech) from "positions that they find unwelcome," contrary to its explicit promise made in Section 440. *Id.* at ¶ 210.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the University Defendants' motion to dismiss in its entirety.

Dated: June 20, 2025                    Respectfully Submitted,

                                        /s/  Amy E. Greer

                                        Amy E. Greer (NY 5910179) (lead counsel)
                                        **Dratel & Lewis**
                                        29 Broadway, Suite 1412

25

New York, NY 10006
(212) 732-8805
agreer@dratellewis.com

**CAIR NATIONAL**
**LEGAL DEFENSE FUND**
/s/Lena Masri
Lena Masri
Gadeir Abbas (VA 81161)*
Nadia Bayado (DC 90023648)
453 New Jersey Ave SE
Washington, DC 20003
(202) 742-6420

**COUNCIL ON AMERICAN ISLAMIC**
**RELATIONS – NEW YORK**
/s/Lamya Agarwala
Lamya Agarwala (NY 5736061)
80 Broad Street, 5th Floor
New York, NY 10009
(646) 665-7599
lagarwala@cair.com

**Jonathan Wallace**
/s/ Jonathan Wallace
Jonathan Wallace (NY 1733757)
PO #728
Amagansett NY 11930
(917) 359-6234
jonathan.wallace80@gmail.com

*Licensed in VA, practice limited to federal matters*

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this opposition contains 7,385 words.

_/s/ Gadeir Abbas_

Gadeir Abbas