**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Mahmoud Khalil, et al.,

     *Plaintiffs,*

v.

Columbia University and the Trustees of
Columbia University, et al.,

     *Defendants.*

Civil Case No. 1:25-cv-02079-AS

Hon. Judge Arun Subramanian

**PLAINTIFFS' OPPOSITION TO THE CONGRESSIONAL COMMITTEE
DEFENDANTS' MOTION TO DISMISS**

Table of Contents

Table of Contents..............................................................................................................i

Table of Authorities........................................................................................................iii

INTRODUCTION.............................................................................................................1

BACKGROUND...............................................................................................................3

      A.      Committee Defendants' Relentless Campaign to Identify,
             Punish, and Target Pro-Palestine Protestors, including Plaintiffs............................3

            1. Protected Speech is at Issue in this Case...........................................................4

            2. Committee Defendants' Definition of Antisemitism Abridges
               Protected Speech..............................................................................................7

LEGAL STANDARD........................................................................................................10

ARGUMENT....................................................................................................................11

      A. This Court Has Subject Matter Jurisdiction.................................................11

            1. The Speech and Debate Clause does not immunize
              the Congressional Defendants from violating
              Plaintiffs' First Amendment rights by demanding
              that Columbia University punish students and turn
              over individual student records and associational
              membership rolls..........................................................................................11

                a. The Committee's actions have no legitimate
                   legislative purpose and are clearly intended
                   threaten exposure through extraction of
                   individual student records and associational
                   rolls from Columbia....................................................................................13

                b.  The Committee's motivation is viewpoint
                   suppression................................................................................................16

               2. There is no relation between the information sought
               and any valid legislative purpose.................................................................18

B. Plaintiffs have standing..............................................................................................23

C. The Committee is not a necessary party......................................................................26

CONCLUSION.......................................................................................................................28

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
    LIMITATION, TYPEFACE REQUIREMENTS
    AND TYPE STYLE REQUIREMENTS...........................................................................30

Table of Authorities

Cases

Ashcroft v. Iqbal, 556 U.S. 662 (2009)..................................................................10

Bantam Books, Inc. v. Sullivan, 372 U.S. 58 (1963)........................................2, 13, 21

Barenblatt v. United States, 360 U.S. 109 (1959)..................................................22

Bastien v Off. of Senator Ben Nighthorse Campbell,
    2005 US Dist LEXIS 34368 (D Colo Dec. 1, 2005,
    Civil Action No. 01-CV-799-CAB (OES)..........................................................27

Bates v. Little Rock, 361 U.S. 516 (1960).............................................................20

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)....................................................10

Buckley v. Valeo, 424 U.S. 1 (1976)...................................................................16

Connick v. Myers, 461 U.S. 138 (1983)................................................................10

Cornelio v. Connecticut, 32 F.4th 160 (2d Cir. 2022).............................................10

Dickinson v Indiana State Election Bd., 933 F2d 497 (7th Cir 1991)..........................28

Doe v. Mc Millan, 412 U.S. 306 (1973)...............................................................14

Eastland, 488 F.2d 1252 (D.C. Cir. 1973)............................................................25

Eastland v. U.S. Servicemen's Fund, 421 U.S. 491 (1975)............................3, 12, 26, 27

Fakhreddine v. Univ. of Pennsylvania,
    No. 24-CV-1034, 2025 WL 345089 (E.D. Pa. Jan. 30, 2025)..............................13

Gates v Collier, 501 F2d 1291 (5th Cir 1974)........................................................28

Gibson v. Fla. Legis. Investigation Comm., 372 U.S. 539 (1963)..................18, 20, 22, 23

Gravel v. United States, 408 U.S. 606 (1972).....................................................2, 12

Hellebust v Brownback, 824 F Supp 1511 (D Kan 1993),
    affirmed  42 F3d 1331 (10th Cir 1994)............................................................28

Lujan v. Defs. of Wildlife, 504 U.S. 555 (1992)..........................................................10

Moody v. NetChoice, 603 U.S. 707 (2024)................................................................16

National Abortion Fed'n v. Center for Med. Progress,
   2015 WL 5818863 (N.D. Cal. Oct. 6, 2015)........................................................26

National Association for Advancement of Colored People v. State of Ala. ex rel. Patterson,
   357 U.S. 449, 463 (1958).................................................................................22

National Rifle Association v. Vullo, 602 U.S. 175 (2024)...........................1, 2, 4, 5, 9, 12, 21, 22

Ottworth v PNC Bank, 2019 US Dist LEXIS 248957
   (WD Mich Sep. 26, 2019, No. 1:18-cv-625)......................................................27

Ottworth v PNC Bank, 2020 U.S. App. LEXIS 23752 (6th Cir. 2020),
   cert. den. 141 S. Ct. 1126 (2021)....................................................................27

Republican National Committee v. Pelosi, 602 F.Supp.3d 1 (D.D.C. 2022)..............................11

Republican National Committee v. Pelosi, No. 22-5123,
   2022 WL 4349778 (D.C. Cir. September 16, 2022)..........................................11

Senate Select Comm. on Presidential Campaign Activities v. Nixon,
   498 F.2d 725 (D.C. Cir. 1974).......................................................................25

Snyder v. Phelps, 562 U.S. 443 (2011).............................................................10, 17

Spokeo, Inc. v. Robins, 578 U.S. 330 (2016).............................................................10

Terminiello v. City of Chicago, 337 U.S. 1 (1949)......................................................17

Trump v. Mazars USA, LLP, 140 S. Ct. 2019 (2020)...........................................25, 26, 27

United States v. American Tel. & Tel. Co., 419 F. Supp. 454 (D.C.C. 1976)........................25, 26

United States v. American Tel. & Tel. Co., 551 F.2d 384 (D.C. Cir. 1976)..........................25, 26

United States v Am. Tel. & Tel. Co., 185 US App DC 254, 567 F2d 121 (1977).......................27

United States v Benson, 2005 US Dist LEXIS 7630
   (ND Ill Apr. 19, 2005, No. 04 C 7403).............................................................27

United States v. Brewster, 408 U.S. 501 (1972)............................................................12

United States Service-men's Fund v. Eastland, 421 U.S. 491 (1975)............................25

Warth v. Seldin, 422 U.S. 490 (1975)..........................................................................10

Watkins v. United States, 354 U.S. 178 (1957)....................................................2, 18, 22

Statutes & Other Authorities

Civil Rights Act of 1964 § 601, 42 U.S.C.A. § 2000d.........................................*passim*

Exec. Order No. 13899, 84 Fed. Reg. 68779 (2019). ..................................................16

Federal Rule of Civil Procedure, Rule 12(b)(1)............................................................10

Federal Rule of Civil Procedure, Rule 12(b)(6)............................................................10

Federal Rule of Civil Procedure, Rule 19 .....................................................................26

U.S. Const. art. I, § 6, cl. 1.........................................................................*passim*

## INTRODUCTION

For nearly eighteen months, Congressional Defendants have been actively engaged in the unconstitutional act of coercing Columbia University into harshly disciplining students who engage in protected speech and advocacy based solely on viewpoints they hold and express, generating a significant repository of disciplinary records, which the Committee Defendants then demand Columbia hand over. Columbia's compliance continues the vicious cycle.

