## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

MAHMOUD KHALIL, et. al.

*Plaintiffs*

v.                                                   **1:25-cv-02079-AS**

COLUMBIA UNIVERSITY, et. al.

*Defendants*

---

## <u>BRIEF OF AMICUS CURIAE DEFENDING RIGHTS & DISSENT IN SUPPORT OF PLAINTIFFS</u>

<u>/s/ Amith Gupta, Esq.</u>
American Trial Law Litigators, LLC
925B Peachtree St. NE #2151
Atlanta, GA 30309
E-mail: amithrgupta@gmail.com
Phone: (408) 355-5782

On Behalf of Defending Rights & Dissent
1325 G St. NW Suite 500
Washington, DC 20005
info@rightsanddissent.org
(202) 552-7409

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………....2

INTEREST OF *AMICUS CURIAE*………………………………………….5

SUMMARY OF ARGUMENT………………………………………………6

STATEMENT OF FACTS……………………………………………………7

I.      The House Un-American Activities Committee (HUAC)…………………...7

II.     The Role of the FBI………………………………………………...14

III.    Frank Wilkinson's Fight Against HUAC…………………………...16

ARGUMENT………………………………………………………...20

I.      Congressional Investigations Must Be Pertinent to a Properly Defined Legitimate Legislative Purpose and Must Have a Substantial Relationship to an Overriding State Interest to Justify the Abridgment of First Amendment Freedoms …..…………………………………………………20

II.     Congress' Investigation of Plaintiffs is Overbroad, Does Not Serve a Legitimate Purpose, and Does Not Serve an Overriding State Interest that Can Justify its Intrusion on Plaintiffs' First Amendment Rights …………………………………………………...28

CONCLUSION……………………………………………………31

APPENDIX: Who We Are……………………………...…………………..A-1

<u>**TABLE OF AUTHORITIES**</u>

**Cases And Case-Related Materials**:

Amici Curiae Brief of 27 Jewish Scholars of Jewish Studies in Support of
Plaintiff's Motion for Summary Judgment, <u>Harvard v. U.S. DHHS</u>,
Case No. 1:25-cv-11048-ADB, ECF Dkt. No. 163 (D. Mass. 2025)
……………………………………………………………...……………29

<u>Barenblatt v. United States, 360 U.S. 109 (1958)</u>……………………..24, 25, 26, 29

<u>Braden v. United States</u>, 365 U.S. 431 (1961)…………………………………….25

<u>De Gregory v. Atty. Gen. Of New Hampshire</u>, 383 U.S. 825, 829 (1966)………..27

<u>Eastland v. USSF</u>, 421 U.S. 491, 504 (1975)……………………………………..20

<u>Gibson v. Fla. Legislative Investigative Comm.</u>, 372 U.S. 539 (1961)

…………………………………………………………...………...26, 27, 29, 30

<u>Sweezy v. New Hampshire</u>, 354 U.S. 234 (1957)………………………...22, 23, 24

<u>United States v. Moalin</u>, 973 F.3d 977 (9th Cir. 2020)…………………………....30

<u>Watkins v. United States</u>, 354 U.S. 178 (1957)...……………….....21, 22, 24, 26, 29

<u>Wilkinson v. FBI</u>, 633 F. Supp. 336 (C.D. Cal. 1986)…………………………….19

<u>Wilkinson v. United States</u>, 365 U.S. 399 (1961)………………………………....19

<u>Wilkinson v. United States</u>, 959 F.2d 973 (11th Cir. 1992)………………………19

<u>Wilkinson v. USA</u>, 774 F. Supp. 1360 (N.D. Ga. 1991)…………………………..19

**Books, Journal Articles, Publications, and News Reports**:

Eric Bentley (Ed.), Thirty Years of Treason: Excerpts from Hearings Before the House Committee on Un-American Activities, 1938-1968 24-25 (Viking Press 1971)
……..………………………………………………………………………………..7

David Caute, The Great Fear: The Anti-Communist Purge Under Truman and Eisenhower 102. (Simon & Schuster 1978)
……………………………………………………………………………8, 9, 10

Richard Criley, The FBI v. The First Amendment (1997)
………………………………………………..………………………...17

Umar A Farooq, How the US revived 'war on terror' era surveillance to suppress pro-Palestine movement, Middle East Eye 4 Oct. 2024
…………………………………………………...…………………………..30

Walter Goodman, The Committee 351-352 (Farrar, Straus and Giroux 1968)
……….……………………………………………………………10, 12, 14, 15, 16

Robin Kelley, Hammer and Hoe 225 (UNC Press 1990)
……………………………………………………….……………………13

Rachel Levinson-Waldman, Harsha Panduranga, Faiza Patel, Social Media Surveillance by the U.S. Government, Brennan Center (Jan. 7, 2022), https://www.brennancenter.org/our-work/research-reports/social-media-surveillance-us-government
……………………………………………………………………….31

Robert S. McNamara, Vietnam War a Mistake, U.P.I., Apr. 9, 1995
…………………………………………………………………….12

Victor S. Navasky, Some Disturbingly Relevant Legacies of Anti-Communism, 304 The Nation 22–29 (May 22–29, 2017)
…………………………………………………………………….12

Kenneth O'Reilly, Hoover and the Un-Americans: The FBI, HUAC and the Red Menace 4-7 (Temple University Press 1983)

4

…………………………………………………………………………...8

Robert Sherrill, <u>First Amendment Felon: The Story of Frank Wilkinson, His 132,000-page FBI File, and His Epic Fight For Civil Rights and Liberties</u> (Nation Books 2005).
…………………………………………………………………………...14, 17

Ellen Shrecker, <u>Many Are the Crimes</u> 91 (Little, Brown and Company 1998)
…………………………………………………………...8, 10, 11, 12, 13, 14, 15

Staff of the S. Select Comm. to Study Governmental Operations with respect to Intelligence Activities, 94th Cong., <u>Report on Intelligence Activities and the Rights of Americans</u>, Book 2.
……………………………………………………………………………….16

Tim Weiner, <u>Enemies: A History of the FBI</u> 189 (Random House 2012).
…………………………………………………………………………………….15

Frank Wilkinson, <u>Revisiting the McCarthy Era: Looking at *Wilkinson v. United States*</u> in Light of *Wilkinson v. Federal Bureau of Investigation*, 33 LOY. L. A. L. REV. 681 (January 2000).
…………………………………………………………...………………………..17

Rebecca Woodham, <u>Southern Conference for Human Welfare (SCHW), Encyclopedia of Alabama</u> (July 7, 2008), https://encyclopediaofalabama.org/article/southern-conference-for-human-welfare-schw/.
…………………………………………………………...………………………..13

Hans Zeisel & Rose Stamler, <u>The Evidence: A Content Analysis of the HUAC Record</u>, 11 HARV. C.R.-C.L. L. REV. 263 (Spring 1976).
…………………………………………………………...…………………....8

## <u>INTERESTS OF AMICUS CURIAE</u>

Defending Rights & Dissent (DRAD) defends the American people's right to know and freedom to act through grassroots mobilization, public education, policy expertise, and advocacy journalism. For over sixty years, DRAD has defended the right to dissent, protest, organize, and hold our government accountable.

