UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAHMOUD KHALIL, *et al.,*

                            Plaintiffs,

                  v.

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW YORK,
*et al.,*

                            Defendants.

No. 25 Civ. 2079 (AS)

**EXECUTIVE BRANCH DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:   (212) 637-2691
*Attorney for Executive Branch Defendants*

BRETT SHUMATE
Assistant Attorney General
Civil Division

  ALLISON M. ROVNER
*Assistant United States Attorney*
     - Of Counsel -

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT........................................................................................................................2

    I.      Legal Standard Governing Preliminary Injunctions ...............................................2

    II.    Plaintiffs Are Unlikely to Succeed on Any of Their Claims ...................................2

        A.     This Court Lacks Subject Matter Jurisdiction ...........................................2

            1.     Plaintiffs Have Not Adequately Established Standing ...................2

            2.     The Tucker Act Bars Plaintiffs from Bringing Their Claims Against the Executive Branch Defendants in this Court .................7

            3.     Plaintiffs' APA Claims Are Unreviewable...................................12

                a.     The Funding Pause Is Committed to the Agencies' Discretion.........................................................................12

                b.     The March 13 Letter Is Not Final Agency Action.............13

        B.     Plaintiffs Have Failed to State or Show a Likelihood of Success on the Merits of Their First Amendment or APA Claims ...................................16

            1.     Plaintiffs' First Amendment Claim Fails......................................16

            2.     Plaintiffs' APA Claims Fail............................................................21

    III.   Plaintiffs Have Failed to Satisfy the Other Preliminary Injunction Factors ..........24

CONCLUSION....................................................................................................................26

**TABLE OF AUTHORITIES**

**CASES**                                                                                              **PAGE(s)**

*Air California v. U.S. Dep't of Transp.*,
    654 F.2d 616 (9th Cir. 1981) ........................................................................... 15

*Air Espana v. Brien*,
    165 F.3d 148 (2d Cir. 1999) ............................................................................ 14

*American Association of University Professors v. United States Dep't of Just.*,
    No. 25 Civ. 2429 (MKV), 2025 WL 1684817 (S.D.N.Y. June 16, 2025),
    *appeal filed* at 25-1529 (2d Cir.) ................................................................ *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................ 17

*Assn of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
    126 F.3d 1158 (9th Cir. 1997) ........................................................................ 15

*Atterbury v. U.S. Marshals Serv.*,
    805 F.3d 398 (2d Cir. 2015) .......................................................................... *passim*

*B&L Prods., Inc. v. Newsom*,
    104 F.4th 108 (9th Cir. 2024) ......................................................................... 17

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................... 13, 14

*Board of Educ. v. Pico*,
    457 U.S. 853 (1982) ........................................................................................ 21

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
    331 F.3d 342 (2d Cir. 2003) ........................................................................... 24

*Brooks v. Giuliani*,
    84 F.3d 1454 (2d Cir. 1996) ........................................................................... 25

*California v. U.S. Dep't of Educ.*,
    769 F. Supp. 3d 72 (D. Mass. 2025) ............................................................ 9, 10

*California v. U.S. Dep't of Education*,
    132 F.4th 92 (1st Cir. 2025) ........................................................................... 10

*Cerame v. Slack*,
    123 F.4th 72 (2d Cir. 2024) ............................................................................. 3

*Church of American Knights of KKK v. Kerik*,
    356 F.3d 197 (2d Cir. 2004) ................................................................................ 20

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985) ................................................................................ 24

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ............................................................................................. 22

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................................... 2, 5

*Ctr. for Auto Safety v. Dole*,
    846 F.2d 1532 (D.C. Cir. 1988) .......................................................................... 12

*Dalton v. Specter*,
    511 U.S. 462 (1994) ............................................................................................. 13

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ............................................................................................... 7

*Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025) ............................................................................... 9, 10, 12

*E. Palo Alto v. United States Dep't of Health & Hum. Servs.*,
    137 F.4th 932 (9th Cir. 2025) ............................................................................... 8

*Elk Run Coal Co. v. U.S. Dep't of Labor*,
    804 F. Supp. 2d 8 (D.D.C. 2011) ........................................................................ 14

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ............................................................................................. 23

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................................................... 4

*Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S.E.P.A.*,
    313 F.3d 852 (4th Cir. 2002) .............................................................................. 15

*Fox v. Board of Trustees of State*,
    841 F.2d 1207 (2d Cir. 1988) ............................................................................. 21

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) ................................................................................... 2

*Heckler v. Chaney*,
    470 U.S. 821 (1985).................................................................................................... 12

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985) ....................................................................................... 8

*Laird v. Tatum*,
    408 U.S. 1 (1972)................................................................................................ *passim*

*Latino Officers Ass'n v. Safir*,
    170 F.3d 167 (2d Cir. 1999) ....................................................................................... 24

*Lincoln v. Vigil*,
    508 U.S. 182 (1993).................................................................................................... 12

*Metro. Transportation Auth. v. Duffy*,
    No. 25 Civ. 1413 (LJL), 2025 WL 1513369 (S.D.N.Y. May 28, 2025)............................. 8

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ................................................................................... 12

*Murthy v. Missouri*,
    603 U.S. 43 (2024)............................................................................................... 2, 5, 6

*National Rifle Association v. Vullo*,
    602 U.S. 175 (2024).................................................................................... 16, 17, 20

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) ....................................................................................... 25

*Nieves v. Bartlett*,
    587 U.S. 391 (2019).................................................................................................... 17

*Nokia Corp. v. InterDigital, Inc.*,
    645 F.3d 553 (2d Cir. 2011) ....................................................................................... 25

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003) ................................................................................... 15

*Seafarers Int'l Union of North America, AFL-CIO v. U.S. Coast Guard*,
    736 F.2d 19 (2d Cir. 1984) ......................................................................................... 15

*Sharkey v. Quarantillo*,
    541 F.3d 75 (2d Cir. 2008) ......................................................................................... 14

*Soundboard Ass'n v. FTC*,
    888 F.3d 1261 (D.C. Cir. 2018) ............................................................... 14

*Student Members of SAME v. Rumsfeld*,
    321 F. Supp. 2d 388 (D. Conn. 2004) ...................................................... 21

*Students for Fair Admissions v. U.S. Mil. Acad. at West Point*,
    709 F. Supp. 3d 118 (S.D.N.Y. 2024) ........................................................ 2

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................................... 3

*Sustainability Inst. v. Trump*,
    No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ....................... 11

*Trump v. CASA, Inc.*,
    606 U.S. ----, 2025 WL 1773631 (June 27, 2025) .................................. 25

*Up State Fed. Credit Union v. Walker*,
    198 F.3d 372 (2d Cir. 1999) ...................................................................... 8

*We The Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021) ....................................................................... 2

