**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAHMOUD KHALIL, et al.,

*Plaintiffs,*

v.

TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, et al.,

*Defendants.*

No. 1:25 Civ. 02079 (AS)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK AND ACTING PRESIDENT CLAIRE SHIPMAN'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT AND MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Marshall L. Miller (Lead Counsel)
Gabrielle E. Tenzer
Zachary Piaker
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
mmiller@heckerfink.com
gtenzer@heckerfink.com
zpiaker@heckerfink.com

Trisha Anderson
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
tanderson@heckerfink.com

*Attorneys for Defendants Trustees
of Columbia University in the City
of New York and Acting President
Claire Shipman*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................... 2

LEGAL STANDARD........................................................................................................ 3

ARGUMENT ................................................................................................................... 4

I.    Plaintiffs fail to state a claim against Columbia on their First Amendment claim and therefore cannot meet their burden to show a likelihood of success on the merits. ........... 4

    A.    Plaintiffs lack standing to assert their First Amendment claim against Columbia. ... 5

    B.    Plaintiffs fail to demonstrate that Columbia is a state actor subject to the First Amendment.......................................................................................................... 20

II.   Plaintiffs fail to meet their burden on the other factors they must meet for a preliminary injunction. ......................................................................................................... 27

    A.    Plaintiffs fail to demonstrate irreparable harm. ....................................................... 27

    B.    Neither the balance of equities nor public interest favor preliminary injunctive relief....................................................................................................................... 29

III.  Plaintiffs also fail to state a breach of contract claim. ....................................................... 30

CONCLUSION............................................................................................................... 32

## TABLE OF AUTHORITIES

**CASES**

*Arma v. Buyseasons, Inc.*,
    591 F. Supp. 2d 637 (S.D.N.Y. 2008).................................................................... 20

*Bohnak v. Marsh & McLennan Cos.*,
    79 F.4th 276 (2d Cir. 2023) ........................................................................... 7, 8

*Bordell v. Gen. Elec. Co.*,
    922 F.2d 1057 (2d Cir. 1991)............................................................................. 10

*Bronx Household of Faith v. Bd. of Educ.*,
    331 F.3d 342 (2d Cir. 2003).............................................................................. 28

*In re CarLotz, Inc. Sec. Litig.*,
    No. 21 Civ. 5906, 2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) ...................................... 20

*Children's Health Def. v. Meta Platforms, Inc.*,
    112 F.4th 742 (9th Cir. 2024) .......................................................................... 27

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
    843 F.3d 48 (2d Cir. 2016)........................................................................... 23, 30

*Church of the Am. Knights of the Ku Klux Klan v. Kerik*,
    356 F.3d 197 (2d Cir. 2004)......................................................................... 18, 19

*Ciambriello v. County of Nassau*,
    292 F.3d 307 (2d Cir. 2002).............................................................................. 20

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985).............................................................................. 29

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999)....................................................................................... 30

*Dinerstein v. Google, LLC*,
    73 F.4th 502 (7th Cir. 2023) ............................................................................. 7

*Do No Harm v. Pfizer Inc.*,
    126 F.4th 109 (2d Cir. 2025) ......................................................................... 5, 9

*Duffield v. Robertson Stephens & Co.*,
    144 F.3d 1182 (9th Cir. 1998) ........................................................................... 26

*EEOC v. Luce, Forward, Hamilton & Scripps*,
   345 F.3d 742 (9th Cir. 2003) ................................................................. 26

*Eletson Holdings, Inc. v. Levona Holdings Ltd.*,
   731 F. Supp. 3d 531 (S.D.N.Y. 2024) ...................................................... 6

*Elrod v. Burne*,
   427 U.S. 347 (1976) ................................................................................ 28

*Fakhreddine v. Univ. of Pa.*,
   No. 24 Civ. 1034, 2025 WL 345089 (E.D. Pa. Jan. 30, 2025) ....................... 6, 22

*Farrakhan v. Anti-Defamation League*,
   No. 24-1237-CV, 2025 WL 24066 (2d Cir. Jan. 3, 2025) .............................. 6

*Felix v. City of New York*,
   344 F. Supp. 3d 644 (S.D.N.Y. 2018) ..................................................... 20

*Gally v. Columbia Univ.*,
   22 F. Supp. 2d 199 (S.D.N.Y. 1998) ...................................................... 32

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*,
   765 F. Supp. 3d 245 (S.D.N.Y. 2025) ..................................................... 27

*Ghafari v. Mun. Ct.*,
   150 Cal. Rptr. 813 (Ct. App. 1978) ....................................................... 19

*Giatas v. Dimitri*,
   162 F.3d 1147 (table), 1998 WL 639408 (2d Cir. 1998) ........................... 12

*Gidatex, S.r.L. v. Campaniello Imps., Ltd.*,
   13 F. Supp. 2d 417 (S.D.N.Y. 1998) ...................................................... 29

*Gill v. Whitford*,
   585 U.S. 48 (2018) ................................................................................ 23

*Gilman v. Marsh & McLennan Cos.*,
   826 F.3d 69 (2d Cir. 2016) ........................................................ 20, 21, 26

*Goldberg v. Pace Univ.*,
   88 F.4th 204 (2d Cir. 2023) ................................................................. 30

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007) ................................................................... 28

*Graseck v. Mauceri*,
    582 F.2d 203 (2d Cir. 1978)........................................................................... 26

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993)........................................................................................ 15

*Hayut v. State Univ. of N.Y.*,
    352 F.3d 733 (2d Cir. 2003)..................................................................... 15, 16

*I.C. v. Zynga, Inc.*,
    600 F. Supp. 3d 1034 (N.D. Cal. 2022) ........................................................ 8

*Informed Consent Action Network v. YouTube LLC*,
    582 F. Supp. 3d 712 (N.D. Cal. 2022) ........................................................ 27

*Int'l Action Ctr. v. City of New York*,
    587 F.3d 521 (2d Cir. 2009).......................................................................... 10

*Keepers, Inc. v. City of Milford*,
    807 F.3d 24 (2d Cir. 2015)............................................................................. 5

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) .................................................................... 29

*Laird v. Tatum*,
    408 U.S. 1 (1972)................................................................................... 10, 15

*Latino Officers Ass'n v. Safir*,
    170 F.3d 167 (2d Cir. 1999).......................................................................... 10

*Loc. 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*,
    667 F.2d 267 (2d Cir. 1981)..................................................................... 22, 23

*Loggins v. Leland Stanford Junior Univ.*,
    No. 24 Civ. 2027, 2024 WL 3955470 (N.D. Cal. Aug. 26, 2024)...................... 8

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)......................................................................................... 5

*Magnet Commc'ns, LLC v. Magnet Commc'ns, Inc.*,
    No. 00 Civ. 5746, 2001 WL 1097865 (S.D.N.Y. Sept. 19, 2001) ................... 29

*Mandala v. NTT Data, Inc.*,
    975 F.3d 202 (2d Cir. 2020).......................................................................... 25

*Manhattan Cmty. Access Corp. v. Halleck,*
    587 U.S. 802 (2019) ............................................................................................ 20

*Mathis v. Pac. Gas & Elec. Co.,*
    75 F.3d 498 (9th Cir. 1996) ............................................................................... 21

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) .............................................................................................. 3

*McNaughton v. de Blasio,*
    No. 14 Civ. 221, 2015 WL 468890 (S.D.N.Y. Feb. 4, 2015) ............................. 7

*Monowise Ltd. Corp. v. Ozy Media, Inc.,*
    No. 17 Civ. 8028, 2018 WL 2089342 (S.D.N.Y. May 3, 2018) ........................ 29

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ........................................................................................ 9, 10

*Moore v. Consol. Edison Co. of N.Y.,*
    409 F.3d 506 (2d Cir. 2005) ................................................................................ 3

*Murthy v. Missouri,*
    603 U.S. 43 (2024) ............................................................................................... 8

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,*
    883 F.3d 32 (2d Cir. 2018) ................................................................................... 3

*Newman v. Legal Servs. Corp.,*
    628 F. Supp. 535 (D.D.C. 1986) .......................................................................... 8

*Novio v. N.Y. Acad. of Art,*
    317 F. Supp. 3d 803 (S.D.N.Y. 2018) ............................................................... 32

*Nungesser v. Columbia Univ.,*
    244 F. Supp. 3d 345 (S.D.N.Y. 2017) ............................................................... 32

*Nungesser v. Columbia Univ.,*
    169 F. Supp. 3d 353 (S.D.N.Y. 2016) .......................................................... 30, 31

*Price v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW),*
    722 F. Supp. 933 (D. Conn. 1989) ..................................................................... 30

*Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.,*
    No. 04 Civ. 704, 2005 WL 1214281 (S.D.N.Y. May 20, 2005) ........................ 32

*Ryan v. County of DuPage,*
    45 F.3d 1090 (7th Cir. 1995) ............................................................... 19

*Rynasko v. N.Y. Univ.,*
    63 F.4th 186 (2d Cir. 2023) ................................................................ 31

*S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.,*
    483 U.S. 522 (1987) ............................................................................. 24

*Saeedy v. Microsoft Corp.,*
    No. 23 Civ. 1104, 2023 WL 8828852 (W.D. Wash. Dec. 21, 2023) ................... 7

*Shaev v. NetScout Sys., Inc.,*
    No. 24 Civ. 5859, 2024 WL 4144031 (S.D.N.Y. Sept. 11, 2024) ............... 3, 27, 29

*Shain v. Ellison,*
    356 F.3d 211 (2d Cir. 2004) .................................................................. 6

*Students for Just. in Pal., at the Univ. of Hou. v. Abbott,*
    756 F. Supp. 3d 410 (W.D. Tex. 2024) ................................................ 14

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................................. 9

*TransUnion, LLC v. Ramirez,*
    594 U.S. 413 (2021) ............................................................................. 8

*Trump v. Deutsche Bank AG,*
    943 F.3d 627 (2d Cir. 2019) .............................................................. 4, 22

*United States v. Int'l Bhd. of Teamsters,*
    156 F.3d 354 (2d Cir. 1998) .............................................................. 24

*Ward v. N.Y. Univ.,*
    No. 99 Civ. 8733, 2000 WL 1448641 (S.D.N.Y. Sept. 28, 2000) .............. 31, 32

*Widmar v. Vincent,*
    454 U.S. 263 (1981) ............................................................................. 12

**FEDERAL RULES**

Fed. R. Civ. P. 12 (b)(1) ............................................................................ 3

Fed. R. Civ. P. 12 (b)(6) ............................................................................ 3

**OTHER AUTHORITIES**

Off. for C.R., U.S. Dep't of Educ., *Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics* (May 7, 2024), https://www.ed.gov/media/document/colleague-202405-shared-ancestrypdf -35100.pdf.................................................................................................................... 15, 16

Off. for C.R., U.S. Dep't of Educ., *Questions and Answers on Executive Order 13899 (Combating Anti-Semitism) and OCR's Enforcement of Title VI of the Civil Rights Act of 1964* (Jan. 19, 2021), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/qa- titleix-anti-semitism-20210119.pdf .................................................................................... 13

## PRELIMINARY STATEMENT

Over the past twenty-one months, Columbia—like many universities across the country—has seen the bonds of its campus community strained in extraordinary ways. The University has worked diligently to provide an environment that balances fostering the education of its students, safeguarding its community from discrimination and harassment, and protecting speech from a wide variety of viewpoints, including by supporting academic freedom. Plaintiffs are students who disagree with the balance the University has struck. But Plaintiffs cannot shoehorn that disagreement with the University's policy decisions into viable legal claims against Columbia, under either a First Amendment or breach of contract theory.

Plaintiffs' First Amendment claims are fundamentally misguided. They allege that congressional and executive branch actors seek to punish and suppress their speech because of their viewpoint. But Plaintiffs have misdirected any First Amendment claims they might have against the government by bringing them against—and seeking to enjoin—Columbia, a private entity. Plaintiffs' breach of contract theory is equally flawed. Notwithstanding their disagreement with the University's policy decisions, Plaintiffs cannot identify any enforceable promises or breaches of such promises with the specificity required for a breach of implied contract claim against a university under New York law.

The motions now before the Court concern Plaintiffs' third attempt to plead these claims and second effort to seek preliminary injunctive relief on the same. But nothing has changed since the Court denied Plaintiffs' prior motion for temporary relief, and Plaintiffs' new submissions do not move the needle. Plaintiffs simply rehash their arguments—notwithstanding a factual record that stubbornly refuses to fit their predetermined narrative, and in spite of the unsatisfied threshold legal requirements identified in Columbia's prior submissions. Plaintiffs still fail to satisfy their burden of establishing standing to bring their First Amendment claim against Columbia, still fail

to demonstrate that Columbia is a state actor as required for a First Amendment claim, and still fail to identify any enforceable promises made by the University. For the reasons detailed more fully below, the Court should deny the motion for a preliminary injunction against the Columbia defendants and should dismiss them from this action.[1]

## BACKGROUND

Columbia incorporates by reference the background section contained in its memorandum of law in support of its motion to dismiss, ECF 84 ("MTD") at 2-6, the substance of which has remained unchanged between the filing of the Second Amended Complaint ("SAC"), ECF 62, on April 18 and Plaintiffs' motion for a preliminary injunction, ECF 99 ("PI Mem."), more than two months later, on June 20, without any explanation for the delay.

On April 4, the Court denied Plaintiffs' motion for a temporary restraining order ("TRO"), holding that "plaintiffs' submissions don't address their standing to challenge the government's March 13, 2025 letter threatening funding cuts or Columbia's response announcing measures to curb antisemitism," nor "their risk of irreparable harm from those measures"; that "plaintiffs can't enjoin what's already done" as to records already produced in response to congressional requests; and that the record did not reflect that additional document productions to the Committee were imminent. ECF 54 at 1-2. The Court granted Plaintiffs leave to file the SAC and to renew their motion for preliminary relief if they could "address the threshold issues identified" by the Court "and in defendants' submissions." *Id.* at 2. Plaintiffs filed the SAC on April 18, ECF 62, unaccompanied by any renewed motion for preliminary relief. Columbia moved to dismiss the SAC on May 23. MTD. Plaintiffs filed their opposition on June 20 and only then moved for a

---

[1] All abbreviations, capitalized terms, and citations to "¶ _" retain their meanings from Columbia's memorandum of law in support of its motion to dismiss. ECF 84. Citations to "Ex. __" refer to exhibits to the Declaration of Marshall L. Miller.

second time for a preliminary injunction without any explanation as to their delay. PI Mem.; ECF 103 ("Pls.' Columbia Opp'n").

The Committee has not issued additional letter requests for student records since the February 13 Letter, nor has Columbia made responsive document productions to the Committee since March 19, 2025, as previously described. ECF 40 ("Rosan Decl.") ¶ 3; Suppl. Decl. of Felice Rosan in Supp. of Columbia Defs.' Mot. to Dismiss & Opp'n to Pls.' Mot. for Prelim. Inj. ("Rosan Suppl. Decl.") ¶ 12. Nor do Plaintiffs identify any institutional actions undertaken by the University in response to the March 13 Letter or any other action by the Agency Defendants, aside from those announced in the March 21 Letter that is already the subject of the SAC.

## LEGAL STANDARD

The standards applicable to a motion to dismiss under Rules 12(b)(1) and 12(b)(6) are set forth in Columbia's opening brief. MTD 6.

"On a motion for a preliminary injunction, the party seeking an injunction must demonstrate: '(1) irreparable harm;'" (2) "a likelihood of success on the merits"; and (3) "that a preliminary injunction is in the public interest." *Shaev v. NetScout Sys., Inc.*, No. 24 Civ. 5859, 2024 WL 4144031, at *1 (S.D.N.Y. Sept. 11, 2024) (Subramanian, J.) (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

Plaintiffs incorporate into their brief a slightly different standard sometimes applied in the Second Circuit: that the moving party must show "serious questions on the merits and a balance of hardships decidedly favoring the moving party." *Shaev*, 2024 WL 4144031, at *1 (quoting *N. Am. Soccer League*, 883 F.3d at 37); *see* PI Mem. 8. That standard does not apply where the

moving party seeks preliminary injunctive relief against the federal legislative and executive branches. *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 637-41 (2d Cir. 2019), *vacated and remanded on other grounds sub nom. Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020). It should therefore not apply to a motion for preliminary injunction against Columbia where such relief is sought on the ground that Columbia is a state actor doing the bidding of those branches. But even if the "serious questions" test were the appropriate standard, Plaintiffs have not satisfied it. For simplicity, this brief will refer to the "likelihood of success" standard, but Columbia's arguments apply with equal force under the "serious questions" test.

## ARGUMENT

As detailed in Columbia's opening brief in support of its motion to dismiss, Plaintiffs fail to state a claim either that Columbia violated the First Amendment or breached any contract with Plaintiffs. They also fail to plausibly allege standing to support their First Amendment cause of action. Plaintiffs now seek a preliminary injunction on their First Amendment claim against Columbia. Because they have failed to state a claim on which relief can be granted, they cannot meet the high bar of demonstrating a likelihood of success on the merits. Nor have they carried their burden to show that the other preliminary injunction factors favor relief. The Court should deny their motion and grant Columbia's motion to dismiss.

