# EXHIBIT B

# COLUMBIA UNIVERSITY
## IN THE CITY OF NEW YORK

**2025**

# Anti-Discrimination and Discriminatory Harassment
## Policies & Procedures for Students

### Office of Institutional Equity



**COLUMBIA UNIVERSITY**

**Anti-Discrimination and Discriminatory Harassment Policy and Procedures for Students**

# Table of Contents

POLICY ........................................................................................................................ iii

I.    INTRODUCTION ................................................................................................. 1

    A.    Fundamental Principles .................................................................................. 1

    B.    Overview of Contents .................................................................................... 2

II.   SCOPE OF THIS POLICY ................................................................................... 3

III.  POLICY AGAINST DISCRIMINATION AND DISCRIMINATORY HARASSMENT.... 5

    A.    Prohibited Conduct ....................................................................................... 5

PROCEDURES ............................................................................................................ 10

IV.   RIGHTS AND RESPONSIBILITIES DURING THE PROCESS .................................. 11

    A.    Parties' Rights ............................................................................................ 11

    B.    Privacy ........................................................................................................ 12

    C.    Advisors ...................................................................................................... 12

    D.    Declining to Participate ................................................................................ 13

    E.    Withdrawal from Participation ...................................................................... 14

    F.    Withdrawal While Matters Are Pending ......................................................... 14

    G.    Time Frames ............................................................................................... 14

    H.    Conflicts of Interest or Bias .......................................................................... 15

    I.    Disability and Reasonable Accommodations ................................................... 16

V.    MAKING A REPORT / DUTY TO REPORT ........................................................... 17

    A.    Reporting Prohibited Conduct ...................................................................... 17

    B.    Duty to Report ........................................................................................... 19

VI.   ONCE A REPORT IS MADE – INITIAL STEPS ..................................................... 21

    A.    Initial Report Review ................................................................................... 21

    B.    Initial Outreach and Meeting ....................................................................... 22

    C.    Case Management ....................................................................................... 22

    D.    Supportive Measures ................................................................................... 23

    E.    Interim Measures ........................................................................................ 23

    F.    Review of Supportive Measures and Interim Measures ..................................... 25

VII.  RESOLUTION PROCESSES FOR RESPONDING TO REPORTS OF PROHIBITED CONDUCT .................................................................................................................. 26

    A.    Investigative Team ...................................................................................... 26

B.      Determining the Appropriate Process ................................................................. 26

C.      Notice to Parties............................................................................................... 27

D.      Available Processes .......................................................................................... 28

E.    Impact of a Law Enforcement Investigation or Proceeding ................................. 35

F.    Education and Training ........................................................................................ 35

VIII.    SANCTIONS AND OTHER REMEDIES ................................................................. 36

A.      How Sanctions Are Determined......................................................................... 36

B.      Possible Sanctions ........................................................................................... 37

C.      Transcript Notations ......................................................................................... 40

D.      Ongoing or Additional Supportive Measures ..................................................... 40

E.    Additional Responses.......................................................................................... 40

IX.     APPEALS ............................................................................................................ 41

A.      Grounds for Appeal........................................................................................... 41

B.      Appellate Procedures ....................................................................................... 42

X.     UNIVERSITY RECORDS AND REPORTING........................................................... 44

A.      Records Retention and Disclosure..................................................................... 44

B.      Annual Assessments and Reports ..................................................................... 45

XI.     OTHER REPRESENTATIONS............................................................................... 46

A.      University Authority / Amendment..................................................................... 46

B.      No Conflicts of Interest or Bias ......................................................................... 46

C.      Training and Education....................................................................................... 46

D.      Designees ........................................................................................................ 46

XII.     APPENDICES...................................................................................................... 46

A.      Appendix A: Campus and Community Resources................................................ 47

B.      Appendix B: Confidentiality Protections and Reporting Obligations............................ 49

C.      Appendix C: New York State Students' Bill of Rights ........................................ 57

D.      Appendix D: Glossary of Certain Terms and Policy-Related Concepts ........................ 58

E.    Appendix E: Scenarios........................................................................................ 63

iii

**POLICY**

## I.      INTRODUCTION

Columbia University is committed to fostering a learning, living, and working environment free from Discrimination and Discriminatory Harassment[1] on the basis of an individual's actual or perceived membership in, or association with, a Protected Class, and to taking appropriate action to address such Prohibited Conduct. These commitments extend to all of the University's programs and activities, including all academic, extracurricular, and University-sponsored activities.

The University recognizes its responsibility to increase awareness of Discrimination and Discriminatory Harassment; to prevent their occurrence; to diligently address Reports of Prohibited Conduct; to support Students and other members of the Columbia community who experience Discrimination, Discriminatory Harassment, and other Prohibited Conduct; and to respond fairly and firmly when University policy is violated. Columbia also recognizes its obligation to treat fairly Students, Active Alums, Student Groups, and other members of the Columbia community who are accused of engaging in Prohibited Conduct. In addressing these issues, all members of the University community must respect and care for one another in a manner consistent with Columbia's academic mission and deeply held community values.

This Policy is designed to provide a safe and non-discriminatory educational environment and to meet relevant legal requirements, including Title VI of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, New York State Education Law 129-B, and other New York State Education and Human Rights Laws, as well as other federal, New York State, and New York City laws that prohibit discrimination on the basis of certain enumerated categories.[2]

### A.      Fundamental Principles

Discrimination and Discriminatory Harassment are antithetical to Columbia's mission and values. The University does not tolerate this Prohibited Conduct and all such conduct, as defined in this Policy, is forbidden.

The University will take tailored and appropriate measures to address all forms of Discrimination and Discriminatory Harassment, including when Prohibited Conduct involves social media postings, flyers or posters on campus, Student Groups or unrecognized Student organizations that create or contribute to a Hostile Environment in a University program or activity or at the University as a whole. A Hostile Environment can be created by unwelcome conduct that, considering the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from any of the University's educational programs or activities. Prohibited Conduct need not be directed at any particular individual or group of individuals to contribute to a Hostile Environment. It also need not be based on a Complainant's actual membership in a Protected Class; rather, it may be based on a Complainant's perceived membership in or association with a Protected Class.

---

[1] Capitalized terms throughout this document have the meaning provided in the Glossary in Appendix D.
[2] This Policy works in tandem with the University's Gender Based Misconduct and Interim Title IX Policies and Procedures for Students and the University's Anti-Discrimination and Discriminatory Harassment Policies & Procedures for Faculty & Staff, or any successive Policy that comes into existence, in fulfilling the University's commitment to providing a safe and non-discriminatory educational environment and to meeting relevant legal requirements.

The University strongly encourages those who have experienced, witnessed, or become aware of Prohibited Conduct to come forward promptly so that the University can take appropriate steps. Although there is no time limit for submitting a Report, prompt reporting increases the University's ability to successfully investigate and otherwise respond effectively to Reports of Prohibited Conduct. As described further below, the University will protect the privacy of those who come forward to the extent possible and permissible by law.

In each instance where the University receives a Report alleging Discrimination or Discriminatory Harassment, the University will, among other steps, assess whether any alleged speech or conduct, based on the totality of the circumstances, created or contributed to a Hostile Environment in any University program or activity or at the University as a whole. The University will also assess whether alleged speech or conduct, described in more than one Report, cumulatively created or contributed to such a Hostile Environment. Where the University determines that any alleged speech or conduct has created or contributed to a Hostile Environment, the University is committed to taking reasonable steps, including but not limited to those described in this Policy, to promptly address the Hostile Environment and its effects, prevent its recurrence, and provide support to those affected.

### B.    Overview of Contents

The "Policy" portion of this document defines the scope of the Policy and describes each form of Prohibited Conduct.

The "Procedures" that follow discuss the rights and responsibilities of Parties and others involved in the process, reporting options and obligations, and the initial steps the Office of Institutional Equity ("OIE") may take upon receiving a Report of alleged Prohibited Conduct, including conducting an Initial Report Review, providing Supportive Measures, and imposing Interim Measures. The Procedures also describe in detail the available processes for responding to Reports, the range of available Sanctions and how Sanctions are determined, and the procedure for appealing a determination of responsibility or Sanction. Remaining sections of the Procedures address University recordkeeping and reporting procedures and other matters.

The appendices include a comprehensive list of resources available to individuals affected by Discrimination or Discriminatory Harassment; details about Confidential Resources and reporting obligations on campus; the New York State Students' Bill of Rights; a glossary of terms and concepts; and illustrative scenarios.

## II.    SCOPE OF THIS POLICY

This Policy[3] governs alleged Prohibited Conduct, including Discrimination and Discriminatory Harassment, where the person alleged to have engaged in the Prohibited Conduct—referred to as the Respondent—is a current University Student or Active Alum, including Students on a leave of absence, and regardless of a Student's current registration status.[4,][5]This Policy also governs the conduct of Student Groups and their members and affiliates; the University is committed to taking appropriate action to address alleged Discrimination, Discriminatory Harassment, and other Prohibited Conduct regardless of whether a Report involves individual Students, Student Groups, or both. Where a Report is made regarding the conduct of a Student organization that is not recognized by the University, Students and/or the Student Groups who, at the time of the alleged incident, are believed to be active and/or involved members of the unrecognized Student organization may be Respondents. Such members are given the same Respondent rights pursuant to the Policy.

Every individual bears responsibility for their own conduct, regardless of whether that conduct occurred in a group setting. Whether this or any other University policy applies to the conduct of a group, conduct by individual members of a group (whether the group is formally recognized or not) may be a basis for disciplinary action for those individuals under this Policy.

The person who makes a Report of alleged conduct pursuant to this Policy—referred to as the Reporter or Complainant—will often, but need not, be a University Affiliate. In cases where the Reporter is someone other than an individual who was subjected to the alleged Prohibited Conduct, this Policy will apply in the same manner as if the affected individual had made the initial Report. The affected individual will be referred to as the Complainant for purposes of this Policy.

This Policy applies to alleged conduct that occurs on, or that creates or contributes to a Hostile Environment for University Affiliates on, any University campus, including conduct that occurs over email, on social media, or other Internet-based platforms where the University exercises control over the circumstances of the conduct. This Policy also applies to alleged conduct that occurs in connection with any University program or activity, whether that alleged conduct occurs on- or off-campus, such as at an off-campus, University-sponsored event.

---

[3] References to "Policy" throughout this document encompass this Policy and the procedures associated with the Policy.

[4] For the purposes of this Policy, the term "University" includes Columbia University only. It does not include Barnard College or Teachers College. If the Respondent is a Barnard College student, employee, or otherwise affiliated with Barnard College, please see Barnard College's Office of Nondiscrimination and Title IX website. If the Respondent is a Teachers College student, employee, or otherwise affiliated with Teachers College, please see the Teachers College Policy and Procedures on Discrimination and Harassment. If the Respondent is a University Student, but the Complainant is a Barnard College affiliate or Teachers College affiliate, this Policy applies. For information about policies applicable to elementary and secondary school students enrolled in University programs, and other information regarding minors on Columbia's campus, please visit Protection and Treatment of Minors at Columbia University.

[5] Reports concerning allegations of Discrimination, Discriminatory Harassment, or other Prohibited Conduct where the Respondent is an Employee or Contractor will be addressed under the University's Anti-Discrimination and Discriminatory Harassment Policies & Procedures for Faculty & Staff. The Office will review Reports of incidents affecting members of the University community that involve Respondents who are not University Affiliates or whose identity is not known and cannot reasonably be identified by the University. In such circumstances, the Office will take appropriate actions to protect the University community, including by identifying appropriate campus and other resources and providing reasonable accommodations.

This Policy is administered by the Office. This Policy will be in effect September 23, 2024, and will not apply retroactively. For Reports submitted before September 23, 2024, the Office will apply the policies and procedures in place when the Incident Report was submitted. For Reports submitted on or after September 23, 2024, the Office will generally apply the definition of acts of Prohibited Conduct in place at the time the conduct is alleged to have occurred but will generally apply the procedures in place at the time a Report is made. The Office may exercise its reasonable discretion to make appropriate adjustments to the procedures in place at the time a Report is made in order to promote fairness in the application of those procedures to a particular Report. In advance of any proceedings, the Complainant(s) and Respondent(s), also each referred to as a Party or collectively as the Parties, will be notified about which definitions and procedures will be applied.

If alleged Prohibited Conduct arises out of the same facts or circumstances as alleged conduct that is prohibited under any other applicable University policy or policies, the Office may coordinate its proceedings with any other University office or entity responsible for enforcing the other applicable policies, or may, in agreement with another University office or entity, consolidate some or all of the allegations into a single proceeding to be administered by the Office, except for allegations concerning conduct that is prohibited under the Rules of University Conduct. However, these provisions notwithstanding, to the extent that a Report involves allegations of Discrimination or Discriminatory Harassment on the basis of gender (sex); gender identity; lactation accommodation; pregnancy; sexual or reproductive health decisions; sexual orientation; or status as a victim of domestic violence, stalking, or sex offenses, the Report will be addressed under the Gender Based Misconduct and Interim Title IX Policies and Procedures for Students. In all other circumstances, where a report does not involve allegations of Discrimination or Discriminatory Harassment on the basis of gender (sex); gender identity; lactation accommodation; pregnancy; sexual or reproductive health decisions; sexual orientation; or status as a victim of domestic violence, stalking, or sex offenses, the Office may, in its sole discretion, proceed on allegations of Prohibited Conduct regardless of the existence or status of any other proceedings under any other University policy or policies.

While this Policy may identify the University office or Employee who will typically perform certain roles or duties, the Office may exercise its reasonable discretion to designate other University offices or Employees to perform any roles or duties described in this Policy. The Office may also exercise its reasonable discretion to assign appropriate non-Employees to perform roles or duties described in this Policy.

Nothing in this Policy prevents a Complainant from seeking the assistance of relevant law enforcement authorities in addition to or instead of any University process.

Nothing in this Policy may be construed to abridge academic freedom, principles of free speech, or the University's educational mission.[6]

---

[6] The fact that Prohibited Conduct includes speech in a public setting or speech that is also motivated by political or religious beliefs does not relieve the University of its obligations to respond if the Prohibited Conduct creates a Hostile Environment.

4

### III.    POLICY AGAINST DISCRIMINATION AND DISCRIMINATORY HARASSMENT

This section sets out definitions of Discrimination, Discriminatory Harassment, and other forms of Prohibited Conduct under this Policy.

### A.    Prohibited Conduct

It is a violation of this Policy for a Student, Active Alum, or Student Group to commit the following acts:

#### 1.    *Discrimination and Discriminatory Harassment*

Treating individuals less favorably because of their actual or perceived membership in, or association with, a Protected Class, or having a neutral policy or practice that has a disproportionate and unjustified adverse impact on actual and/or perceived members or associates of one Protected Class more than others, constitutes Discrimination. Discrimination includes treating an individual differently on the basis of their actual or perceived membership in, or association with, a Protected Class in the context of an educational program or activity without a legitimate, nondiscriminatory reason so as to deny or limit the ability of the individual to participate in or benefit from Columbia's services, activities, or privileges.

Each of the following characteristics constitutes a "Protected Class" for purposes of this Policy: age; alienage or citizenship status; arrest or conviction record; caregiver status; caste; color; credit history; creed; disability; familial status; genetic predisposition or carrier status; marital status; national origin (including shared ancestry, ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity); race; religion; salary history; unemployment status; veteran or active military status; or any other protected characteristic as established by law.[7,8]

Subjecting an individual to unwelcome conduct, whether verbal or physical, that creates or contributes to a hostile working, learning, or campus living environment; that alters the conditions of employment or education; or that unreasonably interferes with an individual's work, academic performance, or ability to participate in or benefit from some aspect of the University's educational programs or activities on the basis of the individual's actual or perceived membership in, or association with a Protected Class constitutes Discriminatory Harassment.

---

[7] The Columbia Antisemitism Task Force defines antisemitism as: "antisemitism can manifest in a range of ways, including as ethnic slurs, epithets, and caricatures; stereotypes; antisemitic tropes and symbols; Holocaust denial; targeting Jews or Israelis for violence or celebrating violence against them; exclusion or discrimination based on Jewish identity or ancestry or real or perceived ties to Israel; and certain double standards applied to Israel." The Office incorporates this definition in considering potential policy violations.

