**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Mahmoud Khalil, et al.,<br><br>  *Plaintiffs,*<br>v.<br><br>Columbia University and the Trustees of<br>Columbia University, et al.,<br><br>  *Defendants.* | No. 1:25-cv-02079-AS |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... ii

TABLE OF AUTHORITIES............................................................................................ iv

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................... 1

I.    Agency Defendants Have Coerced Columbia into Codifying a Definition of Antisemitism That Violates Plaintiffs' First Amendment Rights—and for Which a Preliminary Injunction Should Enter. ...................................................................................................................... 1

    A.    Columbia Has Now Adopted the Federal Government's Unconstitutional Anti-Israel Speech Code, Which Every Court Has Held Violates the First Amendment. ......................... 1

    B.    The Federal Government Forced Columbia to Adopt its Anti-Israel Speech Code by Threatening Hundreds of Millions of Dollars in Funding, Which Violates the First Amendment. ...................................................................................................................... 3

    C.    Columbia Has Adopted the Federal Government's Israel-Specific Speech Code, Which Establishes Columbia as a State Actor. .................................................................................. 5

    D.    Plaintiffs Have Pre-Enforcement Standing to Enforce Their First Amendment Rights Against an Unlawful Speech Code That Applies to Them. ...................................................... 9

    E.    Causation and Redressability are Established by Virtue of Columbia's Capitulation to the Executive Branch and Columbia's Presence as a Party in This Case. ........................... 12

II.    The Executive Branch Defendants Fail to Introduce Any Authorities Barring This Court from Issuing an APA Injunction Premised on the First Amendment. ...................................... 14

    A.    The March 13 Letter, the Agency Funding Freeze—and Now the Contract with Columbia—Are All Final Agency Action Under the APA. .................................................. 14

    B.    Decisions on Allocated Grants Are Not Committed to Agency Discretion and the Tucker Act Does Not Apply Because These Are Not Claims for Contract Damages........... 16

III.    Committee Defendants' Compelled Record Disclosure and Punishment of Plaintiff's Speech—And Columbia's Compliance—Exceed Congressional Authority and Constitute First Amendment Violations. ........................................................................................................ 17

    A.    The Congressional Defendants Have Violated the First Amendment and Fundamentally Chilled Plaintiffs' First Amendment Speech and Associations by Seeking Disclosure of the Identities and Records of Individual Student Protestors. ...................................................... 17

B.    The Federal Speech and Debate Clause is No Bar to Suit Because Seeking to Suppress and Punish Criticism of Israel is Not a Valid Legislative Purpose, As Courts Have Repeatedly Held. ................................................................................................................... 18

C.    Publication of Individual Records in Congress's Possession—Regardless of Motivation—is Never a Valid Legislative Purpose, and the Speech and Debate Clause also Does Not Apply to Bar Suit. .............................................................................................. 23

D.    Plaintiffs' Chilling Harms are Ongoing as a Matter of Law—and Entitle Plaintiffs to Injunctive Relief to Cure Their Chilled Expression. ............................................................ 26

E.    Columbia is a Necessary Party Whose Disclosure to Congressional Defendants Can Be Enjoined. ................................................................................................................................ 28

IV.    Plaintiffs Do Not Move for Preliminary Relief as to All Claims, And All Claims Merit Further Discovery, Whether or Not a Preliminary Injunction is Granted. ................................ 29

V.    Where Likely First Amendment Violations are at Issue, All Other Preliminary Injunction Factors are Satisfied Per Se. ...................................................................................................... 30

CONCLUSION ................................................................................................................................ 30

# TABLE OF AUTHORITIES

## CASES

*A.B.A. v. United States DOJ,* No. 25-cv-1263, 2025 U.S. Dist. LEXIS 92016 (D. D.C. May 14, 2025) .................................................................................................................................. 16

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020) .................................................... 30

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. FEC*, 333 F.3d 168 (D.C. Cir. 2003) ................... 28

*Am. Hospital Asso. v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987) .................................................... 16

*Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717 (W.D. Tex. 2019) ................. 1, 4, 18

*Anilao v. Spota*, 774 F. Supp. 2d 457 (E.D.N.Y. 2011) ................................................................. 7

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ...................................................................... 30

*Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398 (2d Cir. 2015) .................................................. 17

*Bang v. Utopia Restaurant,* 923 F.Supp. 46  (S.D.N.Y.1996) ....................................................... 6

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ..................................................................... 3

*Bates v. Little Rock*, 361 U.S. 516 (1960) ................................................................................... 18

*Bordell v. Gen. Elec. Co*., 922 F.2d 1057 (2d Cir. 1991) ............................................................ 26

*Burrell v. City of Mattoon,* 378 F.3d 642 (7th Cir.2004) ............................................................... 6

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................... 4, 8

*Doe v. McMillan*, 412 U.S., 306 (1973) ......................................................................... 23, 24, 26

*Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491 (1975) ....................................... 17, 18, 19, 23

*Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263 (11th Cir. 2003) ............ 6

*Forbes v. City of New York,* No. 05–CV–7331 (NRB), 2008 WL 3539936 (S.D.N.Y. Aug. 12, 2008) ........................................................................................................................................ 6

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, No. 2025 U.S. Dist. LEXIS 33977 (S.D.N.Y. Feb. 25, 2025) ..................................................................................... 1, 3, 5, 10

*Gibson v. Florida Legislative Committee*, 372 U.S. 539 (1962) ................................................... 18

*Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268 (2d Cir.1999) ............................... 6

*Gravel v. United States*, 408 U.S. 606 (1972) ............................................................................. 19

*Herrera v. Santa Fe Pub. Schs*, 41 F. Supp. 3d 1027 (D. N.M. 2014) .......................................... 6

*Hodgkins v. Peterson*, 355 F.3d 1048 (7th Cir. 2004) .................................................................. 11

*Hutcheson v. U.S*, 369 U.S. 599 (1962) ............................................................................... 19, 21

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) ..................................................................... 23, 26

*Informed Consent Action Network v. YouTube LLC*, 582 F. Supp. 3d 712 (N.D. Cal. 2022) ........ 8

*Jordahl v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018) ................................................. 1, 4, 18

*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) ............................................................... 26

*Knotts v. Oregon Trail Sch. Dist.* 46, 2017 WL 4861521  (D. Ore. Oct. 26, 2017) ..................... 12

*Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018).................................................... 1, 3, 5, 19

*Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergov. Affairs*, No. 07-CV-2243, 2007 U.S. Dist. LEXIS 94947, 2007 WL 4591845 (E.D.N.Y. Dec. 26, 2007).............. 30

*Libertarian Party of L.A. Cty. v. Bowen*, 709 F.3d 867 (9th Cir. 2013) ........................................ 26

*Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267 (2d Cir. 1981)..................................................................................... 28, 29

*Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293 (1961)..................................................... 18

*Martinez v. Valdez*, 2018 WL 6016969 (C.D. Cal. Mar. 22, 2018)...............................................11

*Mathis v. Pacific Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir. 1989)................................................. 8

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995).......................................................... 26

*McSurely v. McClellan*, 553 F.2d 1277 (D.C. Cir. 1976) .......................................................... 23

*Miller v. Board of Managers of Whispering Pines at Colonial Woods Condominium II*, 457 F.Supp.2d 126 (E.D.N.Y. 2006) ........................................................................... 7

*Miller v. Transamerican Press, Inc.*, 709 F.2d 524 (9th Cir. 1983) ............................................ 23

*NAACP v. Alabama*, 357 U.S. 449 (1958) ................................................................. 18, 20, 23, 27

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012)................................................... 4, 7

*Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682 (2d Cir. 2013) ........................................... 26

*NRA v. Vullo*, 602 U.S. 175 (2024 ........................................................................... 3, 17

*NRA v. Vullo*, 602 U.S. 175 (2024)........................................................................... 3, 5

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006).................................... 15

*Pac. Cap. Bank, N.A. v. Conn.*, 542 F.3d 341 (2d Cir. 2008)...................................................... 10

*Picard v. Magliano*, 42 F.4th 89 (2d Cir. 2022) ............................................................... 10

*Pollard v. Roberts*, 393 U.S. 14 (1968)..................................................................... 18

*Port of Astoria v. Hodel*, 595 F.2d 467 (9th Cir. 1979).................................................... 15

*Quinn v. United States*, 349 U.S. 155 (1955))............................................................... 19

*Republican Nat'l Comm. v. Pelosi*, 602 F. Supp. 3d 1 (D.D.C. 2022)...................................... 28

*Sch. Dist. v. Sec'y of the United States Dep't of Educ.*, 584 F.3d 253 (6th Cir. 2009) ................. 12

*Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199 (S.D.N.Y. 2015)......................................................................... 24

*Student Members of SAME v. Rumsfeld*, 321 F. Supp. 2d 388 (D. Conn. 2004).......................... 13

