### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

MAHMOUD KHALIL, et al.,

     *Plaintiffs,*

  v.

TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, et al.,

     *Defendants.*

No. 1:25 Civ. 02079 (AS)

### DEFENDANTS TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK AND ACTING PRESIDENT CLAIRE SHIPMAN'S SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Marshall L. Miller (Lead Counsel)
Gabrielle E. Tenzer
Zachary Piaker
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
mmiller@heckerfink.com
gtenzer@heckerfink.com
zpiaker@heckerfink.com

Trisha Anderson
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
tanderson@heckerfink.com

*Attorneys for Defendants Trustees
of Columbia University in the City
of New York and Acting President
Claire Shipman*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.     Plaintiffs still fail to demonstrate a likelihood of successfully establishing standing for either facial or as-applied challenges to Columbia's consideration of certain definitions of antisemitism. ..................................................................................................................... 3

II.    Plaintiffs have failed to demonstrate a likelihood of success to establish that Columbia is a state actor, and Columbia's recent agreement resolving federal investigations does not indicate otherwise. ............................................................................................................... 8

CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

## CASES

*Anilao v. Spota,*
    774 F. Supp. 2d 457 (E.D.N.Y. 2011) ............................................................... 11

*Child.'s Health Def. v. Meta Platforms, Inc.,*
    112 F.4th 742 (9th Cir. 2024) ............................................................................. 10

*Do No Harm v. Pfizer Inc.,*
    126 F.4th 109 (2d Cir. 2025) ............................................................................... 6

*Erbacci, Cerone, & Moriarty, Ltd. v. United States,*
    939 F. Supp. 1045 (S.D.N.Y. 1996) .................................................................... 10

*Focus on the Fam. v. Pinellas Suncoast Transit Auth.,*
    344 F.3d 1263 (11th Cir. 2003) ........................................................................... 11

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art,*
    765 F. Supp. 3d 245 (S.D.N.Y 2025) .............................................................. 7, 7

*Herrera v. Santa Fe Pub. Schs.,*
    41 F. Supp. 3d 1027 (D.N.M. 2014) .................................................................. 11

*Hudson Shore Assocs. Ltd. P'ship v. New York,*
    139 F.4th 99 (2d Cir. 2025) ................................................................................. 5

*Hulinsky v. County of Westchester,*
    670 F. Supp. 3d 100 (S.D.N.Y. 2023) ................................................................. 5

*Informed Consent Action Network v. YouTube LLC,*
    582 F. Supp. 3d 712 (N.D. Cal. 2022) ............................................................... 10

*Laird v. Tatum,*
    408 U.S. 1 (1972) ................................................................................................. 6

*Logan v. Bennington Coll. Corp.,*
    72 F.3d 1017 (2d Cir. 1995) ............................................................................... 10

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ............................................................................................. 5

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) ............................................................................................. 5

*Orellana v. Macy's Retail Holdings, Inc.*,
    No. 17 Civ. 5192, 2018 WL 3368716 (S.D.N.Y. July 10, 2018) ...................................... 11

*Students for Just. in Pal., at Univ. of Hou. v. Abbott*,
    756 F. Supp. 3d 410 (W.D. Tex. 2024) .......................................................................... 6, 7

*Sybalski v. Indep. Grp. Home Living Program, Inc.*,
    546 F.3d 255 (2d Cir. 2008) ............................................................................................ 9, 9

*United States v. Dist. Council of N.Y.C.*,
    No. 90 Civ. 5722, 2015 WL 5916738 (S.D.N.Y. Oct. 7, 2015) ....................................... 10

*United States v. Int'l Bhd. of Teamsters*,
    941 F.2d 1292 (2d Cir. 1991) ........................................................................................... 10

**OTHER AUTHORITIES**

Exec. Order No. 13,899, 84 Fed. Reg. 68,779 (Dec. 11, 2019) ....................................................... 4

*Frequently Asked Questions*, Yale Univ., https://oiea.yale.edu/frequently-asked-questions ......... 4

