The Clerk of Court is directed to terminate the motion at Dkt. 99, because it is duplicative of the motion at Dkt. 101.

SO ORDERED.

Arun Subramanian, U.S.D.J.
Date: October 17, 2025

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MAHMOUD KHALIL, et al,

       *Plaintiffs.*

v.

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW
YORK, et al,

       *Defendants.*

Civil Case No. 1:25-cv-02079-AS

Hon. Judge Arun Subramanian

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

TABLE OF EXHIBITS ......................................................................................................... v

INTRODUCTION ................................................................................................................ 1

FACTS ................................................................................................................................... 1

    A.   The Committee's February 13 letter demands records about the constitutionally protected political expressions of Columbia's students. ............................................... 1

    B.   Agency Defendants Establish "9 preconditions" Columbia must meet before negotiations about its federal funding can resume ....................................................... 3

    C.   "Columbia FOLDS!" – House Committee (March 21, 2025). ............................... 5

    D.   Defendants' actions impact Plaintiffs directly. ...................................................... 5

ARGUMENT ........................................................................................................................ 8

  I.   Plaintiffs have standing to bring their claims ........................................................ 8

    A.   Defendants have inflicted an injury-in-fact on Plaintiffs ...................................... 8

    B.   Plaintiffs can also bring a pre-enforcement challenge because the violation of their First Amendment rights is ongoing. ......................................................................... 12

    C.   Plaintiffs' injuries are traceable to all Defendants and can be redressed by this Court. ..................................................................................................................... 14

  II.   Plaintiffs' claims are likely to succeed on the merits. ............................................ 16

    A.   The definition of antisemitism the Agency Defendants' coerced Columbia into adopting makes illegal viewpoint discrimination the centerpiece of campus discipline. 17

    B.   Columbia's identify-yourself-when-you-protest rule violates the First Amendment right to anonymous speech ....................................................................................... 19

    C.   The Agency Defendants' pause on Columbia's funding violates the APA (because it violates the First Amendment) and Title VI's procedural requirements.................. 22

    D.   Columbia's further compliance with the Committee's February 13 letter violates the First Amendment ............................................................................................... 22

    E.   The Agency Defendants exceeded their authority under Title VI by ignoring all statutory procedures. ............................................................................................... 24

  III.  The Remaining Preliminary Injunction Factors Also Weigh in Favor of Plaintiffs. 26

CONCLUSION .................................................................................................................. 27

**TABLE OF AUTHORITIES**

<span style="font-variant: small-caps">Cases</span>

*Act Now to Stop War & End Racism Coal. v. D.C.*, 589 F.3d 433 (D.C. Cir. 2009) ................ 12

*Bennett v. Spear*, 520 U.S. 154 (1997)................................................................................ 25

*Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276 (2d Cir. 2023) ......................... 8

*Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342 (2d Cir. 2003)....... 26

*Buckley v. Valeo*, 424 U.S. 1 (1976) ..............................................................................19, 23

*Buckley*, 424 U.S. at 74 ........................................................................................................ 20

*Cerame v. Slack*, 123 F.4th 72 (2nd Cir. 2024) ................................................................11, 12

*Church of the Am. Knights of the KKK v. Kerik*, 356 F.3d 197 (2d Cir. 2004) ...................20, 21

*Cuesnongle v. Ramos,* 713 F.2d 881 (1st Cir. 1983) ........................................................10, 18

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ................................................................. 13

*Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531 (S.D.N.Y. 2024) ............ 11

*Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641 (1990)........................................ 24

*Ghafari v. Municipal Court for the San Francisco Judicial Dist. of the City*, 87 Cal. App. 3d 255
    (Cal. Ct. App. 1978)........................................................................................................ 20

*Hosty v. Carter*, 412 F.3d 731 (7th Cir. 2005)...................................................................... 22

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 2006) ................................................ 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ........................... 24

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)..................................................................7, 13

*McGugan v. Aldana-Bernier*, 752 F.3d 224 (2d Cir. 2014).................................................... 16

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, (1995)..................................................... 19

*Meyer v. Grant*, 486 U.S. 414 (1988). ................................................................................. 12

*Moody v. NetChoice*, LLC, 603 U.S. 707 (2024) ................................................................7, 23

*Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120 (2d Cir. 2020) ............................ 8

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32 (2d Cir. 2018) ................... 7

*NAACP v. Alabama*, 357 U.S. 449 (1958).......................................................................19, 21

*National Abortion Fed'n v. Center for Med. Progress*, 2015 WL 5818863 (N.D. Cal. Oct. 6, 2015)
    ...................................................................................................................................... 14

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................................. 25

*Peace Ranch, LLC v. Bonta*, 93 F.4th 482 (9th Cir. 2024) ..................................................... 12

*Picard v. Magliano*, 42 F.4th 89 (2d Cir. 2022)..................................................................... 13

*Quinn v. United States,* 349 U.S. 155 (1955)......................................................................... 23

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) ....................................................................... 19

*Ryan v. County of DuPage*, 45 F.3d 1090 (7th Cir. 1995)....................................................... 20

*Schlein v. Milford Hosp., Inc.*, 561 F.2d 427 (2d Cir. 1977) ................................................... 16

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974)
    ...................................................................................................................................... 14

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)........................................................................... 9

*Students for Just. in Palestine, at Univ. of Houston v. Abbott*, 2024 at *10 (W.D. Tex. Oct. 28, 2024) ......................................................................................................................... 18

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................................. 8, 11, 13

*Sweezy v. State of N.H. by Wyman*, 354 U.S. (1957) ...................................................... 15, 22

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255 (2d Cir. 2008) ................... 16

*Thornhill v. Alabama,* 310 U.S. 88 (1940) ...................................................................... 10

*Transunion LLC v. Ramirez*, 594 U.S. 413 (2021) .............................................................. 8

*U.S. v. American Tel. & Tel. Co.*, 551 F.2d 384 (D.C. Cir. 1976) ......................................... 14

*United States v. American Tel. & Tel. Co.*, 419 F. Supp. 454 (D.C.C. 1976) .......................... 14

*United States v. Hansen*, 599 U.S. 762 (2023) ................................................................. 18

*Watkins v. United States*, 354 U.S. 178 (1957) ................................................................. 22

<u>STATUTES</u>

5 U.S.C. § 704 ........................................................................................................... 24

*5 U.S.C. § 706* ......................................................................................................... 24

## **TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---|---|
| A | House Committee's February 13 Letter to Columbia |
| B | Agency Defendants' March 7 Press Release |
| C | Agency Defendants' March 13 Demands |
| D | Columbia's March 21 Response |
| E | "Columbia Folds" Committee Tweet on March 21 |
| F | Agency Defendants' March 24 Press Release |
| G | Taskforce on Antisemitism Report #2 |
| H | Koe Declaration |
| I | Soe Declaration |
| J | Moe Declaration |
| K | Loe Declaration |
| L | Noe Declaration |
| M | Roe Declaration |
| N | Exhibit Naration |
| O | Joe Declaration |

## INTRODUCTION

Plaintiffs bring this renewed motion for a preliminary injunction to stop a problem that has only gotten worse since this case was filed. Columbia is not an independent actor. And it is less one now than it was just months ago. With the House Committee surveilling Columbia's disciplinary processes through a still-pending demand for records and federal agencies forcing the school to rewrite campus policies for even a chance again at federal funding, Columbia is not deciding things for itself. What the House Committee and the federal agencies demand, Columbia will provide.

