

# COLUMBIA UNIVERSITY
## IN THE CITY OF NEW YORK

## REPORT #2

COLUMBIA UNIVERSITY STUDENT EXPERIENCES OF ANTISEMITISM AND RECOMMENDATIONS FOR PROMOTING SHARED VALUES AND INCLUSION

TASK FORCE ON ANTISEMITISM

**AUGUST 2024**

Cited in Khalil v. Trs of Columbia Univ
25-cv-2079 Decided 3/19/26
Archived on 3/25/26
This document is protected by copyright.
Further reproduction is prohibited without permission.

**Report #2: Columbia University Student Experiences of Antisemitism and Recommendations for Promoting Shared Values and Inclusion**

**Task Force on Antisemitism[1]**

**August 30, 2024**

Cited in Khalil v Trs of Columbia Univ 25cv2079 Decided 3/19/26 Archived on 3/25/26 This document is protected by copyright. Further reproduction is prohibited without permission.

---

[1] This report reflects the research, analysis and drafting of members of the Task Force's policy working group: Ester Fuchs (Co-Chair, SIPA and Political Science), Clémence Boulouque (Department of Religion), Jeremy A. Dauber (Department of Germanic Languages), Rebecca Kobrin (Department of History), and Deborah Valenze (Affiliate Co-Chair, Barnard College). Extensive analysis and input also was provided by the other members of the Task Force: Nicholas Lemann (Co-Chair, Journalism School), David M. Schizer (Co-Chair, Law School), Peter Coleman (Affiliate Co-Chair, Teachers College), R. Glenn Hubbard (Business School), Magda Schaler-Haynes (Mailman School of Public Health), Nir Uriel (Columbia University Irving Medical Center), Matthew C. Waxman (Law School), and Gil Zussman (Fu Foundation School of Engineering and Applied Science).

**Table of Contents**

Executive Summary                                                                                              4

Introduction                                                                                                    8

 I. Antisemitism on Campus: Student Experiences and Testimonies                                 11

   A. Introduction                                                                                            11

   B. Student Experiences in Day-to-Day Encounters (Including Dorm Life and Social Media)        13

   C. Student Experiences in Clubs                                                                           18

   D. Student Experiences in the Classroom and with the Curriculum                                     22

   E. Student Experiences During Protests and the Encampment                                          29

   F. Israeli Students' Unique Experiences                                                                 26

   G. What We Learned from the Listening Sessions and Reports                                          32

II. Recommendations for Promoting Shared Values and Inclusion:
   Improving the Campus Environment                                                                        39

   A. Introduction                                                                                           39

   B. Anti-bias and Antisemitism Trainings, Workshops, and Informational Websites                      42

     1. Recommendations for Who Should Receive Trainings and Workshops                               43

     2. Recommendations for How Trainings and Workshops Should Be Implemented and What
        Content to Consider                                                                               43

     3. *A Working Definition of Antisemitism*                                                           45

     4. Training and Workshops Recommended for Students and All Members of the University
        Community Who Engage with Students                                                               47

     5. Proposals for Speakers, Convenings, and Panel Discussions Specifically on Antisemitism      48

     6. Customizing Trainings, Workshops, and Resources for Different University Constituencies
        and Schools                                                                                       49

     7. Recommendations for Evaluating the Effectiveness of Training                                  55

   C. Reporting Experiences of Exclusion, Harassment, Bias, and Discrimination and
      Mediation Procedures for Resolving Incident Reports that Don't Involve Title VI                 56

     1. Current Process and Recommendations for Filing a Report                                       56

     2. Current Process and Recommendations for Mediating and Resolving Disputes                     59

     3. Consistency and Coordination between Diversity Equity and Inclusion (DEI) and Deans of
        Students Offices                                                                                  60

   D. Recommendations for Student Groups and Clubs                                                      62

     1. Why Change University Policy?                                                                    64

     2. Recommendations for Promoting Pluralism and Avoiding Discrimination                           74

   E. Inclusion in the Classroom                                                                         75

Conclusion                                                                                                  77

Cited in Khalil v. Trustees of Columbia Univ. 25-cv-2079 Decided 3/19/26. Archived on 3/23/26. This document is protected by copyright. Further reproduction is prohibited without permission.

What We Need from the University                                                          78
Appendices                                                                                80
  A. Listening Session Outreach                                                  80
  B. Columbia Student Op-Eds with Allegations of Antisemitism                     85
  C. Examples of Incidents Experienced by Many Jewish and Israeli Students as Antisemitism   86
  D. Sources: Trainings, Websites, and Scholarship on Antisemitism                89
    1. Additional Suggestions for Trainings                             89
    2. The Institute for Israel and Jewish Studies                      90
    3. Selected Scholarship on Antisemitism                             90
    4. Selected Training Resources on Antisemitism                       92

Cited in Khalil v Trs of Columbia Univ
25cv2079 Decided 3/19/26
Archived on 3/25/26
This document is protected by copyright.
Further reproduction is prohibited without permission.

**Executive Summary**

The demonstrations that roiled our campuses during the past academic year uncovered deep disagreements about the mission of our University. During those months, consensus around the University's formal rules and informal norms of behavior broke down, interfering with our charge to educate students and engage in research.

In addition, the testimonies of hundreds of Jewish and Israeli students have made clear that the University community has not treated them with the standards of civility, respect, and fairness it promises to all its students.

After October 7, many Jewish and Israeli students began to report multiple instances of harassment, verbal abuse and ostracism, and in some cases physical violence. Given the volume of these reports, the Task Force invited all students—not just Jewish and Israeli students—to tell us their stories. Over the course of the spring, nearly five hundred students offered testimonials, at over 20 listening sessions, which provided invaluable insights into the campus climate during these troubled times. These student stories are heartbreaking, and make clear that the University has an obligation to act.

This report recounts student experiences in a wide variety of venues—day-to-day encounters, including dorm life and social media; clubs; and the classroom. Unfortunately, some members of the Columbia community have been unwilling to acknowledge the antisemitism many students have experienced—the way repeated violations of University policy and norms have affected them, and the compliance issues this climate has created with respect to federal, state, and local anti-discrimination law. Many of the events reported in the testimonials took place well before the establishment of the encampments and the takeover of Hamilton Hall; the experiences reported during that period were even more extreme.

We heard about troubling incidents from a diverse group of Jewish students from across the political spectrum; and, even more pronouncedly, from Israeli students, whose national origin both make them members of a specifically protected class under federal law and frequently has caused them to be singled out for particularly terrible treatment.

Students also reported that their efforts to seek redress from the University for the hostility and bigotry they were encountering were often unsuccessful. Many students did not understand how to report these incidents. Although some faculty and staff responded with compassion and determination, others minimized the concerns of these students, reacting sluggishly and ineffectively even to the most clear-cut violations. Even students who had successfully reported an incident spoke of a recurring lack of enforcement of existing University rules and policies.

The experiences of these students demonstrated that there is an urgent need to reshape everyday social norms across the campuses of Columbia University. We need to promote a richer ethic of

Cited as Khalil v. Ts. of Columbia Univ., 25cv2079 (S.D.N.Y. Decided 3/19/26). Archived on 3/25/26. This document is protected by copyright. Further reproduction is prohibited without permission.

4

pluralism, which would encourage greater tolerance of and respect for differences in religion, culture, and national origin. If we were really to succeed in promoting tolerance, students would come to understand and value these differences.

But we are a long way from there. The problems we found are serious and pervasive. We recognize that the University is not monolithic, and the environment at some schools is especially challenging. A wide range of responses is needed—indeed, a broader range than we discuss in this report (which focuses on training, defining antisemitism, reporting, and rules for student groups) and in our last report (which focused on the rules governing protests). We do not want to give the impression that the recommendations here are all that is required. We will address other issues in future reports.

In this report we draw on the many accounts shared with us over the past several months to produce a working definition of antisemitism. Instead of relying on an existing definition, we crafted a working definition that is rooted in recent experiences at Columbia:

> Antisemitism is prejudice, discrimination, hate, or violence directed at Jews, including Jewish Israelis. Antisemitism can manifest in a range of ways, including as ethnic slurs, epithets, and caricatures; stereotypes; antisemitic tropes and symbols; Holocaust denial; targeting Jews or Israelis for violence or celebrating violence against them; exclusion or discrimination based on Jewish identity or ancestry or real or perceived ties to Israel; and certain double standards applied to Israel.

This working definition draws on experiences of many Jewish and Israeli students, who were on the receiving end of ethnic slurs, stereotypes about supposedly dangerous Israeli veterans, antisemitic tropes about Jewish wealth and hidden power, threats and physical assaults, exclusion of Zionists from student groups, and inconsistent standards. We propose this definition for use in training and education, not for discipline or as a means for limiting free speech or academic freedom.

This report also identifies significant problems in university policy and practice and makes recommendations for fixing flawed administrative systems, improving campus climate, and building consensus for a more inclusive and pluralistic university. Specifically, we recommend anti-bias and inclusion trainings for students, resident advisers, resident assistants, teaching assistants, student-facing staff, and faculty. In a community dedicated to freedom of speech and pluralism, we must prepare students with different views and backgrounds to engage with each other. We must encourage mutual respect, tolerance, civility, and an open learning environment.

We also recommend in-person workshops about antisemitism and Islamophobia, as well as a range of optional training and workshops for others in our community, including on implicit bias and stereotypes, bystander interventions, and having difficult conversations.

5

Given the urgent need to train administrators who play critical roles in responding to student needs, we also suggest a range of trainings in dispute resolution.

As part of this effort, we recommend that the Interim President and Provost establish a Cross-School Committee that includes all schools at Columbia, along with Barnard College and Teachers College, to share information and establish a baseline standard for trainings, workshops, and website information for all schools. The Committee should aim to overcome the problem of decentralization within Columbia, which is a barrier to maintaining common objectives across the many spaces shared by undergraduate and graduate students.

We also recommend that the University establish a repository for best practices in anti-bias and inclusion trainings and that it develop a plan for evaluating these programs.

Customized trainings aimed at specific constituencies are particularly important, including first year orientation and new student orientation for graduate programs—a recent area of focus for University Life—and new faculty orientation at all Columbia schools, including affiliate schools, Barnard College, and Teachers College. We recognize that University Life has been working to update and improve its training for student orientation.

We call attention to the need to train teaching assistants (TAs) in sensitivity to bias, exclusion, and antisemitism. Currently, the online course required for all Columbia TAs, available through the Equal Opportunity and Affirmative Action (EOAA) website, lacks guidelines on diversity, inclusion, and bias. TAs need guidance on how to respond to classroom scenarios that stray into discrimination and bias; currently, they are told that no single best practice exists. We recommend giving attention to topics related to race, religion, and national origin in all their complexity. We point to several excellent models offered by other universities in guiding TAs and first-time instructors.

Resident assistants and advisers (RAs) are another group in need of customized training; we offer suggestions for how RAs can foster better attention to inclusion, identification of bias, and elimination of harmful behavior signaling derision and hatred. RAs must fully understand their role as leaders in inclusion: they need to be prepared to listen with respect and to mediate conflicts.

In place of the confusing multiplicity of reporting structures that currently exist, we suggest ways of revamping procedures so that students are not discouraged from speaking with advisors and administrators about prejudicial treatment. Transparency and consistency in how we handle student reports of bias and exclusion are of the utmost importance if we want students to share their experiences. Our aim is for students to engage with faculty or staff who can resolve conflicts before situations rise to the level of legal violations. Antisemitism complaints deserve careful attention from deans and administrators, alongside all forms of bigotry and discrimination.

6

We also recommend ways to ensure that student groups contribute to the University's pluralist mission and comply with anti-discrimination law. Unfortunately, we have heard from many Jewish and Israeli students who have been excluded from student groups because of their Zionist beliefs. This is not acceptable. Student groups must be inclusive, with membership limited only for reasons connected to their mission. Student groups generally should not issue statements unrelated to their missions, so they can welcome students with diverse views and backgrounds. Groups also should have a robust consultation process before issuing statements or joining coalitions. To be clear, there should not be any limits on the free speech rights of a group's *members*. They must be free to speak about any issue as long as they are speaking *for themselves*, not for the group.

Cited in Khalil v Trs of Columbia Univ 25cv2079 Decided 3/19/26 Archived on 3/25/26 This document is protected by copyright. Further reproduction is prohibited without permission.

7

**Introduction**

The Antisemitism Task Force has heard the testimonies of hundreds of Jewish and Israeli students and it is clear that the University community has not treated them with the standards of civility, respect, and fairness it promises to all its students. As we reflect on the antisemitism revealed by their experiences, we realize that these interactions have affected the entire University community. The larger social compact is broken. University policy and individual practice must change if we are to fix the situation. Our research and the many testimonies of students point to a crucial need to alter the current campus climate.[2] That is the purpose of this Second Report of the Antisemitism Task Force.

We have gathered information according to the mandate we were given by Columbia's then-president, Minouche Shafik, Barnard's president Laura Rosenbury, and Teachers College president Thomas Bailey.[3] We are offering recommendations based upon the extensive work we have done to date and we fully expect our Interim President Katrina Armstrong to lead a robust discussion on the broader problem of campus climate. We found that administrative structures intended to ensure that *all* members of our community respect each other, engage in civil discourse, and receive fair treatment in a dispute resolution process are not working effectively for Jewish students (or do not exist at all).

Some of our recommendations are focused on the specific problems facing Jewish students. Other recommendations, especially those concerning training, process, and procedure, suggest more general improvements on behalf of all students, any of whom may, during their years on this campus, face bias, discrimination, exclusion, or intimidation. Certain recommendations are straightforward and should be implemented quickly; others will require more extensive consultation and discussion. We have clearly identified those proposals which call for the creation of a broadly representative faculty, student, and staff committee aimed at developing consistent, clear, and transparent procedures and policies supported by the entire Columbia community, including Barnard College and Teachers College.

Listening sessions, reports to the Task Force, and messages to individual Task Force members provided us with important information about where students are experiencing discrimination, intimidation, harassment, exclusion, targeting, isolation, and fear of violent rhetoric. Equally important, we learned that students may not know how to report these problems—and often they want a less formal channel where they can receive advice about where and how to express concerns that may not rise to the level of a legal complaint. In some cases, they may be interested in an unbiased mediation process.

---

[2] See Peter Coleman, *The Great Reset* (Medium, 2024).

[3] Announcing Task Force on Antisemitism. https://president.columbia.edu/news/announcing-task-force-antisemitism

In principle, the offices of the Deans of Students, the Ombuds, or the DEI offices should be the right places to go. But students reported uneven experiences when they went to these offices. Some administrators were uncertain about how to assign responsibility. Students were unsure of where to turn, and some felt that their concerns were not taken seriously. Indeed, we have heard that students have been referred to counseling and psychological services—which they correctly understood as implying that they just need to learn to accept and cope with antisemitic experiences.

In addition, if a student's complaint is about bias in a club or in the classroom, the student might feel uncomfortable pursuing the issue, especially if key players in the process (e.g., student activity boards, department chairs, deans of students, professors, teaching assistants, etc.) have taken public positions at odds with those of students who otherwise would complain. We recognize the complexity of these issues and we understand the imperative to protect academic freedom; but harassment that takes place in the classroom is still harassment. Students' efforts to defend themselves should not be handled differently in such settings. They should be mediated in processes that are free from bias. Moreover, when it comes to the matter of impartiality and fairness, we need to ensure that publicly expressed positions by a faculty advisor, program director, teaching assistant, or resident adviser do not obstruct the mediation or conflict resolution process. In our First Report[4], we focused on the legal obligations of the University to prevent discrimination and harassment under Title VI, as well as state and local anti-discrimination law. It is important that all parties understand the law and the legal protections afforded students. But reliance on the law would suggest that the University is failing to create an inclusive campus environment.

This report provides recommendations to the Interim President for improving policy and practice in accordance with our mandate. These recommendations draw directly from the research we have done on existing policies and practices in schools across the University and consultations with many administrators, faculty, and students. We have been encouraged by the fact that the administration is already making some changes in university policy and procedures to achieve the same goals as the Task Force.

The recommendations in this report focus on training and workshops; a definition of antisemitism for these educational programs; reporting mechanisms; and the rules governing student groups. As we noted above, the recommendations here and in our prior report, which analyzed the rules governing protests, are not intended to be comprehensive. We will address other issues in future reports.

---

[4] https://president.columbia.edu/content/report-1-task-force-antisemitism

It is our contention that we can improve campus climate by (1) addressing what our students are actually experiencing; (2) improving our understanding of where these experiences are happening; (3) addressing the adequacy of our procedures for reporting experiences of bias and exclusion that do not rise to the level of a legal violation; (4) improving our intra-judicial mediation and fair conflict resolution processes; (5) staying true to the University's pluralist values and encouraging interactions (and hopefully friendship) among people who disagree; (6) protecting all students from discrimination; (7) ensuring that student groups are governed in ways that are consistent with these aspirations; and (8) designing anti-bias trainings and procedures through a process that develops broad consensus among all members of the community, including students, faculty, and student-facing staff.

Cited in Khalil v Trs of Columbia Univ 25cv2079 Decided 3/19/26 Archived on 3/25/26 This document is protected by copyright. Further reproduction is prohibited without permission.

10

## I.    Antisemitism on Campus: Student Experiences and Testimonies

### A. Introduction

After October 7, Jewish students began to report instances of harassment and verbal abuse, as well as incidents of physical violence. Given the volume of such reports, the Task Force thought it important to create opportunities for students to tell their stories, and for faculty members and administrators to hear what those students had to say. Beginning in February 2024, Task Force members reached out to the Deans of every school and through their offices we invited all students from every Columbia school, as well as Teachers College and Barnard College, to formal listening sessions. We also held three listening sessions at the Kraft Center for Jewish Life. (*Appendix A* includes the texts of invitations to the sessions, a general description of the session process, and a list of sessions with dates and listening session protocols.)

The response we received from nearly five hundred students was extraordinary. We heard from college first-years, anxious seniors, graduate students in the arts and sciences and in pre-professional programs, and postdoctoral researchers. Some of those who attended were older than the usual run of students: mature mid-career professionals who have returned to campus to take their career in different directions and students who are already parents. Students came to share their stories from a variety of religious, geographical, ideological, national, racial, ethnic, and political backgrounds. We heard from Zionists, and anti-Zionists, and those whose opinions are not easily categorized. Additionally, we received individual reports sent to our Task Force. Although we can share only a fraction of what we heard, we have attempted to represent this wide range of opinion.

These student testimonials provide a fuller understanding of how hundreds of students experienced the campus climate during these troubled times. Not having had the benefit of the listening sessions, some members of the Columbia community have expressed skepticism that students are experiencing discrimination. To the degree that they are, the skeptics say, such experiences are rare or not serious. Many wish to challenge the identification of these incidents as antisemitic. Our intention is to report these incidents as they were reported to us and to share evidence, provided here by our students, of Jews being singled out in ways that would be considered intolerable in any other context.

Targeting any group for exclusion or derision is unacceptable within the university setting. This report documents a pattern of behavior toward Jewish and Israeli students that is troubling and violates norms of behavior and speech that are central to the values of our university. Particular aspersions cast upon Jewish and Israeli students resonate with the history of antisemitism and, given what we know about the past, such representations can lead to further acts of aggression and exclusion. That such acts and words are being inadequately addressed suggests that the

11

University has failed to set standards of civil behavior. We think these student experiences constitute evidence of a broken social compact, a failure to provide all students with equal respect and access to the vibrant, pluralistic community that Columbia promises to all its members.

Many of the incidents are contrary to University policy, and sufficiently so that we think it imperative to recommend University policy changes informed by these documented experiences. We hope this evidence will assist the University's central administration and every school, undergraduate and graduate, in crafting helpful changes in policy governing academic and social life so that all students feel safe and welcome. Some, though not all, suggest violations of federal and state law. In such cases, Columbia should provide follow-up, investigation, and rigor in dealing with inappropriate behavior toward targeted groups, as we have already recommended in Antisemitism Taskforce (ASTF) Report #1. The frequent failures to do so, documented here, point to the troubling use of inconsistent standards which reinforce the need for significant change.

Voices have been drawn from nearly every Columbia University school. In specific places, we may refer to single schools, such as Barnard College or Columbia College; but it is not our purpose to characterize the climate of any single school. Although some problems are more serious in some schools than in others—variations that are not surprising in such a large and complex institution—no school is completely self-contained. For example, within the undergraduate population, students experience college life across the entire University. Particularly in extracurricular activities, students from various schools join together as members of the University as an all-embracing institution.

We have divided the material by settings (e.g., daily encounters, clubs, the classroom) with the understanding that boundaries between these environments may be blurred at times. The material included here is intended to be illustrative, not exhaustive; much of it, however, was corroborated by multiple sources. We are not adjudicating individual complaints—this is not our role—but we listened and found patterns in student testimony. Because students at the sessions were promised anonymity, we could not investigate the details of the incidents reported to us or seek the perspective of others involved, although in many cases we were given (or were able to find) confirmation. To preserve anonymity, students are not identified. The material below tries to preserve the sense of their words, and we have selected precise quotations whenever possible.

We have attempted to present salient material as it was told to us, aiming not to impose our personal definitions of antisemitism on attendees' experiences, but, rather, allowing students to share and define their own experiences and their own narratives. We did so by asking two simple questions—"What are you experiencing?" and "How have you felt on campus in the past six months?"—and then we listened.

12

This is some of what we heard.

### B. Student Experiences in Day-to-Day Encounters (Including Dorm Life and Social Media)

One of the essential obligations of a university is to provide a feeling of safety, in the most basic sense of the word: the feeling of being safe in one's room, on one's way to class or to study. After October 7, numerous students reported that they no longer felt safe. One student who had moved into her dorm room in September, told us she placed a *mezuzah* on her doorway as required by ritual law, as traditional Jews have done for centuries. In October, people began banging on her door at all hours of the night, demanding she explain Israel's actions. She was forced to move out of the dorm.

Visibly observant students, like ones who wear traditional head coverings, have been frequently met with extreme hostility. "On campus, my friends have been spit on, been called like terrible, terrible names, a very close friend of mine was called, a lover of genocide and then a lover of baby killing. This was only a couple of days after October seventh." A student told us she had been chased off campus with her brother one night.[5] In many cases, episodes like these have led to efforts to hide markers of Jewish identity: while some students felt that they could previously "wear our Jewish identity," now they don't want their peers to know that they are Jewish. The fear of consequences permeated the atmosphere of campus during these months. One student put it this way: "If I walk on campus right now with my star out or kippah or say 'am Yisrael chai' ["the people of Israel live," a traditional song], I could start World War III." Many Jewish students said they now avoid walking alone on campus.[6]

Students have reported having necklaces ripped off their necks and being pinned against walls, while walking back to their dorms on Friday afternoon and when they were on their way to synagogue. There were also multiple reports of visibly Jewish individuals simply walking past 116th Street who have been followed, stalked, and subjected to ethnic slurs and hateful statements, like "go back to Poland" and "I hope you guys suffer. You guys think it's okay to kill innocent babies and bomb hospitals. Yes, Habibi, I'm talking to you," and, when the hecklers saw that the student was filming them, one said to send the video "to all your Israelis." Students

---

[5] Columbia/Barnard Hillel Listening Session, February 21, 2024; Columbia/Barnard Hillel Listening Session, April 21, 2024.

[6] Columbia College Listening Session, February 29, 2024; Law School Listening Session, April 9, 2024; Columbia/Barnard Hillel Listening Session, April 21, 2024.