In their Memorandum in Support of their Motion to Dismiss, Dkt. 81, Committee Defendants attempt to soften their coercion of Columbia by focusing their attention entirely on the contents of the February 13, 2025, Letter, but to focus solely on that single letter loses the critical context surrounding the Letter. After eighteen months of relentless threats, demands, and public humiliation of Columbia Defendants, the February 13 Letter unquestionably carries with it the specter of the numerous prior letters and communications, along with the compulsion of prior subpoenas. For this precise reason, Justice Gorsuch cautioned in his brief concurrence in *National Rifle Association v. Vullo* that when considering jawbone allegations, context matters.[1] Here, Committee Defendants have been so relentless in their threats, demands, and public humiliation of Columbia Defendants, that they now need only submit a letter demanding information, and Columbia not only provides it without question, but provides even more than what was demanded.

Committee Defendants cannot legislate to curb protected associational and political speech rights of Plaintiffs and similarly situated students who are speaking and protesting about matters of great public concern – Palestinian rights and dignity and Israel's assault on

---

[1] *National Rifle Association v. Vullo*, 602 U.S. 175, 199 (2024) (Gorsuch, J. concurring).

the Palestinian people in Gaza and the Occupied West Bank – while remaining inside the boundaries of the First Amendment. Instead, they are engaging in an "informal system of censorship,"[2] doing through Columbia what it cannot do directly – discriminate against, punish, and chill speech solely because of its contents – through coercive and persistent pressure on Columbia. This effort has yielded for Committee Defendants, by its own account, thousands of pages of records, including the individual and associational records of Plaintiffs and other Columbia and Barnard students. In so doing, Committee Defendants have and continue to unlawfully abridge, the First Amendment rights of Plaintiffs, and, in all likelihood, thousands of students nationwide.

Committee Defendants understandably desire to hide their blatant viewpoint discrimination and suppression of protected political speech within the Trojan horse of their proclaimed legitimate legislative purpose of combatting antisemitism in higher education. However, a legitimate legislative purpose cannot include "actions impinging on individual rights," *Gravel v. United States*, 408 U.S. 606, 620 (1972), or efforts "to expose for the sake of exposure," *Watkins v. United States*, 354 U.S. 178, 200 (1957). Committee Defendants are doing just that, and thus the Speech and Debate Clause does not insulate them from Plaintiffs' claims and the requested relief.

The intent and the effect of Committee Defendants' actions are to chill, suppress, and punish the students' and Plaintiffs' First Amendment expressive and associational rights. And they are successful in doing so by engaging in the ongoing unlawful practice of jawboning.[3]

---

[2] *National Rifle Association v. Vullo*, 602 U.S. 175, 200 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71, 83 (1963)).

[3] "Jawboning" has been recognized as a phenomenon by First Amendment scholars since the late 1970s. *See,* e.g., Paul R. Verkuil, *Jawboning Administrative Agencies: Ex Parte Contacts by the White House*, 80 COLUM. L. REV. 943, 943 (1980). Scholars have theorized jawboning as a practice

Even if Committee Defendants can claim that within this Trojan horse exists a scintilla of a legitimate legislative purpose, the demands for individual and associational student disciplinary records that amount to organizational membership rolls exceed the bounds of that stated purpose, and are far attenuated from any "legitimate task of Congress." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505 (1975).

## BACKGROUND

Plaintiffs filed the present suit to, among other things, challenge Committee Defendants' past and ongoing attempts to unconstitutionally compel University Defendants to relinquish individual and associational student records in order to chill, suppress, and punish those students' viewpoints and constitutionally protected advocacy, and to protect themselves against the identification, exposure, and targeting that emanates from Committee Defendants' procurement of those private individual and associational records. *See* Sec. Am. Compl., Claim I.

### A.    Committee Defendants' Relentless Campaign to Identify, Punish, and Target Pro-Palestine Protestors, including Plaintiffs

The Committee on Education and Workforce ("Committee Defendants") has exerted extensive pressure on University Defendants to harass and provide records of students engaged in pro-Palestine activism going back to early 2024. SAC at ¶ 47. Plaintiffs' Second Amended Complaint ("SAC"), at ¶¶ 47-78, and Committee Defendants' Exhibits A through H submitted with their Memorandum in Support of their Motion to Dismiss provide a detailed account as to the methods and means of Committee Defendants' jawboning.

---

of not only the executive branch, but also U.S. Congress, as is the case here. *See* Jeffrey A. Love & Arpit K. Garg, *Presidential Inaction and the Separation of Powers,* 112 MINN. L. REV. 1195, 1233 (2014). *See also* Genevieve Lakier, *Enforcing the First Amendment in an Era of Jawboning*, U. CHI. L. REV., Forthcoming (2026).

### 1. Protected Speech is at Issue in this Case

First, Committee Defendants, in their own public communications and admissions in this suit have at best erroneously mischaracterized, and at worst purposefully mischaracterized the nature of Plaintiffs' and similarly situated students' speech as falling *entirely* outside the realm of protected political speech. Committee Defendants improperly frame student activists' protected political speech as inherently antisemitic and violative of the law using fearmongering and anti-Arab tropes.[4] To Plaintiffs' knowledge, Committee Defendants concluded long before it received any records from Columbia that the *entirety* of Columbia student activists' speech and conduct was violative of Title VI and/or other statutory provisions over which the Committee claims oversight responsibilities, and that *all* of the speech and expressive activities at issue are "antisemitic." But these conclusory assumptions and determinations do not hold muster when looking at the Committee Defendants' own descriptions of the speech and conduct for which it seeks individual and associational student records.

While Congressional Defendants are free to characterize Plaintiffs speech and the student movement more broadly however it would like, and to use their bully pulpit to attempt to persuade others to take their view or criticize the students, legal precedent requires they do not "use the power of the State to punish or suppress disfavored expression." *NRA v. Vullo*, 602 U.S. 175, 188 (2024). This is the line that has been crossed.

Committee Defendants' Memorandum, at 2-5, lists a number of unquestionably concerning incidents of alleged assault and offensive invective hurled at students apparently

---

[4] For example, in its April 21, 2024, Letter (Dkt. 32-2), at 3, the Committee curiously noted that protesters "screamed" "various hateful chants in English and Arabic," and, at 5, that protestors "led a crowd in Arabic chants glorifying terrorism."

because the perpetrator identified them as Jewish. These allegations are indeed serious and based on Committee Defendants' own submissions in this litigation, have been handled by public safety and law enforcement.