Our organization's founders, including Frank Wilkinson, were targeted by the infamous House Un-American Activities Committee (HUAC) and even incarcerated for their refusal to reveal information about their political beliefs and associations. They formed the National Committee to Abolish HUAC, to which DRAD traces its origins, only to be ruthlessly targeted by both HUAC itself as well as the Federal Bureau of Investigation (FBI). In 1975, Representative Robert F. Drinan credited the National Committee to Abolish HUAC, then renamed the National Committee Against Repressive Legislation, for its "extraordinary work" in the struggle to dismantle the HUAC.

As a result of this institutional history, DRAD takes the defense of the First Amendment and its protection from Congressional and police surveillance and harassment with the utmost seriousness. DRAD hereby informs the court of its institutional history and advocacy and relevant court rulings that will assist the court in resolving this litigation.

Chip Gibbons, Policy Director of DRAD, contributed to this brief. Mr. Gibbons is a constitutional law expert and the author of the forthcoming work, The Imperial Bureau, about the FBI's national security surveillance. His background and expertise is discussed in the attached appendix, along with profiles of other DRAD staff and its Board of Directors.

## SUMMARY OF THE ARGUMENT

We have been here before: a Congressional committee exceeds its constitutional authority to harass dissenting speakers over their views on matters pertaining primarily to racial justice and U.S. foreign policy – albeit pretextually.

As Israel stands credibly accused of both violations of international humanitarian law and The Convention on the Prevention and Punishment of the Crime of Genocide, many Americans question the legality, morality, and prudence of their government's unwavering support for Israel's war in Gaza. As Israel has expanded its war into Lebanon, the U.S. has escalated bombing of Yemen, Iraq, and Iran, and war-weary Americans across the political spectrum are increasingly apprehensive that we are heading toward another prolonged Middle Eastern war.

This is precisely the type of situation that requires a robust, democratic debate. But instead, harkening back to the anti-Communist hysteria of the McCarthy era, Congressional investigators seek to stymie discussion and dissent

on issues of racial justice and U.S. foreign policy. This Court need not let the most disgraceful modern period of our nation's history repeat itself. The Court should grant Plaintiff's request for injunctive relief and other associated relief according to the principles derived from DRAD's history and the struggle against HUAC, as discussed below.

## STATEMENT OF FACTS

### I) The House Un-American Activities Committee (HUAC)

HUAC was formed in 1938 and known as the Dies Committee, as one of a successive number of Congressional committees concerned with what they labeled "Un-American" activities or beliefs. Initially, these committees were driven by a complex interplay between those concerned about Communism, as well as fascism. However, they quickly became to be thoroughly dominated by the political right, who used the committee to advance their own political biases. The New Deal, civil rights and civil liberties, and even those with anti-fascist and anti-Nazi views were targeted. During an investigation of the Federal Theater Program, a division of the New Deal's Work Progress Administration that put out of work actors back on the stage, a committee member claimed many Ancient Greek playwrights were

communists stating, "I believe Mr. Euripides was guilty of teaching class consciousness".[1]

HUAC's dramatic and highly political efforts at public shaming, initially developed to attack the New Deal program, attracted enormous publicity and headlines; from 1938 to 1945, HUAC's reauthorization passed by overwhelming margins, until it became a permanent committee in 1945.[2] Indeed, at the outset of the McCarthy Era, Cold Warriors realized that "for their own political objectives to be facilitated, both public opinion and the priorities of official Washington had to be moved to the right"; McCarthyism achieved this objective, with HUAC serving as a propaganda arm for this campaign.[3]

Throughout its existence, HUAC subpoenaed witnesses and obtained records on everyone from Hollywood stars to union organizers to university professors, almost entirely on the flimsy pretext of alleged Communist subversion. HUAC exercised its broad authority by subpoenaing witnesses to speak before the Committee; refusals to respond or failure to answer questions when asked would

---

[1]     Eric Bentley (Ed.), <u>Thirty Years of Treason: Excerpts from Hearings Before the House Committee on Un-American Activities, 1938-1968</u> 24-25 (Viking Press 1971).

[2]     Ellen Schrecker, <u>Many Are the Crimes</u> 91 (Little, Brown and Company 1998).

[3]     Kenneth O'Reilly, <u>Hoover and the Un-Americans: The FBI, HUAC and the Red Menace</u> 4-7 (Temple University Press 1983).

regularly trigger recommendation for criminal prosecution. HUAC maintained an

extensive, two-part file system, including both confidential reports and FBI

contacts, as well as press, letterheads and other public materials.[4]

Over the course of HUAC's existence, the record it created indicated notable

patterns.[5] A sampling of HUAC's responses from witnesses suggests that roughly

three quarters of respondents refused to answer some or all of HUAC's questions;

that an enormous percentage of questions asked were about alleged misdeeds or

views and associations that HUAC viewed as improper; and of which virtually all

questions were about suspect political views and memberships, while only about

five percent of questions were about *actual* criminal activity (such as sabotage).[6]

Indeed, "the majority of the subpoenaed witnesses answered not a single

question…[y]et, with such a paucity of end product, the questioning continued, the

subpoenaing continued and the public labeling continued." [7]

That the primary purpose of the hearings was the self-aggrandizing press it

provided to HUAC and the associated ostracism and shaming of alleged dissidents

---

[4]    David Caute, <u>The Great Fear: The Anti-Communist Purge Under Truman and Eisenhower</u> 101. (Simon & Schuster 1978).

[5]    For a detailed and illuminating content analysis of the Congressional record created by HUAC's interrogations, see Hans Zeisel & Rose Stamler, <u>The Evidence: A Content Analysis of the HUAC Record</u>, 11 HARV. C.R.-C.L. L. REV. 263 (Spring 1976).

[6]    <u>Id</u>. at 267-268.