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ....................................................................................... 2

*Younger v. Harris*,
    401 U.S. 37 (1971) ................................................................................... 17

**STATUTES**

5 U.S.C. § 701 ............................................................................................... 12

5 U.S.C. § 704 ............................................................................................... 13

5 U.S.C. § 706 ............................................................................................... 22

28 U.S.C. § 1491 ............................................................................................. 7

**RULES**

Federal Rule of Civil Procedure 65 ............................................................... 25

## REGULATIONS

2 C.F.R. § 200.340 ................................................................................................. 13, 22

42 C.F.R. § 52.6 ......................................................................................................... 13

48 C.F.R. § 2.101 ....................................................................................................... 13

## OTHER AUTHORITIES

Exec. Order No. 14,188, 90 Fed. Reg. 8,847 (Jan. 29, 2025) ....................................... 22

## PRELIMINARY STATEMENT

The Executive Branch Defendants submit this memorandum of law in opposition to Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 99, "PI Br.") and in further support of their Motion to Dismiss (Dkt. No. 86, "MTD Br.") all of Plaintiffs' claims in the Second Amended Complaint (Dkt. No. 62, "SAC") as against them. For the reasons described in the Executive Branch Defendants' opening brief[1] and below, Plaintiffs—who are current or former Columbia University students—have not only failed to demonstrate that they are entitled to a preliminary injunction requiring the Government to pay approximately $400 million in paused funding to Columbia of which Plaintiffs are not recipients, but they have also failed to adequately allege any claims against the Executive Branch Defendants that survive a motion to dismiss.

As an initial and dispositive matter, this Court lacks subject matter jurisdiction because Plaintiffs do not have standing to bring their claims. Even if they did, this Court also lacks subject matter jurisdiction over the claims against the Executive Branch Defendants pursuant to the Tucker Act, and Plaintiffs' APA claims are not reviewable. Further, Plaintiffs have failed to sufficiently state their First Amendment and APA claims, let alone show they are likely to succeed on the merits such that the Court should issue a preliminary injunction. Finally, Plaintiffs have failed to show irreparable harm or that an injunction would be in the public interest. Accordingly, the Court should deny Plaintiffs' motion for a preliminary injunction and dismiss Plaintiffs' claims against the Executive Branch Defendants.

---

[1] The Executive Branch Defendants incorporate by reference here the facts, arguments, and defined terms contained in their memorandum of law in support of their motion to dismiss and the supporting declarations. *See* MTD Br.; Dkt. No. 87, Oestericher Decl. Exs. A-C; Dkt. No. 88, Lorsch Decl. & Exs. A-C; Dkt. No. 89, Gruenbaum Decl. & Ex. A.

## ARGUMENT

### I.    Legal Standard Governing Preliminary Injunctions

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021).

### II.    Plaintiffs Are Unlikely to Succeed on Any of Their Claims

#### A.    This Court Lacks Subject Matter Jurisdiction

##### 1.    Plaintiffs Have Not Adequately Established Standing

Plaintiffs' allegations are insufficient to establish standing, for the reasons explained in the Executive Branch Defendants' moving brief. *See* MTD Br. 9-14. This inadequacy is not remedied by the materials submitted in support of Plaintiffs' motion for a preliminary injunction. In short, Plaintiffs have failed to show an injury that is "'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (further internal quotation marks omitted)).

Plaintiffs fail to establish standing even under the more lenient standard that they urge applies to pre-enforcement challenges. *See* PI Br. 12-14; Dkt. No. 102 ("MTD Opp.") 13-14 (citing

2

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). As a threshold matter, Plaintiffs' claims against the Executive Branch Defendants are for the most part not properly characterized as pre-enforcement claims because the Government has already paused the funding to Columbia, and a number of the conditions in the letter the Government sent to Columbia on March 13, 2025, *available at* https://s3.documentcloud.org/documents/25577971/31325-letter-to-columbia.pdf) ("March 13 Letter" or "Mar. 13 Ltr."), including that the MESAAS department be placed in receivership, cannot give rise to any enforcement actions against Plaintiffs. *See Susan B. Anthony List*, 573 U.S. at 158 (addressing "when the threatened enforcement of a law creates an Article III injury"). In any event, under the pre-enforcement standard, Plaintiffs must demonstrate "(1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest'; (2) that the intended conduct is 'arguably proscribed by' the challenged regulation; and (3) that 'there exists a credible threat of prosecution thereunder' that is 'sufficiently imminent.'" *Cerame v. Slack*, 123 F.4th 72, 81 (2d Cir. 2024) (quoting *Susan B. Anthony List*, 573 U.S. at 159). Even under this standard, "'[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *See Cerame*, 123 F.4th at 81 n.12 (citing *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). Plaintiffs have failed to satisfy this standard.

For instance, Plaintiffs have not established that they intend to engage in conduct "arguably proscribed" by rules implemented by Columbia in response to any coercion by the Executive Branch Defendants. Nor have Plaintiffs established that there is a "credible threat" of discipline as a result, despite the fact that the rules of which they complain have been in place for months. In fact, Plaintiffs' submissions in support of their motion for a preliminary injunction do not state any intent to engage in conduct that has been arguably prohibited by the University as a result of the Executive Branch Defendants' actions. For example, Plaintiffs do not assert an intent to wear a

mask "for the purpose of concealing one's identity in the commission of violations of University policies or state, municipal, or federal laws," *see* "Advancing Our Work to Combat Discrimination, Harassment and Antisemitism at Columbia," *available at* https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf ("March 21 Memo") at 1-2 (and even if they did, that prohibition did not result from the Executive Branch Defendants' actions, *see* Part II.B.1, *infra*). Plaintiffs assert generally that they feel deterred from wearing Keffiyehs, and that at least two of them intend to again "participate[] in the public debate about Palestine and Israel," but feel deterred from doing so. *See, e.g.*, PI Br. 12-13, MTD Opp. 15-16. But the Government's March 13 Letter did not seek prohibition of that speech, nor is speech of that nature prohibited by Columbia's March 21 Memo. And while certain Plaintiffs' declarations state that they have engaged in speech that meets the IHRA definition of antisemitism, *see* ███████████████████████████████ ██████████, Plaintiffs concede that Columbia did not adopt that definition, PI Br. 18. Nor did the March 13 Letter require that Columbia adopt it. Rather, Columbia adopted a definition of antisemitism recommended by its own taskforce on antisemitism in August 2024. *See* March 21 Memo at 2.[2]

In short, Plaintiffs have not established any injury to them that has "already occurred or [is] likely to occur soon." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). This is also true with respect to the gravamen of Plaintiffs' assertions against the Executive Branch Defendants—that the pause in funding to Columbia somehow harmed them. *See, e.g.*, PI Br. 22,

---

[2] Plaintiffs have also, for example, failed to sufficiently allege a credible threat of injury with respect to the MESAAS department. Contrary to Plaintiffs' allegations, MTD Opp. 16, SAC ¶¶ 131, 154, there is no evidence that the curriculum has changed, nor that Columbia followed the requests in the March 13 Letter to put the MESAAS department in receivership.