**I.    Plaintiffs fail to state a claim against Columbia on their First Amendment claim and therefore cannot meet their burden to show a likelihood of success on the merits.**

Plaintiffs' First Amendment claim against Columbia fails for two independent, threshold reasons. *First*, Plaintiffs lack standing to challenge the University's response to either the February 13 Letter or March 13 Letter on First Amendment grounds. *Second*, Columbia is a private university and not a state actor directly subject to the First Amendment. Because Plaintiffs fail to plausibly state a claim against Columbia, they cannot demonstrate that they are likely to succeed

on the merits.

**A.    Plaintiffs lack standing to assert their First Amendment claim against Columbia.**

For the reasons stated in Columbia's opening brief, and those below, Plaintiffs fail to plausibly allege that they have standing to bring their First Amendment claim. "The evidentiary burden for establishing Article III standing for the purposes of a motion for a preliminary injunction is" even higher than on a motion to dismiss—"at least as onerous as the burden for establishing standing to secure a summary judgment." *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 113-14 (2d Cir. 2025). To obtain a preliminary injunction, Plaintiffs "must set forth by affidavit or other evidence specific facts" demonstrating the elements of standing: injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up). Standing "cannot be inferred, but must affirmatively appear in the record." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 43 (2d Cir. 2015) (cleaned up).

**1.    Plaintiffs lack standing to challenge Columbia's actions in connection with the February 13 Letter.**

Plaintiffs have not met their burden to identify specific facts demonstrating that Columbia's responses to the February 13 Letter caused them an injury in fact that is traceable to Columbia. As Columbia explained in its opening brief, MTD 16-18, the SAC alleges a multi-step, hypothetical theory of injury based on Columbia's responses to the February 13 Letter: that Columbia might produce records with de-identifying redactions to the Committee in response to its requests; that these redacted records might include information concerning Plaintiffs; that the Committee might publicize these redacted records; that unspecified third parties might somehow ascertain Plaintiffs' identities from these redacted records; and that these third parties might then dox and harass Plaintiffs. ¶¶ 7, 10, 58 & n.43, 93-97, 149, 172. But for the reasons already explained, this chain of hypothetical events is "simply too speculative and conjectural" to establish the certainly

5

impending injury necessary for prospective relief. *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004); *see Fakhreddine v. Univ. of Pa.*, No. 24 Civ. 1034, 2025 WL 345089, at *3-4 (E.D. Pa. Jan. 30, 2025) (dismissing similar claim on standing grounds). Nor would any such injury be traceable to Columbia, since Plaintiffs do not claim that Columbia has publicized or will publicize its responses to the Committee or that Columbia has played or will play any role in the Committee's decision to publish reports. *See, e.g.*, *Farrakhan v. Anti-Defamation League*, No. 24-1237-CV, 2025 WL 24066, at *1 (2d Cir. Jan. 3, 2025) (holding "alleged First Amendment injuries are not fairly traceable to the defendants' actions" because harm was caused by "third part[ies] not before the court" and connected to defendant's actions through only "speculative inferences" (cleaned up)).

Perhaps recognizing this, Plaintiffs put forward for the first time a new theory of standing: that they were injured when Columbia provided the Committee with "students' private information, including as to their protected speech and associations," regardless of whether such disclosure caused further harm. Pls.' Columbia Opp'n 17. They have not explained, however, how the mere disclosure of information with de-identifying redactions in response to a congressional committee's request constitutes a cognizable First Amendment injury, despite the fact that it is their burden to do so. The only case that Plaintiffs cite in support, *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531 (S.D.N.Y. 2024) (cited at Pls.' Columbia Opp'n 12, 17), is not a First Amendment case and does not support standing here. Instead, it involved a question about standing to petition for confirmation of an arbitral award where the petitioner's asserted harm was "breach of a contractual right" without allegation of additional harm suffered as a result of the breach. *Id.* That a breach of contract without additional harm can serve as a basis for standing to support contract claims does not speak to the kind of injury required to support a First Amendment

claim. *Cf. McNaughton v. de Blasio*, No. 14 Civ. 221, 2015 WL 468890, at *11 (S.D.N.Y. Feb. 4, 2015) (dismissing First Amendment claim because "Plaintiff here can show neither actual chilling of his speech nor a non-speech-related harm analogous to those recognized by the Second Circuit" as sufficient for a First Amendment claim), *aff'd*, 644 F. App'x 32 (2d Cir. 2016).

It is true that courts have recognized that, in particular circumstances, public disclosure of highly sensitive private information, such as "name[,] Social Security [and] federal tax id number," may give rise to standing without demonstration of additional harm. *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 281, 285 (2d Cir. 2023); PI Mem. 11-12. But even if this case law involving state law causes of action were relevant to Plaintiffs' First Amendment claims, it does not support any theory of standing related to the disclosure of information that Plaintiffs concede Columbia redacted before submitting to Congress. *See* ECF 82-6 at 2 (describing redactions applied to production responding to February 13 Letter); ECF 82-7 at 1 (same); ECF 82-8 at 2 (same); Rosan Suppl. Decl. ¶ 12 (describing de-identifying redaction process); *see also* ¶ 58 n.43 (conceding understanding that Columbia complied with legal obligations under FERPA when supplying student records to Congress). Courts have regularly rejected arguments that disclosure of de-identified records confers standing in the context of other types of claims. *See, e.g.*, *Dinerstein v. Google, LLC*, 73 F.4th 502, 508, 513 (7th Cir. 2023) (finding no plausible allegations of concrete harm to patient whose anonymized electronic health records were disclosed to third parties because neither parties nor court had "identified [any] case in which a court has permitted a plaintiff to bring a public-disclosure tort premised on the dissemination of *anonymized* information" (emphasis in original)); *Saeedy v. Microsoft Corp.*, No. 23 Civ. 1104, 2023 WL 8828852, at *4 (W.D. Wash. Dec. 21, 2023) (collecting cases and explaining "[d]ata and information that has been found insufficiently personal" to establish concrete injury "includes . . .

anonymized data"); *I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1049 (N.D. Cal. 2022) (similar). Nor do Plaintiffs even try to explain how this disclosure of de-identified information to Congress in response to a congressional investigation could give rise to standing given the rule at common law that such disclosures are absolutely privileged. *See Bohnak*, 79 F. 4th at 286 (explaining that for "intangible harm arising from disclosure of one's [personal information]" to be concrete it must have "close historical or common-law analogue" (quoting *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 425 (2021))); *see Loggins v. Leland Stanford Junior Univ.*, No. 24 Civ. 2027, 2024 WL 3955470, at *8-9 (N.D. Cal. Aug. 26, 2024) (applying privilege to statements made to Committee during roundtable on "Antisemitism at Postsecondary Institutions"); *Newman v. Legal Servs. Corp.*, 628 F. Supp. 535, 542 (D.D.C. 1986) ("[T]estimony and statements are absolutely privileged when presented to legislative proceedings at the express request of those conducting such hearings.").

Finally, Plaintiffs also appear to argue that Columbia's provision of de-identified records to the Committee in response to the February 13 Letter will "impact[]" Plaintiffs who "plan to do and say things[] that Columbia has now made punishable" by subjecting them to "easier, faster" discipline and chilling their speech. Pls.' Columbia Opp'n 16. But Plaintiffs' assertion fails to draw any connection between disclosure of the de-identified records to the Committee and any threat of punishment under the definition of antisemitism or otherwise.

Rather than addressing standing as to each of the claims against Columbia distinctly—by identifying the particular alleged harm and then tying it to actions by Columbia alleged in the SAC—Plaintiffs obscure the analysis by mixing and matching their claims, alleged harms, and actors, and impermissibly "treat[ing] the defendants as a monolith." *Murthy v. Missouri*, 603 U.S. 43, 61, 69 (2024) ("Because standing is not dispensed in gross, plaintiffs must demonstrate

8

standing for each claim they press against each defendant, and for each form of relief they seek."
(cleaned up)). Such unsupported speculation plainly fails to meet Plaintiffs' burden to establish
standing for their First Amendment claim against Columbia. *See Summers v. Earth Island Inst.*,
555 U.S. 488, 499 (2009) ("Standing . . . is not an ingenious academic exercise in the conceivable
but requires a factual showing of perceptible harm." (cleaned up)).