[8] Reports concerning allegations of Discrimination or Discriminatory Harassment on the basis of gender (sex); gender identity; lactation accommodation; pregnancy; sexual or reproductive health decisions; sexual orientation; or status as a victim of domestic violence, stalking, or sex offenses will be addressed under the University's Gender Based Misconduct and Interim Title IX Policies and Procedures for Students. Any Report that concerns allegations of Discrimination or Discriminatory Harassment involving another Protected Class that also involves allegations of Discrimination or Discriminatory Harassment on the basis of gender (sex); gender identity; lactation accommodation; pregnancy; sexual or reproductive health decisions; sexual orientation; or status as a victim of domestic violence, stalking, or sex offenses will be addressed under the Gender Based Misconduct and Interim Title IX Policies and Procedures for Students.

Discriminatory Harassment may include, but is not limited to, the following acts that denigrate or show hostility or aversion toward one or more actual or perceived members or associates of a Protected Class: verbal abuse; epithets or slurs; negative stereotyping (including, but not limited to, stereotypes about how an individual looks, including skin color, physical features, or style of dress that reflects ethnic traditions; a foreign accent; a foreign name, including names commonly associated with a particular shared ancestry or ethnic characteristics; or speaking a foreign language); threatening, intimidating, or hostile acts; denigrating jokes; insulting or obscene comments or gestures; calls for genocide and/or violence; and the display or circulation of written or graphic material in any form, including but not limited to social media.

Phone calls, text messages, emails, and social media usage can create or contribute to a hostile working, learning, or campus living environment or otherwise constitute Discriminatory Harassment, even if the communications occur away from campus.

Speech or conduct expressing views regarding a particular country's policies or practices does not necessarily constitute Discriminatory Harassment based on national origin. However, if harassing speech or conduct that otherwise appears to be based on views about a country's policies or practices is directed at or infused with discriminatory comments about persons from, or associated with, that country or another country, then it may constitute Discriminatory Harassment. The use of code words may implicate the Policy. In responding to Reports concerning speech or conduct regarding a country's policies or practices, the Office will consider whether such speech or conduct is an exercise of academic freedom and inquiry.

Each reported incident of alleged speech or conduct will be assessed on a case-by-case basis. The Office will determine whether alleged speech or conduct constitutes Discrimination or Discriminatory Harassment, including by creating or contributing to a Hostile Environment, by considering the totality of the circumstances surrounding an alleged incident or course of conduct. The Office will consider all relevant objective and subjective factors in making its determination. The presence or absence of no single factor will be dispositive in the Office's determination. Objective factors are those that indicate whether a reasonable person would find the alleged speech or conduct to meet the definition of Discrimination or Discriminatory Harassment. Subjective factors relate to how the Complainant actually perceived the alleged speech or conduct and whether the Complainant perceived the alleged speech or conduct to be discriminatory or harassing. The offensiveness of a particular expression as perceived by a Complainant, standing alone, is not a sufficient basis to create a Hostile Environment. Reports of Prohibited Conduct will be evaluated from the perspective of the Complainant and from the perspective of a reasonable person in the Complainant's position, considering all the circumstances.

The factors the Office will consider when assessing whether speech or conduct constitutes Discrimination or Discriminatory Harassment may include, but are not limited to, the following:

- The nature and severity of the alleged speech or conduct. The Office will be more likely to find that alleged speech or conduct constitutes Discrimination or Discriminatory Harassment if it involves words or symbols that are generally understood to express hatred of, or calls for violence against, one or more Protected Classes (*e.g.*, racially

charged epithets, language suggesting that Protected Class members or associates should be harmed or killed, etc.).

- Whether the alleged speech or conduct was intended and/or likely to incite violence, Discrimination, or Discriminatory Harassment, or to create or contribute to a Hostile Environment.

- The frequency, duration, and location of the alleged speech or conduct, and the identity, number, and relationships of the persons involved. For instance, words that might not constitute Discriminatory Harassment if used by a Student as part of a classroom discussion could constitute Discriminatory Harassment if shouted repeatedly by a Student or group of Students at one of their peers.

- Whether the alleged speech or conduct was directed at an identifiable individual or group of individuals. In the case of allegations of discriminatory and/or harassing speech or conduct on social media, the Office will consider whether a post mentions, tags, or links to specific individual(s) or their social media accounts. The Office is more likely to find that such alleged speech or conduct, whether in person or on social media, constitutes Discrimination or Discriminatory Harassment when it is directed at an individual or group of individuals than when it is not. In addition, the Office will consider whether alleged speech or conduct is directed at one or more University Affiliates.

- Whether the Respondent was aware that the alleged speech or conduct took place in the midst of, created, or contributed to a Hostile Environment in any of the University's activities or programs or at the University as a whole. For instance, in evaluating a Report of alleged speech or conduct that may constitute Discriminatory Harassment, the Office will consider whether the Respondent was aware that similar speech or conduct recently occurred.

- Whether the Complainant had any alternative to being subjected to the alleged speech or conduct. For instance, the Office will consider whether the alleged speech or conduct took place in a location the Complainant had to enter or pass by in order to access any of the University's programs and activities and whether the Complainant could have chosen to avoid the alleged speech or conduct without detriment to the Complainant's ability to access any University programs or activities.

- Whether there is any difference in status/authority between the Respondent and the Complainant.

- Whether the alleged speech or conduct otherwise impeded or limited the Complainant's participation in or ability to benefit from any University program or activity.

- Whether the alleged speech or conduct, even if offensive, constitutes an expression of opinion on political, social, or similar topics. The Office will not determine that alleged

speech or conduct constitutes Discrimination or Discriminatory Harassment solely because it may be considered offensive.

- Whether the alleged speech or conduct, even if offensive, constitutes an exercise of academic freedom on the part of a Respondent.

### 2. Retaliation

Retaliation is any adverse action or threatened action, taken or made, personally or through a third party, against a Complainant, a Respondent, or any other individual (such as a Witness, Reporter, or Advisor) because the individual has made a Report pursuant to this Policy, engaged with the Office, and/or participated in a resolution process pursuant to this Policy. All individuals, not just a Respondent or Complainant, are prohibited from engaging in Retaliation.

Retaliation can refer to actions or threatened actions by any individual. Retaliation includes threatening, intimidating, coercing, discriminatory, harassing, or any other conduct that would discourage a reasonable person from seeking services; receiving Supportive Measures; reporting Discrimination, Discriminatory Harassment, and other Prohibited Conduct; or participating in the resolution process as a Complainant, Respondent, Witness, Reporter, or Advisor. It also includes maliciously or purposefully interfering with, threatening, or damaging the academic or professional career of another individual because the individual has engaged with the Office and/or the resolution process pursuant to this Policy.

Reports that are intentionally false or found to have been made in bad faith may also constitute Retaliation. For example, Retaliation could include falsely reporting, or a threat of falsely reporting, a Complainant or Witness in order to deter them from participating in an imminent or pending resolution process.

Retaliation may also include violations of a no-contact directive and/or other Supportive Measures and/or Interim Measures during the course of a proceeding pursuant to this Policy.

If the alleged Retaliation occurs between the Complainant and the Respondent while a matter is pending pursuant to this Policy, the alleged Retaliation may be addressed separately and/or, in the sole discretion of the Office, folded into the pending proceeding, based on the circumstances. Allegations of Retaliation by other parties, *i.e.*, not between the Complainant and the Respondent, will be addressed separately.

Reports of Discrimination and Discriminatory Harassment made in good faith, even if the Respondent is ultimately determined not to be responsible for engaging in any Prohibited Conduct, are not considered Retaliation.

### 3. Intentional Interference

Intentionally interfering with the process of the Office concerning any Report made under this Policy is prohibited. Intentional Interference may include, but is not limited to, the following:

- Any attempt to alter, prevent, or interfere with a Party's or Witness's participation in any proceeding under this Policy;

- Obstruction of any investigative interview, including Witness tampering which attempts to alter, prevent, or interfere with a Witness's statement or testimony as part of any proceeding pursuant to this Policy;

- Intentionally disclosing any information, documents, or materials protected by this Policy's provisions concerning the privacy of the Parties and/or the process (see Section IV.B);

- Intentionally withholding relevant information (other than privileged materials) for purposes of obstructing, interfering, or delaying any proceeding pursuant to this Policy;

- Knowingly making false statements or knowingly submitting false information during any proceedings pursuant to this Policy; and

- Intentionally failing to comply in any way with this Policy.

If a Party is determined to have engaged in Intentional Interference, that determination may result in disciplinary action, the drawing of an adverse inference (*e.g.*, an inference that communications intentionally deleted by a Party contained material adverse to that Party), and/or Sanctions, as appropriate.

### 4. *Failure to Comply with Interim Measures*

Failure to comply with any Interim Measure(s), discussed further in Section VI.E below, is a violation of this Policy and may lead to disciplinary action and/or Sanctions, as appropriate.

9

**PROCEDURES**

## IV.    RIGHTS AND RESPONSIBILITIES DURING THE PROCESS

Both the New York State Students' Bill of Rights (see Appendix C) and the Office's procedures provide the Parties with certain rights, which are set forth below and explained in more detail in subsequent sections of this document.

### A.    Parties' Rights

Consistent with the New York State Students' Bill of Rights, Parties to a resolution process under this Policy have the rights:

- To respect, dignity, and sensitivity;

- To appropriate support from the University;

- To privacy, to the extent possible consistent with applicable law and University policy;

- To information about applicable University policies, including this Policy;

- To the presence of an Advisor throughout the process;

- To participate or to decline to participate in the resolution process, except that a decision not to participate in the process, in whole or in part, may not prevent the process from proceeding with the information available, and except that a Party who is a Student Group may be subject to disciplinary action for refusing to participate in the resolution process or for not responding honestly and completely to questions asked during the process;

- To an opportunity to challenge any Investigator, sanctioning officer, or Appellate Officer or Appellate Panel member for a possible Conflict of Interest in cases involving such persons;

- To a prompt and thorough review of the allegations;

- To adequate time to review documents following an Investigation;

- To refrain from making self-incriminating statements;

- To an Appeal of the decision and of any Sanctions imposed;

- To notification, in writing, of the case resolution;

- To report the incident to law enforcement at any time; and

- To understand that information collected in the process may be subpoenaed in criminal or civil proceedings.

**B.      Privacy**

The Office will reveal information about any Report of Prohibited Conduct only to those who need to know the information in order to carry out their duties and responsibilities or as otherwise provided by law. It will inform all University Affiliates, including Students and Employees, who participate in a resolution process that they are expected to maintain the privacy of the process.

The University seeks to protect the privacy of the Parties and Witnesses during the pendency of any resolution process under this Policy in a manner that does not restrict the ability of the Parties to obtain and present evidence, including by speaking to Witnesses; consulting with their own family members, Confidential Resources, or Advisors; or otherwise preparing for or participating in the resolution process. The University will take reasonable steps to prevent and address the Parties' unauthorized disclosure of information and evidence obtained solely as a result of participation in any resolution process under this Policy.

Parties may seek the assistance of family members, friends, counselors, therapists, clergy, doctors, attorneys, or similar resources. Parties are not prevented from discussing, from their perspective, the incident(s) that are the subject of the resolution process.

**C.      Advisors**

The Parties may be accompanied to any meeting or interview by a single Advisor of their choice, who may, but need not be, an Attorney.  Parties are expected to maintain the same, single Advisor throughout the process but are not required to bring their Advisor to all meetings. Retaining a single, consistent Advisor enables the process to move forward in an efficient manner. In the event that a Party wants to change their Advisor, they must provide written Notice to the Office.

The Advisor may not have a conflicting role within the resolution process. Such conflicting roles may include, but are not limited to, Witnesses; administrators who would make decisions on any potential Sanctions or Appeal; and staff who may provide information or be consulted during the process.

An Advisor may support the Party and provide advice during the resolution process. During meetings and interviews, the Advisor may talk quietly with the Party or pass notes in a non-disruptive manner; take a break, at the Party's request, to speak privately with the Party; and review information provided to the Party by the Office. The Advisor may not intervene in meetings with the Office, including but not limited to, by speaking on behalf of the Party, answering questions posed to the Party, posing questions or making requests (outside of scheduling and accommodations), providing information to the Office, or being disruptive. In addition, while Advisors may provide guidance and assistance throughout the process, all written submissions must be authored by the Party.

12

When the chosen resolution option is Investigation and Determination, an Advisor may address the Investigative Team during an interview or Mandatory Meeting to seek clarity. However, these interactions should be limited.

The Office and University administrators will communicate directly with the Party. It is the Party's responsibility to communicate with their Advisor, including but not limited to, information related to process updates. Any communication with an Advisor by the Office must be authorized in writing by the relevant Party.

Additionally, while efforts will be made to accommodate the schedules of Parties and Advisors, the process will not be unduly delayed due to an Advisor's unavailability. The Office will not intentionally schedule meetings, interviews, or any other related proceedings when an Advisor is not available, provided that the Advisor acts reasonably in providing alternative dates and works collegially to find dates and times that meet all schedules. In order to avoid undue delay, if a Party or Advisor is unable to be physically present for any stage of the resolution process, including for reasons related to public health guidance or related University protocols, accommodations may be made for their participation by other means.

Witnesses and others involved in the resolution process are not permitted to bring another person to any meeting or interview, absent an approved disability accommodation.

### D.    Declining to Participate

The Complainant and/or Respondent may decline to participate in any resolution process, including an Investigation and Determination (see Section VII.D.5 below), and any subsequent Appeal (see Section IX). However, a Student Group Respondent who declines to participate in any resolution process under this Policy may be subject to disciplinary action up to and including group de-recognition.

The Office will make multiple efforts to engage the participation of all Complainants and Respondents. However, the Office may continue the process without a Complainant's and/or Respondent's participation, if it is possible and permitted to do so under applicable law and University policy.

Declining to participate in any part of the process or choosing to participate in a limited fashion may preclude a Complainant or Respondent from participating in other parts of the process. However, the Complainant or Respondent may always submit an impact statement, if applicable, without regard to earlier participation in the process. (See Section VII.D.5 below.) A Complainant's or Respondent's participating in a limited fashion or declining to participate may limit the information that can be reviewed and considered and/or render it impossible for the Office to proceed with an Investigation or other process.

A Party's recurring refusal or failure to respond to outreach by the Office may be interpreted by the Office as the Party declining to participate in the process and may preclude or limit that Party's participation in later stages of the process. Silence or a decision not to participate in the process will not be treated as a negative factor in any resolution process or Appeal. To reiterate, however, a Student Group Respondent who declines to participate in any resolution process under this Policy may be subject to disciplinary action up to and including group de-

recognition.

If a Party declines to participate in a proceeding concerning an allegation of Prohibited Conduct under this Policy, the Office will continue to update each Party throughout the process, unless a Party submits a written request to the Office to cease contact.

### E.    Withdrawal from Participation

Complainants and Student and Active Alum Respondents may withdraw from participation in any resolution process at any time without penalty. If at any time a Student Group Respondent withdraws from participation in a resolution process, the Student Group may be subject to disciplinary action up to and including group de-recognition.

Where a Complainant or Respondent withdraws from participation in a resolution process, the University may, consistent with federal and New York State law, still have obligations to investigate and/or take other action. In those instances when the Office determines that the University must move forward with the process, including but not limited to when the Office determines that there may be discriminatory conduct or a Hostile Environment, the Office will notify the Parties that the University intends to do so. In those instances where the Office determines that the University will not move forward with the process, the Office will similarly notify the Parties and will document its rationale and the actions it has taken.

Withdrawing from participation before a proceeding is completed may preclude a Complainant or Respondent from participating in the remainder of the process, except that a Respondent who withdraws from participation retains the right to an Appeal.

### F.    Withdrawal While Matters Are Pending

If a Student Respondent permanently withdraws from the University with unresolved allegations pending under this Policy, the University will consider whether and how to proceed with any resolution process. The University will continue to address any systemic issues or concerns that may have contributed to the alleged violation(s) and any ongoing effects of the alleged Prohibited Conduct.

A Student Respondent who permanently withdraws from or otherwise permanently leaves the University while the process is pending may not return to the University without first resolving any pending matters, and the records retained by the Office will reflect that status. Such exclusion applies to all University campuses and programs. Admissions will be notified that the Student cannot be readmitted without first resolving any pending matters. The Student may also be barred from University property or events. If a Student Respondent withdraws or takes a leave for a specified period of time (*e.g.*, one semester or term), the resolution process may continue remotely, and the Student will not be permitted to return to the University unless and until the process is fully resolved.