*Student Press Law Center v. Alexander*, 778 F. Supp. 1227 (D. D.C. 1991)................................ 13

*Students for Just. in Palestine, at Univ. of Houston v. Abbott*, 756 F. Supp. 3d 410 (W.D. Tex. 2024) .................................................................................................................. 1, 10

*Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014) ............................................ 9

*Talley v. California*, 362 U.S. 60 (1960) .................................................................. 27

*Tanzin v. Tanvir*, 592 U.S. 43 (2020) ....................................................................... 2

*Tinoqui—Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. U.S. Dep't of Energy*, 232 F.3d 1300 (9th Cir. 2000) ................................................................. 15

*United States v. Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006) ..................................... 7

*Watkins v. United States*, 354 U.S. 178 (1957) ......................................................... 19

*Widakuswara v. Lake*, No. 25-cv-1015, 2025 U.S. Dist. LEXIS 76500 (D.D.C. Apr. 22, 2025)  16

*Williams v. Brooks*, 945 F.2d 1322 (5th Cir. 1991) ................................................... 23

*Woonasquatucket River Watershed Council v. United States Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 U.S. Dist. LEXIS 71378 (D.R.I. Apr. 15, 2025) .......................... 15

**STATUTES**

44 U.S.C. § 702 .......................................................................................................... 25

# INTRODUCTION

This Court has already acknowledged that "this case raises serious questions as to whether two branches of government violated the First Amendment by leveraging the 'threat of invoking legal sanctions and other means of coercion ... to achieve the suppression of disfavored speech.'" April 4, 2025, Order, ECF 54 at 2. Defendants respond with a series of technocratic arguments to avoid responsibility for their own actions, none of which are availing. Because Plaintiffs demonstrate a clear likelihood of success on the merits of their First Amendment and APA claims, and because Plaintiffs have conclusively addressed their own standing and Defendants' procedural defenses, this Court should issue a preliminary injunction to halt Defendants' brazen and ongoing violations of the U.S. Constitution.

# ARGUMENT

## I. Agency Defendants Have Coerced Columbia into Codifying a Definition of Antisemitism That Violates Plaintiffs' First Amendment Rights—and for Which a Preliminary Injunction Should Enter.

### A. Columbia Has Now Adopted the Federal Government's Unconstitutional Anti-Israel Speech Code, Which Every Court Has Held Violates the First Amendment.

Plaintiffs have cited uncontroverted authority establishing that restrictions on anti-Israel speech violate the First Amendment and are not valid anti-discrimination measures. *See* ECF 101 at 13-14, *citing Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, No. 2025 U.S. Dist. LEXIS 33977 at *8-*9 (S.D.N.Y. Feb. 25, 2025); *Students for Just. in Palestine, at Univ. of Houston v. Abbott*, 756 F. Supp. 3d 410, 425 (W.D. Tex. 2024); *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, 1049 (D. Ariz. 2018), *vacated as moot* 789 Fed. Appx. 589 (9th Cir. 2020); *Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717, 750-51 (W.D. Tex. 2019), *vacated as moot* 956 F.3d 816 (5th Cir. 2020); *see also Koontz v. Watson*, 283 F. Supp. 3d 1007, 1022 (D. Kan. 2018) ("This is either viewpoint discrimination against the opinion that Israel mistreats Palestinians or

subject matter discrimination on the topic of Israel. Both are impermissible goals under the First Amendment"). Both the Executive Branch and the Columbia Defendants have conceded this point by failing to argue it anywhere in their briefing.

With no ability to argue the law, the Executive Branch and Columbia Defendants instead argue that their speech restrictions do not prohibit anti-Israel speech. *See* ECF 116 at 18-19; ECF 118 at 13-14. But the two definitions of antisemitism that Columbia has adopted incorporate viewpoint discrimination explicitly. *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020). ("When a statute includes an explicit definition, we must follow that definition, even if it varies from a term's ordinary meaning."). The IHRA definition gives specific examples of speech it considers antisemitic—calling Israel a racist state, comparing Israel to Nazi Germany, or applying double standards to it. Columbia's Antisemitism Taskforce definition does the same. Now incorporated into Columbia's rules, these definitions make Plaintiffs' past and future speech punishable because of the pro-Palestine view they express. That is viewpoint discrimination.

The very text of Columbia's latest Anti-Discrimination Policy singles out pro-Palestine views for special treatment. The Policy labels as discriminatory "certain double standards applied to Israel," and makes such expressions conduct for which students can be disciplined. ECF 120-2 at 11 & n.7. Columbia's policy contains the same overbroad language as the IHRA definition of antisemitism—which Columbia concedes has been found to violate the First Amendment because it limits critique of Israel. IHRA*, Working definition of antisemitism* (2025), available at https://holocaustremembrance.com/resources/working-definition-antisemitism ("*Applying double standards* by requiring of [Israel] a behavior not expected or demanded of any other democratic nation") (emphasis added); *see* ECF 118 at 13-14 ("a district court in Texas concluded that the IHRA definition and examples likely constituted viewpoint discrimination"), *citing Abbott*, 756 F.

Supp. 3d at 425. The policies are indistinguishable—particularly because Columbia's definition also specifically aims to curtail "anti-Israel rhetoric" and "anti-Zionism." *See* ECF 62 at ¶ 89 n.76.

The distinction is now irrelevant. Columbia has informed this Court that it has recently adopted the very IHRA definition of antisemitism that federal courts are clear violates the U.S. Constitution. *See* ECF 124-1 at 2 (adopting the IHRA definition); *see also Abbott*, 756 F. Supp. 3d at 421 (finding a First Amendment claim properly alleged because "IHRA's labeling of these examples as antisemitic arguably proscribes [plaintiffs'] similar criticisms of Israel"); *Gartenberg*, No. 2025 U.S. Dist. LEXIS 33977 at *8-*9; *see also Koontz*, 283 F. Supp. 3d at 1022.

While Plaintiffs can call any other country racist and compare anything else to Nazi Germany, they may not do so about Israel. Under these rules, specific pro-Palestine utterances are *per se* antisemitic and punishable as discriminatory harassment. This is blatant viewpoint discrimination, and the Free Speech Clause does not allow it. *See Abbott*, 756 F. Supp.3d at 425 ("the incorporation of this specific definition of antisemitism is viewpoint discrimination").

    B. <u>The Federal Government Forced Columbia to Adopt its Anti-Israel Speech Code by Threatening Hundreds of Millions of Dollars in Funding, Which Violates the First Amendment.</u>

The Executive Branch Defendants admit that—when the government coerces a third party to violate the First Amendment—the government violates the First Amendment. ECF 86 at 25 (citing *NRA v. Vullo*, 602 U.S. 175, 198 (2024) (the "First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries")); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 (1963) (government cannot use the "threat of invoking legal sanctions and other means of coercion against a third party to achieve the suppression of disfavored speech"). Nor can the Executive Branch Defendants dispute that the sheer amount of Columbia's federal funding they previously cancelled or threatened to cancel is coercive. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581

(2012) ("The threatened loss of over 10 percent of a [...] overall budget, in contrast, is economic dragooning" and leaves "no real option but to acquiesce"); *Id*. at 581 ("the financial inducement [...] is a gun to the head"); *see also Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 533 (N.D. Cal. 2017) ("The Executive Order threatens to deny sanctuary jurisdictions all federal grants, hundreds of millions of dollars on which the Counties rely. The threat is unconstitutionally coercive").

Instead, the Executive Branch argues that Columbia did not succumb to their coercion. That flies in the face of Columbia's agreement with the federal government to adopt the *exact* unconstitutional definition of antisemitism the Trump Administration has demanded in exchange for a restoration of hundreds of millions in university funding. *See* ECF 124-1 at 2 ("Resolution Agreement"). Even before that, the Trump Administration had already coerced Columbia into the enforcement of another antisemitism definition that Columbia *itself* had previously conceded would be unlawful to enforce. *Compare* ECF 99-7 at 44 ("we do not think that a statement should be impermissible just because it qualifies as antisemitic under this definition"), *with* ECF 120-2 at 11 n.7 ("The Office incorporates this definition in considering potential policy violations"); ECF 120 at ¶ 4 (noting that these changes only arose as of April 1, 2025).

The Executive Branch defendants separately argue that they had a right to coerce Columbia's change in definition because they had a legitimate regulatory interest in doing so. ECF 116 at 24. But courts have repeatedly rejected that the government has any legitimate interest in suppressing speech critical of the State of Israel. *See*, *e.g.*, *Amawi*, 373 F. Supp. 3d at 749 (regulation was "a viewpoint-based restriction intended not to combat discrimination on the basis of national origin, but to silence speech with which Texas disagrees"); *Jordahl*, 336 F. Supp. 3d at 1048 ("the State has proffered [...] an interest in preventing discrimination on the basis of national

4

origin […] The Act's history instead suggests that the goal of the Act is to penalize the efforts of those engaged in political boycotts of Israel"); *Koontz*, 283 F. Supp. 3d at 1022 (these are "impermissible goals under the First Amendment"); *see also Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 271 (S.D.N.Y 2025) ("no factual support for [the] assertion that any of these messages were intended to target particular Jewish students, as opposed to efforts to communicate a political message to the Cooper Union community at large"). As such, the Executive Branch Defendants are clearly responsible for their coercive violations of the First Amendment under *NRA v. Vullo*.