Off. for C.R., U.S. Dep't of Educ., *Dear Colleague Letter* (May 7, 2024),
    https://www.ed.gov/media/document/colleague-202405-shared-ancestrypdf-35100.pdf ..... 4

Off. for C.R., U.S. Dep't of Educ., *Questions and Answers on Executive Order 13899*
    *(Combating Anti-Semitism) and OCR's Enforcement of Title VI of the Civil Rights Act of*
    *1964* (Jan. 19, 2021), https://www.ed.gov/media/document/faqs-executive-order-13899-
    combating-anti-semitism-and-ocrs-enforcement-of-title-vi-of-civil-rights-act-of-1964-
    2021-33939.pdf .................................................................................................................. 4

Off. for Community Conduct, Harvard Univ., Frequently Asked Questions,
    https://hwpi.harvard.edu/communityconduct/frequently-asked-questions ........................... 4

Off. of the Governor, Proclamation (June 12, 2022),
    https://www.governor.ny.gov/sites/default/files/2022-
    06/IHRA_Antisemitism_Definition_Proclamation-2022.pdf................................................ 4

Off. of the Mayor, Exec. Order No. 52 (June 8, 2025),
    https://www.nyc.gov/assets/home/downloads/pdf/executive-orders/2025/eo-52.pdf. .......... 4

*Resolution Agreement Between the United States of America and Columbia University*,
    Columbia Univ. (July 23, 2025),
    https://president.columbia.edu/sites/default/files/content/
    July%202025%20Announcement/Columbia%20University%20Resolution%20Agreeme
    nt.pdf ................................................................................................................................ 2, 9

*Student Conduct Guidance and Expectations FAQ*, N.Y. Univ.,
     https://www.nyu.edu/students/student-information-and-resources/student-community-
     standards/student-conduct-guidance-expectations-faq.html ................................................. 4

*Understanding How We Incorporate the IHRA Definition of Antisemitism*, Columbia Univ.
     (Aug. 4, 2025), https://communications.news.columbia.edu/news/understanding-how-
     we-incorporate-ihra-definition-antisemitism ........................................................................ 3

# PRELIMINARY STATEMENT[1]

Columbia has worked diligently in this tumultuous moment to provide an environment that balances fostering the education of its students, safeguarding its community from discrimination and harassment, and protecting speech and academic freedom across a spectrum of viewpoints. To maintain this balance, Columbia recently announced additional actions to address antisemitism and resolve federal antidiscrimination investigations. None of these actions cure the fundamental defects in Plaintiffs' case that have been extensively briefed.

As previously brought to the Court's attention, on July 15 Columbia announced additional commitments to combat antisemitism. ECF 123. Acting President Shipman explained: "Our work toward an agreement with the federal government has put a harsh spotlight on many of the difficult issues regarding discrimination and harassment we've seen on our campuses," but "any government agreement we reach is only a starting point for change" and "[c]ommitting to reform on our own is a more powerful path." ECF 123-1 at 1-2. Columbia's new initiatives included the appointment of Title VI and Title VII Coordinators and additional training. *Id.* at 2-3. Columbia also announced it would "formally incorporat[e] the IHRA definition of antisemitism into the work of our Office of Institutional Equity (OIE)," alongside the previously incorporated University Task Force definition. *Id.* at 2. Columbia has incorporated these definitions into its Anti-Discrimination Policy by directing OIE to "consider[]" them as part of the "totality of the circumstances" when evaluating whether a violation has occurred. Ex. A ("Anti-Discrimination Policy") at 5 n.7.

Columbia also concluded a Resolution Agreement on July 23 with the federal government to resolve pending investigations of alleged violations of antidiscrimination laws and secure

---

[1] Columbia incorporates the background sections in its motion to dismiss, ECF 84 ("MTD") at 2-6, and opposition to Plaintiffs' motion for preliminary injunction, ECF 118 ("PI Opp'n") at 2-3. All abbreviations and capitalized terms retain their meanings from Columbia's prior memoranda of law. Citations to "Ex. __" refer to exhibits to the Supplemental Declaration of Marshall L. Miller.