Plaintiffs seek an injunction aimed at ending Columbia's role as the House Committee's and federal agencies' speech suppressor. This means prohibiting the Agency Defendants from using Columbia's federal funding to pressure the school to punish students. It means prohibiting Columbia from producing and the Committee from demanding disciplinary records that the Committee is using to pressure the school to punish students. And finally, the injunction Plaintiffs seek would reverse two obviously illegal policy changes the Agencies compelled Columbia to make—the definition of antisemitism Columbia adopted that establishes an Israel-specific campus speech code and the rule requiring student protestors to identify themselves to Columbia's authorities at all expressive gatherings.

## FACTS

### A. The Committee's February 13 letter demands records about the constitutionally protected political expressions of Columbia's students.

On February 13, 2025, the U.S. House of Representatives Committee on Education and the Workforce (the "Committee") sent a letter Letter (the "February 13 Letter") demanding that Columbia University (the "University") produce "*all* disciplinary records" to the Committee relating to eleven specific events involving protected political expressions

about Israel and Palestine. *See* Exhibit A at 5 (emphasis added). These events regard prototypical expressive activities—a protest against "former Secretary Hilary Clinton," an off-campus art exhibit called "Hind's House," and a Columbia-authorized gathering on October 7, 2024 that was critical of Israel, among other political events Plaintiffs organized or attended. *Id.*

In response, Columbia produced more than 10,000 documents. Dkt. 82-6 at 2. Those documents include the "disciplinary case files related to eleven events at the University." *Id.* While Plaintiffs do not have document-by-document knowledge of Columbia's production, the documents regard the minutiae of Columbia's campus disciplinary processes, which Columbia details exhaustively. Dkt. 82-7 at 4-9.

Beyond the already-produced records, Columbia is creating new records responsive to the February 13 letter. That is because of the "ongoing nature of some of the cases." *Id.* at 82-7 at 4. *See also* Dkt. 82-7 at 7 (explaining that disciplinary records regarding Hind's House are part of a still-growing "omnibus case file covering multiple incidents and numerous reports"). Columbia stands ready to provide the Committee with such "updates" whenever "further developments related to these matters occur." Dkt. 82-6.

The February 13 letter also discloses "promises and commitments [made by Columbia to the Committee] to end or curb" the kinds of political expressions made by students and Plaintiffs at the eleven events. Ex. A at 3. The Committee understands these "promises and commitments" to include punishing Columbia students for organizing and attending the eleven events and others like them. *Id.* Even those involved in the Hind's House art exhibit, the Committee asserts, Columbia must discipline them to vindicate the Committee's mistaken belief that the event "promoted…the exclusion of Jews," *id.*, though Hind's House featured hundreds of paintings—one completed each day since October 7, 2023—made by

2

Jewish artist Meryl Lynn Ranzer.[1]  Dkt. 62 at ¶ 88.

The February 13 Letter thus pressures Columbia "to administer discipline" against the students and student groups involved in the eleven events the Committee lists. Ex. A at 4. The Committee does this by stating its view that these eleven events reflect "rampant antisemitism," that campus officials can and should use its disciplinary powers "to address the pervasive antisemitism," and then threatens Columbia's "billions in federal funding" if campus officials do not "take the steps necessary" to suppress political expressions the Committee disfavors. *Id.* at 2.

### B. Agency Defendants Establish "9 preconditions" Columbia must meet before negotiations about its federal funding can resume

On March 7, 2025, members of the federal government's Joint Task Force to Combat Anti-Semitism—led by the Department of Justice, and including the Department of Health and Human Services, the Department of Education, and the US General Services Administrations—declared the "immediate cancellation of approximately $400 million in federal grants and contracts to Columbia University." Exhibit B - March 7 Press Release. The Agency Defendants did so after contacting Columbia four days prior, explaining that "chaos and antisemitic harassment have continued on and near campus in the [four] days since." *Id.*

Days later, the Agency Defendants issued a letter ("March 13 Letter") addressed to Columbia making a series of demands. *See* Exhibit C – March 13 Letter. The March 13 Letter demands compliance with a set of policy changes as a "precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States

---

[1] Hinds House Collective's multimedia exhibit explores the pro-Palestinian movement with art from around the world, Columb. Daily Spectator (Nov. 13, 2024), https://www.columbiaspectator.com/main/2024/11/13/hinds-house-collectives-multimedia-exhibit-explores-the-pro-palestinian-movement-with-art-from-around-the-world/.

government." *Id.* at 1.

The March 13 letter outlined actions the Agencies demanded Columbia take by March 21, 2025. *Id.* Those actions include: (1) the specific punishments Columbia must impose on particular students, (2) alterations to campus disciplinary processes, (3) the imposition of a requirement that student protestors disclose their identity to campus police, whether they are wearing a mask or not, and (5) the adoption of a definition of antisemitism like the International Holocaust Remembrance Alliance ("IHRA") definition. *See* Dkt. 62 at ¶ 113.

The March 13 Letter's demands are substantial and bear on Plaintiffs directly. For instance, the IHRA definition of antisemitism the Agency Defendants include in their March 13 letter, if adopted by Columbia, makes Plaintiffs' past expressions punishable violations of Columbia's rules. That is because the IHRA definition applies to speech about Israel being a racist state, comparisons between Israel and Nazi Germany, and even a particular focus on Israel's wrongdoing.[2] With all Plaintiffs having spoken out against Israel itself and involved themselves in events and groups to oppose Israel's violence—Exhibit M at ¶ 9; Exhibit L at ¶ 7; Exhibit H at ¶ 2; Exhibit I at ¶ 3-7; Exhibit M at ¶ 6-10; Exhibit O at ¶ 11; Supp. Moe at ¶ 2-3; Khalil at ¶ 5-6—the adoption of something like the IHRA definition would recast these past expressions as harassing and subject to punishment.