13

also recounted finding jokes about Hitler written on communal dormitory whiteboards. Many students described walking down hallways as a painful daily routine.[7]

Students worried about the long-term impact of tension and conflict on campus. One student worried that students feeling total exhaustion due to lack of rest, stress from finals and, above all, feeling totally unprotected on campus, repeatedly targeted by bullying, was likely to snap because they could only endure so much. More than once, students asked if someone had to be stabbed or shot for the University to do something. Another said, "All of the things we've shared are very well documented.…And so, the emotional exhaustion that all of us feel from doing this over and over again is very profound." And another: "I am exhausted having to defend Israel's right to exist."[8] It should be said that many of these listening sessions occurred well before the events of mid-April. As students headed into finals, a period of high stress, we heard about even more extreme symptoms: anxiety and sleeplessness, which were made worse on the Morningside campus by the protests outside of regular time restrictions. One student reported her mental health has been declining every single week, and she was not alone.[9]

A student told us that "Since October, most people on campus have felt apprehension. Then this Thursday we were walking onto campus. We weren't wearing any symbols of Judaism. We were shouted at, 'We don't want no Zionists here.' They were wearing keffiyehs and shoving us. No one is doing anything.…They were mocking us that 'we think that we are going to be safe.'"[10] That phrase— "We don't want no Zionists here"—echoed the remarks of various students that called attention to the slippage—a slippage that sometimes felt intentional—between "Zionist" and "Jew." One student heard another tell someone they were trying to avoid Hewitt Dining Hall as that was where the kosher dining hall was, and as such it was where "all the Zionists are." Another student argued that the term "Zionism" was increasingly deployed to signify hateful sentiments toward *all* Jewish people.[11]

Anti-Zionism is a term carrying manifold and blurred dimensions; yet to advocate for the active dissolution of the world's only Jewish state is quite different from even the bitterest critique of its policies. Given the absence of such a position in relation to virtually any other political state

---

[7] Columbia/Barnard Hillel Listening Session, February 21, 2024; Personal conversation with David Schizer, November 2023 and Video materials, Kobrin Post-Oct 7 Collection, IIJS Papers, Columbia University Archives, RBML, https://drive.google.com/file/d/1oilU6CNsmdv_t4ARYSIgjkaMgghYoF1L/view?usp=sharing.

[8] Columbia/Barnard Hillel Listening Session, February 21, 2024; Arts & Sciences Listening Session, March 1, 2024; School of Engineering Listening Session, February 22, 2024.

[9] Columbia/Barnard Hillel Listening Session, April 21, 2024.

[10] Columbia/Barnard Hillel Listening Session, February 21, 2024.

[11] Columbia/Barnard Hillel Listening Session, Feb. 20, 2024; School of Engineering Listening Session, Feb. 22, 2024.

in the world, anti-Zionism, as it has been expressed in campus demonstrations during the past academic year, hews far more closely to antisemitism than to a simple critique of Israel.[12]

Indeed, some critiques of Zionism on campus in recent months have incorporated traditional antisemitic tropes about secretive power, money, global conspiracies, bloodthirstiness, and comparisons of Zionists to Nazis or rodents. Purported University "org charts" singling out Jewish trustees, cartoons comparing Israelis to skunks, and posters telling "Zionist donors to keep your hands off our university" echo traditional canards that are all too familiar to many Jews and Israelis.

This hateful rhetoric has often been accompanied by an unwillingness on the part of listeners to engage with Jewish and Israeli students in a wide variety of encounters that are held to be the bedrock of a university community: discussion, empathy, intellectual nuance, argument. Some Jewish students found that whatever they said, their words were distorted. Some students were made to feel as though their support of Israel, or empathy for Israelis, was inseparable from support for the actions being carried out by the Israeli government. A student said, "There's a lot of times where Jewish students are made to justify the actions of Israel, for good and for bad. When you assume that someone's religious beliefs mean they want a group of people dead, that is hurtful." Another recounted feeling unable to criticize what's going on Israel for fear that such discussion would be associated with support for the destruction of the state. Others feared that the assumption that all Jewish students were aligned politically was particularly dangerous for Jews of color, and they were especially concerned about the heightened presence of police on campus. Still students spoke of what they perceive as the University's failure to distinguish between different Jewish denominations, mindsets, and beliefs. Several students argued that the administration was only supportive of Zionist Jews. Others expressed their firm belief in the inextricable connection between Zionism and Jewish identity.[13]

Given the virtual world all of us now spend much of our lives in, it is worth pointing out that not all the encounters described by students took place face-to-face; some occurred on social media. Many students reported that Sidechat, an anonymous online platform accessible only to Columbia students, is suffused with hatred toward Jews and Zionists. In one instance, a user posted, "All you Zionists out there? You are the modern day Hitler." In another instance a user posted, "If you support Israel, you are piece of filth not even worthy of being called human… I wish you enormous pain and suffering."[14] Another posted, "I sincerely hope any IDF veterans

---

[12] See Appendix D on selected scholarship on the evolving relationship between antisemitism, anti-Zionism and anti-Israel rhetoric.

[13] "In Our Name: A Message from Jewish Students at Columbia University" is a letter written and signed by Columbia and Barnard students to articulate their experiences living as Jews on the Columbia campus since October of 2024.

[14] Screenshot of Sidechat posting in Sidechat folder: Kobrin Post October 7 Collection, RBML.

15

here (and this includes [student X], currently 'proudly' serving) die a slow death."[15] By targeting Israelis, these threats and stereotypes can constitute discrimination based on national origin under Title VI. Discrimination against military veterans also violates Columbia's rules. Military service is mandatory for most Israelis. The claim that someone who has served in the Israel Defense Forces (IDF) is by definition threatening, a sentiment that was openly expressed by both faculty and students this spring, makes the campus a hostile place for virtually all Israelis.

One student captured more than 750 antisemitic online posts written by Columbia students and organizations,[16] although many of these do not rise to the level of legal violation, they are nevertheless deeply troubling, and would be attracting universal opprobrium if directed against other groups or countries. A student at the School of General Studies recounted having seen a message claiming that Israel was "a fake country filled with racists, pedophiles, and colonizers." Beyond the hate and misinformation being spread this way, students also pointed out that social media had been used to organize and coordinate on-campus events and demonstrations that had not yet been approved by the administration, and in some cases were in violation of University rules.[17]

It is the opinion of this Task Force that it generally is not the place of the administration to intervene in the social dynamics of students, unless those dynamics are violations of University policy or city, state, or federal law. And yet—as the University does so in many other ways—it must make its expectations clear, universal, transparent, and plain. If these norms are unacceptable, then the University must say so, and the consequences for violating University policy should be clear as well.

Students expressed anxiety not just in the listening sessions, but about them as well. Several said they were refraining from voicing their opinions for fear of being identified and doxed. This was true not only of Zionist students. Students who self-identified as non-Jewish and non/anti-Zionists and/or pro-Palestine, reported being singled out or verbally attacked. One student described an altercation in which a woman was verbally attacked because she was holding a sign saying she was both Jewish and anti-Zionist. A Jewish student who had been on the pro-Palestine side of protests was called "Judenrat," "token Jew," "self-hating Jew," "disgrace," and more. Another recounted seeing a female student wearing both a star of David and a keffiyeh being verbally assaulted.[18] It is vital that *all* these students' stories be heard by the University and that that all exclusion, discrimination, intimidation, stalking, and violence is investigated.[19]

---

[15] Screenshot of Sidechat posting in Sidechat folder: Kobrin Post October 7 Collection, RBML.

[16] School of Engineering Listening Session, Feb. 22, 2024.

[17] Columbia/Barnard Hillel Listening Session, February 21, 2024.

[18] Columbia/Barnard Hillel Listening Session, February 21, 2024; Barnard, April 1, 2024.

[19] Columbia and Barnard have already taken a clear stand against targeting and doxing when they announced the Doxing Resource Group on November 1, 2023 and Resources to Assist After Online Targeting/Doxing.

16

Perhaps just as powerful as fear is hurt and despair. We heard that students felt ostracized and rejected by many of Columbia's multiple communities, on a day-to-day basis. This sense of being shunned was among the most pronounced contributors to the decline of well-being among Jewish students on campus. Less grave, but nonetheless unpleasant, is the withering of friendships due to perceived differences in students' relationship to Israel. One student said, "I used to have friends in my program and would have them to my home. Now they won't talk to me and I sit alone at lunch."[20] In the majority of the cases, this attitudinal shift did not result from a student's open support for Israel's policies. Any expression of a connection to Israel — friends or relatives there, time spent in the country was enough to damage relationships with other students.

As one student put it:

> One of the reasons I chose Columbia was because it's supposed to be so accepting and I wrote about that in my admissions essays. I talked about that with the people who are recommending me and they were, like, yeah this is gonna be [this] really great accepting place. And for like three months it was. I'm part of the queer community as well and they've been super welcoming. Except when they realize that I'm Jewish and that is uniquely painful. Because it feels like a group that is designed to be accepting of everyone is rejecting me.[21]

All this has led to a drastic reduction in students' willingness to express their Jewish identity on campus. One student explained that they were hesitant to attend Shabbat dinner lest their peers assume that they are Zionists who may "believe in genocide." Another student said, "I am scared of wearing my star of David." Another said, "they are going for segregation of the Jewish students. We are being excluded. It is to make us not heard in the collective, and [it] is to make it so Jewish students won't come here."[22]

The singling out of Jewish students occurred for Jewish students with varying views on Israel. As we discussed, Jewish students actively engaged in supporting the rights of Palestinians came to many of the listening sessions and expressed their feelings of pressure to conform to positions they did not wish to take. Regardless of their views, flattening individuals to a single political position, whether expressed or ascribed, is an example of one-dimensional thinking that is a classic feature of prejudice.

---

[20] Irving Medical Center Listening Session, April 8, 2024.

[21] Columbia College Listening Session, February 29, 2024.

[22] Irving Medical Center Listening Session, April 8, 2024; Columbia/Barnard Hillel Listening Session, February 21, 2024; Graduate School of Architecture, Planning and Preservation and Climate School Listening Sessions, February 26, 2024.

17

This can be seen by expanding our perspective from individual encounters to something more institutional.

### C. Student Experiences in Clubs

Many students who professed any positive relationship with Israel reported that they felt excluded from student affinity groups or clubs.

Many of these organizations had nothing to do with Israel, Palestine, or the Middle East, yet nevertheless called for such a litmus test. Perhaps the most notorious incident discussed by students was the LionLez incident in the fall 2023 semester. The founder of an LGBTQ+ group sought to exclude Zionists from the group's events in a flier that read "It's FREE PALESTINE over here. Zionists aren't invited." The founder defended this stance in an email that evinced the slippage between anti-Zionism and antisemitism: "white Jewish people are today and always have been the oppressors of all brown people," and "the Holocaust wasn't special."[23] We heard from students who worried that there had not been adequate consequences for this behavior. As students lamented, "She was bragging about how she was still going to graduate and walked around with her degree and that the school didn't do anything about it…"

More generally, students complained about the apparent unwillingness of many administrators to intervene. They also recounted having witnessed other forms of exclusion and discrimination in student groups and clubs. One of them recounted having been censored by senior student members of a STEM club on campus. Others described having been denied membership or being forced to quit student groups that were supposed to be non-political. A student shared they had been "de-facto kicked out" of student organizations based on the polarizing messaging these organizations displayed, and another said there was a feeling of having to "constantly qualify who we are" in order to participate in organizations.[24]

On January 23, 2024, the Law School Student Senate voted against the official recognition of a proposed student group called Law Students Against Antisemitism. According to its constitution, the group planned on organizing educational events, encouraging dialogue about antisemitism at the Law School, and providing resources and opportunities for students both to learn about antisemitism and find support, should they be targeted by antisemitic acts. Of the nine student groups and clubs that requested approval this past year, Law Students Against Antisemitism was *the only one* that was denied. As one of the senators who voted to approve the organization said,

---

[23] Isabella Ramirez and Rebecca Massel, "LionLez President Comes Under Fire for Viral Email," *Columbia Spectator*, October 27, 2024.

[24] Columbia/Barnard Hillel Listening Session, February 20, 2024; Columbia/Barnard Hillel Listening Session, February 21, 2024; Law School Listening Session, March 5, 2024.

Cited in Khalil v. Trs of Columbia Univ., No. 25-cv-02079, Decided 3/19/26. Archived on 3/25/26. This document is protected by copyright. Further reproduction is prohibited without permission.

"the Student Senate should have stood in support of all organizations that are founded to tackle systems of hate."[25] The decision was eventually reversed by the Student Senate.[26]

Students reported avoiding or ending membership in the 116 faculty-advised and tuition-supported student organizations that are members of the Columbia University Apartheid Divest (CUAD) coalition. CUAD demands, among other things, that Columbia institute an academic boycott to "sever academic ties with Israeli universities, including the Global Center in Tel Aviv, the Dual Degree Program with Tel Aviv University, and all study-abroad programs, fellowships, and research collaborations with Israeli academic institutions."[27] Student groups that are members of the CUAD include those focused on a diverse range of areas including the Vagelos College of Physicians & Surgeons Equity and Justice Fellowship, Columbia Law Parole Advocacy Project, the Mariachi Leones de Columbia, Columbia's mariachi band, and the Barnard Garden Club.[28]

Non-Jewish, Israeli, or Zionist students who tried to maintain a neutral stance were equally shut down or bullied into silence. For instance, a Barnard student from Sewa, a Sikh student group at Columbia, stated that she was ousted from her role as co-president because of her supposed support for Israel, when she actually tried to maintain a neutral position. Speaking as a guest on the student-led podcast *The Uproar*, she said her attempts to keep the group politically neutral at a time when several members wished to publicly support Columbia University Apartheid Divest (CUAD) led to backlash from her peers. Other members of the group did not support CUAD's demands, but ultimately, she said, she was pressured to step down from her position.[29]

A Barnard student provided a detailed account of her experience with a dance team:

> I felt the brunt of the dehumanization on campus through my exclusion from campus activities. Since my freshman year, I have been part of a Columbia dance team. This was one of my most cherished campus involvements, even taking up a board position during my sophomore year. I have been dancing for over fifteen years and this team was the way I was able to continue this commitment through college. After no support or care from the team members following October seventh, I was sent a group text late last semester asking members of the team to fill out a form [asking] if they were uncomfortable with us signing onto CUAD. Not only is that an odd way to phrase the question, instead of asking people to vote on it, but as the only Jew and Israeli on the team it was clear to me that I would be the

---

[25] Rebecca Massel, "Law School Student Senate Denies Approval of Law Students Against Antisemitism group," *Columbia Spectator*, February 1, 2024.

[26] Talia Barnes, "Victory: Columbia University Student Senate Grants Recognition to Law Students Against Antisemitism," February 12, 2024

[27] Columbia University Apartheid Divest

[28] Columbia University Apartheid Divest: Our Coalition

[29] Michael Duke, "Barnard Student Tries to Keep Sikh Group Neutral, Gets Forced Out by Anti-Israel Extremists Anyway," *Campus Reform*, February 28, 2024.

19

only one filling out this form. After not hearing back for about a month I asked the VP for an update. She said they were probably going to sign on because a majority agreed, and again I thought this was strange as we never actually held a vote. She then sent this message to the e-board on my behalf:

"First and foremost, I do not see the need for a dance team to take a political stance that is completely unrelated to the team and its purpose. The team is meant to be a creative space and supportive community where people can come together to dance. There are many other political and world issues that we do not discuss or take stances on as it is not necessary. To clarify, I am Jewish and half Israeli and half my family lives in Israel so this is an extremely personal matter and one that has obviously been so my entire life, not just the last two months. Before getting into the CUAD signing aspect, just from a personal and support aspect I have been extremely disappointed with the team. [X] is the only person on the entire team to even ask me over the past two months if I am okay and if my friends and family are alive and safe.

As far as I know, I am not only the only Jewish member on the team but the only one with Israeli or Palestinian background. To consider a majority vote to be a fair representation when this topic transcends politics for me and is extremely personal makes this vote unfair. I also would have appreciated being cued into the conversations from the start, due to my direct involvement.

If the team signs onto CUAD it will completely ostracize me from a community I have been a part of for 3.5 years now. I have been extremely committed to this team, attending performances on Friday nights without a phone as I run between performing and Shabbat dinner for example, and I would hate to have to end on this note. It will force me into a choice between being in an environment that has singled me out and made me completely uncomfortable or stopping dancing altogether."

To which they responded, "We do not care to have a conversation and we will sign on anyway" (paraphrased). A few weeks later they sent out an email saying they had signed onto CUAD and a few weeks after that I was removed from the team group chat with ZERO communication of why or even that [now] I was off the team.[30]

These were hardly the only examples. We heard from performers who concealed their support for Israel in order to be cast in theater productions, and writers who were dismissed from publications. Jewish students have also quit community service activities focused on vulnerable populations in New York because the groups issued statements blaming Israel for Hamas's brutal

---

[30] Barnard College student, Correspondence to David Schizer, April, 28, 2024, Antisemitism Taskforce Library of Sources.

20

Cited in Khalil v. Trs. of Columbia Univ 25cv2079 Decided on 3/19/26 Archived on 3/25/26 This document is protected by copyright. Further reproduction is prohibited without permission

attacks on October 7. In many cases the atmosphere was so uncomfortable that Zionist students chose to leave,[31] but in some cases Zionist students were dismissed from the group.

All of these examples raise the question of inconsistent standards. We might wonder whether there is any other identity group or nationality singled out in this manner by campus organizations—which receive some financial and institutional support from the University or at least some form of recognition—and what the response would be if they did.

One might say, perhaps, that these cases should—or could—be accounted for by the fact that those involved are, at least, in many cases, fellow students. (Which raises the question of whether inconsistent standards might apply in the application of disciplinary procedures.) However, because of the administration's emphasis on inclusion and belonging, which extends to student groups, "Experiencing a sense of inclusion & belonging can affect every aspect of the Columbia experience—from extracurricular activities to academic performance, making these important values for our community to uphold,"[32] such incidents should receive the utmost attention. This is a delicate balance. The administration should not micromanage student groups, but should ensure that individual students are not associated with a group's statements without authorization; that groups do not violate the University's core values, norms, and policies or discrimination law; and that proper reporting mechanisms are in place.

Unfortunately, not all of the complaints alluded to were in response to the actions of other students. Some were responding to the actions of University faculty and staff.

### D. Student Experiences in the Classroom and with the Curriculum

In March 2005, an Ad Hoc Grievance Committee of Columbia University delivered a report on irregular incidents occurring in classrooms on the Columbia campus. That report, along with its findings, shows that the University has, in the past, made efforts to address behavior targeting or silencing students for their views or identities. Citing an AAUP Report of 1940, the Ad Hoc Committee of 2005 pointed out that "membership in the academic community imposes on students, faculty, administrators, and trustees an obligation to respect the dignity of others, to acknowledge their right to express different opinions, and to foster and defend intellectual honesty, freedom of inquiry and instruction, and free expression on and off campus." The Grievance Committee report states that "students are entitled to an atmosphere conducive to learning and to even-handed treatment in all aspects of the teacher-student relationship."[33]

---

[31] See also Massel, "Where Does a Jew Belong?" ("Two students said they left student groups—one a political activist club and one a performing arts group—they once felt part of after those clubs decided to join the Columbia University Apartheid Divest coalition.").

[32] Inclusion and Belonging Initiative, University Life.

[33] Ad Hoc Grievance Committee Report, March 28, 2005.

Cited in Khalil v Trump of Columbia University, 25-cv-2079 Decided 3/19/25. Archived on 3/25/26. Further this document is protected by copyright. Further reproduction is prohibited without permission.

21

Sometimes statements or discussions that one student finds intimidating motivates others to public argument, a positive outcome that may outweigh the student's shame or embarrassment. But when a student is ridiculed, threatened, or dismissed for holding views contrary or inimical to those of the instructor, that may constitute serious breach of academic norms. We wish to distinguish ridicule or threats from rhetorically combative, but respectful modes of classroom interaction.

Reports by Jewish students of threat, ridicule and exclusion in the classroom, identified nearly twenty years ago by an investigation on this campus, is once again a subject of our concern.[34] We will address these academic issues in a later report.

Three sessions of the 2023 Core Curriculum in Columbia's Mailman School of Public Health provide an instructive case. According to the School, "The Core curriculum, taken by all incoming students in their first semester […] provide[s] a broad, interlocking foundation of knowledge essential for a career in public health." Approximately 450 first-year graduate students are taught the core content during their first semester at Columbia. Public health curricula focus on topics including policy, epidemiology, equity, economics, healthcare delivery in conflict zones, forced migration, health disparities, and refugee health. In the first month of classes, the students were just beginning to learn this foundational public health material.

Some students reported that in the human rights sessions of the Core curriculum, during the first week of the year's Masters of Public Health program, a faculty member presented concerning content. In the first session, the professor extensively discussed, by name, Jewish donors to Columbia University, one for whom the school is named and another for whom one of the school's buildings is named; the faculty member called these Jewish men "wealthy white capitalists" who "laundered" "dirty money" and "blood money" at Columbia. In a second pair of lectures, students were required to engage in a case study in which they played the role of the executive director of a fictionalized new health and human rights nonprofit. Their job was to conceptualize and lead the organization's first human rights mission. The prompt instructed students to fund a project in one of three sites: the Palestinian Aida Refugee Camp; Ukraine/ Mariupol; or the Navajo nation. The professor instructed students that their funding decisions should consider that some "are eager to support your efforts, but your development team is concerned that working in Palestine could turn off wealthy U.S. donors that support Israel." In the third session, the professor invited a panel of guest speakers who introduced the idea of "settler-colonial determinants of health" referred to "so-called Israel" and used "Israel-Palestine" as the primary example of a state in which a "right to health" can never be realized. One of the

---

[34]Ibid.

Cited in Khalil v. Trump, No. 25-cv-02079, Decided on 3/25/26
Archived on 3/25/26
This document is protected by copyright. Further reproduction is prohibited without permission.

guest lecturers suggested to students that it's best not to engage in debate with people who reject the settler-colonial frame.[35]

One might well, again, raise the question of the inconsistent standards with regard to these various examples: would any other religious group or nation—or, for that matter, any other legally protected identity group—be treated similarly? At the time of this writing, The School of Public Health has not communicated to the over 400 students exposed to this content that there was anything problematic about it. For these rising second year graduate students, the content described remains part of the mandatory material they were taught at Columbia.

We heard from students that on Friday, April 19, 2024, FSJP@Columbia Barnard & Teachers College (whose Instagram account "fsjp_cbt" describes itself as "a collective of Columbia University, Barnard College and Teachers College faculty, staff, and graduate workers dedicated to Palestinian freedom") issued a message calling on all faculty to hold classes, office hours, and meetings on the Columbia lawns, meaning on or near the encampments. This amounts to encouraging students to break the University's rules in the name of ideology; it also discriminates against those who don't want to enter the encampments because they don't wish to endorse their political message. Students who decline to enter encampments when their professors request it are being forced against their will to make a political statement, that is, to publicly disagree with their professor. They are also being denied access to educational opportunity.

Similarly, the Task Force heard a great deal about the graduate student union. Some graduate students refused to grade papers. Some graduate students received texts from their union (the source of their health care and other benefits) telling them to join protests, or calling for "Zionists off our campus." Students reported that some faculty made accommodations for participation in the encampment but failed to make accommodations for students who do not feel comfortable in classes (or accommodated them in a way that stigmatized them, as when a Jewish student was the lone Zoom box on screen. Students felt uncomfortable about actions conducted during classes, such as a walkout for Palestine or chanting. When they told the professor about their discomfort with such messages, one professor's response was simply that they did not need to come to class.[36]

Students reported that admission to a major could lead to discomfort because of the overt affiliation of certain departments with pro-Palestinian activism, indicated on department websites and signaled by student-run journals affiliated with those subjects. Students perceived this as an

---

[35] Mailman School of Public Health Fall 2023 PUBH P6020 Mandatory Core Curriculum, lectures from September 8, 2023, September 15, 2023, and September 21, 2023. Video of lectures on file. See also Douglas Belkin, Some Columba Professors Accused of Pro-Palestinian Indoctrination," *The Wall Street Journal*, March 8, 2024. https://www.wsj.com/us-news/education/some-columbia-professors-accused-of-pro-palestinian-indoctrination-002013fc

[36] Columbia/Barnard Hillel Listening Session, February 21, 2024.