However, Committee Defendants use those alarming interpersonal interactions that fall within the purview of law enforcement to characterize the *entirety* of the Columbia pro-Palestine student movement as antisemitic, and as the vehicles through which to compel Columbia to relinquish the individual and associational records of likely hundreds of Columbia and Barnard students, the vast majority of whom were not responsible for and did not engage in the inflammatory examples provided by Committee Defendants. When reviewing the letters Committee Defendants sent to Columbia over the last eighteen months, at Dkt. 32-1 – 32-8, this becomes readily apparent.

First, Committee Defendants claim, in both their first letter to Columbia on February 12, 2024,[5] Letter that they are "investigating Columbia University's response to antisemitism and its failure to protect Jewish students." Feb. 12 Letter (Dkt. 32-1), at 1. The letter then clearly indicates that the Committee Defendants define antisemitism to include any speech or conduct "involving the targeting of Jews, Israelis, Israel, Zionists, or Zionism." Feb. 12 Letter, at 12.

As an example, the Feb. 12 Letter, at 3, listed the following as an antisemitic incident:

On October 19, 2023, Student Workers of Columbia – United Auto Workers Local 2710, which represents over 3,000 undergraduate and graduate student workers at Columbia, issued a statement saying, "we stand in solidarity with the Palestinian people" and "affirm their right to self-determination and freedom from apartheid." The statement condemned what it called "75 years of Israeli settler colonial rule" and "dehumanizing, unsupported claims of Israeli victimhood." The union represents teaching assistants and instructors in positions of authority over Jewish and Israeli students.

---

[5] Hereinafter, Feb. 12 Letter.

While certainly some could find this statement shocking or even offensive, it is without question protected political speech remarking on an issue of great public concern.

Another example describes "a Chanukah menorah lighting ceremony" held by anti-Zionist Jewish students and their allies at Columbia that "compar[ed] the terrorist attack against Israel to the Chanukah story[.]" Feb. 12 Letter, at 9. The allegations continued that the Jewish Voice for Peace "Instagram page stated, "@SJP.Columbia will join us to meditate on the parallels between the Hanukkah story and current events, the importance of grassroots activism, and the significance of solidarity in the face of oppression and suppression." *Id.* The Committee also lists the distribution of "anti-Israel pamphlets saying '[f]rom the river to the sea, Palestine will be free," *id.*, and the holding of "an anti-Israel protest on Barnard's campus," where in students "chant[ed] 'from the river to the sea' and 'intifada, intifada, long live intifada,'" *id.* Again, while some may be offended by this speech, it clearly falls within the auspices of protected political speech.

The Committee Defendants' April 21, 2024, Letter, included in Exhibit B (Dkt. 32-2) freely oscillates between using the terms "antisemitism," "anti-Israel," and "pro-terror." This same letter includes a number of anti-Arab and Islamophobic tropes, *see* **ante** at 4, n.4. And it characterizes clearly protected political speech as "threatening and pro-terror." Apr. 21 Letter, at 5. For instance, at page 5, the Letter highlights the following:

> Protestors have continuously shouted threatening and pro-terror slogans including, "We don't want no Zionists here," "Intifada," "From the river to the sea, Palestine is Arab," "There is no god but Allah, and the martyr is Allah's beloved!," "Brick by brick, wall by wall, Israel will fall," "U.S imperialists, number one terrorists," "Who runs Columbia? We run Columbia," "We don't

6

> want two states, we want all of it," "Settlers, settlers go back home, Palestine is ours alone," "1, 2, 3, 4, open up the prison doors. 5, 6, 7, 8, end the settler Zionist state," "Israel go to hell!," and "[r]esistance is justified when people are occupied."

These are just a few of the examples of protected political speech on a matter of great public concern that Committee Defendants seek to sweep into its expansive and unconstitutional definition of antisemitism, and use to justify breathtakingly broad demands for individual student and personnel records, organizational records, including sources of funding, "related to conduct involving the targeting of Jews, Israelis, Israel, Zionists, or Zionism." Feb. 12 Letter. And which the Committee Defendants acknowledged in their own staff report yielded hundreds of thousands of pages of documents. *See, e.g.*, SAC, at ¶¶ 7, 53-54, 94.

### 2. Committee Defendants' Definition of Antisemitism Abridges Protected Speech

If we blindly follow the Committee Defendants' blatant conflation and/or incorporation into a definition of antisemitism valid critiques of Israel and Zionism,[6] any and all discussions on Columbia's campus (and campuses around the U.S.) regarding Palestine, Palestinians, Palestinian rights, Israel, Israeli policies and actions, etc., and particularly discussions critical of Israel, Israeli policies, and Israeli governmental actors – all matters of great public concern – would be punishable offenses, and trigger university obligations under Title VI.

Under the Committee Defendants' apparent construal of Title VI, they would require

---

[6] S*ee, e.g.*, Statement, Jewish Voice for Peace, "On Antisemitism, Anti-Zionism and Dangerous Conflations," available at https://www.jewishvoiceforpeace.org/2023/11/ 09/antisemitism-dangerous/; "British-Israeli academic Avi Shlaim on anti-Zionism and antisemitism, Middle East Eye (Oct. 31, 2023), available at https://www.middleeasteye. net/live-update/british-israeli-academic-avi-shlaim-anti-zionism-and-antisemitism; Bill Bigelow, "No, Anti-Zionism Is Not Antisemitism," Rethinking Schools (Spring 2024), available at https://rethinkingschools.org/articles/no-anti-zionism-is-not-antisemitism/.

that University administrators determine any critiques of or even condemnation of certain governments of U.S. ally countries, or of the *de jure* or *de facto* policies within those countries, should they offend or anger students and/or faculty/staff members who support or are citizens/residents of those countries, would constitute discrimination and discriminatory harassment, and would deputize universities to patrol and punish any inquiry, critique, or activist efforts regarding any such nation.

Alternatively, should the Committee Defendants' not to follow this absurdist construal to its logical conclusion and instead makes the overly broad exception to free expression in order to expand its legislative purpose *solely* for critiques and criticisms of Israel, then Committee Defendants, through University Defendants, are clearly policing speech based entirely on its content, which is a proscription of the rights afforded by the First Amendment.

Despite the collection of "more than 400,000 pages of documents,"[7] the Committee Defendants returns to Columbia for yet another sweeping demand for individual and associational disciplinary records. In its February 13, 2025, Letter,[8] to Columbia, Committee Defendants demand "*[a]ll* disciplinary records," including "all past disciplinary charges, proposed sanctions, and enacted sanctions" of individuals "implicated" in eleven incidents, nine of which were large protests or other expressive activities that undoubtedly included much of the types of protected speech and expressive activities described above. Regarding the couple of incidents that apparently involved assaultive or harassing conduct, University

---

[7] *See* H. Comm. on Educ. & Workforce, Republican Staff Report, *Antisemitism on College Campuses Exposed* (Oct. 31, 2024), https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf [hereinafter "Oct. 31 Report"].