[7]    <u>Id</u>. at 297.

and their associates was never meaningfully in doubt. Witnesses were often fired as soon as they were subpoenaed, as negative publicity alone was enough to deter their employers.[8] In one incident in 1959, when HUAC canceled a hearing in California but sent its allegations to various California governmental institutions, only to find that many of those accused would keep their jobs, the HUAC Chairman lamented that the authorities "were derelict in their duty or they did not make use of the furnished information."[9] The damage cannot be understated. In one particularly disturbing incident, Stanford University biologist William Sherwood killed himself on the eve of his HUAC appearance, fearing that he would be "assassinated by publicity."[10] Similarly, blacklisted actor Philip Loeb killed himself over obstacles related to the poverty he suffered from his job loss.[11] And countless others suffered the fate of incarceration from contempt charges; vigilante violence aimed at them; harassment (including burning crosses from the KKK); and the extended – sometimes permanent – loss of employment.[12]

Ironically, as Congress passed increasingly vigorous anti-Communist criminal legislation, the justification for witnesses to invoke their Fifth Amendment

---

[8]    Caute, supra note 4 at 102.
[9]    Id.
[10]   Schrecker, supra note 2 at 361; and Caute, supra note 4 at 102.
[11]   Id.
[12]   Id. at 361-368.

rights against self-incrimination grew; numerous witnesses did so, and subsequent

attempts at criminal prosecution ultimately failed.[13] But while the Fifth

Amendment may have provided protection from criminal prosecution, it did little

to temper HUAC's efforts at public shaming. Because of the perceived

implications of pleading the Fifth, HUAC was successful in ruining the reputations

of those witnesses who invoked it and the threat of a subpoena continued to hold

enormous coercive power. And the secondary effects were no less harmful, as

recalcitrant witnesses would often suffer public humiliation, ostracism, and job

loss. Indeed, where individuals invoked their Fifth Amendment rights down the

line, HUAC's accusatory questions would become more far-fetched and

exaggerated, with the Committee's knowledge that Fifth Amendment invocations

would imply that the witness was guilty of increasingly questionable allegations.[14]

The repression associated with HUAC's campaign of public shaming

radically changed public life in America. McCarthyism "had not emerged

spontaneously from an American population rendered panicky by the tensions of

the early Cold War," but instead it was "primarily a top-down phenomenon."[15]

---

[13]      Walter Goodman, The Committee 351-352 (Farrar, Straus and Giroux 1968)
         (all but one of eighteen individuals who invoked their Fifth Amendment
         rights in front of HUAC were ultimately acquitted, and the last one would
         have also been acquitted had he pursued his appeal).
[14]      Id. at 354 note 2.
[15]      Schrecker, supra note 2 at xiii.

Thus the project of McCarthyism was an elite project aimed at remaking American political life through the purposeful constriction of democratic discourse.

One of the most disturbing examples of this was the launching of the disastrous Vietnam War. As McCarthyist hysteria targeted the State Department, the so-called China Hands – China issue experts who were wrongly accused of being soft on Communism – were driven out, leading to a series of poor judgments that led the U.S. to enter the war.[16]

But HUAC's destructive efforts were not limited to U.S. wars with the Communist East. While HUAC investigated an alleged Communist conspiracy in virtually every facet of social life, its disdain for the Civil Rights movement was particularly strong. As early as 1942, Martin Dies' leadership of the Committee was characterized by his belief that the struggle for racial equity was a form of subversion: "I deplore the fact that throughout the South today subversive elements are attempting to convince the Negro that he should be placed on social equality with white people, that now is the time for him to assert his rights."[17] Indeed, HUAC's mission earned the glowing endorsement of the Ku Klux Klan: while one

---

[16]    Robert S. McNamara, Vietnam War a Mistake, U.P.I., Apr. 9, 1995; see also Victor S. Navasky, Some Disturbingly Relevant Legacies of Anti-Communism, 304 The Nation 22–29 (May 22–29, 2017) (Mr. Navasky was a DRAD board member until his passing); and Schrecker, supra note 2 at 372-373.

[17]    Goodman, supra note 13 at 466.

of its 1942 pamphlets stated "The vicious fight on the Klan sprang from the same source which has fought the Dies Committee from the day of its inception," a KKK Imperial Wizard acknowledged that Dies' program "so closely parallels the program of the Klan that there is no distinguish-able difference between them."[18]

Using the same tactics as those aimed at other perceived societal enemies, HUAC played a central role in Southern efforts to discredit the Civil Rights Movement. In 1956, white supremacists tried to discredit a Catholic integration program by smearing Hulan Jack, a visiting Black politician from New York, with Communist Front associations provided by HUAC.[19] Several weeks later, an Arkansas representative sought to discredit Roy Wilkins, A. Philip Randolph, and numerous other distinguished Civil Rights activists and NAACP leaders by reading into the record HUAC's associational allegations against them.[20] In one particularly destructive example, HUAC labeled the Southern Conference on Human Welfare – an Alabama-based integrated community organization counting numerous white and Black civil rights organizers and economic reformers – a Communist front organization in 1947; the organization collapsed a year later.[21] Such destructive

---

[18]     Id.
[19]     Id. at 374.
[20]     Id. at 374-375.
[21]     Robin D.G. Kelley, Hammer and Hoe 225 (UNC Press 1990); and Rebecca Woodham, Southern Conference for Human Welfare (SCHW), Encyclopedia of Alabama (July 7, 2008),

tactics had real-world political results, reshaping the civil rights movement by stigmatizing its ties to left-wing activism and unionism and forcing a notably more conservative outlook on civil rights groups of the era, severing them from internationalist efforts to challenge war and undercutting their involvement in efforts for economic reform.[22] These efforts continued into the Committee's declining years in the 1960s.[23]

Indeed, efforts to challenge HUAC's investigation of union activity in the South – the pretext for HUAC's investigation of Frank Wilkinson and Carl Braden – were staunchly opposed by black churches. Prior to their incarceration but after exhausting their appeals, Martin Luther King. Jr. and the Southern Christian Leadership Conference hosted a reception in their honor, declaring, "These men are going to jail for us. We'll never achieve peaceable integration in the South until the Un-American Committee is abolished."[24]

## II) The Role of the FBI

---

[ ]  https://encyclopediaofalabama.org/article/southern-conference-for-human-welfare-schw/. See also Schrecker, supra note 2 at 391.

[22]  Schrecker, supra note 2 at 389-395.

[23]  Goodman, supra note 13 at 458-459.

[24]  Robert Sherrill, First Amendment Felon: The Story of Frank Wilkinson, His 132,000-page FBI File, and His Epic Fight For Civil Rights and Liberties 227 (Nation Books 2005).