24-26; MTD Opp. 22-23; SAC ¶¶ 175-81, 198-207. Contrary to Plaintiffs' contentions, MTD Opp. 19, they do not sufficiently allege how the termination in funding to Columbia directly affects them. The paragraphs of the Second Amended Complaint they cite do no more than state that the Government has terminated funding to Columbia and that they are "students committed to expressing their views about Palestine and Israel in the future and are directly affected by Columbia losing its federal funding as Columbia students that benefit from the federal funds Defendants have suspended and terminated." *See* MTD Opp. 19 (citing SAC ¶¶ 101, 142, 207). Such vague and conclusory allegations are insufficient to assert standing.

Additionally, Plaintiffs do not sufficiently allege that the injuries they assert were caused by the actions of the Executive Branch Defendants. *See Murthy*, 603 U.S. at 70; *Clapper*, 568 U.S. at 414. To the contrary, Plaintiffs' own declarations suggest that the allegedly chilled speech *predates* the challenged Executive Branch Defendants' action. *See*, *e.g.*, ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████. Moreover, Columbia has explained that the steps it announced on March 21 "in fact differed from those sought in the March 13 Letter in important respects and reflected work that had been underway long before the March 13 Letter." Dkt. No. 84 ("Columbia MTD Br.") 12. As discussed, Columbia's definition of antisemitism and its mask wearing restriction, for example, did not result from the Executive Branch Defendants' actions. *See also* Part II.B.1, *infra*.

Relatedly, and contrary to Plaintiffs' contentions, PI Br. 14-16, Plaintiffs also have not

shown that their alleged injuries are redressable by the relief they seek from this Court against the Executive Branch Defendants—"to reverse the funding pause it imposed on Columbia." PI Br. 16. Nothing in the record supports that requiring the Government to distribute the paused funding to Columbia or withdraw the demands in the March 13 Letter will alleviate the injuries Plaintiffs allege resulted from Columbia's policies.

Finally, Plaintiffs inexplicably fail to mention a recent decision in this district that is apposite on the standing issue here. In *American Association of University Professors v. United States Dep't of Just. ("AAUP")*, No. 25 Civ. 2429 (MKV), 2025 WL 1684817 (S.D.N.Y. June 16, 2025), *appeal filed* at 25-1529 (2d Cir.), the district court considered a motion for a preliminary injunction relating to claims brought under the APA, First Amendment, and other constitutional provisions by two labor organizations comprised of university faculty that challenged the same pause in funding to Columbia that Plaintiffs challenge here. The district court concluded that since "neither Plaintiffs nor their members were ever the recipients of th[e] grants and contracts," they did not have standing to seek the Government's distribution of the funds, including because they had not shown anything more than a subjective chilling of speech in response to the Government's funding pause and March 13 Letter. *See id.* at *1, 8-14. Further, the district court found that the plaintiffs had not shown traceability, as "[c]rucially, Columbia had been planning the reforms it announced in its March 21 Memo, which was about antisemitism on campus, for 'many months' before any of the defendants made any demands," and "[m]oreover, Columbia did not merely implement the steps listed in the March 13 Letter from executive agencies, but rather exercised independent judgment." *Id.* at *14 (citing *Khalil* Tr. at 65:1–8). Therefore, the district court concluded that "Plaintiffs have not shown that Columbia's actions were merely the 'predictable' response to the demands of the executive agency defendants." *Id.* at *14 (citing *Murthy*, 603 U.S.

at 58; *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)).

Here, the student Plaintiffs' standing to challenge the Government's funding freeze and the March 13 Letter is even further removed from the plaintiff faculty organizations in *AAUP*, as some of the faculty in *AAUP* alleged they used the funding for their academic work and that the freeze caused them to lose professional opportunities. *See AAUP*, 2025 WL 1684817, at *13. This Court should likewise conclude that Plaintiffs lack standing.

**2.     The Tucker Act Bars Plaintiffs from Bringing Their Claims Against the Executive Branch Defendants in this Court**

The Court also lacks subject matter jurisdiction over Plaintiffs' claims against the Executive Branch Defendants pursuant to the Tucker Act, 28 U.S.C. § 1491. This is because Plaintiffs' claims are "in essence . . . contract claim[s] over which the Court of Federal Claims has exclusive jurisdiction," based on "the source of the rights upon which . . . plaintiff[s] base[] [their] claims, and . . . the type of relief sought." *See Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (citations and internal quotation marks omitted).

First, Plaintiffs' filings establish that the source of the rights upon which Plaintiffs base their First Amendment and APA claims against the Executive Branch Defendants is the Government's grants and contracts with Columbia. Specifically, both claims are based on the Government's pause of funding to Columbia, which Plaintiffs assert coerced Columbia into implementing certain restrictions upon them. *See* PI Br. 22 (stating that their "substantive APA claim mirrors their First Amendment claim" and "is based on the funding pause the Agency Defendants are using to coerce Columbia into doing as directed," and indicating that their procedural APA claim is based on the "withheld funds" to Columbia), 24-25 (similar); MTD Opp. 22-23 ("Plaintiffs assert that Agency Defendants have cancelled or threatened to cancel various federal grants in order to pressure Columbia to impose a series of speech, conduct, and disciplinary

measures that violate Plaintiffs' First Amendment rights."); SAC ¶¶ 2-3, 5-7, 10, 100-56, 175-81, 198-207 (framing source of APA and First Amendment challenges as the Government's "withdraw[ing], "pausing," or "terminating federal funding" to Columbia).

Regardless of the labels Plaintiffs attach to their claims, these claims stem from the Government's contractual relationship with Columbia, rather than an "independent, non-contractual source." *See Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 376-77 (2d Cir. 1999). Indeed, in the absence of the Government's grants and contracts with Columbia, "it is likely that no cause of action would exist at all." *Id.* at 377 (citation and internal quotation marks omitted).

Moreover, contrary to Plaintiffs' contentions, MTD Opp. 23-26, the terms and conditions of the grants and contracts between the Government and Columbia are integral to Plaintiffs' claims.[3] The Court cannot assess whether the Government properly terminated funding to Columbia without reference to the terms and conditions of the grants and contracts themselves, which, as discussed in the Executive Branch Defendants' moving brief, broadly allow for termination as inconsistent with agency priorities and for convenience. *See* MTD Br. 17-19.