      **2.**      **Plaintiffs lack standing to challenge Columbia's actions in connection with the March 13 Letter.**

Plaintiffs likewise have not met their burden to demonstrate standing for their First
Amendment claim as it relates to Columbia's response to the March 13 Letter. Columbia has
explained why Plaintiffs have failed to plausibly allege harm under any of the three grounds
identified in the SAC: (1) revisions to disciplinary policies, particularly in relation to the adoption
of the University Task Force's definition of antisemitism; (2) the adoption of a policy on masking
during protest activity; and (3) the purported receivership of the MESAAS department. MTD 18-
22. For Columbia's previously given reasons and those stated below, Plaintiffs still fail to "set
forth . . . specific facts" necessary to support standing. *Do No Harm*, 126 F.4th at 119.

As an initial matter, Plaintiffs' motion for preliminary injunctive relief makes clear that
they seek to advance a facial challenge, asking this Court to enjoin the University from "using the
definition of anti-Semitism adopted on March 21, 2025, for law enforcement or discipline" or
"requiring student protestors to identify themselves to campus officials at expressive events" in
any circumstance. ECF 100-1 at 2. But facial challenges are especially "hard to win," because
"courts usually handle constitutional claims case by case, not en masse." *Moody v. NetChoice,
LLC*, 603 U.S. 707, 723 (2024). To obtain relief on a facial basis, Plaintiffs must show that "a
substantial number of [the policy's] applications are unconstitutional, judged in relation to [its]
plainly legitimate sweep," meaning that Plaintiffs must "address the full range of activities the

[challenged policies] cover, and measure the constitutional against the unconstitutional applications." *Id.* at 723-24 (cleaned up).

Plaintiffs do not acknowledge this standard, much less attempt to satisfy it. Indeed, although they cite *Moody* for a proposition about standing and First Amendment overbreadth claims, *see* PI Mem. 8, they neither explain the relevance of overbreadth in this context nor acknowledge the high bar that *Moody* itself stated for facial challenges. *See Moody*, 603 U.S. at 744 ("Even in the First Amendment context, facial challenges are disfavored, and neither parties nor courts can disregard the requisite inquiry into how a law works in all of its applications."). Given that Plaintiffs have neither acknowledged the standard for a facial challenge nor attempted to meet it, the Court should not entertain their request for such disfavored relief.

Even insofar as Plaintiffs seek relief against Columbia's policies as applied to themselves, they must show more than a subjective chill on their activities. *See Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). "Allegations of a subjective chill of First Amendment rights are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Int'l Action Ctr. v. City of New York*, 587 F.3d 521, 529 (2d Cir. 2009) (cleaned up) (quoting *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 170 (2d Cir. 1999)). Rather, to demonstrate standing, "a plaintiff must proffer some objective evidence to substantiate his claim that the challenged conduct has deterred him from engaging in protected activity." *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1061 (2d Cir. 1991). Plaintiffs cannot demonstrate standing by alleging that their speech will be prohibited under an objectively unsupported interpretation of the policies they challenge. That is precisely what they seek to do, as described in more detail below, and why they have not met their burden to show standing for their First Amendment claim as applied to them.

### a.    *Revisions to the Anti-Discrimination Policy*

Plaintiffs seek to enjoin the University's adoption of a definition of antisemitism for "law

enforcement or discipline." ECF 100-1 at 2. Plaintiffs contend that the threat of future discipline has chilled certain forms of constitutionally protected speech and expression, such as wearing keffiyehs on campus, engaging in pro-Palestine speech, attending pro-Palestine rallies, and engaging in discussions related to or mentioning Israel, Palestine, and Gaza. But Columbia's disciplinary policies and procedures, even as revised, do not proscribe this speech or expressive conduct and cannot be reasonably interpreted as doing so.

At the outset, Plaintiffs conflate distinct policies, repeatedly pointing to a set of rules governing student behavior that does not contain a definition of antisemitism as evidence of the supposed chilling effect of the definition. To clarify, the University maintains multiple policies that govern the conduct of its students, two of which are of particular note here: (i) the Rules of University Conduct ("Rules"); and (ii) the Anti-Discrimination and Discriminatory Harassment Policies & Procedures for Students ("Anti-Discrimination Policy"). The Rules apply to "any demonstration" that "takes place on or at a University facility or at any University sponsored activity." Ex. A ("Rules") § 442. The Rules impose certain time, place, and manner restrictions on such demonstrations, prohibiting, for example, placing others in danger of bodily harm, causing property damage, interfering with access to University facilities, disrupting University functions, or failing to disperse when ordered to do so by designated University officials. *Id.* § 443. Although the University recently made changes to the bureaucratic structure that oversees disciplinary proceedings conducted by the University Judicial Board ("UJB"), it made no substantive changes to the Rules themselves. The content-neutral time, place, and manner regulations in the Rules do not incorporate or rely upon any definition of antisemitism.

Despite the absence of the antisemitism definition anywhere in the Rules, Plaintiffs nonetheless assert that they fear their "past speech is now punishable in light of Columbia's new

definition of antisemitism" because they "have engaged in similar past activism" as students and experienced disciplinary consequences based on violations of "Columbia's rules during the first encampment or at Hamilton Hall." Pls.' Columbia Opp'n 21 (quotation marks omitted). But the disciplinary proceedings to which Plaintiffs refer involved conduct that violated time, place, and manner restrictions under the Rules such as those referred to above, adjudicated before the UJB. *See* Rosan Suppl. Decl. ¶ 5. To the extent Plaintiffs intend to suggest that they may risk disciplinary consequences if they engage in "similar" violations of the Rules—such as breaking into, occupying, and vandalizing a University building—that would be the result of conduct that violates the Rules, not because of the University's adoption of an antisemitism definition that is not part of the Rules. And even if Columbia were a public university directly subject to the First Amendment, which it is not, it would be well within its legal discretion to subject to discipline "even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education." *Giatas v. Dimitri*, 162 F.3d 1147 (table), 1998 WL 639408, at *1 (2d Cir. 1998) (quoting *Widmar v. Vincent*, 454 U.S. 263, 277 (1981)) (involving State University of New York College at Fredonia, a state actor as a public university).

Separate from the Rules is the University's Anti-Discrimination Policy. This policy is "designed to provide a safe and non-discriminatory educational environment and to meet relevant legal requirements, including Title VI of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990," and other federal, state, and local antidiscrimination laws. Ex. B ("Anti-Discrimination Policy") at 1. It is administered by the Office of Institutional Equity ("OIE"), *id.* at 2, 4, a separate body from the UJB. The Anti-Discrimination Policy prohibits discrimination[2] and

---

[2] Defined as "[t]reating individuals less favorably because of their actual or perceived membership in, or association with, a Protected Class, or having a neutral policy or practice that has a disproportionate and unjustified adverse impact on actual and/or perceived members or associates of one Protected Class more than others." Anti-Discrimination Policy 5.

discriminatory harassment[3] based on protected status and incorporates the University Task Force's definition of antisemitism "in considering potential policy violations." *Id.* at 5 n.7. That definition reads as follows: "[A]ntisemitism can manifest in a range of ways, including as ethnic slurs, epithets, and caricatures; stereotypes; antisemitic tropes and symbols; Holocaust denial; targeting Jews or Israelis for violence or celebrating violence against them; exclusion or discrimination based on Jewish identity or ancestry or real or perceived ties to Israel; and certain double standards applied to Israel." *Id.* Plaintiffs seek to enjoin the Anti-Discrimination Policy's incorporation of this definition on the grounds that it chills their expressive activity. But Plaintiffs' theory is based on the inaccurate premise that this definition restricts expressive activity on its face, which it does not. They mount several versions of this mistaken argument.