### G.    Time Frames

The Office will make every reasonable effort to ensure that Reports are resolved as expediently and efficiently as possible. Many Reports may require extensive review, and time frames will vary depending on the complexity of the resolution process and the severity and extent of the alleged Prohibited Conduct.

The Office strives to complete an Investigation and Determination within 120 business days after the Parties receive the initial Notice described in Section VII.C below.

Time frames may be extended for good cause as necessary to ensure the integrity and completeness of the process. Reasons for extension of the time frame may also include, but are not limited to: compliance with a request by law enforcement; a limited accommodation of the availability of Parties, their Advisors, and Witnesses; Students on leave, exam periods, school breaks or vacations; and accounting for the complexities of a specific Investigation, including the number of Witnesses and volume of other evidence, whether there is a Cross-Complaint or allegations of Retaliation, and the severity and extent of the alleged Prohibited Conduct.

To enable prompt and efficient resolution of Reports, the Office expects that any individual involved in the resolution process will respond to any outreach from the Office within two (2) business days. In addition, the Office expects its deadlines to be honored absent extraordinary circumstances. Requests for deadline extensions will be considered by the Office on a case-by-case basis.

The Office will give periodic status updates to the Parties, including in writing.

## H.    Conflicts of Interest or Bias

The University requires any participant in any resolution process, including a Complainant, Respondent, Witness, Investigator, sanctioning officer, or Appellate Panelist or Officer, to disclose to the Office any potential or actual Conflict of Interest. A Conflict of Interest would include, for example, situations where an individual is a Party's family member, close friend, current or former faculty member, or academic advisor, or where an individual has any other similar relationships. Where a Student Group is a Party, there may be a Conflict of Interest with either the Student Group itself or with any of its members. Additionally, no person in an investigative or decision-making position in the process may have a Conflict of Interest or bias for or against Complainants or Respondents generally or any individual Complainant or Respondent.

A Complainant or Respondent who believes that an Investigator, sanctioning officer, or Appellate Panelist or Officer has a Conflict of Interest or bias for or against Complainants or Respondents generally or any individual Complainant or Respondent must submit a written request to the Office that the individual not participate in the process. This request must be made within two (2) business days after the Office provides Notice of the name of the individual involved in the process who is believed to have a Conflict of Interest or bias. Any request should include a description of the alleged conflict.

The fact that an individual is of the same or different Protected Class as a Party or other participant in the process is not a Conflict of Interest, and allegations of a Conflict of Interest or requests for changes in staffing on this basis will not be considered.

The following also do not constitute Conflicts of Interest or bias under this Policy:

- Submission of a Report in any other proceeding involving Discrimination, Discriminatory Harassment, or other Prohibited Conduct;

15

- Engagement in or facilitation of an Investigation in any other proceeding involving Discrimination, Discriminatory Harassment, or other Prohibited Conduct;

- Employment status, title, or previous employment; or

- Participation in or facilitation of any Discrimination or Discriminatory Harassment trainings, including trainings concerning Title VI and related laws.

If the Office determines that an actual or potential Conflict of Interest or bias exists, the Office will take steps to address the Conflict of Interest or bias in order to ensure an impartial process.

## I.    Disability and Reasonable Accommodations

The University adheres to the requirements of the Americans with Disabilities Act of 1990, as amended; Sections 504 and 508 of the Rehabilitation Act of 1973, as amended; and all other federal and state laws and regulations prohibiting discrimination on the basis of disability. The University is committed to providing individuals with disabilities equal access and opportunity and strives in its policies and practices to ensure the full participation of individuals with disabilities in all aspects of University life.

Any Party may request reasonable accommodations for disabilities disclosed to the Office at any point related to the implementation of this Policy, including making a Report and participating in a resolution process. Accommodations will be granted if they are appropriate and do not fundamentally alter the process. The Office will not provide disability accommodations that have not been specifically requested by a Party, even where that Party may be receiving accommodations in other University programs and activities. With the consent of the Party, the Office will work collaboratively with Disability Services and/or Leave Management to ensure that approved disability-related reasonable accommodations are honored, as applicable, throughout any process under this Policy.

16

## V.    MAKING A REPORT / DUTY TO REPORT

This section describes how to report an incident of Discrimination, Discriminatory Harassment, or other Prohibited Conduct. It also lays out Employees' obligations for making such Reports.

### A.    Reporting Prohibited Conduct

#### 1.    *Who Can Report Prohibited Conduct?*

Any individual, whether a University Affiliate or not, may report alleged violations of this Policy. The Reporter may be the person who experienced the alleged Prohibited Conduct, someone who was a Witness to or otherwise learned of the alleged Prohibited Conduct, and/or a mandatory Reporter (see Section V.B).

#### 2.    *How to Report Prohibited Conduct*

If you believe you have been subjected to, witnessed, or have otherwise learned of Prohibited Conduct covered by this Policy, you can notify the Office in any of the following ways:

- Via online form at https://cm.maxient.com/reportingform.php?ColumbiaUniv&layout_id=39;

- By e-mail at institutionalequity@columbia.edu;

- By phone at (212) 854-5511;

- By mail at 80 Claremont Avenue, 4th Floor, MC 9620, New York, NY 10027; or

- By hand delivery to 80 Claremont Avenue.

If the circumstances make a discussion with, or a Report to, the Office inappropriate (for example, if the Report involves Office personnel), incidents may be reported to the Office of the General Counsel, 412 Low Library, MC 4308, 535 West 116th Street, New York, NY 10027.

The Office recognizes that Students may be most comfortable disclosing alleged misconduct to a University Employee whom they know well, such as a faculty member, a coach, or a Student engaged in an official capacity, such as a resident advisor. As described in Section V.B below, these individuals and other University Employees are required to report allegations of Prohibited Conduct to the Office. Before a Student reveals information about an alleged incident, Employees will try to ensure that the Student understands their reporting obligations. If a Student wants to maintain confidentiality and has not disclosed information about an alleged incident, these Employees should seek to direct the Student to the University's Confidential Resources. As described in Section V.B below, Confidential Resources are not obligated to report disclosures of Prohibited Conduct except for aggregate statistical data that does not include individuals' names or identifying information. Confidential Resources will not share with the Office identifying information concerning a Student or an incident without the Student's permission, except under exigent circumstances as required by law.

17

The Office takes allegations of Discrimination, Discriminatory Harassment, and other Prohibited Conduct seriously and will take appropriate action with regard to each Report.

### 3. What You Should Include in a Report of Prohibited Conduct

Reports should include all of the information that the Reporter knows about an incident or issue that is being reported. Such information may include, but is not limited to, the following:

- The names and roles (*e.g.*, Student, Student Group, Employee, third party) of the Complainant and the Respondent and their e-mail address(es), telephone number(s), and street address(es), if known;

- Details about the incident(s) or conduct that may have violated this Policy;

- Date(s) and location(s) of the incident(s);

- The name(s) and role(s) of any Witness(es) to the incident(s) and their e-mail address(es), telephone number(s), and street address(es), if known; and

- The Reporter's name, e-mail address, telephone number, and street address.

While a Report may be submitted anonymously, anonymous Reports can limit the Office's ability to respond and investigate. Due to the nature of anonymous Reports, action by the Office in response to an anonymous Report may be more difficult and, at times, impossible.

### 4. Time for Reporting

There is no time limit for submitting a Report of Discrimination, Discriminatory Harassment, or other Prohibited Conduct. However, the Office's ability to effectively respond and investigate diminishes with the passage of time. Additionally, the timing of a Report may affect the Office's ability to impose Sanctions. For example, if a Respondent is no longer a Student at the time the Report is first made, the University is limited in the actions it can take. Accordingly, although there is no time limit for submitting a Report, the Office encourages individuals to report Prohibited Conduct as soon as possible to maximize the Office's ability to respond promptly and effectively. Individuals may meet with Office staff to learn more about the process before making a Report or before providing additional information about a previously filed Report.

### 5. Requesting Confidentiality in Connection with a Report

A Reporter or Complainant may request that the Office not disclose their identity to anyone else, including a Respondent or potential Respondent. However, the Office cannot guarantee that a Reporter's or Complainant's identity will not be disclosed. The Office will consider requests for confidentiality and honor them when appropriate.

In considering a request for confidentiality, the Office will weigh factors appropriate to the specific case, including but not limited to the following:

- Circumstances suggesting that there is an increased risk of the Respondent committing additional acts of Prohibited Conduct, such as whether there have been other Reports against the same Respondent and whether the Respondent threatened further Prohibited

Conduct against the Complainant or others; and

- Whether the University possesses other means to obtain relevant evidence, such as security cameras, Witnesses, or physical evidence.

The Office will promptly notify a Reporter or Complainant who has requested confidentiality whether the Office will be able to honor that request.

Whether or not a Reporter or Complainant requests confidentiality and whether or not the Office is able to grant such a request if made, Office personnel will reveal information about Reports and proceedings only to those who need to know in order to carry out their duties and responsibilities. See Section IV.B, "Privacy," above for more information.

6.    *Public Awareness Events*

The University supports events, forums, and advocacy meetings that raise public awareness of Discrimination and Discriminatory Harassment, and that inform and are a part of the University's campus-wide education and prevention efforts. The disclosure of incidents of Prohibited Conduct at such events, forums, and meetings is not considered a Report to the University or the Office for the purposes of prompting a process under this or any other policy with respect to a particular incident.

7.    *Related Alcohol and Drug Violations (Amnesty for Students)*

The University recognizes that Students who have been drinking and/or using drugs at the time that Discrimination, Discriminatory Harassment, or other Prohibited Conduct occurs may be hesitant to report such incidents due to fear of potential consequences for their own conduct. Because the University strongly encourages Students to report Prohibited Conduct that violates this Policy, the following provision applies: A Student (including a bystander), acting in good faith, who discloses any incident of Prohibited Conduct to a University Employee or to law enforcement will not be subject to subsequent disciplinary action by the University for violations related to the possession or use of alcohol and/or drugs occurring at or near the time of the alleged Prohibited Conduct, whether such possession and/or use was intentional or accidental. This does not apply to those who use alcohol or drugs as a weapon or to facilitate Prohibited Conduct.

In an effort to encourage Students to make honest disclosures during the course of the resolution process, statements related to the use of alcohol or drugs during the reported incident(s) will also fall under this amnesty provision unless, as explained above, the alcohol or drugs were being used to facilitate the alleged Prohibited Conduct.

This amnesty provision applies only to current Students.

**B.    Duty to Report**

The University requires all Columbia Employees, except Confidential Resources (discussed further below and in Appendix B), to report to the Office any instance or allegation of Discrimination, Discriminatory Harassment, or other Prohibited Conduct involving *any Student, Active Alum, or Student Group* that is disclosed to, observed by, or otherwise known to that Employee, whether or not the Student, Active Alum, or Student Group is a potential Complainant or Respondent and whether or not the Student, Active Alum, or Student Group has any formal

19

connection to the Employee who is subject to this duty. This duty applies to all Employees, including faculty, officers of administration, research officers, officers of the libraries, coaching staff, and other staff who work directly with Students (*e.g.*, teaching assistants, advising staff, and residential program staff).

Employees are required to report all information known to and/or learned by them regarding the alleged Prohibited Conduct, including, but not limited to:

- Names of all individuals involved, which includes the potential Complainant(s), Respondent(s), and anyone else who may possess information relevant to the alleged Prohibited Conduct.

- The nature of and circumstances surrounding the alleged Prohibited Conduct;

- When and where the alleged Prohibited Conduct occurred; and

- Any other information related to the alleged Prohibited Conduct.

If an instance or allegation of Prohibited Conduct involves an immediate safety concern, the Employee must report the alleged Prohibited Conduct to the Office *and* to Columbia Public Safety.

If any other University office learns of instances or allegations of Prohibited Conduct during the course of addressing a matter within its jurisdiction or learns of an allegation or Report of Prohibited Conduct that has not been made to the Office, such information must be forwarded to the Office.

The Duty to Report is in place to ensure that Students, Active Alums, and Student Groups are provided appropriate resources, to allow the University to mitigate harm to our community, and to help comply with the University's legal obligations.

The one exception to the Duty to Report is University Employees working in a confidential capacity, including those working in Sexual Violence Response; Clergy; Counseling and Psychological Services (Morningside); Mental Health Services (CUIMC); Disability Services; the Ombuds Office; and Healthcare Providers. University Employees working in a confidential capacity will not report information shared with them, unless requested to do so by the Reporter. See Appendix B below for information about Confidential Resources at the University.

20

## VI.     ONCE A REPORT IS MADE – INITIAL STEPS

The Office is charged with addressing Reports of alleged Discrimination, Discriminatory Harassment, and other Prohibited Conduct. The following section details the Office's Initial Report Review and other initial steps.

### A.     Initial Report Review

Upon receiving a Report of alleged Prohibited Conduct, the Office will promptly review the Report, gather any additional information necessary in order to determine next steps, and, if applicable, offer Supportive Measures and Interim Measures to the Complainant(s).

The purpose of this Initial Report Review is to determine whether the Report falls within the scope of this Policy. Whether the Report falls within the scope of this Policy is based on whether (1) the Respondent is a Student, Active Alum, or Student Group, and (2) if substantiated, the alleged conduct would constitute Prohibited Conduct, as set forth in Section II above.

If, based on the Initial Report Review, the Office concludes that the Report *does* fall within the scope of this Policy, the Office will proceed with Initial Outreach (see below).[9]

In those instances where it is unclear—for instance, where the Office requires additional information to determine whether the Report falls within the scope of this Policy—the Office may contact the Reporter or the Complainant to collect additional or clarifying information in order to make a scope determination. In some cases, the Office may conduct an interview with the Complainant as a part of the Initial Report Review. If, based on the Initial Report Review, the Office concludes that the Report *is not* within the scope of this Policy, the Office will refer the Report to the appropriate University office, if any, and/or refer the Reporter or Complainant to other resources for potential additional action or assistance, administratively close the Report, and give written Notice of the closure to the Complainant(s). The Office may also administratively close the Report and give written Notice of the closure to the Complainant(s) if it determines that the facts as alleged in the Report are refuted by relevant, credible evidence or information known to or possessed by the Office.[10] When referring the Report to another appropriate University office, the Office will consider whether the Report, either on its own or in connection with other Reports the Office has received, alleges speech or conduct that created or contributed to a Hostile Environment for members of any Protected Class in any of the University's programs or activities or at the University as a whole.

In those instances where the Respondent is unidentified, the Office will take reasonable steps, consistent with applicable law and University policy, including employing the services of other University resources, to ascertain the identity of an unidentified Respondent. Such steps, however, may not always be successful. If the Office is unable to ascertain the identity of a Respondent, action by the Office may be more difficult and, at times, impossible. Regardless, the Office will seek to assist affected individuals by identifying appropriate University and other

---

[9] The Office may consolidate Reports involving more than one Respondent, or by more than one Complainant against one or more Respondents, where the allegations arise out of the same facts or circumstances.

[10] Additionally, should the Office learn of evidence, or should information become known to the Office during the resolution process, that leads the Office to conclude that there is no reasonable basis to continue engaging the process, the Office may, in its reasonable discretion, administratively close the Report and give written Notice of the closure of the Report to any Party that previously received Notice regarding the Report

21

resources, providing appropriate accommodations, and directing the individuals to other applicable resources.

**B.    Initial Outreach and Meeting**

If the Office determines that the Report is within the scope of this Policy, the Office will assign an Investigative Team to the matter. A Case Manager and/or Investigator will promptly contact each Complainant to discuss the availability of Supportive Measures and Interim Measures; hear the Complainant's input with regard to Supportive Measures and Interim Measures, if applicable; and explain the processes available under this Policy. The Case Manager and/or Investigator will ask each Complainant for their input as to whether the Complainant elects to participate in the resolution process. This initial outreach to each Complainant will also include a date by which the Office requests the Complainant to respond. Unless the Complainant otherwise notifies the Office by that date, the Office will proceed, using the criteria and procedures described in Section VII.B below, to determine the appropriate resolution process for the Report and to give formal written Notice to the Parties.

The Office may determine that a resolution process is necessary even without the participation of the Complainant(s), including to ensure a safe campus environment. In instances where the Office makes such a determination, the Office will give Notice of that fact to the Complainant(s).