C.    Columbia Has Adopted the Federal Government's Israel-Specific Speech Code, Which Establishes Columbia as a State Actor.

The state action alleged here is Columbia's adoption of an Israel-specific speech code and its use to discipline students. Agency Defendants have successfully coerced Columbia into now formally entering a contract that codifies the unconstitutional restriction at issue and establishes mechanisms to ensure compliance. ECF 124. The contract reflects the state action already challenged in this case, namely, Columbia's incorporation of a speech code that punishes anti-Israel speech under threat of economic and reputational harm. Plaintiffs demonstrate state action under two separate theories: (1) joint action; and (2) state compulsion.

**Joint Action.** While it is true that the mere existence of a contract or consent decree does not transform a private entity into a state actor, ECF 124, Columbia has and will continue to do far more than that. Specifically, the Agency Defendants have successfully enlisted Columbia to continue enforcing an unconstitutional speech code through student discipline proceedings. The Agency Defendants have also established a mechanism of oversight to ensure Columbia achieves those suppressive ends, including by requiring mandatory disclosure of "Agreement-related

meetings and *disciplinary hearings*." ECF 124, *linking and incorporating* Resolution Agreement[1]
(Hereinafter "Resolution Agreement") at ¶ 49 (emphasis added).

Private contracts with the federal government—like this one—that specifically require the contract party to violate the First Amendment rights of third parties establish state action by the contract party. *See, e.g., Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1280 (11th Cir. 2003) ("Where the state contractually requires the private actor to take particular actions [with respect to First Amendment protected speech...] the private actor is merely a surrogate for the state, and the tie between them is sufficiently strong for the nexus/joint action test to be satisfied. This conclusion is strengthened when there is record evidence that the state itself unmistakably directed the private actor to take particular actions"); *Herrera v. Santa Fe Pub. Schs*, 41 F. Supp. 3d 1027, 1097 (D. N.M. 2014) (a private entity directed to conduct unlawful searches under contract was a state actor under a joint action theory because "[t]he unmistakable principle [...] is that where a state actor directs or influences the challenged conduct of the private actor, state action is present"). That is because the "[t]he touchstone of joint action is often a 'plan, prearrangement, [...] or policy' shared by the private actor"—which the Resolution Agreement here satisfies. *See Forbes v. City of New York,* No. 05–CV–7331 (NRB), 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 272 (2d Cir.1999)); *Bang v. Utopia Restaurant,* 923 F.Supp. 46, 49 (S.D.N.Y.1996) ("the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law"); *see also Burrell v. City of Mattoon,* 378 F.3d 642, 650 (7th Cir.2004) ("both public and private actors share a common, unconstitutional goal" (internal quotation marks omitted)).

---

[1] "Resolution Agreement Between The United States of America and Columbia University," available at https://president.columbia.edu/sites/default/files/content/July%202025%20 Announcement/Columbia%20University%20Resolution%20Agreement.pdf.

Moreover, this Court has been clear that ongoing and active involvement in rights violations establishes joint action and state actor liability. *Anilao v. Spota*, 774 F. Supp. 2d 457, 502 (E.D.N.Y. 2011), *aff'd,* 27 F.4th 855 (2d Cir. 2022) (state action where private entity had more than "communications" and "cooperation" with the federal government and instead was "actively involved in the investigation and prosecution of plaintiffs"). Here, Columbia will directly investigate, censor, and discipline Plaintiffs based on unconstitutional terms and definitions that the Agency Defendants have required. These actions establish joint action, not the mere contract itself.

**State Compulsion.** State action is also satisfied if "a state 'exercise[s] coercive power or provide[s] such significant encouragement, either overt or covert, that the decision [by the private actor] must in law be deemed that of the State." *Miller v. Board of Managers of Whispering Pines at Colonial Woods Condominium II*, 457 F.Supp.2d 126, 130 (E.D.N.Y. 2006). Courts have looked to the existence of economic coercion when evaluating whether private entities are state actors under the compulsion theory. *See United States v. Stein*, 440 F. Supp. 2d 315, 334 (S.D.N.Y. 2006) ("The state is prohibited in either event from compelling a statement through economically coercive means, whether they are direct or indirect"). *Stein* found "that the government… quite deliberately coerced, and in any case significantly encouraged, KPMG to pressure its employees to surrender their Fifth Amendment rights.... KPMG's actions in this regard are fairly attributable to the United States." *Id*. at 337 (internal quotations and citations omitted). Neither the Agency Defendants nor Columbia Defendants argues that the amount of funding threatened by the Agency Defendants to ensure Columbia's speech restrictions was not coercive. *See* ECF 116 at 16-17; ECF 118 at 24. Nor can they. *See Sebelius*, 567 U.S. at 581 ("The threatened loss of over 10 percent of a […] overall budget, in contrast, is economic dragooning" and leaves "no real option but to

acquiesce"); *Id*. at 581 ("the financial inducement […] is a gun to the head"); *see also Cnty. of Santa Clara*, 250 F. Supp. 3d at 533 ("The Executive Order threatens to deny […] all federal grants, hundreds of millions of dollars on which the Counties rely. The threat is unconstitutionally coercive").

Finally, while Columbia may agree that the government "sometimes has a point" (ECF 118 at 35), this Court must look carefully at the facts. The Agency Defendants have "dictate[d] *the standard* for decision" by requiring Columbia to adopt the government's own specific standard for what constitutes antisemitism and by establishing mechanisms to ensure Plaintiffs are disciplined subject to that unconstitutional speech code. *See Informed Consent Action Network v. YouTube LLC*, 582 F. Supp. 3d 712, 721 (N.D. Cal. 2022); *see also* ECF 62 at ¶ 106 & n.91 (March 13 demand for IHRA definition); ECF 124 (Columbia adoption of IHRA definition); Resolution Agreement Section 27(b) (commanding enforcement of this policy against demonstrators); Resolution Agreement Section 37 (contemplating injunctive relief as a contract remedy for Columbia's failure to properly enforce against students). The application of these government standards establishes state action, *whether or not* Columbia would have made the same decisions independently. *See*, *e.g.*, *Mathis v. Pacific Gas & Elec. Co.*, 891 F.2d 1429, 1434 (9th Cir. 1989) (because the "minimum standard is stated by the NRC […] backed up by threats of enforcement […] The mere fact that PG & E might have been willing to act without coercion *makes no difference* if the government did coerce") (emphasis added).

The facts before this Court also blatantly demonstrate economic coercion in action. *See* **post** at  I.B. After government pressure on March 13, Columbia already began enforcing a definition of antisemitism that the University had previously conceded would be unlawful to enforce. *Compare* ECF 99-7 at 44 ("we do not think that a statement should be impermissible just

because it qualifies as antisemitic under this definition"), *with* ECF 120-2 at 11 n.7 ("The Office incorporates this definition in considering potential policy violations"); ECF 120 at ¶ 4 (noting that these changes only arose as of April 1, 2025). When that was not enough, the University formally succumbed to federal government compulsion to restore funding and good grace, adopting the very definition of antisemitism the government initially requested and agreeing to be contractually bound to enforce that definition. ECF 123 and 124. The University is in fact enforcing these definitions to punish students, including Plaintiff ███████. *See* Exhibit A, ████ ████████████████████ As described in her declaration and supporting Exhibits, Plaintiff ███ has been issued a ████████████ by the University Judicial Board. The Office of Institutional Equity is now pursuing additional charges specifically reliant on the speech code at issue in this case.

Ultimately, the Agency Defendants have successfully coerced Columbia—through the threat of millions in funding—to take the challenged action here: continuing to enforce an unconstitutional speech code against its students. That establishes Columbia as a state actor.

> D. <u>Plaintiffs Have Pre-Enforcement Standing to Enforce Their First Amendment Rights Against an Unlawful Speech Code That Applies to Them.</u>

Defendants purport that Plaintiffs do not have pre-enforcement standing to challenge the Israel-specific speech code that will be enforced against them. ECF 116 at 10; ECF 118 at 9. That is false. Plaintiffs make clear their pre-enforcement standing to enjoin Defendants' effective ban on anti-Israel speech. *See* ECF 99 at 12-14. For clarity, Plaintiffs rearticulate each element of their pre-enforcement standing to assert this claim under binding Second Circuit law. *See Cerame*, 123 F.4th at 81, *citing Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159, 162 (2014).