restoration of certain terminated grants and eligibility for future grants and contracts. *See* ECF 124; *Resolution Agreement Between the United States of America and Columbia University* ¶¶ 7-8, Columbia Univ. (July 23, 2025), https://president.columbia.edu/sites/default/files/content/July%202025%20Announcement/Columbia%20University%20Resolution%20Agreement.pdf ("*Resolution Agreement*"). In return, Columbia agreed to codify steps announced in the March 21 Letter, including maintaining a Senior Vice Provost focused on regional studies; housing the Rules process within the Office of the Provost; and maintaining trained special officers with the ability to remove individuals from campus when appropriate. *Id.* ¶¶ 12, 26-27, 31. The parties further agreed that compliance would be overseen by a jointly appointed monitor, *id.* ¶¶ 40-42, with either party permitted to initiate a dispute about compliance with the agreement for resolution through non-binding arbitration or by a court, *id.* ¶¶ 33-38.

On July 30, Plaintiffs filed their reply and a modified proposed order addressing these developments. ECF 133 ("Reply"), 133-1. The Court granted leave for Columbia to file a sur-reply "to respond to the new scope of relief requested and any issues raised by Plaintiffs." ECF 130.

## ARGUMENT

Plaintiffs' narrowed request for preliminary injunctive relief still seeks to enjoin Columbia from considering the IHRA and University Task Force definitions of antisemitism and from producing student records in response to congressional requests. ECF 133-1 at 2-3; Reply 29. But Plaintiffs' First Amendment claims still suffer from the fundamental defects described in Columbia's earlier briefs: they have not demonstrated a likelihood of success on the merits because they have neither met the high bar for standing nor shown that Columbia is a state actor. Nothing about Columbia's recent announcements or Plaintiffs' reply cures these flaws.[2]

---

[2] Given this brief's posture as a sur-reply to Plaintiffs' preliminary injunction motion, Columbia addresses only Plaintiffs' narrowed request for such relief. Its arguments are equally applicable, however, to its pending motion to

I.    **Plaintiffs still fail to demonstrate a likelihood of successfully establishing standing for either facial or as-applied challenges to Columbia's consideration of certain definitions of antisemitism.**

Columbia's incorporation of consideration of the IHRA definition into OIE's work does not bolster Plaintiffs' arguments about standing on either a facial or as-applied basis. Far from being an "Anti-Israel Speech Code," Reply 1, 3; *see* ECF 135, Columbia's Anti-Discrimination Policy continues to expressly prohibit its application in a manner that would violate free speech principles. Anti-Discrimination Policy 4 ("Nothing in this Policy may be construed to abridge academic freedom, principles of free speech, or the University's educational mission."). Under the policy, "[s]peech or conduct expressing views regarding a particular country's policies or practices does not necessarily constitute Discriminatory Harassment based on national origin." *Id.* at 6. Instead, when "responding to Reports concerning speech or conduct regarding a country's policies or practices, [OIE] will consider whether such speech or conduct is an exercise of academic freedom and inquiry." *Id.* All reported incidents of alleged discriminatory harassment "will be assessed on a case-by-case basis," through consideration of the "totality of the circumstances." *Id.*

The recent announcement about the IHRA definition does not abrogate these critical, binding elements of Columbia's Anti-Discrimination Policy. Like the University Task Force definition, the IHRA definition is "one of many factors used when considering complaints of discrimination."[3] OIE will now "consider[] the [IHRA] definition of antisemitism, among other resources, including the framework provided for by the Columbia Antisemitism Task Force," "[a]s

_____

dismiss, because Plaintiffs' allegations are deficient for the same reasons they have not satisfied the likelihood-of-success requirement for a preliminary injunction. Additionally, because Plaintiffs have not raised new arguments concerning their request to enjoin Columbia from producing student records to Congress, Columbia does not address those claims here.

[3] *Understanding How We Incorporate the IHRA Definition of Antisemitism*, Columbia Univ. (Aug. 4, 2025), https://communications.news.columbia.edu/news/understanding-how-we-incorporate-ihra-definition-antisemitism ("FAQ").

part of [the] totality of the circumstances analysis for national origin, shared ancestry, and ethnicity claims of antisemitism." Anti-Discrimination Policy 5 n.7.