The identity disclosure requirements the Agency Defendants demanded also affects Plaintiffs directly. Many pro-Palestine protestors, including some plaintiffs, wear masks at pro-Palestine protests on campus to avoid the systematic, sophisticated efforts to dox and

---

[2] *See* International Holocaust Remembrance Alliance, "Working Definition of Antisemitism," available at https://holocaustremembrance.com/resources/working-definition-antisemitism. (providing "contemporary examples of antisemitism," such as speech that claims Israel "is a racist endeavor," "appl[ies] double standards" to Israel," or "draw[s] comparisons of contemporary Israeli policy to that of the Nazis."

harass online anyone attending such events. *See* Supp. Koe Dec. at ¶¶ 5, 7; Supp. Noe Dec. at  17, 20, 22-23. Columbia's identity disclosure requirement applies to all future expressive events, including those some Plaintiffs intend to either organize or attend.

### C. "Columbia FOLDS!" – House Committee (March 21, 2025).

Columbia capitulated quickly to the Agency Defendants' March 13 demands. On March 21st, Columbia detailed its agreement to do the following things: (1) punish certain students in specific ways, *id.* at ¶ 125; (2) centralize its disciplinary processes, *id.* at ¶ 126; (3) require all persons at such events to disclose their identity to campus police or face arrest. *id.* at ¶¶ 127, 130 and 132; (5) appoint an executive to make recommendations regarding "academic restructuring" and "starting immediately with the Middle East" programs. *id.* at ¶ 131; and (6) adopt a definition of antisemitism that is just like the IHRA definition. see Exhibit E – March 21 Letter.

Observing Columbia's response to the Agency Defendants' March 13 Letter, the Committee Defendants celebrated the triumph: "Columbia FOLDS!" *Id.* at ¶ 124; Exhibit E – House Committee Tweet. The Agency Defendants described Columbia's March 21 commitments as "compliance with the Task Force's preconditions." Exhibit F – March 24 Press Release. And those preconditions would only be "the first step in rehabilitating its relationship with the government."[3] *Id.*

### D. Defendants' actions impact Plaintiffs directly.

Plaintiffs are or were undergraduate students (Exhibit H - ██████████████

██████████████████████████████████

---

[3] Press Release, U.S. Dep't of Health & Human Servs., *Columbia to Comply with Antisemitism Task Force Preconditions, HHS Announces* (Mar. 24, 2025), https://www.hhs.gov/press-room/columbia-comply-anti-semitism-task-force-preconditions-met.html.

██████████████████████████████████████████████████, and graduate students (Exhibit N - Exhibit N at ¶ 3; ██████████████████████ All but ████—a student at Barnard University—are or were enrolled at Columbia. ████████████████ ██ Columbia has a practice of disciplining "active alumni" for past conduct, demonstrating an ongoing disciplinary reach based on Columbia's practices. *Id.* at ¶ 11.

All Plaintiffs have engaged in constitutionally protected speech and expressive activities about Israel and Palestine. (Exhibit M at ¶ 9; Exhibit L at ¶ 7; Exhibit H at ¶ 2; Exhibit I at ¶ 3-7; Exhibit M at ¶ 6-10; Supp. Exhibit O at ¶ 11; Exhibit J at ¶ 2-3; Exhibit N at ¶ 5-6. Plaintiffs feel compelled to speak because they are Palestinian themselves, ██████████████ ████████████████████████████ their own family histories, Exhibit K. at ¶¶7, 9 ; Exhibit I. at ¶7 and the moral obligation they believe they have to stop a genocide, Exhibit L at ¶9; Exhibit H. at ¶3; Exhibit J at ¶3. Even Plaintiff Mahmoud Khalil, imprisoned for his protected speech and advocacy for Palestinian human rights, continues to speak out from his cell at great cost to himself and his family.[4]

Plaintiffs have held a variety of leadership roles in student groups. *See* Exhibit M. at ¶5 ████████████████ Exhibit J at ¶2 ████████████████████████████████ ████████████████████████████; Exhibit K. at ¶10 (███████████████████████ ████████████████████████████████████████████████████ ████████████████████████; Exhibit I at ¶11 (████████████████████████ ████████████████████████████████████████

---

[4] Mahmoud Kahlil, *Mahmoud Kahlil's Letter to His Newborn Son: "You Will See the Last Days of This Genocide"*, The Guardian (May 10, 2025, 6:00 AM EDT), https://www.theguardian.com/commentisfree/2025/may/10/mahmoud-kahlil-letter-to-newborn-son.

███████████████ Exhibit L at ¶5 (███████████████████████). And Plaintiff Mahmoud Khalil played an ongoing role as a "mediator and negotiator between the student body and the University's administration" until his arrest in March. Exhibit N at ¶¶5-6.

Defendants' efforts to suppress pro-Palestine speech have succeeded in altering what Plaintiffs say and do, and how they speak and take action. *See* Exhibit O at ¶ 15 Exhibit K at ¶¶18, 23, 37; Exhibit J at ¶¶10, 11, 19; Exhibit I at ¶¶26, 27, Exhibit O at ¶¶15, 16, 29; Exhibit L at ¶¶24-28. Plaintiffs Joe, Noe, and Soe now avoid using not only Arabic words like "intifada" and protest phrases like "from the river to the sea," but also have avoid the words "Israel" and "Palestine" for fear of punishment. Exhibit L at ¶¶ 25, 33; Exhibit O at ¶15, 29; Exhibit I at ¶27. Other Plaintiffs no longer attend teach-ins, protests, or vigils. Exhibit K at ¶39; Exhibit I at ¶17; Exhibit J at ¶¶11-16; Exhibit L at ¶24.

And all Plaintiffs have faced disciplinary processes for expressing their views about Israel and Palestine. Some directly (Exhibit J at ¶ 22; Exhibit O at ¶ 11-14, 21; Exhibit L at ¶ 17-18; Exhibit N at ¶ 13. Exhibit M at ¶ 19) and others via a student group to which they belong, *see* Exhibit K at ¶ 22 (██████████████████████████████████████ ███████████████████████████████████; Exhibit J at ¶ 19. Exhibit I at ¶ 15; Exhibit O at ¶ 5; Exhibit L at ¶ 19-22; Exhibit M at ¶ 5 (█████████████████ █████████████████).

The chilling affect extends to every corner of campus. Defendants intimidate Plaintiffs, their peers, and their professors into silence, causing a decline in the quality of the education, because of the speech people do not utter in an effort to avoid punishment. Exhibit L at ¶34, Exhibit K at ¶¶18-19, 38; Exhibit I at ¶13; Exhibit O at ¶16.

7

**ARGUMENT**

To receive a preliminary injunction in the Second Circuit, a Plaintiff must prove : (1) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; (2) irreparable harm; and (3) that a preliminary injunction is in the public interest. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). Plaintiffs satisfy these standards.