Credit to Khalil, Tis of Columbia Univ., 25-cv-2079 Decided 3/19/26 Archived on 3/25/26 This document is protected by copyright. Further reproduction is prohibited without permission.

implicit demand for support and felt it would lead, inevitably, to the same battle-lines and attacks seen across campus; they reported such incidents to the Task Force. Sometimes faculty would voice opinions that students were powerless to contradict. As a result, students report avoiding particular majors and faculty. A student who was writing a thesis on Israeli artists reported that each time that student made a presentation in their senior thesis seminar, the thesis seminar leader would say, "I hate Israel." This student said, "I wish I had chosen a different topic for my thesis."[37]

In some schools, students reported that discussions of "justice" in their classes and in their programs did not welcome Jewish perspectives. There was, said a graduate student, "an overarching view that Zionism cannot be compatible with other forms of advocacy. If you are Zionist and look Jewish you are grouped into this idea that you cannot be supportive of the LBGTQ community, black community and fight for equal rights for marginalized communities." Another graduate student noted: "If you're Jewish, you may or may not be welcome. We have a lot of class[es] discussing discrimination which is great. But if it comes time to share, and you are Jewish, you don't feel comfortable talking about your experience of discrimination. It's made clear to us that it's not okay for Jews to do that." One student relayed, "When I did share, there were a lot of people that stopped speaking to me. There is some view in these classes today and in this generation that you cannot be a Jewish Zionist and also an advocate for others." When one student participating in a discussion about America and the Holocaust brought up her grandmother, a refugee turned American citizen, her professor said: "I think you're going to have to sit on that."[38]

These minimizations, examples of double standards, of norm and policy violations, all take their toll. "I would like to mention," one student writes, "that [the] Columbia nursing [school] is not a place for Jews":

> The misinformation that has been spread by my fellow midwives and colleagues from the Masters Direct Entry Program is disturbing.…It makes me feel as if I do not belong in my career choice. While others have claimed that they are not antisemitic because they claim not to be. Yet, they won't let me define what antisemitism truly is.…Many of my friends in the pediatric and psych nurse practitioner program have felt a similar sentiment.[39]

"Now I don't really feel like I have a place where I belong," said one student. "I've silently retreated from my program," said one doctoral student. "I feel like I'm experiencing a loss of passion."[40]

---

[37] Rebecca Kobrin Student Meeting, November 27, 2023.
[38] Mailman School of Public Health Listening Session, March 20, 2024; School of Social Work Listening Session, April 4, 2024.
[39] Columbia/Barnard Hillel Listening Session, April 21, 2024.
[40] Irving Medical Center Listening Session, April 8, 2024.

24

The majority of these experiences were reported before the establishment of the encampments in April. At that point, things got worse.

### E. Student Experiences During Protests and the Encampment

Jewish students heard from one of the protesters right outside Columbia's gates, "October seventh [2024] is going to be every day for you." Students reported being told "Kill your fucking self. And I'll fucking kill you." One student said, "I have a friend who went to the anti-Israel protests to try to debate with people. She was told 'I don't talk to White people' and 'I don't want to normalize [having these debates].'"[41]

Students described events in the encampment that they felt targeted both Jewish and/or Zionist students, including vigils and teach-ins. More specifically, students expressed concerns regarding some of the topics discussed, language used, and materials distributed at the encampments, and speakers (some unaffiliated with Columbia) invited to address the protesters. One student said:

> The first thing that I would like to bring up is student organizations hosting "Vigils," labeled as "Glory to our Martyrs." Some of the things said during these events are directly linked to Hamas verbiage, and I do not believe these are actual vigils. That language is not reflective of a vigil and it is violent. It feels like the promotion of death and hate.…I notice people are wearing masks and hiding their identities. I think they know that they are saying things that are not acceptable, but they continue to say them anyway while hiding their identity.…I never heard people say that they care about both sides, all deaths, all life.…There is no sympathy or compassion for Jews affected by the conflict.[42]

Students witnessed and sometimes experienced threats of violence or actual violence in these settings. Several recalled being assaulted while holding Israeli flags, which in at least one case protesters attempted to burn. One recounted having seen a student holding up a sign reading "Al-Qassam Brigade's next target" standing in front of a Jewish student peacefully singing the Israeli National anthem. Students told us about chants such as, "Al-Qassam you make us proud, kill another soldier now," "Yes Hamas, we love you, we support your rockets too," or "We say justice you say how, burn Tel Aviv to the ground." Another talked about fearing for their safety when, during Passover, they did not have a phone: "I don't know how I will get around without my phone, without a video, without the ability to call the police."[43]

---

[41] Columbia/Barnard Hillel Listening Session, February 20, 2024; Columbia/Barnard Hillel Listening Session, April 21, 2024.

[42] Mailman School of Public Health Listening Session, March 20, 2024.

[43] Columbia/Barnard Hillel Listening Session, February 21, 2024; Columbia/Barnard Hillel Listening Session, April 21, 2024.

25

Many students criticized what they thought was an excessively lax policy regarding the presence of non-Columbia affiliates on campus; students were confused as to what extent the Columbia campus could be considered private property and closed to outsiders; students felt it was important to reiterate that the issue did not only stem from "outsiders." A law school student said:

> I don't want to see it like the university is trying to play it like this is all coming from the outside. It is not only coming from outside. To be clear: CUAD [Columbia University Apartheid Divest] is a coalition of over a hundred student organizations. They are getting these people onto campus. They are doing the chants. These are student organizations enabling [this]. It is not all external.[44]

Some felt as though the University preferred to blame the tensions on campus on the presence of non-approved individuals, rather than acknowledge that the conflict was generated primarily by the students.

Students pointed out a crucial fact exacerbating these tensions: a majority of students do not know the University's guidelines surrounding protesting on campus. One student discussed the dangers of gatherings being held without students knowing "what kind of rules they are breaking." Some students felt that the administration was slow to provide students with a clear reminder of what was and wasn't allowed when protesting on campus. Many students objected to face masking, though they interpreted masking in different ways. Some believed it was directly related to the University's failure to identify what hate speech is. Others saw it as proof that the protesters knew they were violating rules and wanted to be insulated from discipline and other consequences. A student said: "[...] you can draw the line when it's terrorism, except on this campus that isn't called out. I think you need to define what is and isn't acceptable to say…at these rallies, this is the baseline. We shouldn't need a listening session for basic morality.[45]

Some events during Commencement week showed an insensitivity to the reactions of many Jewish and Israeli students and their families, which stands in contrast to Columbia's usual attention to the importance of making the entire community feel valued on these ceremonial occasions.[46] The Mailman School of Public Health Class Day featured a single student speaker, whose speech promoted the Columbia University Apartheid Divest (CUAD) platform, including the demand for *"the university to divest from all partnerships with Israeli entities"*. One Jewish graduate described her experience at the ceremony:

---

[44] Columbia/Barnard Hillel Listening Session, February 21, 2024.

[45] Business School Listening Session, April 18, 2024.

[46] One Israeli student from Columbia Journalism School wrote an article for *The Forward* describing her fear of bringing her parents to graduation, https://forward.com/opinion/609871/israeli-columbia-graduation-pro-palestinian-protests/

> The speaker received resounding cheers and chants of "Free Palestine," while I sat wondering when we were going to celebrate our public health achievements. I sat, wearing a stole on which a yellow ribbon and "Bring Them Home" were embroidered, wondering if I would be booed walking across the stage to receive my diploma simply because I want my family and friends to be safe and because I have a Jewish name. My family, who traveled cross-country to attend a special event shook with rage as they listened to someone spew propaganda that was welcomed by my peers and faculty. My best friend, who is Israeli, came to support me, and instead was met with jeers about eliminating her family. If we had known we were not welcome, we would not have attended. That Columbia's administration did nothing to stop this speaker is appalling.[47]

After the speech, a dean applauded the speech from the podium and thanked the student for "an inspiring message" and a third dean congratulated the student speaker with an embrace. There was no recognition of the pain and discomfort her words were causing many Jewish students and their families.

Finally, students captured on video many of the troubling experiences that took place in the vicinity of protests and the encampments.[48]

## F. Israeli Students' Unique Experiences

Among the many students who reported experiencing discrimination and exclusion this past academic year, Israeli students and research scientists reported experiences that were unique to them.

It is estimated that there are several hundred Israeli students at Columbia, Barnard, and Teachers College, including about 170 Israeli undergraduates in the Columbia School of General Studies (GS).[49] In 2020, GS established a dual degree program with Tel Aviv University which admits 30 to 40 students every year.[50] In addition, there are dozens of Israeli graduate students and postdoctoral research scientists in GSAS, SEAS, SIPA, GSB, and CUIMC. Significantly, most

---

[47] Recent Mailman School of Public Health graduate, Correspondence to Antisemitism Taskforce, June 12, 2024; also see May 14, 2024 video of graduation speech, Antisemitism Taskforce Library of Sources.

[48] Video materials, Kobrin Post-Oct 7 Collection, IIJS Papers, Columbia University Archives, RBML, https://drive.google.com/file/d/1oilU6CNsmdv_t4ARYSIgjkaMgghYoF1L/view?usp=sharing.

[49] Beginning in 1947, Columbia created GS for men and women returning from military service after WWII. The program evolved over the decades to be the premier Ivy League college for veterans and other non-traditional students. Aside from US veterans, there are veterans from all over the world, including South Korea, Israel, and Singapore, countries with mandatory military service.

[50] The dual degree program is not exclusively for Israeli students, but students spend part the first two years of their academic experience on campus in Tel Aviv and the second two years at Columbia University in New York.

27

Israeli students and researchers served mandatory service in the IDF. New York State Human Rights Law prohibits discrimination based upon military status.[51]

In general, we found that the anti-Israel rhetoric on campus did not distinguish between the country and its citizens. Israelis were targeted for being Israeli. As one student noted, "I actually haven't ever described myself as a Zionist, but I cannot help that I was born in Israel. And therefore, I am an Israeli citizen." An Israeli student reported, "The situation for Israelis on campus is horrific.…We live there, our parents live there, our siblings live there, we were born there, we served in the army there, and a disproportionate amount of hatred is being directed at us." Another student said, "There is a palpable sense of fear because people can somehow sense that you're Israeli, and there is a visceral hatred toward Israelis on this campus.…Unfortunately, it's something that has become normalized and accepted on this campus."[52]

The hatred toward Israelis has reached alarming levels on campus. While hanging signs with pictures of hostages captured on October 7, an Israeli student was physically attacked.[53] Following the attack, he had to deal with a false complaint that was submitted about him to Columbia (and was eventually dismissed).[54] False complaints targeting Israeli students increased during the spring of 2024.[55]

A student described the situation following October 7: "People that you sat in class with, you had drinks with, you had lunch and dinner with, the next day they say they hope your entire family dies.…I have had people spit at me, I have had people yell at me. I think they just don't know. Some of them think that it's genocide, and it's legitimate to call for the erasure of [the] Israeli state. If I can put it in one word, it is heartbreaking. And it breaks your heart even more than people [not wanting] to have a discussion."[56]

Some Israeli students also have experienced stereotyping, including unfounded claims about the danger Israeli veterans pose to others on campus.[57] This allegation is a way of targeting virtually

---

[51] The Division of Human Rights of New York State defines military status as "a person's participation in the military service of the United States or the military service of another state." https://dhr.ny.gov/system/files/documents/2024/04/nysdhr-military-status.pdf#:~:text=If%20you%20believe%20you%20have,of%20the%20most%20recent%20act.

[52] Judy Maltz, "Columbia Used to Be a Dream School for Israelis. Now They're Campus Pariahs," *Haaretz*, May 3, 2023.

[53] Olga Benacerraf, "'Don't Feel Safe': Jewish Columbia Student Says He Was Attacked by Pro-Palestinian Activist," *The Daily Wire*, October 12, 2023.

[54] Firsthand account shared with Gil Zussman, January 16, 2024.

[55] Firsthand accounts were shared with Gil Zussman, April–May, 2024.

[56] Dean Moses, "Columbia University Student from Israel Recounts Encountering Hate Before and During Encampment: 'I Have Had People Spit at Me,'" *amNY*, April 25, 2024.

[57] For example, a faculty member gave an interview in January to *Democracy Now* in which she said: "[I]t's something that many of us were concerned about, because so many of those Israeli students, who then come to the

all Israeli students and faculty at Columbia since, as noted above, military service is mandatory for most Jewish Israelis. Israeli students reported hearing many others repeat this accusation during the academic year. A student noted, "They say they don't want Zionists on campus and they don't want Israeli army vets on campus. It makes me feel personally targeted."[58] Another Israeli veteran who is a father of a toddler said, "There is a sense of personal threat, and we keep looking over our shoulders. We're careful where we speak Hebrew on campus. We are remaining cautious. Since the beginning of this whole thing, it's been really scary."[59]

An Israeli female student who served in the IDF was harassed in the classroom by a faculty member teaching a class that included material about the conflict. According to the student, conversations were consistently one-sided and often included inaccuracies. The IDF was portrayed as an "army of murderers." The faculty member reportedly told the student that as a former IDF member, she too should be considered a murderer.[60] Following October 7, students in other classes refused to collaborate on group projects with Israeli students. As one Israeli student indicated, "She [a peer student] told our professor that she doesn't want to be in the same room with me."[61]

Students in Columbia's dual degree program with Tel Aviv University faced persistent demands by organizations and protestors to abolish their program.[62] A first-year student who is still in Tel Aviv indicated, "It's one of the main conversations we are having as students right now: Is it our job to go there and to fight and be a part, or to stay in Tel Aviv? Everyone is very concerned." She added "There is one student who came back to Tel Aviv, saying Columbia was too much for him, too much antisemitism around campus."[63]

Israeli students found the pervasive hostility made it difficult to access necessary services, such as healthcare. One Israeli student reported that when she went to health services in July, no one came in to see her and she overheard a discussion between two healthcare professionals in another room in which one said they would not treat her because she was Israeli. She sat in the room for another ten minutes until someone finally came to address her health needs.[64]

---

Columbia campus, are coming right out of their military service. And they've been known to harass Palestinian and other students on our campus." "Professors Slam Columbia's Response to Chemical Skunk Attack on Students at Pro-Palestine Protest," *Democracy Now*, January 25, 2024.

[58] Judy Maltz, "Columbia Used to Be a Dream School for Israelis. Now They're Campus Pariahs."

[59] 103FM via Maariv Online, "Israeli student at Columbia University: 'They broke into the building and smashed windows,'" *Jerusalem Post*, May 2, 2024.

[60] Firsthand account shared with Gil Zussman, July 26, 2024.

[61] Judy Maltz, "Columbia Used to Be a Dream School for Israelis. Now They're Campus Pariahs."

[62] General Studies Listening Session, February 29, 2024

[63] Gavriel Fiske, "Students in Tel Aviv and New York Feel Heat as Columbia Protests Target TAU Program," *The Times of Israel*, May 7, 2024.

[64] Firsthand account of July 17, 2024 event shared with Gil Zussman, July 27, 2024.

Campus demonstrations targeted Israeli students. Throughout the fall and spring, student demonstrators chanted phrases such as "Say it loud, say it clear, we don't want no Zionists here," They held up signs that read "IOF [Israeli Occupation Forces] off campus" and chanted "NYPD, KKK—the IOF, they're all the same."[65] Especially troubling to students was the fact that faculty (including some with leadership roles in the College and in A&S), were present and gave speeches at some of these unapproved protests. Outside of campus, during protests co-organized by Columbia student organizations (particularly CUAD), slogans such as "Israel is the new Nazi Germany" and "Israel steals Palestinian organs" appeared on trucks.

Protesters called for violence against Israel. "There is no safe place, death to the Zionist state," "From the River to the Sea Palestine will be Arab" (in Arabic), and "We don't want two states, we want all of it." As another example, an Israeli student encountered a demonstrator who showed her a phone adorned with a Hamas flag and indicated "we will follow you to Israel and burn your family."[66]

When faculty moved their classes or office hours to the encampment, Israeli students knew they were not welcome. A Columbia English professor who belongs to Columbia's chapter of Faculty and Staff for Justice in Palestine brought one of his classes to the tents as part of a course studying atrocities. "[O]ne of the things that faculty who supported the encampment did," he said, "was take their classes inside the encampment." He told the *New York Times* that two of his Israeli students, who he believed were former members of the Israeli military, did not show up for such a class. "I think the feeling in the class was not running in their favor," he said, "and that may be why they didn't show up." [67]

Overall, these Israeli student experiences underscore a feeling of having been abandoned by the University administration. They see the University's failure to enforce rules, as well as the University's negotiations with leaders who called for the death of Zionists and the destruction of Israel as legitimizing the hatred directed at Israeli students. As one student respondent in a survey of Israeli students noted, Columbia "not only failed to keep its students safe, it allowed discrimination from both students and faculty." Another Israeli student wondered why some Columbia faculty would consider calls for violence and terror as a free speech right, allowing this speech on campus and inside academic buildings. "Globalize the intifada," "all IDF soldiers deserve to die," "Glory to the Hamas militants," "Death to Zionists," "F** the Jews," are

---

[65] Jackie Hajdenberg, "'I'm Ready to Leave This Campus': Jewish Students at Columbia Feel Discomfort and Isolation Following Thursday's Unrest," *Jewish Telegraphic Agency*, April 19, 2024.

[66] Hagar Amger, "Israeli Student Attacked at Columbia Speaks," *N12 News*, In Hebrew, April 23, 2024; Jackie Hajdenberg, "'I'm Ready to Leave This Campus': Jewish Students at Columbia feel Discomfort and Isolation Following Thursday's Unrest."

[67] Anemona Hartocollis, "Taking Cues from Students, U.C.L.A. Faculty Members Join the Protests," *New York Times*, May 6, 2024

30

examples of the hate speech that Israeli students reported. As one student in the survey sadly concluded, "Israeli students' dreams of attending Columbia, a rigorous educational institution devoted to debate and discovery, have been shattered, as we feel the administration has normalized antisemitism and anti-Israel sentiment."[68]

## G. What We Learned from the Listening Sessions and Reports

The listening sessions and reports obtained from other sources tell a story about student experience that is antithetical to University values and norms. We heard about crushing encounters that have crippled students' academic achievement. We heard about students being avoided and avoiding others, about exclusion from clubs and activities, isolation and even intimidation in classrooms, bullying, threats, stereotyping, ethnic slurs, disqualification from opportunities, fear of retaliation, and community erosion.

Almost as troubling were the responses that students received when they attempted to complain about these incidents. Students consistently reported a failure to listen on the part of administrators as well as students or a quick dismissal deployed in the service of closing down the possibility of discussion or argument. We often heard in the listening sessions about students being told, when they pushed back against a claim they suggested was antisemitic, that "that isn't our intent, and the way it is impacting you is wrong." We heard anecdotes about students saying they don't mean "all Jews," in an effort to downplay accusations of antisemitic generalizations. Other students said, "People are justifying antisemitism by saying that it's okay as part of a larger movement."[69]

Recent events on campus have underscored that, in some cases, high-level administrators are minimizing the pain of the Jewish and Israeli Columbia community. [70] With other groups, faculty and administrators often defer to the group's definition of what is painful and hateful. But with Jews and Israelis, there has been no such deference. Instead, others have tried to dictate what does and does not constitute antisemitism.

The listening sessions were marked by frustration with the administration. The majority of students who came to the sessions felt that the administrations of their various schools were late to respond, if they responded at all, and did so in an inconsistent way. To be clear, these students were not asking for protection from ideas or arguments. Many of the incidents that students reported involved being verbally attacked and spit on walking on Broadway because they were wearing kippahs. One student who reported this to the Office of Diversity was told, in response,

---

[68] Quotes obtained from an anonymous survey of Israelis students at Columbia University conducted by Rebecca Kobrin/Gal Kedem between April 3 and May 23, 2024.

[69] Columbia/Barnard Hillel Listening Session, February 20, 2024.

[70] Sharon Otterman, "3 Columbia University Deans Who Sent Insulting Texts Have Resigned," *New York Times*, Aug. 8, 2024.

31

that there was no reason to feel unsafe; and that if the student was feeling unsafe, perhaps they should leave campus. In another case, a program director refused to meet with a student after they made their complaint.

In some cases, students relayed that when they complained about antisemitism, some school administrators tried to steer them to mental health counseling. One student reported, "I tried to reach out to the school but they made me meet with the school social worker before I could meet with the Dean of Student Affairs." While mental health services should be available to anyone who wants or needs them, administrators should not medicalize a student experience of discrimination in lieu of addressing it. One student reported that the school administration dismissed their concerns, saying, "There is not an antisemitism problem, it is an anti-civility problem." Another student reported that when trying to discuss concerns about Jewish discrimination with an administrator, they were told they were the only student who had reported concerns about antisemitism, and were referred for therapy. As it happens, a *second* student in the same program said they were *also* told that they were the only Jewish student to make the same report. Another student was told to file a bias report but, upon following up, found that the form lacked any language for antisemitism.

Indeed, the reporting process is a source of remarkable confusion and distress, followed by skepticism that anything will happen. One student recounted having seen someone wearing a hoodie with a swastika and a star of David on it, and not reporting it because they did not know where to go or whom to talk to. Some students chose not to report because they feared the incident in question was not "blatant enough" to warrant reporting.[71]

One student felt that reporting was a hassle and a tedious process that led to nothing. Others were frustrated that the people expected to respond to their queries were not educated on Jewish harassment issues. Many others recounted having reported incidents and never hearing back from the administration. As one said, "Does it go in a black hole?"[72]

Many students thought that the main address for these complaints was the offices of Diversity, Equity, and Inclusion (DEI). However, DEI offices, which are decentralized across the schools, have generally not engaged Jewish student complaints. In our survey of the various websites, programs, and discussions offered by each of the DEI offices (which vary widely in robustness from unit to unit and school to school), we found only one that mentioned antisemitism. It is possible that some trainings mention antisemitism. This omission fed into a perception of bias in which Jews figured as oppressors in an oppressor/oppressed binary whose power meant they

---

[71] Graduate School of Architecture, Planning and Preservation Listening Session and Climate School Listening Session, February 26, 2024; Irving Medical Center Listening Session, April 8, 2024.

[72] School of General Studies Listening Session, February 29, 2024.

Cited in Khalil TRO of Columbia Univ. 25-cv-2079 Decided 3/19/26. Archived on 3/25/26. This document is protected by copyright. Further reproduction is prohibited without permission.

could not be discriminated against; for others, the omission merely indicted a notable absence of concern for Jewish students.

For many students, the University's shortcomings with accountability are inseparable from its reluctance to discipline various forms of hatred and enforce its own rules. Students feel that the University simply does not take antisemitism seriously. One student said they felt as though "the threshold for [reprimanding] antisemitism was higher [than for other forms of hate]." We also heard the sentiment that the University failed to discipline anti-Israel hate. One student said they had seen communications regarding anti-Palestine hate, antisemitism, and Islamophobia, but no mention of anti-Israel hatred.[73] Anti-Zionist students who attended the listening sessions also felt that the University had failed to discipline what they considered discriminatory or harassing speech.[74]

It should be said that the University's slow responses were in part due to the difficulty identifying perpetrators. Many protesters used face coverings such as surgical masks, sunglasses, keffiyehs, and bandanas to avoid being identified. This made it extremely difficult to identify individuals committing acts of aggression or track recidivism rates. One student said, "Trying to cross to go to Temple on a Friday.…You don't know exactly who pushed you. You don't, people are wearing masks.…I just think it's a very intimidating thing." Another, "This is unacceptable. You have a bunch of students [and] you don't know who they are. No one knows who they are, not affiliates, affiliates. You just don't know who they are, and they can do whatever."[75] A student said:

> I think the way the campus has been trying to make us feel safe has been having the opposite effect. The arrests have made things worse. The sense of community comes from a sense of safety. If the University wants to focus on making students feel safe, they need to focus on students who are an actual threat.…The University needs to take a more targeted approach.[76]

Students observed that the early failure to act on some of the worst incidents, which in their view were straightforward violations of University policy, empowered antagonistic students to become more aggressive. Many zeroed in on what they felt was the administration's insufficient definition of safety. The University, they said, simply wasn't being clear enough: "General

---

[73] School of General Studies Listening Session, February 29, 2024; Columbia/Barnard Hillel Listening Session, February 21, 2024.

[74] See for example, Columbia/Barnard Hillel Listening Session, February 21, 2024; Arts & Sciences Listening Session, March 1, 2024.

[75] Arts & Sciences Listening Session, March 1, 2024.

[76] Columbia/Barnard Hillel Listening Session, April 21, 2024.

33

emails saying, 'We don't support antisemitism, there's a zero-tolerance policy…' are completely meaningless to this group at this point."[77]

A sense of community flows from a sense of safety; one cannot exist without the other. As tensions on campus reached a high point, the administration offered students minimal information and few updates. This led to crippling anxiety among students who felt targeted. One said:

> I don't know how to continue on this campus. I got texts [on] my personal phone from the union meant to represent me for purposes of my health insurance [that were] sending messages to join the protests on Sundial to call for the end of my family and death to my family. They call for Zionists off our campus. Many of the faculty who are less aware only know that police were on campus; they don't know what is going on. They have to know what is going on, [but] they don't. Please make clear what is actually going on.…None of us deserve to be unsafe on campus. We have a difference of views and that is fine.[78]

Students worried about the insufficiency of security protocols such as screening for weapons and monitoring the entry of non-Columbia affiliates who are brought onto campus by students, faculty, and staff.