[8] Hereinafter, Feb. 13 Letter.

Defendants noted that they "have referred those incidents to law enforcement and are fully cooperating with that investigation." Dkt. 32-6, at 2.

Notably, in its acquiescence to the Committee's continued jawboning efforts, University Defendants stated that the records it had already provided to the Committee "may include information related to other incidents,"[9] Dkt. 32-6, at 2. Additionally, it is "providing [to Committee Defendants] materials related to [two January 2025] events that postdate the Committee's letter."[10] *Id.*

When putting all of the pieces included **ante** and detailed in Plaintiffs' Second Amended Complaint together, the Committee Defendants cannot accurately or fairly claim that their sweeping demands for individual and associational disciplinary records include *only* speech and/or conduct that falls within the narrow confines of Title VI or a definition of antisemitism that would pass constitutional muster. Instead, what becomes apparent when carefully reviewing the demands in the February 13 Letter within this broader context, as is required when examining a jawbone claim,[11] is the inverse – that *most* of the speech and

---

[9] Notably, University Defendants "anticipate[d] that the Committee will be interested in the disciplinary measures taken in response to [the South Lawn encampment], and thus, in an effort to cooperate with the Committee's inquiry, Columbia has provided the related files herein." Dkt. 32-8, at 1. It bears noting that the University's allegations against the students were not discriminatory harassment or antisemitic speech – the supposed target of Committee Defendants' investigation – but were related to "entering and remaining in a University facility without authorization[,]" and "for failing to respond to repeated requests to leave the premises." *Id.*

[10] Here, University Defendants refer to the February 13 Letter (Dkt. 32-5), section 1(i), "the January 21, 2025, disruption of a History of Modern Israel class," *id.*, at 5, and 1(j), "the January 21, 2025, outdoor protest," *id.*

[11] *See Vullo*, 602 U.S. at 199 (Gorsuch, J. concurring) (cautioning against "breaking up [] analysis into discrete parts," but instead "view[ing] in context" the alleged conduct to ascertain whether it "could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech.").

expressive activities included in the demanded individual and associational disciplinary records relate to protected political speech on a matter of great public concern – speech that requires the greatest protection.[12]

## LEGAL STANDARD

To survive a dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *id.* at 556).

To survive dismissal under a Rule 12(b)(1) motion to dismiss for lack of standing, plaintiffs must establish that they have standing by alleging facts that affirmatively and plausibly demonstrate (1) a concrete and particularized injury in fact, (2) that is fairly traceable to the defendant's conduct, and (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). And when assessing standing, courts "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Additionally, where standing and state action are fact-intensive inquiries— as they are here—motions to dismiss are generally disfavored. *See Cornelio v. Connecticut*, 32 F.4th 160, 172 (2d Cir. 2022) ("[t]he dismissal of a claim challenging a law that abridges protected speech "will rarely, if ever, be appropriate at the pleading stage. Instead, factual

---

[12] "[P]olitical speech" is a particular category that occupies "the highest rung on the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (*quoting Connick v. Myers*, 461 U.S. 138, 145 (1983)).

development will likely be indispensable to the assessment of whether [such a law] is constitutionally permissible").

## ARGUMENT

### A. This Court Has Subject Matter Jurisdiction

The Congressional Defendants' primary argument for dismissal rests on overbroad interpretations of the Speech and Debate Clause. Contrary to Committee Defendants' assertions, the Clause is not a license for unconstitutional action designed to indirectly suppress protected political speech by coercing a third party to act on their behalf. Further, Plaintiffs have established standing, and Sovereign Immunity does not bar their claims.

> **1. The Speech and Debate Clause does not immunize the Congressional Defendants from violating Plaintiffs' First Amendment rights by demanding that Columbia University punish students and turn over individual student records and associational membership rolls.**

The Committee Defendants ask this Court to allow the Speech and Debate Clause to shield them from any limitation or proscription on their unconstitutional jawbone scheme intended to suppress and chill the speech of Plaintiffs. Currently, the Committee dictates how Columbia disciplines its students, demands individual and associational disciplinary records be turned over to them, and then utilizes the constant threat of compiling ever more individual student records and association membership rolls from Columbia as a tool to identify and target dissidents. But the Constitution does not go as far as the Committee Defendants would like.

The Speech and Debate Clause has the express "purpose [] 'to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the *integrity of the legislative process.*" *Republican National Committee v. Pelosi*, 602 F.Supp.3d 1, 17 (D.D.C. 2022) (emphasis added), *vacated on mootness grounds by Republican National Committee*

*v. Pelosi,* No. 22-5123, 2022 WL 4349778 (D.C. Cir. September 16, 2022)[13] (quoting *United States v. Brewster*, 408 U.S. 501, 524 (1972)). It protects legitimate legislative acts to preserve the independence of the legislative process, but it "has not been extended beyond the legislative sphere." *Gravel v. United States*, 408 U.S. 606, 624–25 (1972). The micromanagement of Columbia's campus discipline process and the ongoing demand for individual student records and membership rolls to identify and target pro-Palestine activists in order to intimidate them and chill their speech is not just attenuated from any legislative purpose, it is "beyond the legislative sphere" entirely. *See id.*

In relying on *Eastland v. U.S. Servicemen's Fund,* 421 U.S. 491 (1975), the Committee Defendants conflate two dissimilar factual situations. *Eastland* involved the enforcement of a subpoena deemed to be within a committee's authorized investigation—in other words, it was considered a legislative act. *Eastland*, 421 U.S. at 505–06.

Here, the February 13 Letter, alongside the myriad of other communication and contact between Columbia and Committee Defendants[14] – coerces Columbia to use its disciplinary system to generate an ever-growing amount of individual student records and then demands Columbia turn over those individual and associational records to Congress, such that Congress can identify and target student activists based solely on the content of their political speech. Instead of gathering information for a legitimate legislative purpose, it is

---

[13] After significant litigation, and while the case was in front of the United States Court of Appeals for the District of Columbia Circuit, the House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol withdrew the subpoena at issue and the Committee defendants in that case filed an "unopposed motion to dismiss on grounds of mootness." *See Republican Nat'l Comm. v. Pelosi*, No. 22-5123, 2022 WL 4349778, at *! (D.C. Cir. Sept. 16, 2022).

[14] *See* **ante**, at 9, n.11, citing Justice Gorsuch's concurrence in *Vullo*.

evidenced by the Committee's on words and actions, as described in Palestine Legal's Amicus Brief, at 2-4, 12-16, and SAC, at ¶¶47-78, and **ante**, at 3-9, that it intends to use Columbia and its possession of private student information to identify and target those engaged in pro-Palestine activism.  To engage in this "informal system of censorship" of protected political speech, *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71, 83 (1963), to then legislate what appears likely to be a formal system of censorship, based on the Committee's own representation are the kinds of Congressional acts by that the Speech and Debate Clause does not immunize against.