Early on, HUAC worked closely and secretly with the FBI as it used intelligence "as an instrument of political warfare" against members of Congress and even the President amid battles over the threat and scope of alleged Communist subversion.[25] Indeed, HUAC's pointed questions of dissident witnesses were informed by advanced access to FBI files.[26]

While the relationship between HUAC and the FBI was not without its politics, the organizations worked symbiotically. As such, HUAC's investigations were not limited to the Committee's own investigatory techniques: they were augmented by politically-motivated intelligence-sharing by the FBI, including information that was gathered illegally or presented selectively. Publicly, HUAC claimed its cooperation with the FBI consisted of giving the FBI access to its files; but in reality, and through unofficial means, "the Committee was getting at least as much help from the FBI as it was giving."[27] Indeed, the now infamous Church Committee Investigation of the FBI's COINTELPRO Program and domestic spying abuses generally summarized those tactics as follows:

> The Government has often undertaken the secret surveillance of citizens on the basis of their political beliefs, even when those beliefs posed no threat of violence or illegal acts on behalf of a hostile foreign power. The Government, operating primarily through

---

[25]    Tim Weiner, <u>Enemies: A History of the FBI</u> 189 (Random House 2012). <u>See also</u> Schrecker, <u>supra</u> note 2 at 90-91.

[26]    <u>Id</u>. at 191.

[27]    Goodman, <u>supra</u> note 13 at 416.

secret informants, but also using other intrusive techniques such as wiretaps, microphone "bugs", surreptitious mail opening, and break-ins, has swept in vast amounts of information about the personal lives, views, and associations of American citizens. Investigations of groups deemed potentially dangerous-and even of groups suspected of associating with potentially dangerous organizations-have continued for decades, despite the fact that those groups did not engage in unlawful activity. Groups and individuals have been harassed and disrupted because of their political views and their lifestyles. Investigations have been based upon vague standards whose breadth made excessive collection inevitable. Unsavory and vicious tactics have been employed-including anonymous attempts to break up marriages, disrupt meetings, ostracize persons from their professions, and provoke target groups into rivalries that might result in deaths. Intelligence agencies have served the political and personal objectives of presidents and other high officials. **While the agencies often committed excesses in response to pressure from high officials in the Executive branch and Congress, they also occasionally initiated improper activities and then concealed them from officials whom they had a duty to inform**.[28]

As such, while HUAC's undemocratic tactics appeared to be public, much of it depended on and was manipulated by the unsavory and wholly unlawful secret tactics that the FBI employed. Throughout the existence of HUAC, the FBI was overtaken by the near obsessive belief by FBI Director J. Edgar Hoover that virtually every facet of American dissent was a potential vector of Communist subversion; the agency worked closely with HUAC to turn negative publicity on those whom it could take no other action.[29]

## III) Frank Wilkinson's Fight Against HUAC

---

[28]    Staff of the S. Select Comm. to Study Governmental Operations with respect to Intelligence Activities, 94th Cong., <u>Report on Intelligence Activities and the Rights of Americans</u>, Book 2, 5 (emphasis added).

[29]    Goodman, <u>supra</u> note 13 at 416-417.

Frank Wilkinson's challenges to HUAC, its coordination with the FBI, and the resulting litigation are indicative of the brazen authoritarianism embraced by HUAC.[30] Wilkinson was summoned before HUAC twice, as well as being subpoenaed by the California State Senate's "Little HUAC" – a term used to describe state-level legislative bodies similar to HUAC[31] – years before that. Wilkinson did not believe that the FBI was involved in any of these efforts. Wilkinson had attracted negative political attention over his roles in attempting to improve public housing – first as a citizen's activist challenging the Los Angeles Housing Authority's efforts to build segregated and uninhabitable public housing plots, and then as a project manager for the Authority.[32] But when challenging an effort by slumlords to prevent a habitable site from being used for public housing as an expert witness, the slumlord's lawyer cross-examined Wilkinson by asking about his political affiliations – using an intelligence dossier alleging his Communist affiliation provided by the FBI. This same dossier would subsequently

---

[30]     Frank Wilkinson discussed his own story in depth in Frank Wilkinson, Revisiting the McCarthy Era: Looking at Wilkinson v. United States in Light of Wilkinson v. Federal Bureau of Investigation, 33 LOY. L. A. L. REV. 681 (January 2000). Unless otherwise indicated, details in this section are taken from his article discussing the ordeal. Further reading on Frank Wilkinson's life and political struggle are available in Sherrill, supra note 24.

[31]     Wilkinson, supra note 26 at 684, note 9 (citing Richard Criley, The FBI v. The First Amendment at 24 (1997)).

[32]     Sherrill, supra note 24 at 68-69.

be used to discredit the Mayor over his affiliation with Wilkinson and to subpoena Wilkinson to the California Little HUAC.

By 1956, Wilkinson was working with the Citizens Committee to Preserve American Freedoms (CCPAF), a civil society organization working to defend those subpoenaed before HUAC hearings; the FBI followed Wilkinson extensively throughout this period, producing summaries with the intention of prosecuting Wilkinson under the Smith Act. And yet, they produced no basis for prosecution. That year, Wilkinson was subpoenaed to appear in front of HUAC for the first time. During the hearing, Wilkinson refused to answer any questions, invoking the First Amendment – not the Fifth and its implied admission of criminality. HUAC called on Anita Schneider, an FBI informant, to allege that Wilkinson and CCPAF were Communist-controlled, though Wilkinson did not know her and recalled having only met her briefly once. Nonetheless, Wilkinson was never charged with contempt over this hearing.

But in 1958, as Wilkinson and allies were calling for HUAC's abolition, he was subpoenaed again. While in Atlanta assisting black churches to circulate a petition opposing HUAC's incursion into the South – where HUAC was purportedly investigating union activity – though many believed the real target with the civil rights movement – Wilkinson received a subpoena at his hotel. A

19

federal marshal delivered the subpoena and indicated to Wilkinson the FBI's involvement. Wilkinson again raised his First Amendment defense; this time, he was cited for contempt and charged. Despite hopes that the Supreme Court would strike down his conviction, the Court voted 5-4 to uphold his conviction; Wilkinson, along with Carl Braden, also convicted, served twelve months prison time.