In arguing otherwise, Plaintiffs not only fail to grapple with the factual underpinning of their claims, but they gloss over the most relevant legal authority in favor of focusing on *Atterbury*, a Circuit decision with facts unlike theirs, as well as mostly unpublished out-of-circuit decisions. MTD Opp. 23, 25-26.[4] *Atterbury* does not support the proposition that the sources of Plaintiffs'

---

[3] Even if this were not so, the determining factor would still be that Columbia's federal grants and contracts are the source of Plaintiffs' rights and remedies. *See Atterbury*, 805 F.3d at 406; *cf. Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77-78 (D.C. Cir. 1985) ("That [the] complaint nowhere mentions breach of contract, therefore, cannot alone suffice to establish jurisdiction in the District Court.").

[4] The decisions in *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 137 F.4th 932, 938 (9th Cir. 2025), and *Metro. Transportation Auth. v. Duffy*, No. 25 Civ. 1413 (LJL), 2025 WL 1513369, at *25 (S.D.N.Y. May 28, 2025), which Plaintiffs cite, are

rights are non-contractual. *See* MTD Br. 20 n.8. In *Atterbury*, the court merely held that the court security officer plaintiff's claims did not derive from a contract between his employer and the federal government that gave the Government the power to remove the employee; thus, the Tucker Act did not apply. 805 F.3d at 406-09. Rather, the plaintiff's claims derived from a separate contract that he had with his employer that gave him a protected property interest in continued employment, which was not within the scope of the Tucker Act since it was not based on a contract with the Government. *Id.* These unique facts are inapplicable here because Plaintiffs' claims *are* grounded in Columbia's contracts and grants *with the Government*—without the grants and contracts, Plaintiffs would have no basis for their claims against the Executive Branch Defendants.[5]

Plaintiffs fail to squarely address the Supreme Court's recent decision in *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025), which, unlike *Atterbury*, involved similar claims to the claims here. In concluding that the Government was likely to succeed in showing that the district court lacked jurisdiction over a challenge to the Government's termination of education-related grants that were terminated as inconsistent with agency priorities, the Supreme Court stated that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *Id.* at 968 (citation and internal quotation marks omitted); *see also California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 76-77 (D.

---

distinguishable because the sources of the rights in those cases were statutes, rather than contracts. The same is true regarding many of the other out-of-circuit district court decisions Plaintiffs cite.

[5] Contrary to Plaintiffs' contentions, MTD Opp. 23 (citing *Atterbury*, 805 F.3d at 407), the fact that the plaintiff in *Atterbury* was not a party to the contract between the Government and his employer was not central to the court's Tucker Act holding and is inapposite. *See* MTD Br. 20 n.9. It would lead to an absurd result if Plaintiffs, as non-parties to the grants and contracts here, could use the APA and Constitution as a workaround to seek the same relief in district court that Columbia, as a party to the contracts, could potentially only seek in the Court of Federal Claims because of the Tucker Act.

Mass. 2025) (describing basis for terminations). As in *California*, Plaintiffs' claims here are in essence contractual.[6]

Plaintiffs again fail to mention *AAUP*, the most relevant decision within this district. In *AAUP*, the plaintiffs asserted APA, First Amendment, and other constitutional claims against the Government relating to the same funding pause that Plaintiffs challenge here. In denying the plaintiffs' motion for a preliminary injunction and dismissing the claims for lack of standing, the district court recognized that *California* "raises several additional hurdles for Plaintiffs" because "the Supreme Court characterized DOE 'grants' as contracts and ruled that, as such, the district court in that case likely lacked jurisdiction to order relief because 'the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money,' and 'the Tucker Act grants the Court of Federal Claims [exclusive] jurisdiction over suits based on . . . contract[s] with the United States.'" *Id.* (quoting *California*, 145 S. Ct. at 968); *see also id* at *1 ("If any funds have been wrongfully withheld, such funds may be recovered at the end of a successful lawsuit by the appropriate plaintiff in an appropriate forum") (citing *California*, 145 S. Ct. at 969). This Court should conclude likewise.[7]

---

[6] Plaintiffs' attempt to distinguish *California*, by stating that "[i]n *California*, it was clear that the 'terms and conditions of each individual grant award [were] at issue,'" fails. *See* MTD Opp. 25. For this proposition, Plaintiffs cite to the First Circuit decision in *California* with which the Supreme Court disagreed and omit the end of the quoted sentence in which the First Circuit incorrectly concluded that "the 'essence' of the claims is not contractual." *Id.* (citing *California v. U.S. Dep't of Education*, 132 F.4th 92, 96-97 (1st Cir. 2025)). To the extent the terms and conditions of the grants in California were at issue, so too here. Indeed, Plaintiffs fail to note that, like them, the plaintiffs in *California* had argued that their "dispute does not hinge on the terms of a contract between the parties." *See California*, 769 F. Supp. 3d at 76.

[7] *See also State of New York v. U.S. Dep't of Educ.*, 25-1424, Dkt. No. 40.1 at 3 (2d Cir. June 20, 2025) (in concluding that the Tucker Act did not apply because the Government actions at issue were more regulatory than contract-based, suggesting that under *California* the district court would lack jurisdiction where, like here, a party "seek[s] enforcement of the Government's contractual obligations").

10

Similarly, the Fourth Circuit recently concluded, following *California*, that the Government was "likely to succeed in showing that the district court lacked subject matter jurisdiction over Plaintiffs' claims" where the plaintiffs challenged under the APA and Constitution the cancellation of grants, because the Tucker Act applied. *See Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *1-2 (4th Cir. June 5, 2025) (citation and internal quotation marks omitted). The Fourth Circuit rejected the plaintiffs' argument, which it recognized as being similar to the plaintiffs' argument in *California*, "that their 'dispute does not hinge on the terms of a contract between the parties,'" because "like the grants in California . . . it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." *Id.* at 2.

Second, the remedies Plaintiffs seek against the Executive Branch Defendants are unquestionably contractual because the only relief they seek is the payment of funding to Columbia pursuant to grants and contracts. *See Atterbury*, 805 F.3d at 406; MTD Br. 20-21. In their Second Amended Complaint, Plaintiffs request "the issuance of a permanent injunction enjoining the Taskforce and related federal agencies from withholding federal funding in order to coerce Columbia into chilling the constitutionally protected academic freedom, speech and association of its students based on viewpoint." *See* SAC Prayer for Relief. Similarly, in their proposed order filed in connection with their motion for a preliminary injunction, Plaintiffs ask the Court to order that the "Agency Defendants shall refrain from terminating or freezing—or threatening to terminate or freeze—any federal grants to Columbia as a mechanism to coerce Columbia" into violating Plaintiffs' First Amendment rights. *See* Dkt. No. 100-1 at 1; *see also* PI Br. 16 (contending that "the Court can order the Agency Defendants to reverse the funding pause it imposed on Columbia"). Despite Plaintiffs' attempts to mischaracterize the relief they seek as prohibiting the Executive Branch Defendants from demanding that Columbia take certain actions, MTD Opp. 26-

11

27, Plaintiffs' filings make clear that what they seek is the payment of money to Columbia pursuant to grants and contracts.