*First*, Plaintiffs assert that "Columbia's new definition of antisemitism restricts expressive activity on its face" because it "prohibits students from criticizing Israel for having undue influence on our country's politics" and "from criticizing Israel as a racist state." Pls.' Columbia Opp'n 20; *see also* ¶ 89 (alleging that Columbia's definition of antisemitism "effectively labels as antisemitic the common and typical criticisms Plaintiffs and others make about Israel, as they would the U.S., and other governments—that it is a racist state, led by war criminals, and/or comparable to Nazi Germany in some ways"). These examples are taken from the IHRA definition,[4] which the University did not adopt and the Anti-Discrimination Policy does not incorporate. Plaintiffs'

---

[3] Defined as "[s]ubjecting an individual to unwelcome conduct, whether verbal or physical, that creates or contributes to a hostile working, learning, or campus living environment; that alters the conditions of employment or education; or that unreasonably interferes with an individual's work, academic performance, or ability to participate in or benefit from some aspect of the University's educational programs or activities on the basis of the individual's actual or perceived membership in, or association with a Protected Class." *Id.*

[4] *See* Off. for C.R., U.S. Dep't of Educ., *Questions and Answers on Executive Order 13899 (Combating Anti-Semitism) and OCR's Enforcement of Title VI of the Civil Rights Act of 1964*, at 5 (Jan. 19, 2021), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/qa-titleix-anti-semitism-20210119.pdf ("Contemporary examples of antisemitism in public life, the media, schools, the workplace, and in the religious sphere could, taking into account the overall context, include . . . claiming that the existence of a State of Israel is a racist endeavor . . . [and] [d]rawing comparisons of contemporary Israeli policy to that of the Nazis.").

reliance on *Students for Justice in Palestine, at the University of Houston v. Abbott*, 756 F. Supp. 3d 410 (W.D. Tex. 2024), in which a district court in Texas concluded that the IHRA definition and examples likely constituted viewpoint discrimination when adopted by a public university, is therefore misplaced. The key language that the court found to be problematic in that case is not contained in Columbia's definition of antisemitism or elsewhere in its policies. Despite this disconnect, Plaintiffs argue without any plausible foundation that Columbia's definition "should be read in light of the IHRA definition's viewpoint-discriminating meaning." PI Mem. 18.

Plaintiffs also repeatedly assert that "their *past* speech is now punishable in light of Columbia's new definition of antisemitism," Pls.' Columbia Opp'n 21, so "Plaintiffs cannot avoid violating the speech code embedded in Columbia's definition, because they have already violated it," PI Mem. 11. But this claim is both unfounded and incorrect. OIE has not applied, and would not apply, the Anti-Discrimination Policy's definition of antisemitism retroactively to conduct that occurred prior to the definition's incorporation. Rosan Suppl. Decl. ¶ 9. Instead, OIE would address such conduct using the principles and definitions applicable before the definition's incorporation. *Id.*

*Second*, Plaintiffs relatedly assert that "Columbia's new definition of antisemitism includes . . . wearing keffiyehs." PI Mem. 18; *see also* Pls.' Columbia Opp'n 5 ("[S]ome Plaintiffs have changed what they do and say to comply with Columbia's new definition of antisemitism. For instance, Plaintiffs Roe, Loe, Noe, and Joe no longer wear Keffiyeh." (citations omitted)). This is simply not accurate. Neither the definition of antisemitism nor the Anti-Discrimination Policy prevents Plaintiffs from wearing keffiyehs. Far from it. That Plaintiffs feel unable to wear keffiyehs on campus despite wishing to do so is deeply regrettable, but they cannot base their First Amendment claims against Columbia on such allegations of "subjective 'chill'" as to expressive

14

activity where Columbia's policy itself cannot reasonably be understood to restrict such activity. *Laird*, 408 U.S. at 13-14.

*Third*, contrary to Plaintiffs' characterization, the Anti-Discrimination Policy is not a "speech code" that "restricts expressive activity on its face." Pls.' Columbia Opp'n 20. For one thing, the Anti-Discrimination Policy explains that "[n]othing in this Policy may be construed to abridge academic freedom, principles of free speech, or the University's educational mission." Anti-Discrimination Policy 4. For another—as the Anti-Discrimination Policy details in language closely tracking well-established anti-discrimination case law and regulatory guidance—any analysis of whether a policy violation has occurred is necessarily highly fact-specific, requiring an analysis of the "totality of the circumstances." *Id.* at 6-8 (detailing ten non-exhaustive factors to be considered in assessing whether discrimination or discriminatory harassment has occurred); *see, e.g.*, *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) ("Making a 'hostility' determination in the educational context, as in the employment context, entails examining the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with' the victim's academic performance." (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993))); Off. for C.R., U.S. Dep't of Educ., *Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics* 6 (May 7, 2024), https://www.ed.gov/media/document/colleague-202405-shared-ancestrypdf-35100.pdf ("May 2024 Dear Colleague Ltr.") ("Whether harassing conduct creates a hostile environment must be determined from the totality of the circumstances."). Relevant factors under the Anti-Discrimination Policy include "[w]hether the alleged speech or conduct, even if offensive,

constitutes an expression of opinion on political, social, or similar topics," and the policy notes that OIE "will not determine that alleged speech or conduct constitutes Discrimination or Discriminatory Harassment solely because it may be considered offensive." Anti-Discrimination Policy 7-8. Further, "[i]n responding to Reports concerning speech or conduct regarding a country's policies or practices," OIE "will consider whether such speech or conduct is an exercise of academic freedom and inquiry." *Id.* at 6.

Nevertheless, Plaintiffs argue that "Columbia's new definition of antisemitism restricts expressive activity on its face, because the definition is explicitly subjective," pointing to the fact that the University Task Force drew on the "reported experiences of Jews and Israelis at Columbia" in drafting their definition. PI Mem. 14. But taking into account the subjective experience of a potential target of discriminatory harassment is a commonplace feature of federal antidiscrimination law. *See, e.g.*, *Hayut*, 352 F.3d at 745 (explaining hostile educational environment claim requires showing that "the victim subjectively perceived the environment to be hostile or abusive"); May 2024 Dear Colleague Ltr. 4 ("OCR interprets Title VI to mean that the following type of harassment creates a hostile environment: unwelcome conduct based on race, color, or national origin that, based on the totality of circumstances, is *subjectively* and objectively offensive . . . ." (emphasis added)). And the Anti-Discrimination Policy specifies that "[t]he offensiveness of a particular expression as perceived by a Complainant, standing alone, is not a sufficient basis to create a Hostile Environment." Anti-Discrimination Policy 6.

*Finally*, Plaintiffs' vague reference to non-specific past and ongoing disciplinary proceedings, *see* Pls.' Columbia Opp'n 21, does not make their assertion of standing any more concrete. As detailed above, neither the Rules nor the Anti-Discrimination Policy prohibit the mere engagement in expressive activity, and Plaintiffs offer no plausible allegation that either the UJB

or OIE has imposed or will impose discipline in a manner inconsistent with these written policies that explicitly recognize and safeguard the expressive rights of students. Additionally, the mere fact that any investigatory or disciplinary processes may be ongoing does not necessarily mean that there will be a finding at the end of the process that the conduct at issue violated University policy, or that discipline will be imposed.

In short, Plaintiffs' many vague allegations of having been "subject to Columbia University disciplinary processes," ¶ 152, unaccompanied by any details about the basis for the discipline or the outcome of those processes, are insufficient to support Plaintiffs' standing for this pre-enforcement challenge. Plaintiffs' declarations do not move the needle. To the extent they refer to any specific disciplinary or investigative processes, those proceedings either did not result in findings of policy violations, concerned time, place, and manner regulations that govern conduct, not speech, or involved allegations of discrimination or discriminatory harassment that predated the incorporation of, and therefore do not implicate, the Anti-Discrimination Policy's definition of antisemitism.

### b.    *Face Mask Policy*

Plaintiffs' contention that they have standing to challenge the University's Policy Regarding Face Masks or Face Coverings on Campus ("Face Mask Policy") similarly rests on both factual and legal inaccuracies.

*First*, Plaintiffs misrepresent the Face Mask Policy in numerous ways. Contrary to Plaintiffs' reference to the policy as a "mask ban," Pls.' Columbia Opp'n 15, the University's Face Mask Policy does not prohibit wearing a mask on campus, nor even wearing a mask while protesting on campus, so long as such protests are in accordance with University policies such as the time, place, and manner restrictions discussed above. Rather, it prohibits "face masks or face coverings . . . *for the purpose of* concealing one's identity in the commission of violations of

University policies or state, municipal, or federal laws." Ex. C (emphasis added). And it further

clarifies that "[f]ace masks or face coverings are always allowed for religious or medical reasons."

*Id.* Plaintiffs' assertion that "Columbia adopted a rule that applies only to 'individuals participating

in demonstrations,'" PI Mem. 19, is also false. The policy provides that "[a]*nyone* on campus,

whether masked or unmasked, must present a valid identification (ID) when asked by a Public

Safety Officer." Ex. D at 2 (emphasis added). Such an identification requirement is not new. The

Rules have prohibited "fail[ing] to self-identify when requested to do so by a properly identified

Delegate" since their inception in 1973. Rules § 443(a)(16); Rosan Suppl. Decl. ¶ 6.

      If a masked individual on campus is asked to present identification, they may also be asked

by Public Safety officers to "briefly pull down their masks" in order "[t]o facilitate identification."