**C.    Case Management**

Case Managers within the Office support Complainants and Respondents. Case Managers help Complainants and Respondents to understand their rights and the resolution process under this Policy. Case Managers are also available to receive reports of concern and help determine an appropriate response to assist a Complainant or Respondent.

Case Managers may help to facilitate the following:

- Academic support, including notifying academic advisors regarding missed classes, dropping classes, withdrawal, exam extensions, etc.;

- Referrals to supportive and Confidential Resources on campus, such as counseling;

- Emergency housing and/or exploring housing options;

- Identification of supportive services on- and off-campus to meet Complainants' and Respondents' needs;

- Support in navigating the resolution process once a Report is filed; and

- Support throughout the time of a Complainant's or Respondent's enrollment or employment at the University, including after any resolution process has concluded.

Where a Student Group is a Party, Case Managers may assist the group and its members with matters concerning the group's operations and activities during the resolution process.

### D.    Supportive Measures

The Office works with all Parties to promote their safety and well-being throughout the resolution process, including by helping to navigate any request for appropriate Supportive Measures. Parties may request Supportive Measures regardless of the type of process they are participating in under this Policy, and even if they have declined to participate in the process. Case Managers do not grant Supportive Measures. Rather, they conduct outreach and facilitate requests for Supportive Measures by connecting Parties with the appropriate decision-making departments within the University.

All Parties and Witnesses in the resolution process are expected to continue performing their academic and/or employment responsibilities during the course of the resolution process, except as modified by any Supportive Measures. Supportive Measures are intended to aid Parties in fulfilling their academic and/or employment responsibilities as the resolution process moves forward.

The University evaluates requests for Supportive Measures in light of the circumstances and information available at the time of the request. In some instances, additional information may be required to sufficiently evaluate the need for, or to provide, a requested Supportive Measure. Time frames for evaluation and implementation of requested Supportive Measures may vary based on the particular circumstances of a specific request. If requested Supportive Measures cannot be granted, the University will provide Notice, in writing, to the Party making the request.

Supportive Measures may include, but are not limited to:

- Relocation of a Student's residence or an Employee's office or worksite;

- Adjusting an Employee's work schedule;

- Changing a Student's academic schedule;

- Allowing a Student to withdraw from or retake a class without penalty; and/or

- Providing access to tutoring or other academic support.

Case Managers will also work with Parties who need assistance requesting other types of reasonable accommodations, as appropriate. (See Appendix A.) The University will provide information about Supportive Measures that have been granted only to those who need to know in order to make the Supportive Measures effective. Any ordinary fees associated with Supportive Measures (*e.g.*, housing changes) that are approved in connection with a proceeding under this Policy will be waived, as applicable.

The imposition of any Supportive Measure does not indicate that the Office has made a final decision about any Report of Prohibited Conduct.

### E.    Interim Measures

At any time after receiving a Report, the Office may impose Interim Measures, based on the totality of the circumstances known at the time, to protect the safety of all Parties involved, to prevent the escalation of conflict, and to protect the integrity of the resolution process while the

process remains ongoing. Interim Measures may include, but are not limited to:

- No-contact directives;

- Restricting a Party's access to campus buildings and/or University property;

- Moving a Student's residence;

- Suspension from activities;

- Indicating on a Student's official transcript that a disciplinary process is pending; and/or

- Withholding a Student's transcript, diploma, and/or degree, as indicated by an administrative hold.

Where a Party is a Student Group, additional Interim Measures may include, but are not limited to:

- Freezing of financial accounts associated with the group;

- Loss of the group's ability to reserve space;

- Temporary restriction of certain individuals from leadership positions in the group; or

- Group probation.

If it is determined that there is an immediate threat to the physical health or safety of any University Affiliate, the University community, or other individual arising from the allegations of Prohibited Conduct, the University may:

- Temporarily suspend a Student Respondent from specified activities and/or positions of leadership;

- Temporarily suspend the recognition of a Student Group Respondent; or

- Temporarily suspend a Student Respondent from enrollment with the University.

Interim suspensions of Respondents will be reasonable and tailored to balance the ability of the Respondent to complete their studies with the safety of both the Complainant or Reporter and the University community at large. When an interim suspension occurs, the Office will provide the Respondent with Notice and an opportunity to appeal the decision immediately following the suspension, as discussed further below (see Section VI.F).

Any Interim Measure(s) implemented will be periodically reviewed and may be revised as appropriate.

The University will provide information about Interim Measures only to those who need to know in order to make them effective. The imposition of any Interim Measure does not indicate that the Office has made a final decision about any Report of Prohibited Conduct.

24

Failure to comply with Interim Measures or other directives is a violation of University policy and may lead to disciplinary action and/or Sanctions, as appropriate.

**F.       Review of Supportive Measures and Interim Measures**

Parties may request review of the need for, and the terms of, any Supportive Measure or Interim Measure (or lack thereof) that directly affects them. Requests for review of a Supportive Measure or Interim Measure must be submitted in writing to the Vice Provost of the Office or their designee, and a reasonable review by Office personnel who were not involved in the decision under review will be conducted within a reasonable period of time upon receipt. Parties may submit relevant evidence in support of their request for review. The Vice Provost of the Office or their designee will provide any Party that requests a review of a Supportive Measure or Interim Measure written Notice of the outcome of the review.

## VII.    RESOLUTION PROCESSES FOR RESPONDING TO REPORTS OF PROHIBITED CONDUCT

Under this Policy, there are several possible processes available for resolving a Report of Prohibited Conduct.

### A.    Investigative Team

Matters will generally be administered by a single Investigator (still referred to throughout this Policy as an Investigative Team), unless the number of Parties, the number or complexity of the alleged incidents involved, the length of time over which the alleged incidents occurred, the number of Witnesses, the volume of other evidence, or other factors counsel in favor of using additional Investigators.

All Investigators will have training in investigating and evaluating Prohibited Conduct. The Investigative Team will be impartial and unbiased.

The Office may, in its sole discretion, assign appropriate non-Office personnel to investigate a matter.

### B.    Determining the Appropriate Process

The Investigative Team will determine the appropriate process to be followed in each case, based on the totality of the circumstances related to a Report.  The factors that the Investigative Team will consider in making their determination include, but need not be limited to:

- The nature and severity of the alleged Prohibited Conduct;

- The potential Sanctions that might be imposed if a Respondent were to be found responsible for a Policy violation; and

- The willingness of the Parties to engage in any resolution process that requires the Parties' consent.

The determination of the appropriate resolution process, while within the Office's sole discretion, will be generally consistent with the Office's handling of similar cases involving similar alleged Prohibited Conduct under similar circumstances.

Should information become known or statements be made to the Office during any resolution process that highlight aspects of the reported conduct that were not previously known to the Office, or that reveal additional Prohibited Conduct, the Office may stop the resolution process, reassess what would be the most appropriate process to follow under the circumstances, and transition to that process after providing appropriate Notice. While the Office may not use any statements a Respondent makes in an Administrative Resolution, Educational Resolution, Restorative Justice, or Mediation process as evidence in any subsequent Investigation of the same

26

alleged Prohibited Conduct, the Office may inquire during the subsequent Investigation into the subject-matter of the previous statements.

### C.    Notice to Parties

Once the Investigative Team determines the appropriate resolution process, the Investigative Team will promptly give all Parties formal written Notice, including information about the timing of the selected resolution process.[11] This formal written Notice will include:

- The identity or identities of the Parties involved in the incident;

- A description of the alleged Prohibited Conduct, including the provisions of this Policy that may have been violated; and

- The date(s) and location(s) of the alleged incident(s).

The Notice will also include:

- A written explanation of the Party's rights and available resources;

- A statement of which definitions of acts of Prohibited Conduct and which procedures will be applied during the resolution process;

- A statement that Respondents are presumed not responsible for alleged Prohibited Conduct and that any determination regarding a violation of this Policy is made at the conclusion of an Investigation;

- A reminder that the University prohibits knowingly making false statements or knowingly submitting false information during any resolution process;

- A direction to preserve any relevant evidence in the Party's possession, including emails, texts, social media posts, or other electronic communications or records;

- A statement that this Policy will not be construed to abridge academic freedom, the principles of free speech, or the University's educational mission; and

- A reminder that Retaliation against a Complainant, a Respondent, or any other individual because that individual has engaged with the Office and/or the resolution process is a violation of the Policy.

---

[11] Where a Party is a Student Group, Notice will initially be sent to members of the group known or believed by the University to serve in leadership positions, with a copy to the Student Group's advisor. Such members of the Student Group will be the Student Group's representative(s) in any resolution process under this Policy. The Student Group may, however, elect to designate different or other members to serve as its representative(s) in a resolution process by providing written Notice to the Office. Subsequent Notices will be sent to such representative(s) and the Student Group's advisor. All of the Student Group's representative(s) must attend each meeting or interview. References in this Policy to an individual Party or Parties will be interpreted to include the representative(s) of a Party that is a Student Group.

**D.     Available Processes**

There are several possible processes available for resolving a Report of Prohibited Conduct under this Policy, each of which is described below.[12]

*1.     Administrative Resolution*

An Administrative Resolution can include no-contact directives, implementation of safety measures, referrals to counseling, a meeting that includes a policy reminder and targeted education and training. Administrative Resolution can take place, for example, when a Complainant does not wish to engage in other resolution processes and/or the Office, in its discretion and based on the available information, determines that an Administrative Resolution is necessary and/or sufficient to ensure the ability of all members of the University community to access the University's activities and programs free from Prohibited Conduct.

*2.     Educational Resolution*

A Report concerning allegations of Prohibited Conduct that would typically result in Sanctions no more severe than a warning or reprimand may proceed through Educational Resolution.

A Respondent who participates in Educational Resolution must be willing to accept responsibility for their actions. Should the Respondent be unwilling to accept responsibility, the Respondent will proceed through one of the other resolution processes and, if found responsible, an appropriate Sanction will be imposed.

As part of the Educational Resolution process, the Respondent must meet with Office personnel to discuss the conduct at issue and the Respondent's understanding of this Policy. Failure to participate in this meeting may result in further proceedings and possible Sanctions, as appropriate. The Respondent is permitted to bring an Advisor to the meeting.

*3.     Restorative Justice*

Restorative Justice ("RJ") is an approach to wrongdoing and interpersonal conflict that emphasizes the impact of challenging behaviors on individuals and communities. Instead of focusing on the appropriate consequence for violating a rule, RJ focuses on how the actions in question affected others and what can be done to make things right moving forward. While RJ encompasses a variety of processes, two common approaches are the RJ Circle and the RJ Conference.

An RJ Circle is a facilitated group conversation in which individuals who were affected by an action or series of actions can come together to discuss what has happened in the past, what they are experiencing in the present, and how they hope to move forward in the future. This process is most often used when there is no clearly identifiable wrongdoer or when harmful behavior is pervasive within a group. An RJ Circle may culminate with a written group statement of intention about how to move forward, but such a statement is not a necessary element of the process.

---

[12] Where a resolution process other than Investigation and Determination is commenced, no person responsible for administering that process (including, but not limited to, a facilitator of a Restorative Justice process or a Mediator) may subsequently serve as an Investigator or decision-maker in an Investigation and Determination regarding the same alleged Prohibited Conduct.

28

An RJ Conference is a dialogue facilitated by a trained facilitator intended to restore relationships and repair harm. The Respondent(s) and Complainant(s) come together to identify what harm was caused and collaboratively determine how conflict and trust might be resolved and repaired, respectively. Each Respondent and Complainant may bring an Advisor to participate in the RJ Conference with them.

To qualify for an RJ Conference, the Respondent(s) must accept responsibility for the harm that was caused. The Complainant(s) must also be willing to meet with the Respondent(s). Additionally, all involved Parties must agree that if the RJ is successful, they will abide by the terms of any agreed-upon resolution.

If the RJ process is successful, the terms of a resolution agreed to by all involved Parties will be memorialized in writing by the Office, at which time the process is concluded and the Report will be closed. If a resolution cannot be reached or the RJ Conference is otherwise terminated, the Office will evaluate other options for resolution.

An RJ process, whether a Circle or a Conference, will typically commence within ten (10) business days after the Office receives written consent to proceed from all Parties. During the RJ process, any potential Investigation and Determination and any associated deadlines will be stayed. The RJ process will continue until it is successfully concluded or until the Office determines that the conference will not be successful and terminates the conference.

RJ may not be an appropriate mechanism for all conflicts. The Office will review any request for RJ and may decline to initiate RJ based on the facts and circumstances of a particular Report. As voluntariness is a foundational principle of RJ, an RJ Circle or Conference will proceed only if all Parties agree in writing to participate.

   *4. Mediation*

The purpose of a Mediation is for the Parties to identify the implications of a Respondent's alleged Prohibited Conduct and, with the assistance of a trained facilitator (the "Mediator"), to identify points of agreement and appropriate remedies. Mediation will be used only if each of the Parties consents in writing to engage in Mediation.

The Mediation process will typically commence within ten (10) business days after the Office receives written consent to Mediate from all Parties, and will continue until concluded or terminated by any Party, the Mediator, or the Office. During Mediation, any potential Investigation and Determination and any associated deadlines will be stayed.

The Mediator will guide a discussion between the Parties. In circumstances where the Parties do not wish to meet face to face, any Party can request "caucus" Mediation, and the Mediator will conduct separate meetings with each of the Parties. Whether or not the Parties agree to meet face to face, each Party will be permitted to bring an Advisor to any part of the Mediation.

If the Mediation results in a resolution, the Mediator will memorialize in writing the agreement reached between the Parties and approved by the Office. The Office will monitor adherence to the agreement and close the Report when compliance is satisfactory.

If a resolution cannot be reached, or the Mediation is otherwise terminated prior to resolution, the Office will evaluate other options for resolution, including Investigation and

Determination.

> 5. *Formal Investigation and Determination*

In cases where the other resolution processes discussed above are unavailable, have been rejected by one or more of the Parties, have been unsuccessful, or are deemed inappropriate or insufficient by the Office, in its sole discretion, the Office may conduct a Formal Investigation and Determination.

> (a)    General Investigative Procedures

> (i)    Notice

At least five (5) business days prior to a Party's initial interview, the Parties will receive the formal written Notice described in Section VII.C above. The Office will ensure that the Parties are updated throughout the Formal Investigation and Determination process, including by providing timely Notice of meetings in which a Party may participate and/or if there are updates to the alleged violation(s) that will be investigated based on information learned during the Investigation.

> (ii)    Non-Disclosure Agreements

The Parties and their Advisors will be asked to sign a non-disclosure agreement at the start of a Formal Investigation and Determination. The Investigative Team will not share confidential materials with any Party or Advisor who fails to sign a non-disclosure agreement. Witnesses will be asked to sign a non-disclosure agreement at the start of an interview, if applicable. Any Party or Witness who engages in the unauthorized disclosure of information and evidence obtained solely as a result of participation in any resolution process under this Policy and/or violates the non-disclosure agreement may be subject to discipline.

> (iii)    Gathering of Information

An Investigative Team has the authority and responsibility to gather information from all sources judged necessary for fair resolution of a Report. The Investigative Team will attempt to gather relevant information by interviewing the Parties and any other person(s) with relevant information about the alleged incident(s), and may also review documents and other materials that may be relevant to the Investigation, as follows:

*Evidence:* The Investigative Team will direct the Parties, Witnesses, and other interested individuals to preserve any relevant evidence. Examples of relevant evidence include, but are not limited to, electronic messages (*e.g.*, emails, text messages, social media and digital app messages) and other relevant writings, photographs, and recordings. Any evidence submitted to the Investigative Team for consideration may become part of the Investigative Report in redacted form and may, as discussed below, be shared with the opposing Party and their Advisor, if applicable. The Office may impose restrictions or require a non-disclosure agreement to prevent the dissemination of any evidence.

A Party is not required to provide any particular Witness or evidence for an Investigation to proceed, nor should a lack of such information dissuade any Party from participating in the process.

*Relevance:* Throughout the Investigation, the Investigative Team may exercise the discretion to determine the relevance of any Witness testimony and/or evidence and to determine that certain Witnesses and/or evidence should be included in or excluded from the investigative process based on their relevance. Witnesses and information are relevant to an Investigation if they help to show that an allegation is more or less likely to be true.