**Conduct Affected with Constitutional Interest.** Plaintiffs repeatedly assert their desire to sharply criticize the State of Israel, which is constitutionally protected speech. *Compare* ECF

101-8 at ¶¶ 3, 10, ECF 101-9 at ¶¶ 3-16, 31, ECF 101-10 at ¶¶ 3, 12-16, 18, ECF 101-11 at ¶¶ 7-8, 32-39, ECF 101-12 at ¶¶ 7-10, ECF 101-13 at ¶¶2, 4, 9, 24, *with Gartenberg*, 2025 U.S. Dist. LEXIS 33977 at *8-*9 ("pure speech by pro-Palestinian members of Cooper Union's community" is protected "under the First Amendment"). Defendants do not seriously argue to the contrary.

**Conduct *Arguably* Proscribed by Regulation.** "Courts are to consider whether the plaintiff's intended conduct is *arguably* proscribed by the challenged statute, not whether the intended conduct is *in fact* proscribed." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (emphasis in original and quotations omitted). That means Plaintiffs have standing if it is "reasonable enough" to assume that their speech will be prohibited by the applicable regulation. *Picard*, 42 F.4th at 98, *citing Pac. Cap. Bank, N.A. v. Conn.*, 542 F.3d 341, 350 (2d Cir. 2008). Courts have already held that the IHRA definition of antisemitism forced on Columbia more than arguably restricts criticism of Israel—and that Plaintiffs therefore can assert standing to challenge it. *Abbott*, 756 F. Supp. 3d at 421 ("The Court finds the connections between these definitions sufficient at this stage to show Plaintiffs' planned conduct is arguably proscribed").

Defendants' sole response is that they do not interpret Columbia's policies as prohibiting any anti-Israel speech. ECF 118 at 11 ("Columbia's disciplinary policies and procedures, even as revised, do not proscribe this speech"). But Defendants' cabined interpretations of their own speech regulation are irrelevant to Plaintiffs' facial challenge. *Picard*, 42 F.4th at 98 (irrelevant "whether [speech] was in fact proscribed under the best interpretation of the statute or under the government's own interpretation of the statute"), *citing Pac. Cap. Bank*, 542 F.3d at 350. All that matters is whether Plaintiffs reasonably interpret the text of Columbia's new antisemitism policy to preclude criticism of Israel. *Id.* That interpretation is clearly reasonable for the reasons noted above. Moreover, Columbia has reaffirmed that it will enforce its definition to prohibit "certain

double standards applied to Israel." ECF 119 at ¶ 8. If students like Plaintiffs are critical of Israel, they may face disciplinary consequences by the terms of the policy itself. ECF 120-2 at 3 ("conduct by individual members of a group (whether the group is formally recognized or not) may be a basis for disciplinary action for those individuals under this Policy"). Plaintiffs' conduct is, therefore, more than arguably proscribed by Defendants' speech regulation.

**Credible Threat of Ongoing Censure.** Defendants argue that Plaintiffs do not allege a credible threat that their First Amendment rights will continue to be curtailed. Plaintiffs credibly fear both discipline and arrest because Columbia has agreed to enforce a definition of antisemitism that proscribes their protected political speech and subjects them to discipline, removal, or even arrest for failure to comply. *See* ECF 124-1 at 2; ECF 120-2 at 11 n.7 ("The Office incorporates this definition in considering potential policy violations"); *see also* ECF 62, ECF 123, ECF 101-4 at 2 (Columbia responding that it is "committed to rigorous […] enforcement of its rules and antidiscrimination policies" and that it has "special officers who will have the ability to remove individuals from campus and/or arrest them when appropriate"); Resolution Agreement Section 27(e) ("Student groups are subject to discipline for discriminatory conduct or other violations of University policy"); Resolution Agreement Section 28 (requiring "prompt and consistent enforcement of disciplinary rules and policies").

These enforcement pronouncements establish injunctive relief standing as a matter of law. *See*, *e.g.*, *Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) (A "realistic threat of arrest is enough to chill First Amendment rights"); *Martinez v. Valdez*, 2018 WL 6016969, *5 (C.D. Cal. Mar. 22, 2018) ("A police officer investigating or arresting someone meets [the chilling effect] standard. Express or implied threats may also have a chilling effect, even if not carried out" (citation omitted)); *Knotts v. Oregon Trail Sch. Dist.* 46, 2017 WL 4861521, *7 (D. Ore. Oct. 26,

2017) ("reasonable jurors could conclude that [the defendant 's] actions [in asking the plaintiff to leave a school event] . . . could chill the exercise of protected expression" since the defendant made the request "with security personnel present," and the "security presence could be intimidating").

Columbia leans too heavily on a declaration reflecting one campus official's prediction that its disciplinary bodies will not apply its two definitions of antisemitism retroactively. *See* ECF 119 at ¶ 9. But the declaration is contradicted by the text of Columbia's own policy, which does not contain the *ex post facto* rule the university tries to establish via declaration. *See generally* ECF 120-2. The University's policy instead directs campus officials to apply two new definitions of antisemitism as they administer campus discipline. ECF 120-2 at 5 n.7; ECF 123-1 at 2.

Even if the court allows Columbia to insert an *ex post facto* rule into its campus policies via declaration, Plaintiffs still have standing because they intend to engage in expressive activities now and in the future that will violate the IHRA and Columbia Taskforce definitions of antisemitism. *See* ECF 101-5 at ¶ 4; ECF 101-8 at ¶¶ 3, 5-7, 10; ECF 101-14 at ¶¶ 1, 4-5; ECF 101-11 at ¶¶ 6-8, 11, 20, 22, 39; ECF 101-12 at ¶¶ 7, 9-10, 33; ECF 101-13 at ¶¶ 2, 24; ECF 101-9 at ¶¶ 3-7, 17, 19, 22, 28, 31; ECF 101-10 at ¶¶ 2-3. No defendant disputes that speech uttered after Columbia's adoption of its definitions of antisemitism is subject to enforcement. Thus, even if the Court credits Columbia's dubious assertion that it won't retroactively apply its two new definitions of antisemitism, these policies govern the *future* speech Plaintiffs intend to make.

    E.   <u>Causation and Redressability are Established by Virtue of Columbia's Capitulation to the Executive Branch and Columbia's Presence as a Party in This Case.</u>

Where the government applies funding pressure on a third party to violate plaintiffs' civil rights, Article III causation and redressability against the government are established *per se*. *See, e.g., Sch. Dist. v. Sec'y of the United States Dep't of Educ.*, 584 F.3d 253, 278 (6th Cir. 2009) ("And enjoining the Secretary from withholding federal funds for failing to comply with the Act's

12

requirements will redress the threatened injury"); *Student Press Law Center v. Alexander*, 778 F. Supp. 1227, 1231-32d (D. D.C. 1991) ("the universities would release the information but for the risk of losing federal funds"); *Student Members of SAME v. Rumsfeld*, 321 F. Supp. 2d 388, 397 (D. Conn. 2004) (student harms were "fairly traceable" to the Department of Defense's regulation denying federal funding to universities because the "threat" had "forced" the university to suspend its nondiscrimination policy).[2]

Defendants' reliance on *AAUP v. United States Dep't of Justice* is misplaced. *American Association of University Professors v. United States Dep't of Just.* ("*AAUP*"), No. 25 Civ. 2429 (MKV), 2025 WL 1684817 (S.D.N.Y. June 16, 2025). The facts underlying standing here are readily distinguishable from the facts in *AAUP*. The alleged injuries here—restrictions on Plaintiffs' speech—are directly traceable to Agency Defendants' threats and demands. *See* **post**.

In *AAUP*, the court held that "while some of Plaintiffs members used federal grants to Columbia for academic work," they did not have standing because Columbia committed to providing salary coverage for the newly withheld grants. *AAUP*, 2025 WL 1684817 at *13. The *AAUP* court held that, because Columbia redressed Plaintiffs' losses as a result of the funding cuts at issue in that case, the injury was no longer traceable to the Government. Columbia has done the

---

[2] Nor is this a circumstance in which the absence of a necessary party makes a case non-redressable. Here, both Columbia and the federal government are parties before the Court—which is all that *Lujan* requires. *Cf. Am. Ass'n of Univ. Professors*, No. 25 Civ 2429 (MKV), 2025 U.S. Dist. LEXIS 114591 at *35 ("Plaintiffs' and Columbia's different assessments of the litigation risks simply underscores that non-party Columbia is the party with "the personal stake in the litigation"); see also *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (causation and redressability cannot depend on "the independent action of some third party *not before the court*") (emphasis added).

opposite here—it has acquiesced to the federal government's speech restrictions and imposed them on its students.[3]

Furthermore, Defendants cannot rely on *Murthy* to assert a redressability problem—because here there is "proof of an ongoing [government] pressure campaign." *Murthy v. Missouri*, 603 U.S. 43, 68 (2024). Indeed, Columbia now has a contractual obligation with the Executive Branch that they must continue to violate the First Amendment rights of their students or face further economic harms.