Consideration of the IHRA definition as part of a totality-of-the-circumstances analysis is consistent with longstanding guidance from regulators that enforce antidiscrimination laws. Since 2019, all federal agencies "enforcing Title VI, and identifying evidence of discrimination" have been required to "consider" the IHRA definition, as well as its accompanying examples. Exec. Order No. 13,899 § 2(a), 84 Fed. Reg. 68,779 (Dec. 11, 2019). OCR has published guidance in both the Trump and Biden Administrations explaining the IHRA definition's role in Title VI enforcement.[4] Under this guidance, an "anti-Semitic incident does not violate Title VI merely because it is anti-Semitic, or because it involves an example of anti-Semitism contemplated by the IHRA." 2021 FAQ 2. Instead, "a detailed analysis is required to determine if a particular act constitutes discrimination prohibited by Title VI, as is true with all other Title VI complaints." *Id.* (quotations omitted); *accord* May 2024 Ltr. 5 n.18. New York State and City have similarly issued proclamations or executive orders encouraging or directing consideration of the IHRA definition.[5] And like Columbia, many peer private universities, including Yale, Harvard, and NYU, have incorporated consideration of the IHRA definition into their antidiscrimination policies,[6] without

---

[4] Off. for C.R., U.S. Dep't of Educ., *Dear Colleague Letter* (May 7, 2024), https://www.ed.gov/media/document/colleague-202405-shared-ancestrypdf-35100.pdf ("May 2024 Ltr."); Off. for C.R., U.S. Dep't of Educ., *Questions and Answers on Executive Order 13899 (Combating Anti-Semitism) and OCR's Enforcement of Title VI of the Civil Rights Act of 1964* (Jan. 19, 2021), https://www.ed.gov/media/document/faqs-executive-order-13899-combating-anti-semitism-and-ocrs-enforcement-of-title-vi-of-civil-rights-act-of-1964-2021-33939.pdf ("2021 FAQ").

[5] Off. of the Governor, Proclamation (June 12, 2022), https://www.governor.ny.gov/sites/default/files/2022-06/IHRA_Antisemitism_Definition_Proclamation-2022.pdf; Off. of the Mayor, Exec. Order No. 52 § 1 (June 8, 2025), https://www.nyc.gov/assets/home/downloads/pdf/executive-orders/2025/eo-52.pdf.

[6] *See, e.g.*, *Frequently Asked Questions*, Yale Univ., https://oiea.yale.edu/frequently-asked-questions (last visited Aug. 5, 2025); Off. for Community Conduct, Harvard Univ., *Frequently Asked Questions*, https://hwpi.harvard.edu/communityconduct/frequently-asked-questions (last visited Aug. 5, 2025); *Student Conduct Guidance and Expectations FAQ*, N.Y. Univ., https://www.nyu.edu/students/student-information-and-resources/student-community-standards/student-conduct-guidance-expectations-faq.html (last visited Aug. 5, 2025) (incorporating IHRA definition but not accompanying examples).

4

triggering injunctions or findings of legal violations.

On its face, consistent with this regulatory guidance, Columbia's Anti-Discrimination Policy—and its instruction to consider the University Task Force and IHRA definitions of antisemitism—respects, rather than reflects disregard for, free speech. In light of the policy's actual terms, Plaintiffs' speculation cannot meet the high bar for the facial challenge they continue to press. Reply 16. Plaintiffs have not even attempted to meet their burden to show that "a substantial number of [the policy's] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep," and have neither "addressed the full range of activities the [challenged policies] cover," nor "measured the constitutional against the unconstitutional applications." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723-24, 744 (2024) (cleaned up). Instead, their facial challenge rests on pure "specula[tion] about" "improbable imaginary cases" in which they hypothesize Columbia might apply its Anti-Discrimination Policy in a manner that conflicts with its express terms. *Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 107 (2d Cir. 2025) (cleaned up). Such speculation is insufficient to meet the "heavy burden" they bear in advancing their facial claim. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998).