## I.    Plaintiffs have standing to bring their claims

Plaintiffs can establish Article III standing because they show (1) an injury in fact, (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "[likelihood]" that the injury "will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992)). The Supreme Court further recognizes that overbroad restrictions of speech, like the ones challenged here, create standing for anyone affected by the restrictions, even when such restrictions are lawfully applied to the litigants bringing such claims. *See Moody v. NetChoice*, LLC, 603 U.S. 707, 742 (2024).

Here, Plaintiffs have standing because all Defendants have caused them to suffer an ongoing injury. Additionally, Plaintiffs have pre-enforcement standing because, as discussed in full **ante**, they satisfy the *Susan B. Anthony List* factors. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

### A.  Defendants have inflicted an injury-in-fact on Plaintiffs

An injury in fact must be "concrete, particularized, and actual or imminent." *Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276, 280 (2d Cir. 2023). The injuries here are.

Plaintiffs' injuries are "concrete," because they are traditionally recognized. Plaintiff brings First Amendment claims about viewpoint discrimination, jawboning, and the Government Defendants' unlawful demands for punishment and records. These are classic

violations that give rise to long-recognized injuries. *See Transunion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (explaining that "traditionally recognized" harms include "reputational harms," the "disclosure of private information," and "harms specified by the Constitution itself." *Id.* It is exactly these kinds of harms Plaintiffs seek to remedy, Sec. Am. Compl. ¶¶ 157-197.

Plaintiffs' APA claim is likewise firmly rooted, because it is based on the Agency Defendants' failure to follow Title VI's termination-of-funds procedures. *Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 131 (2d Cir. 2020) ("zone of interests for an APA claim is defined by 'the statute that the plaintiff says was violated,' rather than by the APA itself."); *See* 42 U.S.C. § 2000d1 (requiring an agency cancelling funds subject to Title VI to take certain administrative steps not taken here). These procedures exist to insulate Plaintiffs from exactly the dangers present here—federal agencies using financial leverage to subordinate funding recipients to the Government's will. *See See* CONGRESSIONAL RECORD - HOUSE OF REPRESENTATIVES (Feb. 7, 1964), *available at* https://www.congress.gov/bound-congressional-record/1964/02/07/house-section (describing an approved amendment adding procedures to Title VI as an effort to "bring into play other minds in connection with this question of decision to cut off a federal assistance program.").

Plaintiffs' injuries from the February 13 and March 13 letters are also particularized because, as delineated **post**, the Government Defendants' demands "affect the plaintiff[s] in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, (2016), *as revised* (May 24, 2016). The Committee's February 13 letter calls for *all* disciplinary records related to eleven events . █████████████████████████████████

████████████████████████████████████████

████████████. Disciplinary proceedings regarding Hind's House are still pending, and future records generated by that process are responsive to the February 13 letter when they are created. *See* Dkt. 82-6 (Columbia offers "to provide updates" to the Committee whenever "further developments related to these matters occur")

Both the February 13 and March 13 letters demand that Columbia harshly discipline its students who, like Plaintiffs, express pro-Palestine views. The February 13 letter demands Columbia fulfill its "promises and commitments" to suppress Plaintiffs' pro-Palestine views. Ex. A at 1. And the March 13 letter orders Columbia to adopt a definition of antisemitism, and the definition campus officials select makes Plaintiffs' prior conduct punishable violations of campus rules—just like the IHRA definition. *See* Ex. C at 5; Exhibit G – Columbia Task For on Antisemitism's Report #2 at 44 & Appendix C. This is enough to make Plaintiffs' injuries particularized, because they are "an object of the action…at issue," Lujan, 504 U.S. at 561–62.

Plaintiffs' injuries are also both ongoing and imminent.

The injuries are ongoing, because the February 13 and March 13 letters demanding that Columbia punish its pro-Palestine students have already altered what Plaintiffs do and say. *See* Exhibit O at ¶ 15, 16, 29 Exhibit K at ¶¶18, 23, 37, 39; Exhibit M at ¶ 9; Ex. I  at ¶¶26, 27; Exhibit L at ¶¶24-28. Indeed, the Government Defendants' demands have warped the campus debate in which Plaintiffs—as speakers and listeners—participate.[5] *See Cuesnongle v. Ramos,* 713 F.2d 881, 884 (1st Cir. 1983) (there is "a zone of First Amendment protection for

---

[5] *See Khalil v. Trump, et al., No. 2:25-cv-1963 (MEF)*, ECF #284 (citing numerous declarations of Columbia students and faculty describing the profound chilling effect government surveillance and strong-arming of Columbia, and Columbia's capitulation, has had on the campus, which have also been heavily redacted for fear of retaliation by Congressional and Executive Branch actors).

the educational process itself, which, in proper circumstances, must include not only students and teachers, but their host institutions as well"). Plaintiffs, other students, and faculty will continue censoring themselves to avoid violating the Israel-specific speech code Columbia has adopted. This injury is ongoing because the "pervasive threat" that Columbia will punish its students—per the Government Defendants' demands—is ongoing, posing a constant "danger to the freedom of discussion." *Thornhill v. Alabama,* 310 U.S. 88, 97 (1940).

The injuries are also imminent for two reasons. First, the March 13 letter's successful demand that Columbia adopt a definition of antisemitism makes Plaintiffs' past conduct punishable. Dkt. 62 at ¶ 148. Even if they wanted to, Plaintiffs cannot avoid violating the speech code embedded in Columbia's definition, because they have already violated it. *Id.* Second, because disciplinary proceedings regarding Hind's House and other pro-Palestine events remain ongoing, Columbia is creating new records responsive to the February 13 letter. *See* Dkt. 86-2 at 2; *See also* Dkt. 82-7 at 4-10 (detailing ongoing disciplinary proceedings). The threat of future punishment and additional disclosures makes the injury imminent.

The imminence of the injury is underscored by Columbia's track record of prior disclosures. Here, Columbia has not limited itself to producing records responsive to the Committee's request. On March 19, 2025, Columbia provided disciplinary records *without prompting* because campus officials knew that "the Committee [would] be interested in the disciplinary measures taken" by campus officials against pro-Palestine students. Dkt. 82-8 at 2. Because Columbia is eager to show that it doled out the punishments the Government Defendants are demanding, all Plaintiffs who have faced disciplinary charges are imperiled— whether that discipline relates to the eleven events mentioned in the February 13 letter or not. *See Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 573 (S.D.N.Y.

11

2024) ("The Second Circuit has held . . . that a plaintiff whose private information has been disclosed to third parties has standing to sue regardless of whether the third parties used that information to cause additional harm."). Without the Court's intervention, Columbia will turn over additional records—either newly created records in response to the February 13 letter or non-responsive records meant to show the Committee its punishing pro-Palestine students as directed.