Many students, across the political spectrum, felt that Columbia had failed to make the right decisions when it came to crisis management and de-escalation. One student said:

> I don't feel like I can support the people who are there to keep us safe. I have problems with the way the University has handled this. I'm to the left on a lot of things. I don't think I can support the way the campus is trying to keep us safe. I don't like seeing them drag my friends from campus. I don't like how the University has handled this. I've heard from my most left and most right friends that no one feels like Public Safety can keep them safe.[79]

The absence of clarity about what constitutes discrimination and how to report may well affect all groups, not just Jews. Essential questions in the treatment of antisemitism—continues to beg for an answer: would we, as a community, accept this environment in relation to any other group? Would we handwave it away by referring to our negligible responsibility if events happened directly outside the campus gates? Would we feel comfortable with the minimization of such claims, or would we dismiss it as gaslighting? As students became increasingly

Cited at Khalil v. Trustees of Columbia University, 25-cv-2079, Decided on 3/25/26. Archived on 3/19/26. This document is protected by copyright. Further reproduction is prohibited without permission.

---

[77] Arts & Sciences Listening Session, March 1, 2024.

[78] Columbia/Barnard Hillel Listening Session, April 21, 2024.

[79] Columbia/Barnard Hillel Listening Session, April 21, 2024.

34

disheartened with the administration's delayed and vague responses, many of them turned to their community for both support and information. One student in the School of Social Work said:

> We are a very close-knit Jewish community here to protect ourselves. We give each other information about what happened this semester, we're identifying professors that will protect us that are Jewish.…We're being separated. Jewish students who are the victims of antisemitism are being removed from the situation, rather than the perpetrators being removed from the situation, which is so against social work values. I can't even fathom who thought that was a good idea.[80]

While this is a powerful example of students building solidarity in times of crisis, students should not be the sole source of support and updates.

We were gratified to see a rich, nuanced conversation taking place in the listening sessions. Yet many students reminded us that to express such nuance and complexity in their daily lives was difficult—that they felt that they would not be accepted anywhere unless they picked a side.

Students worried that new norms were being established by the months of conflict on campus. One student said, "We're seeing on campus intimidation, active exclusion, assault, conspiracies of blood libel and media and financial control, historical erasure, and calls for violence. And even as the active discussion of these ideas may subside, they will already have started to settle subconsciously as the norm amongst the majority of the non-Jewish student body." "Why should I, as a Jew in America, feel vulnerable?" was one doctoral student's question. Whether Jews feel vulnerable in America is an open question: but they feel vulnerable at Columbia. And its reputation as a place that tolerates antisemitism is spreading. We have heard reports of Jewish students declining offers of admission to Columbia, in some cases making such decisions after experiencing hostility at an admitted students' day event on campus.[81]

> There is a deep breach of trust and belonging at this university. The University doesn't want me here and I don't want to be here. I have a visibly Israeli name; can I stay at Teachers College? Do I want to finish my PhD program here? I get my daily "Morningside Campus closed" [message]. I want the university to reach out to me and tell me how to transfer to another school and to change their housing contract. *I want out.*[82]

---

[80] School of Social Work Listening Session, April 4, 2024.

[81] Irving Medical Center Listening Session, April 8, 2024; Teachers College, March 26, 2024.

[82] Columbia/Barnard Hillel Listening Session, February 21, 2024.

As for admitted students, one said, "I don't get congratulations for being at Columbia anymore. All I get are calls to ask if I'm okay." Another said, "I want to be proud of where I went to school. Now I'm just wanting to know when I get my expensive piece of paper and get out of here."[83] We do not have data on student transfers out of Columbia and Barnard, nor do we know how many Jewish students have declined admission to the colleges and graduate programs. We do know that Ramaz, a prestigious Jewish high school in New York City, will not be sending any graduates to Columbia College this fall, for the first time in over twenty years.[84]

At the same time, many students despite unpleasant experiences, retain their faith in the power of education to confront the impasse in which the university has found itself.

Students demonstrated an awareness of the importance of programs that bring diverse voices and different points of view together. Students generally continued to hope that multiple points of view could be accommodated in safe spaces, even though they are also aware that such spaces are becoming rare on campus. One student said, "When I was doing orientation there were programs on sexual respect, DEI, lots of programs in these areas. Something I don't remember seeing was how to engage in respectful dialogue with people you disagree with." "If there was a program that put people who support Israel and Palestine [in the same room], that would feel like a miracle at this point," another remarked.[85]

This point, we think, is central to understanding these events: the clashes between students, protesters, faculty, and the administration have led to a significant decrease in real dialogue. One student said, "People who have an Israeli or Palestinian flag don't talk to each other.…They don't even view each other as human beings." And another, "Students are not engaging in respectful discourse and don't make an honest attempt to even hear the other side." Adding to the difficulty of having thoughtful conversations is what many students regard as misinformation, disinformation, and confusion about the Israeli-Palestinian conflict. One student said, "There is too much discourse happening. Anytime there is a dialogue, there are students and a moderator but very little defining or factual information." As one student put it, education plus misinformation can often lead to antisemitism. To this effect, another student felt that student orientation should include education on antisemitic tropes. Another student suggested "adjusting the syllabus for Contemporary Civilization to include a unit on the Holocaust and the rise of European antisemitism.[86]

---

[83] Irving Medical Center Listening Session, April 8, 2024.
[84] Carl Campanile, "Every graduate of elite NYC Jewish high school avoids Columbia for first time in decades," *New York Post*, August 18, 2024.
[85] School of General Studies Listening Session, February 29, 2024.
[86] School of General Studies Listening Session, February 29, 2024; Law School Listening Session, April 9, 2024; College and Core Listening Session, February 29, 2024.

Cited w. Khalil v Trs of Columbia Univ 25-cv-2079 Decided 3/19/26 Archived on 3/25/26 This document is protected by copyright. Further reproduction is prohibited without permission.

To be clear: the students do not believe that a simple commitment to dialogue, a refreshing of pieties about conversation and argument, is close to sufficient at this point. Nor do they want the University to issue statements about where they side. They believe that the University has a responsibility to establish structures to educate students on the difference between free speech and discriminatory or harassing speech, as well as acceptable and unacceptable action. They consider the University bound by duty and by law to ensure students are able to learn and live in a neutral environment in which discrimination is not tolerated, without fear for their safety.

What we heard makes clear that hundreds of Jewish and Israeli students did not have this experience at Columbia University in the academic year 2023-2024.

Cited in Khalil v Trs of Columbia Univ
25cv2079 Decided 3/19/26
Archived on 3/25/26
This document is protected by copyright.
Further reproduction is prohibited without permission.

37

## II.    Recommendations for Promoting Shared Values and Inclusion: Improving the Campus Environment

### A. Introduction

On December 20, 2023, then-President Shafik announced a series of programs and policies signaling a reinvestment in Columbia's core values. "Our differences should be a source of strength," she observed. We "build community and encourage vigorous debate" among students who come "from different backgrounds and have different ways of looking at the world."[87]

Columbia offers students the invaluable opportunity to engage in the classroom, in student clubs, and all types of co-curricular activities with peers who grew up in very different circumstances. Students arrive from cities, suburbs, and rural areas, and from continents thousands of miles apart. They speak different languages, celebrate different faiths, and are of different races and ethnicities. They have different sexual orientations and gender identities. Some come from comfortable or wealthy backgrounds, while others come from families who have struggled economically. Columbia students may be first-generation immigrants or "Dreamers" or their ancestors may go back to the American Revolution. Some are the first in their families to go to college, while others are the children or grandchildren of Columbia graduates.

Columbia offers our students a unique opportunity to form lifelong friendships with people different from themselves. Over the years, this has been a hallmark of a Columbia education. We hear this from graduates again and again. They met many of their closest friends at Columbia; these are people they might never otherwise have met if Columbia had not introduced them to each other.

In encouraging these ties, Columbia provides our students with skills to build bridges and to value pluralism, both of which are essential in an increasingly polarized world. Societies cannot thrive when they are composed of warring camps. Individuals need to approach disagreements with tolerance and respect and recognize the many goals and values they still share. Universities should be places where these skills are modeled and taught.

The student testimony in the previous section makes clear that the University has failed to meet the expectations of Jewish students that they will be treated with the same standards of civility, respect, and fairness as other students. The social compact is broken. University policy and individual practice must change if we are to fix it.

There are a broad range of challenges. We started by addressing the rules governing protests in our first report. The rest of this report focuses on training and workshops, defining antisemitism

---

[87] *Columbia Launches a Reinvestment in Its Values and Mission.*

for those programs, issues in reporting, and the rules governing student groups. We will address other important issues in future reports.

The recommendations in this report are based upon student testimony, the research we have done on how other universities are dealing with similar problems, conversations with numerous administrators and faculty, and a careful review of current practices and procedures across the Columbia campuses.

We found that administrative structures intended to ensure that all members of our community respect each other, engage in civil discourse, and receive fair treatment in a dispute-resolution process are not working effectively for Jewish students. The University's ethos of concern for belonging and inclusion hasn't applied to Jews (at least not those identifies as "Zionist" or Israelis). All students should feel that they belong. We expect Interim President Armstrong to lead a robust discussion on how to improve the campus climate, building on her statements.

While some of our recommendations are specifically focused on Jewish and Israeli students, developments have impacted the entire University community. We believe that our recommendations concerning training, process, and procedure should be implemented to improve the experience of *all* students who face bias, discrimination, exclusion, or intimidation. Some of our recommendations are straightforward and should be implemented quickly; others will require more extensive consultation and discussion, including the creation of a broadly representative faculty and staff committee. We urge the involvement of faculty members so that real change grows directly out of community engagement.

Our recommendations have been informed by the following findings:

- Columbia's administrative decentralization has made it difficult for the University to respond quickly and effectively to a crisis. Every school has a different approach to handling student reports of discrimination and disruption of academic events. As a result, responses to antisemitism have been uneven. For the University to respond to crises effectively (especially ones as threatening and prone to escalation as the ones we saw this past academic year), it has to make sure all schools are aligned on anti-discrimination policy and procedures. This is beginning to happen, as University Life facilitates Title VI orientation training for the Students Affairs staff.
- Even under ordinary conditions, systemic problems related to oversight, transparency, and accountability stand in the way of uniformly implementing policies that support inclusion.
- Existing operational infrastructure aimed at building consensus over points of contention on campus is inadequate. Faculty and administrators operate in separate silos in times of crisis.

39

We begin by addressing the need to improve the experience of all students who face bias, discrimination, exclusion, or intimidation, including antisemitism. We think much can be accomplished through expanded and improved trainings, workshops, and informational websites, as well as improved reporting procedures.

Successful trainings require willing participation by all community members and an ongoing commitment to apply new knowledge. Trainings only work when they are part of an ongoing effort, so we advise building upon these sessions with additional programming throughout the academic year. The next part focuses on practical issues of implementation, including who should design and assume responsibility for trainings. We offer recommendations for what should be covered: education, through trainings and workshops, on how to mediate difficult conversations, dealing with divisive topics, implicit bias and stereotype training, and allyship training. Further, we discuss the need for an educational focus on antisemitism, suggesting mandates for training in cultural competency. We also make recommendations for how the University can build consensus across the community by raising awareness and engendering knowledge in a consistent, comprehensive, and accessible way. Finally, we recommend that all trainings and workshops be periodically evaluated for their effectiveness—what works, what doesn't—and updated to reflect the changing needs of the University community.

The second part of this general discussion identifies weaknesses in the existing system of reporting at the University, given that shortcomings have been at the heart of the testimonies we heard in our listening sessions. We explain current procedures for report/grievance-filing and dispute resolution. We then provide recommendations for improving both. In addition to the formal processes that are in place and administered centrally, we believe that students would benefit from being able to use informal procedures for reporting and for mediating complaints, but the availability of these informal dispute resolution opportunities, which are generally offered by Deans of Students, is uneven across the various schools.

In the third part we address a specific site of exclusion: student clubs. We recommend that student groups engage in a robust consultation process before issuing statements or joining coalitions; that student groups be inclusive and membership be limited only for reasons connected to the club's mission; and that student groups generally should not issue statements unrelated to their missions. In making this recommendation, we emphasize that there should be no limits on the free speech rights of a group's members when they speak for themselves, instead of for the group.

The final part of this section acknowledges another important place where students experience antisemitism: the classroom. The Task Force will be providing specific recommendations for addressing anti-bias and inclusion in the classroom in a future report.

### B. Anti-bias and Antisemitism Trainings, Workshops, and Informational Websites

40

A singular advantage of Columbia University is that students come from every part of American society and from around the world, which presents students with a form of diversity that most have never before encountered. Mutual respect grows out of greater knowledge of the makeup of this broad community and how to protect the rights of all members. Students must learn how to share the spaces afforded by campus life, not just when it comes to classroom activities, but also in day-to-day interactions. They should be cognizant of behavior that enhances group life and they need to know what forms of speech and actions may make others feel threatened or uncomfortable. Faculty and student-facing staff should model respectful behavior in all their interactions with each other and with students. Such basic acknowledgment constitutes the bedrock of trust necessary for university life.

Training sessions and educational workshops have been an established part of the University practice for many years, and they remain essential to ensure that we follow through on our promise of accommodating the demands of diversity. It is clear from our research that we have not kept up with the evolving needs of our University community.

The student testimonies in our listening sessions highlight the need for required training in antisemitism at student orientations and for all student-facing staff, just like the existing programs that address race, gender, and social issues such as sexual conduct. We also wish to call attention to the needs of Muslim, Arab, and Asian students. Our values call for equal treatment for all, supported by legal obligations under Federal, State, and local civil rights laws.

Training is an especially good fit for a university because it is a form of education. The goal is not to ban or require particular speech, but to help all people within the community, especially new members, gain a better understanding of how words and actions may be perceived and can cause harm. If students must rely only on legal remedies to address problems of biased treatment and exclusion, we have failed as an educational institution and as a community.

On July 8, 2024, the University announced that in the fall of 2024 it would begin mandating that Columbia students, faculty, and staff undergo anti-discrimination training (including a focus on antisemitism).[88] This is an important first step. However, at this point, it is unclear whether this initiative will be for all, or exclusively for incoming students, faculty, and staff. It is also unclear whether this is a standardized University-wide initiative, or if each school will be responsible for creating its own curriculum. We expect the University to recognize the rise in antisemitism on campus, as we document in Section I of this report, and we recommend that the University respond by adding specific guidance on how to identify and address antisemitism in its anti-discrimination training, workshops, and websites.

Our review of current practices and specific recommendations for improvement follow.

---

[88] https://president.columbia.edu/news/messages-president-shafik-and-provost-olinto

**1. Recommendations for Who Should Receive Trainings and Workshops**

If we are to change the campus climate so that all students, faculty, and staff feel included, we need all members of the University community who engage with students to receive training that reinforces our shared values.

*We recommend all students, teaching assistants, residence assistants, faculty, senior administrators, and student- facing staff receive required training.*

**2. Recommendations for How Trainings and Workshops Should Be Implemented and What Content to Consider**

Columbia's Equal Opportunity and Affirmative Action (EOAA) website provides a suggested syllabus highlighting ways to make students feel included and safe, such as encouraging them to share their pronouns, to reach out to the University's disability office, and teaching them what the duty to report means. It is unclear whom this syllabus is geared toward, or how it is enforced. We have identified more than ten different courses being offered by different schools across the University that focus on anti-bias and exclusion. This multiplicity poses several challenges, especially with regard to consistency.

*We recommend that the provost establish a Cross-School Committee that includes Barnard College and Teachers College in order to standardize basic aspects of training, workshops, and website information for all schools.*

*A working group within the Cross-School Committee should be setup immediately with responsibility for vetting trainings and ensuring consistency in values and procedures for these trainings across the University.*

*Training should focus on all parts of university life where students experience bias and feel excluded. These include the classroom; dorms; student organizations and groups (clubs); day-to-day encounters; protests; and social media.* This can be accomplished by affording every constituency that is receiving training the opportunity to share their own experiences with the Cross-School Committee and to relate what behavior they find to be discriminatory, harassing, or insensitive.

Some aspects of training will require adaptation to the needs of particular schools, but baseline values, expectations, and procedures must be consistent across campus. Simply put, we must be telling students, student-facing staff, new faculty, teaching assistants, and resident assistants the same thing in all schools and programs across the University. The decentralized structure of Columbia is an obvious problem for ensuring consistency in values and procedures across the University and must be mitigated in the Cross-School Committee. *Training material and procedures must be uniform, accessible, and transparent.*

*We recommend that the central administration set up a repository for best practices so that offices responsible for different University constituencies can share information and coordinate*

Cited in Khalil v. Trs of Columbia Univ, 25cv2079 Decided 3/19/26, Archived on 3/25/26. This document is protected by copyright. Further reproduction is prohibited without permission.

42

*procedures.* This *resource bank* would be a first step in achieving consistency, accessibility, and transparency.

*The University central administration should collect and provide basic material that all schools use for student orientation, new faculty orientation, training for teaching assistants, and training for resident advisers and resident assistants, as well as material for new staff.*

Each school should make available to the public, online, as much shared and consistent information as possible. We understand that some content may have to be communicated internally to faculty and staff or communicated via email directly to involved parties. Ultimately, all schools and affiliates of the University must, in good faith, show complete transparency in their approach to anti-bias training. Mitigating antisemitism and all other forms of bias requires a multifaceted plan that incorporates various means of sensitizing and educating community members.

*The Cross-School Committee should consider how training should be delivered and how often.* Almost every school at Columbia has sections on its website dedicated to its efforts to foster inclusion and diversity, and most offer optional programs and resources related to anti-bias and inclusion issues. However, few actually require that students take a live training course. The current mix of online and in-person training and workshops, as well as interactive and static content online, must be evaluated. Simply offering training and courses online, which many schools do, carries the risk of generating too little student involvement and interest. Without opportunities for questions and dialogue, students may well find it difficult to engage in a genuine way with the issues. Faculty- and student-facing staff may also experience challenges with online training. *We recommend careful consideration and evaluation of how training is offered and we encourage in-person training, especially for incoming students and new faculty.*

*The Cross-School Committee should also examine the design features that go into effective anti-bias and inclusion training.* Research indicates the greatest success is associated with sustained and continuous effort, rather than one-time sessions. Long-term programs help by building skills gradually, which in turn prompts behavioral and organizational changes.[89]

### 3. A Working Definition of Antisemitism

*The Task Force supports former [President Shafik and Provost Olinto's July 8, 2024 announcement](#) that the provost's office will launch new anti-discrimination training that includes antisemitism training for faculty and staff this fall. University Life is also developing related training for students.*

---

[89] There is a vast research literature on how to evaluate the effectiveness of trainings. A useful place to begin is T.N. Garavan, *et al.* (2020). *The Current State of Research on Training Effectiveness. In: Learning and Development Effectiveness in Organisations*. Palgrave Macmillan

In order for trainings or workshops to be effective in combating antisemitism, the University needs a working definition of antisemitism based on the experiences of students, faculty, and staff in recent months. This definition must offer guidance about the most common manifestations of antisemitism at Columbia. Without a working definition, it would be impossible to offer examples of antisemitism in practice that are useful for staff who directly engage students, and in the design and evaluation of new trainings and programs.

Instead of starting our work by adopting an existing definition of antisemitism, we followed the "inductive approach" recommended by Sergio Della Pergola,[90] formulating guidance based on the reported experiences of Jews and Israelis at Columbia. We call this definition a "working" definition because it is likely to evolve based on further research and changing circumstances.[91]

*The Task Force recommends the following **working definition of antisemitism** for pedagogy and training purposes only. It is not intended to be used in disciplinary procedures:*

> *Antisemitism is prejudice, discrimination, hate, or violence directed at Jews, including Jewish Israelis. Antisemitism can manifest in a range of ways, including as ethnic slurs, epithets, and caricatures; stereotypes; antisemitic tropes and symbols; Holocaust denial; targeting Jews or Israelis for violence or celebrating violence against them; exclusion or discrimination based on Jewish identity or ancestry or real or perceived ties to Israel; and certain double standards applied to Israel.*

We have developed this guidance solely for educational purposes and not to limit speech. Trainings and workshops should draw on it to educate members of our community about what many Jewish and Israeli people find offensive, just as existing programs provide guidance about other forms of bigotry and hate.

---

[90] See Sergio Della Pergola, "How Best to Define Antisemitism? A Structural Approach," *Antisemitism Studies* 4, no. 8 (2024) (recommending "bottom-up rather than top-down" approach that "consider[s] empirical real-world Jewish perceptions and experiences of antisemitism—the experiences of the people who are directly and personally affected by antisemitism"); see also Sergio Della Pergola, "Antisemitism: National or Transnational Constellation?" in *Confronting Antisemitism From Perspectives of Philosophy and Social Sciences* 21 (2021) (exploring fundamentals of contemporary antisemitism using quantitative data techniques). This follows a shift in the scholarship on antisemitism, which engages previous attempts to define the term that prodded leading historian David Engel to suggest moving away from the term altogether. See Yehuda Bauer, "In Search of a Definition of Antisemitism," in Michael Brown, ed., *Approaches to Antisemitism: Context and Curriculum* (New York: American Jewish Committee, 1994), 10–23; David Engel, "Away From a Definition of Antisemitism: An Essay in the Semantics of Historical Description," in Jeremy Cohen and Moshe Rosman, eds., *Rethinking European Jewish History* (Oxford: Oxford University Press, 2009), 30–53; David Nirenberg, *Anti-Judaism: The Western Tradition* (New York: Norton, 2013); Dan Michman, "The Jews as a Problem for Modern European Political Logic" in Armin Lange, Kerstin Mayerhofer, Dina Porat, and Lawrence H. Schiffman, eds., *An End to Antisemitism Vol. 3, Comprehending Antisemitism Through the Ages: A Historical Perspective* (Berlin: De Gruyter, 2021), 27–43.

[91] The definition might also evolve over time to take into account the way that the Department of Education and the courts interpret and apply Title VI, as well as any new federal or state legislation.

Cited in Khan v. Trustees of Columbia Univ. 25-cv-2079. Decided on 3/22/26. Archived on 3/22/26. This document is protected by copyright. Further reproduction is prohibited without permission.

To be clear, we do not think that a statement should be impermissible just because it qualifies as antisemitic under this definition. Offensive statements generally are protected under the University's rules, so the University can encourage vibrant debate. *The purpose of this definition is to educate, not to ban.* We expect that when some people learn that a statement is offensive to their colleagues, they will *choose* to make their point in a different way. But this definition should not be used to impose discipline.

This is not to say that "anything goes." The University's rules do limit speech to comply with Title VI of the Civil Rights Act of 1964 and other federal, state, and local civil rights law.[92] Notably, these statutes—and, thus, the University's rules—do not ban "antisemitism," but a "hostile environment" and "discriminatory harassment." The reason why these concepts are more general is that they apply not only to Jews, but to all protected classes.

In fact, Title VI requires all protected classes to receive the same treatment. The statute does not permit a university to offer some protected classes more protection than others. Rather, the statute guarantees them the same rights. As a result, any limits on speech rooted in anti-discrimination law must be general, applying the same way to all protected classes, including all religious minorities, as well as Black, Latino, Asian, Arab, female, and LGBTQ+ members of our community. This is why our first report, which focused on rules and discipline, did not include a definition of "antisemitism," and focused instead on "discriminatory harassment" and "hostile environment.[93] This report, however, discusses training and workshops, so we offer a definition for that purpose.

To lend further clarity to this definition, Appendix C offers examples of incidents experienced by many Jewish and Israeli students as antisemitism, drawn from student experiences, which include ethnic slurs (e.g., "F*** the Jews"), antisemitic tropes (e.g., "Zionist trustees and donors keep your hands off our university"), stereotypes (e.g., alleged threats from Israeli veterans), calls to violence (e.g., "Al-Qassam Brigade's next target"), exclusion (e.g., of Zionists from student groups), and double standards applied to Israel (e.g., calls for divestment solely from Israel).

---

[92] In some cases, the University can comply by condemning speech, instead of limiting it.

[93] The law already offers guidance on what constitutes discrimination against Jews under Title VI. Executive Order 13899 provides that "In enforcing Title VI, and identifying evidence of discrimination based on race, color, or national origin, all executive departments and agencies charged with enforcing Title VI shall consider" the IHRA's "non–legally binding working definition of anti-Semitism," as well as the IHRA's "Contemporary Examples of Anti-Semitism" …to the extent that any examples might be useful as evidence of discriminatory intent." The Executive Order also provides that in considering the IHRA definition and examples, "agencies shall not diminish or infringe upon any right protected under Federal law or under the First Amendment" and that "the inquiry into whether a particular act constitutes discrimination prohibited by Title VI will require a detailed analysis of the allegations."