> a.    **The Committee's actions have no legitimate legislative purpose and are clearly intended threaten exposure through extraction of individual student records and associational rolls from Columbia.**

The Committee Defendants' arguments pretend (Dkt. 81, at 31) that the February 13 Letter is simply a request for information, like the document request at issue in *Fakhreddine v. Univ. of Pennsylvania*, No. 24-CV-1034, 2025 WL 345089, at *5 (E.D. Pa. Jan. 30, 2025). It is not. What makes this case different from *Fakhreddine*, in part, is that the Committee Defendants' February 13 Letter, at 3-4, in context with all the other forms of pressure Committee Defendants have put Columbia, chastises Columbia's "permissiveness" toward what it has categorically and erroneously deemed "antisemitic conduct," and demands that Columbia discipline its students more severely. The Letter, at 3, complains that campus officials have not followed through on "promises and commitments" Columbia made to the Committee "to end or curb" the kinds of political expressions made by students and Plaintiffs about Palestine and Israel. *Id.* The Committee Defendants explain what Columbia should do: "administer discipline" against pro-Palestine students so that disfavored expressions do not "continue to take place."  Feb. 13 Letter, at 4.

The Committee Defendants then demand that University Defendants turn over "all" *individual and associational* disciplinary records of students associated with eleven different events or incidents. They do not request high level outcomes of disciplinary proceedings, nor do they ask Columbia Defendants to specifically outline what its administrators have done to address specific incidents of assaultive or harassing behavior. Instead, they demand the private individual records, and what amount to membership rolls of student organizations, the majority of whom were engaged in protected political speech regarding Palestinian rights and/or Israel's actions and policies. Thus, Committee Defendants clearly seek to identify and target individual students and student associations because of the contents of their speech.

The Speech and Debate clause does not shield actions that, under the guise of legislative inquiry, are intended to punish disfavored viewpoints, enforce particular outcomes, and coerce third parties into violating constitutional rights. *Doe v. Mc Millan*, 412 U.S. 306, 313 (1973) ("legislative acts are not all-encompassing") (internal citations and quotation marks omitted) (cleaned up). Importantly, it is the *nature and intention* of the act, not its mere form (letter requests or subpoena), that determine the Speech and Debate Clause's applicability. *See The New York Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006).

The Committee Defendants argue that they need to know the minutiae of Columbia's campus discipline processes because it is investigating the school's "deliberate indifference" to expressive events the Committee Defendants believe are hostile to some Jewish students. Dkt. 81 at 21. But the February 13 Letter is not investigative. Indeed, it strains credulity as the Committee, by its own admission, has already procured thousands of pages of documents, emails, texts, social media posts, disciplinary records, and much more, *see* October 31 Report, SAC at ¶ 64. Committee Defendants do not answer in their Memorandum how, given the

14

incredible amount of "factfinding" that has already been done, what other possible legitimate legislative purpose could Committee Defendants have for demanding another multitudinous request for individual student disciplinary records? And, if the Committee's alleged purpose is aimed at the University's efficacy or lack thereof at punishing protected speech—though this would still be unlawful jawboning—why is it demanding individual *student* disciplinary records instead of higher-level University records that do not identify specific students and/or their associations?

Instead, the February 13 Letter coerces Columbia to impose specific and harsh punishments for past student conduct, and condemns Columbia for allowing some students disciplined for the Hamilton Hall incident to graduate, apologizing to students arrested at last spring's encampment, and allowing Hind's House to occur. *See* 82-5 at 3. Committee Defendants demand that other officials "administer discipline" to prevent pro-Palestine expressions on campus, because "the disciplinary process has failed" as it has not met the Committee Defendants' prior demands for harsh punishment.

These records become responsive to the February 13 Letter once they are created, creating a kind of ongoing surveillance. The February 13 letter is also coercive to Columbia and threatening to Plaintiffs. But some disciplinary proceedings—like the one regarding Hind's House—remain ongoing. And campus officials are not free to use their own judgment if the Committee is surveilling the minutia of Columbia's disciplinary processes.

While the Committee may disagree with Columbia's approach to disciplining students, it was and is Columbia's right to decide how and whether to punish students gathering to express themselves. *See, e.g.*, *Keyishian v. Board of Regents,* 385 U.S. 589 (1967); *Sweezy v. State of N.H. by Wyman*, 354 U.S. (1957).

The Committee Defendants' demands for disciplinary records, read together with its demand for more severe punishment, coerce Columbia into punishing a viewpoint Congressional Defendants disfavor – the very viewpoint held by Plaintiffs and hundreds of other students at Columbia. *See Moody v. NetChoice*, 603 U.S. 707, 742 (2024) ("the government may not 'restrict the speech of some elements of our society in order to enhance the relative voice of others") (citing *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976)).

### b.  The Committee's motivation is viewpoint suppression.

As detailed previously, the Committee's stated concern with "antisemitism" is a pretext for suppressing any and all speech critical of Israel, a viewpoint they disfavor. The Second Amended Complaint explains that pretext extensively, and relies in part on the contents of the February 13 Letter itself. At the Motion to Dismiss stage, this Court must credit Plaintiffs' inferences drawn from the February 13 Letter and the meaning Plaintiffs plausibly ascribe to it.

This allegation is well pleaded, because it is extensively supported by facts supplied both by Plaintiffs in the Second Amended Complaint and by Congressional Defendants themselves, in Exhibits A-H attached to their Memorandum. First, when the Committee Defendants use the word "antisemitism," they are referring to the common and typical political expressions Plaintiffs and other pro-Palestine students make about Israel and Palestine. Executive Order 13899 ordered the Department of Education to adopt the IHRA definition of antisemitism, and so when the House Committee on Education demands that an educational institution fulfill its "promises and commitments to end or curb antisemitism," they are referring to particular views expressed by Plaintiffs and other pro-Palestine students. SAC at ¶¶ 143-156. The demand "to end or curb *antisemitism*" is intentionally and functionally

a demand to end or curb the expression of a pro-Palestine view the Committee Defendants disfavor.

Second, the contents of the Letter reflect a primary focus on suppressing disfavored views. In the February 13 Letter, for example, the Committee accuses students who organized a peaceful rally in recognition of "Martyrs' Day" on Veterans' Day of "promot[ing] terrorism and vilify[ing] the U.S. military." SAC at ¶ 57. The peaceful rally did not do either of those things. But no matter the contents of the event's message, a peaceful student gathering is not an appropriate topic of legislative inquiry. While the Committee may not agree with the message of Martyr's Day (or other student-organized events), and while members of the Committee may speak openly about their dislike or disagreement with those events, they are proscribed by their role in the Government to ban, punish, suppress, or chill directly or indirectly that speech. *Snyder v. Phelps*, 562 U.S. 443, 131 (2011) (finding a church's inflammatory protests at a US soldier's funeral to be protected speech). Indeed, "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).