By the 1980s, however, the FBI's illegal domestic spying had long been exposed; after uncovering nearly forty-years of FBI surveillance against Wilkinson, he sued the FBI successfully over breaches of his constitutional rights.[33] But Wilkinson's petition for a writ of coram nobis to overturn his contempt conviction – alleging that the Government and the FBI withheld records suggesting that Schneider was unreliable as a witness, thereby undercutting any lawful reason to investigate him – was thrown out.[34] That court limited its resolution of the issue to whether or not the Supreme Court would have ruled differently in its evaluation of his contempt conviction, and held that it would not have done so, where Wilkinson also admitted he was a member of the Emergency Civil Liberties Committee, which the Court said HUAC had probable basis to investigate for

---

[33]    Wilkinson v. FBI, 633 F. Supp. 336 (C.D. Cal. 1986).

[34]    Wilkinson v. USA, 774 F. Supp. 1360 (N.D. Ga. 1991); and Wilkinson v. United States, 959 F.2d 973 (11th Cir. 1992) (affirming).

Communist ties. That this basis was itself Schneider's testimony did not sway the Court; Wilkinson's contempt conviction was upheld.

## **ARGUMENT**

There can be no discernible doubt that McCarthyism – and HUAC's role in it – were deeply deleterious to American freedoms as part of a machinery of federal weaponry against democracy, including the Civil Rights movement. HUAC plainly and consistently sought to do what the Supreme Court acknowledged it could not do, utilizing selective access to often unlawfully gathered FBI investigative materials in the process. And while the Supreme Court did not rule in favor of Frank Wilkinson, it is clear from subsequent cases that these rulings were limited to the unique Congressional focus on the Communist Party and the hysteria surrounding it. This history should inform the court in evaluating Plaintiffs' claims as follows.

**I)    Congressional Investigations Must Be Pertinent to a Properly Defined Legitimate Legislative Purpose and Must Have a Substantial Relationship to an Overriding State Interest to Justify the Abridgment of First Amendment Freedoms.[35]**

### *Watkins and the First Amendment*

---

[35]    This brief focuses on the constitutional scope of Congress' legislative authority. While it does not touch on the issue of the Speech and Debate Clause per se, the two issues are closely related. See, e.g. Eastland v. USSF, 421 U.S. 491, 504 (1975) (holding that legislators acting "within the sphere of legitimate legislative activity" are entitled to immunity pursuant to the Speech and Debate Clause) (internal citations omitted).

Though the direction and scope of the First Amendment's protection from Congressional overreach vacillated through the years of HUAC's witch hunt and McCarthyism more broadly, certain core principles emerged. Watkins v. United States, 354 U.S. 178 (1957) was the Supreme Court's first foray into the First Amendment limits to a Congressional committee's investigative powers. When a union officer invoked the First Amendment as a basis to refuse to answer HUAC's allegedly irrelevant questions about his associations, the Court overturned his resulting conviction for contempt of Congress. The Court reasoned Congress' power of inquiry, while "broad," "is not unlimited", and that investigations "conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." Watkins at 187. The Court continued that the First Amendment's command that Congress make no law abridging free speech applies to the investigatory process of law-making; that the mere summoning of a witness and compelling him to testify about his beliefs, expressions, or associations is necessarily a form of governmental interference; that the ensuing "public stigma, scorn, and obloquy" apply also to those implicated by the witness. Watkins at 197. The Court added that "there is no congressional power to expose for the sake of exposure". Watkins at 199. While the Court did not seek to evaluate the subjective motives of the Congressmen responsible for

Watkins' questioning, it concluded that neither HUAC's authorizing resolution nor the questions and introductory statements HUAC personnel made at Watkins' hearing would have properly advised him of what questions would have been pertinent to a legitimate Congressional purpose, as all of these were extremely broad and indicated generalized investigation of subversive activity. Watkins at 208-216. While the Watkins Court focused on the duty of Congress to inform a witness as to the pertinence of its questions, the underlying principle which should have protected Watkins from prosecution was a First Amendment shield from intrusions on his rights of speech and association by impertinent investigations – such as those intended solely to shame him and others for allegedly holding disfavored views.

The same year, the Court decided Sweezy v. New Hampshire, 354 U.S. 234 (1957). When the New Hampshire Attorney General, operating at the behest of New Hampshire's Little HUAC, summoned Marxist scholar Paul Sweezy to answer a series of wide-ranging personal questions about his personal life, political affiliations, his wife's political affiliations, and the topics of his academic lectures at the University of New Hampshire, Sweezy invoked the First Amendment and refused to answer some questions; he was found guilty of contempt. Sweezy at 239-244. New Hampshire state courts held that, although the investigation

necessarily abridged Sweezy's constitutionally protected freedoms, the menace of the Communist threat to the government's survival and the associated need for the legislature to be informed about this threat outweighed the deprivation of constitutional rights in the process. Sweezy at 249-251. A plurality of the Supreme Court, without ruling on the nature of this balancing test, found in Sweezy's favor where there was no basis "to connect the questioning of [Sweezy] with this fundamental interest of the State." Sweezy at 251. Again, the Court focused on overbreadth: "Instead of making known the nature of the data it desired, the legislature has insulated itself from those witnesses whose rights may be vitally affected by the investigation...it has told the Attorney General, in effect to screen the citizenry of New Hampshire to bring to light anyone who fits into the expansive definitions [of New Hampshire's Subversive Activities Act]." Sweezy at 253. In a concurrence, two justices instead focused not on the deference of the New Hampshire legislature to the Attorney General, but rather on New Hampshire's balancing test. They wrote that "the inviolability of privacy belonging to a citizen's political loyalties...cannot be constitutionally encroached upon on the basis of so meagre a countervailing interest of the State as may be argumentatively found in the remote, shadowy threat to the security of New Hampshire allegedly presented in the origins and contributing elements of the [alleged Communist-front

organization Sweezy was asked about] and in [Sweezy's] relations to these."

Sweezy at 265. In essence, the justices emphasized both the vagueness of the investigation's purpose and the amorphous nature of the state interest at stake.

### The Balancing Test

Beginning with Barenblatt v. United States, 360 U.S. 109 (1958), however, the Supreme Court began to limit these holdings. Nonetheless, as discussed infra, the limits have since been cabined. In Barenblatt, a professor interrogated by HUAC challenged his contempt conviction on First Amendment grounds, arguing his case was largely similar to Watkins because HUAC's authorizing resolution remained vague and overbroad. The Court balked. Separating the pertinence challenge from Barenblatt's constitutional challenges, the Court held that Barenblatt, unlike Watkins, had been properly apprised and that the general breadth of HUAC's authorizing resolution was not enough to evaluate the pertinence of the hearing or its questions. On his constitutional challenges, the Court adopted a balancing test, holding that "[w]here First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown….[t]he critical element is the existence of, and the weight to be ascribed to, the interest of the Congress in demanding disclosures from an

unwilling witness." Barenblatt at 126 (internal citations omitted). Because of the alleged existential threat posed by Communist activity ("Communist infiltration furthering the alleged ultimate purpose of overthrow") such an interest had been established. Barenblatt at 128. Four justices dissented, emphasizing the Committee's illegitimate purpose of exposure for its own sake, its overbroad authorizing resolution, as well as questioning the First Amendment balancing test as a violation of the Constitution.