This is precisely the type of relief that the Supreme Court in *California* concluded could not be sought in district court under similar circumstances. *See California*, 145 S. Ct. at 968. Indeed, in *AAUP*, in which the plaintiffs sought the payment of the very same withheld funds to Columbia, the district court concluded that "the principal relief Plaintiffs seek is money." *AAUP*, 2025 WL 1684817, at *14. This Court should reach the same conclusion here.

### 3. Plaintiffs' APA Claims Are Unreviewable

#### a. The Funding Pause Is Committed to the Agencies' Discretion

The APA's limited waiver of sovereign immunity does not apply in circumstances where "agency action is committed to agency discretion by law," that is, if statutes or regulations provide no "meaningful standard against which to judge the agency's exercise of discretion." *See* 5 U.S.C. §§ 701(a)(2), 702, 706(1)-(2); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988). Withdrawal of funding like that at issue here is quintessential agency action committed to agency discretion by law. *See* MTD Br. 22-23.

Plaintiffs' attempt to assert otherwise, MTD Opp. 21-22, is unavailing. In *Lincoln* v. *Vigil*, 508 U.S. 182, 192-93 (1993), which Plaintiffs fail to directly address, the Supreme Court held that an agency's decision to discontinue a program that it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion and thus not reviewable under the APA. *See* MTD Br. 22-23. The same reasoning applies to the grants and contracts at issue in this case. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002).

For example, the relevant statutes and regulations afford NIH broad discretion in awarding the grants that comprise the bulk of funding to Columbia, to ensure that NIH distributes its limited

12

funds to programs that are consistent with agency priorities. *See* Dkt. No. 88, Lorsch Decl. ¶¶ 6-9 (citing 42 C.F.R. § 52.6(a)). Similarly, the provisions that allowed the agencies to stop grant payments as inconsistent with agency priorities, *see* 2 C.F.R. § 200.340, and terminate contracts for convenience for not being in the Government's interest, *see* 48 C.F.R. §§ 2.101, 49.101, 49.501-505, 52.249-1-5, reflect deference to the agencies and do not provide meaningful standards for judicial review. *Cf. AAUP*, 2025 WL 1684817, at *15 ("[I]t is not the role of a district court judge to direct the policies of the Executive Branch first and ask questions later."). Therefore, the Court lacks jurisdiction over Plaintiffs' APA claims.

### b.        The March 13 Letter Is Not Final Agency Action

Although for the most part Plaintiffs characterize the final agency action they are challenging as the Executive Branch Defendants' pause or freeze of funding to Columbia, *see* PI Br. 22-25, in their opposition to the Executive Branch Defendants' motion to dismiss, Plaintiffs state that the final agency actions they are challenging include the March 13 Letter, *see* MTD Opp. 17 (citing SAC ¶¶ 199, 206) (internal quotation marks omitted). To the extent Plaintiffs allege that the March 13 Letter constitutes final agency action, that is incorrect.

Under the APA, judicial review is limited to "final agency action[s]." 5 U.S.C. § 704; *Dalton v. Specter,* 511 U.S. 462, 469 (1994). A "preliminary, procedural, or intermediate agency action or ruling" is not directly reviewable under the APA but instead is subject to review only on "review of the final agency action." 5 U.S.C. § 704. In *Bennett v. Spear*, the Supreme Court established a two-part test for determining finality. 520 U.S. 154 (1997). It held that in order to be "final," the action (1) "must mark the 'consummation' of the agency's decisionmaking process" and not be "merely tentative or interlocutory," and (2) "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 177-78 (citations

13

omitted). Both prongs must be satisfied and "deficiency in either is sufficient to deprive [plaintiff] of a cause of action under the APA." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018). Plaintiffs bear the burden of identifying with specificity the discrete final agency action that they challenge. *See Elk Run Coal Co. v. U.S. Dep't of Labor*, 804 F. Supp. 2d 8, 31 (D.D.C. 2011).[8]

First, the March 13 Letter does not mark "the 'consummation' of the agency's decisionmaking process," but rather represented an "interlocutory" step in a negotiation process with Columbia regarding its funding. *See Bennett*, 520 U.S. at 178. Indeed, the March 13 Letter itself stated that Columbia's counsel had contacted the Government to discuss "next steps" and that "this letter outlines immediate next steps that we regard as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government." The parties have since continued to negotiate. *See, e.g.*, Lorsch Decl. ¶ 19; Gruenbaum Decl. ¶ 12.[9]

Because the March 13 Letter was part of the negotiation process between Columbia and the Government, the decisionmaking process had not concluded, and therefore the first *Bennett*

---

[8] The Second Circuit has left open the question of whether a plaintiff's failure to identify a "final agency action" requires dismissal under Rule 12(b)(6) or Rule 12(b)(1). *Compare Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) ("The APA . . . requirement of finality is jurisdictional"); *with Sharkey v. Quarantillo*, 541 F.3d 75, 87-88 (2d Cir. 2008) (suggesting that whether the "threshold requirements" of APA review are satisfied may be analyzed under Rule 12(b)(6)). It is not necessary for the Court to answer this question to decide the instant motions.

[9] *See also, e.g.*, "Supporting and Strengthening Columbia's Research Enterprise," *available at* https://president.columbia.edu/news/supporting-and-strengthening-columbias-research-enterprise (Columbia letter from acting president, dated May 9, 2025, stating: "We continue to engage with the federal government with the aim of restoring funding and reestablishing the flow of grant support in a manner that upholds and strengthens our institutional values."); "An Update from Acting President Shipman on Our Commitment to Combatting Antisemitism," *available at* https://president.columbia.edu/news/update-acting-president-shipman-our-commitment-combatting-antisemitism (Columbia letter from acting president, dated May 23, 2025, indicating that Columbia is still "working to resolve the issues with regard to our critical and long-standing partnership with the federal government").

prong has not been satisfied. *See, e.g.*, *Air California v. U.S. Dep't of Transp.*, 654 F.2d 616, 622 (9th Cir. 1981) (in concluding that there was no final agency action, stating that "[f]lexibility is essential to the administrative process," and "[w]here the regulator and the regulated can achieve accommodation without resort to litigation, as here, [the Court should be] reluctant to intervene at the behest of a third party"); *Assn of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1184 (9th Cir. 1997) ("Negotiations, which are not final actions, therefore are not reviewable, and we decline to consider them."); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 734 (D.C. Cir. 2003) (no final agency action where agency requested that plaintiff take voluntary corrective action but had not ordered plaintiff to comply and further proceedings were anticipated); *Seafarers Int'l Union of North America, AFL-CIO v. U.S. Coast Guard*, 736 F.2d 19, 26 (2d Cir. 1984) (agency action not final until "the process of administrative decision-making has reached a stage where judicial review will not be disruptive of the agency process") (citation omitted).