Ex. D at 2. Furthermore, "upon request, including for those wearing masks due to a medical issue

or religious observance, this can be done in a less public setting." *Id.* "Individuals who refuse either

to provide ID or facilitate identification will be warned that noncompliance may result in removal

from campus and, for affiliates, potential further sanctions as indicated by University Rules and

policies." *Id.* At that point, "[c]ontinued refusal will result in a second warning, a trespass notice,

and escort from campus." *Id.* "The goal of this policy is to ensure the safety of" the University

"community including reducing the risk of disruption or harm from non-affiliates." Ex. C.

      *Second*, and more fundamentally, Plaintiffs have no First Amendment right to conceal their

appearance at a public demonstration, as the Second Circuit has held. *See Church of the Am.*

*Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004); MTD 21. Plaintiffs do not

meaningfully engage with this point. Plaintiffs misleadingly cite *Kerik* for the separate point that

"Supreme Court decisions establish that the First Amendment is implicated by government efforts

to compel disclosure of names in numerous speech-related settings." ECF 102 at 10 (quoting *Kerik*,

356 F.3d at 209); PI Mem. 21 (same). But Plaintiffs omit the very next sentence of the Second Circuit's opinion that "*[i]n contrast*, the Supreme Court has never held that freedom of association or the right to engage in anonymous speech entails a right to conceal one's appearance in a public demonstration." *Kerik*, 356 F.3d at 209 (emphasis added). Nor do they acknowledge that the Second Circuit in *Kerik* expressly "decline[d]" to "extend the holdings of *NAACP v. Alabama* and its progeny and to hold that the concealment of one's face while demonstrating is constitutionally protected," thus "reject[ing] the view that the First Amendment is implicated every time a law makes someone—including a member of a politically unpopular group—less willing to exercise his or her free speech rights." *Id.*

Plaintiffs also assert that "[f]ederal courts have repeatedly recognized that the government violates the First Amendment when it bans the wearing of masks so that it can identify, target, and retaliate against dissenting voices," citing one federal and one state court decision. PI Mem. 21 (citing *Ryan v. County of DuPage*, 45 F.3d 1090 (7th Cir. 1995); *Ghafari v. Mun. Ct.*, 150 Cal. Rptr. 813 (Ct. App. 1978)). But *Ryan* held that the plaintiff had no First Amendment right to wear a mask in a courthouse. 45 F.3d at 1096. And while *Ghafari* held almost 50 years ago that a California statute making it a crime to conceal one's identity with a mask in public was unconstitutionally vague and overbroad, 150 Cal. Rptr. at 815-18, the Second Circuit's subsequent decision in *Kerik* is controlling to the extent of any conflict with the analysis in that state court opinion.

### c.    *Review of MESAAS Department*

In its opening brief, Columbia explained that Plaintiffs failed to plausibly allege standing with respect to their claims concerning the MESAAS department for multiple reasons. *See* MTD 21-22. In their opposition, Plaintiffs fail altogether to engage with Columbia's case law and arguments, instead merely reiterating the underlying allegations from the SAC in a single

paragraph. *See* Pls.' Columbia Opp'n 6. Because "Plaintiffs don't respond, . . . they have abandoned any claim" with respect to the MESAAS department. *In re CarLotz, Inc. Sec. Litig.*, No. 21 Civ. 5906, 2024 WL 1348749, at *13 (S.D.N.Y. Mar. 29, 2024) (Subramanian, J.); *see, e.g.*, *Felix v. City of New York*, 344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018) ("Courts 'may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.'" (quoting *Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008))). In any event, Plaintiffs fail to plausibly allege standing as to their MESAAS claims for the reasons previously explained. MTD 21-22.

## B.    Plaintiffs fail to demonstrate that Columbia is a state actor subject to the First Amendment.

In addition to their failure to plausibly allege standing, Plaintiffs similarly fail to plausibly claim that Columbia's responses to the Committee's February 13 Letter and Agency Defendants' March 13 Letter render Columbia a state actor, let alone demonstrate a likelihood of success in proving those claims. *See* MTD 7-15; *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808-09 (2019); *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002).

### 1.    Columbia's actions to respond to the Committee's oversight requests and demands are not state action.

For the reasons explained in Columbia's opening brief, the provision of information by a private entity to a governmental body with prosecutorial, regulatory, or oversight authority does not transform that party into a state actor. *See* MTD 9 (collecting cases). In brief, the Second Circuit has squarely rejected the notion that "acts that are taken by a private company in response to government action," including the provision of information to government investigators, "and that have as one goal obtaining better treatment from the government, amount to state action." *Gilman v. Marsh & McLennan Cos.*, 826 F.3d 69, 77 (2d Cir. 2016) (addressing circumstances where "likely use of [an] internal investigation was that [private company] would offer up its findings

. . . in the nature of a sacrifice to an angry prosecutor"). This makes good sense. Any rule that would conclude otherwise "would be incompatible with . . . . modern regulation." *Id.*; *see also, e.g.*, *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996) (rejecting argument "that regulatory interest in a problem transforms any subsequent private efforts to address the problem (even those expressly designed to obviate the need for regulation) into state action").

Plaintiffs' opposition largely does not engage with this well-established body of case law. Plaintiffs do address the *Fakhreddine* case cited by Columbia, albeit briefly and in conclusory fashion. They do not argue it was wrongly decided but rather assert, baldly and unconvincingly, that *Fakhreddine* "did not involve distinctly similar constitutional claims," because it "centered on a single House Committee information request, with no demands for the university to punish anyone." Pls.' Columbia Opp'n 10-11 (cleaned up). In fact, *Fakhreddine* is on all fours. (Indeed, counsel for Plaintiffs here—who also represents the plaintiffs in *Fakhreddine*—identified this litigation as related to *Fakhreddine* in their opening brief on appeal before the Third Circuit just weeks ago. Ex. E at 1, 16.)

Plaintiffs contend that "[w]hat makes this case different from *Fakhreddine*" is, "in part," that the February 13 Letter "chastises Columbia's 'permissiveness' toward what it has categorically and erroneously deemed 'antisemitic conduct,' and demands that Columbia discipline its students more severely." ECF 104 at 13. But as Plaintiffs' counsel argued in *Fakhreddine*, the letter request to the University of Pennsylvania ("Penn") was in the context of "the House Committee's pioneer effort beginning in 2023, followed and magnified by the present Presidential administration, to humble, forcefully shape and even destroy the University." Ex. E at 7. Like the Committee's letter to Columbia, that letter also chastised Penn for "tolerating antisemitic vandalism, harassment, and intimidation," Ex. F at 7; identified multiple allegedly

antisemitic incidents that apparently did not result in discipline, *id.* at 2-7; and sought the production of disciplinary records, including from specified events, *id.* at 10-12; *see also Fakhreddine*, 2025 WL 345089, at *2 ("[T]he Committee sent Penn an 'Information Letter' accusing Penn of failing to address antisemitism on campus . . . ."); *id.* at *1 ("The Committee also asked" the university president during a hearing "why" the plaintiff professor "was still employed."). Nevertheless, the court in *Fakhreddine* had little trouble dismissing the First Amendment claim, concluding that the plaintiffs had failed to plausibly allege state action under a "close nexus" test that asked whether the government "coerced or encouraged the complained of acts." 2025 WL 345089, at *5 (cleaned up).

Plaintiffs argue, Pls.' Columbia Opp'n 11, that it is not even necessary that they establish state action by Columbia, relying on cases involving the standing of third parties to challenge requests for information by government entities from unrelated document custodians. *See Trump v. Deutsche Bank AG*, 943 F.3d at 635; *Loc. 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 271 (2d Cir. 1981). While it is true that these cases acknowledge the standing of such third parties directly to challenge the lawfulness of such government requests, that is distinct from the merits question of whether such custodians engaged in state action by responding to such requests—*i.e.,* whether *they* can be held responsible for the alleged legal violations (here a First Amendment violation) by the government entity that requested the information. The court in *Trump v. Deutsche Bank AG* did not address that issue because the plaintiffs there did "not assert any constitutionally based privilege that might protect their financial records from production by the Banks to the Committees, such as the privileges secured in the Bill of Rights," including the First Amendment, *id.* at 650, nor did they bring any freestanding constitutional claims against the third-party document custodians for which state action would

have been required.

And although *Local 1814* did involve First Amendment interests, it too did not disturb the basic requirement that a plaintiff bringing a freestanding First Amendment claim against a private party must establish state action. As in *Trump v. Deutsche Bank AG*, the union plaintiffs in *Local 1814*, unhappy about a governmental commission's subpoena to a shipping association as part of an investigation into a longshoreman's union and affiliated political action committee, 667 F.2d at 269-70, brought an action seeking "to enjoin the [government commission] from enforcing [the] subpoena." *Id.* at 269. The district court and Second Circuit allowed the government commission to enforce the subpoena as modified and did not consider any claims brought by plaintiffs directly against the private third party itself.