*Documentary and Other Evidence:* To streamline the investigative process and ensure a fair review of the evidence, Parties and Witnesses are expected to submit evidence to the Investigative Team in an electronic format, and in accordance with any additional instructions provided by the Investigative Team. However, the Investigative Team will work with Parties and Witnesses to receive evidence in another manner when electronic submission is not possible.[13]

Intentional manipulation, editing, or other forms of fabricating evidence may result in disciplinary action or the drawing of an adverse inference against a Party found responsible for such fabrication (*e.g.*, an inference that the evidence in its original form was prejudicial to the Party that engaged in fabrication).

No Party, Advisor, or Witness may copy or photograph any documents or other evidence to which they are afforded access as part of the investigative process.

*Limitations on Evidence:* Certain types of evidence will not be considered or will only be considered under appropriate circumstances. For example, a Party's medical, psychological, or similar records cannot be accessed, considered, disclosed, or otherwise used as part of the investigative process without the Party's voluntary, written consent. Each Party has the right to request that evidence regarding their mental health diagnosis and/or treatment be excluded from consideration. However, if an individual wishes to present evidence of their own mental health diagnosis and/or treatment, they may do so in limited circumstances, to be determined by the Investigative Team based upon relevance.

A Party's prior violations of this Policy will not be considered in determining responsibility and will therefore not be addressed in any Investigative Report. The Office is committed to ensuring that each Party has a meaningful opportunity to be heard in any given case; for this to occur, the Investigation and Determination of any one Report must be based on facts relevant to that Report and may not be influenced by allegations and determinations from another, separate Report. However, prior determinations of responsibility for allegations of the same type of Prohibited Conduct may be considered in the Sanctioning stage of the process.

Any information protected by a legally recognized privilege (*e.g.*, attorney-client, doctor-patient) will not be considered at any point during an Investigation, unless the privilege is properly waived by the Party who holds the privilege.

*Questions:* Throughout the Investigation, any Party may propose to the Investigative Team questions to be asked of any other Party or of any Witness involved in the Investigation. Questions

---

[13] In the event that any evidence is gathered during the course of an Investigation that is not in English, the Office will obtain an official translation via University resources. Where the Office obtains a translation through University resources, or an outside company or agency, the translation received will be the official translation for the Investigative Team to consider; however, the Parties may offer their own clarifications, if relevant. The Investigative Team may ask the providing Party for a translation into English, at its discretion and in limited circumstances, such as when the text to be translated is not substantively related to the Investigation but will assist the Investigative Team in better understanding the material. Any translator may be asked to sign a non-disclosure agreement.

will be reviewed by the Investigative Team for their appropriateness, relevance, and permissibility pursuant to this Policy. If any questions proposed by a Party are outside the scope of this Policy or are irrelevant to the case, such questions will not be asked. The Investigative Team may, in its sole discretion, modify any proposed question for appropriateness, relevance, or clarity. The Investigative Team may, in its sole discretion, pose or decline to pose any proposed questions.

*Weight and Credibility Assessments:* The Investigative Team will consider the weight and credibility of any evidence. The weight to be given to any evidence is based on the believability or persuasiveness of such evidence. Different evidence holds different weight in inducing belief with respect to the facts and circumstances to be proved. Evidence that is indirect, vague, or improbable will be given less weight than evidence that is direct and unrefuted. Evidence given by a Witness who testifies credibly from personal observation is of greater weight than evidence offered by a Witness who is testifying from general knowledge alone. The Investigative Team will afford the greatest weight to credible testimony concerning firsthand knowledge by Witnesses and Parties regarding their own memory of specific facts or incidents that occurred.

Credibility refers to whether evidence is worthy of belief. The Investigative Team will consider the following factors when assessing the credibility of Parties and Witnesses: consistency or inconsistency of accounts of events over time; potential for bias in favor of a specific Party or outcome; any corroborating evidence; and reasonable and logical statements, including statements about details associated with the allegations.

*Witnesses:* Each Party has the right to identify any individuals who may be Witnesses to or otherwise have relevant information concerning the alleged Prohibited Conduct. It is possible for both a Respondent and a Complainant to list one or more of the same individuals as Witnesses.

The Investigative Team will attempt to contact and interview any Witnesses it deems to have relevant information, including but not limited to those identified by the Parties. . Witnesses and others involved in the resolution process are not permitted to bring another person to any meeting or interview, absent an approved disability accommodation

The Investigative Team may require any Employee or Contractor of the University to participate in an interview. An Employee's or Contractor's failure to participate in an interview upon request of the Investigative Team may be subject to separate disciplinary action.

All interviews conducted as part of the Investigation will be recorded by the Investigative Team, and each recording or a transcript of each recording will be made available to the Parties during the Summary of Evidence. No Witness may record any meeting or interview conducted as part of the investigative process.

All Witnesses are obligated to be honest and act in good faith. Any Witness who knowingly makes a false statement in connection with an Investigation may be subject to separate disciplinary action.

*Standard and Burden of Proof:* The Investigative Team will apply "preponderance of the evidence" as the standard of proof in reaching its determinations as to whether a violation of this Policy has occurred. Preponderance of the evidence means that the Investigative Team must determine, based on the evidence presented, whether a Respondent was more likely than not to have engaged in the alleged Prohibited Conduct. During the Investigation and Determination process, Respondents are presumed not responsible.

32

The Investigative Team bears the burden of showing evidence to support its determination of responsibility. The burden is not on any Respondent to prove that they did not engage in a violation of this Policy.

(iv)    Summary of Evidence

The Investigative Team will prepare a Summary of Evidence containing a summary of all relevant, credible evidence on which the Investigative Team intends to rely. Where an Investigation involves multiple Complainants, multiple Respondents, or both, the Office may issue a single Investigative Report, and therefore prepare a single Summary of Evidence.

In accordance with FERPA, the Investigative Team will redact Students' names and other identifying information from the Investigative Report and related materials. The Investigative Team retains sole discretion over redactions, consistent with this Policy, the University's FERPA policy, and other applicable laws and regulations.

(b)    Formal Investigation and Determination Procedures

In addition to the general investigative procedures noted above, where the Office conducts a Formal Investigation and Determination, the Investigative Team will conduct initial interviews with each Party separately. The Parties' Advisors may be present for the interview. During these initial interviews, the Investigative Team will discuss with each Party the nature of the allegation(s), the rights and responsibilities of each Party, the prohibition against Retaliation, and the process to be followed. The Investigative Team will then speak to each Party in detail about the allegation(s) and ask each Party to provide a list of Witnesses and/or copies of any relevant documents or evidence to be considered. During the interview, a Party's Advisor may talk quietly with the Party or pass notes in a non-disruptive manner; take breaks of reasonable length and frequency, at the Party's request, to speak privately with the Party; review information provided to the Party by the Investigative Team; and seek clarity about questions posed to the Party. The Advisor may not intervene, including but not limited to speaking on behalf of the Party, answering questions posed to the Party, posing questions or making requests of the Investigative Team, providing information, or being disruptive. All interviews conducted as part of the Investigation will be recorded by the Investigative Team, and each recording or a transcript of each recording will be made available to the Parties, subject to FERPA and other applicable laws and policies. No Party or their Advisor may record any meeting or interview conducted as part of the investigative process, but Parties and Advisors may take written notes during meetings and interviews.

The Investigative Team will also collect evidence and interview Witnesses, as appropriate.

All Parties and Witnesses are obligated to be honest and act in good faith. Any Party or Witness who knowingly makes a false statement in connection with an Investigation may be subject to separate disciplinary action.

The initial allegations that are reported to the Office, as well as the allegations contained in the initial Notice to the Respondent(s), may not be the same as the final allegations submitted for Determination, which are dependent on the information gathered during the Investigation. Whenever there are additional or modified allegations to be investigated, Notice will be provided to both Parties.

33

Following the Investigative Team's collection of evidence, the Office will provide a copy of the Summary of Evidence that has been watermarked and redacted in compliance with FERPA and other applicable laws and policies to the Parties and their respective Advisors for their review. Media exhibits such as video recordings and photographs of individuals will be available for in- person review, at a prearranged time. The Investigative Team will remind the Parties and each Advisor that the non-disclosure agreement signed at the start of the Formal Investigation and Determination remains in effect. A Party or Advisor who has not signed the non-disclosure agreement will not be permitted to access the Summary of Evidence or any evidence or descriptions of evidence.

The Parties will have five (5) business days to review the Summary of Evidence and to provide a written response. The written response may include (1) corrections to the Summary of Evidence, including correcting names, dates, and/or other minor factual errors; (2) additional clarifications to the Summary of Evidence; (3) arguments that the Summary of Evidence is inaccurate; (4) identification of additional Witnesses to be interviewed; (5) additional evidence to be considered or included as an exhibit in the Investigative Report; and/or (6) questions for the Investigative Team to ask of any other participant in the process, including Parties and Witnesses. Proposed questions should be related to the Summary of Evidence and should not be duplicative or seek a restatement of a fact that has already been included in the Summary of Evidence. If any questions proposed by a Party are outside the scope of this Policy or are irrelevant to the case, such questions will not be asked. The Investigative Team may, in its sole discretion, modify any proposed question for appropriateness, relevance, or clarity. The Investigative Team may, in its sole discretion, pose or decline to pose any proposed questions and may, in its sole discretion, incorporate responses, as appropriate, into the Summary of Evidence.

Each Party's written response is that Party's final opportunity to offer questions and propose corrections to the Summary of Evidence, including corrections of names, dates, or other minor factual errors. The Investigative Team will review all Parties' written responses and make any appropriate changes to the Summary of Evidence, which the Parties may review, in the same manner that the Parties reviewed the initial Summary of Evidence, no fewer than five (5) business days before the Investigation is considered closed.

After the Parties' written responses have been submitted and appropriate changes and corrections to the Summary of Evidence have been made, the Investigation is considered closed. The Investigative Team will finalize its Investigative Report, which will include (1) the final Summary of Evidence; (2) the Investigative Team's factual findings and analysis; and (3) a determination of responsibility for each alleged violation of this Policy.

Any Party may, upon request to the Office, make arrangements to review a copy of the Investigative Report that has been redacted in compliance with FERPA and other applicable laws and policies to preserve the privacy of all participants in the process. Any such Party may be accompanied by an Advisor while reviewing the Investigative Report and may take notes of the Investigative Report, but may not take photos, screenshots, or copy it in whole or in part when reviewing it.

Each Party will receive a written Determination Letter, stating the Investigative Team's determination(s) of responsibility.[14] The Determination Letter will briefly summarize the alleged Prohibited Conduct that was the subject of the Formal Investigation and Determination, identify the provisions of this Policy at issue, and indicate the Office's determination(s) as to whether the alleged Prohibited Conduct violated the Policy. The Determination Letter will also describe the applicable timeline for an appeal for the Respondent. Only the Respondent has the right to appeal.

If there is a determination of responsibility and as part of the sanctioning process, each Party may provide a written impact statement discussing how the alleged Prohibited Conduct has impacted them. The written statement must be prepared by the Party and be no more than five single-spaced typed pages, using size 12-point Times New Roman font and one-inch margins. The statement must be submitted within three (3) business days of the Determination Letter.

Each Party will be given written Notice that the Investigation has been closed.

### E.    Impact of a Law Enforcement Investigation or Proceeding

Any resolution process will ordinarily continue during any law enforcement investigation or proceeding. The Office may, however, need to temporarily delay a resolution process while law enforcement is gathering evidence. In such instances, the Office will resume the resolution process after learning that law enforcement no longer requires a delay or has completed the evidence-gathering stage of its investigation; the Office need not wait for the conclusion of any related criminal proceedings. It should be noted that the standards of criminal law are different than those employed by the University. While information collected by law enforcement may be included in a resolution process under this Policy, determinations in criminal investigations and proceedings may not be considered by the Office.

### F.    Education and Training

At any point during or after the resolution process, including in cases where a Report is closed or a Respondent is found not responsible for an alleged violation of this Policy, the Dean of Students or equivalent administrator at the Respondent's school may require that any Respondent, and/or any member or affiliate of a Respondent that is a Student Group, receive appropriate education and/or training related to any alleged Prohibited Conduct. Such education and/or training will not call for abridging the Respondent's academic freedom. The Dean of Students or equivalent administrator may also recommend counseling or other support services.

---

[14] A Complainant may participate in the Summary of Evidence, have access to the Investigative Report, upon request, and Determination Letter but due to restrictions imposed by FERPA and consistent with the University's FERPA policy, a Complainant will not be notified of any sanctions or outcomes of any appeals imposed as a result of the process. The Complainant will receive Notice that the process has been completed either once the Respondent's deadline to appeal has passed, if the Respondent has not appealed, or after a decision has been rendered on the Respondent's Appeal.

## VIII.  SANCTIONS AND OTHER REMEDIES

If a Respondent is found responsible for a violation of this Policy, Sanctions will be imposed. This section describes how Sanctions are determined, provides a non-exhaustive list of possible Sanctions, and explains other steps the Office may take after a determination of responsibility has been made.

### A.    How Sanctions Are Determined

Any Sanction imposed will be:

- Fair and appropriate, given the facts of the particular case;

- Adequate to promote the ability of all members of the University community to access the University's activities and programs free from Discrimination or Discriminatory Harassment;

- Designed to address any Hostile Environment to which the Prohibited Conduct contributed in any of the University's programs or activities or at the University as a whole;

- Reflective of the seriousness of the Prohibited Conduct that was found to have occurred; and

- Generally consistent with Sanctions imposed in similar cases under similar circumstances.

In determining the Sanction, relevant factors that may be considered include, but are not be limited to:

- The specific Prohibited Conduct at issue;

- The totality of the information available about the circumstances surrounding the Prohibited Conduct;

- The Respondent's state of mind, or the state of mind of the Respondent's members or affiliates if the Respondent is a Student Group;

- The Respondent's prior disciplinary history in proceedings under the Policy or any other University policy;

- Sanctions imposed on the Respondent in other matters involving similar Prohibited Conduct;

- Sanctions imposed on any other Respondents in the same matter;

36

- The impact of the Prohibited Conduct on the Complainant and on the University community more generally;

- The existence of a Hostile Environment in any of the University's programs or activities or at the University as a whole, and the extent to which the Respondent's Prohibited Conduct created or contributed to any such Hostile Environment; and

- Any extenuating, aggravating, or other information deemed relevant.

When a Student or Active Alum Respondent is found responsible for a violation of this Policy following an Investigation and Determination, a Sanction will be determined by the Dean of Student Affairs of the Student or Active Alum Respondent's school, in consultation with the Investigative Team and the Office.[15] The Sanction will be communicated to the Student or Active Alum Respondent by letter within ten (10) business days of the date of the Determination Letter. The time frame for Sanctioning decisions may be adjusted, however, based on the availability of the individuals responsible for making the Sanctioning decisions.

When a Student Group is found responsible for a violation of the Policy following an Investigation and Determination, a Sanction will be determined by the Student Group's Dean of Student Affairs or equivalent administrator at the applicable school, in consultation with the Investigative Team and the Office. The Sanction will be communicated to the Student Group by letter within ten (10) business days of the date of the Determination Letter. However, the time frame for Sanctioning decisions may be adjusted based on the availability of the individuals responsible for making the Sanctioning decisions. The administrative office through which the Student Group is recognized will be tasked with implementing appropriate Sanctions.

In those cases that go through the Investigation and Determination process, there will be no Sanction without a determination of responsibility.

## B.    Possible Sanctions

The University may, consistent with applicable law and Columbia's policies, impose one or more of the following Sanctions on a Student determined to have violated this Policy:

- Reprimand/disciplinary warning;

- Conditional disciplinary probation;

- Disciplinary probation;

- Revocation of honors and/or awards;

- Restriction of access to University facilities or activities, up to and including a total ban from access to all University-owned buildings or property (*i.e.*, *persona non grata* status);

- Removal from and/or restricted participation in academic or extracurricular activities

---

[15] For purposes of this Policy, an Active Alum's school is the school of the University from which the Active Alum most recently received a degree.

and/or University organizations (including Student Groups), or restriction from receiving University services;

- Removal from student housing;

- Admission revocation;

- Disciplinary suspension (suspension for a fixed period of time or indefinite suspension, with the opportunity to petition for re-admission);

- Expulsion; and/or

- Withholding or deferral of issuance of degree.

The University may impose one or more of the following Sanctions on an Active Alum determined to have violated this Policy:

- Revocation of honors and/or awards;

- Revocation of degree; and/or

- Revocation of alumni privileges.