## II.    The Executive Branch Defendants Fail to Introduce Any Authorities Barring This Court from Issuing an APA Injunction Premised on the First Amendment.

### A.    The March 13 Letter, the Agency Funding Freeze—and Now the Contract with Columbia—Are All Final Agency Action Under the APA.

As Plaintiffs note in their opening brief—as a result of the same substantive First Amendment violations identified above—Plaintiffs pursue a preliminary injunction based on the APA. *See* ECF 99 at 27; *see also* ECF 102 at 23-24. The Executive Branch Defendants are simply wrong that the March 13 Letter, its conditions, and the prior funding freeze against Columbia are not final agency action. Both funding freezes and Department of Education enforcement letters have been held to be "final agency action" for purposes of the APA. *See, e.g., Woonasquatucket*

---

[3] Defendants misrepresent *AAUP* as a broad holding that any non-recipient of Government funds lacks standing to challenge the distribution of the funds. *See* ECF 116 at 6. The *AAUP* holding, however, is much narrower than that. Courts hearing challenges brought by unregulated parties consistently held that the unregulated parties do, indeed, have standing. *See, e.g.*, *Thakur v. Trump*, F.Supp.3d ____, 2025 WL 1734471 at *22 (N.D. Cal. June 23, 2025) (holding that an unregulated party can challenge Government action because "Article III standing rules do not change simply because the alleged harm occurred through the termination of a contract with a third party."); *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716, 2025 WL 1276857 at *23 (D.D.C. May 2, 2025) (holding that plaintiff "plainly" established standing and rejecting defendants' theory that plaintiff did not have standing because plaintiff was not party to the Government's threatened canceled contracts); *Nat's Ass'n of Diversity Officers in Higher Educ v. Trump*, 767 F.Supp.3d 243, 268 (D. Md. 2025) (holding that organization of professors had standing to challenge terminated grants that cause professors' projects to be halted).

*River Watershed Council v. United States Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 U.S. Dist. LEXIS 71378 at *43-*45  (D.R.I. Apr. 15, 2025) ("funding freezes constitute final agency action" because there are "no further steps the agencies need to take to determine whether they will freeze that funding" and "legal consequences surely flow, given that grant recipients cannot access previously awarded funds"); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-cv-091-LM, 2025 U.S. Dist. LEXIS 77874 at *85-*86 (D.N.H. April 24, 2025) (Department of Education Dear Colleague Letter was "final agency action" because the "practical effect" was a "substantial threat of consequences for failing to comply with the 2025 Letter").[4]

Regardless, should the Court find that Plaintiffs' First Amendment rights have been violated, the terms of Columbia's contract with the Executive Branch Defendants do not immunize them from the APA. *See* ECF 124-1 at 2. To the extent that the parties' contractual obligations conflict with the Court's injunction, these terms can be stricken or declared unenforceable as final agency action under the APA. *See Tinoqui—Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. U.S. Dep't of Energy*, 232 F.3d 1300, 1305 (9th Cir. 2000) (court has authority under the APA to order rescission of a contract for sale if the federal agency "acted in excess of statutory authority or without observance of the procedures required by law"); *Port of Astoria v. Hodel*, 595 F.2d 467, 480 (9th  Cir. 1979) (noting that a district court properly "declar[ed] the contract

---

[4] Similarly here, the March 13 letter: (1) required "immediate compliance with these critical next steps"; (2) stated that it was a "formal response" because Columbia "has fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964"; and (3) demanded that Columbia "ensure and document compliance with the following no later than the close of business on Wednesday, March 20, 2025." ECF 62 at ¶ 106 & n.91. Columbia responded as it was required to in its March 21 letter. ECF 101-4.  These conditions establish final agency action. *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (final agency action exists "if immediate compliance with the terms is expected").

unenforceable pending the preparation of an EIS" pursuant to the APA); *Am. Hospital Assoc. v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987) (noting that under the APA, "[t]he court's May 30, 1986 order also invalidated the RFPs and the contracts entered into thereunder as violative of § 553"). As such, this Court can declare unenforceable any portion of Defendants' agreement that would require Columbia to enforce university discipline policies against students purely for engaging in speech critical of Israel or for wearing a mask in conjunction with their protected speech activity.

      B.   <u>Decisions on Allocated Grants Are Not Committed to Agency Discretion and the Tucker Act Does Not Apply Because These Are Not Claims for Contract Damages.</u>

Plaintiffs have already addressed that decisions to withdraw or freeze funding are *not* committed to agency discretion when the funds have already been awarded. *See* ECF 102 at 27. Plaintiffs have also briefed at length that courts *regularly* issue decisions that affect federal contracts and grants despite the Tucker Act—specifically where the plaintiff is not even a party to any relevant contract and the relief sought is not akin to contract damages. ECF 102 at 28-30. Indeed, federal courts across the country have continued to enjoin the Executive Defendants' unlawful contracting practices as recently as the last few months. *See A.B.A. v. United States DOJ*, No. 25-cv-1263, 2025 U.S. Dist. LEXIS 92016 at *17-*18 (D. D.C. May 14, 2025) ("The Supreme Court's recent *pe curiam* opinion in *Department of Education v. California* […] does not compel a contrary result […] Defendants terminated its cooperative agreements in retaliation for protected speech, an act that would violate the First Amendment regardless of the agreements' terms"); *Widakuswara v. Lake*, No. 25-cv-1015, 2025 U.S. Dist. LEXIS 76500 at *9 (D.D.C. Apr. 22, 2025) ("In California, the source of the rights relied on by the plaintiffs were contained in the grant agreements […] Here, by contrast, the source of the [plaintiffs]' rights is not rooted in the grant agreements"). Defendants' attempts at arguing the contrary are unavailing. *See* ECF 116 at 16-17.

The Agency Defendants' Tucker Act argument is that Plaintiffs' APA claim against the funding pause and March 13 Letter is really just a "disguised Tucker Act claim." *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015). To make that determination, courts must examine both "the source of the rights upon which the plaintiff bases [his] claims, and ... the type of relief sought." *Id.* at 406. Here, this case is not a contract dispute about vague boilerplate language authorizing the Agencies to terminate or pause contracts in some circumstances. *See* Section 200.340. It is a civil rights case about the meaning of the Free Speech Clause. *See* ECF 102 at 28-30.

Indeed, the only contractual language the Agencies point to in justifying its funding pause is a termination clause that gives the Agencies some authority to pause or terminate federal funding "if an award no longer effectuates the program goals or agency priorities." But the Agencies can terminate a contract only "to the extent authorized by law." *Id.* If the contract termination is not "authorized by law," then the Agencies cannot exercise Section 200.340's powers. In this case, Plaintiffs have demonstrated—mostly through the Agency Defendants' own words—that the Agency Defendants paused Columbia's funding "to do indirectly what it could not do directly." *Vullo*, 602 U.S. at 190.

### III. Committee Defendants' Compelled Record Disclosure and Punishment of Plaintiff's Speech—And Columbia's Compliance—Exceed Congressional Authority and Constitute First Amendment Violations.

#### A. The Congressional Defendants Have Violated the First Amendment and Fundamentally Chilled Plaintiffs' First Amendment Speech and Associations by Seeking Disclosure of the Identities and Records of Individual Student Protestors.

It is axiomatic that the federal government violates the First Amendment right to free association when it seeks disclosure of the identity of specific individuals based on their political expression and related associations. *See Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491 (1975) ("The right of voluntary associations, especially those engaged in activities which may not meet

with popular favor, to be free from having either state or federal officials expose their affiliation and membership […] has been made clear a number of times."), *citing NAACP v. Alabama*, 357 U.S. 449 (1958); *Bates v. Little Rock*, 361 U.S. 516 (1960); *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293 (1961); *Gibson v. Florida Legislative Committee*, 372 U.S. 539 (1962); *Pollard v. Roberts,* 393 U.S. 14 (1968). That is precisely what the Congressional Defendants have done here. On this point, there can be no credible dispute. *See* ECF 101-1 at 5 ("Please produce...*[a]ll* disciplinary records, including *complete* case files and *all* UJB records, relating to the following incidents...") (emphasis added).

    B.  <u>The Federal Speech and Debate Clause is No Bar to Suit Because Seeking to Suppress and Punish Criticism of Israel is Not a Valid Legislative Purpose, As Courts Have Repeatedly Held.</u>

Congressional Defendants are not immune from suit for violation of First Amendment speech and associational injuries—unless the congressional action falls within the "sphere of legitimate legislative activity."[5] *See Eastland*, 421 U.S. at 501; *Id.* at 498 (noting that "the right to voluntary associations" is indeed assertable against congressional defendants in the absence of a valid immunity defense).