Even on an as-applied basis, Plaintiffs have not met their burden to establish standing. They have not demonstrated they have engaged, or will engage, in protected speech that is even arguably proscribed by Columbia's Anti-Discrimination Policy, in part because their allegations rest on mischaracterizations of the policy and the modest role the challenged definitions play in it. *See Hulinsky v. County of Westchester*, 670 F. Supp. 3d 100, 111 (S.D.N.Y. 2023) (relevant consideration for pre-enforcement standing is whether plaintiff's interpretation is "arguable or reasonable"). Under the policy, any future speech will be assessed under the requirements that decisionmakers consider the totality of circumstances and refrain from abridging principles of

academic freedom or free speech, with the definitions of antisemitism serving as one of many factors. Anti-Discrimination Policy 6-8. Because Plaintiffs' claims rest on an unreasonable understanding of Columbia's Anti-Discrimination Policy, they represent the kind of allegations of subjective chill that do not support standing. *See Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

Plaintiffs point to two OIE proceedings, Reply 9, 22, but neither bolsters their standing. One proceeding concerned a finding of discriminatory harassment that predated the incorporation of any antisemitism definition into the Anti-Discrimination Policy and therefore has no relevance to Plaintiffs' request to enjoin the IHRA and University Task Force definitions. ECF 134-2 ¶ 29. The other concerns the occupation of a University library by a large group of protestors during Columbia's finals study period—more than mere speech. At any rate, the investigation remains ongoing, with no determinations having been reached. ECF 134-1 ¶ 7. These examples fall far short of the kind of evidence Plaintiffs need to demonstrate that OIE has imposed or is reasonably likely to impose discipline for nothing more than anti-Israel speech.

Likewise, *Students for Justice in Palestine, at University of Houston v. Abbott*, involving a public university's incorporation of the IHRA definition, does not bolster Plaintiffs' case for standing. 756 F. Supp. 3d 410 (W.D. Tex. 2024). There, the court denied a preliminary injunction but held that the plaintiff student groups adequately alleged standing to challenge, on First Amendment grounds, a state executive order directing public universities to incorporate the IHRA definition into university policies and those policies. *Id.* at 414, 421-22. In doing so, the court appears to have addressed standing under pleading standards, not the higher standard for a preliminary injunction. *See Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 113-14, 119 (2d Cir. 2025). And importantly, in assessing standing, the court appears to have accepted plaintiffs' contention that the challenged policies *per se* proscribed any speech "similar" to the IHRA definition's

examples. *Abbott*, 756 F. Supp. 3d at 421. That is not how Columbia's Anti-Discrimination Policy works. As detailed above, Columbia now treats the IHRA and University Task Force definitions as "one of many factors used when considering complaints" of antisemitic discrimination. FAQ.

Rather than explaining how Columbia's Anti-Discrimination Policy reasonably could be understood to chill their speech, Plaintiffs argue the merits of their First Amendment claims. Plaintiffs claim to have "cited uncontroverted authority establishing that restrictions on anti-Israel speech violate the First Amendment and are not valid anti-discrimination measures." Reply 1. But these cases do not bear on Plaintiffs' standing arguments, nor do they support Plaintiffs' apparent view that any consideration of speech under Columbia's Anti-Discrimination Policy would violate the First Amendment (assuming it applies). Instead, the decisions recognize that universities subject to antidiscrimination laws may appropriately take speech into account in assessing claims of discrimination.

Plaintiffs repeatedly point, for example, to *Gartenberg v. Cooper Union for the Advancement of Science & Art*, 765 F. Supp. 3d 245 (S.D.N.Y 2025). There, Judge Cronan recognized that construing Title VI "not to reach instances of pure speech on matters of public concern, or an institution's failure to censor or punish the same, does not mean that such expression is irrelevant to determining whether actionable harassment occurred." *Id.* at 267. Instead, the court noted that First Amendment-protected speech could appropriately be considered in assessing motive for alleged harassment because, as courts "have long recognized," "there is no constitutional problem with using . . . offensive speech as evidence of motive or intent." *Id.* (quotations omitted). Judge Cronan proceeded to find that plaintiffs had adequately alleged an antisemitic hostile environment based in part on speech that "support[ed] at least a plausible inference of animus towards Jews." *Id.* at 269. Columbia's Anti-Discrimination Policy, including

its incorporation of the IHRA and University Task Force definitions, is fully consistent with this understanding of the role speech may play in assessing claims of discriminatory harassment on campus.