### B. Plaintiffs can also bring a pre-enforcement challenge because the violation of their First Amendment rights is ongoing.

For "preenforcement" challenges, a plaintiff must demonstrate (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that the intended conduct is "arguably proscribed by" the challenged regulation; and (3) that "there exists a credible threat of prosecution thereunder" that is "sufficiently imminent." *Cerame v. Slack*, 123 F.4th 72, 81 (2nd Cir. 2024) (quoting *Susan B. Anthony List*, 573 U.S. at 159). Plaintiffs satisfy these factors.

First, Plaintiffs have all participated in the public debate about Palestine and Israel, a classic example of the "interactive communication concerning political change" the Supreme Court considers to be "core political speech." *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). And Plaintiffs' Koe and Moe, for example, explicitly intend to do so again in the future. *See* Exhibit H at ¶ 10 and Exhibit J at ¶18 (detailing future plans to express things forbidden by Columbia's rules about discussing Israel and Palestine). This "credible statement…of intent to commit violative acts" coupled with a "conventional background expectation" of enforcement is enough to satisfy this prong. *See Act Now to Stop War & End Racism Coal. v. D.C.*, 589 F.3d 433, 435 (D.C. Cir. 2009).

Other plaintiffs have been successfully deterred from expressing forbidden ideas about Palestine and Israel, which also satisfies this prong. The fact that Plaintiffs "feel forced to speak less openly" on topics they've discussed in the past "is more than enough at the pleading stage to assert their desire to engage in a course of conduct affected with a constitutional interest." *Cerame*, 123 F.4th at 83. Indeed, "courts must ask whether the plaintiff would have the intention to engage in the prescribed conduct, were it not proscribed." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024).

Here, each plaintiff deterred makes clear that it is the suppressive efforts of Defendants that is causing them to alter their conduct. *See, e.g.*, Roe Supp. Dec. at ¶ 7 (Roe avoids even saying or writing the words Israel, let alone critiquing its government); Moe Supp. Dec. at ¶ 11 (Moe no longer holds expressive events); Joe Supp. Dec. at ¶¶ 19-20 (████████████ ███████████████████████████████████ and no longer wears a Keffiyeh or expresses her Palestinian identity); Loe Supp. Dec. at ¶¶ 32-35, and 37 (Loe no longer wears a Keffiyeh, avoids attending demonstrations, and avoids using specific words when describing what is happening in Palestine); Koe Supp. Dec. at ¶ 5 (████████████████████ ████████████████████████████████████); Noe Supp. Dec. (Noe avoids discussing Palestine, takes extraordinary measures when he does discuss Palestine, and no longer wears a Keffiyeh); Soe Supp. Dec. at ¶¶ 22, 29-31(Soe wears a mask to avoid being identified, avoids discussing Palestine or criticizing Israel in class, and is careful about what she says about demonstrations).

Finally, there is a credible and sufficiently imminent threat of prosecution. *Susan B. Anthony List*, 573 U.S. at 159. A threat of prosecution is presumed when what is challenged "facially restrict[s] expressive activity." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022).

Here, Columbia's new definition of antisemitism restricts expressive activity on its face, because the definition is explicitly subjective. *See* Ex. G at 44. It was drawn up "based on the reported experiences of Jews and Israelis at Columbia." *Id.* at Appendix C. In other words, Columbia is letting some of the students offended by Plaintiffs' speech decide whether or not the speech is antisemitic. Given this definition of antisemitism, the Court can presume future enforcement.

### C. Plaintiffs' injuries are traceable to all Defendants and can be redressed by this Court.

The other two standing factors—traceability and redressability—are also met. To show traceability, Plaintiffs must have injuries that are "fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. But because traceability "requires no more than de facto causality," it permits a theory based on the "predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

Here, the Committee is compelling Columbia to produce *all* student disciplinary records related to eleven expressive events while demanding Columbia discipline its pro-Palestine students, including Plaintiffs who helped organize the Hind's House art exhibit. *See* Ex. A at 2. The Agency Defendants likewise demand punishment, requiring Columbia to meet preconditions that coerce campus officials into disciplining its pro-Palestine students or permanently lose federal funding. Ex. C at 1. The "predictable effect" of this coercion is the chill imposed on all campus expressions—in the classroom and quad—as Columbia's students attempt to avoid running afoul of the Israel-specific rules campus officials have adopted.

There are a number of ways this Court can redress the injuries at issue here. First, this Court can narrow or quash the Committee Defendant's February 13 Letter demanding individual student records or enjoin Columbia's compliance with such demands. Ex. A. This is something that courts do all the time with regards to subpoenas, and there is no reason why it cannot do so for the informal requests made in the February 13 Letter. *See, e.g.*, *United States v. American Tel. & Tel. Co.*, 419 F. Supp. 454, 461 (D.C.C. 1976) (enjoining AT&T from complying with a Congressional subpoena without the prior authorization of the Executive Branch), *aff'd in part*, *U.S. v. American Tel. & Tel. Co.*, 551 F.2d 384 (D.C. Cir. 1976); *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 733 (D.C. Cir. 1974) (finding the congressional subpoena by the House Judiciary Committee "too attenuated and too tangential to its functions" to require compliance); *see National Abortion Fed'n v. Center for Med. Progress*, 2015 WL 5818863, at *1 (N.D. Cal. Oct. 6, 2015) (recognizing that "case law allows courts to modify or quash Congressional subpoenas in order to protect constitutional rights from infringement by Congress").

Second, the Court can enjoin any of the policy changes Columbia made in response to the Agency Defendants' March 13 demands. Plaintiffs' proposed order, for example, seeks an injunction that blocks campus officials from using their newly-adopted definition of antisemitism for disciplinary or law enforcement purposes. That definition puts Plaintiffs at odds with the campus rules, because of their past conduct and future plans. Exhibit M at ¶ 9; Exhibit L at ¶ 7; Exhibit H at ¶ 2; Exhibit I at ¶ 3-7; Exhibit M at ¶ 6-10; Exhibit O at ¶ 11; Supp. Moe at ¶ 2-3; Khalil at ¶ 5-6. A preliminary injunction against the definition redresses this problem by relieving Plaintiffs from the present threat of future punishment campus

15

officials could otherwise impose for violations of the speech code Columbia was compelled to adopt.

Third, the Court can enjoin Columbia from requiring "individuals participating in demonstrations" to disclose their identity to campus officials, whether they are wearing a mask or not. Ex. D. This ongoing disclosure requirement affects Plaintiffs who have not yet graduated, including Plaintiff Soe who was arrested by campus officials for violating this identity disclosure requirement. Ex. I at ¶¶ 20-24.