45

**4. Training and Workshops Recommended for Students and All Members of the University Community Who Engage with Students**

*The University should consider offering a variety of elective and mandatory trainings and workshops to all members of the University community who engage with students. Examples include:*

- *How to Have Difficult Conversations on Divisive Topics Training* provides students, student-facing staff, and faculty with basic information on how to have difficult conversations. Professor Peter Coleman runs a conflict resolution Lab at Columbia Teachers College. He is also a member of this Task Force. Professor Coleman and his Lab have produced an extremely helpful document, *How to have Constructive Conversations on Divisive Topics*,[94] which could be shared with the entire University community. In March of 2024, the School of Professional Studies at Columbia posted a guide on their website to help faculty navigate difficult conversations in the classroom. We would encourage the University to create a similar guide and for schools to add specific material when needed for their communities. Unfortunately, an online guide alone is not sufficient to address some of the problems identified by students in the classroom. We think all faculty would benefit from mandated training on how to mediate sensitive conversations in the classroom. Beyond reiterating and clarifying what constitutes hate speech, these training sessions should present faculty with varied scenarios for them to evaluate. Among the anti-bias and inclusion topics presented in these scenarios, there should be specific ones about antisemitism.
- *Implicit bias and stereotype training* helps participants uncover and address unconscious biases and stereotypes that contribute to antisemitic attitudes. This type of training can use tools like the Implicit Association Test (IAT) to reveal hidden biases. Stereotype deconstruction can be used to identify and challenge common stereotypes about Jewish people and Jewish history. This training can promote behavioral change strategies, which help students to develop skills to counteract biased thinking and actions.
- *Bystander intervention training* empowers individuals to recognize and effectively respond to bias incidents. This type of training would be especially helpful in teaching faculty, students, and staff to recognize antisemitism by learning how to identify antisemitic behavior and language. This training can include simple intervention techniques that teach practical methods to intervene and support victims safely. Students' testimony has made it clear that they know little about how to report incidents or access resources for assistance. This training would be one opportunity to provide students with those resources, both for themselves and should they need to share it with others.

---

[94] Peter Coleman, "How to have Constructive Conversations on Divisive Topics." https://icccr.tc.columbia.edu/resources/how-to-have-constructive-conversations-on-divisive-topics/

46

In Appendix D we have also compiled a list of suggestions for trainings and workshops, along with selected scholarship on antisemitism, anti-Zionism, and anti-Israel rhetoric, which should be useful as the University expands its resources for students, faculty and student-facing staff. We were especially impressed with the work of Zach Schaffer at Project Shema and Iboo Patel at Interfaith America.

**5. Proposals for Speakers, Convenings, and Panel discussions Specifically on Antisemitism**

*Recognizing that trainings are only one way to change campus culture, then-President Shafik and Provost Olinto have also committed to scheduling talks, workshops, and retreats. They go on to say, "The urgent aim is to build an inclusive and welcoming environment for every member of our community."[95] The Task Force endorses this important statement and we expect that the recommendations in our reports will support such an effort.*

Throughout the University, we found notably few ongoing programs that focus on antisemitism. Although different schools and departments have hosted workshops on the topic, we could not find any substantial examples of mandatory or permanent guidelines relating to antisemitism or Islamophobia. The training and workshops we propose specifically focus on antisemitism but should be considered for other forms of hate and discrimination, including anti-Arab bias and Islamophobia.

University Life offers resources and initiatives specifically aimed at combating antisemitism and Islamophobia on its Promoting Inclusion & Belonging at Columbia webpage. Their site includes educational materials and support for addressing these issues and we have been informed that these support services are being updated. *The Task Force supports University Life's efforts to update its informational resources and services for students experiencing antisemitism and all forms of hate and expand its lectures and convenings.*

During this past academic year Columbia College seems to have scheduled only one event in which students could engage with faculty on the issue of antisemitism, Community Discussion: Racism, Antisemitism, and Islamophobia, on November 28, 2023.

*Two promising initiatives: Campus Conversations and Dialogue Across Difference.*

In December of 2023, as tensions on campus were building up, former President Shafik announced that the University would be launching a series of initiatives aimed at "reinvest[ing] in Columbia's values and mission." Among these initiatives were the Task Force on Antisemitism and the Dialogue Across Difference (DxD), "designed to foster a resilient and inclusive community of learners among students, faculty, and staff to engage with different

---

[95] Then President Shafik and Provost Olinto's July 8, 2024 announcement.

Cited in Khalil v Trs of Columbia Univ. 25 cv 2079 Decided on 3/25/26. Archived on 3/25/26. This document is protected by copyright. Further reproduction is prohibited without permission.

perspectives and navigate challenging conversations." After a combined 19 events were hosted between January and February 2024, only six were hosted between March and April. We understand that this downturn may be in part related to the semester coming to a close, but we nonetheless were surprised to see only one event being hosted in April, at a time when tensions were at an all-time high, and students may have benefited from both guidance and learning opportunities. Beyond the obvious need for the administration to focus on the active crisis on campus, exacerbated by the illegal encampments, it is our understanding that several student organizations and faculty were actively promoting a boycott of this program, so it was difficult to continue scheduling speakers. This further demonstrates the need for the University both to mandate more comprehensive anti-bias and inclusion training for all, and to organize events and learning opportunities more consistently that are promoted with and across all the schools.

*The central administration should work with the Cross-School Committee to reboot the Dialogue Across Difference Program (DxD) and encourage the schools and departments to identify speakers and promote this important educational opportunity.*

**6. Customizing Trainings, Workshops, and Resources for Different University Constituencies and Schools**

We recognize that training, workshops, and resources also need to be customized for different constituencies and schools. Our conversations with administrators, faculty, and students have made it clear that the University needs consistency and transparency when it comes to training and reporting procedures. It is critical that customization not result in confusion and contradiction.

*The Cross-School Committee should ensure that when schools or administrative offices create their own trainings and resources, they should build on a baseline training that is consistent with existing University-wide policies and procedures.*

Columbia's administrative decentralization has not only created confusion for students and faculty and contradictions in policies and practice, but it also creates inefficiencies. *When schools or administrative offices customize trainings or resources their work should be made available to others in the University involved in these activities through the resource bank.*

In this section, we suggest ways in which different schools and administrative units may decide to customize their training resources.

- *Customizing Trainings and Workshops for Students*

Orientation creates a special opportunity to introduce students to University values and norms and to set expectations about behavior. It is also an opportunity to educate students about

48

diversity, pluralism, and tolerance. University Life has been working to update and improve its student training for orientation. The Task Force has had the opportunity to confer with their office and offer our suggestions. We are very supportive of its work and we recognize that these trainings will be evaluated and changed during the next academic year. University Life has its Inclusion and Belonging Initiative. It provides a choice of programs including trainings, independent projects, and tutorials. Their overarching goal is "to foster an inclusive community that supports all students and their sense of belonging." We encourage University Life to evaluate these offerings and compare their impacts on students who went through different orientation experiences.

Examples of ways in which the office has been working to modernize the student orientation training material include more in-depth training on Title VI; an improved and more extensive list of resources students can access to learn about religious discrimination and bias; more opportunities to learn about university policies; what may constitute an infringement; and where and how students may report grievances. Reporting and training are inseparable, and the modernization of training and workshops will fundamentally help with the modernization of reporting mechanisms. (Please see the following subsections for recommendations on training and reporting.)

The most successful training should provide students with a shared experience that builds consensus. We do not expect agreement on contentious issues, but students need to learn how to have respectful conversations in social settings and in the classroom.

We know that introducing anti-bias and inclusive teaching frameworks early in a student's university experience can contribute to fostering a campus culture that values diversity and inclusion. Reiterating, redefining, and clarifying what constitutes discriminatory behavior can give students clear guidelines on what *is* and *is not* tolerated at Columbia, and ultimately can help set the tone University-wide.

*While it is expected that every school tailor its orientation programs to its specific constituencies, we recommend the following for all student orientations*:

- *That both first year students and their orientation leaders across the University follow the same anti-bias, diversity, and inclusion training.*
- *That orientation leaders are not responsible for dispensing the training alone, and that the University ensures they are both trained and accompanied by professionals, whether from within or outside of the University.*
- *That the University promotes pluralism by inviting speakers who specialize in topics related to anti-bias and inclusion.*

49

- *That some of these programs focus on antisemitism, Islamophobia, anti-Arab, and anti-Asian prejudice, from learning how to identify these forms of discrimination to learning how to address them.*

*Students would benefit from having Leadership and Allyship workshops made available specifically for them.* The purpose of this type of workshop is to cultivate leaders and allies who advocate for and support Jewish students in the Columbia community. Students would learn advocacy skills—specifically how to advocate effectively for anti-discrimination measures. They would also learn allyship practices in order to become an active and supportive ally to Jewish students, especially those experiencing exclusion.

- *Customizing Faculty Training*

The only required training we recommend for faculty (other than teaching assistants and new faculty) is the training that the University has already announced, but additional optional training should also be available. In our listening sessions, we heard many students request that faculty be offered training in classroom facilitation, specifically as it relates to political and controversial content, navigating difficult discourse, and fostering and responding to multiple perspectives. As mentioned earlier, the Task Force agrees. Before we make further recommendations for faculty, we briefly review current policies and trainings.

Currently, faculty at Columbia (especially new and junior faculty) are encouraged to enroll in the online Office of the Provost Faculty Orientation. This training is supposed to complement each individual school's orientation programs, and focuses on supporting teaching and scholarship at Columbia. This training is not mandatory for all new faculty.

There are many modules in the online Office of the Provost Faculty Orientation, but none of them introduces religion in depth. The *Guide for Inclusive Teaching at Columbia* (last updated in 2020), created by the Center for Teaching and Learning (CTL), mentions religion several times, but it lacks specificity as to how faculty should identify and address discrimination on the basis of religion. The program [Columbia's Inclusive Teaching: Supporting All Students in the College Classroom](), is an online course that has a fee. There is a free version, but it provides limited access to course material.

At Columbia, many schools have opted to provide their faculty with additional orientation programming (beyond general faculty orientation). Given the decentralized structure of the University, this is not surprising, but is it effective? We examined orientation programs for four of the University's largest units (based on 2022 enrollment data): Columbia College, SEAS, the Graduate School of Arts and Sciences (GSAS), and the School of Professional Studies (SPS).

We could not find any additional Columbia College customized faculty training. For SEAS and Barnard College, new faculty orientation takes place in person in the form of a three-hour presentation. Diversity and inclusion are discussed during the program, but we could not find any information that specifically focused on identifying and dealing with religious discrimination or bias. We could not find any additional GSAS customized faculty training. We could not find any additional SPS customized faculty training.

*If any of the schools choose to develop a customized faculty training, we recommend the approaches taken by the school of Engineering and Barnard which conduct the training in person at a faculty orientation.*

- *Customizing Trainings for Teaching Assistants*

All teaching assistants (TAs) at the University are required to take a course called Columbia TA Guide: Essential Resources Rules and Guidance, made available electronically through Columbia's Equal Opportunity and Affirmative Action (EOAA) website. The purpose of the training, according to the website is to cover "requirements and best practices on a variety of topics including academic integrity, student mental health, challenges, discrimination, harassment, sexual misconduct, reporting obligations, and other issues." The website also provides a guide with tools and resources for TAs to identify and respond to problems related to challenging classroom discussions and discrimination.

This program appears to be the only one available University-wide and schools do not seem to be offering their own versions. The TA guidelines and handbooks made available by specific schools do not provide much more information regarding anti-discrimination training. Take, for instance, the Graduate School of Arts and Science (GSAS) website. It indicates that "departments must train and supervise graduate students who teach in the department" and that such training should be "set up as a course that precedes or accompanies the teaching." It also states that there should be a "clear understanding among all concerned about what constitutes unacceptable performance." No additional information is given regarding the suggested safety parameters TAs should adopt or what guidelines can be used to identify "unacceptable performance." Of the six guides and handbooks that the School of International and Public Affairs (SIPA) provides on its website for student officers, none include guidelines on diversity, inclusion, and bias. SIPA's website like GSAS's, offers detailed information regarding academic, professional, and administrative duties, but nothing on anti-bias and inclusion.

In its online training, "Columbia TA Guide: Essential Resources Rules and Guidance" asks that prospective TAs choose among different answers in response to classroom scenarios dealing with discrimination and bias. For some of these scenarios, the University's response is that "there is not a single best practice." Advising TAs that there is no clear-cut approach to dealing with

51

these issues is not a best practice and may have contributed to some of the problems Jewish students have experienced with TAs.

New TAs need clear guidelines for what constitutes inappropriate behavior in the classroom and how they might go about addressing incidents and disagreements in the moment. Recommending that TAs refer to the EOAA or the Office of Student Conduct and Community Standards is impractical and insufficient. Discussions of topics like race and religion are complex and delicate, and it is fundamental that TAs be given more guidance in ways that are uniform across the University. This is one way to ensure that both TAs and students work and learn in safe environments conducive to respectful learning.

The Columbia TA guide discusses many essential topics such as gender discrimination, sexual abuse and assault, mental health, disability accommodations, pregnancy, immigration status, and, to some limited extent, implicit bias. However, it lacks content on other crucial issues such as discrimination on the basis of race, ethnicity, and religion. Beyond its scenario of a student uncomfortable with a classroom discussion on these matters, the guide does not adequately explain how to handle such topics in the classroom, how to mediate these conversations, and what exactly constitutes discrimination based on race, ethnicity, or religion. The rise in antisemitism, Islamophobia and anti-Arab prejudice at the University reinforces just how important in-depth training on these topics is.

*We recommend that the Cross-School Committee immediately reassess not only the quality of the content displayed in the TA guide, but also the diversity of content made available, and that it includes scenarios and guidance on racial, ethnic, and religious discrimination in the classroom.*

We reviewed approaches used by several North American universities in the area of TA anti-bias and inclusion training and found Berkeley's Graduate Student Instructor Teaching Guide particularly deep and comprehensive. Before they can begin their work as TAs, first-time Graduate Student Instructors must complete a Professional Standards and Ethics Online Course. The course is structured in five modules: responsibilities and ethics; creating inclusive classrooms; teaching students with disabilities; fostering academic integrity; and creating an educational environment free of sexual harassment.

- *Customizing Training for Resident Assistants and Advisers*

The University must ensure that resident halls are inclusive environments for all students. What could be more alienating than feeling excluded and experiencing bias in the place where you live? Resident advisers and resident assistants (RAs) have a critical role to play in maintaining an inclusive environment in residence halls. They should ensure that students who do experience

Credit: Khalil v. Trustees of Columbia University 25-cv-2079 Decided 3/49/26 Archived on 3/25/26 This document is protected by copyright. Further Reproduction reproduction is prohibited without permission.

52

harassment have a person they trust to help them deal with it and should connect them to the right University office for reporting serious violations, should such a step be warranted.

In its list of requirements for prospective RAs, the Columbia College and Columbia SEAS website states that prospective RAs must have taken the following training courses: Under1Roof, Title IX, and Bystander Intervention. Title IX and Bystander Intervention focus on sexual harassment, sexual abuse, and sexual violence, as well as other essential themes such as consent, navigating different forms of masculinity, addressing stereotypes about feminism, learning how to become an advocate, and compassion. Two other programs are offered: CU Safe Zone, which provides students with foundational knowledge on how to support LGBTQ+ communities at Columbia, and ROOTED (Respecting Ourselves and Others Through Empathy and Dialogue), which focuses on creating spaces of solidarity, empathy, and learning in the Columbia community to explore identity, power, and privilege. It is unclear whether these two are required.

Under1Roof delves into diversity, but it does not have content on fundamental discrimination patterns like antisemitism. Additionally, the three trainings that are required of incoming students (Under1Roof, Title IX, and Bystander Intervention) must be taken by all incoming students during New Student Orientation Program (NSOP), meaning that at the time RAs begin their jobs, it has already been at least a year since they took the courses.

An RA has a duty to foster community and safety. As students' first points of contact in their residences, they play a crucial role in fostering a physically and emotionally safe living environment for all students—many of whom are living away from home for the first time in their lives. RAs are also often tasked with mediating conflicts. Because they play such a critical role in students' lives as well as their living situations, it is fundamental that RAs be adequately trained on the issues that affect students' feeling of safety. Critical among these are discrimination and exclusion. At a time when antisemitism and Islamophobia on campus are on the rise, it is crucial that these trainings provide educational material on religion-based discrimination.

Creating compelling and efficient training curricula is neither a straightforward nor easy task. In her study on "Communicative Social Justice Training for Resident Advisors," Jessica Zhivotosky demonstrates that RAs often feel that putting training into practice is challenging.[96] Simply telling RAs that "they need to be more inclusive" is pointless. Unless they are given the necessary resources and tools to understand what inclusivity means and how to foster it, things will not change.

---

[96] Jessica Zhivotosky, "Communicative Social Justice Training for Resident Advisors: RAs Experiences and Uses of Training" (Spring 2016).

Cited in Khalil v TS of Columbia Univ. 25-cv-2019 Decided 3/19/26. Archived on 3/25/26. This document is protected by copyright. Further reproduction is prohibited without permission.

*We recommend that RAs be provided mandatory comprehensive training, so they can understand and identify antisemitism and Islamophobia.* This should include real-life incidences of antisemitism and Islamophobia as experienced by students, rather than cookie-cutter scenarios, as well as basic education in Judaism and Islam. For instance, they might learn what fasting is and how it impacts students, or why some students follow religious dietary restrictions. We understand that everybody observes religion differently, but providing RAs with a basic understanding of religious practice would be helpful.

*RAs should also be required to participate in How to Have Difficult Conversations on Divisive Topics trainings* mentioned earlier in this section. Residence halls should provide spaces and formal opportunities where constructive and healing conversations can take place. *RA training must be customized so RAs develop the skills to lead these discussions.* An interesting initiative that should be considered was developed by Jewish on Campus (JOC), a student-run organization fighting to eliminate antisemitism on campus. Their ambassador program for students facilitates student discussions of their experiences with hate on campus. Designing a similar program in which frequent listening sessions are held with diverse students and RAs as moderators would be beneficial to the Jewish and Muslim students living in University residence halls.

## 7. Recommendations for Evaluating the Effectiveness of Training

Trainings should not be developed and left in place without evaluation of their effectiveness. It is clear from the work of our Task Force and the report of the Ad hoc Grievance Committee, issued in 2005, that many of the conditions that contributed to the explosion of antisemitism on our campus were developing before this academic year. Consequently, the University should periodically reconsider existing needs that may result from changes occurring on the campus.

*We recommend that the University evaluate all training and workshops to determine whether they are achieving their intended purpose.*

*The University should also conduct regular assessments of the campus climate to identify and address emerging issues related to antisemitism and other forms of exclusion, discrimination, and bias.*

## C. Reporting Experiences of Exclusion, Harassment, Bias, and Discrimination and Mediation Procedures for Resolving Incident Reports that Don't Involve Title VI

This section primarily focuses on how the University can improve procedures and create transparency for students who wish to report experiences of discrimination, harassment, and

54

exclusion that may be antithetical to University rules and norms, but may not rise to the level of a legal violation under federal, state, or local anti-discrimination law.

The University has already done considerable work on improving reporting procedures required for legal compliance for students experiencing discrimination. Columbia's Center for Student Success and Intervention (CSSI) office is responsible for these complaints.[97] This work will be moving to the new Office of Institutional Equity (formerly EOAA).

Students frequently told us that it is difficult to figure out where to complain; when they reported an incident it was often not taken seriously; and finally, the burden was often placed on the student to resolve the problem.

## 1. Current Process and Recommendations for Filing a Report

The EOAA, CSSI, the Dean of Students office in each school, and University Life are all identified as places where students can report experiences of discrimination, harassment, and exclusion.

Reporting discrimination, exclusion, or bias can be difficult for several reasons. Some may fear their grievances lack hard evidence or they simply feel powerless. Others are reluctant to share their experiences because they distrust the system or believe the individuals in charge will not be fair or will ignore their grievance. Students in our listening sessions shared all these frustrations and concerns, which need to be addressed in changes to the current system for reporting grievances. We think the ideal reporting process would be impartial, transparent, and supportive. It would also follow uniform procedures. Also needed is an easily accessible online tool that informs students of these procedures and offers a standardized form for reporting.

The current procedures for reporting discrimination, harassment, and exclusion are available on the University Life website, where students will find the following confusing and long text:

> Discrimination, including Antisemitism, Anti-Arab or Anti-Muslim Discrimination, Form may be used to report an incident of discrimination or harassment. (Incidents involving faculty/staff are routed directly to the Office of Equal Opportunity and Affirmative Action (EOAA). For gender-based incidents, please use the next form on the list.)
>
> This form may be used to report discrimination or harassment incidents, including but not limited to the following: Age; Anti-Arab; Anti-Muslim; Antisemitism; Citizenship/Alienage; Disability; National Origin; Race/Color; Religion/Creed

---

[97] See ASTF Report #1.

On the same University Life website on the page for specifically supporting Jewish Communities it states under "Reporting Bias":

> All students can report incidents of bias to their Dean of Students.

- Students may also report incidents [to https://universitylife.columbia.edu/columbias-bias-response-faqs].
- Columbia College and SEAS undergraduate students, please report incidents to the Columbia College and Columbia Engineering Bias Response Team

In a training for students the slide "How to File a Concern" explains the procedures as follows:
- Complete an online report.
- Community members may file an incident report electronically through the sites listed on this webpage (universitylife.columbia.edu/report).
- Community members across Columbia campuses, including students, may also make reports in person at the Office of Equal Opportunity and Affirmative Action (EOAA), and students may go to the Center for Student Success and Intervention (CSSI)
- Students may also contact University Life or their Dean of Students and their respective offices for assistance with filing reports.
- These options, above, provide a window into the decisions students face in taking steps to report an incident.

These instructions offer the opportunity for in person assistance, but these procedures are labyrinthine and should be clarified. A significant number of those who attended listening sessions or wrote to the Task Force were stymied by reporting procedures.

*Recommendations for Reporting*

*The reporting system is being reviewed by University Life and EOAA with the goal to simplify. The Task Force has been actively engaged with University Life and supports this long overdue overhaul of reporting procedures and the website.*

*We recommend that University Life develop, in collaboration with EOAA, Deans of Students and DEI Offices, and the Ombuds Office, one set of guidelines and standard information together with a universal tool for reporting. This information and tool should be made available to students through the Deans of Students Offices and DEI offices in every school. The reporting tool should offer two options: one for those seeking legal reporting, and one for those seeking informal dispute resolution/impartial conversation.*

*We recommend addressing the following questions as a revised, streamlined, and clear system for reporting is developed:*

Greated in Khalil v Trs of Columbia Univ 1:25-cv-02079 Decided 3/19/26 Archived on 3/25/26 This document is protected by copyright. Further reproduction is prohibited without permission.

- *How does a student decide whether they should report through University Life or their Dean of Students office or seek the assistance of the Ombuds?*
- *How soon should students report to the bias response team and will waiting make a difference?*
- *Will different offices respond differently to reporting?*
- *Are the reporting forms the same, regardless of where you report?*
- *Is the process of dispute resolution the same, regardless of where you report?*
- *Does the type of experience affect where a student should report?*
- *Should a student file more than one report for the same incident if they are not sure where to report?*

By answering the above questions and incorporating that information in new guidelines, the administration will achieve greater transparency, a key to increasing trust in the process throughout the University community. If this approach to reporting is to succeed, students must also receive support in better understanding which of the two reporting options—legal report or request for informal dispute resolution—is more appropriate to their situation. Students should also be made aware of the timeline for their complaints to be processed and addressed, as uncertainty as to the length of the processing of a case can be daunting.

We also have an obligation to ensure that all students can bring their grievances, in person, to impartial faculty and staff who will be informed of our procedures. *All student-facing staff and faculty must be trained in the new procedures through an online workshop. We recommend that faculty and staff involved in informal dispute resolution participate in mandatory training programs that are in person on "How to Have Difficult Conversations" and in mediation.*

## 2. Current Process and Recommendations for Mediating and Resolving Disputes

When students report complaints of bias or exclusion that they hope can be resolved through an informal dispute resolution process—instead of through CSSI or EOAA—they usually reach out directly to faculty, Department Chairs, or Deans of Students staff. Students can also bring disputes to the Columbia Ombuds Office. We found a very compelling process outlined on its website. The Ombuds Office first meets with the disputing parties, then all parties meet and have an opportunity to share their perspective on the issue. The Ombuds Office helps the parties in a dispute find common ground to achieve a settlement. Barnard has its own Ombuds Office which offers similar services. Additionally, Columbia Law School has a mediation clinic, which provides the Columbia community with free and confidential dispute resolution. At a minimum, students need to be made aware of all these confidential mediation services. Since all these mediation offices are confidential, grievances cannot be tracked. We do not recommend expanding this process, but it could be explained and integrated better into the University's options for conflict resolution.