The Committee Defendants are wrong to invoke Title VI to justify its February 13 Letter.[15] Dkt. 81 at 19-21. As outlined in full **ante**, the majority of the speech and expressive acts the Committee Defendants are coercing Columbia to punish and then relinquish

---

[15] *See*, *e.g.*, Benjamin Eidelson and Deborah Hellman, A*ntisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, Harvard Law Review Forum, Forthcoming (June 2025), available at http://dx.doi.org/10.2139/ssrn.5271044 ("Under existing [Title VI] law, however, discrimination based on cultural practices or viewpoints that may be associated with [] immutable characteristics—as Zionism might be associated with Jewishness—is ordinarily not cognizable as discrimination based on the protected characteristic itself.").

individual records created during the punishment regard matters of protected speech that Committee Defendants do not like. *Id.* at ¶ 59.

Taken all together – the many letters, the subpoenas, the compelled testimony, the public humiliation – the Committee Defendants' choice to undertake its inquiry is evidence that it is using the pretext of antisemitism to attack ideas it opposes by engaging in jawboning – using Columbia to punish, suppress, and chill protected speech.   Then, Committee Defendants use this pretextual investigation as ground to receive hundreds of individual and associational records as a means to identify and target Plaintiffs and other pro-Palestine student activists. As the U.S. Supreme Court held in *Watkins v. United States*, 354 U.S. 178, 187 (1957), "[i]nvestigations conducted solely…to 'punish' those investigated are indefensible."   Therefore, the Speech and Debate Clause cannot immunize Committee Defendants from the relief Plaintiffs seek.

**2.  There is no relation between the information sought and any valid legislative purpose.**

Even if the Court finds that Committee Defendants have shown a legitimate legislative purpose in its stated intent to investigate antisemitism at Columbia "so that it may fashion legislative remedies needed to protect Jewish students from discrimination, prejudice, harm[,]" Committee Defendants' Memo (Dkt. 81), at 1, there can be no doubt that the sheer breadth of the Committee Defendants investigation "intrudes into the area of constitutionally protected rights of speech . . . [and] association." *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 546 (1963).  Nowhere in Committee Defendants' Memo, in Committee Defendants' February 13 Letter, or indeed in any of the provided communications between Committee and University Defendants, have they shown a "substantial relation between the information sought" – *all* private individual and associational disciplinary records, including *all* past

disciplinary charges, for "individuals implicated" in eleven named incidents, some of which involving a hundred or more students, Feb. 13 Letter, at 5 – and the Committee Defendants' stated legislative purpose.

Committee Defendants' investigative efforts, which have until now included compelling Columbia to punish protected speech and provide a plethora private individual and associational records that themselves contain information regarding protected speech and associations, have already had a chilling effect on Plaintiffs' First Amendment rights. Plaintiffs have repeatedly and in detail outlined the ways in which they have been and continue to exercise their First Amendment rights of speech, expression, and association to advocate for Palestinian rights and dignity and to criticize Israel – its origination, policies, actions, etc.  *See* SAC, at ¶¶ 10, 34-41, 143-156.  *See also*, Plaintiffs Renewed Motion for Preliminary Injunction, Dkt. 99.

Moreover, as discussed in detail in the SAC, at ¶¶ 49, 57, and **ante**, the Committee Defendants' are evidently operating with a definition of antisemitism that clearly encompasses protected political speech.  Thus, the very definition of antisemitism on which the Committee Defendants' investigation is premised, abridges Plaintiffs' First Amendment rights.

To that end, Plaintiffs have demonstrated the ways in which Committee Defendants' actions – particularly coercing Columbia into punishing their advocacy and then demanding University Defendants relinquish Plaintiffs' and other students individual and associational records to the Committee – have severely chilled their First Amendment protected speech and associations.  *See* SAC, at ¶¶ 10, 34-41, 143-156.  *See also* Plaintiffs Renewed Motion for Preliminary Injunction, Dkt. 99. Consequently, Plaintiffs have shown that Committee

Defendants' jawbone scheme "intrudes into the area of constitutionally protected rights of speech . . . [and] association." *Gibson*, 372 U.S. at 546. And "[f]reedoms such as these are protected not only against heavy-handed front attack, but also from being stifled by more subtle governmental interference." *Id.*, at 544.

While Committee Defendants may be able to "[v]alidat[e] [] the broad subject matter under investigation," such validation "does not necessarily carry with it automatic and wholesale validation of all individual questions, subpoenas, and documentary demands." *Id.*, at 545. Committee Defendants' "legislative power to investigate, broad as it may be, is not without limit[,]" nor does it "compel the conclusion that the investigatory body is free to inquire into or demand all forms of information[,]" *id.*

As a result, "it is an essential prerequisite to the validity of the investigation[,]" *id.*, at 546, that Congressional Defendants "convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest," *id.* And here is the rub. "[T]he Committee has not 'demonstrated so cogent an interest in obtaining and making public' the membership information [and information regarding individual protected expressive activity] sought to be obtained as to 'justify the substantial abridgment of associational freedom which such disclosures will effect.' *See id.*, at 546 (citing *Bates v. Little Rock*, 361 U.S. 516, 524 (1960)).

The Committee uses this wildly broad definition of antisemitism to then make the conclusory determination that any and all protest activity at Columbia, as indicated in previous letters, and each of the eleven events for which they seek records in the February 13 Letter, were themselves antisemitic in nature, and thus any and all students engaged in expressive activities encompassed by the Committee's description of the events must also be

antisemitic. But even following that faulty logic, the Committee Defendants, who claim to be holding *Columbia* accountable for "rampant antisemitism on *Columbia*'s campus," Feb. 13 Letter, at 1, do not and likely cannot explain, let alone demonstrate a substantial relation, as to how the records of *individual students or student associations* can possibly aid in their investigation into how the *institution* is grappling with antisemitism.

Furthermore, the Committee fails to show the substantial relation to the February 13 Letter's requests for individual student records is substantially related to an investigation where the Committee has already issued subpoenas to multiple institutions of higher education, including Columbia, collecting "more than 400,000 pages of documents." Oct. 31 Report, at 1.

These issues are exacerbated by two other areas of concern. Critically, many of the students and student associations, and quite possibly *most* of the students and student associations whose records are implicated in the February 13 Letter did not, in fact, engage in antisemitic, discriminatory, or harassing speech, conduct, or activity. Their only infraction, if there was one, may have been to violate the conduct code, such as not leaving University property when asked. *See* **ante**, at 9 n.9. Therefore, their speech, associational, and privacy rights are being abridged by the Committee's demands when the students themselves did not engage in the types of speech or conduct the Committee claims to be investigating.[16]

Additionally, and an added layer to the *Gibson* analysis, is that Committee Defendants do not seek individual and associational records that contain private information regarding

---

[16] *See also Vullo*, 602 U.S. at 196 (quoting *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 64 (1963)) ("*Bantam Books* held that the commission violated the First Amendment by invoking legal sanctions to suppress disfavored publications, some of which may or may not contain protected speech (*i.e.*, nonobscene material)").

constitutionally protected advocacy directly from those individuals or organizations engaged in the advocacy, as the government actors did in *Gibson*, and the myriad other cases grappling with the question of legislative purpose and First Amendment protections,[17] which enabled them to vindicate their own First Amendment rights directly. Committee Defendants instead seek an extraordinary amount of documentation about Plaintiffs and their peers protected expressive and associational activity from a third-party intermediary, which "allows government officials to be more effective in their speech-suppression efforts because intermediaries will often be less invested in the speaker's message and thus less likely to risk the regulator's ire." *Vullo*, 602 U.S. at 198 (citing Brief for First Amendment Scholars as *Amici Curiae* Supporting Petitioner, at 8).[18]  Columbia is unquestionably more devoted to its own institutional survival as a multi-billion-dollar corporation, than it is to its community's First Amendment rights.