The Court ruled similarly in Wilkinson v. United States, 365 U.S. 399 (1961) and Braden v. United States, 365 U.S. 431 (1961), the cases of Frank Wilkinson and Carl Braden. In Wilkinson, the Court refused to distinguish its holding from Barenblatt where Wilkinson had focused on HUAC's purpose in targeting him for speaking out against HUAC itself. In both cases, four justices again dissented, reaffirming their criticisms in Barenblatt and adding that where Wilkinson was targeted for criticizing HUAC, this should have been interpreted as beyond HUAC's authorizing resolution. Wilkinson at 416-417.

The dissent in Wilkinson emphasizes that the sole basis for an alleged link between Wilkinson's activity and the Communist party was "a flat conclusory statement by the informant that it was so." Wilkinson at 418-419. That is important: as discussed supra, this informant was known to be unreliable, and the

lack of reliability was necessarily known to HUAC based on the FBI's shared information. The dissent therefore squarely contradicts the subsequent ruling in Wilkinson's coram nobis case and strongly suggests that the case, already decided by a slim majority, may have been different had the Court been aware of the entirety of the information available to HUAC at the time.

### *Refining the Balancing Test*

While Barenblatt, Wilkinson, and Braden fell victim to the Court's balancing test, the Court began to limit the holding of these cases in subsequent rulings. In Gibson v. Fla. Legislative Investigative Comm., 372 U.S. 539 (1961), the Supreme Court raised the bar for intrusive investigations after a Miami NAACP branch leader refused to turn over organizational membership lists to Florida's little HUAC on First and Fourteenth Amendment grounds and was adjudged in contempt. The Court overruled his contempt conviction, drawing on its prior ruling in Watkins.

The Court distinguished Barenblatt and its progeny by emphasizing that those cases involved the witness' own alleged involvement in the Communist Party specifically, which "is not an ordinary or legitimate political party, as known in this country, and that, because of its particular nature, membership therein is itself a permissible subject of regulation and legislative scrutiny." Gibson at 547. Because

there was no indication that the NAACP was <u>itself</u> a "subversive organization," the expectation that the NAACP turn over its general membership list failed the Court's balancing test: "Moreover, even to say, as in <u>Barenblatt</u> ... that it is permissible to inquire into the subject of Communist infiltration of educational or other organizations does not mean that it is permissible to demand or require from such other groups disclosure of their membership by inquiry into their records when such disclosure will seriously inhibit or impair the exercise of constitutional rights and has not itself been demonstrated to bear a crucial relation to a proper governmental interest or to be essential to fulfillment of a proper governmental purpose." <u>Gibson</u> at 549.

The Court continued, "the record in this case is insufficient to show a substantial connection between the Miami branch of the NAACP and Communist activities which the respondent Committee itself concedes is an essential prerequisite to demonstrating the <u>immediate, substantial, and subordinating state interest necessary to sustain its right of inquiry into the membership lists of the association</u>." <u>Gibson</u> at 551 (emphasis added). The State must show "a substantial relation between the information sought and a subject <u>of overriding and compelling state interest</u>." <u>Gibson</u> at 546 (emphasis added); <u>see also</u> <u>De Gregory v. Atty. Gen. Of New Hampshire</u>, 383 U.S. 825, 829 (1966) (such an interest was lacking where

the New Hampshire Attorney General's investigation into petitioner's alleged

Communist ties sought information that was "historical, not current").

## II)   Congress' Investigation of Plaintiffs is Overbroad, Does Not Serve a Legitimate Purpose, and is Not Substantially Related to an Overriding State Interest that Can Justify its Intrusion on Plaintiffs' First Amendment Rights.

Applying the principles that the Supreme Court derived, it is clear that

Plaintiffs raise valid First Amendment challenges to the investigation against them.

First, Congress' witch-hunt for "anti-Semitism," like HUAC's overbroad

search for "subversive activity," cannot be used as a blanket basis for a dragnet

search for all manner of activity. Notably, like HUAC's overbroad authorizing

resolution, the Congressional defendants in this case make no effort whatsoever to

define "anti-Semitism" meaningfully. In their October 31, 2024 report,

Congressional defendants imply that almost any allegation of any behavior,

including lawful behavior, that however vaguely touches on the topic of Israel or

Zionism to be anti-Semitic in nature and therefore relevant to Congress'

enforcement of Title VI; no effort is made to distinguish or identify a racially

discriminatory motive beyond the behaviors which the report condemns.[36] Such

---

[36]   Indeed, depending on Congressional defendants' idea of what, specifically, about anti-Israel sentiment is "anti-Semitic," it appears that they may even be validating or promoting anti-Semitic tropes and stereotypes in the course of their investigation. See, e.g. Amici Curiae Brief of 27 Jewish Scholars of Jewish Studies in Support of Plaintiff's Motion for Summary Judgment, Harvard v. U.S. DHHS, Case No. 1:25-cv-11048-ADB, ECF Dkt. No. 163

overbreadth cannot pass the test articulated in Watkins and its progeny: Congressional investigations and the legislative tasks associated with them must be pertinent to a legitimate legislative purpose, and such a purpose cannot be defined in vague or amorphous terms.

But even if Congress' harassment of Plaintiffs could be construed as serving the purpose of enforcing Title VI, such a purpose alone cannot justify the associated intrusions on privacy protected by the First Amendment. The balancing test articulated in Barenblatt and refined in Gibson does not permit such intrusion for any governmental purpose: rather, as such an intrusion necessarily involves the abridgment of fundamental freedoms, it must serve a purpose that is "immediate," "substantial," "overriding," and "compelling". Gibson at 546, 551. Gibson was distinguished from Barenblatt where, in the latter, a compelling interest was found in investigating an alleged threat to the very system of government itself: the Communist Party, a particular organization believed to be seeking the eventual overthrow of the government itself. Merely reciting even this overriding threat and alleging such a nexus against the NAACP was insufficient to obtain the same result in Gibson. In short, merely alleging that the NAACP or its membership could have

---

(D. Mass. 2025) (Jewish scholars suggest that Jewish communities hold varying opinions about the State of Israel, Zionism, and Israeli Military's Actions in Gaza and that the conflation of Zionism with Jewishness in Title VI enforcement promotes anti-Semitic stereotypes).

had ties or sympathies with those involved in the threat of the overthrow of government was insufficient to violate the NAACP's constitutional rights to privacy. Here, Congressional defendants do not even <u>claim</u> such an overriding interest. The amorphous evil of discrimination, while repugnant and subject to regulation, does not threaten the very existence of the United States. As such, it cannot be the basis to invade Plaintiffs' privacy.