Second, the March 13 Letter does not determine the rights and obligations of Plaintiffs and has no legal consequences for them. And further, not only was the March 13 Letter merely part of the negotiation process and therefore not determinative, Columbia stated that it would have taken the actions outlined in its March 21 Memo irrespective of the March 13 Letter. *See, e.g.*, MTD Br. 6; Oestericher Decl. Ex. C, Tr. at 65:1-8; Columbia MTD Br. 11-13. Because the March 13 Letter had no direct effect on Plaintiffs, it does not constitute a final agency action that they can challenge. *See, e.g.*, *Air California*, 654 F.2d at 620-21 (finding lack of final agency action due to an action's "indirect effect upon the complaining party" and where another party "controlled . . . the consequences which flowed from them"); *Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S.E.P.A.*, 313 F.3d 852, 861 (4th Cir. 2002) (finding lack of final agency action where restrictions

were "decisions [that] are attributable to independent responses and choices of third parties" rather than the defendants).

Accordingly, any APA claims Plaintiffs assert relating to the March 13 Letter should be dismissed.

**B.      Plaintiffs Have Failed to State or Show a Likelihood of Success on the Merits of Their First Amendment or APA Claims**

**1.       Plaintiffs' First Amendment Claim Fails**

Plaintiffs allege violation of the First Amendment based on a coercion theory, claiming that the termination of funding and March 13 Letter coerced the University to take actions that chilled Plaintiffs' speech. *See* SAC ¶¶ 175-181. In their briefing, Plaintiffs limit their First Amendment claim to three actions Columbia took: (1) the promulgation of a definition of antisemitism, MTD Opp. 5-8, PI Br. 17-19; (2) requiring "all student protestors to identify themselves to campus officials—whether they are wearing a mask or not," MTD Opp. 9-10; PI Br. 19-22; and (3) appointing an administrator to review the MESAAS department, MTD Opp. 10-12.

Plaintiffs fail to credibly allege or prove that the Executive Branch Defendants coerced Columbia to take these actions, that the Executive Branch Defendants' actions were taken to punish or suppress Plaintiffs' speech, or that the speech at issue is constitutionally protected. *See* MTD Br. 23-28. In fact, Plaintiffs admit that the demands in the March 13 Letter do not align with the actions taken by Columbia of which Plaintiffs now complain. *Id.* at 5, 9-11. And Columbia agrees, while also noting that the policies that it announced on March 21 were being developed before the Executive Branch Defendants issued their March 13 Letter. Columbia MTD Br. 11-13; *see also* SAC ¶ 123 n.100. In short, Plaintiffs have failed to credibly plead that the Executive Branch Defendants coerced Columbia to violate the First Amendment.

Plaintiffs rest their claim on a misinterpretation of *National Rifle Association v. Vullo*, 602

16

U.S. 175, 198 (2024), asserting that the Executive Branch Defendants acted with "suppressive intent" to coerce Columbia to censor Plaintiffs' speech and that this "suppressive intent establishes an independent First Amendment violation whether or not protected speech is at issue." MTD Opp. 12-13. As an initial matter, there are no plausible allegations or evidence that any of the Executive Branch Defendants' actions were taken to suppress Plaintiffs' speech. Plaintiffs' reliance upon allegations that presuppose an intention to suppress speech "critical of Israel" is conclusory and unsupported. *See* MTD Opp. 13 (citing SAC ¶¶ 176, 179, 181). Plaintiffs also cite the March 13 Letter itself as "evidence" of an intent to suppress Plaintiffs' speech but fail to acknowledge that the letter specifically references Columbia's failure to protect students and faculty from "antisemitic violence and harassment"—not an intent to suppress Plaintiffs' speech—in announcing the requested next steps. *Id*. (citing SAC ¶ 106 n.91). As noted in the Executive Branch Defendants' opening brief, Plaintiffs' assertions not only run headlong into the presumption of regularity, *see Nieves v. Bartlett*, 587 U.S. 391, 400–02 (2019), but they also fail to satisfy the basic requirements of pleading, *Ashcroft v. Iqbal,* 556 U.S. 662, 682 (2009).

Plaintiffs also fail to address the material differences between the allegations here and those in *Vullo*. Unlike in *Vullo*, here, the Government is using its enforcement authority to act directly upon a regulated entity that receives federal funding (Columbia) because of *that entity's* own conduct. *See B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 n.16 (9th Cir. 2024)); Columbia MTD Br. 9. Any alleged impact on Plaintiffs' speech rights is incidental to the Government's legitimate interest in ensuring that taxpayer funds are not used to support an institution that has failed to protect Jewish students. *Younger v. Harris*, 401 U.S. 37, 51 (1971) ("[T]he existence of a chilling effect even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action.") (internal quotation marks omitted). Indeed, in

17

*AAUP*, the district court found this distinction significant, noting that the Executive Branch Defendants terminated funding to address Columbia's failure to protect students and faculty from antisemitism on campus, and that the "evidence does not support the subjective feelings of Plaintiffs' members that funding has or will be cut to punish protected speech and scholarship." *AAUP*, 2025 WL 1684817, at *13 (citing *Laird*, 408 U.S. at 13).

As to the three actions by Columbia that Plaintiffs claim intrude on their First Amendment rights to free speech and association, none of the actions were requested by the Executive Branch Defendants—let alone coerced by them. A simple comparison between the March 13 Letter and March 21 Memo, both of which are incorporated into Plaintiffs' Second Amended Complaint, establishes as much. *See* SAC ¶¶ 3 n.4 (March 13 Letter), 123 n.100 (March 21 Memo). Columbia agrees, noting: "Columbia's actions announced on March 21 . . . in fact differed from those sought in the March 13 Letter in important respects and reflected work that had been underway long before the March 13 Letter. . . . [T]he initiatives described in the March 21 Letter were fundamentally the product of considered decisionmaking by University leadership based on its own assessment of Columbia's needs." Columbia MTD Br. 11-13.