Even if the Court were to conclude that Plaintiffs are likely to succeed on the merits of their First Amendment claim against the government Defendants, that conclusion should not extend to Columbia. Given the requirements of state action, and the rule that an injunctive "remedy must of course be limited to the inadequacy that produced the injury" complained of, *Gill v. Whitford*, 585 U.S. 48, 50 (2018) (citation omitted); *accord Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 72 (2d Cir. 2016), Columbia should not be the subject of any preliminary injunction. Nonetheless, if the Court is inclined to issue a preliminary injunction in connection with the February 13 Letter and believes it necessary to include Columbia in that relief, Columbia respectfully submits that the Court should fashion an order that: (i) clearly predicates any preliminary injunctive relief on First Amendment violations caused by the state actor, not Columbia; and (ii) does not place Columbia in a position where it is forced to choose between risking contempt of this Court or noncompliance with the Committee's requests or any future subpoenas, which could place Columbia at risk of being in contempt of Congress.

### 2. Columbia's actions to respond to the Agency Defendants' regulatory demands are not state action.

There is no dispute that Columbia is subject to regulatory oversight by federal agencies, including under Title VI. It should therefore come as no surprise that the University is responsive to concerns raised by those regulators. That responsiveness is not evidence that Columbia is a state actor. Indeed, "[e]ven extensive regulation by the government does not transform the actions of the regulated entity into those of the government." *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 544 (1987). And it is likewise "well-established that the mere receipt of public funds will not transform a private actor into a state actor." *United States v. Int'l Bhd. of Teamsters*, 156 F.3d 354, 360 (2d Cir. 1998).

Plaintiffs' theory under their First Amendment claim is that the institutional actions announced in the March 21 Letter were the product of compulsion by the Agency Defendants' March 13 Letter so as to render them state action for constitutional purposes. Pls.' Columbia Opp'n 12. But Plaintiffs are wrong to suggest that the University "capitulated" to the demands contained in the March 13 Letter. PI Mem. 5. Instead, Columbia's actions in response to the March 13 Letter were, as explained in Columbia's opening brief, the product of considered decision-making by University leadership based on its own assessment of Columbia's needs. MTD 13; *see also* Ex. G at 2 ("It is simply a fact that antisemitic incidents surged on our campus after October 7th, and that is unacceptable. . . . We engaged in conversations with the government about their concerns—which were and continue to be our concerns and our community's concerns."). Indeed, Columbia's response departed from what the Agency Defendants demanded in meaningful ways.

For example, while the March 13 Letter sought to have the University adopt the IHRA definition of antisemitism, ECF 15-2 at 2, as discussed above, the University instead incorporated a different definition of antisemitism developed by an internal University Task Force into its Anti-

Discrimination Policy, ECF 40-1 at 2. And while the March 13 Letter demanded that the University broadly "[b]an masks that are intended to conceal identity or intimidate others," and require across-the-board that "[a]ny masked individual must wear their Columbia ID on the outside of their clothing," ECF 15-2 at 2, the University's Face Mask Policy instead prohibits wearing a mask only "for the purpose of concealing one's identity while violating a University policy or rule or state, municipal, or local law," Ex. D. It does not require masked individuals to wear their ID on the outside of their clothing, but only to present identification to a Public Safety officer when asked to do so. *Id.* Furthermore, while the March 13 Letter demanded that the UJB be abolished, ECF 15-2 at 1, the University did not do so. Yet because these facts do not support their predetermined narrative, Plaintiffs simply act as if they don't exist, basing their arguments, for example, on an antisemitism definition and a protestor-specific mask ban that the University did not adopt.

Moreover, the timeline itself refutes Plaintiffs' theory. For example, while the government's March 13 Letter references certain disciplinary processes stemming from the occupation of a University building, findings of Rules violations were made by the UJB in those processes *prior to* receipt of the March 13 Letter. Rosan Suppl. Decl. ¶ 5. The UJB's decisions reflect the culmination of a thorough, months-long investigative and disciplinary process, and were issued following hearings completed weeks earlier. *Id.* And while the March 13 Letter demands that "Columbia security ha[ve] full law enforcement authority," ECF 15-2 at 2, the University had already begun the process by July 2024 of recruiting and training special patrol officers with the appropriate credentials to remove individuals from campus, Rosan Suppl. Decl. ¶ 10. "Facts are stubborn things," *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 205 (2d Cir. 2020), that often do not fit predetermined narratives, like those espoused by Plaintiffs.

To be clear, the University continues to be engaged in discussions with the Agency

Defendants about restoring federal funds that have been cut and resolving regulatory inquiries. But as Acting President Shipman recently announced: "Our red lines remain the same and are defined by who we are and what we stand for. We must maintain our autonomy and independent governance. We decide who teaches at our institution, what they teach, and which students we admit. Any agreement we might reach must align with those values. The government has the ability to regulate us, and we are committed to following the law." Ex. G at 2. Those red lines were observed and incorporated into the actions announced in the March 21 Letter, which reflect the considered judgment of University leadership and best practices across the higher education community, *see* MTD 11-12 & nn.5-6, not simple acquiescence to government demands.

Plaintiffs argue that the fact that the University "acknowledges that the Government Defendants' conduct crystalized efforts that were already underway" somehow constitutes "a concession substantial enough to defeat Columbia's state action arguments at the motion to dismiss stage." Pls.' Columbia Opp'n 8 (cleaned up). That argument is contradicted by the cases cited in Columbia's opening brief, which recognizes that a private party may be responsive to government concerns without becoming a state actor. *See Gilman*, 826 F.3d at 77 (rejecting argument that "acts that are taken by a private company in response to government action, and that have as one goal obtaining better treatment from the government, amount to state action"); *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1201-02 (9th Cir. 1998) (finding no coercion in the New York Stock Exchange's decision to require mandatory arbitration of employment-related disputes even though the SEC "ha[d] exercised influence over" the Exchange's rules), *overruled on other grounds*, *EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003); *Graseck v. Mauceri*, 582 F.2d 203, 210 (2d Cir. 1978) (finding no state action in Legal Aid Society's termination of employee even though "the conflicts between [the employee] and the judges

undisputedly were among the factors which prompted the Society's decision to discharge appellant"); *Informed Consent Action Network v. YouTube LLC*, 582 F. Supp. 3d 712, 721 (N.D. Cal. 2022) (rejecting state action argument where the claims "fail[ed] to allege that governmental direction dictates *the* standard for decision" (cleaned up)). As these cases recognize, the University "does not become an agent of the government just because it decides that [it] sometimes has a point." *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 757 (9th Cir. 2024).

Ironically, in seeking this preliminary injunction, it is Plaintiffs who are seeking to have this Court micromanage the University's policies, disciplinary procedures, and efforts to maintain a safe campus environment. But "freedom of academic inquiry and expression on American college campuses could not survive in such an environment of judicial superintendence." *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 275 (S.D.N.Y. 2025). Plaintiffs' submissions provide no basis for the Court to superintend the operations of a private university on First Amendment grounds.

## II.    Plaintiffs fail to meet their burden on the other factors they must meet for a preliminary injunction.

Plaintiffs have now had two opportunities to establish that they face irreparable harm absent preliminary relief and that the balance of equities and the public interest favor preliminary injunctive relief. *See Shaev*, 2024 WL 4144031, at *1. They once again fail to do so, and the Court should deny Plaintiffs' motion for a preliminary injunction for this reason as well.

### A.    Plaintiffs fail to demonstrate irreparable harm.

With respect to irreparable harm, in denying Plaintiffs a TRO, this Court previously concluded that Plaintiffs had failed to "address their risk of irreparable harm from" either "the government's March 13, 2025 letter threatening funding cuts or Columbia's response announcing measures to curb antisemitism." ECF 54 at 1. The Court permitted Plaintiffs to "renew their

motion" *only* "[i]f [they] c[ould] address the threshold issues" of standing and irreparable harm. *Id.* at 2. Contravening this direction, Plaintiffs seek preliminary injunctive relief without even arguing irreparable harm. Instead, they repeat nearly verbatim the conclusory assertions in their TRO motion that the Court has already rejected. *Compare* ECF 15 at 16, *with* PI Mem. 26. The Court therefore should deny Plaintiffs' preliminary injunction motion against Columbia for the same reasons it denied their TRO motion. *See Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) ("[I]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, and . . . accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." (cleaned up)).