The University may impose one or more of the following Sanctions on a Student Group determined to have violated this Policy:

- Reprimand/disciplinary warning;

- Deduction of funds from the Student Group's budgetary allocation;

- Freezing of the Student Group's ability to access its budgetary allocation or to reserve space;

- Temporary or permanent prohibition of certain individuals from serving in leadership positions in the Student Group;

- Disciplinary probation of the Student Group;

- Disciplinary suspension of the Student Group; and
- De-recognition of the Student Group.

These lists are not exhaustive, and the Office may fashion other Sanctions appropriate to the circumstances of any particular case. Definitions of these Sanctions may be found in Appendix F.

If a Sanction of disciplinary probation, disciplinary suspension, expulsion, withholding of degree, or revocation of degree is issued to a Student Respondent, the Student will be considered not in good disciplinary standing. In addition, if a Student Respondent receives a Sanction of expulsion, the Student will be permanently separated from the University and will not be permitted to return at any time.

Where a Student Respondent is found responsible and the Sanction includes disciplinary suspension or expulsion, the Student may be removed from a campus residence and either severely restricted in their movements on campus or barred completely from campus during the entirety of the Appeal-filing period and appellate process.

Where a Student Respondent is found responsible and the Sanction includes an indefinite suspension, while on such an indefinite suspension, the Student may not obtain academic credit elsewhere that may be applied toward the completion of a Columbia degree. Any written petition for readmission must be prepared by the Student. The petition for readmission should be submitted to the Office, for consideration by the Office, in consultation with appropriate University partners, no later than April 1 if the petition is for re-admission for the fall semester and no later than November 1 if the petition is for re-admission for the spring semester. While there are no specific content requirements, a request for re-admission must include a personal statement of no more than ten (10) single-spaced typed pages, using 12-point Times New Roman font and one-inch margins, and may include, but is not limited to, the following additional supporting materials:

- Letters of support;

- Proof of community involvement;

- Certified completion of related individual or group counseling, training, or education; and

- Any other indicators of changes in life circumstances or personal growth.

In addition to any other Sanction (except where the Sanction is, for a Student Respondent, the withholding of a degree, expulsion, or revocation of degree), the Office may require any Respondent, or any member or affiliate of a Student Group Respondent, found responsible for a violation of this Policy to receive appropriate education and/or training related to the Prohibited Conduct at issue. The Office will conduct the appropriate education and/or training. The Office may also recommend counseling or other support services to the Respondent or Respondent member or affiliate.

### C.    Transcript Notations

Upon conclusion of the appellate process, a transcript notation will be placed on a Student Respondent's record for cases resulting in disciplinary suspension or expulsion and for cases where the Respondent withdrew from the University during the pendency of any resolution process. Notations on transcripts will be made in compliance with applicable federal and state law and will appear as follows: disciplinary suspension; disciplinary expulsion; withdrawn with disciplinary action pending. Further information on transcript notations is available in the policy on Standard Transcript Notations contained in the University Regulations.

### D.    Ongoing or Additional Supportive Measures

Whatever the outcome of any resolution process or Appeal under this Policy, the Parties may request ongoing or additional Supportive Measures, and the Office, in consultation with the designated administrator of a Student, Active Alum, or Student Group Party's school or an Employee Party's Supervisor, will determine whether such Supportive Measures are appropriate. Ongoing or additional Supportive Measures that do not unreasonably burden a Party may be considered and provided even if the Respondent is found not responsible for violating this Policy. These ongoing or additional Supportive Measures may also be available for individuals who choose not to file a Report or for Complainants who choose not to participate in the process or a part of the process. Potential ongoing or additional Supportive Measures include, but are not limited to:

- Issuing or maintaining a no-contact directive;

- Providing an escort;

- Moving a Student's residence or an Employee's worksite;

- Changing a Student's academic schedule;

- Adjusting a Student's or Employee's work schedule;

- Allowing a Student to withdraw from or retake a class without penalty; and/or

- Providing access to tutoring or other academic support, such as extra time to complete or re-take a class.

### E.    Additional Responses

The Office may determine that additional measures are appropriate to respond to the effects of an incident on the University community. Additional responses for the benefit of the University community may include, but are not limited to, increased monitoring, supervision, or security at locations or activities where the misconduct occurred; additional training and educational materials for Students, Active Alums, and Student Groups; or revision of this Policy or related University policies.

## IX.    APPEALS

All Respondents may appeal a determination of responsibility and/or Sanction within ten (10) business days after the Respondent receives a sanctioning Notice by filing an Appeal in writing to the Office. Failure to meet the deadline for an Appeal will result in waiver of the right to appeal.

Any Sanction imposed prior to the filing of an Appeal will remain in place during the pendency of the Appeal. The pendency of an Appeal does not stay the imposition of a Sanction.

### A.    Grounds for Appeal

Disagreement with a determination of responsibility or with a Sanction is not, by itself, grounds for appeal. The four grounds for appeal include:

*Procedural Irregularity:*  An Appeal based on procedural irregularity must identify with specificity each alleged procedural irregularity within the resolution process and the ways in which the specified procedural irregularity or irregularities substantially affected the decision of the Investigative Team or Sanctioning officer to the detriment of the appealing Party. Disagreement with the determination is not, by itself, a ground for appeal.

*New Information:* An Appeal based on new information must explain why the information was not available or not provided to the Investigative Team in a timely manner and how this information would have substantially altered the decision by the Investigative Team or Sanctioning officer. If a Party declined to participate or withdrew from the process, the Appellate Officer or Panel will not consider information that the Party could have provided if they had fully participated in the process. This includes situations where a Party declines to participate on the advice of their Advisor or due to a concurrent criminal investigation.

*Conflict of Interest/Bias:*  An Appeal based on Conflict of Interest or bias must explain how the Office, the Investigative Team, or Sanctioning officer had a Conflict of Interest or bias for or against Complainants or Respondents generally, or the individual Complainant or Respondent, that affected the outcome of the matter. Complainants and Respondents are afforded the opportunity throughout the process to raise a potential Conflict of Interest or alleged bias. Parties must exercise this opportunity to raise a potential Conflict of Interest or alleged bias (*e.g.*, to identify situations where a participant in the process is a Party's family member, close friend, current or former faculty member, or academic advisor) so that any Conflicts of Interest or biases are immediately addressed before the process moves forward. Accordingly, only newly known or newly apparent Conflicts of Interest or bias will be considered on appeal.

*Inappropriateness of the Sanction:*  An Appeal based on the imposed Sanction must explain why the Sanction is inappropriate based on the weight of the information provided during the Investigation and Determination.

41

### B.     Appellate Procedures

Appeals involving Student and Active Alum Respondents are decided by the majority vote of an Appellate Panel. The Appellate Panel will consist of three Deans: the Dean of the Respondent's school; the Dean of the Complainant's school; and a Dean from another school. Should the Complainant and the Respondent attend or work for the same school or should a Dean from any Party's school have a Conflict of Interest, Deans from other schools will be added to the Appellate Panel so that it consists of three Panelists. Should the Parties both be Students or Active Alums of a graduate or professional school, Deans from graduate or professional schools will comprise the panel. Should one Party be an undergraduate Student or Active Alum and another Party a graduate or professional Student or Active Alum, the Appellate Panel will consist of the Dean of the Respondent's school, the Dean of the Complainant's school, and a Dean of a School from the academic level of the Respondent. All Deans will receive relevant training at least once a year on how the resolution and appeal processes work, the elements essential to a fair and balanced review, and the sensitive issues in reviewing cases of Discrimination or Discriminatory Harassment.

Appeals involving Student Group Respondents are decided by an Appellate Officer to be designated by the Office. The Appellate Officer will be a senior officer of the University.

Attached to their Appeal, the appealing Party may provide a written submission for the Appellate Panel or Officer to review. The written statement must be prepared by the Party and be no longer than five (5) single-spaced typed pages, using 12-point Times New Roman font and one-inch margins. No attachments or exhibits will be accepted; references to evidence should be made to cited portions of the Determination Letter or sanctioning Notice, the Investigative Report, or materials included with the Investigative Report.

The purpose of an Appeal is not to initiate a review of substantive issues of fact, or to make a new determination of whether a violation of this Policy has occurred. The Appellate Panel or Officer is strictly limited to determining if an Appeal should be granted based on the above grounds for appeal. In making a determination, the Appellate Panel or Officer will have access to and the ability to review all applicable documents, including the Appeal, the complete Investigative Report and all exhibits, and any other materials submitted to the Investigative Team. The Appellate Panel or Officer may also request additional information from the Investigative Team and/or the Sanctioning officer. In the event that a Party submits an Appeal containing inaccurate facts or information outside the scope of this Policy, those portions of the information may be redacted and/or the Office may provide a curative instruction to the Appellate Panel or Officer.

The Appellate Panel or Officer may take the following actions:

• Affirm the determination and/or Sanction;

• Revise the Sanction; or

- Reverse the determination and send the matter back to the Investigative Team or a different Investigative Team for further consideration.

If the matter is returned to an Investigative Team, the Appellate Panel or Officer will provide instructions regarding the nature and extent of the reconsideration. Following reconsideration by the Investigative Team, further proceedings will be conducted as appropriate.

Decisions with regard to Appeals generally will be rendered within twenty (20) business days after the receipt of the last written submission by either of the Parties, depending on the availability of the Appellate Panel or Officer at the time of the Appeal. The Office will notify the Parties if there is a delay.

There is no further recourse beyond the decision of the Appellate Panel or Officer. The Appellate Panel or Officer will notify the Respondent of its decision in writing. The Complainant(s) will receive Notice that the resolution process has been completed but, due to restrictions imposed by FERPA and consistent with the University's FERPA policy, the Complainant will not be notified of the fact that the Respondent appealed nor of the outcome of the appellate process.

## X.     UNIVERSITY RECORDS AND REPORTING

### A.     Records Retention and Disclosure

The Office must retain documentation generated during the course of its assessment of and response to Reports of Discrimination, Discriminatory Harassment, and other Prohibited Conduct for seven (7) years. This includes, as applicable, Reports, documentation of attempts to determine the identity(ies) of Parties involved in reported incidents if not known to the Reporter, Notices, interview notes and recordings, documentary evidence collected, documentation concerning Supportive Measures and Interim Measures, Investigative Reports, Determination Letters, Sanction Notices, documentation pertaining to Appeals, and any other relevant documents or correspondence. Relevant portions of this documentation may become part of a Student Respondent's educational record or the University's files concerning a Student Group Respondent.

Records of disciplinary proceedings involving Students are subject to FERPA, a federal law governing the confidentiality of student information. FERPA generally limits disclosure of Student information outside the University without the Student's consent, but it does provide for release of Student disciplinary information without a Student's consent in certain circumstances. For example, it is important to note that the release of Student disciplinary records is permitted, without prior consent, to University officials with a legitimate educational interest, such as a Student's academic advisor and staff of Columbia Athletics if the Student is an athlete. The University will also release information when a Student gives written permission for information to be shared.[16]

Any information gathered by the Office may be subpoenaed by law enforcement authorities as part of a parallel or subsequent investigation into the same conduct or required to be produced through other compulsory legal processes.

Unless otherwise specified by a Student Respondent, the University will respond to third-party requests for a Student's disciplinary records (*e.g.*, requests by graduate schools or employers) by disclosing only records of disciplinary matters that result in the change of a Student's good disciplinary standing at the University, and only with the Student's prior written permission. Matters that resulted in disciplinary probation are reported for seven (7) years from the date that the Student was found responsible for a violation of University policy. Matters that result in a disciplinary suspension or in expulsion from the University are reported as a part of the Student's permanent education record. Matters where Students maintained good disciplinary standing are not reported unless otherwise specified by the Student. Any such disclosure includes the Student's violation(s), the corresponding Sanction(s), and the date of determination.

Students and alumni may inquire about their disciplinary record here.

---

[16] Additional information about FERPA is contained in Columbia University's Policy on Access to Student Records under the Federal Family Educational Rights and Privacy Act (FERPA) of 1974, as Amended.

**B.      Annual Assessments and Reports**

A federal law called the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act") requires the University to record and report certain information about campus safety, including the number of incidents of certain crimes on or near campus. As described in the chart in Appendix B, many Employees who receive Reports of Prohibited Conduct are required by the Clery Act to notify Columbia Public Safety about such incidents for statistical reporting purposes only; these notifications may include the classification and location of the reported crime, but do not identify the individuals involved.

Additionally, as a matter of policy unrelated to the Clery Act, the University plans to start reporting aggregate information to the University community concerning reported incidents of Discrimination or Discriminatory Harassment and the results of related disciplinary proceedings. Such reports will not contain information identifying individual participants.

At least annually (and possibly more frequently, as circumstances dictate), the Office will (i) search University websites and publications to ensure that information regarding policies and procedures concerning Discrimination or Discriminatory Harassment, and the links to such policies, procedures, and reporting forms are up to date; and (ii) review all Reports received, regardless of their disposition, to determine if any patterns, recidivism, or collective incidents exist that may have created or contributed to the existence of a Hostile Environment for members of any Protected Class in any University program or activity or at the University as a whole.

## XI.    OTHER REPRESENTATIONS

### A.    University Authority / Amendment

The University may amend this Policy periodically, including in response to new or amended laws or regulations. Nothing in this Policy affects the inherent authority of the University to take such actions or alter, change, or modify this Policy as it deems appropriate to further the educational mission or to protect the ability of all members of the University community to access the University's activities and programs free from Discrimination, Discriminatory Harassment, and other Prohibited Conduct. The information in this Policy is intended to be explanatory and not contractual in nature.

### B.    No Conflicts of Interest or Bias

As discussed above in Section IV.H, any individual designated by the University as an Investigator, Sanctioning officer, Appellate Officer or Panel member, or to otherwise facilitate a resolution process pursuant to this Policy will not have a Conflict of Interest or bias for or against Complainants or Respondents generally or an individual Complainant or Respondent.

### C.    Training and Education

The University ensures that Investigators, Sanctioning officers, Appellate Officers or Panel members, and anyone designated to otherwise facilitate a resolution process pursuant to this Policy receives training on University policies and procedures; the scope of the University's education programs and activities; how to conduct an Investigation, Determination, Appeal, and/or other resolution process, as applicable; the interaction of this Policy and the University's academic mission, including its commitment to academic freedom; and how to serve impartially, including by avoiding prejudging the facts at issue, Conflicts of Interest, and bias. Training also includes the use of any necessary technology and on issues of relevance of questions and evidence.

### D.    Designees

While this Policy identifies University offices and Employees who will typically perform certain roles or duties, the University may designate other University offices, Employees, or appropriate non-Employees to perform any roles or duties described in this Policy.

## XII.    APPENDICES

46

A.    **Appendix A: Campus and Community Resources**

## Anti-Discrimination and Discriminatory Harassment
ANTI- DISCRIMINATION AND DISCRIMINATORY HARASSMENT RESOURCES FOR STUDENTS

### ON-CAMPUS RESOURCES

The University Health Services Student Fee covers the on-campus resources that are available to students enrolled in their school's health service program. Services are available during normal business hours, 9:00 a.m.-5:00 p.m., unless otherwise noted.

### CONFIDENTIAL

**Sexual Violence Response & Rape Crisis/Anti-Violence Support Center***
- ☐ Morningside: Alfred Lerner Hall, Suite 700
- CUIMC: 60 Haven Ave, Bard Hall, Suite 206
- Barnard: 105 Hewitt Hall, 1st Floor
- ☐ Helpline: 212-854-HELP (4357) *(Available 24 hours a day year-round)*

**Ombuds Office**
- Morningside: 660 Schermerhorn Ext. | 212-854-1234
- CUIMC: 154 Haven Ave, Room 412 | 212 -304-7026

**Medical Services**
- ☐ Morningside: John Jay, 4th Floor | 212-854-7426 | Mon–Thur 9am-4:30pm | Fri 8am – 3:30pm
- CUIMC: 100 Haven Ave, Tower 2, 2nd Floor| 212-305-3400
- Barnard: Lower Level Brooks Hall | 212-854-2091

**University Counseling and Psychological Services**
- ☐ Morningside: Alfred Lerner Hall, 5th and 8th Floors | 212-854-2878
- CUIMC: 100 Haven Ave, Tower 2, 3rd Floor | 212-305-3400
- Barnard: 100 Hewitt Hall, 1st Floor | 212-854-2092 After hours 855-622-1903

**University Pastoral Counseling**
- Office of the University Chaplain: *(Ordained Clergy)* W710 Lerner Hall | 212-854-1493
- Columbia Religious Life: *(Ordained Clergy)* 303 Earl Hall | 212-854-2184

**Columbia Office of Disability Services** *(Confidential Resource for Columbia Only)*
- Morningside: Wien Hall, Suite 108A | 212- 854-2388
- CUIMC: 105 Bard Hall | 212-304-7029 http://www.health.columbia.edu/disability-services

☐ Indicates that facility supports Teachers College.