Federal courts have repeatedly held that seeking to suppress speech critical of the State of Israel is *not* a valid legislative purpose and have invalidated such actions accordingly. *See*, *e.g.*, *Amawi*, 373 F. Supp. 3d at 749 (statute was "a viewpoint-based restriction intended not to combat discrimination on the basis of national origin, but to silence speech with which Texas disagrees"); *Jordahl*, 336 F. Supp. 3d at 1048 ("the State has proffered […] an interest in preventing discrimination on the basis of national origin […] The Act's history instead suggests that the goal

---

[5] *See also*, Brief for Defending Rights & Dissent as Amici Curiae Supporting Plaintiffs, ECF 111-1 at 21-29.

of the Act is to penalize the efforts of those engaged in political boycotts of Israel"); *Koontz*, 283 F. Supp. 3d at 1022 (these are "impermissible goals under the First Amendment").

Nor is punishment in the sphere of permissible legislative activity. *Gravel v. United States*, 408 U.S. 606, 620 (1972). Efforts "to expose for the sake of exposure," *Watkins v. United States*, 354 U.S. 178, 200 (1957), particularly when the "[i]nvestigation [is] conducted solely to aggrandize the investigator or punish the investigated, either by publicity or by prosecution," *Hutcheson v. U.S*, 369 U.S. 599, 624 (1962) (Brennan, J. concurring), are also prohibited. *See also Eastland*, 421 U.S. at 504 n.1 ("[w]e have made it clear [] that Congress is not invested with a 'general' power to inquire into private affairs.'). The U.S. Supreme cautioned that "the power to investigate must not be confused with any of the powers of law enforcement." *Hutcheson*, 369 U.S. at 624 (Brennan, J. concurring) (quoting *Quinn v. United States*, 349 U.S. 155, 161, 75 S.Ct. 668, 672 (1955)).

The Congressional Defendants fail both of these tests for legislative legitimacy. As such, the Speech and Debate Clause does not apply to protect them from their misconduct.[6]

Plaintiffs have previously detailed the ways in which Committee Defendants engage in blatant censure of students critical of Israel, despite Committee Defendants' attempts to characterize it otherwise. *See*, *e.g.*, ECF 104 at 3-11; ECF 99 at 23-24, ECF 62 at ¶¶ 54-57, 66-78. In sum, Committee Defendants have (1) weaponized the concept of antisemitism to denounce *all* speech critical of Israel, speech critical of the U.S. role in Israel's assault on Gaza and speech supportive of Palestinian rights and dignity,[7] (2) deemed such speech as "anti-American" or "pro-

---

[6] Plaintiffs incorporate in its entirety their Opposition to the Congressional Committee Defendants' Motion to Dismiss, ECF #104. *See also* Brief for Defending Rights & Dissent as Amici Curiae Supporting Plaintiffs, ECF 111-1 at 29-32.

[7] *See* ECF 104 at 7-10; ECF 32-1 at 1, 3. *See also* Brief for Palestine Legal as Amici Curiae Supporting Plaintiffs, ECF 79-2 at 16-20 (hereinafter "Pal Legal Amicus").

terror,"[8] (3) conducted an "investigation . . . unprecedented in [] depth and scope"[9] of universities and specific members of those universities' communities; (4) urged, and sometimes demanded resignations, firings, and campus crackdowns on speech;[10] (5) vilified students engaging in expressive activities and with associations that support Palestinian rights and/or against the unfolding genocide in Gaza,[11] (5) exposed the disciplinary records of Columbia and Barnard students,[12] and (6) generated numerous press releases and participated in media spots discussing those records.[13] Ultimately, the Committee has intentionally exposed Plaintiffs' political associations and conduct in a way that obviously chills those political associations in violation of the First Amendment — absent any legitimate government purpose. *See NAACP*, 357 U.S. at 462

---

[8] *See* Letter from U.S. H.R. Rep. Comm. Educ. & Workforce to Dr. Katrina Armstrong, then-Interim President of Columbia Univ., Mr. David Greenwald & Ms. Claire Shipman, Co-Chairs of the Trs. Columbia Univ. (Feb. 13, 2025), at 3, ECF 101-1f (hereinafter the "February 13 Letter"). *See also* Pal Legal Amicus at 19-27.

[9] *See* H. Comm. on Educ. & Workforce, Republican Staff Report, *Antisemitism on College Campuses Exposed* (Oct. 31, 2024), https://edworkforce.house.gov/uploadedfiles/ 10.30.24_committee_on_education_and_the_workforce_republican_staff_report_- _antisemitism_on_college_campuses_exposed.pdf (hereinafter "October Report").

[10] As a recent example, in July, Committee Defendants held another hearing during which Representative Elise Stefanik specifically named a clinical faculty member at City University of New York Law school and asked: "Is this acceptable that the legal defense for Mahmud Khalil is the head of CUNY CLEAR? That's acceptable under your watch. . . . So will this person be fired?" *Antisemitism in Higher Education: Examining the Role of Faculty, Funding and Ideology* Before the H. Comm. On Education and Workforce, 119th Cong. (July 15, 2025) at 1:32:57, available at https://www.youtube.com/watch?v=T-R8vkAYekI. *See also, e.g.*, SAC at ¶¶ 66-78.

[11] In the same July 15 hearing, Representative Stefanik specifically named Mr. Khalil and dangerously and falsely stated that he is "the chief pro-Hamas agitator that led to the antisemitic encampments at Columbia, the rioting and violent takeover of Hamilton Hall, the harassment and physical assault of Jewish students." *Id.; See also* February 13 Letter; Letter from H. Comm. on Educ. & Workforce to Dr. Minouche Shafik, Columbia Univ. President, Ms. Claire Shipman & Mr. David Greenwald, Co-Chairs of Trs. Columbia Univ. (Feb. 12, 2024), https://edworkforce.house.gov/uploadedfiles/2-12-24_Foxx_letter_to_columbia_university.pdf.

[12] October Report, Appendix A and B.

[13] *See, e.g.* **post** at III.C.

("This court has recognized the vital relationship between freedom to associate and privacy in one's association").

Committee Defendants allege that no letter "sent by Congressional Defendants to Columbia [ ] focuses on Plaintiffs' views on the Middle East[,]" ECF 115 at 12 n.5, but instead "Congressional Defendants are concerned about Columbia's admitted antisemitism problem and its resulting violation of federal antidiscrimination law[,]" *id.* at 13. However, these statements are misleading at best and disingenuous at worst. Committee Defendants are clearly suppressing association as they expose students and label those students' constitutionally protected political speech critical of Israel as antisemitism. *See* ECF 104 at 5-11. They rely on this definition to identify, target, and expose students and student associations as punishment —which is the kind of punitive purpose that falls outside protected legislative activities and inherently burdens free association.[14] *See Hutcheson*, 369 U.S. at 624 (Brennan, J. concurring).

Indeed, Committee Defendants made this clear in their February 13 Letter, where they are not just seeking information but seeking punishment of dissidents like Plaintiffs.[15] The Letter labels specific student groups "pro-Hamas" and characterizes peaceful gatherings as "explicitly call[ing] for terrorism." February 13 Letter at 3. Committee Defendants aver that Columbia's "disciplinary process has failed," *id.* at 1, then dictate that campus officials punish these expressions and demand the individualized and associational disciplinary records at issue, *id.*, while citing the "billions of dollars in federal funding," *id.* at 4.

---

[14] ECF 104 at 12-23; *see also* Pal Legal Amicus at 19-27.
[15] *See also*, ECF 101-1.

With speed, Columbia met the February 13 Letter's demands, directly harming Plaintiffs. For instance, ███████ the student group that hosted the Hind's House art exhibition,[16] an event listed in the February 13 Letter, received a Notice of Allegations from Columbia's Office of Institutional Equity ("OIE")[17] alleging the art exhibition constituted discriminatory harassment ███████████ ███████ *See* Exhibit B, ███████████████████████ On February 13, the same day the Committee issued its demands for more punishment, the OIE issued a "Summary of Evidence" against ███████, *id.* at ¶ 26,[18] and then a Determination Letter on February 26, finding ███████ responsible for discriminatory harassment pursuant to an expansive definition of "Protected Class."[19] *Id.* at ¶ 29. Columbia's sudden rush to punish a student group involved in the art exhibition was an obvious attempt to satisfy the Committee's demands. Indeed, in correspondence with the Committee, Columbia assured the Congressional Defendants about its intentions in the case: "[s]anctions in this case are forthcoming." *See* ECF 32-7 at 7.

Without question, these actions also demonstrate the Committee's true purpose in sending the February 13 Letter—to ensure that Plaintiffs and other students expressing views critical of Israel and/or supportive of Palestine be severely punished and disincentivized from continuing their associational and expressive activities. Committee Defendants' actions between February 2024 and the present—culminating in the February 13 Letter[20] – have sent a clear message to

---

[16] ██████████████████████████████████████████ ████████████████████████████████████████████

[17] *See* SAC at ¶¶ 86-92.