Otherwise, Plaintiffs point to caselaw involving challenges to anti-Boycott, Divestment, and Sanctions legislation. Reply 1 (citing cases). These cases, too, do not bear on Plaintiffs' standing and are inapposite. Each involved First Amendment challenges to statutes that prohibited government contractors from engaging in expressive boycotts of Israel. That a legislature may not adopt *per se* rules prohibiting particular expressive activity by government contractors says little about whether a university may consider certain speech in evaluating potential violations of antidiscrimination policies under the totality of the circumstances.

## II.    Plaintiffs have failed to demonstrate a likelihood of success to establish that Columbia is a state actor, and Columbia's recent agreement resolving federal investigations does not indicate otherwise.

Plaintiffs also fail, for the reasons previously outlined, *see* MTD 11-15; PI Opp'n 24-27, to demonstrate a likelihood of success on their First Amendment claim against Columbia because it is not a state actor. The Resolution Agreement, like the changes Columbia previously announced in the March 21 Letter, does not transform it into a state actor. Plaintiffs contend that Columbia is a state actor under both compulsion and "joint action" theories. Reply 5-8. Under any theory of state action, Plaintiffs must demonstrate "that the state was involved with the *activity that caused the injury* giving rise to the action," a showing they cannot make. *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257-58 (2d Cir. 2008) (cleaned up).

Plaintiffs assert that "Agency Defendants have successfully coerced Columbia into now formally entering a contract that codifies the unconstitutional restriction at issue"—an "Israel-specific speech code," they claim—and that the Resolution Agreement "establish[es] state action" with respect to the antisemitism definitions because it "specifically require[s] the contract party to

violate the First Amendment rights of third parties." Reply 5-6. But Plaintiffs cite no specific provision of the Resolution Agreement to support this argument, because it contains none. On July 15, Columbia announced it would incorporate consideration of the IHRA definition into OIE's policies. Columbia took this step, along with other measures to combat antisemitism, because "[c]ommitting to reform on our own is a more powerful path." ECF 123-1 at 2. Columbia subsequently entered the Resolution Agreement, which contains no provisions pertaining to any antisemitism definition. The agreement's only commitments concerning the Anti-Discrimination Policy are that Columbia must "impartially implement and apply University rules and policies, including prompt and consistent enforcement of disciplinary rules and policies without regard to identity or ideology" and "evenly implement its institution-wide policies on harassment and discrimination under Title VI." *Resolution Agreement* ¶¶ 28-29.

Even if Columbia's announcement on July 15 concerning the IHRA definition could be understood to reflect some sort of agreement with the government, that alone would not suffice, as Plaintiffs concede. Reply 5 ("existence of a contract or consent decree" with the government "does not transform a private entity into a state actor"). Plaintiffs still need to show governmental involvement with the challenged activity (*i.e.*, the imagined future discipline Plaintiffs contend chills their speech), *Sybalski*, 546 F.3d at 257-58, but have not alleged any. University administrators, not government actors, will continue to be responsible for administering Columbia's Anti-Discrimination Policy, including any consideration of relevant definitions of antisemitism under the totality of the circumstances. Courts in this Circuit and elsewhere have repeatedly rejected state-action contentions when the necessary linkage between the state and the challenged activity is absent. *See, e.g.*, *id.* at 259 (no state action notwithstanding extensive regulation of visitation limits in mental-health facilities where "administrators of those facilities

make the decision about whether such limitations should be imposed"); *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1028 (2d Cir. 1995) (rejecting argument that "any action undertaken in compliance with" private university sexual harassment policy adopted pursuant to settlement with state is state action and holding no state action in discipline under policy where state "had no involvement in" disciplinary case); *Child.'s Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 757 (9th Cir. 2024) ("Meta was entitled to encourage . . . input from the government as long as the company's employees decided how to utilize this information based on their own reading of the flagged posts." (quotations omitted)); *Informed Consent Action Network v. YouTube LLC*, 582 F. Supp. 3d 712, 722 (N.D. Cal. 2022) (no state action where "Defendants maintain their independent professional judgment even while relying on government-created guidelines" (quotations omitted)).