Fourth, the Court can order the Agency Defendants to reverse the funding pause it imposed on Columbia. The Agency Defendants are using that funding pause to demand Columbia suppress political expressions Plaintiffs and other pro-Palestine students have made and plan to make in the future. In fact, there are ongoing disciplinary proceedings against Plaintiffs right now, including about the Hind's House art exhibit. *See* Dkt. 82-6. A preliminary injunction unpausing Columbia's funding undoes the Agency Defendants' illegal jawboning of campus officials and is a necessary precondition for Columbia to stop being a state actor. *See Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 263, 77 S. Ct. 1203, 1218 (1957) (recognizing the academic freedom of universities as a First Amendment right).

What Defendants have done, this Court can undo.

## II.    Plaintiffs' claims are likely to succeed on the merits.

The Committee and the Agencies do the same illegal thing—both coerce Columbia to use punishment to suppress a disfavored viewpoint on campus. Ex. A; Ex. C.The Committee and Agencies do so differently. The Agency Defendants coerce Columbia via viewpoint-discriminatory campus policies they have required Columbia to adopt, as a precondition of receiving its federal funds back. The Committee does so via its still-pending February 13 letter.

That letter demands disciplinary records but also for campus officials to deliver on the "promises and commitments" Columbia previously made to the Committee to "end or curb" pro-Palestine expressions. Both are illegal.

So is Columbia's response, which is attributable to the Government Defendants, because "the State compelled the conduct." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014). Or at least gave enough "significant encouragement" to make the two campus policies "attributable to the state." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008). Columbia's status as a state actor under the compulsion and close nexus tests is well earned.

### A. The definition of antisemitism the Agency Defendants' coerced Columbia into adopting makes illegal viewpoint discrimination the centerpiece of campus discipline.

With regards to the definition of antisemitism Plaintiffs challenge, Columbia's response to the Agency Defendants' demand makes the former a state actor because the state was involved with "the activity that caused the injury." *Schlein v. Milford Hosp., Inc.*, 561 F.2d 427, 428 (2d Cir. 1977). The Agency Defendants demanded that Columbia adopt a definition of antisemitism on March 13, 2025 as a "precondition" for negotiating Columbia's federal funding. In response, on March 21, 2025, Columbia did exactly as they were asked and adopted a definition of antisemitism. The cause and effect is perfect here.

The definition of antisemitism Columbia adopted exposes all Plaintiffs to punishment because all Plaintiffs have sharply criticized Israel. *Id.* at ¶¶ 113, 148, 179, 195. *All* Plaintiffs have expressed pro-Palestine views, using prohibited phrases and making prohibited historical comparisons. *Id.* at ¶¶ 34, 147-48. These protected political expressions violate the antisemitism definition the Agency Defendants compelled Columbia to adopt. *See* See id. at

¶ 69 (Columbia's former president describing a political slogan all Plaintiffs use as "antisemitic"). And there is no legitimate purpose in punishing those protected political expressions.

Columbia's new definition of antisemitism includes whatever some Jewish or Israeli students find offensive. That is because it was drawn up "based on the reported experiences of Jews and Israelis at Columbia." Antisemitism Report at Appendix C. This "inductive" definition considers an expression antisemitic if some Jewish and Israeli students are offended by it. That includes advocating for a boycott of Israel, which causes some Jewish and Israeli students to "avoid[] or end[] membership" in student groups that so advocate. Antisemitism Report at 19. It includes criticizing Zionism, which might "shock[] and offend[]" some Jewish and Israeli students. *Id.* at 60. And wearing keffiyehs as well. *See* Andrew Lapin, "I was triggered: Some Jews are struggling as they encounter keffiyehs' in their daily lives," Jewish Telegraphic Agency (November 20, 2024), available at: https://www.jta.org/2024/11/20/united-states/jews-struggle-with-how-to-react-to-seeing-keffiyehs-in-public.

While Columbia did not adopt the IHRA definition of antisemitism, its meaning is relevant to understanding the viewpoint discrimination the Agency Defendants are demanding Columbia implement. In the Agency Defendants' opposition, Plaintiffs explained the viewpoint discrimination embedded in the IHRA definition that governs what the Department of Education considers to be antisemitic. *See* Executive Order 13899. To the extent that the definition of antisemitism Columbia adopted is ambiguous, it should be read in light of the IHRA definition's viewpoint-discriminating meaning. *See*, *e.g.*, *Students for Just. in Palestine, at Univ. of Houston v. Abbott*, No. 1:24-CV-523-RP, 2024 WL 4631301, at *10

18

(W.D. Tex. Oct. 28, 2024) ("the Court finds the incorporation of this specific definition of antisemitism is viewpoint discrimination" because it "labels calling the State of Israel a racist endeavor and drawing comparisons of contemporary Israeli policy to that of the Nazis as antisemitic"). The IHRA definition, like the one Columbia ultimately adopted, discriminates against pro-Palestine viewpoints. *See Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020) (when a law "includes an explicit definition," a court "must follow that definition, even if it varies from a term's ordinary meaning").

At bottom, the Agency Defendants' demand that Columbia adopt a definition of antisemitism has warped the campus debate in which Plaintiffs—as speakers and listeners—participate. *See Cuesnongle v. Ramos,* 713 F.2d 881, 884 (1st Cir. 1983) (there is "a zone of First Amendment protection for the educational process itself, which, in proper circumstances, must include not only students and teachers, but their host institutions as well"). Plaintiffs, other students, and faculty will continue censoring themselves to avoid violating the Israel-specific speech code Columbia has adopted, a categorical problem that unlocks facial relief. *See United States v. Hansen*, 599 U.S. 762, 770 (2023) ("the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak."). The Court should enjoin the Agency Defendants from demanding and the University Defendants from enforcing the definition of antisemitism Columbia adopted on March 21, 2025.

### B. Columbia's identify-yourself-when-you-protest rule violates the First Amendment right to anonymous speech

The Agency Defendants demanded that Columbia "ban masks that are intended to conceal identity or intimidate others." Ex. B at 2. To comply with that demand, Columbia adopted a rule that applies only to "individuals participating in demonstrations." Ex. D at 2. Because Columbia

adopted that rule in response to the Agency Defendants' coercive demands, it is attributable to the state under the compulsion test. *Rendell-Baker v. Kohn,* 457 U.S. 830, 838 (1982) (the "ultimate issue" in determining whether a private entity is a state actor is whether "the alleged infringement of federal rights [is] fairly attributable to the State"). Because the Agency Defendants have enmeshed themselves in Columbia's campus rules, this identity disclosure rule is state action under the close nexus test.

Columbia's rule requires "all individuals who engage in protests or demonstrations," whether or not they are wearing a mask, to identify themselves to campus officials or face "discipline, being escorted off campus, and detention for trespass." This violates Plaintiffs' right to speak anonymously.