57

We are encouraged that the University is working to improve its systems for reporting experiences of exclusion and bias and for informal conflict resolution. We understand that the University has a legal obligation to protect students from discrimination, but legal remedies may not be a preferred option when they have a grievance

*Recommendations for Informal Dispute Resolution*

*Ensure that at least one member of all Deans of Students offices is skilled in dispute resolution and can advise on other resources that are available. The University office designated to review and address discrimination concerns should also be fully staffed. It should be the designated resource to conduct mediations and facilitated dialogue with students about issues that may not warrant an investigation but still need (or would benefit from) discussion. With this approach, we could ensure that students and others in our community can opt for a different process, while still allowing the University to track the volume of concerns and ensure that we are taking appropriate steps to address them in a timely way.*

**3. Consistency and Coordination between Diversity Equity and Inclusion (DEI) and Deans of Students Offices**

We are including a discussion of DEI offices in our report because their mandate is to address issues of diversity, equity, and inclusion that affect students at the University. We believe that DEI offices could play an important role in helping all students deal with the experiences of exclusion and bias on campus, if their mandate is modified.

While diversity is valued on campus today, historically, minority groups were expected to adopt the norms and perspectives of the majority. Over time, multiculturalism came to the fore as a core value at universities. A multicultural university is one in which people with strong cultural, religious, ethnic, and political identities may keep those identities while participating fully in the life of the university. In other words, those identities should not be grounds for exclusion.

Unfortunately, many students are experiencing exclusion at Columbia—not just feelings of exclusion, but actual exclusion from extracurricular, curricular, and dorm spaces. Many of the students we heard from have chosen to maintain a strong and often visible Jewish identity, which often entails being more religiously observant than is typical among Columbia students, being active in Jewish organizations, and being strongly connected to Israel as an essential aspect of who they are. In theory, in a university strongly committed to multiculturalism and diversity, students' choices should be honored and respected. In practice, as we show in this report, that is often not the case.

58

Group identity is the way most of us think of and organize ourselves, but identities are complex: people can belong to multiple groups, and relations between groups change constantly. In an institution as diverse and as complex as Columbia, it is neither empirically accurate nor desirable to divide identity groups into two master categories, marginalized and privileged, and to restrict the University's multicultural embrace to members of the former category. In this typology, Jews are considered privileged, no matter what circumstances they come from or what their experiences have been. This kind of thinking, often supported by DEI offices, makes it difficult to acknowledge our students' experience of antisemitism, even when it's happening on our own campus.

DEI at Columbia should be committed to pluralism, an ethos of ongoing, peaceful, respectful interactions among a wide variety of groups, identities, and viewpoints, carried out according to an agreed-upon set of rules. As our colleagues at the Stanford Antisemitism Task Force wrote in their recent report: "A pluralistic framework does not call for ignoring identity. Rather, it provides a framework where identity is construed broadly and understood as the source of creative scholarship and education rather than the basis for exclusion and fragmentation." Their report quotes political philosopher Danielle Allen, a member of Harvard's Antisemitism and Islamophobia Task Forces, who recently wrote: "Pluralism is important because it can avoid the binaries of anti-racism and achieve a broader vision of understanding that considers the heterogeneity of our culture and the emergence of excellence within it."

Elsewhere in her work, Professor Danielle Allen offers "social connectedness," with constant, productive interactions between groups, as an ideal. That is appealing, but, frankly, it has seemed out of reach at Columbia in recent months. Pluralism ought to come first, as a precondition for social connectedness. Unilateral moral condemnations, like the condemnations of Zionism we have seen by some at Columbia, violate a pluralist spirit in their denial of respect to a group's core beliefs and in their conviction that one cause is so overwhelmingly urgent that it negates the need to abide by the rules of the community.

All schools and Columbia affiliates have their own DEI offices and websites. The Office of the Provost and University Life have made an important effort to coordinate these offices, but they remain administratively decentralized. We think that better coordination of DEI offices across all Columbia schools and a clarification of their mandate would help improve the campus climate. After reviewing the mission statements, programs, and capacity of the 18 DEI offices at all Columbia schools and affiliates, we determined that their active role in framing larger issues of inclusion across the University needs to be better defined.

DEI offices should play a direct role in assisting all students to report or deal with experiences of bias or exclusion. However, our review of all the DEI websites found that most DEI offices only address matters relating to diversity when "diversity" is defined in terms of race, gender, and sexual identity. Some Jewish and Israeli students have assumed that they could find information

59

and assistance in DEI offices when experiencing bias or exclusion. They were very disappointed when they were told that their experiences fell outside the purview of DEI.

DEI offices should support a robust vision of pluralism. This means avoiding blunt classifications of "privileged" and "marginalized."[98] The goal should be to celebrate differences and to encourage interactions that promote understanding, collegiality, and friendship across differences. We consider the rich diversity of our campus to be, as Danielle Allen has observed, "an opportunity—a chance to achieve a higher level of excellence powered by intense engagements across a vast range of viewpoints."[99]

*DEI offices should include all forms of diversity in their programming, including antisemitism and other forms of discrimination against faith-based identity groups (e.g., Jews, Muslims, Evangelical Christians, Hindus, Sikhs), as well as disability and age discrimination. This should also be explicit in their mission statements as a strong signal of their commitment to a truly inclusive campus. Some standardization of these newly expanded DEI parameters should be developed in the Provost's Cross-School Committee in consultation with DEI officers and supported by central administration.*

*As we suggested earlier, DEI staff have a role to play in developing trainings and workshops and should be part of the Cross-School Committee that standardizes trainings and workshops for all schools. They should also be part of the University's overall effort to improve procedures and processes for reporting and mediating student experiences of bias and exclusion.*

*DEI Offices are generally small, so we are not recommending that they engage in dispute resolution. Rather, their staff should have the knowledge and capacity to assist students, and the new reporting tool should be available on their websites.*

## D. Recommendations for Student Groups and Clubs

As noted above, in our listening sessions and in other conversations with Jewish and Israeli students, we heard that many of them have been excluded from student groups because of their ties to Israel. They have been shocked and offended that "Zionist" has become a disparaging term in some student groups, even though these students consider Zionism—the idea that Israel has a right to exist—to be a core part of their Jewish identity.[100]

---

[98] We found this formulation in the Mission Statement of <u>School of Social Work Office of DEI</u>. "We view this as a guiding principle for our community – using a power, race, oppression and privilege (PROP) framework across our curriculum, administrative practices, operations and personal interactions."

[99] Danielle Allen, "We've Lost Our Way on Campus. Here's How We Can Find Our Way Back," *Washington Post,* December 10, 2023, https://www.washingtonpost.com/opinions/2023/12/10/antisemitism-campus-culture-harvard-penn-mit-hearing-path-forward/.

[100] Rebecca Massel, "Where Does A Jew Belong?: Over 20 Pro-Israel Jewish Students Report Feeling Ostracized On Campus," *Columbia Spectator*, April 1, 2024.

Cited in Khalil v. Trump, Columbia Univ. 25cv2079 Decided 3/19/26 Archived on 3/23/26 This document is protected by copyright. Further reproduction is prohibited without permission.

Although this is not true of every Jew at Columbia—we also have heard from Jewish students and faculty who passionately oppose Zionism—the evidence about the American Jewish community as a whole, and the Jewish community worldwide, shows that the overwhelming majority are Zionists: according to recent polls, 80 percent of American Jews consider Israel to be "an essential or important part" of their Jewish identity.[101]

The exclusion of Zionist Jewish students is unacceptable, just as it would be unacceptable to exclude students who believe in core tenets of other religions. Not only is this exclusion fundamentally at odds with the University's pluralist values, but it also can violate anti-discrimination law.

These Jewish and Israeli students were not excluded for supporting specific policies of the Israeli government—indeed, many are critical of the current government—but for embracing the core tenet of Zionism, which is that Jews should have a national homeland in Israel. A number of student groups issued statements or joined coalitions contending that the state of Israel is illegitimate and should not exist, even though these positions were far removed from the missions of these groups. In many cases, these steps made many Jewish and Israeli students so uncomfortable that they chose to leave. In some cases, Zionist students were explicitly kicked out.

To be clear, the experience of being excluded because of one's beliefs is not limited to students who are Jewish and Zionist. We also heard from anti-Zionist Jewish students who reported that they no longer feel comfortable in some Jewish groups and communal activities. This is wrong. We urge Jewish organizations on campus to be inclusive and welcoming to all, including Anti-Zionist Jews, in all ways that are consistent with their mission, including at religious services, Shabbat meals, etc.

In addition, we have heard from non-Jewish students who have been criticized or even ostracized for defending Jewish and Israeli students or for being insufficiently supportive of pro-Palestinian positions.

These incidents are all the more discomfiting because the University regularly emphasizes the importance of inclusion and belonging, including in student groups.[102] Columbia has a rich array of student activities. They include groups dedicated to community service, athletics, writing,

---

[101] See, e.g., "Pew Research Center: Jewish Americans in 2020: U.S. Jews' Connections with and Attitudes Toward Israel," May 11, 2021, https://www.pewresearch.org/religion/2021/05/11/u-s-jews-connections-with-and-attitudes-toward-israel ("Eight-in-ten U.S. Jews say caring about Israel is an essential or important part of what being Jewish means to them.").

[102] For example, in requiring all new students to participate in an Inclusion and Belonging Initiative, University Life's website provides: "Experiencing a sense of inclusion & belonging can affect every aspect of the Columbia experience—from extracurricular activities to academic performance, making these important values for our community to uphold." https://universitylife.columbia.edu/inclusion-initiative

politics and public policy, the arts, religious faith, identity, and advocacy. In the eloquent words of Columbia's undergraduate admissions website:

> You'll tap into the energy and ideas inspired by more than five hundred student clubs and organizations ranging from intramural athletics and philosophy journals to investment clubs and culinary societies. Whatever you love to do, you can do it at Columbia. And wherever your passions take you, you'll find friends to enjoy them with—creating the kinds of adventures, memories, and moments of delight that New York City's best stories are made of.[103]

The problem of exclusion from student groups was clearly identified in our listening sessions as reported in Section I. Our recommendations are based on those students' experiences and numerous conversations with different stakeholders, including deans, representatives of University Life, the University's legal staff and advisors, deans of students from several schools, leaders of student groups, members of student activities boards, and many Jewish and Israeli students.

Although many members of the campus community share our concerns, others deny that there is any issue. Some say they have not received many complaints, while others downplay incidents as voluntary departures over political disagreements. We are concerned that proposals shared with us so far to address this problem are not sufficient. Therefore, before making policy recommendations about student groups, we explain why changes are urgently needed.

### 1. Why Change University Policy?

*Importance of Student Groups.* In structuring policies for student groups, the University should consider their important contribution to our intellectual community. Their *educational benefits* are obvious. Student groups and clubs enable students to pursue mutual interests, celebrate shared values and identities, acquire new skills and knowledge, learn to lead and to work as a team, and earn valuable professional credentials.

Student groups also forge communities that support each group's mission. To advance this goal, *student groups generally should be free to limit membership to those who value the mission and can help advance it* but they should not engage in discrimination. For example, it makes sense for the College Democrats to be open only to Democrats, not Republicans. Similarly, student statements are most appropriate when they are closely tied to the group's mission. For example, a group that is organized to oppose fossil fuel development should be free to criticize fracking, while a group that is committed to US energy independence should be free to advocate for fracking.

---

[103] https://undergrad.admissions.columbia.edu/life/here/clubs

The University also has reason not to micromanage student groups. One of the functions of student groups is to offer students opportunities to hone leadership skills. So in most situations, the University should defer to students, even when they make mistakes. But deference cannot be unlimited.

There are three important reasons for the University to give guidance to student groups, which we discuss in turn: first, to protect students from being associated with statements they oppose or were not involved in issuing; second, to prevent practices that infringe on the University's pluralist values; and third, to ensure that groups comply with anti-discrimination laws.

***Consultation and Notice.*** All members should have a voice in deciding whether a group makes statements or joins coalitions. Conversely, they should be given an opportunity to signal their opposition. This is necessary because otherwise the full group will be associated with the decision, with reputational consequences for everyone. This problem arose when leaders of some groups joined statements after October 7 without consulting their members broadly.[104] We have heard from members who were upset about being criticized for a decision they did not make, as well as about the lack of a mechanism to express their disagreement.

To mitigate these problems, groups need the right processes. *When a group decides to make a statement there generally should be some combination of broad consultation, a clear decision rule (e.g., unanimity, a supermajority, etc.), and a mechanism for dissenters to be publicly identified. The University should consult with student groups in developing options for these sorts of processes.* We understand that some student group boards have already begun considering this issue.

***Pluralism and the Importance of Inclusiveness in Student Groups.*** Another key limit on the deference to student groups is the University's mission to forge a pluralistic community. Our commitment to pluralism is critical not just for Jewish and Israeli students, but for everyone.

In healthy societies, individuals join shifting coalitions, depending on the issue. They do not fragment into warring camps that dislike, compete with, and avoid each other. In a practical sense, pluralism reinforces inclusion and works when people with different views are able to find common ground and work together. In society, support for the value of inclusion has thus become inextricably linked to our ability to tackle the complex problems confronting us. To avoid polarization, problem-solvers and democracy advocates opt for inclusion and pluralism.

---

[104] See, e.g., "Joint Statement from Palestine Solidarity Groups at Columbia University regarding the recent events in Palestine/Israel: Oppression Breeds," October 9, 2023 ("The weight of responsibility for the war and casualties undeniably lies with the Israeli extremist  government and other Western governments, including the U.S. government, which fund and staunchly support Israeli aggression, apartheid and settler-colonization."), https://docs.google.com/document/u/1/d/1RcXX5DEO3yfJ9R4ksURnzpIPCyVxo575-Y-SoC_vZFk/mobilebasic?urp=gmail_link.

Just as this is the right path for society at large, it is the right path for Columbia. Our students should engage with each other, learn from each other, and befriend each other, even when they disagree—however passionately—on particular issues.[105] Columbia is "a place for received wisdom and firmly held views to be tested, and tested again," the Rules of University Conduct state, "so that members of the University community can listen, challenge each other, and be challenged in return." As our 18 deans recently emphasized, "[t]he right of members of our university to share views that may be unpopular or deemed offensive is protected and fundamental to an academic community that depends on the free exchange of views and ideas."[106] We want our students to learn from each other, even when—indeed, especially when—they disagree or come from different backgrounds.

If the Columbia campus fragments, we fail to achieve a core element of our mission. Our campus, our graduates, and society at large lose future leaders and citizens who have learned to disagree with civility, still respect each other, and join forces on other issues. Instead, as our Deans have emphasized, the Columbia ideal is "true listening" that exemplifies "our commitment to mutual respect and community."[107]

This mission-critical goal has an important implication for student groups: they should be as inclusive as possible, consistent with their individual mission. Indeed, a key reason why the University supports student groups with funding, space, and the right to use the Columbia name is to forge a pluralistic community. Student groups can build bridges, enabling students who disagree on some issues to discover common interests, learn to work with people with different backgrounds and views, and form friendships. But this cannot happen if people with specific backgrounds or views are either explicitly excluded or are made to feel unwelcome.

This is not to say that there should be no membership criteria or that student groups should never make statements. As noted above, it is appropriate for the College Democrats to be open only to Democrats. Likewise, a soup kitchen can be open only to those who are committed to aiding local community members in need. These membership criteria are appropriate because they have an obvious—indeed, a definitional—connection to the group's mission (and, of course, they don't violate anti-discrimination rules, as discussed below).[108]

A group can take positions and make statements about its mission. For example, a group focused on Middle East policy can issue statements on Zionism, Hamas, the atrocities on October 7, the

---

[105] See, e.g., Danielle Allen, "Toward a Connected Society," in Nancy Cantor & Earl Lewis, ed., *Our Compelling Interests: The Value of Diversity for Democracy and a Prosperous Society* (Princeton University Press, 2016) ("To build a connected society, then, we need to identify the capacities, skills, and bodies of knowledge that constitute an 'art of bridging,' an art of forming productive social relationships across boundaries of difference.").

[106] https://ourvalues.columbia.edu/content/deans-message-columbia-and-community.

[107] Id.

[108] Even if a student group's mission is to celebrate or promote a religion, identity, or background, it cannot exclude members of other religions, identities, or backgrounds under Columbia policy or under antidiscrimination law. See, e.g., N.Y. Exec. L. § 296(4); N.Y.C. Admin. Code § 8-107(4)(a)(1)(a).

64

humanitarian tragedy in Gaza, and any other issues about the region. These can be endorsements, condemnations, or anything in between. The topic is closely connected to the group's mission, so the group should be free to address it (after consulting its members, as noted above).

Likewise, the College Democrats can endorse a Democratic policy priority—even if this would make Republican members feel unwelcome—since this is the mission of the group. Similarly, a soup kitchen should be free to issue statements about food security.

But membership criteria and statements that are not directly related to the group's mission are potentially problematic. A soup kitchen should not be open only to Democrats or make statements on abortion or gun control. These steps can undercut a core function of student groups: creating opportunities for people with different views and backgrounds to interact, learn from each other. Instead of promoting pluralism, student groups would contribute to polarization.

Since this problem arises only with criteria and statements *outside* the group's mission, a reasonable judgment is required about the scope of the mission. It should not be defined so broadly as to cover virtually any political statement.[109]

***Protecting Student Speech.*** In making this recommendation, we emphasize that we are *not* suggesting—and do not support—limits on free speech rights of a group's *members*. The question is not whether Columbia students can express views on any issue, no matter how contentious. Of course, they can. Rather, the question is whether they can do so *through a specific student group*.

For example, although a soup kitchen generally should not issue a statement on gun control—a topic outside its mission—an individual officer or volunteer at the soup kitchen, obviously, can still write an op-ed or post on social media in her own name. Another option is that she can join with others from the soup kitchen to sign a "members' letter" on gun control, which says that they speak only for themselves, not the group. Or she can join (or form) another group whose mission includes this topic, such as "the Columbia Gun Control Forum," which can issue a statement.

The idea of a subject-specific forum—which invites speech only on specified topics—is well established under the First Amendment. For example, if a board of education calls a meeting to discuss the science curriculum, it can prevent speakers from addressing athletics. There is no right to use a forum created for one topic to address another.[110] Likewise, certain types of non-

---

[109] For example, a soup kitchen might try to justify statements on gun control or abortion by defining its mission— not as "providing food to vulnerable populations"—but as "combating injustice and oppression." Erring in the direction of a more precise definition encourages more interactions among people with different views and is less likely to exclude people.

[110] See Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37 (1983); Cornelius v. NAACP, 473 U.S. 788 (1985); Rosenberger v. University of Virginia, 515 U.S. 819 (1995); Christian Legal Society

profits cannot endorse a political candidate, but their professionals and volunteers can do so in their individual capacity.[111] In the same way, the University should distinguish between a student group (which generally should make statements only on its mission) and the group's members (who can make statements in their own names about anything).

***Discrimination Under Federal, State, and Local Anti-discrimination Laws.*** In addition to safeguarding Columbia's pluralist mission, there is another critical reason to give guidance on a student group's eligibility requirements and statements.

A commitment to inclusivity is grounded not just in our values, but also in the law. Although there generally is no legal bar on discrimination based on political viewpoint—so, for instance, Republicans and Democrats are not "protected classes"[112]—the law does not allow universities to tolerate discrimination based on race, color, or national origin. This sort of bigotry is illegal under federal, state, and local law.

Discrimination based on religion is also illegal. Under Title VI of the Civil Rights Act of 1964, religion is protected to the extent that it reflects shared ancestry or ethnic characteristics. "These protections extend to students and school community members who are or are perceived because of their shared ancestry or ethnic characteristics," the Department of Education recently observed, "to be Jewish, Israeli, Muslim, Arab, Sikh, South Asian, Hindu, Palestinian, or any other faith or ancestry."[113] New York law also bars discrimination based on religion and creed.[114]

This means that groups generally cannot exclude students who are Israelis, Jews, Palestinians, or Muslims, just as they cannot exclude students who are Black, Asian, or Latino. Universities cannot allow a hostile environment that "limits or denies a student's ability to participate in or benefit from the school's program or activity."[115] So a student group cannot have a "no Israelis

---

v. Martinez, 561 U.S. 661 (2010) ("Our limited-public-forum precedents adequately respect both CLS's speech and expressive-association rights, and fairly balance those rights against Hastings' interests as property owner and educational institution.")

[111] Specifically, a non-profit organized under Section 501(c)(3) cannot do so. As a result, a University policy enacted in 1970 limits the participation of student groups in political campaigns. See Partisan Political Campaign Activities on Campus or at Campus Facilities, https://universitypolicies.columbia.edu/content/partisan-political-campaign-activities-campus-or-campus-facilities.

[112] An exception is N.Y. Labor Law Sec. 201(d), which prevents employers from refusing to hire or dismissing employees based on their political activities outside of work.

[113] Office of Civil Rights, Department of Education, "Dear Colleague Letter," May 7, 2024, at 1.

[114] The NYSHRL prohibits "an educational institution to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student…by reason of…religion." N.Y. Exec. L. § 296(4). Similarly, the NYCHRL prohibits a provider of public accommodation, including a privately operated educational institution, to "withhold from or deny to [any] person the full and equal enjoyment, on equal terms and conditions," of any service or program, "[b]ecause of…creed." N.Y.C. Admin. Code § 8-107(4)(a)(1)(a).

[115] "Dear Colleague Letter" at 5. The Department of Education considers student groups as part of the analysis. See example 3 (interfering with student group's ability to invite an Israeli speaker and with ability of Jewish members to enter building housing organization would give OCR reason to open an investigation); example 7 ("calling the students who attended the meeting [of an Arab student group] terrorists, blocking students' ability to leave the area, and shoving students" would give OCR reason to open an investigation).

Cited in Khalil v. Trump, or Columbia Univ. 25-cv-2079 Decided 11/3/26 Archived on 3/23/26 This document is protected by copyright. Further reproduction is prohibited without permission.

allowed" policy, since this would be discrimination based on national origin. Likewise, a group cannot have a "no Jews allowed" policy, since this would be discrimination based on shared ancestry or ethnic characteristics. As a safeguard, various Columbia policies governing student groups include explicit bans on discrimination that are broader than what Title VI prohibits.[116]

Just as a "no Jews allowed" policy violates anti-discrimination laws, the same can also be true of a "no Zionists allowed" policy. Targeting a characteristic that *closely correlates* with a protected class can be an indirect way of targeting the protected class. So, in the same way that a group cannot say "we don't accept members who eat only kosher food," it cannot say "we don't accept members who are Zionists."

At Columbia, an open letter signed by over six hundred students emphasized the link between Judaism and Zionism, "We proudly believe in the Jewish People's right to self-determination in our historic homeland as a fundamental tenet of our Jewish identity. Contrary to what many have tried to sell you—no, Judaism cannot be separated from Israel. Zionism is, simply put, the manifestation of that belief."[117]

Faculty and staff signed a similar letter.[118] This is the view of an overwhelming majority of Jews. As noted at the beginning of this section, 80 percent of American Jews consider Israel to be "an essential or important part" of their Jewish identity.

This is not surprising. The Old Testament, the holiest of books in the Jewish faith, chronicles Abraham's journey to Israel, his descendants' departure during a famine, their descendants' struggle to escape slavery in Egypt, the journey through the desert back to Israel, the rule of the prophets and kings, the trauma of exile, and the enduring yearning for Zion. The New Testament also describes Jewish life in Israel during the time of Jesus. References to Israel and Jerusalem are pervasive in Jewish rituals and prayers.[119] The Jewish connection to Israel is grounded not only in faith, but also in security. Centuries of violence and discrimination in Europe and the Middle East—culminating in the horrors of the Holocaust—reinforce the determination of most

---

[116] For example, the constitution of the undergraduate Student Governing Board or "SGB" provides that to be a member of SGB, student groups must commit: "To uphold SGB guiding principles of community self-governance, social responsibility, and inclusion in accordance with Title VII." SGB Constitution Article VI Sec. 1.j. Likewise, the constitution of the Interschool Governing Board requires groups to: "Be open to all members of the Columbia community regardless of race, ethnicity, national origin, religion, sexual orientation, gender, veteran's status, or physical ability." IGB Constitution, Art. V Sec 2.i.