As to the Plaintiffs, there is no question, as pleaded in the Second Amended Complaint, and as outlined in the Renewed Preliminary Injunction, Dkt. 99, the "disclosure of their membership" in the student associations implicated in the February 13 Letter, along with the disclosure of their identities in connection to their protected speech activities also implicated in the Letter, "will seriously inhibit or impair the exercise of constitutional rights and has not itself been demonstrated to bear a crucial relation to a proper governmental interest or to be essential to fulfillment of a proper governmental purpose." *Gibson*, 372 U.S.

---

[17] *See, e.g.*, *Barenblatt v. United States*, 360 U.S. 109 (1959); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 463 (1958); *Watkins v. United States*, 354 U.S. 178 (1957).

[18]  The amicus filed in *Vullo* by First Amendment scholars is available at https://www.supremecourt.gov/DocketPDF/22/22-842/295757/20240116081345654_First%20Amendment%20Scholars%20Amicus%20Brief%20-%20NRA%20v.%20Vullo.pdf.

at 549. Critically, Plaintiffs do not "automatically forfeit their rights to privacy of association," and their rights to protected political speech, "simply because the general subject matter of the legislative inquiry," *id.*, as the Committee perceives it, includes potentially antisemitic or even "pro-terror" speech or conduct – and, of course, Plaintiffs would contest that their speech falls into either of those categories.

With all of these components at play, and where the Committee Defendants' fail to show a "substantial relation" between the individual and associational records of Plaintiffs and their peers, and their stated "overriding and compelling state interest" in investigating and legislating to "protect Jewish students from discrimination, prejudice, and harm,"[19] Committee Memo, at 1, Committee Defendants' overly broad and intrusive efforts to chill and suppress Plaintiffs' protected political speech by demanding that Columbia furnish their individual and associational records must be enjoined, as these demands are a substantial abridgement of Plaintiffs' First Amendment rights.

### B. Plaintiffs have standing.

The Committee Defendants make three limited arguments about standing. Each rests on a misunderstanding of how Plaintiffs' claim against the Committee works.

The Committee Defendants' February 13 letter inflicts an injury on Plaintiffs—directly and indirectly. It does so directly by demanding the records of Plaintiffs. In the Second Circuit, the demand for records itself—without further showing of harm—gives rise to standing. *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 573 (S.D.N.Y.

---

[19] Itamar Mann and Lihi Yona, *Defending Jews from the Definition of Antisemitism*, 71 UCLA L. REV. 1150 (Dec. 2024) ("broadening of the definition of antisemitism has resulted in a narrowing of Jewish identity and a delegitimization of anti-Zionist and non-Zionist Jewish communities. Constructing Jewish identity along rigid and fixed lines, the contemporary legal definition of antisemitism imposes upon Jews a straitjacket of Zionism.").

2024) ("The Second Circuit has held . . . that a plaintiff whose private information has been disclosed to third parties has standing to sue regardless of whether the third parties used that information to cause additional harm."). The Committee Defendants appear to acknowledge this, at least partially. They do not dispute that "four of the eight Plaintiffs have been subject to disciplinary proceedings involving any of the eleven incidents." Dkt. 81 at 29. For these Plaintiffs, even the Committee Defendants do not contest their injury. And that injury is ongoing, because the disciplinary proceedings regarding some of the eleven events—including Hind's House, which involved several Plaintiffs—are ongoing. *See, e.g.*, Dkt. 32-6 – 32-8.

But all Plaintiffs – and indeed all students at Columbia – are also indirectly injured. The Committee's efforts to force Columbia to more harshly discipline students has implications for many Plaintiffs. Plaintiffs Mahmoud Khalil, Ned Noe, Lucy Loe, Will Moe, and Sally Roe were each present at or attended expressive events on campus specifically identified by the Committee's February 13th Letter. *Id.* at ¶ 149. For these expressive events, so long as the February 13 Letter remains unencumbered, campus officials *and* Plaintiffs know that the Committee is scrutinizing each disciplinary decision Columbia makes—ensuring discipline that reflects the Committee's preferences.

The Committee's February 13 Letter broadly interferes with protected speech at Columbia. Sally Roe, Ned Noe, Lucy Loe, Sam Soe, and Will Moe have all been members or leaders of student groups that have organized or aimed to organize events in support of Palestine. *Id.* at ¶ 147. All Plaintiffs have attended pro-Palestine events where students expressed views comparable to those made at the eleven events the Committee's letter identifies. *Id.* at ¶ 148. Their past conduct and future planned conduct, with the February 13

Letter still pending, exposes them to ongoing Committee scrutiny and congressionally-coerced disciplinary processes. This deters students and Plaintiffs from speaking.

Defendants make a traceability argument by misconstruing Plaintiffs' injury as only the doxing and harassment third parties do to Plaintiffs and others who express pro-Palestine views. Dkt. 81 at 30. But the Committee's satisfied demands for student records is the injury itself. *See Trump v. Mazars USA, LLP,* 140 S. Ct. 2019, 2028 (2020). Plaintiffs do not have to show further harm from the record, *id.*, though the Second Amended Complaint details such harm extensively.

Likewise, redressability exists and can be done in a number of ways. First, this Court can narrow or quash the Committee Defendant's February 13 Letter. This is something that courts do all the time with regard to subpoenas, and there is no reason why it cannot do so for the informal requests made in the February 13 Letter. *See, e.g.*, *United States v. American Tel. & Tel. Co.*, 419 F. Supp. 454, 461 (D.C.C. 1976) (enjoining AT&T from complying with a Congressional subpoena without the prior authorization of the Executive Branch), *aff'd in part*, *U.S. v. American Tel. & Tel. Co.*, 551 F.2d 384 (D.C. Cir. 1976); *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 733 (D.C. Cir. 1974) (finding the congressional subpoena by the House Judiciary Committee "too attenuated and too tangential to its functions" to require compliance); *Eastland*, 488 F.2d 1252, 1270 (D.C. Cir. 1973) (staying the enforcement of a congressional subpoena because "forced surrender [] of the subpoenaed records . . . would invade the constitutional rights of the plaintiffs"), *rev'd on other grounds*, *United States Service-men's Fund v. Eastland*, 421 U.S. 491 (1975); see *National Abortion Fed'n v. Center for Med. Progress*, 2015 WL 5818863, at *1 (N.D. Cal. Oct. 6, 2015)

(recognizing that "case law allows courts to modify or quash Congressional subpoenas in order to protect constitutional rights from infringement by Congress").