Finally: hindsight is 20/20. While the Supreme Court did not have the benefit of realizing that HUAC had access to enormous sums of intelligence that were gathered unlawfully in its since cabined cases, today the reality of surveilling those involved in the movement to defend Palestinian rights and other activist movements are well-known.[37] Aside from newsworthy instances of surveillance abuse[38], even lawful surveillance, due to technology, encompasses forms of monitoring that were unimaginable in 1958.[39] Additionally, the record itself makes

---

[37]    <u>See</u>, <u>e.g.</u> Umar A Farooq, <u>How the US revived 'war on terror' era surveillance to suppress pro-Palestine movement</u>, Middle East Eye 4 Oct. 2024 (discussing increased use of surveillance, including no-fly lists, watch lists, home visits, and electronic surveillance, against pro-Palestine activists and speakers).

[38]    <u>See</u>, <u>e.g.</u> <u>United States v. Moalin</u>, 973 F.3d 977 (9th Cir. 2020) (discussing mass surveillance by NSA, and that it is unlawful and likely unconstitutional; emphasizing the role of technology).

[39]    Rachel Levinson-Waldman, Harsha Panduranga, Faiza Patel, <u>Social Media Surveillance by the U.S. Government</u>, Brennan Center (Jan. 7, 2022), https://www.brennancenter.org/our-work/research-reports/social-media-surveillance-us-government (discussing use of social media for mass

plain that additional records, even if sought for legitimate and constitutional

purposes, would likely not assist Congress – just as the availability of FBI records

should have undercut any legitimate need that HUAC may have had in

investigating Wilkinson. As such, the changed climate of surveillance and its

widespread recognition should further prompt the Court to acknowledge that the

balance has changed even further in favor of Plaintiffs.

## CONCLUSION

The Court should grant Plaintiffs' requested relief.

Respectfully submitted this 2nd Day of July, 2025.


/s/ Amith Gupta, Esq.
American Trial Law Litigators, LLC
925B Peachtree St. NE #2151
Atlanta, GA 30309
E-mail: amithrgupta@gmail.com
Phone: (408) 355-5782

On Behalf of Defending Rights & Dissent
1325 G St. NW Suite 500
Washington, DC 20005
info@rightsanddissent.org
(202) 552-7409

---

surveillance by numerous U.S. governmental agencies, and resulting law
enforcement actions).

# APPENDIX A

## Defending Rights & Dissent: Who We Are

*Staff:*

Sue Udry, Executive Director

---

Sue Udry's career in public service spans four decades and includes advocating for peace, civil rights, and economic justice. She is an experienced non-profit administrator and expert on issues related to the intersection of national security, human rights, and civil society.

As Executive Director of Defending Rights & Dissent, Udry leads the organization's advocacy and public education efforts to protect and strengthen civil society and challenge government abuse of First and Fourth Amendment rights. She represents DRAD in the media, in numerous coalitions, and on several boards of directors.

Prior to coming to DRAD, Udry was the legislative coordinator for United for Peace and Justice, a coalition of over 1,600 groups working to end the wars in Iraq and Afghanistan. While living in Chicago, Udry served as the Executive Director of the Chicago Committee to Defend the Bill of Rights, and as an organizer for the Coalition for New Priorities, and organized child care workers for the Day Care Action Council of Illinois. She currently serves on the board of the National Coalition to Protect Student Privacy, and the DC chapter of the National Lawyers Guild, and the DC-NLG Litigation Fund, as well as the Advisory Board of the Charity and Security Network. She is a co-founder of the Montgomery County Civil Rights Coalition.

Chip Gibbons, Policy Director

---

Chip Gibbons is an expert on US Constitutional law, a journalist and researcher focusing on the US national security state, and a longtime activist. For over half a decade, he has led Defending Rights & Dissent's work exposing threats to political expression posed by US national security policy, as well as defending the right to protest. Chip has advised both state and federal lawmakers on the First Amendment implications of pending legislation. He is a frequently cited expert on the history of FBI political surveillance and the impact of the Espionage Act on press freedoms. Chip is currently working on a book on the history of the FBI exploring the relationship between domestic political surveillance and the emergence of the US national security state. Titled *The Imperial Bureau,* forthcoming from *Verso*.

Chip was an early contributor to the Dissent NewsWire. In 2015, he formally joined Defending Rights & Dissent after having led a successful campaign to defeat a proposed unconstitutional anti-boycott bill in Maryland. Since joining our team, he has hosted the *Still Spying* podcast and authored the groundbreaking reports *Still Spying on Dissent: The Enduring Problem of FBI First Amendment Abuse* and *Ag Gag Across America: Corporate-Backed Attacks on Activists and Whistleblowers.* He has led efforts to educate decision makers and the public alike about the need to reform the Espionage Act, rein in the FBI, and restore constitutional war powers.

Chip has been published in *Jacobin*, *The Nation*, *In These Times*, and *The Washington Post*. In 2020, he published an exposé at *The Intercept* based on his half decade long quest to force the FBI to release documents pertaining to its surveillance of nonviolent Palestinian solidarity activists. Bringing his journalistic talents to Defending Rights & Dissent, he did extensive first hand reporting on the unprecedented prosecution of Trump Inauguration protesters.

Nathan Fuller, Communications Manager

---

Nathan Fuller serves as Communications Manager for Defending Rights & Dissent. Nathan is the former Executive Director of the Courage Foundation, a whistleblower and journalist defense organization, where he campaigned on behalf of Edward Snowden, Chelsea Manning, Daniel Hale, Lauri Love, and several others.

Nathan also led Assange Defense, the U.S. campaign to free WikiLeaks publisher Julian Assange, who was released from prison in 2024. Previously, Nathan was the courtroom reporter and press liaison for the Chelsea Manning Support Network, covering Manning's entire court-martial in Fort Meade. In 2024, Defending Rights & Dissent worked with Nathan and Courage to co-organize a coalition of more than 100 journalists and press freedom organizations to call for a U.S. arms embargo on Israel.