Plaintiffs' contention that the Executive Branch Defendants "pressed Columbia to adopt an overbroad, viewpoint-based definition of Anti-Semitism," MTD Opp. 5 (cleaned up), PI Br. 17-19, is unsupported. With respect to the March 13 Letter, Plaintiffs incorrectly claim that it directed Columbia to adopt the IHRA definition of antisemitism, "which is tantamount to an Israel-specific speech code." SAC ¶ 113. However, as is clear from the face of the March 13 Letter, no such demand was made. It merely references the IHRA definition as an example and specifically states that the definition must address anti-Zionist discrimination against Jews, but only to the extent "*unrelated* to Israel or [the] Middle East." March 13 Ltr. at 2 (emphasis added). In fact, Plaintiffs

18

concede that Columbia did not adopt the IHRA definition. PI Br. 18 ("Columbia did not adopt the IHRA definition of antisemitism"); *see also* Columbia MTD Br. 12. As is apparent from the March 21 Memo, the definition adopted by Columbia was developed by the University months before the March 13 Letter, in August 2024—prior to the Executive Branch Defendants taking office. *See* March 21 Memo ("The University's approach and relevant policies will incorporate the definition of antisemitism recommended by Columbia's Antisemitism Taskforce in August 2024").[10] As such, Plaintiffs have failed to plead, let alone show, that the Executive Branch Defendants coerced Columbia to adopt a definition of antisemitism that infringes on their First Amendment rights. *See AAUP*, 2025 WL 1684817, at *9-10 (noting that the March 13 Letter "did not demand that Columbia adopt [the IHRA] definition of antisemitism," and that Columbia ultimately adopted the definition proposed by its taskforce in August 2024).

Plaintiffs' claim that Columbia's policy requiring "all student protestors to identify themselves to campus officials—whether they are wearing a mask or not" was compelled by the Executive Branch Defendants and violates the First Amendment, MTD Opp. 9-10, *see also* PI Br. 19-22, is also unavailing. Columbia's mask policy restricts mask wearing "for the purpose of concealing one's identity in the commission of violations of University policies or state, municipal, or federal laws." March 21 Memo at 2. This does not align with the "mask ban" requested by the Executive Branch Defendants in the March 13 Letter, which is the sole source cited by Plaintiffs to support their claim of coercion. MTD Opp. 9, PI Br. 19-20 (citing March 13 Ltr. at 2); *see also*

---

[10] To the extent Plaintiffs allege that Columbia was coerced by the Executive Branch Defendants to impose discipline based on the antisemitism definition developed in August 2024 by Columbia's taskforce, MTD Opp. 5 (citing SAC ¶ 195), this allegation is meritless, as the March 13 Letter does not include any demand regarding how the definition of antisemitism adopted by Columbia should be used. *See* March 13 Ltr. at 2.

19

*AAUP*, 2025 WL 1684817, at *10 ("While the March 13 Letter demanded a ban on all 'masks that are intended to conceal identity or intimidate others, with exceptions only for religious and health reasons,' Columbia announced a more narrow prohibition on masks. . . .").[11]

Columbia did adopt a separate policy requiring participants in protests or demonstrations to present their University identification when asked, regardless of whether they are wearing a mask, *see* March 21 Memo at 1, but Plaintiffs do not allege that this policy was a demand in the March 13 Letter or elsewhere. As there was no coercion, there can be no First Amendment violation by the Executive Branch Defendants arising from a policy enacted by Columbia, a private actor. *See Vullo*, 602 U.S. at 191.

Finally, Plaintiffs claim that the Executive Branch Defendants are "urging Columbia to violate Plaintiffs' right to receive information" because the March 13 Letter contains a demand to place the MESAAS department under academic receivership. MTD Opp. 10-11 (cleaned up). But as with Columbia's other policy enactments, Columbia did not comply with the demand. *See AAUP*, 2025 WL 1684817, at *10 (finding that "Columbia did not place the MESAAS department under academic receivership. Rather, Columbia announced that it would appoint a 'new Senior Vice Provost' to review Columbia's 'portfolio of programs in regional areas,' starting with the Middle East, whose goals would include 'promoting excellence' and 'intellectual diversity'") (quoting March 21 Memo at 3). As with the above policy enactments, there can be no coercion where Columbia has rebuffed the Executive Branch Defendants' request.

---

[11] As Plaintiffs concede, the Second Circuit has upheld the use of mask bans during political demonstrations to guard against potentially unsafe conduct. MTD Opp. 10; PI Br. 21 (citing *Church of American Knights of KKK v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004)). According to the March 21 Memo, this is why Columbia instituted its mask policy. March 21 Memo at 2 (noting that Columbia has had "important instances in the recent past where individuals unaffiliated with the University have caused significant disruptions on our campus").

20

Further, there is simply no allegation that the Executive Branch Defendants have prohibited the sharing of any information. Plaintiffs do not plead, nor could they, that the Executive Branch Defendants have any control over Columbia's planned review of its regional studies programs. Instead, Plaintiffs make the barebones allegation that "Columbia University also is altering its curriculum . . . in line with the [Executive Branch Defendants'] demand that they place under academic receivership the [MESAAS department]." SAC ¶ 131. But that is contradicted by the March 13 Letter, which contains no demand or guidance as to any changes to the MESAAS department curriculum. March 13 Ltr. at 2. And there is no allegation as to whether any alterations have actually occurred to date—let alone what those changes are or will consist of.[12]

For these reasons, Plaintiffs fail to state a First Amendment claim under Rule 12(b)(6), and their request for a preliminary injunction also should be denied as unlikely to succeed on the merits. *See generally AAUP*, 2025 WL 1684817 (dismissing complaint and denying plaintiffs' preliminary injunction motion in case arising out of the same conduct alleged here).

### 2.  Plaintiffs' APA Claims Fail

Plaintiffs have failed to state APA claims or demonstrate a likelihood of success on the merits of such claims. As an initial matter, the Court should reject Plaintiffs' unsupported assertion that the funding to Columbia was paused pursuant to Title VI and that the procedural requirements of that statute apply. *See* MTD Br. 28-29; PI Br. 22, 24; MTD Opp. 19-21; SAC ¶¶ 135-42, 198-207. None of the letters terminating funding reference Title VI; rather, the letters state that the funding was terminated as inconsistent with agency priorities and for convenience, and Plaintiffs

---

[12] For these same reasons, Plaintiffs' citations to *Student Members of SAME v. Rumsfeld*, 321 F. Supp. 2d 388 (D. Conn. 2004), *Board of Educ. v. Pico*, 457 U.S. 853 (1982), and *Fox v. Board of Trustees of State*, 841 F.2d 1207 (2d Cir. 1988), are misplaced. *See* MTD Opp. 11-12. Each of the cited cases involved the prohibition of specific information or speakers by the government. That has not occurred here.

do not challenge the OMB and FAR termination procedures. *See* Lorsch Decl. ¶¶ 11, 17 & Exs. B-C; Oestericher Decl. Exs. A-B.