In addition, as Columbia has explained, ECF 39 ("TRO Opp'n") at 13-14, any presumption of irreparable harm that applies upon the showing of a constitutional violation, *e.g.*, *Elrod v. Burne*, 427 U.S. 347, 373 (1976), provides no support for preliminary injunctive relief against Columbia. As a private entity as to which Plaintiffs have not demonstrated state action, *see supra* Part I.B, Columbia has not and cannot have violated Plaintiffs' First Amendment rights. *Bronx Household of Faith v. Board of Education*, 331 F.3d 342 (2d Cir. 2003), which Plaintiffs cite in their preliminary injunction motion, *see* PI Mem. 27 (asserting that the risk of irreparable harm "is 'presumed' here because these campus policies 'directly limi[t] speech'" (quoting *Bronx Household*, 331 F.3d at 350)), is not to the contrary. That case involved claims against a government actor, not a private entity like Columbia.

Moreover, Plaintiffs' unexplained delay in seeking a preliminary injunction undercuts any argument that emergency relief is necessary to prevent imminent, irreparable harm. The Court denied Plaintiffs' TRO motion on April 4. ECF 54. Plaintiffs filed their preliminary injunction

motion on June 20—eleven weeks later—once briefing on Defendants' motions to dismiss the operative SAC (filed over two months earlier on April 18) was well underway and without providing any explanation for the delay. Such conduct "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (citation omitted). This Court has denied a preliminary injunction where the plaintiff waited just two weeks after filing her complaint to seek emergency relief, reasoning that, "[i]f the injury posed [wa]s as certain and as permanent as [the plaintiff] claim[ed], she should have moved for an injunction immediately." *Shaev*, 2024 WL 4144031, at *4. More generally, although "[t]here is no bright-line rule for how much delay is too much," "courts in this Circuit 'typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.'" *Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17 Civ. 8028, 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018) (quoting *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998)); *cf. Magnet Commc'ns, LLC v. Magnet Commc'ns, Inc.*, No. 00 Civ. 5746, 2001 WL 1097865, at *1 (S.D.N.Y. Sept. 19, 2001) (denying preliminary injunction given twelve-week delay).

### B. Neither the balance of equities nor public interest favor preliminary injunctive relief.

Plaintiffs likewise fail to establish that the balance of equities and the public interest favor preliminary injunctive relief. On that score, Plaintiffs offer a one-sentence assertion that the balance of equities and the public interest are presumed to favor Plaintiffs because "neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance." PI Mem. 16 (quoting *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)). But as noted above, Columbia stands in a different position from the government, and any presumption that might apply to claims against the government is not applicable to Columbia. *See*

29

*Price v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW)*, 722 F. Supp. 933, 936 (D. Conn. 1989) (finding no irreparable harm because there was no state action and "plaintiffs' claimed injuries . . . [are] only irreparable to the extent that first amendment rights are involved"), *aff'd*, 927 F.2d 88 (2d Cir. 1991).

In any event, the balance of equities and public interest favor Columbia. As previously explained, *see* TRO Opp'n 14, Columbia shoulders the responsibility for and relies upon the discretion that the law affords to universities to address concerns of discrimination and harassment on campus. *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 653 (1999) (balancing Title IX's requirements with "the practical realities of responding to student behavior"). The public interest favors Columbia having the legally recognized discretion to respond swiftly and appropriately to rapidly changing events on campus and to comply with its obligations under Title VI and other laws. *See, e.g.*, *Church & Dwight Co.*, 843 F.3d at 72 (injunctive relief should "not impose unnecessary burdens on lawful activity" (citation omitted)).

## III.    Plaintiffs also fail to state a breach of contract claim.

Plaintiffs do not move for preliminary injunctive relief on their breach of contract claim, and in all events, such relief would be unavailable. Columbia addresses this claim as part of its response to Plaintiffs' opposition to its motion to dismiss. Plaintiffs' opposition does not convincingly explain how they have plausibly alleged a breach of contract claim.

To succeed under New York law, a university student claiming breach of contract must "identify an express promise for 'certain specified services' in the university's relevant materials." *Goldberg v. Pace Univ.*, 88 F.4th 204, 210 (2d Cir. 2023) (citation omitted). "General policy statements and broad and unspecified procedures and guidelines will not suffice." *Nungesser v. Columbia Univ.* ("*Nungesser I*"), 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (cleaned up). As noted in Columbia's opening brief, the SAC did not allege that the University had violated any specific

policies or promises. MTD 25. In their opposition, Plaintiffs now identify three statements on which they purportedly base their breach of contract claim: § 440 of the Rules; an October 11, 2023 email from the Provost; and a sentence from the March 21 Letter (which Plaintiffs otherwise argue violated their First Amendment rights and, in any event, post-dated their decisions to attend Columbia and therefore cannot form the basis of this breach of contract action[5]). Pls.' Columbia Opp'n 24.

None of these statements are "specifically designated and discrete promises" that can form the basis of a breach of contract action. *Ward v. N.Y. Univ.*, No. 99 Civ. 8733, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000). Instead, they are "general policy statement[s]." *Nungesser I*, 169 F. Supp. 3d at 370. Specifically, the language referenced in § 440 of the Rules reflects first principles and value statements articulating the University's broad and general commitment to freedom of expression. *See* ¶ 210 (noting that "the University cannot and will not rule any subject or form of expression out of order on the ground that it is objectionable, offensive, immoral, or untrue," that "the role of the University is not to shield individuals from positions that they find unwelcome," and that "the University is a place for received wisdom and firmly held views to be tested, and tested again, so that members of the University community can listen, challenge each other, and be challenged in return"). The statements from the Provost's email and the March 21 Letter are similar. *See* Pls.' Columbia Opp'n 24 ("I write to remind everyone that freedom of expression is *a core University value* . . . . "[F]reedom of expression is what enables the rigorous debate and free inquiry *on which our academic mission depends*." (emphases in original)). Moreover, the same materials recognize that freedom of expression is not unlimited: § 440 of the

---

[5] *See Rynasko v. N.Y. Univ.*, 63 F.4th 186, 198 (2d Cir. 2023) (noting with respect to breach of contract claim against university, the court's "role is to ascertain the intention of the parties *at the time they entered into the contract*" (emphasis in original)).

Rules explicitly recognizes limits, such as for reasonable time, place, and manner restrictions and genuine threats of harassment.

Courts in this District have regularly found similar value statements too general to form a contract under New York law. *See, e.g.*, *Novio v. N.Y. Acad. of Art*, 317 F. Supp. 3d 803, 813 (S.D.N.Y. 2018) (alleged promises "to provide plaintiff with an educational environment free of sexual harassment" and "not to retaliate"); *Ward*, 2000 WL 1448641, at *4 (alleged promises "to provide a great learning environment" and "to not discriminate"); *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 203 n.1 (S.D.N.Y. 1998) (alleged promise that "[a]ll students should receive fair and equal treatment"); *see also Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 376 (S.D.N.Y. 2017) (holding that provision of Rules stating "'[a]ll members of the University community are assumed to be innocent until proven guilty' . . . is too general to give rise to a breach of contract claim").

Plaintiffs' breach of contract claim also fails because they have failed to "state when and how the defendant breached the specific contractual promise." *Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, No. 04 Civ. 704, 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005). Despite asserting that the SAC "repeatedly illustrate[s] how Columbia breached the specific promises it made to Plaintiffs," Pls.' Columbia Opp'n 25, Plaintiffs fail to identify a single, specific instance of that alleged breach including in any of the ten consecutive paragraphs of the SAC cited in Plaintiffs' responsive chart, ECF 103-1—a lack of specificity that is fatal to their claim, *see Gally*, 22 F. Supp. 2d at 207 (holding general "allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction, grant Columbia's motion to dismiss, and dismiss the SAC with prejudice as against

Columbia.


Dated:  July 11, 2025                                    Respectfully submitted,
        New York, New York

Marshall L. Miller (Lead Counsel)
Gabrielle E. Tenzer
Zachary Piaker
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
mmiller@heckerfink.com
gtenzer@heckerfink.com
zpiaker@heckerfink.com

Trisha Anderson
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
tanderson@heckerfink.com

*Attorneys for Defendants Trustees
of Columbia University in the City
of New York and Acting President
Claire Shipman*

33

## CERTIFICATE OF COMPLIANCE

I, Marshall L. Miller, hereby certify that this memorandum of law complies with the wordcount limitations set forth in Local Civil Rule 7.1(c) and the Court's order dated June 26, 2025 granting leave to file Columbia's reply memorandum of law in support of its motion to dismiss and memorandum of law in opposition to Plaintiffs' motion for a preliminary injunction in a single memorandum of law, ECF 108, and contains 10,610 words, exclusive of the caption, the table of contents, the table of authorities, the signature blocks, and this certificate.

Dated: July 11, 2025
New York, New York

Marshall L. Miller