The medical treatment resources listed above can provide treatment for injuries and for potential exposure to sexually transmitted diseases. They also provide emergency contraception and other health services. They can assist in preserving evidence or documenting any injuries, including by helping find a Sexual Assault Nurse Examiner, who is specially trained to collect evidence. Taking these steps promptly after an incident can be very helpful in later criminal proceedings and/or in seeking a protective order.

### ADDITIONAL RESOURCES (NON-CONFIDENTIAL)

**Center for Student Success and Intervention ("CSSI")**
- Case Management and Community Engagement CSSI@columbia.edu | 212-854-1717

**Office of Institutional Equity ("OIE")**
- institutionalequity@columbia.edu | 212-854-5511 **University Title IX**
- Columbia University: Marjory Fisher, Associate Vice President | 201A Kent Hall mdf2166@columbia.edu 212-853-1276
- Barnard: Joanne Delgadillo, Director of Nondiscrimination and Title IX | Elliott Hall, 1st Floor | jdelgadi@barnard.edu | 212-854-0037
- Teachers College: Janice Robinson, Vice President for Diversity and Community Affairs | Zankel 128 jsr167@tc.columbia.edu | 212-678-3391

**University Public Safety**
- Morningside: 212-854-2797
- Manhattanville: 212-853-3301
- CUIMC: 212-305-8100
- Barnard: 212-854-3362
- Teachers College: 212-678-3333

**International Students and Scholars Office ("ISSO")**
- 524 Riverside Drive, 1st Floor https://isso.columbia.edu/ | 212-854-3587

**Requesting Accommodations for a Disability at Barnard and Teacher's College**
- Teachers College Office of Access and Services for Individuals with Disabilities: Zankel 301 http://www.tc.columbia.edu/oasid 212-678-3689
- Barnard Office of Disability Services: 101 Althschul Hall http://www.barnard.edu/disabilityservices |
- 212-854-4634

## OFF-CAMPUS RESOURCES**

Unless otherwise noted, all facilities listed below are available 24 hours a day.

☽ indicates facilities that are not available 24 hours a day.  **Fees may apply.

### Off-Campus Advocacy, Counseling and Health Services

- Safe Horizon
  Sexual Assault Hotline:  212-227-3000
  Domestic Violence Hotline: 800-621-HOPE (4673)

- ☽Mt. Sinai St. Luke's Hospital Crime Victims
  Treatment Center 1-212-523-4728 *by appointment only*
  (sexual assault advocates available 24 hours a day).
- New York-Presbyterian/CUIMC Emergency Room
  1-212-305-6204
- New York City Anti-Violence Project
  1-212-714-1184
- New York State Office of Victim Services
  1-800-247- 8035
- New York State Office of Campus Safety
  1-518-474- 6460
- New York State Office for the Prevention of Domestic
  Violence 1-800-942-6906
- It's On Us 1-202-908-5226 www.itsonus.org

### Neighboring Hospitals with SAFE Centers:

- Mt. Sinai St. Luke's Hospital *(CHP Group)*
  1111 Amsterdam Avenue at West 113th Street
- Mt. Sinai West Hospital *(CHP Group)*
  1000 10th Avenue at West 58th Street
- Beth Israel-Petrie Campus *(CHP Group)*
  281 First Avenue at East 16th Street
- Bellevue Hospital *(HHC Group)*
  462 First Avenue at East 27th Street
- Harlem Hospital *(HHC Group)*,
  506 Malcolm X Boulevard at West 135th Street
- Metropolitan Hospital Center *(HHC Group)*
  1901 First Avenue at 96th Street
- Mount Sinai Medical Center *(Mount Sinai)*,
  1 Gustave L Levy Place (Fifth Avenue) at East 98th Street
- New York-Presbyterian - Columbia *(NYP)*
  622 West 168th Street
- New York-Presbyterian - The Allen Pavilion *(NYP)*,
  5141 Broadway at West 221st Street
- New York-Presbyterian - Weill Cornell *(NYP)*, 525 East
  68th Street at York Avenue

Mt. Sinai St. Luke's Hospital's Emergency Room at 1111 Amsterdam Avenue (West 113th Street between Amsterdam and Morningside Avenues) and New York-Presbyterian Hospital/CUIMC Emergency Room at 630 West 168th Street (at Broadway) can provide treatment for injuries and for potential exposure to sexually transmitted infections, emergency contraception, and other health services. They can assist in preserving evidence or documenting any injuries and have personnel who are specially trained to collect evidence.

### Off-Campus Law Enforcement

- New York City Police Department (NYPD)
  Emergency: 911
  26th Precinct: 212-678-1311
- New York County District Attorney's Office
  Domestic Violence Unit: 212-335-4308
  Sex Crimes Unit:  212-335-9373
- New York Campus Sexual Assault Victims Unit
  Hotline 1-844-845-7269
- Sex Crimes Report Hotline 212-267-7273

### Additional Government Resources

The government resources listed here may provide additional assistance for students wishing to file an external complaint of gender-based misconduct or students with inquiries regarding the application of Title IX and its implementing regulations:

- ☽NYC Family Justice Center – Manhattan
  https://www1.nyc.gov/site/ocdv/programs/family-justice-centers.page
  212-602-2800 | 80 Centre St New York, NY 10013

- ☽New York State Office of Victims Services
  https://ovs.ny.gov/ |1-800-247-8035

- ☽U.S. Department of Education, Office for Civil
  Rights  |  http://www.ed.gov/ocr
  646-428-3800 |New York – Region II, 32 Old Slip, 26th
  Floor  |  OCR.NewYork@ed.gov

- ☽U.S. Department of Justice, Office on Violence
  Against Women | https://www.justice.gov/ovw
  202-307-6026 |145 N St, NE, Suite 10W.121
  Washington, D.C. 20530

- National Domestic Violence Hotline
  1-800-799-SAFE

- ☽National Crime Victim Center
  http://www.ncvc.org | 855-484-2846 (8:30 am – 7:30 pm)

### Overseas Services

In an emergency, contact the nearest U.S. Embassy or Consulate, or call these numbers:
- From Canada: 1-888-407-4747
- From Overseas: +1-202-501-4444-4747

See the chart on the following page for an explanation of these resources' reporting obligations.
Up-to-date contact information can be found on the University's *Sexual Respect* website at http://sexualrespect.columbia.edu.

**B.    Appendix B: Confidentiality Protections and Reporting Obligations**

| CONFIDENTIALITY PROTECTIONS & REPORTING OBLIGATIONS | | |
|---|---|---|
| Confidential resources will not share information with some exceptions. Exceptions to confidentiality are listed below. | | |
| TYPE | PERSONNEL | REPORTING OBLIGATIONS |
| C O N F I D E N T I A L | University Chaplains (*Ordained Clergy*) | • None, unless acting in a role described below. |
| | Counseling and Psychological Services | • If a patient's clinical state poses a substantial risk of harm to the patient or others, as manifested by conduct, this resource must report to County Mental Health officials. (NY Mental Hygiene Law) <br> • If there is reasonable cause to suspect that a minor has been sexually abused, this resource will report to the requisite state officials. (NY Social Services Law) |
| | Physicians and Other Health Professionals | • This resource will report incidents on an aggregate periodic basis without any identifying information to the Office to enable the University to understand the existence and extent of the problem. (Title IX) <br> • If a patient's clinical state poses a substantial risk of harm to the patient or others, as manifested by conduct, these resources will report to New York County Mental Health officials. (NY Mental Hygiene Law) <br> • If there is reasonable cause to suspect that a minor has been sexually abused, this resource will notify the requisite state officials. (NY Social Services Law) |
| | Sexual Violence Response & Rape Crisis/Anti-Violence Support Center | • This resource will report incidents on an aggregate periodic basis without any identifying information to the Office to enable the University to understand the existence and extent of the problem. (Title IX) <br> • If there is reasonable cause to suspect that a minor has been sexually abused, this resource will notify University leadership. (NY Social Services Law) <br> • When disclosure may prevent harm to self or others where the danger is imminent (i.e. suicide or homicide) N.Y. [Mental Hygiene] Law <br> • If there is reasonable cause to suspect abuse or neglect of an Incompetent or Physically Disabled Person (defined as persons who are unable to care for themselves because of physical disability, mental disease or defect). (Article 260, NYS Penal Law & Soc. Services) |
| | Disability Services (*for Columbia only*) <br><br> University Ombuds Offices | • This resource will report incidents on an aggregate periodic basis without any identifying information to the Office to enable the University to understand the existence and extent of the problem. (Title IX) <br> • If a patient's clinical state poses a substantial risk of harm to the patient or others, as manifested by conduct, these resources will report to New York County Mental Health officials. (NY Mental Hygiene Law) <br> • If there is reasonable cause to suspect that a minor has been sexually abused, this resource will notify University leadership. (NY Social Services Law) |

| CONFIDENTIALITY  PROTECTIONS  &  REPORTING  OBLIGATIONS | | |
|---|---|---|
| Non-confidential resources are required to protect students' privacy to the greatest extent possible and will only disclose identifying information on a need-to-know basis. | | |
| TYPE | PERSONNEL | REPORTING OBLIGATIONS |
| ADDITIONAL  RESOURCES  (NON-CONFIDENTIAL) | Center for Student Success and Intervention<br><br>Title IX Coordinators<br><br>Office of Institutional Equity | • Unless a complainant requests otherwise and the request is granted, this resource will investigate and respond to reported gender-based misconduct incidents (Title IX)<br>• If the incident may be a crime, this resource will report it without any identifying information to Campus Public Safety for inclusion in the daily crime log and annual statistical report and for issuance of any required timely warning. (Clery Act)<br>• This resource will share information with University personnel who need to know it in order to carry out University policies and procedures |
| | Public Safety Personnel | • Public Safety will report to the Office all information received about gender-based misconduct incidents so the University can investigate and respond. (Title IX)<br>• If the incident may be a crime, Public Safety will include it in a crime log and annual crime statistics without identifying the alleged victim. (Clery Act)<br>• If the incident may be a crime and poses a serious or continuing threat, Public Safety will issue an emergency notification or timely warning. (Clery Act)<br>• If there is reasonable cause to suspect that a minor has been sexually abused, Public Safety will notify University leadership. (NY Social Services Law)<br>• Public Safety will share information with University personnel who need to know it in order to carry out University policies and procedures |
| | Other University Personnel<br><br>Disability Services<br>*Barnard and Teacher's College* | • Will report to the Office all information received about gender-based misconduct incidents so the University can investigate and respond. (Title IX)<br>• If the incident may be a crime, a "campus security authority" will report it without any identifying information to Campus Public Safety for inclusion in the daily crime log and annual statistical report and for issuance of any required timely warning. (Clery Act)<br>• If there is reasonable cause to suspect that a minor has been sexually abused, other University personnel will notify University leadership. (NY Social Services Law)<br>• Other University personnel will share information with University personnel who need to know it in order to carry out University policies and procedures. |

### C.    Appendix C: New York State Students' Bill of Rights

# NYS STUDENTS'
# BILL OF RIGHTS

New York State law requires that all institutions of higher education in New York publish the following Bill of Rights for all students attending higher education institutions in the State.

**All students have the right to:**

1. Make a report to local law enforcement and/or state police
2. Have disclosures of domestic violence, dating violence, harassment, stalking, sexual exploitation, sexual assault, and retaliation treated seriously
3. Make a decision about whether or not to disclose a crime or violation and participate in the University gender- based misconduct process and/or criminal justice process free from pressure by the University
4. Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard
5. Be treated with dignity and to receive from the University courteous, fair, and respectful health care and counseling services, where available
6. Be free from any suggestion that the Complainant is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations
7. Describe the incident to as few University representatives as practicable and not be required to unnecessarily repeat a description of the incident
8. Be protected from retaliation by the University, any student, the accused and/or the Respondent, and/or their friends, family, and acquaintances within the jurisdiction of the University
9. Access to at least one level of appeal of a determination
10. Be accompanied by an advisor of choice who may assist and advise a Complainant, accused, or Respondent through the judicial or conduct process included during all meetings and hearings related to such process
11. Exercise civil rights and practice of religion without interference by the investigative, criminal justice or judicial or conduct process of the University

**D.    Appendix D: Glossary of Certain Terms and Policy-Related Concepts**

The following terms and concepts apply to the interpretation and application of this Policy. Only these definitions may be used in proceedings under this Policy, including as further described later in this document.

**Active Alum:** A graduate of a Columbia undergraduate or graduate degree-granting program (*i.e.*, non-certificate programs) with an intent to participate in one or more of Columbia's alumni-specific groups or associations, or a person who graduated from a Columbia undergraduate or graduate degree-granting program within the six months prior to reporting an allegation of misconduct to the University through the procedures outlined in this Policy.

**Administrative Resolution:** A resolution process that may be available when a Complainant does not wish to engage in other resolution processes and/or the Office, in its discretion and based on the available information, determines that an Administrative Resolution is necessary and/or sufficient to ensure the ability of all members of the University community to access the University's activities and programs free from Discrimination and Discriminatory Harassment.

**Advisor:** An individual chosen by a Party who may be, but need not be, an attorney and who may accompany that Party to any meeting or interview.

**Appeal:** A request that a determination of responsibility or a Sanction be reviewed.

**Appellate Officer or Panel:** The University official or group of University officials who decide an Appeal.

**Case Manager:** Personnel within the Office who support Complainants and Respondents.

**Complainant:** A person who makes a Report of Prohibited Conduct pursuant to this Policy. In cases where the Reporter is someone other than the individual who was subjected to the alleged Prohibited Conduct, that individual, rather than the Reporter, will be referred to as the Complainant for purposes of this Policy.

**Confidential Resource:** Employees of the University who are not obligated to report disclosures of instances or allegations of Prohibited Conduct except for aggregate statistical data that does not include individuals' names or identifying information.

**Conflict of Interest:** A reason why the impartiality of any Investigator, sanctioning officer, Appellate Panelist or Officer, or any other Employee playing a role in any resolution process might reasonably be questioned. Conflicts of Interest may include, but not be limited to, situations where an individual is a Party's family member, close friend, current or former faculty member, or advisor, or where an individual has a bias for or against Complainants or Respondents generally or any individual Complainant or Respondent.

**Contractor:** An individual who, while not an Employee, is directly or indirectly retained by the University to provide goods or services.

**Cross-Complaint:** A case in which a Complainant and a Respondent each makes allegations of Prohibited Conduct by the other presents a Cross-Complaint. In such cases, the Parties will be referred to as "Party A" and "Party B" instead of as Complainant and Respondent. Each such Party will have all of the same rights and be subject to the same procedures that apply to Complainants and Respondents. Allegations in Cross-Complaints will be resolved simultaneously, other than in exceptional circumstances or at the discretion of the Investigative Team.

**Determination Letter:** A Notice sent by the Office to inform the Respondent of the Investigative Team's determination(s) of responsibility following an Investigation and Determination.

**Discrimination:** Treating individuals less favorably because of their actual or perceived membership in, or association with, a Protected Class, or having a neutral policy or practice that has a disproportionate and unjustified adverse impact on actual and perceived members or associates of one Protected Class more than others. See Section III.A.1 for further details.

**Discriminatory Harassment:** Subjecting an individual to unwelcome conduct, whether verbal or physical, that creates or contributes to a hostile working, learning, or campus living environment; that alters the conditions of employment or education; or that unreasonably interferes with an individual's work, academic performance, or ability to participate in or benefit from some aspect of the University's educational programs or activities on the basis of the individual's actual or perceived membership in, or association with a Protected Class. See Section III.A.2 for further details.

**Duty to Report:** All Employees, except Confidential Resources, are required to report to the Office any instance or allegation of Prohibited Conduct involving *any Student, Active Alum, or Student Group* that is disclosed to, observed by, or otherwise known to that Employee, whether or not the Student, Active Alum, or Student Group is a potential Complainant or Respondent and whether or not the Student, Active Alum, or Student Group has any formal connection to the Employee who is subject to this duty.