[18] Unfortunately, Plaintiff cannot present any of the evidence underlying the decision to suspend him because ████████████████████ ████████████████████████

[19] *See* SAC at ¶89.

[20] Contrary to Committee Defendants position, the February 13 Letter is not akin to the Senator Schiff's letter at issue in *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505 (D.D.C.

Plaintiffs: we will identify who you are and who you associate with, and we will ensure you are punished for your speech and associations because of the viewpoint you hold. Such conduct cannot constitute a legitimate legislative purpose —and exposes the Congressional Defendants to traditional First Amendment liability for unduly burdening free association. *See Eastland*, 421 U.S. at 498, *citing NAACP*, 357 U.S. 449.

C. Publication of Individual Records in Congress's Possession—Regardless of Motivation—is Never a Valid Legislative Purpose, and the Speech and Debate Clause also Does Not Apply to Bar Suit.

The Speech and Debate Clause *does not* "immunize those who publish and distribute otherwise actionable materials beyond the reasonable requirements of the legislative function." *Doe v. McMillan*, 412 U.S. 306, 315-16 (1973). *See also, e.g.*, *Hutchinson v. Proxmire*, 443 U.S. 111, 133, 99 S.Ct. 2675 (1979) ("[T]he transmittal of information . . . to inform the public and other Members is not a part of the legislative function or the deliberations that make up the legislative process."); *Williams v. Brooks*, 945 F.2d 1322, 1328 (5th Cir. 1991) ("Nor does the Speech or Debate Clause protect a private republication of documents"); *Miller v. Transamerican Press, Inc*., 709 F.2d 524, 531 (9th Cir. 1983) ("Republication of intra-Congressional material outside Congress, is not a protected legislative activity.") (cleaned up); *McSurely v. McClellan*, 553 F.2d 1277, 1285 (D.C. Cir. 1976) ("To the extent plaintiffs charge dissemination outside of the Halls of Congress, the federal defendants are not immune to further questioning."); *Sec. & Exch.*

---

2021), *aff'd*, 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS*"). The Schiff Letter does not demand and threaten the third-party recipient companies to turn over individual and associational records of their users. *See id.* at 518. Instead, "[a]ll three letters sought responses to the same specific questions concerning a matter on which Congressman Schiff actively legislates, votes, and engages in other official responsibilities." *Id.* Nor did "the open letters and public statements made by Congressman Schiff [ ] mention AAPS, do not advocate for any specific actions, and do not contain any threatening language." *Id.* at 515. Finally, unlike here, AAPS could "[]not show that Congressman Schiff's actions caused the technology companies to behave in a particular way … [and] they cannot establish that a remedy directed at his actions would result in the companies changing their behavior." *Id.* at 516.

*Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199,

238 (S.D.N.Y. 2015) ("The Clause also does not protect the dissemination of information outside

of Congress."); *Id.* (collecting cases).

Furthermore, the *McMillan* Court cautioned that "the fact of congressional authorization

for the questioned act is not sufficient to insulate the act from judicial scrutiny. *McMillan*, 412 U.S.

at 316 n.10. The Court explained

> we cannot accept the proposition that in order to perform its
> legislative function Congress not only must at times consider and
> use actionable material *but also must be free to disseminate it to the*
> *public at large, no matter how injurious to private reputation that*
> *material might be. . . To hold otherwise would be to invite gratuitous*
> *injury to citizens for little if any public purpose. We are unwilling to*
> *sanction such a result*, at least absent more substantial evidence that,
> in order to perform its legislative function, Congress must not only
> inform the public about the fundamentals of its business but also
> must distribute to the public generally materials otherwise
> actionable under local law.

*Id.* at 316-17 (emphasis added).

Justice Douglas noted in his prescient concurrence that the "age of technology" is creating

massive data banks where vast amounts of personal data are stored, making data accessible in

perpetuity. *See McMillan*, 412 U.S. at 329-30 (Douglas, J., concurring). Here, Plaintiffs' political

and associational records are easier for Committee Defendants to demand and for Columbia

Defendants to provide. Now, once the Committee Defendants have Plaintiffs' digital information,

it is accessible to the Committee Defendants and their successors for years to come. Compounding

this access is the fact that congressional committees have effectively become their own publishers,

regularly using committee websites and individual member sites as locations to publish reports,

press releases, commentary about committee hearings, investigation findings, and other such

communications.

For example, the 118th Congress's House Committee on Workforce and Development published the October 2024 Report on its official congressional website.[21] The Report is 325 pages long: 125 pages include findings with images of email chains, text messages, and many other forms of communications the Committee had demanded/subpoenaed, and the final 200 pages records clearly marked "confidential," that include one section of letters and disciplinary records, and another section containing different kinds of documents including emails about negotiations with students, positions on Gaza, student disciplinary notices, and the like.[22]

The Committee did not need to send its report to the Public Printer—or at least, it did not only send its report to the Public Printer, pursuant to 44 U.S.C. § 702—where only the "usual number" of approved individuals within the legislative sphere have access. Instead, Committee Defendants published the report on their own website and disseminated it widely through media, press releases, social media, and other forms of publicity.[23] As Committee Defendants have

---

[21] Committee on Education & Workforce, "Antisemitism on College Campuses Exposed, Education and the Workforce Committee Releases Report," (October 31, 2024), available at https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=412025; House GOP, Press Releases, "House Committee on Education and the Workforce Releases Antisemitism Report" (October 31, 2025), available at https://www.gop.gov/news/documentsingle.aspx? DocumentID=1862. *See also*, ECF 62 at ¶¶ 53-55, 61, 64, 94; ECF 104 at 14-15.

[22] Columbia Defendants did not consent to having these records made public. SAC at ¶ 54. While Columbia Defendants did redact student names, as alleged in the students were easily identifiable due to context clues and other descriptions left visible.

[23] *See, e.g.*, Press Release, Representative Elise Stefanik, "Statement on House Education and Workforce Committee Report Revealing Absolute Failure of Universities to Hold Antisemitic Students and Faculty Accountable" (Oct. 31, 2024), available at https://stefanik.house.gov/ 2024/10/statement-on-house-education-and-workforce-committee-report-revealing-absolute-failure-of-universities-to-hold-antisemitic-students-and-faculty-accountable; Press Release, Representative Virginia Foxx (Former Chair), "Foxx Op-Ed: So-Called Elite Universities have a Glaring Antisemitism Problem" (Nov. 4, 2024), available at https://edworkforce.house.gov/news/ documentsingle.aspx?DocumentID=412027. *See also*, Virginia Foxx, "Opinion: These so-called elite universities have a glaring antisemitism problem," *The New York Post* (Oct. 31, 2024), available at https://nypost.com/2024/10/31/opinion/these-so-called-elite-universities-have-a-glaring-antisemitism-problem/. *See also* E&W Blog, "What They're Saying: Universities 'Refused

become the publisher and distributor of their own "investigative" reports, they are no longer acting in their "legislative sphere," and cannot be shielded from suit. *See McMillan*, 412 U.S. at 315-16; *Hutchinson*, 443 U.S. at 133.

### D. Plaintiffs' Chilling Harms are Ongoing as a Matter of Law—and Entitle Plaintiffs to Injunctive Relief to Cure Their Chilled Expression.

A chilling of fundamental First Amendment associational rights is—as a matter of law—an ongoing injury for which an injunction can enter. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) (The Second Circuit evaluates pre-enforcement First Amendment claims under "somewhat relaxed standing and ripeness rules" and "a real and imminent fear of such chilling is enough."); *Bordell v. Gen. Elec. Co*., 922 F.2d 1057, 1060 (2d Cir. 1991) ("[T]he fact that a plaintiff's speech has actually been chilled can establish an injury in fact .... "). *See also*, *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) ("there is an ongoing injury in fact if plaintiffs make a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression"); *Libertarian Party of L.A. Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("[A]s the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury").

Plaintiffs have clearly outlined the chill they are experiencing because of the Committee Defendants' conduct and are experiencing ongoing harm because Committee Defendants are now in possession of records that reveal their speech, expressive activities, and associations.[24] *See also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) ("Anonymity is a shield from the

---

to Contain Chaos,' Antisemitism Report Finds," Committee on Education and Workforce, U.S. House of Representatives (Nov. 5, 2024), available at https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=412028.