The entire crux of Plaintiffs' state action theory—like their theory of standing—rests on their flawed argument that the government has forced Columbia to adopt an "Israel-specific anti-speech code" under which any anti-Israel speech is *per se* proscribed (thus presumably excusing the need to show state involvement in subsequent disciplinary decisions). As explained above, any such contention is not only contradicted by the Anti-Discrimination Policy's express language but fails to reflect an even arguable understanding of the role the definitions of antisemitism play in it.

Any arguments premised on the fact that an independent monitor will oversee Columbia's compliance with the Resolution Agreement similarly fail to support state action. It is well-established that the actions of even a court-appointed monitor to oversee the terms of a consent decree with the government are not state action. *See, e.g.*, *United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292, 1296-97 (2d Cir. 1991); *United States v. Dist. Council of N.Y.C.*, No. 90 Civ. 5722, 2015 WL 5916738, at *10-11 (S.D.N.Y. Oct. 7, 2015); *Erbacci, Cerone, & Moriarty, Ltd. v.*

*United States*, 939 F. Supp. 1045, 1054 (S.D.N.Y. 1996). Here, the monitor is to be privately appointed, even further weakening any state action arguments based on the independent monitor. *See Orellana v. Macy's Retail Holdings, Inc.*, No. 17 Civ. 5192, 2018 WL 3368716, at *18-19 (S.D.N.Y. July 10, 2018) ("If the actions of a *court* appointed security monitor are not state action, then *a fortiori* neither are the actions of . . . a monitor appointed by the *monitored party* . . . [or] the *monitored party* itself."). But more fundamentally, it is the *Resolution Agreement* that the independent monitor will oversee, and that agreement says nothing about any antisemitism definition and gives no role to the monitor in Columbia's individual disciplinary decisions.

Finally, none of the cases Plaintiffs cite in support of their joint action theory is to the contrary. All these cases reflect direct government involvement in the challenged actions, in contrast to the situation here. *See, e.g., Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1268-69, 1278 (11th Cir. 2003) (holding state action in challenge to private party's rejection of proposed advertisements where private party's contract with municipal agency directed it to reject certain advertisements and expressly provided the agency with "final decision-making authority"); *Herrera v. Santa Fe Pub. Schs.*, 41 F. Supp. 3d 1027, 1176 (D.N.M. 2014) (holding private security firm under contract with a public school district engaged in state action when conducting searches pursuant to district's directives while "literally st[anding] side-by-side" with district officials); *Anilao v. Spota*, 774 F. Supp. 2d 457, 501-02 (E.D.N.Y. 2011) (holding private actors engaged in state action where they pressured prosecutors to bring charges against plaintiffs, resulting in prosecutors substituting judgment of private actors for their own), *aff'd*, 27 F.4th 855 (2d Cir. 2022). Plaintiffs make no similar allegations here, nor could they given the absence of any role for the government in Columbia's individual disciplinary decisions.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: August 6, 2025                              Respectfully submitted,
      New York, New York

Marshall L. Miller (Lead Counsel)
Gabrielle E. Tenzer
Zachary Piaker
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
mmiller@heckerfink.com
gtenzer@heckerfink.com
zpiaker@heckerfink.com

Trisha Anderson
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
tanderson@heckerfink.com

*Attorneys for Defendants Trustees
of Columbia University in the City
of New York and Acting President
Claire Shipman*

## CERTIFICATE OF COMPLIANCE

I, Marshall L. Miller, hereby certify that this memorandum of law complies with the wordcount limitations set forth in Local Civil Rule 7.1(c) and contains 3,494 words, exclusive of the caption, the table of contents, the table of authorities, the signature blocks, and this certificate.


Dated: August 6, 2025
New York, New York

_____
Marshall L. Miller