The Supreme Court has long recognized that the First Amendment protects the right to speak anonymously—specifically to avoid government censure. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, (1995) ("Anonymity is a shield from the tyranny of the majority…to protect unpopular individuals from retaliation -- and their ideas from suppression -- at the hand of an intolerant society"). Compelling Plaintiffs and other pro-Palestine students to disclose their identities at protests will deprive them of this shiled and thus harm their ability "to pursue collective effort to foster beliefs which they admittedly have the right to advocate.." *NAACP v. Alabama*, 357 U.S. 449, 462-63 (1958).

Columbia's disclose-your-name-to-the-police-at-the-protest rule is a presumptive violation of the First Amendment because it "compels personal name identification at the precise moment when [Plaintiffs'] interest in anonymity is greatest." *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 200 (1999). Plaintiffs want to appear at protests with masks to benefit from the anonymity-based protections those masks provide. These measures protect

Plaintiffs from fellow students who take pictures and video of pro-Palestine protestors in an effort to publicly embarrass them. [Koe Decl. at ¶6,7; Loe Decl at ¶ 34]. Columbia's new rule means that Plaintiffs and others are forced to disclose their names to campus officials whenever they attend a protest. To avoid this rule, many will not go.

Federal courts have repeatedly recognized that the government violates the First Amendment when it bans the wearing of masks so that it can identify, target, and retaliate against dissenting voices. *See*, *e.g.*, *Ryan v. County of DuPage*, 45 F.3d 1090, 1095 (7th Cir. 1995) (noting that "there is no real conflict" as to "whether prohibitions against appearing masked in a public place violate the First Amendment" because all relevant cases address "the absence of appropriate, speech-related exceptions"), *Ghafari v. Municipal Court for the San Francisco Judicial Dist. of the City*, 87 Cal. App. 3d 255, 260, 150 Cal. Rptr. 813 (Cal. Ct. App. 1978) (striking law flatly prohibiting anonymous public appearances as "inhibiting the exercise of free speech or exposes the speaker who dares, to retaliation….").

This is consistent with Second Circuit precedent— despite Defendants' contentions. Dkt. 86 at 19. In fact, the Second Circuit has explicitly recognized that the disclosure of names and identities violates Plaintiffs' First Amendment rights to anonymous speech. *See Church of the Am. Knights of the KKK v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004) ("These Supreme Court decisions establish that the First Amendment is implicated by government efforts to compel disclosure of names in numerous speech-related settings"). In *Kerik*, the Second Circuit declined to strike down a mask ban precisely because the only injury at issue was that plaintiffs' faces were revealed—not that their names and identities were being collected for reprisal based on the content of their speech. *Compare Kerik*, 356 F.3d at 209, *with Buckley*, 424 U.S. at 74 ("Plaintiffs "need show only […] reprisals from either Government officials or private parties"). Agency Defendants'

identification requirements—and the mask ban that facilitates it—are the kind of forced identity disclosure and "substantial restraint[s]" the Second Circuit makes clear are prohibited by the First Amendment. *Kerik*, 356 F.3d at 197, *citing NAACP*, 357 U.S. at 462-63.

### C. The Agency Defendants' pause on Columbia's funding violates the APA (because it violates the First Amendment) and Title VI's procedural requirements.

While Plaintiffs' substantive APA claim mirrors their First Amendment claim, Plaintiffs' procedural APA claims is based on the Agency Defendants' failure to follow Title VI's requirements prior to terminating Columbia's funding. Both provide independent bases to enjoin the Agency Defendants' funding pause.

The substantive APA claim is based on the funding pause the Agency Defendants are using to coerce Columbia into doing as directed, and it is unlawful for the reasons explained above. The funding pause is the mechanism the Agency Defendants are using to turn Columbia into its jawbone. If enlisting Columbia into doing its bidding is illegal, the means of doing so (a funding pause) are illegal as well.

The procedural APA claim also warrants unpausing Columbia's withheld funds. That is because, though the Agency Defendants repeatedly invoked Title VI to justify its conduct, the Agency Defendants did not follow Title VI's procedures. Those procedures regard notice, a hearing, and other formal steps federal agencies must take prior to cancelling Title VI funds. [42 U.S.C. § 2000d1]. While the Agency Defendants now deny using Title VI, [Dkt. 88 at ¶ 17], the Columbia Defendants agree with Plaintiffs. *See* ECF No. 84, at 21 ("Columbia is subject to regulatory oversight under Title VI [42 U.S.C. § 2000d1] the Agency Defendants stated that they were acting pursuant to that regulatory power over Columbia").

### D. Columbia's further compliance with the Committee's February 13 letter violates the First Amendment

The Committee's investigative power is "justified solely as an adjunct to the legislative process." *Watkins v. United States*, 354 U.S. 178, 196–97 (1957). Congressional demands for information, therefore, cannot be made "for the purpose of law enforcement," a power assigned to the other branches of government. *Mazars USA*, 591 U.S. at 863.

But punishment is exactly the Committee's purpose. The February 13 letter complains that campus officials have not followed through on "promises and commitments" Columbia made to the Committee "to end or curb" the kinds of political expressions made by students and Plaintiffs about Palestine and Israel. *Id.* The Committee Defendants explain what Columbia should do: campus officials must "administer discipline" against pro-Palestine students so that disfavored expressions do not "continue to take place." Thus, the demand for records is just a way of confirming that campus officials have fulfilled the "promises and commitments" they made to the Committee to punish Plaintiffs and other pro-Palestine students.

Even for incidents involving violations of campus rules, it is beyond the Committee's authority to dictate how a university disciplines its students. The Constitution protects "'the four essential freedoms' of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy*, 354 U.S. at 263. *See also Hosty v. Carter*, 412 F.3d 731, 736 (7th Cir. 2005) ("academic freedom includes the authority of the university to manage an academic community and evaluate teaching and scholarship free from interference by other units of government"). Columbia has been deprived of many of those freedoms, to Plaintiffs' detriment.

The Committee Defendant's February 13 Letter is singularly focused on punishing students for even minor expressions of protest against the genocide with no apparent

relevance to a legislative purpose. An off campus art exhibit, the Committee claims, is bigoted. So is a protest marking October 7, 2024 as the first anniversary of the start of Israel's genocide in Gaza. The February 13 letter also seeks student records for an incident where students "used bullhorns inside an academic building during a course taught by former Secretary of State Hillary Clinton," and campus officials did not punish students involved. Exhibit A - February 13 Letter at 2. While the Committee may disagree with Columbia's approach in disciplining students, it was and is Columbia's right to decide against punishing students who gathered for a peaceful sit-in to criticize a leading political figure on an issue of great public concern. After all, there is nothing antisemitic about protesting Hillary Clinton.