[117] Sharon Otterman, "In Letter, 540 Jewish Columbia Students Defend Zionism, Condemn Protests," *The New York Times*, May 9, 2024. Since this article was published, the number of students who signed the letter has increased to over 600.

[118] "Columbia's Pain and its Protests: The Heated Debate Among Jewish Faculty," *NY Daily News*, April 28, 2024, https://www.nydailynews.com/2024/04/28/columbias-pain-its-protests-the-heated-debate-among-jewish-faculty/.

[119] For example, the Passover seder ends with "Next Year in Jerusalem." Many Jews light candles on Hanukkah to celebrate a successful Jewish rebellion against the Greeks that liberated the Jewish Temple in Jerusalem, and a glass is broken at Jewish weddings to mourn the destruction of this Temple.

Cited in Khalil v. Trump on Columbia Univ 25-cv-2079 Decided 3/19/26. Archived on 3/25/26. This document is not protected by copyright. Further reproduction is prohibited without permission.

Jews to support Jewish self-determination, if only so Jews across the globe have a refuge from the persecution that, tragically, has been a recurring feature of Jewish life across the centuries.

Just as excluding Zionists can be a proxy for excluding Jews, it also can be a proxy for excluding Israelis. Although some Israelis are not Zionists, the vast majority believe that their country does, in fact, have the right to exist. This is true of nearly all Israeli Jews (whether they are secular or religious), and also of many Israeli Arabs.[120] The idea that Israel should exist as a nation finds support on the Israeli left, center, and right. Even as Israelis disagree vehemently about many issues, there is a broad consensus that the country is legitimate and has the right to defend itself. In other words, "Zionist" closely correlates with "Israeli," so excluding "Zionists" can be discrimination against Israelis, which violates Title VI as discrimination based on national origin.

*Is Excluding Zionism Just Exclusion Based on Viewpoint*? Obviously, not every Jew or Israeli is a Zionist. As noted above, we have heard from faculty and students at Columbia who are Jewish but oppose Zionism (or defend anti-Zionism).[121] Some suggest that the very existence of Jews who oppose Zionism proves that the exclusion of Zionists is not about Judaism, but about politics.[122] They defend the exclusion of Zionists as based on political views, not race or religion.

As indicated above, our view is that exclusion based on political views usually should not be allowed, even though it generally is legal. Excluding Republicans or Democrats undercuts the University's efforts to forge a pluralistic community, as noted above. However, we also disagree that the exclusion of Zionists is merely legal discrimination based on political views, as opposed to illegal discrimination under Title VI. Although Zionism is not a part of the Jewish identity of *some* Jews, it is still part of the Jewish identity of *many other* Jews. Anti-Zionist Jews cannot validate the exclusion of Zionists by, in effect, saying, "this is not important to us, so therefore it must not be important to them." Anti-Zionist Jews are entitled to their view, but so are the vast

---

[120] Jaimie Sarkonak, "The Druze Arabs Who Fight With Steadfast Loyalty to Israel," *National Post*, December 8, 2023 ("Druze men serve the IDF at a greater rate than Jewish youth."), https://nationalpost.com/opinion/the-druze-arabs-who-fight-with-steadfast-loyalty-to-israel.

[121] See Debbie Becher, Helen Benedict, Nina Berman, Susan Bernofsky, Elizabeth Bernstein, Amy Chazkel, Yinon Cohen, Keith Gessen, Nora Gross, Jack Halberstam, Sarah Haley, Michael Harris, Jennifer S. Hirsch, Marianne Hirsch, Joe Howley, David Lurie, Nara Milanich, D. Max Moerman, Manijeh Moradian, Sheldon Pollock, Bruce Robbins, James Schamus, and Alisa Solomon, "Jewish Faculty Reject Weaponization of Antisemitism," *Columbia Spectator*, April 10, 2024, https://www.columbiaspectator.com/opinion/2024/04/10/jewish-faculty-reject-the-weaponization-of-antisemitism/.

[122] Ethan Fraenkel, Noam Chen-Zion, Caitlin Liss, and Charlie Steinman, "Task Force On Antisemitism, Can You Hear Us Now?" *Columbia Spectator*, June 11, 2024 ("Zionism is a political ideology—*not* an ethnic or religious identity…a political ideology is not an unchanging part of one's identity, and it is not a protected class."), https://www.columbiaspectator.com/opinion/2024/06/11/task-force-on-antisemitism-can-you-hear-us-now/.

68

majority of Jews who feel quite differently;[123] for the latter, excluding Zionists has the effect of excluding Jews.[124]

To be clear, our point is not to assess whose version of Jewish identity is more authentic. All Jews are entitled to be Jewish in their own way. Rather, the point is that some views and characteristics do correlate closely with being Jewish, even if the correlation is not perfect. So, as we noted above, we think it would clearly be discriminatory to say, "we have nothing against Jews, but our group doesn't permit people who keep kosher." This policy would not exclude *all* Jews—many don't keep kosher—but this doesn't make it any less discriminatory for those who *do*. Would anyone seriously argue that this was merely exclusion based on "culinary preference"?

To test whether a situation violates the law, lawyers often reason by analogy. For example, what if the chess club decided to exclude feminists? Would this really just be a political litmus test, which is not discriminatory? We doubt it, given the correlation between this membership criterion and the protected status of gender. Granted, not all women are feminists and, of course, not all feminists are women. Yet there is enough of a correlation that "no feminists" violates anti-discrimination laws.[125] In the same way, not all Jews are Zionists (and not all Zionists are Jews), but the relationship is close enough that excluding Zionists is discriminatory.[126]

It is well-established that eligibility criteria that are nominally based on beliefs can have a discriminatory impact. As Justice Ruth Bader Ginsburg put it, a student organization might "cloa[k] prohibited status exclusion in belief-based garb":

> If a hypothetical Male-Superiority Club barred a female student from running for its presidency, for example, how could the Law School tell whether the group rejected her bid because of her sex or because, by seeking to lead the club, she manifested a lack of belief in its fundamental philosophy?[127]

---

[123] See Elisha Baker, "On Tokenism and the Denial of Antisemitism," *Columbia Spectator*, June 22, 2024, https://www.columbiaspectator.com/opinion/2024/06/22/on-tokenism-and-the-denial-of-antisemitism/.

[124] NYU came to the same conclusion in their Guidance and Expectations on Student Conduct ("Using code words, like "Zionist," does not eliminate the possibility that your speech violates the NDAH Policy.  For many Jewish people, Zionism is a part of their Jewish identity."). https://www.nyu.edu/students/student-information-and-resources/student-community-standards/nyu-guidance-expectations-student-conduct.html#:~:text=Using%20code%20words%2C%20like%20%E2%80%9CZionist,NDAH%20if%20directed%20toward%20Zionists.

[125] In principle, it might be permissible for a student group that focused on related policy issues, so that this criterion was core to the mission.

[126] Again, this eligibility requirement might be acceptable if it was relevant to the student group's mission, as might be the case with a group devoted to analyzing Middle East policy and politics.

[127] Christian Legal Soc. Chapter v. Martinez, 561 U.S. 661, 688 (2010).

To avoid the "daunting labor" of deciding whether a belief-based eligibility requirement was discriminatory, the Supreme Court upheld a requirement that student groups had to be open to all students.[128]

*A "Different Treatment" Problem Under Title VI.* Finally, there is still another problem with asking Jews and Israelis to disavow Zionism as the price of acceptance[129] at student organizations with unrelated missions: as far as we know, other protected classes generally are not encountering this sort of barrier. If Israelis and Jews are essentially alone in being singled out in this way, this different treatment can create an issue under Title VI, which requires the same treatment for all protected classes.[130]

Alternatively, if Jews and Israelis actually are not alone—and students from other protected classes also are regularly facing this sort of challenge—the problem is even more pervasive than we think. Either way, a solution is urgently needed.

*What Counts as Exclusion?* Excluding students from student groups based on their viewpoint clashes with our values, while excluding them based on their race, religion, or national origin (or a proxy for those characteristics) violates anti-discrimination laws. But what does it mean to exclude students from a group?

Obviously, students are excluded when the leaders or other members of a student group explicitly kick them out or tell them that they (or Jews, Israelis, or Zionists generally) are not welcome. Unfortunately, we are aware of some cases where this has happened. In other cases, the group made statements (such as joining a statement blaming Israel for Hamas's atrocities of October 7) or took positions (such as joining Columbia University Apartheid Divest), sponsored events, or circulated materials that were so offensive to Jewish and Israeli students that in good conscience many of these students felt that they could no longer remain in the group. These students were hurt at not being included in these decisions or at having their concerns ignored (often in a summary and dismissive manner). They worried about the reputational costs of being associated with initiatives they found offensive and, more fundamentally, they felt that their peers did not value them and, in some cases, were deliberately putting them in an untenable position.

Some suggest that in situations where a student was not explicitly disinvited or dismissed, there was no exclusion; rather, Jewish and Israeli students merely chose to leave. It was up to them

---

[128] Id.

[129] See Massel, "Where Does a Jew Belong?" (reporting on exclusion of Zionist students and noting that most "expressed their desire to participate actively in the campus community. Yet, none of them are willing to hide or compromise their Jewish and pro-Israel identity to be accepted").

[130] "Dear Colleague Letter," example 9 (finding a problem under different treatment analysis where a high school history teacher, in "ask[ing] the class to discuss the Israel-Hamas conflict…, asks the only Jewish student in the class, who he assumes is Jewish based on her last name, to explain her position on the conflict.").

Cited as Khalil v. Trs. of Columbia Univ., 25-cv-02079 Decided 3/19/26. Archived on 3/25/26. This document is protected by copyright. Further reproduction is prohibited without permission.

whether to continue to associate with people who don't agree with them, and they made a choice. But discrimination can still manifest in a seemingly voluntary departure. For example, if a woman chooses to leave a job because her co-workers constantly tell off-color jokes and display sexist or pornographic material, the fact that her departure was (nominally) voluntary is not a defense. Nor does it matter whether her co-workers were deliberately trying to force her out. This is a classic case of a hostile environment, which is not permissible under Title IX of the Civil Rights Act. Likewise, a hostile environment for Jews and Israelis is not permissible under Title VI.

To sum up, the University has a key stake in ensuring that student groups promote pluralism instead of polarization, and that they do not contribute to a hostile environment under Title VI. The University should respond with policies governing the groups it recognizes and supports. In crafting these policies, the University should consider two choices, which are highlighted in the parts of this section: first, who should make these decisions; and, second, what decisions they should make.

*Potential Decisionmakers and Mechanisms for Providing Guidance.* Although there is pedagogical value in deferring to student groups—including in letting them learn from mistakes—complete deference is not appropriate for issues that are central to the University's mission or can expose it to liability. As emphasized above, eligibility requirements and statements outside a group's mission can pose unacceptable risks. First, they can keep students with different views and backgrounds from learning from and befriending each other. Second, excluding members of our community is unfair and, when this exclusion is based on protected status, it can violate anti-discrimination laws. So, in our view, although student input on these issues is important, the University cannot rely solely on students to shape these policies.

For the same reasons, enforcement of the relevant policies should not be left to student boards. These boards can offer advisory opinions or have concurrent jurisdiction, but the University needs its own enforcement mechanism to ensure an inclusive and welcoming environment in all student groups.

Deans of Students, University Life, and other student services professionals have an important role to play in supervising student groups. For example, as some of them have suggested to us, they can work with students to provide training (e.g., on rules and best practices), create checklists for student group policies, conduct periodic audits to ensure compliance, mediate and resolve disputes, and step in to reform noncompliant organizations.

To ensure a welcoming environment in student groups across the University, the University should not rely solely on individual schools to address these issues. Some University-level guidance is needed. This is necessary not only to ensure that every school complies with the law, but also to address the reality that some student organizations include members from different

71

schools, including many organizations that serve undergraduates. This guidance from the University can be implemented in various ways. On some issues, it can be mandatory. On other issues, the University can offer a menu of approved options. On still other issues, the University can recommend but not require best practices.

This guidance should be developed in a collaborative process. The resulting policies should reflect input from students, administrators, and faculty, including from Deans, University Life, Deans of Students, the University Senate, the Office of the General Counsel, student activities boards, and student governments.

### 2. Recommendations for Promoting Pluralism and Avoiding Discrimination

We recommend five steps to address exclusion from student groups:

*First, student groups generally should be open to all students. Eligibility can be based on criteria closely connected to the mission (e.g., College Democrats can be open only to Democrats), but otherwise no one should be excluded based on their viewpoint. In addition, obviously no one should be excluded based on actual or perceived membership in, or association with, a protected class, including based on race, national origin, religion, gender, sexual orientation, or any other protected status under Columbia University's Non-Discrimination Statement and Policy.[131]*

*Second, student groups need policies to determine how they decide whether to make statements and join coalitions that advocate particular positions. At a minimum, there should be clarity about how this decision is made, and this process should be noted in whatever statement is issued. In addition, we recommend a broadly consultative process, so the leader or a small group cannot do this on their own. We also recommend allowing members who do not agree with the decision to be given the opportunity to issue a counterstatement or to be listed as dissenters, so they are not in the awkward position of having others assume that they supported the relevant statement or position.*

*Third, the University should encourage student groups not to issue statements or to join coalitions on issues outside their mission, and should consider limits on the ability of groups to do so. For these purposes, we recommend defining the mission precisely, not expansively (e.g., "a soup kitchen that feeds vulnerable populations" not "a soup kitchen that combats oppression"). This guidance could take the form of best practices or requirements.*

*Fourth, issuing statements and joining coalitions must not be permitted when such actions have a discriminatory effect.*

---

[131] https://facultyhandbook.columbia.edu/content/columbia-universitys-non-discrimination-statement-and-policy

Cited in Khalil v. U.S. of Columbia Univ 25cv2079 Decided 3/23/26 Archived on 3/23/26 This document is protected by copyright law. Further reproduction is prohibited without permission.

*Fifth,* the consequences, penalties, and punishments for infractions of these respective rules, guidelines, and policies must be made clear and transparent by the University, and administrative responsibility for enforcement of these rules and guidelines must be clearly assigned and transparent to students.

### E. Inclusion in the Classroom

The listening sessions and student reports reveal serious concerns about bias and exclusion in the classroom. Quite apart from issues of political difference, students have witnessed behavior of some faculty and TAs that they have experienced as antisemitic. In both our first report and these pages, we have discussed how to improve reporting procedures for such incidents, but more work needs to be done. When a significant number of students feel the need to report experiences of exclusion or bias of any kind in the classroom, it is clear that policies and procedures are failing to speak to this moment in our history as an institution.

**A separate report on academic issues related to exclusion in the classroom and bias in curriculum will be issued by the Task Force in the coming months.**

Cited in Khalil v Trs of Columbia Univ 25cv2079 Decided 3/19/26 Archived on 3/25/26 This document is protected by copyright. Further reproduction is prohibited without permission.

**Conclusion**

As we have shown throughout this report, the surge in violent antisemitic and xenophobic rhetoric that shook our campus this past academic year has revealed that the consensus around our norms and values no longer exists, and that the rules and procedures we thought we were operating under are not working or are insufficient to address our current problems. This report is the product of months of engagement, research, observation, and reflection. It also follows a collective reckoning within our community pointing to an obvious reality: the ways in which the University has been dealing with the important objectives of diversity and inclusion need to be reevaluated, rethought, and revamped.

Columbia has prided itself on the diversity of its students, faculty, and staff. As we discussed in the introduction to this report, diversity is integral to the richness of academic life, as well as the social experience at Columbia. In fact, many students choose to attend Columbia in order to engage with and learn from others who do not share their heritage, culture, or life experiences. We come together with an expectation that we will treat each other civilly and with respect. In many ways, Columbia reflects what Mayor Dinkins (the city's first Black mayor and a Professor at SIPA for decades) liked to call the "gorgeous mosaic" of New York City. Mayor Dinkins recognized the value and beauty of the city's extraordinary diversity, but he intentionally chose the mosaic for his metaphor, recognizing that each distinct piece within a mosaic must somehow cohere to make a larger picture. We, too, recognize the beauty and value in every individual on our campus and we do not expect anyone to give up their views or their identity. At the same time, for the University community to thrive, we need to come together in agreement about the basic goals and values that we share.

For our University to be a successful community, we must maintain an atmosphere of mutual respect and tolerance, one in which a wide range of people can feel safe, and also challenged to grow in intellectual and emotional ways. Everyone must feel that they are valued as full members of the community, that they truly belong. No one should feel excluded, marginalized, disrespected, or unheard. The University aims to do a significantly better job at this than the world outside its gates does. This inclusive atmosphere is necessary not only to honor the University's core values, but also to comply with the law.

In this report we have documented Jewish and Israeli students' experiences at Columbia during this past academic year and found the University to be failing at its basic mission.

Most of the testimonies we heard were difficult to listen to. Students described being shoved, pushed to the ground, berated for showing support for Zionist causes, and watching Israeli flags burned. They recounted seeing drawings of swastikas in their dorms, students yelling pro-Hamas chants, and being denied access to public spaces and opportunities simply because they were Jewish or Israeli. We heard from students who had been chased off campus, called horrific and

74

deeply antisemitic slurs, and heard others minimize or silence claims of antisemitism. The majority of the incidents they recounted took place between students. But some were between students and faculty or staff. Several students told us stories of faculty members antagonizing the Israeli community, refusing to take students' concerns and fears seriously, or even expressing openly antisemitic views. Some students were pressured to adhere to political positions they didn't hold; others were silenced or exposed and humiliated in classrooms. All these accounts are only a few of the ones that were shared with us.

Students voiced demands for the University to remedy these lamentable situations. We were humbled by their deep understanding of the ways in which systemic oppression and silencing can manifest themselves, and by the constructive nature of their appeals. Many believed the hate they had witnessed on campus stemmed in large part from ignorance, and urged the University to take steps to ensure access to knowledge of religious discrimination and the historical experiences of Jews, including the Holocaust. Many also expressed frustration with the slow pace at which their grievances were addressed, and with what they perceived as a lack of consideration for their lived experiences. A considerable number of them asked that the University rethink its whole approach to fighting discrimination and exclusion.

**What We Need from the University**

Based on our own observations of the events that have unfolded at the University this past academic year, our students' testimonies and demands, and consultations with other administrators and faculty, we have provided several recommendations for the University to improve institutional policies and practices, with more still to come. Many of this report's recommendations are specific to antisemitism, and some are focused on discrimination, bias, and exclusion more broadly. Uniformity in trainings, reporting procedures, and policies across all schools is key if we want to improve campus culture and the experiences of all at the University.

We divided our recommendations into several sections, with the first dedicated to diversity and inclusion education on campus. We highlighted the need to expand and improve trainings, workshops, and websites, some for students, some for faculty, some for staff, and many for all. Examples include Title VI, allyship training, and Holocaust education. We also discussed the need to develop mechanisms to implement and periodically review the effectiveness of these trainings. If we want these changes to work, we must take the process of implementing them seriously, from conception to evaluation.

One of the listening sessions' central topics was reporting. Many students feel that the current processes are lengthy, inaccessible, and often emotionally draining. Too few students know where and to whom to turn when they encounter discrimination, and the uncertainties involved have made the process taxing and arduous. It should not fall on students to have to remedy the

75

issue of discrimination on campus. As such, we asked that the University take action to centralize and standardize reporting procedures so that DEI and Deans of Students offices can effectively assist students, and for students to be made aware of the several options available to them when they need help with reporting or conflict resolution.

In the listening sessions, many students discussed challenges in the classroom. We will analyze these issues in a later report.

Finally, another theme in the listening sessions was the exclusion of many Jewish and Israeli students from student groups because of their ties to Israel, even when the mission of these groups has nothing to do with Israel. This is unacceptable, and we recommend various ways to address this urgent issue.

We believe that mutual respect among students across our campuses will follow from a confident assertion of academic space as a welcoming space, bound by common interests and rules governing the open exchange of ideas. Our educational mission, provided at great cost to students during their few years on this campus, is critically important. We urge administrators and faculty to reaffirm their commitment to providing a rigorous educational environment embedded in principles of tolerance, inclusion, and pluralism. A campus that is more reliant on the courts than universal agreement on its mission is a community at risk. We urge every member of the University to consider their place in upholding that compact by fostering greater respect as an aspect of our diversity.

76

## Appendices

**Appendix A: Listening Session Outreach**

*1. ASTF Listening Session Deans Outreach 2024*

| School | Title | Name |
|---|---|---|
| Graduate School of Arts and Sciences | Dean | Carlos J. Alonso |
| Executive Vice President for Health and Biomedical Sciences and Dean of the Faculties of Health Sciences and the Vagelos College of Physicians and Surgeons; CEO of CUIMC | Dean | Katrina Armstrong |
| School of the Arts | Interim Dean | Sarah Cole |
| School of Social Work | Dean | Melissa D. Begg |
| Engineering | Dean | Shih-Fu Chang |
| Journalism | Dean | Jelani Cobb |
| Climate School | Interim Dean | Jeffrey Shaman |
| Nursing | Dean | Lorraine Frazier |
| Mailman School of Public Health | Dean | Linda P. Fried |
| Executive Vice President for Arts and Sciences and Dean of the Faculty of Arts and Sciences | Dean | Amy Hungerford |
| Architecture | Dean | Andrés Jaque |
| Law | Dean | Gillian Lester |
| Business | Dean | Costis Maglaras |
| General Studies | Dean | Lisa Rosen-Metsch |
| College | Dean | Josef Sorett |
| SIPA | Dean | Keren Yarhi-Milo |
| GSAPP | Dean | Andrés Jaque |
| Barnard | President | Laura Rosenburyy |
| TC | President | Tom Bailey |

Cited in Khalil v. Trs of Columbia Univ. 25cv2079 Decided 3/19/26 Archived on 3/25/26 This document is protected by copyright. Further reproduction is prohibited without permission.

77

*2. ASTF Student Listening Session Schedule*

| Date | School | Time | TF member 1 | TF member 2 | Notetaker/ Recorded | Room |
|---|---|---|---|---|---|---|
| Feb. 20 | Hillel 1 | 4:30–5:30 | David Schizer | Nick Lemann | Staff Notetaker | Kraft Center |
| Feb.21 | Hillel 2 | 12:30–1:30 | Ester Fuchs | | Staff Notetaker | Kraft Center |
| Feb. 22 | Engineering | 12:30–1:30 | Gil Zussman | | Staff Notetaker | Mudd 1300 |
| Feb. 26 | GSAAP + Climate School | 6:30–7:30 | Ester Fuchs | | Staff Notetaker | Fayerweather 209 |
| Feb. 26 | Journalism + School Arts | 6:10–7:10 | Nick Lemann | Peter Coleman | Faculty Notetaker | Pulitzer Hall 601B |
| Feb 29 | General Studies | 6:10–7:10 | Gil Zussman | | Notetaker | Baer Conference Room, 408 Lewisohn Hall |
| Feb.29 | College and Core | 12:30–1:30 | Rebecca Kobrin | Jeremy Dauber | Recorded | 401 Lerner Hall |
| Feb. 29 | SIPA | 12:30–1:30 | Ester Fuchs | Clemence Boulouque | Notetaker | IAB 324 |
| Mar. 1 | Arts & Sciences | 12:30–2:00 | Rebecca Kobrin | Ester Fuchs | Recorded | Philosophy Hall 302 |
| Mar. 20 | Public Health | 6:10–7:10 | Magda Schaler-Haynes | Nir Uriel | Notetaker | Allan Rosenfield Building (ARB) Student Lounge |
| Mar. 26 | TC | 6:00–7:00 | Peter Coleman | Ester Fuchs | Notetaker | TC Zankel Hall Rm 408 |
| April 1 | Barnard | 5:00–6:00 | Deborah Valenze | Ester Fuchs | Notetaker | Milbank 202 |
| Apr. 4 | Social Work | 12:30–1:30 | Ester Fuchs | Clemence Boulouque | Notetaker | SW 1109 |
| Apr. 9 | Law | 12:10–1:10 | David Schizer | Matt Waxman | Notetaker | WJW 209 |
| April 8 | CUIMC + Nursing + Dental | 5:00–6:00 | Magda Schaler-Haynes | Nick Lemann | Notetaker | VEC 1402/1403 |
| April 18 | Business | 12:30–1:30 | Glenn Hubbard | Ester Fuchs | Recorded | Kravis 820 |
| Apr. 21 | Hillel 3 | 5:00–7:30 | Ester Fuchs; Magda Shayler-Hanes; Lisa Rosen-Metsch | David Schizer; Peter Coleman; Nick Lehman | Faculty notetaker/ Recorded | Kraft Center |

Cited to Khalil v Trs of Columbia Univ 25cv02079 Docketed 3/10/26 Archived on 3/25/26 This documents protected by copyright. Further reproductions prohibited without permission.