Plaintiffs also incorporate the standing facts made in the Second Amended Complaint, and the standing arguments made in the Renewed Motion for Preliminary Injunction. Dkt. 99.

## C. The Committee is not a necessary party

Congressional Defendants argue incorrectly that they should be dismissed because they are necessary parties under Rule 19 but are immune. This argument fails because it would effectively "immunize congressional investigatory actions from judicial review" whenever records are held by a third party, the very outcome the *AT&T* line of cases sought to avoid.

As *U.S. v AT&T*, 419 F Supp 454 (D. D.C. 1976), *remanded for attempted settlement*, 551 F.2d 384 (1976)*, affirmed* 567 F.2d 121 (D.C. Cir. 1977), and its progeny, including *Trump v. Mazars USA, LLP,* 140 S. Ct. 2019, 2028 (2020) illustrate, an individual named in a Congressional subpoena issued to a third party may sue the third party alone, without naming Congress, in order to avoid Speech and Debate clause issues that would arise from directly suing members of congress:

> the [Speech and Debate] Clause does not and was not intended to immunize congressional investigatory actions from judicial review. Congress' investigatory power is not, itself, absolute... And the fortuity that documents sought by a congressional subpoena are not in the hands of a party claiming injury from the subpoena should not immunize that subpoena from challenge by that party. If the request letters were only in the hands of the Justice Department, it could have refused to comply with the legislative demand... The fact that the request letters are available from AT&T as well as from the Justice Department does not make the legislative authority unreviewable in court, for AT&T could have refused to comply and insisted on an ultimate court decision to avoid prosecution. The fact that the Executive is not in a position to assert its claim of constitutional right by refusing to comply with a subpoena does not bar the challenge so long as members of the Subcommittee are not, themselves, made defendants in a suit to enjoin implementation of the subpoena.

*U.S. v Am. Tel. & Tel. Co.,* 185 US App DC 254, 567 F2d 121, 129 (1977). "[T]he District Court properly entertained the action in order to provide a forum in which respondent could assert its constitutional objections to the subpoena, since a neutral third party could not be expected to resist the subpoena by placing itself in contempt," *Eastland,* 421 US at 514 (1975) (Justice Marshall, concurring); *Mazars USA, LLP,* 140 S. Ct. at 2028 (2020) ("Although named as defendants, Mazars and the banks took no positions on the legal issues in these cases, and the House committees intervened to defend the subpoenas"). Given the House's ability to intervene to protect its interests, dismissing this case on the grounds that the House is a necessary party which cannot be sued would in fact "immunize congressional investigatory actions from judicial review," the evil which the *AT&T* cases seek to avoid.

Generally, and quite contrary to the Indian tribe cases relied on by the Committee, Courts have denied motions to dismiss on the grounds that Congress, a state legislature, or an individual representative was a necessary party. *See, e.g.*, *Ottworth v PNC Bank,* 2019 US Dist LEXIS 248957, at *8 (WD Mich Sep. 26, 2019, No. 1:18-cv-625), *affirmed* 2020 U.S. App. LEXIS 23752 (6th Cir. 2020), *cert. den.* 141 S. Ct. 1126 (2021) ("Congress is not a necessary party to plaintiff's lawsuit against PNC"); *United States v Benson,* 2005 US Dist LEXIS 7630, at *15 (ND Ill Apr. 19, 2005, No. 04 C 7403) ("[R]equiring the presence of the United States Congress is unnecessary for resolving this case as it stands in front of this Court"); *Bastien v Off. of Senator Ben Nighthorse Campbell,* 2005 US Dist LEXIS 34368, at *14 (D Colo Dec. 1, 2005, Civil Action No. 01-CV-799-CAB (OES)) (ADEA lawsuit against Senator's Congressional office did not require Senator to be named as necessary party); *Dickinson v Indiana State Election Bd.,* 933 F2d 497, 500 (7th Cir 1991) ("Section Two's requirement that federal courts make an affirmative effort to remedy improperly formed

27

districts does not require that the legislature be a party"); *Hellebust v Brownback,* 824 F Supp 1511, 1521 (D Kan 1993), *affirmed* 42 F3d 1331 (10th Cir 1994) ("The Kansas state legislature is not a necessary party to this action"); *Gates v Collier,* 501 F2d 1291, 1320 (5th Cir 1974) ("On the contrary, appellants cite no cases in support of their contention that the relief fashioned by the trial court cannot be granted" without naming the state legislature).  This Court should follow suit.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Congressional Committee Defendants' motion to dismiss in its entirety.


Dated: June 20, 2025                    Respectfully Submitted,

                                        /s/  Amy E. Greer

                                        Amy E. Greer (NY 5910179) (lead counsel)
                                        **Dratel & Lewis**
                                        29 Broadway, Suite 1412
                                        New   York,   NY   10006
                                        (212) 732-8805
                                        agreer@dratellewis.com

                                        **CAIR NATIONAL**
                                        **LEGAL DEFENSE FUND**
                                        /s/Lena Masri
                                        Lena Masri
                                        Gadeir Abbas (VA 81161)*
                                        Nadia Bayado (DC 90023648)
                                        453 New Jersey Ave SE
                                        Washington, DC 20003
                                        (202) 742-6420

**COUNCIL ON AMERICAN ISLAMIC RELATIONS – NEW YORK**
<u>/s/Lamya Agarwala</u>
Lamya Agarwala (NY 5736061)
80 Broad Street, 5th Floor
New York, NY 10009
(646) 665-7599
lagarwala@cair.com

**Jonathan Wallace**
<u>/s/ Jonathan Wallace</u>
Jonathan Wallace (NY 1733757)
PO #728
Amagansett NY 11930
(917) 359-6234
jonathan.wallace80@gmail.com
*Licensed in VA, practice limited to federal matters*

*Attorneys for Plaintiffs*

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS
AND TYPE STYLE REQUIREMENTS

This memorandum complies with the type-volume limitation of Local Rule 7.1(c). This Memorandum of Law contains 8,197 words, excluding the parts exempted by the Court's Individual Rules.

This Memorandum of Law complies with the typeface requirements because this brief has been prepared in a proportionally spaced typeface using Word in Calisto MT font size 12.

Dated: 20 June 2025
        New York, New York

/s/  Amy E. Greer

Amy E. Greer (NY 5910179) (lead counsel)
**Dratel & Lewis**
29 Broadway, Suite 1412
New  York,  NY  10006
(212) 732-8805
agreer@dratellewis.com