***Board of Directors***

Shannon Al-Wakeel, Board Co-President

---

Shannon Al-Wakeel is an attorney based at Stanford Law School where she is executive director of the Levin Center for Public Service and Public Interest Law and teaches public interest law and practice. Her background is in community lawyering; immigration, civil liberties, and national security policy advocacy; and legal representation of people pressured to speak with Joint Terrorism Task Forces. She was founding executive director of Muslim Justice League, a nonprofit formed by Muslim women in 2014 — in response to federal piloting of a "countering violent extremism" campaign — to defend rights threatened under pretexts of protecting national security. She also previously worked with Massachusetts Law Reform Institute's Immigrants Protection Project as a Kaufman Fellow; Massachusetts Immigrant and Refugee Advocacy Coalition as state policy director, and Northeastern Law School's Center for Public Interest Advocacy and Collaboration.

Sascha Meinrath, Board Co-President

---

Sascha is the Palmer Chair in Telecommunications at Penn State and director of X-Lab, an innovative think tank focusing on the intersection of vanguard technologies and public policy. Sascha is a renowned technology policy expert and is internationally recognized for his work over the past two decades as a community internet pioneer, social entrepreneur, and angel investor.

Prior to founding X-Lab, Sascha was vice president of the New America Foundation, where he founded the Open Technology Institute in 2008 and built it into one of the largest public interest tech policy organizations in Washington, D.C. He also founded the Commotion Wireless Project, which works around the globe to strengthen communities by providing tools to build their own local communications infrastructures, and co-founded Measurement Lab, a global online

platform for researchers to deploy Internet measurement tools that empower the public and key decision-makers with useful information about broadband connectivity.

Sascha was elected as an Ashoka Fellow for Social Entrepreneurship in 2012, and has been named to the *Time Magazine* "Tech 40" as one of the most influential figures in technology, to the "Top 100" in Newsweek's Digital Power Index, and is a recipient of the Public Knowledge IP3 Award for excellence in public interest advocacy. He is widely published in both academic and media outlets.

Jilisa Milton, Clerk

---

Jilisa Milton is an Alabama-based civil rights attorney, policy analyst, social worker, and racial justice activist. She has a joint JD/MSW degree from the University of Alabama. She became one of the founders of Black Lives Matter Birmingham Chapter in 2016, namely as a survivor of police violence, and is currently the Vice-President of the National Lawyers Guild. Jilisa leads reproductive work in the deep south as the President of Yellowhammer Fund, a southern abortion fund and reproductive justice organization, and a board member of West Alabama Women's Center, a reproductive health facility, both dedicated to fighting against the criminalization of healthcare advocacy and on behalf of the right to bodily autonomy and gender justice.

In her daily work, Jilisa is Deputy Director of Greater Birmingham Alliance to Stop Pollution (GASP),  a climate & environmental justice organization, and advocates for the rights of progressive voices in the southern region of the US.

Donald Goldhamer, Treasurer

---

Don  is an activist and advocate focused on civil liberties and individual privacy. As a computer specialist since the 1960's he has focused attention on the abuse of technology to undermine privacy and rights, through organizations such as the Computer Professionals for Social Responsibility and the ACM. Beginning in the 1970's he has been involved in work toward prison abolition, transparency and civilian oversight; and later with the control and oversight of urban police.

Emily Berman, Vice-President

---

Emily is professor of Constitutional Law at University of Houston Law School. Her research interests focus on whether and how the legal, constitutional, and regulatory structures of the domestic criminal justice apparatus have been transformed by the past decade's focus on efforts to detect, prevent, and punish the threat of terrorist violence. Her current work seeks to elucidate the implications of these changes for both criminal law and national security law. She has written extensively about domestic intelligence collection, executive power and the Federal Bureau of Investigation. She has worked at the Brennan Center for Justice, New York University Law School and Brooklyn Law School.

Mike Rufo, Vice-President

---

Mike is a Bay Area activist, singer/songwriter, and sustainable energy consultant. Mike has directed several sustainable energy consultancies and is currently an Executive Consultant for Itron Inc. Mike also serves on the board of the Clean Power Campaign and was previously a board member with the Center for Energy Efficiency and Renewable Technology (CEERT). In addition to his work addressing sustainable energy, his passions for civil liberties, social justice, the environment, and music come together in songs that promote grassroots activism.

Fadi Saba, Vice-President

Fadi specializes in teaching students.  He brings his background knowledge in civil liberties and rights into the classroom where students engage in critical thinking and debates.  Outside of teaching, Fadi is involved in the anti-war and pro-Palestinian freedom movements.  He is the president of Culture and Conflict Forum, a volunteer-run organization dedicated to bringing voices from and about the Global South.

Shahid Buttar

Shahid is the former Executive Director of BORDC. He also serves on the advisory bodies of the National Campaign to Restore Civil Rights, and South Asian Americans Leading Together. Shahid received his J.D. from Stanford Law School in 2003, where he served as executive editor of the Stanford Environmental Law Journal, and graduated summa cum laude from Loyola University Chicago with a BA in political science and creative writing in 2000. Shahid also supports populist constitutionalism as an independent columnist, community organizer, and hip-hop and electronica MC and DJ. In his creative capacities as a poet and musician, Shahid has performed around the world for audiences as large as 30,000, co-founded several grassroots art and culture groups around the country, facilitated workshops for young people and emerging artists, and released his debut CD, Get Outta Your Chair, in 2008.

Arun Gupta

---

Arun is an independent journalist whose work can be found at Telesur, Alternet and Truthout. He is the founding editor of The Indypendent and the Occupied Wall Street Journal.

Jeffrey Sterling

---

Jeffrey Sterling is a whistleblower, civil liberties advocate, and former CIA case officer. During his decade at the CIA, Sterling worked on the Iran Task Force. After facing racial discrimination at the CIA, he filed an employment discrimination suit against the CIA. The case was dismissed under the state secrets doctrine with no ruling on the merits of Sterling's claim ever being made. Sterling also blew the whistle on a disastrous CIA covert operation against Iran to Senate investigators. Years later, the government brought a vindictive, retaliatory prosecution against Sterling under the Espionage Act. The government claimed Sterling also shared the information he lawfully gave to the Senate to a reporter who previously covered Sterling's racial discrimination claims. Sterling professed his innocence and took the case to trial. Shockingly, although no incriminating evidence was produced, Sterling was wrongfully convicted and served two and a half years in prison. His memoir, "Unwanted Spy: The Persecution of an American Whistleblower," was published in late 2019. He continues to advocate for whistleblowers and has been tireless in the effort to reform or abolish the Espionage Act.