Indeed, in *AAUP*, the district court explained that "all of Plaintiffs' arguments that Defendants violated the APA . . . by failing to comply with procedural requirements for cutting funding pursuant to Title VI simply presuppose that Title VI is the exclusive vehicle by which the Executive Branch may withdraw financial support for an institution that allows religious discrimination." *AAUP*, 2025 WL 1684817, *15. However, "it strikes this Court as unlikely that Title VI is the sole and exclusive 'legal tool[]' available to a President who instructs executive agencies to prioritize 'combat[ting] anti-Semitism . . . on university and college campuses.'" *Id.* (citing Exec. Order No. 14,188, 90 Fed. Reg. 8,847 (Jan. 29, 2025)). The Court further noted that it "is not aware of authority" for the plaintiffs' proposition "without citation to any authority, that the Executive Branch may not count repudiating antisemitism among 'agency priorities' within the meaning of 2 C.F.R. § 200.340(a)(4)." *Id.*

Plaintiffs' substantive APA claim, which they state is based on the funding pause to Columbia and mirrors their First Amendment claim, MTD Opp. 17, PI Br. 22, also fails. Plaintiffs have failed to sufficiently allege, let alone prove a likelihood of success on the merits regarding, how the funding terminations were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). Under this standard, an agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). "Judicial review under that standard is deferential, and a court

22

may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The funding pause here meets this standard.

As NIH explained in the termination notice letters that it sent, it was terminating the grants for nonalignment with agency priorities of funding safe research environments and ensuring that taxpayer funds are used in ways "that benefit the American people and improve their quality of life." Lorsch Decl. ¶ 17 & Exs. B-C. The letters further stated that it is the NIH's policy that funded institutions should "foster safe, equal, and healthy working and learning conditions conducive to high-quality research and free inquiry," and that recent events, including antisemitism and actions concerning the safety and wellbeing of Jewish students taking place at Columbia University and Columbia University's inaction, contradict that policy. *Id.* ED similarly explained in its termination letter that it found the grants to be inconsistent with agency priorities to eliminate discrimination in education, Oestericher Decl. Exs. A-B, and the Government terminated the contracts for convenience due to the University's insufficient response to antisemitism, Gruenbaum Decl. ¶ 10. Plaintiffs will therefore be unable to show that the termination decisions substantively violated the APA. Indeed, Columbia has acknowledged that the Government had "legitimate concerns" with antisemitism on the campus. *See, e.g.*, March 21 Memo.[13]

Therefore, Plaintiffs have failed to show a likelihood of success on the merits of their APA claims, and these claims should be dismissed pursuant to Rule 12(b)(6).

---

[13] To the extent Plaintiffs allege that the March 13 Letter—which also was not final agency action—substantively violated the APA, that claim fails. *See* Part II.B.1, *supra*. As discussed, Columbia acknowledged the Government had legitimate concerns and on March 21 announced changes to combat antisemitism that the University had been developing for months. Thus, even if it could be considered a reviewable agency action, which it is not, the March 13 Letter was not arbitrary, capricious, or otherwise not in accordance with law.

**III.    Plaintiffs Have Failed to Satisfy the Other Preliminary Injunction Factors**

Plaintiffs fail to satisfy the remaining preliminary injunction factors. First, Plaintiffs have not shown irreparable harm absent the requested injunction. To show irreparable harm "in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights." Order, Dkt. No. 54 at 1 (quoting *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 350 (2d Cir. 2003)). Thus, "to establish a cognizable claim founded on the chilling of First Amendment rights, a party must articulate a 'specific present objective harm or a threat of specific future harm.'" *Id.* (quoting *Laird*, 408 U.S. at 14).

Here, Plaintiffs allege irreparable harm from "Columbia's definition of antisemitism and disclose-your-name-to-the-police-at-the-protest policy." PI Br. 27. Plaintiffs have failed to demonstrate irreparable harm in the form of an actual or imminent loss of First Amendment freedoms caused by the Executive Branch Defendants. Further, Plaintiffs do not sufficiently tie their vague allegations of chilled speech to the relief they actually seek through this preliminary injunction—restoration of federal funding. Plaintiffs' allegations of chilled speech are simply too speculative and conjectural, and they fail to demonstrate that the requested injunction would prevent the feared deprivation of First Amendment rights. *See, e.g.*, *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999) ("Although we acknowledge that, as a theoretical matter, [the challenged requirements] may make some officers more reluctant to speak . . ., this kind of conjectural chill is not sufficient to establish real and imminent irreparable harm.").[14]

---

[14] Further, Plaintiffs' delay in filing their motion for a preliminary injunction—*i.e.*, waiting to file until June 20, Dkt. Nos. 99-100, when the Court gave them leave to refile on April 4, *see* Dkt. No. 54 at 2—undermines their assertion of irreparable harm. *See, e.g.*, *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that

The equities and public interest—which Plaintiffs do not meaningfully address, *see* PI Br. 26—also weigh strongly against issuing a preliminary injunction. Although "securing First Amendment rights is in the public interest," *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), for the reasons discussed, Plaintiffs will be unable to show that the Executive Branch Defendants have infringed on their First Amendment rights. Rather, Plaintiffs are seeking to hamstring the executive branch from lawfully effectuating policy decisions with respect to funding, Executive Branch priorities, and combatting antisemitism. *See AAUP*, 2025 WL 1684817, at *14 (rejecting the plaintiffs' arguments regarding the public interest and equities). There is no public interest in compelling federal agencies to make certain discretionary funding decisions, particularly where the requested injunction would restrain the Government from promoting lawful and important priorities. *See Brooks v. Giuliani*, 84 F.3d 1454, 1467 (2d Cir. 1996) ("Injunctive relief should be narrowly tailored to address specific harms and not impose unnecessary burdens on lawful activity." (internal quotation marks omitted)); *see also generally Trump v. CASA, Inc.*, 606 U.S. ----, 2025 WL 1773631 (June 27, 2025) (granting stay of preliminary injunctions "to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue").[15]

---

there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action."). Plaintiffs have provided no reason for the delay nor asserted any material changes in the circumstances suddenly necessitating a renewed motion for injunctive relief.

[15] If the Court grants Plaintiffs' motion for a preliminary injunction, it should require Plaintiffs to post a bond. Federal Rule of Civil Procedure 65(c) provides that a court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see also Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557-58 (2d Cir. 2011). Here, should the Government ultimately prevail in this action, it will potentially be at the cost of hundreds of millions of dollars in grant and contract money that it has limited ability to recoup. Therefore, the posting of a substantial bond is warranted.

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction and should dismiss the claims in Plaintiffs' Second Amended Complaint as against the Executive Branch Defendants.

Dated: New York, New York
July 11, 2025

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for Executive Branch Defendants*

By:    */s/ Allison M. Rovner*
ALLISON M. ROVNER
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2691


BRETT SHUMATE
Assistant Attorney General
Civil Division

26

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 8,694 words.

*/s/ Allison M. Rovner*
Assistant United States Attorney

27