**Educational Resolution:** A resolution process that may be available in cases involving a Report of alleged Prohibited Conduct that would typically result in Sanctions no more severe than a warning or reprimand.

**Employee:** Any individual employed by the University, whether full-time or part-time and in any capacity.

**Formal Investigation and Determination:** A resolution process that is followed in cases where the Office determines that (1) a Report may not be resolved solely on the basis of evidence in the Office's possession, and (2) initial interviews of the Parties are necessary due to the otherwise available credible and reliable evidence.

**Hostile Environment:** A learning, working, or living environment created by unwelcome conduct that, considering the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from any of the University's educational programs or activities.

**Initial Report Review:** A process that the Office undertakes upon receiving a Report of alleged Prohibited Conduct to determine whether the Office has jurisdiction over the Report.

**Intentional Interference:** Intentionally taking action to impede any process of the Office conducted pursuant to this Policy.

**Interim Measure:** Any action the Office may take or cause to be taken, based on the totality of circumstances known at the time, to protect the safety of all Parties involved, to prevent the escalation of conflict, and to protect the integrity of the resolution process while the process remains ongoing.

**Investigation:** The portion of the Investigation and Determination resolution process during which the Investigative Team may interview Parties and Witnesses, gather other evidence, and prepare a Summary of Evidence.

**Investigation and Determination:** A resolution process involving an Investigation followed by a determination of responsibility.

**Investigative Report:** A document prepared as part of the Investigation and Determination resolution process containing the Investigative Team's Summary of Evidence, findings and analysis, and determination of responsibility for each alleged violation of the Policy.

**Investigator or Investigative Team:** One or more personnel of the Office assigned to a matter upon the Office's receipt of a Report of alleged Prohibited Conduct. In the Office's sole discretion, the Office may assign appropriate non-Office personnel as an Investigator or Investigative Team.

**Mediation:** A resolution process in which the Parties identify the implications of a Respondent's alleged Prohibited Conduct and, with the assistance of a Mediator, identify points of agreement and appropriate remedies.

**Mediator:** A trained facilitator who guides the discussion between the Parties in a Mediation and assists the Parties to identify points of agreement and appropriate remedies.

**Notice:** A written communication between the Office and one or more Parties that is sent pursuant to this Policy.

**Office:** Columbia University's Office of Institutional Equity.

**Party:** A Complainant or Respondent. The Complainant(s) and Respondent(s) are referred to collectively as the "Parties."

**Policy:** This Policy and the procedures associated with it.

**Prohibited Conduct:** Conduct that violates this Policy, including but not limited to Discrimination and Discriminatory Harassment.

**Protected Class:** A group of people with a common characteristic who are protected from Discrimination and Discriminatory Harassment on the basis of that characteristic. This Policy addresses Reports of Discrimination or Discriminatory Harassment on the basis of any of the following characteristics: age; alienage or citizenship status; arrest or conviction record; caregiver status; caste; color; credit history; creed; disability; familial status; genetic predisposition or carrier status; marital status; national origin (including shared ancestry, ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity); race; religion; salary history; unemployment status; veteran or active military status; or any other protected characteristic as established by law.[17]

**Relevant:** Helping to show that an allegation of Prohibited Conduct is more or less likely to be true.

**Report:** An allegation of Prohibited Conduct received by the University.

**Reporter:** A person who makes a Report of alleged Prohibited Conduct.

**Respondent:** A Student, Active Alum, or Student Group alleged to have engaged in Prohibited Conduct.

**Restorative Justice ("RJ"):** A resolution process that is based on an approach to wrongdoing and interpersonal conflict that emphasizes the impact of challenging behaviors on individuals and communities.

**Retaliation:** Any adverse action or threatened action, taken or made, personally or through a third party, against a Complainant, a Respondent, or any other individual (such as a Witness, Reporter, or Advisor) because the individual has made a Report pursuant to this Policy, engaged with the Office, and/or participated in a resolution process pursuant to this Policy.

**Sanction:** A consequence imposed upon a Respondent who has been determined to be responsible for Prohibited Conduct.

**Student:** A person who has gained admission to the University, including a person who is not officially enrolled for a particular semester.

**Student Group:** An organization of Students that is recognized by the University.

---

[17] Reports concerning allegations of Discrimination or Discriminatory Harassment on the basis of gender (sex); gender identity; lactation accommodation; pregnancy; sexual or reproductive health decisions; sexual orientation; or status as a victim of domestic violence, stalking, or sex offenses will be addressed under the University's Gender Based Misconduct and Interim Title IX Policies and Procedures for Students. Any Report that concerns allegations of Discrimination or Discriminatory Harassment involving another Protected Class that also involves allegations of Discrimination or Discriminatory Harassment on the basis of gender (sex); gender identity; lactation accommodation; pregnancy; sexual or reproductive health decisions; sexual orientation; or status as a victim of domestic violence, stalking, or sex offenses will be addressed under the Gender Based Misconduct and Interim Title IX Policies and Procedures for Students.

**Summary of Evidence:** In a case being resolved by Investigation and Determination, a summary prepared by the Investigative Team of the relevant, credible evidence on which the Investigative Team intends to rely.

**Supportive Measure:** An accommodation the University may provide to any Party during or following the resolution process.

**University:** Columbia University only, not including Barnard College or Teachers College.

**University Affiliate:** A current University Student, Employee, Contractor, Active Alum, or Student Group, including Students and Employees on a leave of absence, and regardless of a Student's current registration status or a Student Group's current recognition status.

**Witness:** An individual who may have observed or otherwise have relevant information concerning alleged Prohibited Conduct.

### E.  Appendix E: Scenarios

The following scenarios are meant to help illustrate some applications of this Policy:

\*\*\*

An undergraduate student files a Report with the Office alleging that she was subjected to a Hostile Environment because she is Jewish. In support of her Report, she alleges that the dry-erase board on her dorm room door was defaced with swastikas. Additionally, she alleges that epithets referencing poor hygiene and racial impurity of Jewish people and white supremacist slogans stating conspiracy theories about Jewish people were scrawled on the door and posted by fellow students as comments to her social media feed. The student informs her academic advisor of these incidents and tells her advisor she no longer feels comfortable going to her dorm. The advisor has a meeting with the student to discuss her concerns but fails to take any further action.[18]

*Students or Active Alums who engaged in the alleged harassing actions violated the Policy. The alleged harassment appears to be based on the student's membership in one or more Protected Classes (e.g., her Jewish religion, as well as the shared ancestry and actual or perceived shared ethnic characteristics of Jewish people). The use of swastikas and the graffiti/taunts related to hygiene, impurity, and racial hierarchy suggest that the alleged harassing conduct depicts Jewish people as a separate, and inferior, race who share certain characteristics. If the Office's investigation confirms these allegations, the Office could find that those who participated in these harassing actions engaged in Discriminatory Harassment. The alleged conduct unreasonably interfered with the student's ability to participate in or benefit from the services, activities, or opportunities offered by the University, including access to her dorm, i.e., created a Hostile Environment. In addition, the Office could find that the academic advisor failed to fulfill her Duty to Report the conduct that the student brought to her attention.*

\*\*\*

Student A is a Sikh student who wears a turban. One day, as he was crossing campus to get to class, another student ran up behind him, grabbed his turban off his head, whispered an anti-Sikh slur in Student A's ear, and ran away. Student A reported the incident to Columbia Public Safety, which was able to identify the student who took the turban off Student A's head as Student B. Student B is also Sikh. Student A had never met Student B.

*Student B violated the Policy. He subjected Student A to unwelcome verbal and physical conduct based on Student A's membership in a Protected Class, thereby engaging in Discriminatory Harassment. The fact that Students A and B are members of the same Protected Class does not negate that Student B's conduct violated the Policy.*

\*\*\*

---

[18] This scenario is adapted from the May 7, 2024 Dear Colleague Letter issued by the Office for Civil Rights ("OCR"), U.S. Department of Education ("OCR"). *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202405- shared-ancestry.pdf at 6–7.

\*\*\*

Student H has a visible disability. Some of Student H's classmates asked him about what it was like to live with his disability. Student H told his classmates that he was at Columbia to learn and was not comfortable answering their questions. A few of Student H's classmates—Students I, J, and K—refused to let the subject go. They kept coming up to Student H before and after class with questions about whether he could succeed at school and whether his disability resulted from something wrong his parents had done. Student H kept explaining that he was not interested in talking about the subject. After a few weeks went by and his classmates did not change their behavior, Student H asked to switch to another section of the same course.

*Students I, J, and K likely violated the Policy when they refused to stop asking Student H questions about his family and when they employed the stereotypes that persons with disabilities cannot succeed and that the parents of people with disabilities are to blame for their disabilities. Student H made it clear that their conduct was unwelcome. The conduct of Students I, J, and K was based on Student H's membership in a Protected Class (i.e., disability), and their refusal to respect Student H's wishes may have created or contributed to a Hostile Environment for Student H, as evidenced by his request to change course sections.*

\*\*\*

A group of Arab students receives University approval to form a new Student Group to empower and support Arab students. The Student Group hosts monthly meetings in an outdoor space and is open to all students.

As Student Group members begin gathering for one of the meetings, dozens of other students surround the Student Group members and refer to them as "terrorists" and "jihad supporters." The students participating in the meeting become fearful when they realize that they are unable to leave because their fellow students encircle and shove them. Some Arab students who are members of the Student Group recognize their classmates in the crowd of harassers and skip class the next day because they fear encountering the harassing students in class. The Arab students file a Report with the Office.

Members of the Student Group complain to University administrators about the harassing conduct they experience during their meeting. The administrators express sympathy and note that "college is difficult, and things are tense." The administrators take no further actions. The Student Group members cancel all future meetings because they do not believe that they can safely hold them on campus.[19]

*The students who surrounded the Student Group members violated the Policy. The alleged harassment—calling the students who attended the meeting terrorists, blocking their ability to leave the area, and shoving them—appear to be based on Protected Classes (i.e., the students' actual or perceived race, color, or national origin, including their Arab shared ancestry or ethnic characteristics). If confirmed by the Office's investigation, the Office could find that calling the students terrorists and supporters of jihad constituted Discriminatory Harassment in violation of*

---

[19] This scenario is adapted from OCR's May 7, 2024 Dear Colleague Letter. *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202405-shared-ancestry.pdf at 13–14.

*the Policy because the conduct created or contributed to a Hostile Environment based on the Student Group members' shared ancestry or ethnic characteristics. The alleged threatening behavior of the harassers, including shoving some students and physically restricting students from leaving the event, caused the students to fear for their safety and limited or denied some members of the Student Group the ability to participate in or benefit from the University's education activities because some Student Group members did not attend class the next day due to fear of encountering fellow students who had harassed them, and the Student Group cancelled all its future meetings. In addition, the Office could find that the University administrators failed to fulfill their Duty to Report the conduct that was brought to their attention.*

\*\*\*

A Jewish student wearing a kippah is walking to class. At the door of the classroom, he encounters a group of students who, immediately upon seeing him, surround him at close quarters and state: "No Zionists are welcome here. You support genocide." The group refuses to move, and the student is prevented from attending class. The same thing happens the next time the student tries to attend class; this time, the other students say: "Colonizers aren't welcome here," and "go back to Europe." After these incidents continue to repeat, the student meets with his Dean of Students to express that these incidents of harassment made him feel unsafe, unwelcome, and concerned about continuing his education at the University. No action is taken by the Dean, and the harassing conduct continues. The student subsequently makes a Report to the Office.[20]

*The students who harassed the Jewish student violated the Policy. Even though the students used the word "Zionists" and other phrases, the alleged incidents of harassing conduct appear to be based on the Jewish student's perceived membership in one or more Protected Classes (e.g., religion and national origin, including shared ancestry or ethnic characteristics). The other students' alleged conduct repeatedly prevented the Jewish student from attending class, which limited his ability to participate in or benefit from an element of the University's educational program. Blocking students from attending class and accusing them of supporting genocide solely on the basis that the students are perceived to be Jewish are discriminatory actions grounded in the perceived religion, national origin, and shared ancestry of these students. Therefore, the Office could find that the other students engaged in Discriminatory Harassment. In addition, the Office could find that the Dean of Students failed to fulfill his Duty to Report the conduct that the student brought to his attention.*

\*\*\*

Student O, a Latino male, and Student P, a White male, were enrolled in the same sociology class. Student P often didn't do the assigned readings and kept asking Student O to send him his notes. One day, Student O told Student M that he wouldn't provide Student P with any more of his notes, explaining that Student P needed to do his own work. Student P responded by texting Student O the phrase "goody two-shoes" every half-hour for two days straight. Student O never responded. Then, starting on the third day, Student P started texting Student O an anti-Latino slur every half-hour. Student O still didn't respond and blocked Student P's number.

---

[20] This scenario is adapted from a portion of OCR's May 7, 2024 Dear Colleague Letter. *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202405-shared-ancestry.pdf at 9–10.

*Student P violated the Policy. Text messages, phone calls, emails, and other forms of electronic communication fall within the scope of the Policy. Repeatedly texting Student O the phrase "goody two-shoes" does not constitute Discriminatory Harassment (because the phrase is not related to Student O's actual or perceived membership in or association with a Protected Class), although texting Student O repeatedly over the course of two days could violate other University policies. However, when Student P began repeatedly texting the racial slur, he engaged in Discriminatory Harassment and may have contributed to a Hostile Environment for Student O because verbal abuse and using epithets or slurs are forms of harassment, Student P's conduct was frequent and occurred over a long period of time, and the particular slur that Student P used was based on Student O's membership in a Protected Class.*

***

An undergraduate student files a Report with the Office alleging that he was subjected to a Hostile Environment because he is Chinese. The student alleged that a professor stated during office hours that "Chinese people don't deserve to be in this country." The professor and other students make similar comments in subsequent classes. The student's Report stated that several Chinese students in the professor's class, including the Complainant, reported the professor's and classmates' comments to administrators and noted that they felt threatened. The student alleged that the administrators declined to speak to any students who indicated they felt threatened by their professor's or classmates' conduct. Chinese students in the class stopped attending.[21]

*The professor and the other students who made comments about Chinese students violated the Policy. The alleged harassment appears to be based on the Complainant's Chinese national origin. If the Office confirms that the alleged harassing conduct occurred, then the Office could find that the professor and the other students engaged in Discriminatory Harassment because they subjected the Complainant and other Chinese students to unwelcome conduct that created a Hostile Environment and limited the Chinese students' ability to participate in class. In addition, the Office could find that the administrators failed to fulfill their Duty to Report the conduct that was brought to their attention.*

***

Students L, T and N, all members of the same Student Group, were asked to collaborate on a group project. Student L is Black; Students T and N are White. When the three students met to work on the project, every time Student L made a statement that Student T disagreed with, Student T made the "OK" hand gesture that is associated with white supremacist movements. Student N sat silently the whole time. Student L refused to continue working with Students T and N and complained about Student T's behavior to the Office. When Student T was notified of Student L's Report, she asked Student N to tell Student L that unless he dropped his Report, Student T would not support Student L's candidacy to be president of the Student Group. Student N relayed Student T's message to Student L and told Student L to let the matter go.

---

[21] This scenario is adapted from OCR's May 7, 2024 Dear Colleague Letter. *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202405-shared-ancestry.pdf at 12–13.

*Student T violated the Policy by engaging in Discriminatory Harassment, and in addition, Students T and N both violated the Policy by engaging in Retaliation. First, Student T's use of a hand movement associated with white supremacist movements constituted a threatening, intimidating, or hostile act and an insulting or obscene gesture, both of which are forms of Discriminatory Harassment based on Student L's race that could create a Hostile Environment.*

*Second, Student T threatened to take adverse action against Student L because he complained about Student T's conduct. By relaying Student T's message and telling Student L that he should give in to Student T's threat, Student N also took adverse action against Student L. Threatening Student L in this manner is conduct that would discourage a reasonable person from participating in the disciplinary process as a Complainant and therefore constitutes Retaliation. The Policy prohibits Student N from engaging in Retaliation even though she was not a Respondent in Student L's original Report.*

\*\*\*

# Office of Institutional Equity

 **Email**
institutionalequity@columbia.edu

 **Phone Number**
212-854-5511

 **Office Location**
80 Claremont Ave

4th Floor, MC 9620

New York, NY, 10027