[24] ECF 99 at 1-3, 6-7, 10, 13, 15; *see also*, Plaintiffs Declarations, ECF 101-8 at ¶¶2-3; ECF 101-9 at ¶¶3-7; ECF 101-10 at ¶¶2-3, 10-19, 22; ECF 101-11 at ¶¶ 10, 18-19, 22-23, 37, 39; ECF 101-12 at ¶¶7, 17-28, 33-34; ECF 101-13 at ¶¶5, 9, 13; ECF 101-14 at ¶13; ECF 101-15 at 5, 11-16, 29.

tyranny of the majority […] It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation – and their ideas from suppression – at the hand of an intolerant society"); *Talley v. California*, 362 U.S. 60, 65 (1960) ("The reason for those holdings was that identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance"); *NAACP*, 357 U.S. at 462-63 ("compelled disclosure […] is likely to affect adversely the ability of [the NAACP] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate"). Moreover, the arrests and detentions of Plaintiff Khalil and other peers advocating for Palestinian rights and the broader administration's threats to undertake more arrests, and the fact that Committee Defendants demanded and now maintain individual and associational records, has further chilled Plaintiffs' speech in addition to the events outlined **ante** at III.B.

Additionally, the concern about publication given the Committee's history outlined **ante** at III.B., is not speculative, but rather the natural and logical conclusion of Defendants' own pattern of conduct. Since the February 13 Letter, Committee Defendants have sent out letters to numerous institutions,[25] held additional hearings where specific individuals were identified for censure as recently as two weeks ago,[26] named Plaintiff Khalil personally on an ongoing basis, and engaged

---

[25] *See*, *e.g.*, Press Release, "Stefanik Leads Letter Exposing Columbia University's Leadership for Potential Title VI Violations and Betrayal of Jewish Students and Board Members," Committee on Education and Workforce (July 1, 2025), available at https://stefanik.house.gov/2025/7/stefanik-leads-letter-exposing-columbia-university-s-leadership-for-potential-title-vi-violations-and-betrayal-of-jewish-students-and-board-members; Press Release, "Walberg, Owens Demand Bowdoin College Comply with Antisemitism Investigation," Committee on Education and Workforce (June 2, 2025), available at https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=412512; Press Release, "Walberg, Owens Demand Answers from Five Colleges Following Their Lackluster Response to Antisemitism," Committee on Education and Workforce (March 27, 2025), available at https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=412306.
[26] *See* **ante**, at 20 n.11.

in inflammatory speech. The conduct is indicative of the Committee Defendants' continued efforts to name, humiliate, implicate, and punish Plaintiffs and their peers. As a result, it is not speculative for Plaintiffs to expect another report is imminent, or that Committee Defendants would publicly share their records.

      E.  <u>Columbia is a Necessary Party Whose Disclosure to Congressional Defendants Can Be Enjoined.</u>

Plaintiffs may assert constitutional rights against Columbia as a custodian of records regarding their pro-Palestine associations and expressions. Courts routinely find that when "the government-compelled disclosure is directed at a third party, [Columbia], rather than directly at [the Plaintiffs]," "First Amendment rights are implicated." *See Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 271 (2d Cir. 1981) (collecting cases). That is, the Plaintiff's constitutionally protected information in Columbia's possession is "entitled to the same protection" as if it were possessed by the students. *Id. See also Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. FEC*, 333 F.3d 168, 178 (D.C. Cir. 2003) (concluding Democratic National Committee and AFL-CIO have "substantial First Amendment interests in [preventing] the disclosure of their own internal materials" related to FEC investigation); *Republican Nat'l Comm. v. Pelosi*, 602 F. Supp. 3d 1, 22 (D.D.C. 2022) (finding that RNC had standing to bring claims against Salesforce as the custodian of the records sought), *vacated on other grounds*, No. 22-5123, 2022 WL 4349778 (D.C. Cir. Sept. 16, 2022).

That the Committee Defendants successfully relied on other mechanisms of compulsion instead of a subpoena does not change the fact that the records maintained by Columbia implicate constitutionally protected rights. Columbia's argument (ECF 118 at 15-16) that they "de-identified information" prior to giving the records to the Committee misses *Longshoreman's* key holding: what triggers First Amendment protections over custodian-held documents is the

presence of documents that regard "actions that play an integral part in facilitating an association's normal arrangements." *Longshoremen*, 667 F.2d at 267, 271. The Committee's February 13 Letter demands disciplinary records about events Plaintiffs took part in by themselves and through their student groups.  Gathering for those events "play[s] an integral part" in Plaintiffs and others expressing their pro-Palestine views. *Id.* Under *Longshoremen,* therefore, the First Amendment protects these records.

IV.    **Plaintiffs Do Not Move for Preliminary Relief as to All Claims, And All Claims Merit Further Discovery, Whether or Not a Preliminary Injunction is Granted.**

Plaintiffs have never sought a preliminary injunction against Defendants for their First Amendment academic freedom claim—the contours of which are detailed elsewhere in the briefing. *See* ECF 102 at 16-18. Furthermore, Plaintiffs hereby seek leave to withdraw their Motion for Preliminary Injunction as to Title VI, as a result of Agency Defendants' recent restoration of grant funding to the Columbia Defendants. Plaintiffs also seek leave to withdraw their Motion for Preliminary Injunction as to Defendants' mask ban as a result of the Columbia and Agency Defendants' recent clarification that students engaging in demonstrations are not, in fact, subject to a blanket mask ban during otherwise rule-compliant demonstrations. *See* Resolution Agreement Section 27(c)-(d). As such, the sole remaining claims Plaintiffs pursue on a preliminary injunction are: (1) First Amendment violations for enforcement of an Israel-related speech code—against Columbia and Agency Defendants; (2) APA claims resulting from this ongoing First Amendment violation; and (3) First Amendment violations related to the Committee Defendants' request and disclosure of personal student records in a way that chills First Amendment association and other expressive activity.  These are the sole claims pursued at the preliminary injunction stage—and all of these claims and each other claim in the litigation merit discovery, whether or not a preliminary injunction is issued. *See*, *e.g.*, *Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. &*

*Intergov. Affairs*, No. 07-CV-2243, 2007 U.S. Dist. LEXIS 94947, 2007 WL 4591845, at *13 (E.D.N.Y. Dec. 26, 2007) ("[U]nlike a preliminary injunction motion, dismissal pursuant to Rule 12(b)(6) is not based on whether Plaintiff is likely to prevail, and all reasonable inferences must be viewed in a light most favorable to Plaintiff"); *see also* ECF 102 at 11-27 (identifying relevant allegations in the Complaint as to each claim).

## V.    Where Likely First Amendment Violations are at Issue, All Other Preliminary Injunction Factors are Satisfied Per Se.

The Second Circuit makes clear that when Plaintiffs pursue a preliminary injunction based on the First Amendment—provided that Plaintiffs show a likelihood of success on the merits—all other factors supporting a preliminary injunction are established *per se*. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) ("[b]ecause the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases the likelihood of success on the merits is the dominant, if not the dispositive, factor"). Furthermore, Plaintiffs need not establish their case in full; they need only show that they are likely to succeed on their First Amendment claims based on the facts and the law as presented to the district court, which Plaintiffs have amply done here. *See Antonyuk v. James*, 120 F.4th 941, 1048 n. 126 (2d Cir. 2024) ("We emphasize that we are here reviewing facial challenges to these provisions at a very early stage of this litigation. A preliminary injunction is not a full merits decision, but rather addresses only the likelihood of success on the merits") (internal quotations and citations omitted).

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' renewed Motion for Preliminary Injunction.

Dated: July 30, 2025                    Respectfully Submitted,

                                        /s/  Amy E. Greer


                                        Amy E. Greer  (NY 5910179)
                                        **Dratel & Lewis**
                                        29 Broadway, Suite 1412
                                        New York, NY 10006
                                        (212) 732-8805
                                        agreer@dratellewis.com

                                        **CAIR NATIONAL**
                                        **LEGAL DEFENSE FUND**
                                        /s/Lena Masri
                                        Lena Masri
                                        Gadeir Abbas (VA 81161)*
                                        Nadia Bayado (DC 90023648)
                                        453 New Jersey Ave SE
                                        Washington, DC 20003
                                        (202) 742-6420

                                        **COUNCIL ON AMERICAN ISLAMIC**
                                        **RELATIONS – NEW YORK**
                                        /s/Lamya Agarwala
                                        Lamya Agarwala (NY 5736061)
                                        80 Broad Street, 5th Floor
                                        New York, NY 10009
                                        (646) 665-7599
                                        lagarwala@cair.com

                                        **Jonathan Wallace**
                                        /s/ Jonathan Wallace
                                        Jonathan Wallace (NY 1733757)
                                        PO #728
                                        Amagansett NY 11930
                                        (917) 359-6234
                                        jonathan.wallace80@gmail.com

                                        *Licensed in VA, practice limited to federal matters*

                                        *Attorneys for Plaintiffs*

31

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that this document is compliant with the 10,500 word limit permitted by this Court at ECF 132. As measured by the word processing system used to prepare it, this reply contains 10,005 words.

/s/ Amy E. Greer