The only explanation for this unprecedented overreach is a desire to suppress a disfavored viewpoint. But that violates the First Amendment. *See NetChoice*, 603 U.S. at 742 ("the government may not 'restrict the speech of some elements of our society in order to enhance the relative voice of others.") (citing *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976)).

Congressional investigations cannot "inquire into private affairs unrelated to a valid legislative purpose," nor can they "extend to an area in which Congress is forbidden to legislate[,]" such as suppressing speech based on viewpoint, and more particularly, speech regarding issues of great public concern. *Quinn v. United States,* 349 U.S. 155, 161 (1955). Here, the Committee's focus demands for punishment and disciplinary records reveals an unlawful purpose—the "suppression of free expression"—and such a purpose "may not [be] pursue[d] [] consistent with the First Amendment." *NetChoice*, 603 U.S.at 742.

### E.  The Agency Defendants exceeded their authority under Title VI by ignoring all statutory procedures.

Plaintiffs are entitled to APA review of the Agency Defendants' decision to freeze Columbia's funding for two reasons. First, the decision to pause funding to Columbia is final

24

agency action. 5 U.S.C. § 704. That is because it fixes the legal relationships between Columbia and the Agency Defendants—both financially by withholding money from Columbia and non-financially by leveraging the funding pause to compel policy changes that violate the Free Speech Clause and impact Plaintiffs directly.  *See* Exhibit B - March 13 Letter, Exhibit D – March 21 Letter, Exhibit E – March 24 Letter Furthermore, the APA claim targets the Agency Defendants' failure to follow Title VI's intricate statutory and regulatory scheme that is designed to protect students and institutions from bad actors using the federal government's overwhelming financial leverage to accomplish unlawful ends. *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990) (holding that an agency "must abide by its own regulations"). The injuries Plaintiffs accrued as a result of the Agency Defendants exceeding their Title VI authority places Plaintiffs' claims "within the zone of interests protected by the law." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014); *See also 5 U.S.C. § 706* (the APA requires courts to "set aside agency action" whenever it is "in excess of statutory…authority" or "without observance of procedure required by law"). In short, the funding pause is based on authority that Title VI does not give the Agency Defendants and ignored (but required) procedures.

The purpose of the funding pause is also critical. The funding pause is the means by which the Agency Defendants are doing "indirectly what [they are] barred from doing directly," *Vullo*, 602 U.S. at 189. Government officials would normally be unable to micromanage Columbia's campus disciplinary processes but, having paused Columbia's funding and threatening to summarily remove billions more, Columbia will do what is asked of it.  The University Defendants' March 21 response is irrefutable proof of that.

And with "no other adequate remedy," this Court must consider Plaintiffs' APA claim. *Bennett v. Spear*, 520 U.S. 154, 157 (1997). There is no alternative mechanism by which Plaintiffs could challenge the Agency Defendants' decision to pause funding to Columbia until Plaintiffs' speech is adequately suppressed. *See also AAUP v. Rubio,* (denying the Government's motion to dismiss similar APA claim because Plaintiff-specific relief "does not address the broader injury alleged by Plaintiffs," which included the "ability to hear from and associate" with students and faculty intimidated into silence and isolation).

### III.  The Remaining Preliminary Injunction Factors Also Weigh in Favor of Plaintiffs.

Upon establishing a likelihood of success on the merits, the remaining preliminary injunction factors automatically weigh in favor of Plaintiffs. Adjudication of the first factor subsumes the remaining factors because the injuries for which the Plaintiff seeks the Court's relief concern their right to free speech, thus irreparable harm is presumed if the constitutional injury is proven. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Similarly, the fact that Plaintiff's free speech claim is against the government means that "the third and fourth factors, harm to the opposing party and the public interest, merge[,]" *Nken v. Holder*, 556 U.S. 418 (2009), because "neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance[,]" s*ee, e.g., KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). As such, because Plaintiffs have shown they are likely to succeed on the merits, the remaining factors are presumed in their favor, and they are entitled to a preliminary injunction.

In the Court's April 4 decision denying Plaintiffs' prior motion for preliminary injunction, the Court asked Plaintiffs to "address their risk of irreparable harm" in any renewed motion. Dkt. 54 at 1. That risk, however, is not only that Columbia's definition of antisemitism and disclose-your-name-to-the-police-at-the-protest policy "may only potentially affect speech." Dkt. 54 at. The risk, rather, is "presumed" here because these campus policies "directly limi[t] speech." *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 350 (2d Cir. 2003). The definition of antisemitism makes disfavored expressions about Palestine punishable. The disclose-your-name-to-the-police-at-the-protest does the same for anonymous protesting. An injunction against these two campus policies will fully prevent the policies from violating Plaintiffs' rights. *Id.* at 342 ("the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights").

The Committee's still-pending February 13 letter (and Columbia's ongoing response to it) similarly provides this Court with an easy and effective injunctive opportunity. The Court can enjoin Columbia's further compliance with the Committee's February 13 letter. Columbia is still creating new records responsive to the Committee's still-pending February 13 letter. That is because of ongoing disciplinary proceedings about various expressive activities, including the Hind's House art exhibit that many Plaintiffs helped organize. A narrow injunction against the Committee's February 13 letter—prohibiting Columbia from providing student disciplinary records and the Committee from demanding them—will certainly prevent the future disclosure of records Columbia holds about Plaintiffs that are protected by the First Amendment.

## CONCLUSION

For the reasons explained above, this Court should grant Plaintiffs' motion for a preliminary injunction and enter the proposed order filed here.

Dated: June 20, 2025                      Respectfully Submitted,

/s/  Amy E. Greer

Amy E. Greer (NY 5910179) (lead counsel)
**Dratel & Lewis**
29 Broadway, Suite 1412
New York, NY 10006
(212) 732-8805
agreer@dratellewis.com

**CAIR NATIONAL**
**LEGAL DEFENSE FUND**
/s/Lena Masri
Lena Masri
Gadeir Abbas (VA 81161)*
Nadia Bayado (DC 90023648)
453 New Jersey Ave SE
Washington, DC 20003
(202) 742-6420

**COUNCIL ON AMERICAN ISLAMIC**
**RELATIONS – NEW YORK**
/s/Lamya Agarwala
Lamya Agarwala (NY 5736061)
80 Broad Street, 5th Floor
New York, NY 10009
(646) 665-7599
lagarwala@cair.com

**Jonathan Wallace**
/s/ Jonathan Wallace
Jonathan Wallace (NY 1733757)
PO #728
Amagansett NY 11930
(917) 359-6234
jonathan.wallace80@gmail.com

*Licensed in VA, practice limited to federal matters*

28

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this opposition contains 7,948 words.

 /s/ *Gadeir Abbas*
Gadeir Abbas