78

*3. Outreach Letter to Deans*

Dear Dean [XXX]

We are writing to you in our capacity as co-chairs of the Antisemitism Task Force. As you know, we are working with our faculty Task Force to provide recommendations directly to the University president. We have heard from many students over the last months concerning what has transpired on campus since October 7, 2023. In the next few weeks, we are inviting students from every school on campus to listening sessions. We are strongly committed to the well-being of not only Jewish students on campus **but to all students** on campus. We would appreciate your assistance in sharing the attached invitation with all students in your school. It is important that we hear directly from students. We want to hear about their experiences, we want to better understand their fears and concerns, and we want their advice about what changes they would like to see in University policy.

Two faculty members of the Taskforce and a notetaker* will be at the session. We will be serving a light meal. These sessions are for registered students only. We would like to hold the session for your school in a convenient location, so would appreciate assistance in booking a room in your building for Date [XXX] at time [XXX]. Please let us know if you can assist with the room booking. If there is no space, we will locate another space.

Please share the attached invitation with your students. Please reach out directly to me if you have any questions.

Thank you for your assistance.

Best,
Ester Fuchs, Nicholas Lemann, and David Schizer, Co-Chairs
Members of the Antisemitism Task Force

* There were several sessions where we did not have a notetaker and recorded the session (See 2. ASTF Listening Session Schedule.) In all sessions we recorded, students were informed at the beginning of the session.

Cited in Khalil v Trs of Columbia Univ. 25 cv 2079 Decided 3/19/26 Archived on 3/25/26 This document is protected by copyright. Further reproduction is prohibited without permission.

79

*4. Outreach Letter to Students*

Dear students,

We are writing to you in our capacity as co-chairs of the Antisemitism Task Force. We are working with our faculty Task Force to provide recommendations directly to the University president. We have heard from many of you over the last months concerning what has transpired on campus since October 7, 2023. In the next few weeks, we are inviting students from every school on campus to listening sessions. We are strongly committed to the well-being of not only Jewish students on campus **but to all students** on campus. It is important that we hear directly from you. We want to hear about your experiences, we want to better understand your fears and concerns, and we want your advice about what changes you would like to see in University policy.

We are holding the session at [SPECIFIC LOCATION FOR EACH SCHOOL]. We will be serving a light meal. These sessions are for registered students only. Please use the following link to sign up.

We look forward to seeing you.

Best,
Ester Fuchs, Nicholas Lemann, and David Schizer, Co-Chairs
Members of the Antisemitism Task Force

Cited in Khalil v. Trs of Columbia Univ 25cv2079 Decided 3/19/26 Archived on 3/25/26 This document is protected by copyright. Further reproduction is prohibited without permission.

80

*5. Guidelines for Listening Sessions*

**Guidelines for CU Antisemitism Task Force Listening Sessions**

February 19, 2024

**Goals for the sessions**
   I.   The primary purpose of our listening sessions is to offer students a chance to be heard by representatives of the University who are members of the Task Force on Anti-Semitism.
   II.   These sessions are *not* organized to find facts or to adjudicate disputes, but can help us learn about matters to be pursued later (exploratory research).
   III.   They can also provide task force members with a fuller sense of the current state of our community.

**Guidelines for the sessions**
   A.   The facilitators begin by welcoming participants and articulating the primary goals of the session.
   B.   Mention that there is a notetaker present, but students are not permitted to record. If there isn't a notetaker present mention to students that you will be recording the session.
   C.   Next, the facilitators offer the following guidelines and norms for the session:
        **a.   Please speak honestly about issues from your personal experience. Do not question or interrogate other speakers. Speak only from your own experiences**
        **b.   Try to keep your comments to 5 minutes or less. Please allow each speaker the time to share their stories and experiences.**
        **c.   Please remain respectful of others in attendance. Try to avoid blaming, attacking, or insulting language.**
   D.   Then ask for agreement with the norms (if people later violate a norm, remind them of our agreement).
   E.   The facilitators should allow for the sharing of stories but be prepared to step in and redirect the conversation if necessary.

Cited in Khalil v. Trump Columbia Univ. 25-cv-2079 Decided 3/19/26. Authentication 3/25/26. This document is protected by copyright. Further reproduction is prohibited without permission.

**Appendix B: Columbia Student Op-Eds with Allegations of Antisemitism**

Between October 2023 and July 2024 there have been 31 pieces written by at least 38 authors, with some pieces written by multiple authors and others attributed to student groups and one 2019 alumnus.

- The Columbia Daily Spectator: Opinion: Complicity will not protect you (BC/CU Jewish Voices for Peace, 7/19)
- The Columbia Daily Spectator: Letter to the Editor: Accusing Israel of foreign interference at Columbia is disingenuous and ironic (Elisha Baker, 7/19)
- Forward: Opinion: I'm grateful Columbia deans were disciplined for their antisemitic texts, but it's far from enough (Eleanor H. Reich, 7/12)
- The Columbia Daily Spectator: Opinion: President Shafik, save Columbia's soul (Elisha Baker, Eliana Goldin and Eden Yadegar, 7/12)
- The Wall Street Journal: Opinion: Can a Federal Court Stop Antisemitism at Columbia? (Michael Gross, 7/11)
- Columbia Daily Spectator: Opinion: On tokenism and the denial of antisemitism (Elisha Baker, 6/22)
- The Columbia Daily Spectator: Opinion: Task Force on Antisemitism, can you hear us now? (Ethan Fraenkel, Noam Chen-Zion, Caitlin Liss and Charlie Steinman, 6/11)
- The Jerusalem Post: Opinion: Campus protests were a missed opportunity (Jonathan Harounoff and Jessica Schwalb, 5/19)
- National Review: Opinion: My Columbia Education Is Not What I Expected (Jessica Schwalb, 5/16)
- The Jerusalem Post: Opinion: 'Freshman fear': How Antisemitism tainted my first year at Columbia University (Sophie Kasson, 5/14)
- The Washington Post: Opinion: Four Columbia students reflect on campus life in the midst of protest (Ethan Zachary Chua, Ekaterina Venkina, Julian Heiss and Jacob Schmeltz, 5/5)
- The Columbia Daily Spectator: Our Campus. Our Crisis. Inside the encampments and crackdowns that shook American politics. A report by the student journalists of the Columbia Daily Spectator. (Isabella Ramírez, Amira McKee, Rebecca Massel, Emily Forgash, Noah Bernstein, Sabrina Ticer-Wurr, and Apurva Chakravarthy, 5/4)
- Forward: Opinion: I'm an Israeli Columbia student. I never thought I'd be afraid to invite my parents to my graduation (Eleanor H. Reich, 5/4)
- The Jerusalem Post: Opinion: Jewish Columbia student calls for empathy in the face of campus antisemitism (Becca Baitel, 4/29)
- Haaretz: Opinion: Jewish students are no longer safe at Columbia University (Noah Lederman, 4/25)
- The Columbia Daily Spectator: Opinion: On the 'un-Jews' of Columbia (Shay Lev, 4/16)
- The Columbia Daily Spectator: Opinion: Why do Jews tend to support Zionism? (Nick Baum, 4/2)
- The Columbia Daily Spectator: Opinion: Do not indulge the exclusionary BDS referenda on campus (Students Supporting Israel and Columbia Aryeh, 3/26)
- The Columbia Daily Spectator: Opinion: On bigotry in the classroom (Elisha Baker, 3/19)
- New York Post: Opinion: Why I joined the lawsuit against Columbia over its antisemitism (Valerie Gerstein, 3/10)

82

- The Columbia Daily Spectator: Opinion: Antizionist Jews aren't cosplaying Judaism—you are (Milene Klein, 3/8)
- The Columbia Daily Spectator: Opinion: Why I counterprotest SJP rallies (David Lederer, 3/8)
- The Columbia Daily Spectator: Opinion: Columbia students' disturbing justification of sexual violence against Jewish-Israeli women following the October 7 attacks (Saphira Samuels, 2/20)
- The Jerusalem Post: Opinion: News about antisemitism on campus is scary, but doesn't draw the full picture (Tamar Weiss, 1/4)
- Newsweek: Opinion: I'm a Jewish Student at Columbia. Campus After October 7 Is Disturbing (Sonya Poznansky, 12/8)
- Forward: Opinion: Calling for genocide is antisemitic. Why couldn't the president of my alma mater say so? (Eva Ingber, 12/8)
- The Times of Israel: Opinion: You Can't Cancel Joy (Talia Bodner, 12/7)
- Jewish News Syndicate: Opinion: The pandemic of academic antisemitism (Jonathan Harounoff, 12/6)
- The Columbia Daily Spectator: Opinion: If you hate Zionist Jews, you hate most Jews (Daniel Konstantinovsky, 11/29)
- The Jerusalem Post: Opinion: To be Jewish on a college campus where students support Hamas (Mynda Barenholtz, 10/19)
- The Columbia Daily Spectator: Opinion: Columbia, you are failing your Palestinian, Muslim, Arab, Black, Brown, and Jewish student activists (Jewish Voice for Peace and Students for Justice in Palestine, 10/17)
- The Columbia Daily Spectator: Letter to the Editor: Don't downplay the violence in Israel (Eliana Goldin, 10/10)

**Appendix C: Examples of Incidents Experienced by Many Jewish and Israeli Students as Antisemitism**

Our working definition is based on experiences of Jewish and Israeli students, faculty and staff, including those reported in Section I of this report.

*Slurs and Tropes.* Unfortunately, ethnic slurs have been used on campus (e.g., "F*** the Jews"), along with the caricature that American Jews are not "real Americans" (e.g., "go back to Poland"), various stereotypes (e.g., Israeli veterans are dangerous, American Jews are agents of the Israeli government, etc.), and antisemitic tropes about Jewish money and power (e.g., "Zionist trustees and donors keep your hands off our university").

*Calls for Violence Against Jews and Israelis.* Jewish and Israeli students also have been targeted with violence (e.g., a student pinned against a wall) and threats (e.g., a sign pointed at Israeli and Jewish students that said "Al Qassam's next targets"). Likewise, the increasing use of Hamas symbols and slogans on campus feels like a threat of violence to many Jews and Israelis, since Hamas's leaders and founding documents urge the murder of Jews and the destruction of Israel. "The Day of Judgment will not come about until Moslems fight Jews and kill them," Article 7 of the Charter states. "Then, the Jews will hide behind rocks and trees, and the rocks and trees will cry out: 'O Moslem, there is a Jew hiding behind me, come and kill him.'" Horribly, Hamas did,

Citing in Khalil v. Trump (S.D.N.Y.) / Columbia Univ / 25-cv-2079 Decided on 3/5/26 / Archived on 3/5/26 / This document is protected by copyright. / Further reproduction is prohibited without permission.

indeed, murder Israeli civilians who were trying to hide from them on October 7. Although Hamas issued a new charter in 2017 that claims its quarrel is with "Zionists," not "Jews," it did not formally revoke or repudiate the original charter.

*Exclusion.* Exclusion has also become a lonely reality for many Jewish and Israeli students, including the exclusion of Zionists from student groups. As noted above, although Zionism is not a part of the Jewish identity of *all* Jews, it is still part of the Jewish identity of *the vast majority*. Targeting a characteristic that *closely correlates* with a group can be an indirect or coded way of targeting the group.[132]

*Double Standards Applied to Israel.* Many Jewish and Israeli students experience the application of double standards to Israel as antisemitic. For instance, some on campus regularly call to sever ties with Israel, but not other countries. What is the justification for targeting Israel, but not China[133] or Turkey[134]—let alone Iran, Syria, or North Korea? Similarly, some on campus question the legitimacy of Jewish nationalism and of a nation state for Jews— that is, of Zionism—but lodge no similar objection to nation states for other peoples. Why are national aspirations legitimate for Tibetans, Ukrainians, Kosovars and, for that matter, Palestinians, but not for Jews? Likewise, many Jewish and Israeli students have been shocked by the double standard applied to sexual violence against Israeli women in the current conflict. Some who are usually adamant that rape claims must be taken seriously nevertheless seem to have adopted a skeptical stance about whether Hamas actually engaged in mass rape on October 7.

At the same time, the Jews and Israelis we've heard from at Columbia are adamant that many criticisms of Israel are not antisemitic (and, indeed, that they themselves often criticize Israel). After all, Israel is a democracy whose citizens constantly criticize their government, as do Jews across the globe. Nor did we hear anyone say they consider it antisemitic to champion the rights or national aspirations of Palestinians. Many Jews and Israelis at Columbia share this view, hoping for a two-state solution that accommodates Palestinian self-determination and Israeli security. We also heard a recognition that a focus on Israel can be a sign—not of hate—but of

---

[132] See supra Part II.D.1

[133] Determination of the Secretary of State on Atrocities in Xinjiang, U.S. State Department, January 19, 2021 ("After careful examination of the available facts, I have determined that since at least March 2017, the People's Republic of China (PRC), under the direction and control of the Chinese Communist Party (CCP), has committed crimes against humanity against the predominantly Muslim Uyghurs and other members of ethnic and religious minority groups in Xinjiang."), https://2017-2021.state.gov/determination-of-the-secretary-of-state-on-atrocities-in-xinjiang/.

[134] Ayça Alemdaroğlu and Fatma Müge Göçek, "Kurds in Dark Times: New Perspectives on Violence and Resistance in Turkey," Stanford Center on Democracy, Development, and the Rule of Law, January 6, 2023 ("The history of the Kurds in Turkey is marked by state violence against them and decades of conflict between the Turkish military and Kurdish fighters."), https://cddrl.fsi.stanford.edu/publication/kurds-dark-times-new-perspectives-violence-and-resistance-turkey.

84

concern, support, or even admiration (e.g., among Americans who consider Israel a close ally and know that it receives significant foreign aid).

As a result, judgments about when double standards are antisemitic require sensitivity and nuance. Again, in offering this working definition, our focus is not on discipline, but on training and orientations. Our goal is not to punish or ban speech, but to raise awareness about the sensitivities of many Jews and Israelis at Columbia.

Cited in Khalil v Trs of Columbia Univ
25cv2079 Decided 3/19/26
Archived on 3/25/26
This document is protected by copyright.
Further reproduction is prohibited without permission.

85

**Appendix D: Additional Suggestions and Sources for Trainings, Websites, and Scholarship on Antisemitism**

### 1. Additional Suggestions for Trainings

*Awareness and Sensitivity Training* is designed to educate individuals about the history and impact of antisemitism. Best practices include modules on the historical context and modern manifestations of antisemitism, including its impact on Jewish communities. Teaching the history of antisemitism includes expulsions, migration, pogroms, the Holocaust, and systemic discrimination of the past. In modules on modern manifestations of antisemitism participants should learn to identify and understand contemporary forms of antisemitism. There should also be a focus on how      antisemitism impacts Jewish individuals and communities today, including college campuses.

*Cultural Competency Training* is designed to foster respect and understanding. Research has demonstrated that teaching cultural understanding and appreciation for diversity is effective in reducing bias and promotes tolerance. This should be applied to trainings that educate members of the University community about the diversity of Jewish culture, traditions, practices/customs, and beliefs. It is especially important to recognize the diversity within Jewish communities, including differences in denominations, cultures, and nationalities. Effective cultural competency training generally includes interfaith dialogues that promote understanding and collaboration between different religious and cultural groups.

*Legal and Policy Training* educates all members of our community about Title VI and other laws and policies related to antisemitism and discrimination. The training should explain legal definitions and protections against antisemitism. The training, as a basic objective, must help participants recognize what constitutes a hate crime and understand the legal consequences. The University's interest in improving the campus climate and reducing bias and discrimination requires us also to understand antisemitic attitudes and behavior that might not rise to the level of a legal violation. Many students in our listening sessions discussed the need for a specific and "user-friendly" definition of antisemitism. Indeed, distinguishing antisemitism and anti-Zionism, together with understanding the distinction between antisemitism and opposing policies of the current Israeli government, are key to reducing harmful misinformation that may lead to antisemitic behavior. The training needs to provide specific scenarios for members of the Columbia community impacted by bias and exclusion, with instruction on how to recognize harmful behavior. A final module in this workshop should discuss Columbia's policies that combat antisemitism, how people can report an experience of antisemitism, and how enforcement works.

*Media Literacy and Critical Thinking Training* equips individuals with skills to critically analyze and respond to antisemitic content online and in media. The training includes disinformation

86

awareness which could be useful in teaching faculty, students and staff to recognize and debunk antisemitic myths and conspiracy theories. It generally teaches participants to be critical consumers offering techniques for how to evaluate sources for credibility and bias.

### 2. The Institute for Israel and Jewish Studies

The Institute for Israel and Jewish Studies (IIJS) is the academic center for the study of Israel and Jewish civilization at Columbia University. It is the leading place on campus and in the United States to engage in cutting-edge research and debate concerning Israel and Jewish history. Founded by historian Salo Baron in 1950, IIJS is committed to interdisciplinary study. Its affiliated faculty teach courses spanning from antiquity to contemporary culture, in departments as diverse as History, German, Sociology, Music and Religion. The Institute offers courses in Israel studies, the arts (Jewish music, Israeli and Jewish film) and the study of antisemitism. IIJS also hosts postdoctoral scholars who teach a wide variety of courses. They offer a minor for Columbia and GS undergraduates and an MA program in Jewish Studies. At its center on campus, the Institute organizes public events, scholarly conferences, and a University Seminar. It maintains a full calendar of offerings for students, faculty, and the public to engage in questions and research concerning Israel, the Jewish past, Jewish literature and antisemitism. The IIJS has been an important resource for the work of this Task Force.

### 3. Selected Scholarship on Antisemitism

Steven Beller, "When Does It Make Sense to Call Hostility Towards Jews Antisemitism and When Does it Not? A Historical Perspective on Contemporary Debates," *Antisemitism Studies* 6, no. 1 (Spring 2022), 115–132.

Steven Beller, *Antisemitism: A Very Short Introduction* (Oxford University Press, 2015).

Jovan Byford, "Conspiracy Theory and Antisemitism," in *Conspiracy Theories: A Critical Introduction*, ed. Jovan Byford (London: Palgrave Macmillan UK, 2011), 95–119.

William Brustein, *Roots of Hate: Anti-Semitism in Europe before the Holocaust* (Cambridge University Press, 2003).

Leonard Dinnerstein, *Anti-Semitism in America* (Oxford University Press, 1994).

David Engel, "Away from a Definition of Antisemitism: An Essay in the Semantics of Historical Description," in *Rethinking European Jewish History*, ed. Jeremy Cohen and Moshe Rosman (Liverpool University Press, 2009), 30–53.

Phyllis Goldstein, *A Convenient Hatred: The History of Anti-Semitism* (Facing History and Ourselves, 2012).

Jeffrey C. Herf (ed). *Antisemitism and Anti-Zionism in Historical Perspectives: Convergence and Divergence* (Routledge, 2007).

Jonathan Karp, "Anti-Israelism," *Jewish Review of Books*, Winter 2024.

Walter Lacqueur, *The Changing Face of Antisemitism: From Ancient Times to the Present Day* (Oxford University Press, 2006).

Geoffrey Levin, *Our Palestine Question: Israel and American Jewish Dissent, 1948–1978* (Yale University Press, 2023).

Deborah Lipstadt, *Antisemitism Here and Now* (Schocken Books, 2019)

Deborah Lipstadt, *Denying the Holocaust: The Growing Assault on Truth and Memory* (Penguin, 1993).

James Loeffler, "Anti-Zionism," *Key Concepts in the Study of Antisemitism*, eds. Sol Goldberg, Scott Ury, and Kalman Weiser (Palgrave, 2021).

Kenneth L. Marcus, "Anti-Zionism as Racism: Campus Anti-Semitism and the Civil Rights Act of 1964," *William and Mary Bill of Rights Journal* 15, no. 3 (February 2007), 837–892.

David Nirenberg, *Anti-Judaism: The Western Tradition* (Norton Books, 2014).

Derek J. Penslar, *Zionism: An Emotional State* (Rutgers University Press, 2023).

Derek Penslar, "Who's Afraid of Defining Antisemitism?" *Antisemitism Studies* 6, no. 1 (2022), 133–145.

Leon Poliakov, *De l'antisionisme à l'antisémitisme* (Calmann-Lévy, 1969).

Timothy Snyder, *Black Earth: The Holocaust as History and Warning* (Crown, 2015).
Kenneth S. Stern, *Anti-Semitism Today: How It Is The Same, How It Is Different, and How to Fight It* (American Jewish Committee, 2006).

Magda Teter, *Christian Supremacy: Reckoning with the Roots of Antisemitism and Racism* (Princeton University Press, 2023).

Cited in Khalil v. Trs of Columbia Univ., 25cv2079, Decided 3/19/26. Archived on 3/25/26. This document is protected by copyright. Further reproduction is prohibited without permission.

88

Scott Ury, "Strange Bedfellows? Anti-Semitism, Zionism, and the Fate of 'the Jews'" *American Historical Review* 123, no. 4 (October 2018): 1151–1171.

Eric Ward, "Skin in the Game: How Antisemitism Animates White Nationalism," https://politicalresearch.org/2017/06/29/skin-in-the-game-how-antisemitism-animateswhite-nationalism.

Dov Waxman, David Schraub, and Adam Hosein, "Arguing about Antisemitism: Why We Disagree about Antisemitism, and What We Can Do about It," *Ethnic and Racial Studies* 45, no. 9, 2022: 1803–24.

Dov Waxman, "Antisemitism isn't just 'Jew-hatred'—it's anti-Jewish Racism," *The Conversation*, https://theconversation.com/antisemitism-isnt-just-jew-hatred-its-antijewish-racism-193614.

### 4. Selected Training Resources on Antisemitism

*For Campuses*
- Berkeley Center for Jewish Studies, training video, <u>Antisemitism in our Past and Present,</u> <u>https://jewishstudies.berkeley.edu/antisemitism-education/antisemitism-training-film#film</u> (Highly Recommended).
- Workshop exercise on AEN video, <u>https://drive.google.com/file/d/1VyqGFRc35uKEXa9p0pT1bLUcrIeNorLM/view</u>
- AEN Presentation on Jewish Identity, <u>https://drive.google.com/file/d/1NeiberZGwYXoeqICcgxkmTnA2JMOixKT/view.</u>
- Hillel training (currently being updated), <u>https://www.hillel.org/three-part-video-series-on-antisemitism/</u>
- Yad Vashem training (<u>https://www.yadvashem.org/education/online-courses/antisemitism.html</u>)

*For the Workplace*

- ADL Training Module: Antisemitism 101 for the Workplace, <u>https://www.adl.org/sites/default/files/workplace/mini-course/antisemitism/story.html.</u>
- ADL: Creating a Jewish ERG, <u>https://www.adl.org/sites/default/files/pdfs/2022-06/2668_ADL_ERG%20Toolkit.pdf</u>

*Resources for Progressive and Pluralistic Communities*
- A Very Brief Guide to Antisemitism, https://truah.org/antisemitism/, Truah, the Rabbinic Call for Human Rights.

Cited in Khalil v. Trs of Columbia Univ 1:25-cv-02079 Decided 3/19/26 Archived 3/25/26 This document is protected by copyright. Further reproduction prohibited without permission.

- Dismantling Antisemitism, https://dismantlingantisemitism.org/, July 2024 - a message guide for progressive communities.
- Project Shema, https://www.projectshema.org/, Co-founder Zach Schaffer, Resources, Trainings, Workshops (Highly Recommended).
  - Rapid Response to October 7th Resources, https://www.projectshema.org/rapid-response.
  - Talking about Colonialism, https://drive.google.com/file/d/1EE_2ufouKxv3qXNxhxluV8nmYcgFfGFW/view, Resource Guide.
  - Talking about Genocide, https://drive.google.com/file/d/1g-gfn87F7UGD_AsDGoztZsr56VctzDS3/view, Resource Guide.
- Interfaith America, https://www.interfaithamerica.org/sectors/higher-education/, founder Iboo Patel, Resources, Trainings, Workshops (Highly Recommended).
- Jewish on Campus, https://www.jewishoncampus.org/ (Recommended).

Cited in Khalil v Trs of Columbia Univ 25cv2079 Decided 3/19/26

Archived on 3/25/26

This document is protected by copyright. Further reproduction is prohibited without permission.

90